**CONSUMER LAW PRACTICE**
Daniel T. LeBel
PO Box 720286
San Francisco, CA 94172
Tel: 415-513-1414
Fax: 877-563-7848
danlebel@consumerlawpractice.com

**WADDELL LAW FIRM LLC**
A. Scott Waddell
2600 Grand Blvd., Suite 580
Kansas City, Missouri 64108
Tel: 816-914-5365
Fax:  816-817-8500
scott@aswlawfirm.com
(*pro hac vice* forthcoming)

**BELL LAW, LLC**
Bryce B. Bell
Mark W. Schmitz
Andrew Taylor
2600 Grand Blvd., Suite 580
Kansas City, Missouri 6410
Tel: 816-886-8206
Fax:  816-817-8500
Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com
(*pro hac vice* forthcoming)

*Attorneys for Plaintiffs JERMAINE THOMAS, JERMAINE MILLER, TAMMIE BARNES, and JAMIE POSTPICHAL, individuals, on behalf of themselves and others similarly situated,*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **JERMAINE THOMAS, JERMAINE MILLER, TAMMIE BARNES, and JAMIE POSTPICHAL, individuals, on behalf of themselves and others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**CRICKET WIRELESS, LLC and CRICKET COMMUNICATIONS, INC.,**<br><br>Defendants. | ) Case No.<br>)<br>) **CLASS ACTION COMPLAINT**<br>)<br>) 1. Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*)<br>) 2. Untrue or Misleading Advertising (Cal Bus. & Prof. Code §§ 17500 *et seq.*)<br>) 3. Negligence/Negligence Per Se<br>) 4. Unjust Enrichment<br>) 5. Unlawful, Unfair, and Fraudulent Business Acts and Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)<br>) 6. Violations of the Missouri Merchandising Practices Act<br>) 7. Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.<br>) 8. Various State Consumer Protection Acts.<br>) 9. Racketeering Influenced and Corrupt Organizations Act.<br>) 10. Public Injunctive Relief.<br>)<br>) **DEMAND FOR JURY TRIAL** |

Plaintiffs, JERMAINE THOMAS, JERMAINE MILLER, TAMMIE BARNES, and JAMIE POSTPICHAL, on behalf of themselves and all others similarly situated, sue Defendants Cricket Wireless, LLC and Cricket Communications, Inc. for selling 4G/LTE phones that had no 4G/LTE capabilities on their system and allege as follows:

## NATURE OF THE ACTION

1.      Beginning in 2012, Leap Wireless International, Inc. ("LEAP"), by and through its subsidiaries including, but not limited to, Cricket Wireless, LLC ("Cricket Wireless") and Cricket Communications, Inc. ("Cricket Communications"), marketed 4G/LTE services throughout the United States (Defendants and their affiliated entities will be referred to hereinafter, collectively, as "Cricket", which is the commonly known brand name).

2.      Further, Cricket strategically combined its advertisement of 4G/LTE services with "unlimited" plans in a manner that strongly and deceptively implied that Cricket offered *unlimited* 4G/LTE services, when it most certainly did not.

3.      For example, one Cricket advertisement—which appears to have been a mailer and/or posted on the internet—stated: "**4GLTE SPEED MEETS UNLIMITED EVERYTHING: Now get the latest smartphones from Cricket with unlimited data, talk and text at 4G LTE speed, plus *no contract*.**" (emphasis added):[1]

/ / /

/ / /

/ / /

---

[1] For simplicity, Plaintiffs generally refer to this line of marketing as advertising "UNLIMITED 4G/LTE."



4.       Based on the representations made by Cricket, Plaintiffs and thousands of other consumers seeking better call connectivity and faster Internet and data speeds purchased high-end, expensive 4th Generation/ Long Term Evolution ("4G/LTE")-capable mobile cellular phones ("4G/LTE-capable phones"), such as the iPhone and Samsung Galaxy, in an attempt to take advantage of Cricket's advertised 4G/LTE service throughout the United States.

5.       Contrary to Cricket's advertisements of nationwide 4G/LTE service, Cricket did not have the ability to provide anything close to nationwide, let alone unlimited, 4G/LTE service to its customers; indeed, no (or very limited) service was available in most of the metro areas where Cricket sold its products.

6.       LEAP's own documents filed with the SEC confirm the limited coverage of Cricket's 4G/LTE network: "[T]o date, we [LEAP] have covered approximately 21 million POPs[2] with next-generation LTE network technology . . .  However, given the significant decrease in the size of our customer base in recent quarters, our high level of indebtedness, and the high cost of LTE deployment, **we have generally determined not to deploy LTE network technology in additional markets at this time**."[3] For comparison, the U.S. Census Bureau estimated that there were nearly 319 million residents of the United States in 2014.[4]

7.       Further, to the extent the distinction may be significant, those 21 million POPs were contained within the Cricket network's "footprint"[5]—i.e., even that figure may have been unduly aspirational.

/ / /

---

[2]"POPs" is a term that refers to the customers that a network could *potentially* cover. Specifically, defined it as "information relating to population and potential customers, or 'POPs,' [that] is based on 2012 population estimates provided by Claritas Inc., a market research company." LEAP WIRELESS INTERNATIONAL, INC., Form 10-K for the Period Ending December 31, 2013 (filed with the SEC on Mar. 6, 2014), at 1.

[3] *Id.* at 7.

[4]U.S. CENSUS BUREAU, 2014 Population Estimate, https://data.census.gov/cedsci/all?q=2014%20population%20estimates&hidePreview=false&table=DP05&tid=ACSDP1Y2014.DP05&t=Counts,%20Estimates,%20and%20Projections&y=2014&lastDisplayedRow=15 (last visited Nov. 1, 2019).

[5] LEAP WIRELESS INTERNATIONAL, INC., Form 10-K for the Fiscal Year Ended December 31, 2012 (filed with the SEC on Feb. 25, 2013), at 5.

8.      Despite LEAP's admissions that Cricket's current 4G/LTE could only cover a maximum of 21 POPs and that it had no plans to expand its 4G/LTE coverage, it continued to advertise and market to consumers nationwide that it offered 4G/LTE.

9.      Defendant's advertisements and representations to consumers that it offered unlimited and/or nationwide 4G/LTE service were false.

10.     Based on LEAP's own statements to the SEC and FCC, Defendants made such advertisements and representations to consumers with full knowledge that they were false.

11.     As such, Defendants' advertisements and representations to consumers were willful, malicious, and unconscionable.

12.     Not long after the deception at issue in this case occurred, the Chairman of the FCC stated that "**consumers deserve to get what they pay for. Broadband providers must be upfront and transparent about the services they provide**. The FCC will not stand idly by while consumers are deceived by misleading marketing materials and insufficient disclosure."[6]

13.     Plaintiffs bring this lawsuit against the named Defendants on behalf of themselves, individually, and all other similarly situated consumers.

## JURISDICTION AND VENUE

14.     Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

15.     As outlined below, Cricket has since been acquired by AT&T, Inc. but at all times mentioned in this Complaint, Defendants were, and are, entities doing business in California.

16.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because many members of the proposed class are citizens of states different from those of Defendants and the amount in controversy greatly exceeds $5 million.

/ / /

---

[6] FEDERAL COMMUNICATIONS COMMISSION, Press Release, *FCC Plans to Fine AT&T $100 Million for Misleading Consumers* (June 17, 2015).

17. This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in California, Defendants were authorized to do business in California, Defendants have sufficient minimum contacts with California, and/or Defendants intentionally availed themselves of the markets in California through the promotion, marketing, and sale of mobile cellular products and services in California.

18. In addition, venue is proper pursuant to 28 U.S.C. 1391(b)(2) and (d) because the Defendants were residents of this District at the time of the conduct alleged herein and the decision to deploy the false advertising campaigns described in more detail herein were made at Defendants' then-principal places of business in this District.

## PARTIES

19. Plaintiff Jermaine Thomas is a resident of the State of California.

20. Plaintiff Jermaine Miller is a resident of the State of Pennsylvania.

21. Plaintiff Tammie Barnes is a resident of the State of Illinois.

22. Plaintiff Jamie Postpichal is a resident of the State of Missouri.

23. Defendants are wholly owned subsidiaries of AT&T, Inc. ("AT&T") which, at all times relevant since the Merger described below, directly owned and controlled various entities including, but not limited, to Cricket Wireless, LLC.

24. Specifically, Cricket Communications, Inc. was incorporated in Delaware, with a principal place of business at 5887 Copley Drive, San Diego, CA 92111.

25. Meanwhile, Cricket Wireless, LLC was a Delaware Limited Liability Company. As a Limited Liability Company, it is domiciled in each state in which its members reside. At the time, Cricket Wireless, LLC's only member was LEAP, which is and was domiciled in California. Since the merger, Cricket Wireless' only member has become AT&T Mobility Corporation, which has a principal place of business in Georgia.

26. In July of 2013, AT&T and LEAP entered into an Agreement and Plan of Merger ("Merger Agreement").

27. In March of 2014, the Merger Agreement was formally consummated after approval

by the FCC.

28.     Pursuant to the Merger Agreement, Mariner Acquisition Sub, Inc. (a Delaware corporation and a wholly owned subsidiary of AT&T) merged with and into LEAP, with LEAP surviving as a wholly owned subsidiary of AT&T (the "Merger").[7]

29.     As a result of the Merger, Cricket Communications remained a subsidiary of LEAP, which itself became a subsidiary of AT&T.

30.     LEAP still maintains its principal place of business in San Diego, California.[8] Accordingly, upon information and belief, Cricket Communications is still domiciled in California.[9]

### THE ATT – LEAP MERGER: TIMELINE AND FACTS

31.     On or about August 1, 2013, Cricket License Company, LLC, LEAP Wireless International, Inc. and AT&T filed an Application for Assignments and Transfers of Control ("the Application") with the FCC.

