Archis A. Parasharami (State Bar No. 321661)
Daniel E. Jones (*pro hac vice*)
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
Telephone:      +1.202.263.3000
Facsimile:      +1.202.263.5000
Email:          aparasharami@mayerbrown.com
                djones@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone:  +1.212.506.2373
Facsimile:   +1.212.849.5973
Email:          mingber@mayerbrown.com


Attorneys for Defendant
CRICKET WIRELESS LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERMAINE THOMAS, JERMAINE MILLER, JAMIE POSTPICHAL, RONALD ELLISON, SARAH WATERS, KAMILAH RIDDICK, FELICIA REDDICK, TIARA CROMWELL, LYSHA ENCARNACION, LANI HALE, MELIZZA WEAVER, ALFREDO SANCHEZ, and CLARISSA KELLY, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CRICKET WIRELESS LLC,<br><br>Defendant. | Case No. 3:19-cv-07270-WHA<br><br>**CRICKET WIRELESS LLC'S MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION OF THE CLAIMS OF PLAINTIFFS JERMAINE THOMAS, SARAH WATERS, AND KAMILAH RIDDICK**<br><br>Date: June 18, 2020<br>Time: 8:00 a.m.<br>Courtroom: 12, 19th Floor<br><br>Judge: Hon. William H. Alsup |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

NOTICE OF MOTION ................................................................................................................. 1

RELIEF REQUESTED .................................................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 2

BACKGROUND ............................................................................................................................. 4

      A.     Plaintiffs Agree To Arbitrate Their Disputes With Cricket. .................................. 4

            1.     Jermaine Thomas. .................................................................................... 4

            2.     Sarah Waters and Kamilah Riddick. ....................................................... 6

      B.     AT&T's And Cricket's Arbitration Provisions Provide Consumers With
            Fair Procedures For The Resolution Of Individual Disputes. ............................... 7

      C.     Plaintiffs Sue Notwithstanding Their Arbitration Agreements. ........................... 8

ARGUMENT .................................................................................................................................. 9

I.     PLAINTIFFS' ARBITRATION AGREEMENTS ARE ENFORCEABLE
       UNDER THE FAA. ........................................................................................................ 9

      A.     Plaintiffs Agreed To Arbitrate. ......................................................................... 10

            1.     Jermaine Thomas. .................................................................................. 12

            2.     Sarah Waters and Kamilah Riddick. ..................................................... 13

      B.     The Scope Of Plaintiffs' Arbitration Agreements Covers Their Claims
            Against Cricket. ................................................................................................. 14

      C.     The *McGill* Rule Provides Plaintiffs No Basis For Evading Their
            Obligation To Arbitrate. ..................................................................................... 17

II.    THE CLAIMS OF PLAINTIFFS THOMAS, WATERS, AND RIDDICK
       SHOULD BE STAYED PENDING ARBITRATION. ................................................. 20

CONCLUSION ............................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. AT&T Mobility LLC,*
  524 F. App'x 322 (9th Cir. 2013) ...........................................................15

*Aghaji v. Bank of Am., N.A.,*
  247 Cal. App. 4th 1110 (2016) ...........................................................20

*Allied-Bruce Terminix Cos. v. Dobson,*
  513 U.S. 265 (1995)...........................................................10

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011).........................................................8, 10

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
  475 U.S. 643 (1986).........................................................16

*Barraza v. Cricket Wireless LLC,*
  2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) ...........................................2, 10

*Bell-Sparrow v. SFG*Proschoicebeauty,*
  2019 WL 1201835 (N.D. Cal. Mar. 14, 2019)...................................4, 19

*Blair v. Rent-A-Center, Inc.,*
  928 F.3d 819 (9th Cir. 2019) ...........................................................17

*Blau v. AT&T Mobility,*
  2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ...........................................................13

*Burcham v. Expedia, Inc.,*
  2009 WL 586513 (E.D. Mo. Mar. 6, 2009) ...........................................................12

*Citibank (S.D.), N.A. v. Wilson,*
  160 S.W.3d 810 (Mo. Ct. App. 2005)...........................................12, 13

*Clarke v. Alltran Fin., LP,*
  2018 WL 1036951 (E.D.N.Y. Feb. 22, 2018)...........................................................16

*Clifford v. Quest Software Inc.,*
  38 Cal. App. 5th 745, 754 (Ct. App. 2019)...........................................................17

*Collie v. Wehr Dissolution Corp.,*
  345 F. Supp. 2d 555 (M.D.N.C. 2004) ...........................................................14

*First Intercontinental Bank v. Ahn,*
  798 F.3d 1149 (9th Cir. 2015) ...........................................................11

ii

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991)..................................................................................................21

*In re H & R Block IRS Form 8863 Litig.*,
   2014 WL 3401010 (W.D. Mo. July 11, 2014)......................................................12

*Johnson v. J.P. Morgan Chase Bank, N.A.*,
   2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) .....................................................19

*Kaselitz v. hiSoft Tech. Int'l, Ltd.*,
   2013 WL 622382 (N.D. Cal. Feb. 15, 2013) ........................................................15

*Kilgore v. KeyBank Nat'l Ass'n*,
   718 F.3d 1052 (9th Cir. 2013) .......................................................................17, 18

*Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*,
   137 S. Ct. 1421 (2017)...........................................................................................10

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019)...........................................................................................17

*Major v. McCallister*,
   302 S.W.3d 227 (Mo. Ct. App. 2009).............................................................12, 13

*Makarowski v. AT&T Mobility LLC*,
   2009 WL 1765661 (C.D. Cal. June 18, 2009) ......................................................13

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,
   89 Cal. App. 4th 1042 (2001) ...............................................................................14

*Martin v. Vance*,
   514 S.E.2d 306 (N.C. Ct. App. 1999) ...................................................................14

*McGill v. Citibank, N.A.*,
   393 P.3d 85 (Cal. 2017) .................................................................................. *passim*

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)...............................................................................................17

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)............................................................................................16, 17

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir. 2015) ...............................................................................10

*Norwest Mortg., Inc. v. Superior Court*,
   72 Cal. App. 4th 214 (1999) ..................................................................................20

iii

*Pierce v. Plains Commerce Bank*,
2012 WL 5992730 (W.D. Mo. Nov. 29, 2012)...................................................................13