/ / /

---

[7] On March 13, 2014, LEAP made the following statement to the SEC in its Form 8-K: "Pursuant to the Agreement and Plan of Merger, dated as of July 12, 2013 (the "Merger Agreement"), by and among Leap Wireless International, Inc., a Delaware corporation (the "Company"), AT&T Inc., a Delaware Corporation ("AT&T"), Laser, Inc., a Delaware corporation (the "Stockholder's Representative"), and Mariner Acquisition Sub Inc., a Delaware corporation and a wholly owned subsidiary of AT&T ("Merger Sub"), on March 13, 2014, Merger Sub merged with and into the Company with the Company surviving as a wholly owned subsidiary of AT&T (the "Merger")". LEAP WIRELESS INTERNATIONAL, INC., Form 8-K, Introduction (filed with the SEC on Mar. 14, 2014). AT&T noted that it closed its acquisition of Leap Wireless Intl., Inc. on March 13, 2014. AT&T, INC., Form 10-Q (filed with the SEC on Aug. 1, 2014), at 7.

[8] *See, e.g.,* https://www.bloomberg.com/profile/company/LEAP:US (Address: 7337 Trade Street, San Diego, CA 92121) (last visited Nov. 1, 2019); https://www.linkedin.com/company/leap-wireless/about/ ("Headquarters: San Diego, CA" … "Corporate Headquarters: 5887 Copley Drive, San Diego, CA 92111") (last visited October 25, 2019). On October 25, 2019, Plaintiffs also conducted a search of the Georgia Corporations Division Business Search (https://ecorp.sos.ga.gov/BusinessSearch, using "contains" filter) for "Leap Wireless," but that search returned zero results. The same day, Plaintiffs also utilized the "Service of Process Search" (https://ecorp.sos.ga.gov/SOPSearch), with the same search criteria.  That search also returned zero results.

[9] *See, e.g.,* https://www.bbb.org/us/ca/san-diego/profile/cell-phone-supplies/cricket-communications-inc-1126-14002260 (listing Cricket Communications, Inc.'s headquarters as being at 5887 Copley Drive, San Diego, CA 92111) (last visited Nov. 1, 2019).

32.     In the Application, AT&T sought permission to purchase Cricket and LEAP's wireless communication rights and licenses.

33.     Included in the Application were the following statements made by the joint applicants AT&T and LEAP:

      a.     "LEAP's financial resources and limited spectrum depth make it uneconomic to upgrade its current 3G CDMA platform to LTE throughout its network; **to date it has deployed LTE technology in only 11 metropolitan areas** covering approximately 21 million people and has little prospect today of financing significant upgrades to cover the remainder of its network footprint" (emphasis added);

      b.     "LEAP had deployed LTE technology in only 11 metropolitan areas . . .**offers only slower, less spectrally efficient 3G CDMA EVDO elsewhere to 65 percent of its subscribers**"; and

      c.     "LEAP primarily deployed its spectrum to support CDMA EVDO technology, which is far less spectrally efficient than AT&T's 4G network. To the extent that LEAP has deployed LTE, it has done so in 3x3 MHz and 5x5 MHz block configurations. In contract, AT&T is typically deploying spectrum to support LTE in 10x10 MHz blocks, with 5x5 MHz configuration as a minimum".

34.     In March of 2014, the FCC approved the merger.

35.     On or about May 18, 2014, the "New Cricket" re-launched under AT&T.

## PLAINITFFS' EXPERIENCES
### Plaintiff Jermaine Thomas

36.     Plaintiff Jermaine Thomas ("Jermaine") has been a customer of Cricket since approximately 2006.

37.     Jermaine was lured to Cricket Wireless by their promise of "no contract" wireless service.

38.     In late 2012, Jermaine wanted to use his cellphone to download music, stream videos, access the Internet, and have more reliable wireless coverage.

39.    To be able to use his cellphone for such purposes, Jermaine visited a Cricket store located at 25 W. 39th Street, Kansas City, Missouri to purchase a new 4G/LTE-capable phone.[10]

40.    The Cricket store Jermaine visited prominently displayed signs advertising unlimited plans with 4G/LTE coverage.

41.    Jermaine ultimately purchased a 4G/LTE-capable phone—specifically, a Samsung Galaxy S III—and began paying $60.00 per month for unlimited 4G/LTE service, which Cricket never intended to provide.

42.    While Jermaine waited in the store, one of Cricket's employees opened the box the Galaxy S III came in and activated the phone.

43.    In 2013, Jermaine purchased another 4G/LTE-capable phone—this time, a ZTE Grand—from the same Cricket Wireless store.

44.    Again, while Jermaine waited in the store, one of Cricket's employees opened the box the ZTE Grand came in and activated the phone.

45.    Thereafter, Jermaine continued paying $60.00 per month for unlimited 4G/LTE service, which Cricket never intended to provide.

46.    Despite purchasing multiple 4G/LTE-capable phones and paying for Cricket's advertised unlimited 4G/LTE service, Jermaine did not receive that service.

**Plaintiff Jamie Postpichal**

47.    Plaintiff Jamie Postpichal ("Jamie") was a customer of Cricket from approximately September 2011 to approximately June 2014.

48.    On November 30, 2013, Jamie visited a Cricket store located in Kansas City, Missouri with the intention of purchasing a 4G/LTE-capable phone so that she could have better call quality, Internet access, faster download speeds, and more reliable wireless coverage.

49.    Upon information and belief, the store Jamie visited has since closed and/or moved.

/ / /

---

[10] The term "4G/LTE-capable phone" is used to describe any mobile cellular phone which is capable of receiving a 4G/LTE signal. Common examples include the Apple iPhone and Samsung Galaxy.

50.    At the time of Jamie's visit, that Cricket store had many signs prominently advertising 4G/LTE coverage.

51.    While there, Jamie purchased two 4G/LTE-capable phones; each was a Samsung Galaxy S4.

52.    Upon purchasing these Galaxy S4 phones, a Cricket employee opened the boxes and activated the phones while Jamie waited.

53.    Jamie also began paying approximately $60.00 per line per month for unlimited 4G/LTE service, which Cricket never intended to provide.

54.    Despite purchasing 4G/LTE-capable phones and paying for the advertised 4G/LTE service, Jamie never received that service.

55.    On or about March 2016, an agent or employee of Cricket named Gary contacted Jamie, and attempted to convince her to return to Cricket.

56.    Gary and Jamie spoke on two or three more occasions shortly thereafter; however Jamie still had a contract with Sprint, so she could not switch over.[11]

57.    Gary asked Jamie to contact him after her Sprint contract expired, and has not spoken with her since.

**Plaintiff Tammie Barnes**

58.    Plaintiff Tammie Barnes ("Tammie") purchased a 4G/LTE-capable phone, a ZTE, in 2013 from Cricket at a store located in Chicago Illinois.

59.    The back of the phone Tammie purchased included the statement "Cricket 4G/LTE."

60.    While Tammie was in the store for the purchase, the Cricket employee opened the box the phone came in and activated it while she was waiting.

61.    Despite purchasing a 4G/LTE-capable phone and paying for the advertised 4G/LTE service, Tammie never received that service.

/ / /

---

[11] This was before cell phone companies began their assorted advertising campaigns wherein they offered to buy consumers out of their cell phone contracts.

**Plaintiff Jermaine Miller**

62.     Plaintiff Jermaine Miller ("Miller") became a Cricket customer in or about 2013 and remained a Cricket customer for at least three years.

63.     Miller is a resident of eastern Pennsylvania.

64.     Miller's first Cricket phone was a 4G/LTE-capable Samsung Galaxy SIII, which she purchased on or about April 17, 2014. Her second Cricket phone was also a Samsung. Jermaine's son was also on a Cricket plan.

65.     At the time Miller purchased that phone, Cricket's "4G/LTE" claims were displayed throughout the store in which she purchased the phone.

66.     As a Cricket customer during the years 2013-2014, Miller persistently had calls dropped.

67.     Further, she could not tell the difference between 3G and 4G (despite living in the greater Philadelphia area).

**COMMON FACTUAL ALLEGATIONS**

**Cricket's 4G/LTE Advertising and Marketing to Consumers**

68.     Cricket described itself as providing "innovative, high-value wireless services to a fast-growing, young, and ethnically diverse customer base."[12]

69.     Beginning in 2012, Cricket advertised to many consumers across the United States the opportunity to purchase a 4G/LTE-capable phone with 4G/LTE services without distinction, clarification, or disclosure that such 4G/LTE coverage was extremely limited in size, scope, and strength and, in most cities, nonexistent.

70.     Cricket advertised its 4G/LTE services via a variety of methods including, but not limited to, in-store advertising, printed marketing materials, radio, television, billboards, and the Internet.

---

[12]   PR NEWSWIRE, Press Release, *Leap Announces Expanded Availability of Cricket Products and Services Through Key National Retail Outlets* (Sept. 22, 2011), http://www.prnewswire.com/news-releases/leap-announces-expanded-availability-of-cricket-products-and-services-through-key-national-retail-outlets-130327813.html (last visited Nov. 1, 2019).

71. Such advertisements included statements that Cricket's 4G/LTE services provided unlimited 4G/LTE in the United States without noting any areas of limited or nonexistent coverage.

72. 4G/LTE is the most advanced type of network currently available to the general public.

73. 4G/LTE has several significant advantages over conventional 3G service.

74. This includes, but is not limited to: a significantly higher quality cellular service for making phone calls, faster text messaging, and exponentially faster data and Internet/data services (approximately eight times faster than 3G).

75. Cricket's own current "Acceptable Use Policy" described data speeds as follows:[13]

a. Cricket's 4G LTE service currently offers download speeds up to 8 Mbps;[14] and,

b. 3G service as providing download speeds from 700 Kbps up to 1.7 Mbps.

76. 4G/LTE services allow a consumer to get the best and highest use out of a 4G/LTE-capable phone. This includes, but is not limited to:

c. Ability to download or stream music and videos;

d. Greatly enhanced speed of downloading or streaming music and video;

e. Ability to use mobile applications that have practical, safety-enhancing features such as turn-by-turn GPS directions;

f. The use of other mobile applications that would require 4G/LTE services as advertised by Cricket (such as MUVE); and,

g. In general, the ability of a consumer to have the full functionality of a 4G/LTE-capable phone.