*Pleasants v. Am. Express Co.*,
2007 WL 2407010 (E.D. Mo. Aug. 17, 2007), *aff'd*, 541 F.3d 853
(8th Cir. 2008).......................................................................................................................13

*Revitch v. DIRECTV, LLC*,
2018 WL 4030550 (N.D. Cal. Aug. 23, 2018), *appeal pending*, No. 18-16823
(9th Cir.)...............................................................................................................................16

*Roberts v. AT&T Mobility LLC*,
2018 WL 1317346 (N.D. Cal. Mar. 14, 2018)....................................................................20

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ..............................................................................................15

*Shannon-Vail Five Inc. v. Bunch*,
270 F.3d 1207 (9th Cir. 2001) ............................................................................................11

*Sponheim v. Citibank, N.A.*,
2019 WL 2498938 (C.D. Cal. June 10, 2019) ................................................................4, 19

*Sullivan v. Oracle Corp.*,
254 P.3d 237 (Cal. 2011) .....................................................................................................20

*United States v. Clayton*,
108 F.3d 1114 (9th Cir. 1997) ............................................................................................10

*Wright v. Sirius XM Radio Inc.*,
2017 WL 4676580 (C.D. Cal. June 1, 2017) ..................................................................4, 19

**Statutes**

9 U.S.C. § 2.......................................................................................................................9, 10

9 U.S.C. § 3...........................................................................................................................20

9 U.S.C. § 4.............................................................................................................................2

**Other Authorities**

Restatement (Second) of Conflicts of Laws .........................................................................11

Webster's Third New International Dictionary (2002).........................................................15

iv

1

## NOTICE OF MOTION

Please take notice that on June 18, 2020 at 8:00 a.m., before the Honorable William H. Alsup, Defendant Cricket Wireless LLC ("Cricket" or "Cricket Wireless") will and hereby does move the Court for an order: (i) compelling plaintiffs Jermaine Thomas, Sarah Waters, and Kamilah Riddick to pursue his or her claims in arbitration on an individual basis; and (ii) staying the claims of those plaintiffs pending the outcome of arbitration.

The motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declarations of Paula Berg, David Dennis, Nicole E. Garcia, Daniel E. Jones, Dan Northington, Archis A. Parasharami, Paula Phillips, and Lara Schnieber, any reply memorandum that Cricket Wireless may file, any arguments of counsel, and any other matter that the Court deems appropriate.

## RELIEF REQUESTED

An order: (i) compelling plaintiffs Jermaine Thomas, Sarah Waters, and Kamilah Riddick to pursue his or her claims in arbitration on an individual basis; and (ii) staying the claims of those plaintiffs pending the outcome of arbitration.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether plaintiffs Jermaine Thomas, Sarah Waters, and Kamilah Riddick entered into arbitration agreements requiring them to resolve their claims in this case by individual arbitration.

2.      Whether the Federal Arbitration Act requires enforcement of these plaintiffs' arbitration agreements.

## MEMORANDUM OF POINTS AND AUTHORITIES

As the Court knows, this is the third case filed by the Waddell and Bell firms representing plaintiffs here challenging the marketing and sale of 4G/LTE phones by the legacy Cricket Wireless ("Cricket") in the 2012-2014 time period prior to Cricket's acquisition by AT&T Inc.  In the first of those cases, Cricket moved this Court to compel arbitration of the two plaintiffs' claims on the basis of the arbitration provision located in the "Quick Start Guide" accompanying their phone purchases.  *Barraza v. Cricket Wireless LLC*, 2015 WL 6689396, at *1-3 (N.D. Cal. Nov. 3, 2015).  This Court concluded that the issue of contract formation could not be resolved as a matter of law and required a summary trial under Section 4 of the Federal Arbitration Act ("FAA") on whether a reasonable consumer in the position of the plaintiffs in that case had "inquiry notice" of the fact that "certain terms and conditions applied to their service with Cricket, which would, in turn have led them to consult the documents contained in the product box or to Cricket's website." *Id.* at *5.   As the Court is aware, Section 4 of the FAA calls for a summary jury trial if either party so elects, and accordingly the parties in *Barraza* were preparing for a jury trial on the question of inquiry notice when the case settled.

Rather than relitigate *Barraza* and put the parties and the Court to the burden of a jury trial in this case, Cricket limits this motion to three plaintiffs whose circumstances are readily distinguishable from the ones at issue in *Barraza*.

First, plaintiff Jermaine Thomas received two text messages from Cricket on May 22, 2014—while he was still a Cricket customer—each of which alerted him to the fact that Cricket had updated its terms of service (after being acquired by AT&T) and that the updated terms included an arbitration clause:

> See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at http://mycrk.it/1kmlTEn.

Decl. of Nicole E. Garcia ¶ 16.  By continuing to use Cricket service after receiving these text messages expressly alerting him to Cricket's updated terms and the arbitration clause in particular, Thomas agreed to those terms—including the arbitration provision modeled after AT&T's—as a matter of Missouri law (the state where he resided at the time, as well as at the

time of his phone purchases).

Second, some plaintiffs have become customers of AT&T after AT&T acquired Cricket. That is the case for at least two plaintiffs, Sarah Waters and Kamilah Riddick.  When those plaintiffs signed up for wireless service with AT&T Mobility (long after AT&T had acquired Cricket), they signed their name directly under an acknowledgement that "I have reviewed and agree to the rates, terms, and conditions for the wireless products and services described in the Wireless Customer Agreement (including limitation of liability and *arbitration provisions*) and the Customer Service Summary, both of which were made available to me prior to my signing." Decl. of Paula Berg Exs. 2, 9, 13 (emphasis added).  That act leaves no doubt that these plaintiffs agreed to the arbitration provision in their Wireless Customer Agreements with AT&T Mobility. This case is solely about legacy Cricket's practices before its acquisition by AT&T; but these plaintiffs agreed to arbitrate their claims not only against AT&T Mobility, but also against any of AT&T Mobility's "affiliates" (Berg Decl. Ex. 17 § 2.2(1))—including Cricket.[1]

The FAA requires enforcement of these plaintiffs' arbitration agreements.  The complaint indicates that plaintiffs intend to resist enforcement of their arbitration agreements by invoking *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), in which the California Supreme Court held that arbitration agreements that prevent consumers from pursuing so-called public injunctions are invalid under California law.  First Am. Compl. (FAC) ¶¶ 241-247.  But for several reasons detailed below, *McGill* simply does not apply here as a matter of state law.  Most fundamentally, the complaint is focused on alleged conduct by legacy Cricket that plaintiffs acknowledge ceased after AT&T acquired Cricket in 2014.  Forward-looking injunctive relief is inherently incompatible with these allegations based on long-ceased conduct.  And while plaintiffs tack on allegations that AT&T—not Cricket—has labelled some phones with a "5GE" logo in a strained