77. From 2012, Cricket offered a variety of monthly wireless cell phone plans (talk, text, and data) on either or both a 3G and 4G network, including the following:

a. 3G Basic Plans starting at approximately $35.00 or $45.00 per month; and,

---

[13]CRICKET WIRELESS, *Acceptable Use Policy* (Revised May 18, 2014), https://www.cricketwireless.com/legal-info/acceptable-use-policy.html (further updated since).
[14] "Mbps" = Megabytes per second.

b.   4G/LTE plans starting at approximately $50.00 to $60.00 per month.

(prices of such plans, as well as addition of plans, were obviously subject to change)

**Cricket's 4G/LTE-Capable Phones**

78.   To access Cricket's 4G/LTE services, Cricket required consumers to purchase a 4G/LTE-capable phone from Cricket.

79.   From 2012 to the present, Cricket offered a variety of high-end, 4G/LTE-capable phones, such as various versions of the Apple iPhone and the Samsung Galaxy.

80.   Cricket offered these high-end 4G/LTE-capable phones for sale at full retail price, generally between $399.99 and $599.99.

81.   Upon information and belief, Cricket tens of thousands, and more likely hundreds of thousands, of these 4G/LTE-capable phones throughout the country using these false advertisements during the Class Period (as defined below).

82.   4G/LTE-capable phones were the most expensive kind of mobile wireless phones that Cricket offered for sale and were purchased by Plaintiffs and the putative class.

83.   During that same time period, Cricket also offered 3G-capable wireless mobile smart-phones.

84.   3G-capable smartphones were significantly cheaper than Cricket's 4G/LTE-capable phones and could generally be purchased for between $99.99 and $269.99.

**Cricket's Packaging of Its 4G/LTE-Capable Phones**

85.   The 4G/LTE-capable phones offered for sale by Cricket and purchased by Plaintiffs and the putative class members were branded with a "4G/LTE" symbol.

86.   These measures were so significant and widespread that an objectively reasonable consumer, having purchased a 4G/LTE-capable phone from Cricket, would believe that the phone would receive 4G/LTE coverage; this is especially true when coupled with Cricket's advertisements of nationwide 4G/LTE without any disclaimer indicating that such 4G/LTE coverage was extremely limited and, in most cases, nonexistent.

87.   Such 4G/LTE branding included the packaging of the phone itself—for example:

1
2
3
4
5
6
7



8   88.   Such 4G/LTE branding also included in the "Quick Start Guide: A Simple Guide to

9   Activating Your Phone":

10
11
12
13
14
15
16
17
18
19



20   89.   Such 4G/LTE branding also included the Subscriber Identification Module ("SIM")

21   card holder contained in the box provided by the Defendants. The SIM card holder had a large

22   moniker stating "4G/LTE" and a notation stating "4G/LTE Technology – Lets you live, work, and

23   play **faster than with 3G**" (emphasis added). For example:

24   / / /

25   / / /

26   / / /

27   / / /

28

90.     Such 4G/LTE branding also included the 4G/LTE-capable phone itself.

91.     This type of branding (SIM card, phone, booklet, etc.) is not typically found with any other major carrier that has 4G/LTE coverage.

92.     Upon information and belief, Cricket took these actions to intentionally deceive and confuse Plaintiffs and the putative class members that after purchasing a 4G/LTE-capable phone, Cricket would provide 4G/LTE coverage.

**THE ILL-FATED ROLLOUT**
**OF CRICKET'S "NATIONWIDE" 4G/LTE NETWORK**

93.     One can form, via various press releases, articles, and forum posts, a reasonable timeline of Cricket's ill-fated attempts to offer a competitive 4G/LTE network.

94.     On or about March 14, 2012, Cricket announced a five-year LTE wholesale agreement with Clearwire, a wireless network.[15]

95.     Importantly, *Clearwire's LTE network had not even been deployed at that time—it was to be, speculatively, launched by June 2013*. Further, there was "no word on which markets [would] be the first to get the high-speed network."[16]

96.     Nonetheless, Cricket advertised its 4G/LTE services on a nationwide basis well before June 2013.

---

[15] *See, e.g.,* Ben Kersey, *Cricket Signs Five-Year Clearwire LTE Deal*, SLASHGEAR (Mar. 14, 2012), https://www.slashgear.com/cricket-signs-five-year-clearwire-lte-deal-14218329/ (last visited Nov. 1, 2019).

[16] Dante D'Orazio, *Clearwire's LTE Network to Be Deployed Over 5,000 Cell Sites by June 2013*, THE VERGE (Feb. 16, 2012), https://www.theverge.com/2012/2/16/2802630/clearwire-lte-network-deployment (last visited Nov. 1, 2019).

97.     Even if Cricket *aspired* to one day offer a nationwide 4G/LTE network, it did not even *plan* to use Clearwire's network to offer such coverage to more than, approximately, 60% of the Cricket network.[17]

98.     Clearwire was ultimately purchased by Sprint in July 2013; Sprint had entered a merger agreement with Clearwire in late 2012.

99.     Despite Clearwire's ambitions to roll out 5,000 LTE sites by June 2013, the company encountered substantial delays in its LTE expansion.

100.    Per the May 2, 2013 Schedule 14A proxy statement filed on Clearwire's behalf in advance of the proxy vote concerning its acquisition by Sprint, the magnitude of these delays was revealed.[18]

101.    Specifically, that proxy statement cited Clearwire's CEO, on a March 4, 2013 earnings call, as stating that the company "expect[ed]" to have 2,000 LTE sites on air by June 2013.[19] That is, Clearwire's expectations for June 2013 had fallen from 5,000 LTE sites to just 2,000 sites.

102.    By comparison, AT&T reported that it covered "all major metropolitan areas and nearly 280 million people" with its LTE technology in its 2013 10-K.[20]

103.    Thus, not even Cricket's *wholesaler* could offer anything remotely close to "nationwide" or "unlimited" 4G/LTE services by the time Cricket began marketing such.

104.    Further, it is not as if Cricket were naive with regard to thwarted 4G/LTE ambitions: in March 2011, Cricket had announced plans to enter into a 4G/LTE roaming agreement with LightSquared, another wireless network.[21] In May 2012 LightSquared declared bankruptcy.[22]

---

[17] Kersey, *supra* note 14 ("Cricket are hoping to expand LTE coverage to around 60% of its existing network coverage.")
[18] CLEARWIRE CORP., Schedule 14A (filed by Crest Fin. Ltd. and Crest Inv. Co. with the SEC).
[19] *Id.* at 6.
[20] AT&T, INC., Form 10-K for the Fiscal Year Ended December 31, 2013 (filed with the SEC on Feb. 21, 2014), at 2.
[21] *See, e.g.,* Chris  Ziegler, *Cricket Ties Up with LightSquared for Roaming Agreement*, ENGADGET (Mar.  23,  2011),  https://www.engadget.com/2011/03/23/cricket-ties-up-with-lightsquared-for-lte-roaming-agreement/ (last visited Nov. 1, 2019).

105.   As for Cricket's own 4G/LTE network, it was largely inchoate. Indeed, this is essentially why Cricket needed to approach wholesalers in the first place.

106.   On information and belief, the only areas where Cricket's network offered any manner of 4G/LTE coverage were in parts of Arizona and greater Philadelphia.

107.   For example, coverage maps taken from Cricket's own website show that Cricket did not have 4G/LTE coverage in Southern California *as of December 2014*. Note that potential consumers are notified that "*a 4G device is required for 4G/LTE service*" (emphasis added):




---

[22] *See, e.g.,* Tracy Rucinski, *LightSquared Strikes Spectrum Deal and Exits Bankruptcy*, REUTERS (Dec. 8, 2015), https://www.reuters.com/article/us-lightsquared-bankruptcy-idUSKBN0TR2QL20151209 (last visited Nov. 1, 2019).

108.     In contrast, coverage maps from Cricket's own website show that there was abundant 3G coverage throughout all of the major metropolitan areas of Southern California:




109.     By way of further example, this is a depiction of Cricket's 3G coverage in the Kansas City area at the time:

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12



110.    In contrast, Cricket could provide virtually no 4G/LTE coverage in that same market:



13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

111.    Chicago also had no 4G/LTE service whatsoever:



112.    The coverage maps Cricket posted on its own website reveal a similar trend in numerous other metropolitan areas. Other markets where Cricket could provide little to no 4G/LTE service included (but are by no means limited to) Albuquerque, Anchorage, Cleveland, Columbus, Denver, El Paso, Fresno, Louisville, Omaha, Pittsburgh, San Jose, Seattle, St. Louis, Washington, D.C., and the entire state of Hawaii.

113.    Further, these maps, again, *were as of December 2014*—effectively two years after Cricket began marketing its 4G/LTE plans.

114.    As of December 31, 2013, Cricket 3G service was offered in 48 states and the District of Columbia across an extended area covering approximately 292 million POPs.

115.    As discussed, LEAP's SEC filings admitted that 4G/LTE coverage extended to only approximately 21 million POPs in the entire United States.

116.    LEAP's SEC filings also made the following public statements concerning its lack of 4G/LTE capabilities and its lack of ability to expand its 4G/LTE capabilities:

a.    "Many of our competitors also offer LTE services over a significantly larger geographic area than we do";[23]

b.    "Given the significant decrease in the size of our customer base in recent quarters, our high level of indebtedness, and high cost of LTE deployment, **we have generally determined not to deploy LTE network technology in additional markets at this time**" (emphasis added);[24] and

c.    "[O]ur ability to compete effectively against wireless carriers with nationwide networks and significantly greater deployment of 4G . . ." was a significant risk factor for Cricket's business.[25]

117.    By Cricket's own admissions, it made a conscious decision not to expand their 4G/LTE coverage—none of which was divulged in its nationwide advertising campaign for nationwide coverage and unlimited 4G/LTE service.

118.    Indeed, not only were Cricket's national advertisements of 4G/LTE service entirely premature but the company persisted in that campaign even though it was clear that it would not be able to offer such service.