---

[1]    Of the remaining ten plaintiffs, Cricket has not been able to locate the following named plaintiffs—Lysha Encarnacion, Lani Hale, Clarissa Kelly, and Felicia Reddick—in its records. Cricket has asked plaintiffs' counsel for identifying information and received incomplete information for these plaintiffs; plaintiffs' counsel also failed to inform us whether they could identify wireless phone numbers for these plaintiffs reflecting that they were in fact legacy Cricket customers.  Decl. of Archis A. Parasharami Ex. 1.  If in fact any of the plaintiffs cannot show that they were customers of Cricket during the proposed class period, that would raise meaningful concerns about the complaint's allegations to that effect.

3

effort to invoke *McGill*, those allegations are disconnected from the claims and parties here.  No plaintiff alleges purchasing a phone labeled 5GE from AT&T, or that **Cricket** has marketed and sold any such phones.   Moreover, numerous courts have held that conclusory allegations "[m]erely declaring that a claim seeks a public injunction . . . [are] not sufficient" to trigger the *McGill* rule.  *Sponheim v. Citibank, N.A.*, 2019 WL 2498938, at *4 (C.D. Cal. June 10, 2019); *see also, e.g.*, *Bell-Sparrow v. SFG*Proschoicebeauty*, 2019 WL 1201835, at *5 n.9 (N.D. Cal. Mar. 14, 2019); *Wright v. Sirius XM Radio Inc.*, 2017 WL 4676580, at *9-10 (C.D. Cal. June 1, 2017).

## BACKGROUND

### A.      Plaintiffs Agree To Arbitrate Their Disputes With Cricket.

Each of the three plaintiffs who are the subjects of  this motion—Jermaine Thomas, Sarah Waters, and Kamilah Riddick—agreed to arbitrate his or her claims in this case.

#### 1.      *Jermaine Thomas.*

The complaint alleges that Thomas purchased a Samsung Galaxy S3 cell phone—which is a 4G/LTE capable phone—and a Cricket wireless service plan at a Cricket authorized retailer in Kansas City, Missouri in late 2012.  FAC ¶¶ 56-59.  His cell phone was activated for use on Cricket's network the same day.  *Id.* ¶ 60.  The complaint further alleges that Thomas purchased a "ZTE Grand" from the same store in 2013 (*id.* ¶ 61), but Cricket did not offer any phone called a "ZTE Grand" in 2013, or in 2012 for that matter.  *See* Decl. of David Dennis ¶¶ 5-6.  It was not until August 2014—after Cricket was acquired by AT&T—that Cricket began offering a 4G/LTE capable device with a similar name: the "ZTE Grand X."  *Id.* ¶ 7.

When Thomas allegedly purchased his Samsung Galaxy, the device was sold to Cricket customers encased in a box, and the outside of the box referred customers to Cricket's terms and conditions of service.   Garcia Decl. ¶¶ 9-11 & Exs. 3-4.   The full terms of service, which included an arbitration provision, were printed in a Quick Start Guide enclosed inside the phone box.  *Id.* ¶ 12 & Ex. 5. The arbitration provision allowed customers to opt out of its terms: "You may reject this arbitration clause by sending us a rejection notice ('Rejection Notice') within sixty (60) days after the date of your phone activation or our disclosure of this section to you

4

('Opt-Out Deadline') by going to www.mycricketdisputeresolution.com." *Id.* Ex. 5 § 20(b).

According to Cricket's records, Thomas did not opt out. Decl. of Paula Phillips ¶ 7.

Most relevant for purposes of this motion, after AT&T acquired Cricket, Cricket updated its terms of service. Cricket's records show that on May 22, 2014, Thomas received two text messages alerting him to this change and specifically referencing the arbitration provision:

> See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at http://mycrk.it/1kmlTEn.

Garcia Decl. ¶ 16; *see also* FAC ¶ 242 (acknowledging that some legacy Cricket customers "received updated contractual terms and conditions" following AT&T's acquisition of Cricket). The hyperlink pointed to the then-current version of the Cricket Terms, which were also available at www.cricketwireless.com/terms. Garcia Decl. ¶ 5 & Ex. 2.

The third section of the updated Cricket terms, entitled "Acceptance of the Ts&Cs," provides that, among other things, using, upgrading, or paying for Cricket service all amount to acceptance of the terms:

> **Your Agreement with Cricket begins when you accept the Ts&Cs by: (a) giving us a written or electronic signature or telling us orally that you accept, or by otherwise accepting through any other printed, oral, or electronic means; (b) paying for Service; (c) activating the Service; (d) using or attempting to use the Service in any way; (e) upgrading or modifying the Service; or (f) opening any Device packaging, or starting any application, program or software that says you are accepting. If you do not want to accept the Terms and Conditions, do not take any of these actions.**

Decl. of Dan Northington Ex. 1. Thomas continued to accept and pay for his Cricket service after receiving the two text messages, thus accepting the updated Cricket Terms. Garcia Decl. ¶ 17. Thomas remained a Cricket customer until 2015. *Id.* ¶ 18.

The updated version of the Cricket terms also contained an arbitration provision that parallels the arbitration provision long used by AT&T:

> Cricket and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

Northington Decl. Ex. 1.

### 2. *Sarah Waters and Kamilah Riddick.*

Plaintiffs Sarah Waters and Kamilah Riddick have each agreed to the terms of AT&T's Wireless Customer Agreement as a condition of receiving wireless services from AT&T Mobility.