119.    Cricket failed to inform customers that its 4G/LTE services were (and would continue to be) only available in very limited geographic regions.

120.    Essentially, Cricket told one story to the SEC and FCC but continued to engage in a mass advertising campaign that told a very different story to its consumers regarding its ability to provide nationwide 4G/LTE coverage.

---

[23] LEAP WIRELESS INTERNATIONAL, INC., Form 10-K for the Fiscal Year Ended Dec. 31, 2013 (filed with the SEC on Mar. 6, 2014), at 8.
[24] *Id.* at 5.
[25] *Id.* at 1.

121.   Cricket's overall failure to construct, or obtain access to, a competitive 4G/LTE network during this time occurred within the context of intense competition in the wireless industry and overall financial weakness for Cricket itself.

122.   Generally, Cricket could not afford to obtain 4G/LTE coverage in many urban areas, even though these were the precise areas targeted by Cricket.

123.   It is thus reasonable to infer that Cricket, knowing that it could not realistically obtain competitive 4G/LTE service and yet that a "white knight" may wish to acquire it during a period of mergers and consolidation in the industry, decided to falsely advertise its 4G/LTE capabilities at the undue expense of its own customers in a bid to remain viable.

## **NO CONTRACT OR AGREEMENT WAS OR EVER COULD HAVE BEEN FORMED; THUS, ANY PURPORTED AGREEMENT TO ARBITRATE IS UNENFORCEABLE AS A MATTER OF LAW**

124.   Any purported arbitration clause that Defendants may allege exists is unenforceable because no contract or agreement between Cricket and consumers was ever formed.

### **Cricket's "No Contract" Representations**

a.   During all relevant time periods in this Complaint, Cricket marketed itself to all consumers, including Plaintiffs and the putative class, as the "Home of the **No Contract,** No Hassle Wireless Carrier" (emphasis added).

b.   For example, the "Quick Start Guide" that Defendants provided to Plaintiffs and the putative class members welcomed them to Cricket Wireless includes this slogan:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Welcome to Cricket Wireless, the home of no contract, no hassle wireless. **This guide includes information to program your Cricket phone and start your service.** Please see the accompanying manufacturer's user guide for additional information about your phone. If you have any additional questions, concerns or issues with your device, visit us online at mycricket.com or call us toll free at 1-800-CRICKET (1-800-274-2538).

    c.      In addition, from approximately May 1, 2012 to June 1, 2014, Cricket advertised on its website that its services had Unlimited Data, Talk, Text & Music with "**No Contracts**." (emphasis added). For example, this was posted on Cricket's website in 2013:



    d.      Significantly, after AT&T finalized its acquisition of LEAP/Cricket (on or about May 18, 2014), the marketing and advertising messages conveyed to consumers changed to "No *Annual* Contract" (emphasis added) instead of its prior message of "No Contract". The clear implication is that AT&T knew the "No Contract" advertisement campaign was problematic and changed the advertising message accordingly.

    e.      Thus, Defendants cannot enforce an arbitration clause or other contractual provision against any class-member consumers in this case since no contract or agreement, including any arbitration provision, was ever offered or formed due to Defendants' prior

representations to consumers (through marketing, advertisements, printed materials, etc.) that Cricket's 4G/LTE services had "no contract."

### Cricket's Failure to Meaningfully
### Disclose any Arbitration Provision

f.      Upon information and belief, Defendants provided the same or similar "Quick Start Guide" to all consumers that purchased 4G/LTE-capable phones from 2012 to mid-2014.

g.      The arbitration provision was included in a booklet titled "Quick Start Guide" with the subtitle "A Simple Guide to Activating Your Phone" (herein, "Quick Start Guide: Simple Activation Guide").

h.      There is no mention or description on the front of the booklet about anything in the "Quick Start Guide: Simple Activation Guide" relating to additional "agreements," "contracts," "terms of service," or arbitration clauses.

i.      Because Cricket failed to meaningfully and conspicuously notify consumers of the existence of any "terms of service" that contained an arbitration provision, no contract or agreement was or could have been formed due to the following:

i.      First, the "Quick Start Guide: Simple Activation Guide" could only be accessed *after* the deal to purchase a 4G/LTE phone.

ii.     Second, Cricket included an arbitration clause in a "Quick Start Guide: Simple Activation Guide," which was described as a "***simple way of activating your phone,***" (emphasis added), a misnomer designed to mislead consumers about what was contained therein.

iii.    Third, the arbitration provision was buried on the final pages of the "Quick Start Guide: Simple Activation Guide".

iv.     Fourth, the entire "Terms of Service" included in the "Quick Start Guide: Simple Activation Guide" was printed in extremely small font (either 5 or 6-point character size) that is very difficult, if not impossible, for an average consumer to read or understand. Each page contained within the

---

"Quick Start Guide: Simple Activation Guide" is approximately 3x4 inches. A sample page from the "Quick Start Guide" used by Cricket—*in actual size*—is listed below:



v.      Fifth, because Cricket advertised that its services had "no contract," an objectively reasonable consumer would have no reason to believe that the "Quick Start Guide: Simple Activation Guide," designed to guide a consumer through the process of activating the 4G/LTE-capable phone, would contain any contractual provisions.

vi.      Sixth, ***Cricket's own employees activated Plaintiffs' phones*** in the store, leaving Plaintiffs with no reason to even look at the "Quick Start Guide: Simple Activation Guide."

/ / /

/ / /

/ / /

## THE CRICKET ENTERPRISE

125.    Cricket, as described above, entailed multiple related entities held by the parent, LEAP.

126.    Cricket phones were distributed through an expansive network of Cricket-branded franchise stores ("dealers"), as well as retail locations that would sell Cricket phones along with other brands.

127.    Some of these dealers were owned by Cricket itself, while others comprised franchisees that owned Cricket-branded stores under the banner of independent legal entities.

128.    Specifically, in Cricket's own words: "Our indirect channel consists of our authorized dealers and distributors, including premier dealers and local market authorized dealers. Premier dealers are *independent* dealers that sell Cricket products exclusively in stores that *look and function similar to our company-owned stores*, enhancing the in-store experience and the level of customer service and expanding our brand presence within a market. *Premier dealers tend to generate significantly more business than indirect dealers*. As of December 31, 2013, we had approximately 2,530 indirect dealer locations, of which approximately 2,100 were premier dealer locations."[26] (emphasis added).

129.    Thus, Cricket directly stated that a network of "independent" dealers was essential to its business model.

130.    Further, as that same statement intimates, these independent dealers were also bound, as is typical with franchisees, to a significant level of homogeneity in their offerings and marketing. These offerings and marketing directives came on a "top-down" basis and were adopted by the independent dealers.

131.    For example, these independent dealers would receive standardized marketing media, including various ones representing unlimited 4G/LTE coverage.

132.    These independent dealers were also the recipients of group emails, which emanated from a Cricket corporate entity and pertained to various aspects of the business, including

---

[26]*Id.* at 6.

1  marketing.

2      133.    These relationships were formalized by Non-Exclusive Dealer Agreements.

3      134.    As stated above, Cricket maintained relationships with over 2,000 independent,

4  *Cricket-only* dealers; these dealers were naturally concentrated in urban areas.

5      135.    As detailed above, Cricket's 4G/LTE coverage was extremely sparse or nonexistent

6  in many urban areas.

7      136.    On information and belief, a number of independent dealers received numerous

8  complaints about the quality and/or absence of 4G/LTE coverage.

9      137.    Employees of independent dealers would commonly ascribe the poor quality or

10 absence of 4G/LTE coverage to some Cricket-controlled medium—for example, "the network is

11 down" or "a tower is down."

12     138.    Further, because employees of Cricket *and* the independent dealers would commonly

13 activate phones for customers, they would have had occasion to see firsthand the weakness or

14 nonexistence of 4G/LTE signals on the phones they were selling.

15     139.    Per the above-cited 10-K, Cricket specifically stated that its competitors' capacities,

16 including the ability to "***offer LTE services over a significantly larger geographic area than we***

17 ***do***," also allowed them to "***better attract and retain third-party dealers and distributors***."[27]

18 (emphasis added).

19     140.    It follows logically that Cricket's false claims of "unlimited" nationwide 4G/LTE

20 coverage would have been important, if not essential, to retaining its independent dealer network, as

21 well as inducing new individuals to invest in Cricket franchises.

22     141.    Likewise, from the viewpoint of an independent dealer who had already invested in a

23 Cricket store, it would obviously be valuable to offer potential customers robust 4G/LTE service.

24     142.    It also follows logically that existing dealers, who had already committed to the

25 national 4G/LTE ad campaign and more expensive 4G/LTE-capable phones, continued to market

26 such phones and services even when it was obvious that Cricket could not actually provide such

27

28 [27] *Id.* at 8.

1   services.

2   143.   As stated above, independent dealers were essential in marketing these false claims

3   regarding 4G/LTE coverage to consumers.

4   144.   Likewise, independent dealers were responsible for selling 4G/LTE-capable phones

5   and/or "4G/LTE" plans to consumers.

6   ## CLASS ACTION ALLEGATIONS

7   145.   Plaintiffs, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3),

8   bring this action on behalf of all others similarly situated (the "Nationwide Class") from May 1,

9   2012 to October 1, 2014 (the "Class Period"[28]), initially defined as:

10
11   **All persons in the United States who purchased a 4G/LTE-capable phone from Cricket (including its affiliates and subsidiaries) during the Class Period.**

12   146.   Plaintiffs, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), also

13   bring this action on behalf of all similarly situated California citizens (the "California Class") from

14   May 1, 2012 to October 1, 2014 (the same Class Period), initially defined as:

15
16   **All persons in California who purchased a 4G/LTE-capable phone from Cricket (including its affiliates and subsidiaries) during the Class Period.**

17
18   147.   Plaintiffs, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), also

19   bring this action on behalf of Missouri citizens (the "Missouri Class") from May 1, 2012 to October

20   1, 2014 (the same Class Period), initially defined as:

21   **All persons in Missouri who purchased a 4G/LTE-capable phone from Cricket (including its affiliates and subsidiaries) during the Class Period.**

22   148.   Plaintiffs, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3),also

23   bring this action on behalf of Illinois citizens (the "Illinois Class") from May 1, 2012 to October 1,

24   2014 (the same Class Period), initially defined as:

25
26
27   [28] On information and belief, all 4G/LTE-capable phones purchased on or after May 19, 2014 were

28   a part of AT&T's 4G network and, thus, not a part of this class action; however, the Class Period as defined above may be revised and amended based on information uncovered in discovery.