On December 18, 2018, Waters purchased a new line of service and entered into a wireless service contract at an AT&T retail store. Berg Decl. ¶¶ 13-17 & Exs. 9-11. During that transaction, Waters was presented with an electronic signature-capture device that displayed the AT&T Wireless Customer Agreement, enabling her to read through the entire document electronically or print it by pressing an on-screen "Print" button. Decl. of Lara Schnieber ¶¶ 3-5 & Exs. 1-2. After she pressed the on-screen "Accept" button, Waters signed her name under the following acknowledgment: "I have reviewed and agree to the rates, terms, and conditions for the wireless products and service described in the Wireless Customer Agreement (including limitation of liability and arbitration provisions) and the Customer Service Summary, both of which were made available to me prior to my signing." Berg Decl. Ex. 9. On May 7, 2019, Waters again agreed to AT&T's contract terms under a materially identical process, including again signing her name under an identical acknowledgment, when she opened another line of service at an AT&T retail store. Berg Decl. ¶¶ 18-22 & Exs. 12-15. In November 2019, Waters's account was closed for non-payment of a balance of $1,070.02. *Id.* ¶ 23 & Ex. 16.

On February 10, 2020—one day before joining this lawsuit as a plaintiff in the amended complaint—Kamilah Riddick purchased two lines of service at an AT&T retail store and agreed to AT&T's Wireless Customer Agreement for each line under the same process described in the previous paragraph. Berg Decl. ¶¶ 6-10 & Exs. 1-5; Schnieber Decl. ¶¶ 3-5 & Exs. 1-2.

At all relevant times, including in December 2018, May 2019, and February 2020, the second paragraph of AT&T's Wireless Customer Agreement highlighted that it contains an arbitration provision. Specifically, that paragraph states that "**THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS**." Berg Decl. Exs. 17-

6

18.  The arbitration provision itself states that "AT&T and you agree to arbitrate **all disputes and claims** between us," and "includes, but is not limited to," "claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising)." *E.g.*, *id.* Ex. 17 § 2.2(1).  The provision also specifies that "[r]eferences to 'AT&T,' 'you,' and 'us' include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services of Devices under this or prior Agreements between us."  *Id.*  Finally, the provision reminds the customer, "**You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.**"  *Id.*

**B.     AT&T's And Cricket's Arbitration Provisions Provide Consumers With Fair Procedures For The Resolution Of Individual Disputes.**

AT&T's arbitration provision—and Cricket's updated provision, which is modeled after AT&T's—include several features that ensure that customers have a simple and efficient means of resolving any disputes that may arise:

- **Cost-free arbitration:**  For claims up to $75,000, AT&T or Cricket "will pay all [American Arbitration Association ("AAA")] filing, administration, and arbitrator fees" unless the arbitrator determines the customer's claim "is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b))."

- **$10,000 minimum award:**  If the arbitrator issues an award in favor of a customer that is greater than AT&T or Cricket's "last written settlement offer made before an arbitrator was selected," then AT&T or Cricket will pay the customer $10,000 rather than any smaller arbitral award.

- **Double attorneys' fees:**  If the arbitrator awards the customer more than AT&T or Cricket's "last written settlement offer made before an arbitrator was selected," then the company "will * * * pay [the customer's] attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses (including expert witness fees and costs), that [the] attorney reasonably accrues for investigating, preparing, and pursuing [the] claim in arbitration."[2]

- **Small claims court option:**  Either party may bring a claim in small claims court as

---

[2]     The provision for double attorneys' fees "supplements any right to attorneys' fees and expenses [the customer] may have under applicable law."  *E.g.*, Berg Decl. Ex. 17 § 2.2(5). Thus, even if an arbitrator were to award a customer less than the company's last settlement offer, the customer would be entitled to an attorneys' fees award to the same extent as if his or her individual claim had been brought in court.

an alternative to arbitration.

- **Flexible consumer procedures:**  Arbitration will be conducted under the AAA's Consumer Arbitration Rules, which the AAA designed with consumers in mind.[3]

- **Choice of in-person, telephonic, or no hearing:**  For claims of $10,000 or less, the customer has the exclusive right to choose whether the arbitrator will conduct an in-person hearing, a telephonic hearing, or a "desk" arbitration in which "the arbitration will be conducted solely on the basis of documents submitted to the arbitrator."

- **Conveniently located hearing:**  Arbitration will take place "in the county (or parish) of [the customer's] billing address."

- **AT&T or Cricket disclaims right to seek attorneys' fees:**  "Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award."

- **No confidentiality requirement:**  Either party may publicly disclose the arbitration and its result.

- **Full individual remedies available:**  The arbitrator can award any form of relief on an individualized basis (including statutory and punitive damages, attorneys' fees, and injunctions that would affect the claimant alone) that a court could award.

- **Right to a written decision:**  "Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based."

*E.g.*, Berg Decl. Ex. 17 §§ 2.2(3)–(6) (AT&T); Northington Decl. Ex. 1 at 9-10 (Cricket).[4]  The arbitration provisions at issue in this motion are materially identical to the one considered by the Supreme Court in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 337, 351-52 (2011).

### C.   Plaintiffs Sue Notwithstanding Their Arbitration Agreements.

This is the third in a series of putative class actions filed by plaintiffs' counsel asserting

---

[3]     The arbitration provision references the AAA's Commercial Arbitration Rules and Supplementary Procedures for Consumer-Related Disputes.  *E.g.*, Berg Decl. Ex. 17 § 2.2(3).  But in September 2014, the AAA replaced those rules for administering consumer disputes with its new Consumer Arbitration Rules.  Decl. of Daniel Jones Ex. 1, at 1.  The AAA applies the Consumer Arbitration Rules "whenever" an agreement has "provided for arbitration by the American Arbitration Association ('AAA'), and" the agreement has "specifie[d] that the Supplementary Procedures for Consumer-Related Disputes shall apply."  *Id.* Ex. 1 at 9.

[4]     The arbitration provision in the updated version of Cricket's Terms at the time Thomas received the text messages in May 2014 is substantively identical to Cricket's current arbitration provision.  *Compare* Northington Decl. Ex. 1 at 9-10 (May 2014) *with* Garcia Decl. Ex. 2 (current).  In all events, as explained on its website, Cricket "will abide by the terms of its current arbitration provision in all instances."  Garcia Decl. Ex. 1.

that legacy Cricket deceptively marketed and sold 4G/LTE mobile phones in markets without 4G/LTE service from May 2012-October 2014.  *See Barraza v. Cricket Wireless, LLC*, 15-cv-2471-WHA (N.D. Cal.); *Thomas v. Cricket Wireless, LLC*, No. 16-cv-1065 (W.D. Mo.) (*Thomas I*).

Thomas and Postpichal, the plaintiffs in *Thomas I*, filed this third action on November 4, 2019.  *See* Dkt. No. 1.  Plaintiffs filed an amended complaint on February 11, 2020, dropping one plaintiff but adding ten new plaintiffs—bringing the total number of plaintiffs to thirteen. FAC, Dkt. No. 16.