**All persons in Illinois who purchased a 4G/LTE-capable phone from Cricket (including its affiliates and subsidiaries during the Class Period.**

149.    The following persons shall be excluded from the Class and California Class: (1) Defendants and their subsidiaries and affiliates; (2) governmental entities; and (3) the judge(s) to whom this case is assigned and any immediate family members thereof.

150.    The claims for relief asserted herein satisfy the prerequisites for certification as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3):

        a.     There are common questions of law or fact common to the Class and California Class;

        b.     The claims or defenses of the representative parties are typical of the claims or defenses of the respective Class;

        c.     The representative party will fairly and adequately protect the interests of the respective Class;

        d.     The questions of law or fact common to the respective Class members predominate over any questions affecting only individual members; and

        e.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

151.    **Numerosity.**  The members of the Class and California Class are so numerous that individual joinder of all the members is impracticable. Although the exact size of the Class and California Class are unknown, Defendants submitted to a prior Court that over 10,000 Samsung Galaxy S4s were sold to California consumers alone from June 1, 2012 to May 18, 2014. The identifying information of the group is unknown to Plaintiffs; however, that information is readily available from the Defendants.

152.    **Commonality and Predominance.** This action involves common questions of law or fact, which predominate over any questions affecting individual class members, including, but not limited to, the following:

        a.    Whether Defendants advertised "No Contract";

        b.    Whether Defendants advertised and/or provided "4G/LTE-capable phones";

c. Whether Defendants advertised and/or provided "4G/LTE Services";

d. Whether Plaintiffs and Class members purchased 4G/LTE-capable phones from Defendants;

e. Whether Plaintiffs and Class members purchased 4G/LTE wireless phone plans from Defendants;

f. Whether and to what extent Defendants failed to provide 4G/LTE services;

g. Whether Defendant's Terms of Service were adequately disclosed to and were consented to by the Plaintiffs and class members;

h. Whether Defendants acted in bad faith in falsely advertised the scope of their 4G/LTE coverage;

i. Whether Defendants' claims of "no contract" was likely to mislead objectively reasonable consumers;

j. Whether Defendants' 4G/LTE advertisements and marketing were likely to mislead an objectively reasonable consumer;

k. Whether Defendant engaged in deceptive and unfair business and trade practices;

l. Whether Plaintiffs and class members are entitled to restitution, damages, and/or other equitable relief; and,

m. Whether Defendants should be enjoined from engaging in this type of conduct.

153. **Typicality.** The named Plaintiffs' claims are typical of the claims of the Class and California Class because, among other things, Plaintiffs, like all members of the respective classes, purchased 4G/LTE-capable phones anticipating to receive 4G/LTE services. Cricket never provided 4G/LTE services or provided only extremely limited 4G/LTE services in most cities across the United States. In addition, named Plaintiffs have the same or similar remedies as the members of the putative classes.

/ / /

154.   **Adequacy of Representation.**   Plaintiffs are adequate representatives of the Class and California Class because their interests do not conflict with the interests of the classes that they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the classes will be fairly and adequately protected by Plaintiffs and their counsel.

155.   **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy, including, but not limited to, the following reasons:

a.   The damages or other financial detriment suffered by individual Class and California Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Cricket, so it would be impracticable for the members of the classes to individually seek redress for Cricket's wrongful conduct;

b.   Even if the members of the classes could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court; and

c.   No unusual difficulties are likely to be encountered in the management of this class action.

156.   **Ascertainability.**   Defendants are in possession of the necessary records in the form of receipts and billing statements to identify members of the classes; as such, both the Class and California Class will be easily ascertainable.

## NULLITY OF ARBITRATION PROVISION, AS APPLICABLE

157.   Because of the above-described Merger, some number of Cricket customers were migrated to AT&T's network and policies.

158.    On information and belief, approximately half of Cricket customers at the time of the Merger were eventually migrated to AT&T's network and, in whatever manner and/or sequence, received updated contractual terms and conditions that supplanted those that had existed under Cricket.

159.    To the extent that, as applicable, Defendants may argue that respective class members are subject to such revised terms and conditions, the arbitration provision included in those terms is null and void in its entirety here.

160.    Under California law, parties may not agree to waive the right to seek public injunctive relief under California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act in any forum and any such agreements are contrary to California public policy and are unenforceable. *See McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017).

161.    The terms and conditions, drafted by AT&T, that were sent to legacy Cricket customers following the Merger contained language purporting to bar the arbitrator from granting the type of public injunctive relief authorized under California law for claims under the Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act. That arbitration provision is therefore unenforceable under *McGill*.

162.    The AT&T-drafted terms and conditions also contained a non-severability, or "poison pill," provision declaring that the entire arbitration provision would be null and void should that particular provision be found unenforceable.

163.    Because the aforementioned improper waiver of public injunctive relief in any forum is unenforceable under *McGill*, the entire arbitration provision is null and void. *See Roberts v. AT&T Mobility LLC*, No. 3:15-cv-3418-EMC, 2018 WL 1317346 (N.D. Cal. Mar. 14, 2018); *McArdle v. AT&T Mobility LLC*, No. 09-cv-1117-CW, 2017 WL 4354998 (N.D. Cal. Oct. 2, 2017).

## STATUTES OF LIMITATIONS AND REPOSE

164.    The statute(s) of limitations and statute(s) of repose for these claims, relating to the purchase of 4G/LTE-capable phones and 4G/LTE service plans "up through October 1, 2014," were

1   tolled by prior agreement with Defendants. That tolling agreement runs "up to and including

2   November 4, 2019."

3      165.   Further, Defendants' conduct was inherently deceptive, concealing the damage from

4   the consumers, as more fully outlined herein. Accordingly, any and all applicable statutes of

5   limitations are and were equitably tolled.

6   **CAUSES OF ACTION**

7      166.   Plaintiffs do not plead, and hereby disclaim, any causes of action under the Federal

8   Communications Act and regulations promulgated by the FCC.

9   **CHOICE OF LAW**

10      167.   At all times relevant to this Complaint, Defendants' (and LEAP's) principal place of

11   business and principal executive offices were located in California; in addition, LEAP owned and

12   controlled Defendants and various other Cricket entities.

13      168.   On information and belief, all business and marketing decisions, including decisions

14   to not expand 4G/LTE coverage and continue to market "Unlimited 4G/LTE," were made at LEAP

15   and Cricket Wireless' offices in California.

16      169.   As such, California law applies to Plaintiffs' and the putative Class members' claims

17   because:

18         a.   A substantial part of the alleged misleading and deceptive conduct emanated

19      from California; and

20         b.   The bad faith, unfair, and unlawful conduct occurred in California.

21      170.   In the alternative, the laws of the states in which each Plaintiff and each class

22   member resides apply. In that case, Plaintiffs and the putative class members hereby incorporate

23   every state's laws relating to consumer protection, unconscionability, false advertising, unjust

24   enrichment, negligence, and negligence per se.

25   / / /

26   / / /

27   / / /

28

**COUNT ONE:**
**VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1750, et. seq.**
(As to All Defendants)

171.   Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

172.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, et seq. ("CLRA").

173.   Plaintiff and other proposed class members purchased from Defendants "goods" (specifically, Cal. Civ. Code § 1761(a)) and "services" (specifically, Cal. Civ. Code § 1761(b)).

174.   Defendants' actions, representations, and conduct have violated the CLRA because they extended to transactions that are intended to result, or which resulted in, the sale or lease of goods or services to consumers.

175.   Plaintiffs and other class members are "consumers" as that term is defined by the CRLA, specifically, Cal. Civ. Code § 1761(d).

176.   By engaging in the conduct described above, Defendants violated the CLRA as follows:

    c.   By representing that goods or services have sponsorship, approval, characteristics, etc. which they do not have, in violation of Cal. Civ. Code § 1770(a)(5);

    d.   By representing that goods or services are of a particular standard, quality, or grade if they are of another, in violation of Cal. Civ. Code § 1770(a)(7); and

    e.   By advertising goods or services with intent not to supply them as advertised, in violation of Cal. Civ. Code § 1770(a)(9).

177.   Specifically, Defendants' acts and practices led customers to falsely believe that their "goods" and "services" would allow consumers to have access to a 4G/LTE network when they knew such representations to be false and/or misleading.

178.     On or about May 1, 2015, former plaintiff Flor Barraza, upon filing these claims in a prior action, put Defendants on notice of her allegations and demanded that Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein within thirty days.

179.     Plaintiffs Jermaine and Jamie also additionally put Defendants on notice of their allegations and similarly demanded correction, repair, replacement, and/or other rectification via their own prior lawsuit.

180.     Defendants have refused to correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein.

181.     Cricket's conduct alleged herein caused substantial injury to Plaintiffs and members of the proposed classes, as well as the public generally. Cricket's conduct is ongoing and is likely to continue and recur absent a permanent injunction.

182.     Specifically, as described above, Cricket is now entirely owned by AT&T and operates on AT&T's wireless network.

183.     AT&T has continued to engage in conduct almost wholly similar to that alleged here. Specifically, given that the incipient—***yet not yet arrived for consumers***—new wireless technology is 5G, AT&T nonetheless began labeling its phones with a "5GE" logo:



184.    AT&T's behavior in this regard essentially makes a mockery of consumer laws generally, the public, and the notion that a corporation should strive for some semblance of truth in its advertising.

185.    AT&T competitor Sprint sued over this "5GE" labeling;[29] competitors Verizon and T-Mobile also lambasted AT&T over its obvious deception.