The thrust of the plaintiffs' claims (which mirror the allegations in *Barraza* and *Thomas I*) is that plaintiffs bought Cricket Wireless phones based on allegedly misleading advertisements concerning Cricket Wireless's 4G/LTE service, and that Cricket Wireless did not provide the 4G/LTE service that it had allegedly advertised.  *See, e.g.*, FAC ¶¶ 1, 4-5.  As in *Barraza*, plaintiffs seek to represent a nationwide class and various state-wide classes of persons who purchased 4G/LTE-capable phones from Cricket between May 1, 2012 and October 1, 2014.  *See id.* ¶¶ 220-233.

On behalf of themselves and the putative classes, plaintiffs assert state statutory and common-law claims for false advertising, unfair competition, and negligence.  *See* FAC ¶¶ 255-476.  Plaintiffs also assert a claim under RICO.  *Id.* ¶¶ 477-542.  Although the complaint expressly provides that the putative class period ends in October 2014 and acknowledges that "all [Cricket] 4G/LTE-capable phones purchased on or after May 19, 2014 were a part of AT&T's 4G network and, thus, not a part of this class action" (*id.* ¶ 220 n.29), plaintiffs incongruously seek forward-looking injunctive relief in addition to damages (*see id.* ¶¶ 543-546). That request appears to be a strained attempt to invoke the *McGill* rule, which should be rejected for the reasons discussed below (at 17-20).

## ARGUMENT

## I.   PLAINTIFFS' ARBITRATION AGREEMENTS ARE ENFORCEABLE UNDER THE FAA.

Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable, save

9

upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 563 U.S. at 344.  And this "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary." *Id.* at 346 (quotation marks omitted).

The FAA applies to any "written" agreement to arbitrate that appears in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2.  Here, both criteria are met: (i) Plaintiffs' arbitration agreements are in writing (*see* pages 4-7, *supra*); and (ii) contracts for wireless service involve commerce because "[t]elephones are instrumentalities of interstate commerce." *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997); *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995) (FAA "signals an intent to exercise Congress' commerce power to the full.").  Indeed, both AT&T's and Cricket's arbitration provisions specify that the contract "evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision." *E.g.*, Berg Decl. Ex. 17 (AT&T); Northington Decl. Ex. 1 (Cricket).

The three plaintiffs at issue in this motion agreed to arbitrate, their claims fall within the scope of their arbitration agreements, and they have no valid ground to resist enforcement of their agreements.

### A.       Plaintiffs Agreed To Arbitrate.

As this Court has previously acknowledged, the question of whether an arbitration agreement was formed is governed by "state-law principles that govern the formation of contracts." *Barraza*, 2015 WL 6689396, at *3 (quoting *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2015)).  As a matter of federal law, courts making this determination must "place arbitration agreements on equal footing with all other contracts," both in terms of "the 'enforce[ment]' of arbitration agreements" and in terms of "their initial 'valid[ity]'—that is, what it takes to enter into them." *Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*, 137 S. Ct. 1421, 1424, 1428 (2017) (quotation marks omitted).

"To determine the law governing a contract, California courts look to the relevant statute and, for further guidance, to the choice-of-law principles outlined in the Restatement." *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001) (citation omitted); *see also First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1154 (9th Cir. 2015) (applying the Restatement (Second) of Conflicts of Laws).

Here, the question of contract formation for each plaintiff is governed by the law of the states of their respective residence at the time the contracts containing the arbitrations agreements were formed. Section 188(2) of the Restatement (Second) of Conflicts of Laws identifies multiple factors relevant to determining "the law applicable to an issue" involving the validity of a contract, including "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." Apart from Cricket's and AT&T Mobility's place of incorporation and principal place of business, the remaining factors all point towards the state where each plaintiff entered into the contract and resided and received wireless service under the contract.[5]

Accordingly, the formation of Thomas's arbitration agreement is governed by the law of Missouri. Thomas was a resident of Kansas City, Missouri from "1987 until September 2014." *Thomas I* Dkt. No. 1 ¶¶ 2-3. That time period includes when he received the text messages informing him of Cricket's updated terms and when he made his alleged purchases of 4G/LTE phones from a Cricket store in that state. The formation of Sarah Waters's arbitration agreement is governed by the law of California, where she resided and received wireless service at the time of her transactions with AT&T Mobility in December 2018 and May 2019. Berg Decl. Exs. 8-

---

[5]     Because the question here is whether a contract was formed, Cricket is not relying on the choice of law provisions in the updated Cricket Terms and the AT&T Wireless Customer Agreement. But the same law would apply regardless. The updated Cricket Terms provide that "[t]he law of the state in which our records indicate your telephone number is located shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law." Northington Decl. Ex. 1 at 11. And AT&T's Wireless Customer Agreement provides that "[t]he law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law." *E.g.*, Berg Decl. Ex. 17 § 10.3.2.

15.  And the formation of Kamilah Riddick's arbitration agreement is governed by the law of North Carolina, where she resided and received wireless service at the time of her February 2020 transaction with AT&T Mobility (and continues to do so).  *Id.* Exs. 1-7; FAC ¶ 33.

### 1. Jermaine Thomas.

In May 2014, Thomas received two text messages clearly and directly alerting him to "Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions"—and linking to those terms.  *See* pages 2, 5, *supra*.  When Thomas continued to use and pay for Cricket's service after receiving two text messages alerting him of and hyperlinking to the new version of the Cricket Terms, he agreed to those terms, including the new arbitration provision. *See* Northington Decl. Ex. 1 ("[Y]ou accept these Ts&Cs by . . . paying for Service . . . [or] using or attempting to use the Service in any way . . . . If you do not want to accept these Ts & Cs, do not take any of these actions.").