186.    Nonetheless, AT&T's CEO lauded the "5GE" campaign, characterizing the underlying technology as "a step that is required to get to ultimate 5G. And it's an evolutionary step to 5G. It's a critical step. So we are characterizing this as 5GE, 5G Evolution."[30]

187.    The "5GE" label refers to what is commonly considered late-stage 4G technology; this can be seen plainly by the fact that AT&T has debuted a separate 5G network in limited cities and *only for business customers*.

188.    This logo can only have one *reasonable* meaning (that it somehow demarcates a new *generation*—the 5th—markedly distinct from 4G), yet AT&T has claimed that it reasonably refers to late-stage 4G technology. It is not, for example, as if AT&T adopted an entirely new network-speed naming convention or claimed something entirely outlandish (e.g., "7G" or "10G"). Rather, AT&T selected a logo referring to a network type that was just close enough to be plausible and yet was not actually available to consumers.

189.    Put simply, Cricket's parent AT&T, just like Cricket itself, has shown little or no compunction about lying to consumers in this regard.

190.    If consumers are to pay more for a given service—and they *do*—then terms like "4G" and "5G" must have some substantive meaning or else the notion of "misrepresentation," a bedrock of consumer law, is likewise rendered meaningless.

191.    Cricket is, again, owned by AT&T, operates on AT&T's network, and adopted AT&T-drafted terms and conditions.

---

[29] *See, e.g.,* Anne Cullen, *AT&T and Sprint Settle "5G" False Advertising Suit*, Law360 (Apr. 22, 2019).
[30] Jacob Wolinsky, *AT&T CEO Randall Stephenson on 5G Lawsuit*, ValueWalk (Feb. 8, 2019; citing a CNBC interview transcription).

192.    Thus, because Cricket's conduct alleged herein is likely to continue and recur absent a permanent injunction, Plaintiffs seek an order enjoining Cricket from such practices.

193.    Plaintiff has provided notice to Defendant of its violations of the Consumers Legal Remedies Act concurrent with the filing of this Complaint.  Should Defendant fail to remedy its conduct pursuant to the notice, Plaintiffs shall amend this complaint to seek monetary damages pursuant to Cal. Civ. Code § 1780(a)(1).

194.    Pursuant to Cal. Civ. Code § 1780, Plaintiffs and those similarly situated, are entitled to restitution of the purchase price of the 4G/LTE-capable phones and 4G/LTE service plans, are entitled to an order requiring Defendants to correct the misrepresentation to its Customers, and to recover reasonable attorneys' fees and costs.

195.    Plaintiffs, on behalf of those similarly situated, seek restitution and injunctive relief pursuant to Cal. Civ. Code § 1780.  The Consumers Legal Remedies Act, § 1750, et seq., is designed to protect consumers against unfair and deceptive business practices.  It applies to Defendants' conduct because it covers transactions that are intended to result or that result in the sale or lease of goods and services to consumers.

## COUNT TWO:
## VIOLATION OF THE FALSE ADVERTISING LAW
### Business Professions Code § 17500 *et. seq.*
(As to All Defendants)

196.    Plaintiffs, on behalf of themselves and those similarly situated, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

197.    Defendants made untrue, false, deceptive, and/or misleading statements in connection with the advertising and marketing of their products and services.

198.    Defendants made representations through advertisement (through a variety of mediums) and product labeling/branding, as described above, that led reasonable customers to believe that they were purchasing a 4G/LTE-capable phone that would receive 4G/LTE services in their respective geographic regions.

199.     Defendants deceptively failed to inform Plaintiffs, and those similarly situated, that their goods and services did not actually provide for 4G/LTE services in their respective geographic areas.

200.     Defendants' acts and omissions were likely to deceive the general public.

201.     Defendants engaged in these false, misleading, and deceptive advertising and marketing practices to increase their profit. Accordingly, Defendants have engaged in false advertising, as defined by Cal. Business and Professions Code § 17500 *et seq*.

202.     Plaintiffs and those similarly situated are entitled to and do seek both a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

203.     The aforementioned practices, which Defendants used to their significant financial gain, also constituted unlawful competition and provided an unlawful advantage over Defendants' competitors and result in injury to the general public.

204.     Defendants have refused to correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein.

205.     Cricket's conduct alleged herein caused substantial injury to Plaintiffs and members of the proposed classes, as well as the public generally. For the reasons described above, Cricket's conduct is ongoing and is likely to continue and recur absent a permanent injunction.

206.     Because Cricket's conduct alleged herein is likely to continue and recur absent a permanent injunction, Plaintiffs seek an order enjoining Cricket from such practices.

207.     Plaintiffs individually seek public injunctive relief, under the False Advertising Law, to protect the general public from Cricket's false and/or misleading advertisements and omissions.

208.     Plaintiffs also seek, on behalf of those similarly situated, full restitution of monies as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiff, the general public, or those similarly situated by means of the false, misleading, and deceptive advertising and marketing practices complained of herein, plus interest.

209.     As a direct and proximate result of such actions, Plaintiffs and the other members of the Class have suffered, and continue to suffer, injury in fact and have lost money and/or property

as result of such false, deceptive, and misleading advertising in an amount that will be proven at trial but which is in excess of the jurisdictional minimum of this Court.

**COUNT THREE:**
**NEGLIGENCE/NEGLIGENCE PER SE**
(As to All Defendants)

210.    Plaintiffs, on behalf of themselves and those similarly situated, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

211.    Cricket, during the Class Period, owed Plaintiffs and the classes a duty to be forthcoming and to inform Plaintiffs and the classes of the current and projected limits of its 4G/LTE Services.

212.    During the Class Period, Cricket represented—through in-store materials and various advertising mediums—to Plaintiffs and the classes that it offered extensive 4G/LTE services, in breach of this duty.

213.    Cricket's violations of California's Business and Professionals Code § 17200 et seq. and § 17500 et seq. constitute negligence per se.

214.    Cricket's intentional breach of this duty constitutes gross negligence.

215.    Cricket knew that its 4G/LTE service was very limited and that its customers would rely upon their representations and advertisements; thus, its actions were voluntary.

216.    Plaintiffs and the proposed classes did not know, and could not have known, that such representations and/or advertisements were false.

217.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the class have been damaged.

218.    Defendant's negligence was a substantial factor of the harm Plaintiffs and the class members suffered.

219.    Plaintiffs and the classes seek restitution and disgorgement of profits related to the false advertisement and offer and/or declaratory relief as may be appropriate.

/ / /

/ / /

**COUNT FOUR:**
**UNJUST ENRICHMENT**
(As to All Defendants)

220.   Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

221.   Defendants knowingly retained a benefit at the expense of Plaintiffs and the putative class members.

222.   Defendants derived this benefit at the expense of Plaintiffs and the putative class members in the form of substantial revenue from Plaintiffs' and the putative class members' purchase of 4G/LTE-capable phones and "4G/LTE" service, owing to Defendants' 4G/LTE misrepresentations. [31]

223.   Plaintiffs' and the putative class members' detriment and Defendants' enrichment are traceable to, and resulted directly and proximately from, the conduct alleged in this complaint including, but not limited to, Defendants' 4G/LTE misrepresentations.

224.   It would be inequitable for Defendants to retain the benefits they received from Plaintiffs and the putative class members without payment to Plaintiffs and the putative class members.

225.   Plaintiffs and the class have no adequate remedy at law.

226.   Plaintiffs and the class seek disgorgement and/or a constructive trust on all of the inequitable payments and profits Defendants retained from Plaintiffs and class members.

**COUNT FIVE:**
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**California Business & Professions Code § 17200 et seq.**
(As to All Defendants)

227.   Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

---

[31] See *supra*, paragraph 49.

228.    Section 17200 of the California Business & Professions Code ("UCL") prohibits any unlawful, unfair, or fraudulent business practice.

229.    Defendants violated the "unlawful" prong of the UCL by making material misrepresentations that they offered nationwide 4G/LTE when, in fact, such 4G/LTE coverage was extremely limited in size and strength and, in most cities, nonexistent, in violation of the CLRA, Cal. Civ. Code §1750 *et seq*.

230.    Defendants' practice of advertising nationwide 4G/LTE service without regard for whether or not Defendants could actually provide such 4G/LTE coverage violated the "unfair" prong of the UCL because it was immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the putative class members. Defendants' practices were also contrary to legislatively declared and public policy and the harm it caused to consumers outweighed its utility (if any).

231.    Defendants violated the "fraudulent" prong of the UCL by making material misrepresentations that they had nationwide and/or unlimited 4G/LTE service when they did not, and by failing to disclose and actively concealing material information regarding their lack of 4G/LTE coverage. These material misrepresentations and nondisclosures were likely to mislead consumers.

232.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent conduct, Plaintiffs and the class members lost money or property.

233.    Defendants' conduct caused substantial injury to Plaintiffs and the putative class members.

234.    Defendants have refused to correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein.

235.    Cricket's conduct alleged herein caused substantial injury to Plaintiffs and members of the proposed classes, as well as the public generally. For the reasons described above, Cricket's conduct is ongoing and is likely to continue and recur absent a permanent injunction.

236.    Because Cricket's conduct alleged herein is likely to continue and recur absent a permanent injunction, Plaintiffs seek an order enjoining Cricket from such unfair and fraudulent practices.

237.    Plaintiffs individually seek public injunctive relief, under the Unfair Competition Law, to protect the general public from Cricket's false and/or misleading advertisements and omissions.

238.    Plaintiffs also seek an order granting restitution to Plaintiffs and members of the classes in an amount to be proven at trial.

239.    Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**COUNT SIX:**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
(As to All Defendants)

240.    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

241.    The Missouri Merchandising Practices Act ("MMPA") forbids the use of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce.

242.    Cricket, as alleged in this Complaint, engaged in conduct that was deceptive, fraudulent, a false pretense, a false promise, a misrepresentation, an unfair practice, and the concealment, suppression, and/or omission of material fact(s) (herein, the "unlawful conduct").