Under Missouri law, "[a]cceptance of an offer need not be made by spoken or written word. . . .  An offer may, instead, be accepted by the offeree's conduct or failure to act." *Citibank (S.D.), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005) (citation omitted) (holding that credit card customer accepted terms of revised agreement by continuing to use her card after receiving new terms in the mail).  As one federal court in Missouri has observed in the course of enforcing an arbitration provision, "assent can be shown . . . through the parties' conduct."  *In re H & R Block IRS Form 8863 Litig.*, 2014 WL 3401010, at *2 (W.D. Mo. July 11, 2014).  Indeed, Missouri recognizes as "standard contract doctrine" the principle that "when a benefit is offered subject to stated conditions, and the offeree . . . take[s] the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms."  *Major v. McCallister*, 302 S.W.3d 227, 230-31 (Mo. Ct. App. 2009) (citation omitted); *see also Burcham v. Expedia, Inc.*, 2009 WL 586513, at *2-4 (E.D. Mo. Mar. 6, 2009) ("A customer on notice of contract terms available on the internet is bound by those terms. . . .  That [Plaintiff] either didn't read the agreement or didn't see it may be unfortunate for him, but it does not change the outcome.").  Under *Major*, either "actual *or constructive* knowledge" is enough to constitute

12

reasonable notice.  302 S.W.3d at 230 (emphasis added).

Missouri courts routinely enforce contracts in analogous circumstances—i.e., continued use of a product or service after receipt of clear notice of the contractual terms and conditions governing that use.  For example, in *Wilson*, the Missouri Court of Appeals held that a credit-card customer bound herself to a revised credit agreement by continuing to use her card after she received the amended terms in the mail.  160 S.W.3d at 813; *see also Pierce v. Plains Commerce Bank*, 2012 WL 5992730 (W.D. Mo. Nov. 29, 2012) (credit card customer accepted arbitration agreement by using his card after the terms were mailed to him); *Pleasants v. Am. Express Co.*, 2007 WL 2407010 (E.D. Mo. Aug. 17, 2007) (same, with prepaid debit card), *aff'd*, 541 F.3d 853 (8th Cir. 2008).

If anything, a concise text message—explicitly referencing the arbitration agreement and linking to Cricket's Terms—provides *even stronger* notice than a sheet of terms enclosed in a credit card mailing.  The text message is virtually inescapable—showing up on the customer's phone—and is short enough to be read and comprehended at a glance.  Moreover, the terms themselves are only a tap away.  Thomas was thus put on notice of Cricket's terms—and the arbitration provision specifically—by the May 22, 2014 text messages he received from Cricket.  By continuing to use and pay for his service, he accepted and agreed to those terms.

### 2.    Sarah Waters and Kamilah Riddick.

In December 2018 and May 2019, Waters signed at a retail store to accept the terms of AT&T's Wireless Customer Agreement, including its provision requiring arbitration of "**all disputes and claims** between us"—with "us" defined to include AT&T Mobility's "affiliates"— after being presented with the full Agreement.  Riddick did the same in February 2020.  *See* pages 4-7, *supra*; Berg Decl. Exs. 17-18 § 2.2(1).

By signing to accept the terms of AT&T's Wireless Customer Agreement, Waters and Riddick formed a valid contract.  It is axiomatic that signing demonstrates assent to a contract, including under the laws of California (Waters) and North Carolina (Riddick).  *See, e.g.*, *Blau v. AT&T Mobility*, 2012 WL 10546, at *3-4 (N.D. Cal. Jan. 3, 2012) (Breyer, J.) (compelling arbitration on the basis of an electronic signature an at AT&T retail store); *Makarowski v. AT&T*

13

*Mobility LLC*, 2009 WL 1765661, at *1 (C.D. Cal. June 18, 2009) (same); *see also Collie v. Wehr Dissolution Corp.*, 345 F. Supp. 2d 555, 559 (M.D.N.C. 2004) (holding, under North Carolina law, that "plaintiff's signature was 'a clear and unambiguous certification of her willingness to submit disputes" to arbitration) (quoting *Martin v. Vance*, 514 S.E.2d 306, 309 (N.C. Ct. App. 1999)); *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1050 (2001) ("ordinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms").

**B.    The Scope Of Plaintiffs' Arbitration Agreements Covers Their Claims Against Cricket.**

Cricket's and AT&T's arbitration provisions cover the claims that plaintiffs assert here. Both the Cricket updated provision to which Thomas agreed and the AT&T provision to which Waters and Riddick agreed state that that the provision "is intended to be broadly interpreted" and requires arbitration of "***all*** disputes and claims," with no exceptions.  *E.g.*, Berg Decl. Ex. 17 § 2.2(1) (emphasis added); Northington Decl. Ex. 1 at 9.  Both provisions also explicitly require arbitration of "claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising)" (Berg Decl. Ex. 17 § 2.2(1); Northington Decl. Ex. 1 at 9)— which includes claims based on plaintiffs' purchases of phones and service from legacy Cricket.

The fact that plaintiffs Waters and Riddick entered into wireless service agreements with AT&T Mobility does not relieve them of their obligation to arbitrate.  The arbitration provision in AT&T's Wireless Customer Agreement further makes clear that references to "AT&T" and "us" in the arbitration agreement include AT&T Mobility's "subsidiaries, ***affiliates***, agents, employees, predecessors in interest, successors, and assigns."  *Id.* (emphasis added).

The plain language of AT&T's broad arbitration provision therefore encompasses Waters's and Riddick's claims against Cricket.  Cricket is an "affiliate[]" of AT&T Mobility because Cricket and AT&T Mobility are sibling corporations that are both owned by AT&T Inc.  *See* Dkt. No. 23.  As the Ninth Circuit has held, "[t]he term 'affiliate' carries its own, independent legal significance," and "the plain and ordinary meaning of 'affiliate' is "'a company effectively controlled by another or ***associated with others under common ownership***

14

or control.'"  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (quoting Webster's Third New International Dictionary (2002)) (emphasis added).

There is nothing unusual about enforcing requiring arbitration of claims against related corporate entities based on the plain language of an arbitration agreement.  For example, in *Adams v. AT&T Mobility LLC*, 524 F. App'x 322 (9th Cir. 2013), the issue was whether AT&T Mobility could compel arbitration under an agreement between the plaintiff and her former wireless carrier Unicel that covered both Unicel and "various additional parties, such as assignees, parent companies, successors, subsidiaries, and affiliates."  *Id.* at 324.  The *Adams* court described the issue as whether the plaintiff's "dispute with ATTM is within the scope of the arbitration clause in her wireless contract."  *Id.*; *see also id.* (applying the rule that "ambiguities as to the scope of the arbitration clause must be resolved in favor of arbitration") (emphasis added; quotation marks omitted).  The Ninth Circuit held that AT&T Mobility could enforce the agreement under its plain language because it was a "parent compan[y]" of New Cingular, the company that acquired plaintiffs' service contracts, which in turn was a "successor[]" to Unicel.  *Adams*, 524 F. App'x at 324.  As the court explained, the arbitration provision "include[s] various additional parties, such as assignees, parent companies, successors, subsidiaries, and affiliates."  *Id.*  The same is true here.