243.    Defendants' unlawful conduct was the "sale" and/or "advertisement" of "merchandise," as defined by the MMPA, specifically §§ 407.010.1, 407.010.4 and 407.010.6 RSMo.

244.    Pursuant to 15 C.S.R. § 60-8.020, **Unfair Practice in General**, an "Unfair Practice is any practice which – (A) either (1) offends any public policy as it has been established by the ...

1    statutes or common law of this state or (2) is unethical, oppressive or unscrupulous; and (B)

2    represents a risk of, or causes, substantial injury to consumers."

3    245.   Pursuant to 15 C.S.R. § 60-8.090, **Illegal Conduct**, "(1) it is an unfair practice for

4    any person in connection with advertisement or sale of merchandise to engage in any method, use or

5    practice which – (A) violates state or federal law intended to protect the public; and (B) presents a

6    risk of, or causes, substantial injury to consumers."

7    246.   Pursuant to 15 C.S.R. § 60-9.040, **Fraud in General**, "(1) Fraud includes any acts,

8    omissions or artifices which involve falsehood, deception, trickery, breach of legal or equitable

9    duty, trust, or confidence, and are injurious to another or by which an undue or unconscientious

10   advantage over another is obtained."

11   247.   Pursuant to 15 C.S.R. § 60-8.040 **Duty of Good Faith**, "(1) It is an unfair practice

12   for any person in connection with the advertisement or sale of merchandise to violate the duty of

13   good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith.

14   248.   Defendants' sale and/or advertisement of merchandise occurred within the state of

15   Missouri.

16   249.   Defendants' unlawful conduct occurred in the course of commerce within Missouri.

17   250.   Defendants' unlawful conduct was committed in connection with the sale and/or

18   advertisement of cellular equipment to Plaintiff and other consumers.

19   251.   Defendants' violations of the MMPA include, but are not limited to, the following:

20        (a)   Falsely representing that that the 4G/LTE-Capable Phones sold to be used on
21   their network by members of the Putative Class could be used as 4G/LTE devices with all of
     the aforementioned benefits, when in fact the telephones they sold could not be used as
22   4G/LTE devices in the vast majority of locations served by Defendants' network;

23        (b)   Falsely advertising 4G/LTE-Capable Phones as operable on Defendants'
     "UNLIMITED 4G/LTE" network with the intent to sell mobile telephones that could not be
24   used as such with Defendants' network;

25        (c)   Defendants engaged in other fraudulent and deceptive conduct which created
26   a likelihood of confusion or misunderstanding and constituted unfair and deceptive practices
     under Mo. Rev. Stat. § 407.020.; and,

27

28

(d)     In other particulars at present unknown to Plaintiffs but which Plaintiffs believe will be revealed during discovery.

252.    Defendants intended for Plaintiffs and similarly situated consumers to rely upon the unlawful conduct described above.

253.    Defendants' actions violated a statute that has a public interest impact and has potential for repetition by these Defendants.

254.    Defendants' actions were wanton, willful and/or reckless in that Defendants knew they were not capable of providing their customers with the service they were advertising and selling in connection with the purchase of 4G/LTE-Capable Phones.

255.    The value of the goods and services Plaintiffs and others received was not equal to the value that was promised.

256.    As a direct and proximate result of Defendants' unlawful practices identified herein, Plaintiffs and proposed class members suffered ascertainable monetary losses as well as considerable distress, inconvenience and disruption of their personal business.

257.    Defendants' conduct as outlined herein was intentional, willful, wanton, fraudulent, reckless, and/or malicious, thereby entitling Plaintiffs to the recover of punitive damages.

258.    Plaintiffs are further entitled to recover their costs and reasonable attorneys' fees.

259.    Plaintiffs are also entitled, and should be granted, a permanent public injunction enjoining Defendants from continuing to engage in this deception.

## COUNT SEVEN:
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, et seq.)
(As to All Defendants)

260.    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

261.    Cricket, as alleged in this Complaint, engaged in conduct that was deceptive, fraudulent, a false pretense, a false promise, a misrepresentation, an unfair practice, and the

concealment, suppression, and/or omission of material fact(s) (herein, the "unlawful conduct"), each of which is declared unlawful by 815 ILCS 505/2.

262.    Defendants' violations of the MMPA include, but are not limited to, the following:

a.    Falsely representing that that the 4G/LTE-Capable Phones sold to be used on their network by members of the Putative Class could be used as 4G/LTE devices with all of the aforementioned benefits, when in fact the telephones they sold could not be used as 4G/LTE devices in the vast majority of locations served by Defendants' network;

b.    Falsely advertising 4G/LTE-Capable Phones as operable on Defendants' "UNLIMITED 4G/LTE" network with the intent to sell mobile telephones that could not be used as such with Defendants' network;

c.    Defendants engaged in other fraudulent and deceptive conduct which created a likelihood of confusion or misunderstanding; and,

d.    In other particulars at present unknown to Plaintiffs but which Plaintiffs believe will be revealed during discovery.

263.    By purchasing 4G/LTE-capable phones and 4G/LTE service which Cricket could not, and did not intend, to provide, Plaintiffs and the putative calss members sustained actual damages.

264.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the putative class are entitled to recover "actual economic damages or any other relief which the court deems proper." Accordingly, Plaintiffs and the putative class can recover their actual damages and punitive damages.

265.    Pursuant to 815 ILCS 505/10a(c), Plaintiffs, individually, are entitled to obtain public injunctive relief.

266.    Pursuant to 815 ILCS 505/10a(c), Plaintiffs and the putative class are entitled to recover their costs and reasonable attorney's fees.

/ / /

/ / /

## COUNT EIGHT:
## STATE CONSUMER PROTECTION STATUES
(As to All Defendants)

267.    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

268.    As more fully outlined above, Defendants' false advertising campaign with respect to **UNLIMITED 4G/LTE**, **NO CONTRACTS**, and **Nationwide Coverage** was conducted across the nation, in, upon information and belief, all 50 states and in Washington, D.C.

269.    Plaintiffs, on behalf of themselves and those similarly situated, allege that Defendants' conduct, as set forth herein, violated the following consumer protection statutes:

a.      Code of Ala. § 8-19-1, et seq.;

b.      Alaska Stat. § 45.50.471, et seq.;

c.      A.R.S. § 44-1522, et seq.;

d.      A.C.A. § 4-88-101, et seq.;

e.      Cal. Civ. Code § 1750, et seq.;

f.      Cal. Bus. & Prof. Code § 17200, et seq. and § 17500, et seq.;

g.      C.R.S. § 6-1-105, et seq.;

h.      Conn. Gen. Stat. § 42-110a, et seq;

i.      6 Del. C. §§ 2511, et seq. and 2531, et seq.;

j.      D.C. Code § 28-3901, et seq.;

k.      Fla. Stat. § 501.201, et seq.;

l.      C.G.A. §§ 10-1-372, et seq., 10-1-392, et seq., and 10-1-420, et seq.;

m.      HRS § 480-1, et seq.;

n.      Idaho Code § 48-601, et seq.;

o.      815 ILCS § 505/1, et seq.;

p.      Burns' Ind. Code Ann. § 24-5-.05-1, et seq.;

q.      Iowa Code § 714.16, et seq.;

1     r.     Kan. Stat. Ann. § 50-623, et seq.;

2     s.     KRS § 367.170, et seq.;

3     t.     La. R.S. § 51:1401, et seq.;

4     u.     10 M.R.S. § 1211, et seq.;

5     v.     Md. Com. Law Code § 13-101, et seq.;

6     w.     Mass. Gen. L. Ch. 93A § 1, et seq.;

7     x.     MCLS § 445.901, et seq.;

8     y.     Minn. Stat. §§ 325D.43, et seq., 325F.67, et seq., and 325F.68, et

9            seq.;

10    z.     Miss. Code Ann. § 75-24-1, et seq.;

11    aa.    § 407.010 RSMo., et seq;

12    bb.    Mont. Code Ann. § 30-14-101, et seq.;

13    cc.    Neb. Rev. Stat. § 59-1601, et seq.;

14    dd.    Nev. Rev. Stat. Ann. § 598.0903, et seq;

15    ee.    N.H. Rev. Stat. §385-A:1, et seq.;

16    ff.    N.J. Stat. § 56:8-1, et seq.;

17    gg.    N.M. Stat. Ann. § 57-12-1, et seq.;

18    hh.    N.Y. Gen. Bus. Law §§ 349, et seq. and 350, et seq.;

19    ii.    N.C. Gen. Stat. § 75-1.1, et seq.;

20    jj.    N.D. Cent. Code, §§ 51-12-01, et seq. and 51-15-01, et seq.;

21    kk.    Ohio Rev. Code Ann. § 1345.01, et seq.;

22    ll.    15 Okl. St. §751, et seq.;

23    mm.    Or. Rev. Stat. § 646.605, et seq.;

24    nn.    73 Pa. Stat. § 201-1, et seq.;

25    oo.    R.I. Gen. Laws § 6-13.1-1, et seq.;

26    pp.    S.C. Code Ann. § 39-5-10, et seq.;

27    qq.    S.D. Codified Laws § 37-24-1, et seq.;

28

1      rr.      Tenn. Code § 47-18-101, et seq.;

2      ss.      Tex. Bus. & Com. Code § 17.41, et seq.;

3      tt.      Utah Code Ann. § 13-11-1, et seq.;

4      uu.      9 Vt. Stat. Ann. § 2451, et seq.;

5      vv.      Va. Code Ann. § 59.1-196, et seq.;

6      ww.      Rev. Code Wash. § 19.86.010, et seq.;

7      xx.      W. Va. Code § 46A-6-101, et seq.;

8      yy.      Wis. Stat. § 100.20, et seq.; and,

9      zz.      Wyo. Stat. § 40-12-101, et seq.