Similarly, in *Kaselitz v. hiSoft Tech. Int'l, Ltd.*, 2013 WL 622382 (N.D. Cal. Feb. 15, 2013), defendant hiSoft Technology sought to compel arbitration under an arbitration provision in agreements between plaintiffs and hiSoft Envisage and "its subsidiaries, affiliates, successors or assigns."  Plaintiffs argued that hiSoft Technology could not enforce the arbitration provision because it was "not a party."  *Id.* at *6.  Applying California law, the court disagreed, noting that the agreement covered "hiSoft Envisage, its subsidiaries, affiliates, successors or assigns."  *Id*.  The court reasoned that hiSoft Technology, as a parent of hiSoft Envisage, was an "affiliate[]," and therefore entitled to enforce the arbitration provision.  *Id.* at *6-7.

In yet another case, the issue was whether a collections company hired by Citibank could compel arbitration under the plaintiff's cardholder agreement with Citibank, which covered claims between plaintiff and not only Citibank, but also "anyone connected with" Citibank,

15

including an "agent, representative, affiliated company, predecessor or successor." *Clarke v. Alltran Fin., LP*, 2018 WL 1036951, at *1-2 (E.D.N.Y. Feb. 22, 2018).  The court held that the collections company could enforce the arbitration agreement "under the plain language of the card agreement," applying "basic principles of contract interpretation." *Id.* at *4 (emphasis added); *see also id.* at *6 (collecting other cases allowing third parties to compel arbitration under the same or similar card agreement).[6]

Moreover, the complaint recognizes that AT&T completed its acquisition of Cricket in 2014 (FAC ¶¶ 52-53)—*i.e.*, long before Waters and Riddick accepted the AT&T Mobility terms in 2018, 2019 or 2020.  Accordingly, this case is readily distinguishable from *Revitch v. DIRECTV, LLC*, 2018 WL 4030550 (N.D. Cal. Aug. 23, 2018), *appeal pending*, No. 18-16823 (9th Cir.), in which Judge Spero acknowledged that two companies commonly owned by AT&T Inc. qualify as "affiliates," but concluded that AT&T Mobility's arbitration provision did not apply to "*future* affiliates"—*i.e.*, "an entity that became affiliated with AT&T Mobility . . . after [the plaintiff] entered into the original contract." *Id.* at *10-11 (emphasis added).  Here, Cricket was already an existing affiliate of AT&T Mobility at the time that Waters and Riddick agreed to arbitrate their claims against AT&T Mobility's "affiliates."

Finally, even if there were uncertainty as to whether these three plaintiffs' claims fall within the scope of their arbitration agreements—and there is none—"as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also*, *e.g.*, *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.") (quotation marks omitted).  Just last year, the Supreme Court made clear that the "FAA provides the default rule for resolving certain

---

[6]     The *Clarke* court also held that the defendant collections company could compel arbitration "as Citibank's agent" under principles governing the enforcement of contracts by non-signatories, but only as an "[a]lternative[]" to its holding based on "the plain language of the card agreement" itself.  *Id.* at *6.

16

ambiguities in arbitration agreements," including the rule "that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration," and that rule preempts any state law to the contrary—including the state-law canon "that ambiguity in a contract should be construed against the drafter." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417-19 (2019) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Moses H. Cone*, 460 U.S. at 24-25)).

## C.   The *McGill* Rule Provides Plaintiffs No Basis For Evading Their Obligation To Arbitrate.

Plaintiffs contend that the arbitration provisions here are unenforceable under *McGill* because they preclude the arbitrator from awarding public injunctive relief under California's Consumers Legal Remedies Act, Unfair Competition Law, and False Advertising Law.  FAC ¶ 245.  But that argument fails as a matter of California law, which is clear that merely asserting a claim under those statutes and a request for injunctive relief does not amount to a request for *public* injunctive relief that triggers the *McGill* rule.

As the California Supreme Court put it, the "first" step in the inquiry is whether the "complaint does, in fact, appear to seek the type of public injunctive relief" that triggers the rule. *McGill*, 393 P.3d at 90.  The Ninth Circuit's decision in *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 831 n.3 (9th Cir. 2019), followed the same approach.  And even before *McGill*, the *en banc* Ninth Circuit held that it was unnecessary to apply a prior California rule prohibiting arbitration of public injunction claims when the plaintiffs did not seek public injunctive relief in the first place.  *Kilgore v. KeyBank Nat'l Ass'n*, 718 F.3d 1052, 1060 (9th Cir. 2013).

As *McGill* itself states, "[r]elief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff—*or to a group of individuals similarly situated to the plaintiff*—does *not* constitute public injunctive relief."  *Id.* at 90 (emphasis added); *accord Clifford v. Quest Software Inc.*, 38 Cal. App. 5th 745, 754 (Ct. App. 2019).  Instead, public injunctive relief is "relief that 'by and large' *benefits* the general public."  *McGill*, 393 P.3d at 89 (emphasis added).  To qualify as a "public injunction," the relief sought must have "the primary purpose and effect of prohibiting unlawful acts that *threaten future injury to the general*

*public*." *Id.* at 86 (emphasis added; quotation marks omitted).

Here, plaintiffs' claims are inherently incompatible with a request for injunctive relief of *any* kind—much less of a kind that qualifies as for the benefit of the general public. Their claims focus on alleged practices regarding the marketing and sale of 4G/LTE devices and service by legacy Cricket between 2012 and 2014—prior to AT&T's acquisition of Cricket. As plaintiffs acknowledge, the challenged practices have long-since ceased: "all 4G/LTE-capable phones purchased on or after May 19, 2014, were a part of AT&T's 4G network and, thus, not a part of this class action." FAC ¶ 220 n.29. All of the plaintiffs' claims against Cricket and all of the factual allegations underpinning those claims are likewise based on 4G/LTE purchases, service, coverage and marketing prior to the AT&T acquisition. *Id.* ¶¶ 54-219. This Court's order on the motion to dismiss reinforces the point; the Court concluded there was personal jurisdiction because "Cricket maintained its principal place of business in California for the entire period during which the alleged wrongful conduct occurred" and "at the time of the underlying events giving rise to this action"—*i.e.*, "prior to the merger" with AT&T. Dkt. No. 35, at 2, 7.