270.   As a result of Defendants' violations of the foregoing state consumer protection statutes, Plaintiffs and the class members are entitled to compensatory damages, statutory damages, restitution, and/or any other damages allowed by law (including but not limited to costs and attorneys' fees).[32]

**COUNT NINE:**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
(As to All Defendants)

271.   Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

272.   The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**A. Enterprise-in-Fact.**

---

[32] With regard to the California Consumer Legal Remedies Act, the pleading of Count One is intended to supersede this paragraph, at least until Plaintiffs amend as noted in paragraph 193.

273.    An enterprise includes any individual, partnership, organization, corporation, association, or other entity, and also includes any union or group of individuals associated in fact, even if they do not comprise a formal legal entity.  Accordingly, there are generally two varieties of RICO enterprises: (1) one or more corporate entities being used as a vessel by one or more bad actor(s) to commit acts of racketeering; and (2) an association-in-fact enterprise.

274.    Defendants, as described above, did not own and operate many (over 2,000) Cricket-branded stores; rather, these were owned and operated by independent dealers.  Thus, Cricket utilized a franchise model not dissimilar to that of many popular fast food chains.

275.    This association-in-fact enterprise therefore consists of the Cricket Defendants and each franchisee/licensee who operated a Cricket store that deployed the 4G/LTE advertisements in a market where Cricket could not provide 4G/LTE service.

276.    Upon information and belief, at least one of the stores from which Plaintiff(s) purchased their phones was actually owned and/or operated by an independent dealer.

277.    Like virtually all RICO enterprises, the ultimate purpose of the Cricket-independent dealer enterprise was to profit.

278.    Here, as described above, the common purpose of the enterprise as it pertains to this suit was to profit by marketing 4G/LTE service that was much desired by consumers.

279.    This common purpose was, in large part, literally common—that is, business entities that were owned by Cricket and business entities that were controlled by many different, independent entities displayed and otherwise marketed the same messages and materials pertaining to 4G/LTE- service.

280.    This Cricket enterprise profited using fraudulent means.  Specifically, the 4G/LTE advertisements were known by all parties to this enterprise to be false.

281.    Cricket knew such advertisement was false, as proven by its statements to the SEC, outlined above.

282.    The independent dealers also knew, or should have known, of this falsity given the fact that they activated customers' phones in-store (so as to be able to personally see the lack of

4G/LTE signal); received persistent complaints about lack of 4G/LTE coverage; and could read in various articles at the time just how nascent Cricket's 4G/LTE services actually were. To the extent that any number of independent dealers and their employees actually owned Cricket 4G/LTE-capable phones, they would have had firsthand experience of such.

283. This knowledge was further informed by Cricket emails that were sent to all indirect dealers.

284. The enterprise's fraud can be traced along a particular timeline. As alluded to above, Cricket—including its independent dealers—began advertising 4G/LTE plans *at least* as early as January 1, 2013. These advertisements appeared on Cricket's website, in stores, and elsewhere.

285. Based upon, as detailed above, the actuality of Cricket's 4G/LTE services during that timeframe, it would not have even consummated its wholesale deal with Clearwire yet—indeed, that was not announced until March 2013 and Clearwire's own capabilities were also formative; LightSquared, its former putative LTE provider, was about to enter bankruptcy.

286. Cricket's own 4G/LTE network at the very beginning of 2013 would not have been robust beyond, as stated above, some parts of Arizona (e.g., Cricket first rolled its own network out in Tucson) and, possibly, parts of greater Philadelphia.

287. Even in those few places where Cricket was able to offer its own 4G/LTE services, its bandwidth deployment was less spectrally efficient and therefore less able to provide the marginal user with robust 4G/LTE services than more efficient deployers of bandwidth.

288. As averred above, Cricket and its dealers did not inform *consumers* with regard to the greatly limited availability of 4G/LTE coverage. That is, Cricket made an executive decision sometime before the beginning of 2013 to begin marketing nationwide 4G/LTE services before they could offer them and the dealers participated in such fraud.

289. Likewise, Cricket and the independent dealers sold more expensive 4G/LTE-capable phones during this same time period, regardless of whether the customer purchased a 4G/LTE plan to go along with it and/or regardless of whether Cricket could actually provide them with such service for the phone they had purchased.

290.    Put simply, the Cricket enterprise's reach greatly exceeded its grasp: in an attempt to remain financially viable and perhaps attract suitors, it rolled out a national ad campaign that bore no relationship to its national 4G/LTE capabilities. This was, again, at the expense of its own customers.

291.    This fraud was ongoing and can be documented via any number of sources, many of which are preserved online. For example, the following poster was hanging in a Columbus, GA Cricket store on or about February 5, 2013:



292.    Meanwhile, Cricket's own 4G/LTE coverage map for Columbus, GA from late December 2014—nearly two years later—shows no 4G/LTE coverage in the area even then:



**B.  Pattern of Racketeering**

293.   Plaintiffs allege that Defendants conspired to commit, and did in fact commit, mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

294.   As noted above, Cricket's 4G/LTE advertisements were disseminated nationwide through TV, the radio, and the Internet (including on Cricket's website at the time).

295.   Plaintiffs know that Cricket had begun advertising 4G/LTE plans nationwide *at least* by Jan. 1, 2013.

296.   These advertisements were displayed/aired/televised/etc. countless times during 2013 until the time Cricket could actually offer nationwide 4G/LTE services—when it was migrated to AT&T's network following the Merger in, approximately, May 2014.

297.   Upon information and belief, the physical advertisements—which included posters and large banners—were delivered to the storefronts through the use of the mails and/or a common courier. For instance, some advertisements, such as the 4G/LTE Meets Unlimited advertisement displayed above in paragraph 3appear to have also been delivered to consumers directly through the mail.

298.   For instance, Cricket's website at the time included advertisements for a 4G/LTE plan that would have "**NATIONWIDE COVERAGE**", "**NO CONTRACTS**", and "**NO OVERAGES**" (emphasis added).[33]

299.   When the iPhone 4S was rolled out, Cricket's website included advertisements such as "ONLY $55/MONTH WITH **UNLIMITED TALK/TEXT/DATA AND NO CONTRACT**" (emphasis added).[34]

300.   When the iPhone 5S was rolled out, Cricket advertised "**NATIONWIDE** talk/text/date" with "**NO CONTRACTS**" (emphasis added).[35]

---

[33] *See, e.g.,* https://www.youtube.com/watch?v=B20TaR4b7d0 (approximately 0:42 mark) (last viewed October 25, 2019); *see also* https://www.youtube.com/watch?v=-Rd2MDiD-aM (approximately 0:45 mark through 1:02 mark) (last viewed October 25, 2019).
[34] Plaintiffs do not know exactly when these advertisements began, but the iPhone 4S was released in 2011.

301.    The common purpose of this racket, as described, was to perpetuate the illusion of 4G/LTE service on a nationwide basis in order to profit.

**C.  Causation and Damages**

302.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1692(c) and (d), Plaintiffs and members of the classes were been injured in their business and/or property within the meaning of 18 U.S.C. § 1694(c).

303.    Plaintiffs and the members of the classes were the direct victims of this scheme to defraud.  There is a direct and single line from the fraud committed by the enterprise to Plaintiffs and the class members.

304.    These damages include the difference in the cost between a 4G/LTE-capable Phone and a 3G phone, as well as the difference in cost per line per month between a 4G/LTE plan and a 3G plan.

305.    Under 18 U.S.C. § 1964(c), Defendants are each jointly and severably liable to Plaintiff and the class members for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT TEN (Individually):**
**PERMANENT PUBLIC INJUNCTIVE RELIEF**
**Under Cal. Civ. Code § 3422 and All Inherent or Other Authority**
(As to All Defendants)

306.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

307.    If not enjoined by this Court, Cricket will continue to injure the general public through its false advertising and omissions alleged herein, which are directed at the consuming public, including in California.

308.    In order to prevent injury to the general public, Plaintiffs individually seek public injunctive relief in the form of a judgment and injunction to permanently enjoin Cricket from falsely advertising its wireless capabilities, as well as any other relief this Court deems just and proper.

---

[35] Plaintiffs do not know exactly when these advertisements began, but the iPhone 5S was released in September 2013.

309. The balance of equities favors the entry of permanent public injunctive relief. The general public will be harmed as Cricket, as well as its controlling parent, AT&T, continue to show no compunction regarding their blatant misrepresentations, as described above; this behavior is likely to recur absent a permanent injunction. Therefore, a public permanent public injunction is in the public interest.

310. **Jury Demand.** Plaintiffs, on behalf of themselves and others similarly situated, demand a trial by jury for all issues so triable under the law.

<u>**PRAYER FOR RELIEF**</u>

Plaintiffs, on behalf of themselves and those similarly situated request that the Court order relief and enter judgment against the Defendants as follows:

1.      Approving of the Class, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

2.      Declaring that Defendants committed the violations alleged herein;

3.      Granting a permanent public injunction for the benefit of the public enjoining the unlawful practices described herein;

4.      Granting damages, except as limited in Count One, restitution, treble damages, and/or disgorgement to Plaintiffs and class members;

5.      Granting compensatory damages, the amount of which is to be determined at trial, except as limited in Count One;

6.      Granting punitive damages;

7.      Granting pre- and post-judgment interest;

8.      Granting attorneys' fees and costs; and

9.      Granting further relief as this Court may deem proper.

/ / /

/ / /

/ / /

Dated: November 4, 2019

**CONSUMER LAW PRACTICE**
Daniel T. LeBel
PO Box 720286
San Francisco, CA 94172
Tel: 415-513-1414
Fax: 877-563-7848
danlebel@consumerlawpractice.com

**WADDELL LAW FIRM LLC**
A. Scott Waddell
2600 Grand Blvd., Suite 580
Kansas City, Missouri 64108
Tel: 816-914-5365
Fax:  816-817-8500
scott@aswlawfirm.com
(*pro hac vice* forthcoming)

**BELL LAW, LLC**
Bryce B. Bell
Mark W. Schmitz
Andrew Taylor
2600 Grand Blvd., Suite 580
Kansas City, Missouri 6410
Tel: 816-886-8206
Fax:  816-817-8500
Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com
(*pro hac vice* forthcoming)

*Attorneys for Plaintiffs*