As the Ninth Circuit put it in *Kilgore*, plaintiffs cannot be seeking a public injunction "where Defendants' alleged statutory violations have, by Plaintiffs' own admission, already ceased." 718 F.3d at 1061; *see id.* (defendant was no longer in the "private school loan business" and therefore relief sought with respect to the defendant's practices in that area "for all practical purposes, relates only to past harms suffered by the members of the limited putative class").

In a transparent effort to find some hook for asserting a claim for injunctive relief, plaintiffs allege for the first time in their cause of action under the CLRA that "AT&T . . . began labeling its phones with a '5GE' logo" prior to the availability of 5G service. FAC ¶ 267. But that allegation is entirely disconnected from the parties and claims in this case, which revolve entirely around legacy Cricket. No plaintiff alleges purchasing a 5G capable or 5GE-labeled phone, and plaintiffs do not allege that *Cricket Wireless*, the sole defendant in this case, has marketed or sold 5G-capable devices to anyone—much less to them—or that Cricket phones are labeled "with a '5GE' logo."

Accordingly, plaintiffs' conclusory assertion that "Cricket's conduct is ongoing and is likely to continue and recur" (FAC ¶ 276) is belied by their factual allegations, and their general request for an "injunction to permanently enjoin Cricket from falsely advertising its wireless capabilities" (*id.* ¶ 545) does not trigger *McGill*, because they do not actually challenge any ongoing advertising by Cricket.  As Judge Gonzalez Rogers put it, "[m]erely requesting relief which would generally enjoin a defendant from wrongdoing does not elevate requests for injunctive relief to requests for *public* injunctive relief." *Bell-Sparrow*, 2019 WL 1201835, at *5 n.9; *see also Johnson v. J.P. Morgan Chase Bank, N.A.*, 2018 WL 4726042, at *6 (C.D. Cal. Sept. 18, 2018) (same; compelling arbitration despite *McGill* because "[t]he Court finds these prayers for monetary relief to be the heart of Plaintiffs' claims," and the "generalized request for [an] injunction [was] merely incidental"); *Sponheim*, 2019 WL 2498938, at *4 ("Merely declaring that a claim seeks a public injunction . . . is not sufficient to bring that claim within the bounds of the rule set forth in *McGill*.") (quotation marks omitted).

The plaintiffs' requested injunction is not "public" within the meaning of *McGill* for a second reason:  it is aimed (in theory) principally to benefit a defendant's customers rather than the public at large.  Under such circumstances, federal courts in California have repeatedly characterized requests for injunctions as "private." *E.g.*, *Sponheim*, 2019 WL 2498938, at *5 (injunction sought was fundamentally "private" in nature because the "primary aim" of the plaintiff's suit was to "gain[] compensation for injury for himself and others similarly situated"—there, all "California plaintiffs that have held Citibank checking accounts within the applicable statute of limitations"); *Wright*, 2017 WL 4676580, at *9–10 (requested injunction was necessarily "private" in nature, because it would "solely benefit" those who had purchased lifetime subscriptions from the defendant).  Here, the (unsupported) request for injunctive relief necessarily would benefit only the "defined group of plaintiffs" in the putative class—legacy Cricket customers who already purchased 4G/LTE phones during the relevant time period—not the general public. *Johnson*, 2018 WL 4726042, at *7.

Finally, even if any plaintiff could request an injunction, *McGill* would be available only to plaintiffs who are entitled to seek relief under California law.  Someone who does not reside in

California cannot seek an injunction under California law. Judge Chen held as much when he compelled arbitration as to the claims of an Alabama plaintiff "because his claims for relief are governed by Alabama law, not California law." *Roberts v. AT&T Mobility LLC*, 2018 WL 1317346, at *9 (N.D. Cal. Mar. 14, 2018).

It is plain that plaintiff Riddick cannot invoke *McGill*; she is a current resident of North Carolina and allegedly resided in Virginia at the time of her phone purchase from legacy Cricket. FAC ¶ 33. Thomas likewise cannot invoke *McGill*; although he currently claims to reside in California (*id.* ¶ 28), his claims are based entirely on conduct that occurred when he was a resident of Missouri, which is also where he entered into his contracts with Cricket and received wireless service. *See* pages 4-6, *supra*; FAC ¶¶ 28, 57-64. Indeed, Thomas previously filed suit under Missouri's consumer protection laws based on the same allegations. *See Thomas I*, Dkt. No. 1. Waters cannot seek forward-looking relief under California law either. While she used to reside in California at the time her claims arose based on *past* alleged conduct by legacy Cricket, she now resides in Missouri—and Cricket also no longer resides in California. FAC ¶¶ 32, 43. California's UCL, CLRA, and FAL do "not apply extraterritorially," and therefore "plaintiffs who are not California residents must . . . allege facts to show that the alleged violations occurred within California." *Aghaji v. Bank of Am., N.A.*, 247 Cal. App. 4th 1110, 1119 (2016) (citing *Sullivan v. Oracle Corp.*, 254 P.3d 237 (Cal. 2011); *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214 (1999)). Any claim for injunctive relief would have to be based on an ongoing violation of law, and Waters does not—and could not—allege any ongoing violation within California, because neither she nor Cricket is currently located there.

In short, the *McGill* rule does not apply here, and plaintiffs' arbitration agreements are fully enforceable under the FAA.

## II.   THE CLAIMS OF PLAINTIFFS THOMAS, WATERS, AND RIDDICK SHOULD BE STAYED PENDING ARBITRATION.

When, as here, the FAA governs an arbitration provision that covers a plaintiff's claims, Section 3 of the FAA directs the district court to compel arbitration and stay the claims of those plaintiffs. *See* 9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of

arbitration); *see also, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25 (1991).

**CONCLUSION**

The Court should enter an order (i) compelling plaintiffs Jermaine Thomas, Sarah Waters, and Kamilah Riddick to arbitrate their claims in accordance with their arbitration agreements; and (ii) staying those plaintiffs' claims pending the resolution of any such arbitrations.

Dated:  May 4, 2020                                    Respectfully submitted,

**MAYER BROWN LLP**

*/s/ Archis A. Parasharami*
Archis A. Parasharami

Counsel for Defendant
CRICKET WIRELESS LLC

21