**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice* pending)
Eric D. Barton (*pro hac vice* pending)
Melody R. Dickson (*pro hac vice* pending)
Austin Brane, CA Bar #286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
Tel: 816-701-1100
Fax: 816-531-2372
thudson@wcllp.com
ebarton@wcllp.com
mdickson@wcllp.com
abrane@wcllp.com

**BELL LAW, LLC**
Bryce B. Bell (admitted *pro hac vice*)
Mark W. Schmitz (admitted *pro hac vice*)
Andrew R. Taylor (admitted *pro hac vice*)
2600 Grand Blvd., Suite 580
Kansas City, MO 6410
Tel: 816-886-8206
Fax: 816-817-8500
Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com

**CONSUMER LAW PRACTICE**
Daniel T. LeBel (SBN 246169)
PO Box 720286
San Francisco, CA 94172
Tel: 415-513-1414
Fax: 877-563-7848
danlebel@consumerlawpractice.com

**WADDELL LAW FIRM LLC**
A. Scott Waddell (admitted *pro hac vice*)
2600 Grand Blvd., Suite 580
Kansas City, Missouri 64108
Tel: 816-914-5365
Fax: 816-817-8500
scott@aswlawfirm.com

Attorneys for Plaintiffs JERMAINE THOMAS, JERMAINE MILLER, JAMIE POSTPICHAL, RONALD ELLISON, SARAH WATERS, KAMILAH RIDDICK, FELICIA REDDICK, TIARA CROMWELL, LYSHA ENCARNACION, LANI HALE, MELIZZA WEAVER, ALFREDO SANCHEZ, and CLARISSA KELLY, individuals, on behalf of themselves and others similarly situated,

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| JERMAINE THOMAS, et al., individually and on behalf of others similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>CRICKET WIRELESS LLC,<br><br>                    Defendant. | Case No. 3:19-cv-07270-WHA<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO CRICKET WIRELESS LLC'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION OF THE CLAIMS OF PLAINTIFFS JERMAINE THOMAS, SARAH WATERS, AND KAMILA RIDDICK**<br><br>Date: June 18, 2020<br>Time:  8:00 a.m.<br>Courtroom: 12, 19th Floor<br><br>Judge: Hon. William H. Alsup |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

RELIEF REQUESTED.................................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ............................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................2

ARGUMENT ...............................................................................................................4

I.    Jermaine Thomas Did Not Agree to Arbitrate this Dispute Through His Inaction Because It Would Not Have Been Clear to a Reasonable Person in His Position That Action Was Needed to Avoid Arbitration. .......................................................................................4

    a.   Under Missouri law, arbitration cannot be compelled in absence of a contract ........4

    b.   Text messages sent to Thomas do not create a contract because Cricket cannot show that there was a meeting of the minds..........................................................................5

II.   Sarah Waters and Kamilah Riddick Did Not Agree to Arbitrate this Dispute By Signing Up for New Service From AT&T Because It Would Not Have Been Clear to a Reasonable Person in Their Position That They Were Assenting to Arbitrate a Dispute with Cricket that Has No Connection to Their AT&T Service Agreement......................................................10

III.  The Court Should Rule as a Matter of Law That No Agreement Was Formed to Arbitrate this Dispute. .......................................................................................................17

CONCLUSION............................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Adams v. AT&T Mobility, LLC*,
  816 F.Supp.2d 1077 (W.D. Wash. 2011), *aff'd* 524 F. App'x. 322 (9th Cir. 2013).......................16

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333, 131 S. Ct. 1740, 179 L.Ed.2d 742 (2011)..............................................................12

*Baier v. Darden Restaurants*,
  420 S.W.3d 733 (Mo. App. W.D. 2014).................................................................................5, 6, 7

*Barraza v. Cricket Wireless LLC*,
  2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) ......................................................................2, 8, 17

*Chiron Corp. v. Ortho Diagnostic Sys. Inc.*,
  207 F.3d 1126 (9th Cir. 2000) ..................................................................................................11

*Citibank (S.D.), N.A. v. Wilson*,
  160 S.W.3d 810 (Mo. Ct. App. 2005)........................................................................................8, 9

*Dang v. Samsung Electronics Co., Ltd.*,
  No. 15-16768, 2017 WL 218896 (9th Cir. 2017) .......................................................................2, 6

*Dunn Indus. Group, Inc. v. City of Sugar Creek*,
  112 S.W.3d 435 (Mo. Banc 2003) ................................................................................................5

*Esparza v. SmartPay Leasing, Inc.*,
  No. C 17-03421 WHA, 2017 WL 4390182 (N.D. Cal. Oct. 3, 2017) .........................................14

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)....................................................................................................................11

*Guidry v. Charter Communications, Inc.*,
  269 S.W..3d 520 (Mo. App. E.D. 2008). ......................................................................................6

*Hobbs v. Tamko Building Products, Inc.*,
  479 S.W.3d 147 (Mo. App. S.D. 2015) .............................................................................3, 6, 7, 8

*In re Jiffy Lube International, Inc., Text Spam Litigation*,
  847 F.Supp.2d 1253 (S.D. Cal. 2012).....................................................................................12, 14

*Int'l Foodsource, LLC v. Grower Direct Nut Co.*,
  No. 16CV3140WHWCLW, 2016 WL 4150748 (D.N.J. Aug. 3, 2016)........................................9

*Johnson v. McDonnell Douglas Corp.*,
  745 S.W.2d 661, 662 (Mo. Banc 1988) ........................................................................................5

*Johnson v. Vatterott Education Centers, Inc.*,
  410 S.W.3d 735 (Mo. App. W.D. 2013).........................................................................................5

*Kaselitz v. hiSoft Tech. Int'l, Ltd.*,
    2013 WL 622382 (N.D. Cal. Feb. 15, 2013) ..................................................... 16

*Kunzie v. Jack-In-The-Box,*
    *Inc.*, 330 S.W.3d 476 (Mo. App. E.D. 2010) ........................................... 3, 6, 7, 8

*M & I Marshal & Illsley Bank v. Sader & Garvin,*
    *LLC.,* 318 S.W.3d 772 (Mo. App. W.D. 2010).............................................. 5

*Marenco v. DirecTV LLC*,
    233 Cal. App. 4th 1409, 183 Cal. Rptr. 3d 587 (2015)................................... 4

*Mey v. DirecTV, LLC*,
    No. 5:17-cv-179, 2018 WL 7823097 (N.D. W. Va. Apr. 25, 2018).................. 13, 14, 15

*Morrow v. Hallmark Cards, Inc.*,
    273 S.W.3d, 15, 22-23 (Mo. App. W.D. 2008) .......................................... 5, 7

*Norcia v. Samsung Telecomms. Am., LLC*,
    845 F.3d 1279 (9th Cir. 2017) ................................................................. 2, 9, 17

*PCS Nitrogen Fertilizer, L.P. v. The Christy Refractories, LLC*,
    225 F.3d 974 (8th Cir. 2000) ...................................................................... 7

*Pride v. Lewis*,
    179 S.W.3d 375 (Mo. App. W.D. 2005).......................................................... 6

*Register v. White*,
    160 N.C. App. 657, 587 S.E.2d. 95 (N.C. App. 2003) ................................ 11

*Revitch v. DirecTV, LLC*,
    No. 18-CV-01127-JCS, 2018 WL 4030550 (N.D. Cal. Aug. 23, 2018).................. 10, 11, 13, 16

*Samsung Elecs. Am. v. Ramirez*,
    No. 18-16094, 777 Fed. Appx. 243 (9th Cir. Sept. 17, 2019). ......................... 2

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012).......................................................................... 9

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ..................................................................... 9

*Shockley v. PrimeLending*,
    929 F.3d 1012 (8th Cir. 2019) ................................................................. 3, 6, 8

*Slaughter v. Swicegood*,
    162 N.C. App. 457, 591 S.E.2d 577 (N.C. App. 2004) ............................... 11

*Smith v. Steinkamp*,
    318 F.3d 775 (7th Cir. 2003) .................................................................... 12

*Theroff v. Dollar Tree Stores, Inc.*,
   591 S.W.3d 432 (Mo. banc 2020) ................................................................................. 5

*U.S. Bank v. Lewis*,
   326 S.W.3d 491 (Mo. App. S.D. 2010) ........................................................................ 5

*Velasquez-Reyes v. Samsung Elecs. Am.*,
   No. 17-56556, 777 Fed. Appx. 241 (9th Cir. Sept. 17, 2019) ..................................... 2

*Wexler v. AT & T Corp.*,
   211 F. Supp. 3d 500 (E.D.N.Y. 2016) ........................................................ 4, 12, 13, 14, 15

*Whitworth v. McBride & Son Homes, Inc.*,
   344 S.W.3d 730 (Mo. App. W.D. 2011) ...................................................................... 5

*Wolsey, Ltd. v. Foodmaker, Inc.*,
   144 F.3d 1205 (9th Cir. 1998) ................................................................................... 11

*Women's Care Specialists v. Troupin*,
   408 S.W.3d 310 (Mo. App. E.D. 2013) ...................................................................... 6

**Statutes**

9 U.S.C. § 2 ............................................................................................................................ 4

**Treatises**

2 WILLISTON ON CONTRACTS §610 (4th ed.2007) ....................................................... 6

**RELIEF REQUESTED**

An order denying Cricket Wireless, LLC's ("Cricket") Motion to Compel Arbitration and to Stay Litigation of the Claims of Plaintiffs Jermaine Thomas, Sarah Waters, and Kamilah Riddick (ECF No. 50) ("Cricket Br." or "Motion").

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Whether a reasonable person in plaintiff Jermaine Thomas's position would understand that receiving two short, boilerplate text messages with a hyperlink to terms and conditions and continuing with Cricket service constituted assent to an arbitration provision, where the text messages did not appear to be a contract offer and did not indicate that by continuing with service the purchaser was accepting a contract offer?

2.     Whether a reasonable person in plaintiffs Sarah Waters' and Kamilah Riddick's position would understand that signing to accept the terms of AT&T's Wireless Customer Agreement in 2018 (or later), in connection with the purchase of a new line of service with AT&T, constituted assent to arbitration of a prior dispute with Cricket, where Cricket was not a party to the agreement, the AT&T terms did not mention Cricket by name or indicate that Cricket was a subsidiary of AT&T, and the dispute with Cricket arose years earlier when Cricket was a competitor of AT&T?

/ / /

/ / /

/ / /

## MEMORANDUM OF POINTS AND AUTHORITIES

Cricket begins its Motion by acknowledging that it is not re-litigating the issues in *Barraza et al. v. Cricket Wireless LLC et al.*, No. C 15-02471 WHA, 2015 WL 6689396 (N.D. Cal. Nov. 3, 2015).  Cricket Br. at 2.  For good reason, as the Ninth Circuit has now put to rest any argument that arbitration could be compelled based on the circumstances surrounding the purchase of a Cricket phone during the 2012-2014 time period by any of the 13 named plaintiffs or any other member of the class.  *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1287 (9th Cir. 2017), *cert denied*, No. 17-1, 2017 WL 2870039 (U.S. Oct. 2, 2017); *Dang v. Samsung Electronics Co., Ltd.*, No. 15-16768, 2017 WL 218896 (9th Cir. 2017); *Velasquez-Reyes v. Samsung Elecs. Am.*, No. 17-56556, 777 F. App'x. 241 (9th Cir. Sept. 17, 2019); *Samsung Elecs. Am. v. Ramirez*, No. 18-16094, 777 F. App'x. 243 (9th Cir. Sept. 17, 2019).  The Ninth Circuit's opinions in the Samsung cases make clear that no reasonable person was put on notice of Cricket's arbitration provision when (a) it was buried in the middle of a "Quick Start Guide" that initially described Cricket as "the home of no contract, no hassle wireless" and did not mention that the booklet contained terms and conditions for the use of Cricket's service; (b) Cricket has put forth no evidence of a policy informing customers of an arbitration provision; and (c) Cricket has no evidence that it set up a contract formation process with customers that required a purchaser to take any affirmative action to acknowledge acceptance of an arbitration provision.  *Id.*

Perhaps understanding this and hoping to side-step those Ninth Circuit cases, Cricket identifies three named plaintiffs that it contends have circumstances "readily distinguishable" from those in *Barraza*.  Cricket Br. at 2.  But this attempt fails for the same basic reason as Cricket's last attempt to compel arbitration: none of the named plaintiffs or any member of the proposed class agreed to arbitrate this dispute with Cricket.

While Cricket is no longer asserting that any named plaintiff agreed to an arbitration provision when they purchased the Cricket 4G/LTE phones at issue in this case, it now contends that Jermaine

Thomas later assented to a new agreement to arbitrate.  This agreement supposedly was formed on or around May 22, 2014, when AT&T sent him (and presumably every other existing Cricket customer) two short text messages that stated:

> See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at http://mycrk.it/1kmlTEn.

In Cricket's view, under Missouri law, there was a meeting of the minds, resulting in Thomas assenting to arbitrate this dispute with Cricket.  This occurred, according to Cricket, with the mere sending of this text message twice by Cricket—the self-proclaimed "home of the No Contract wireless service"—and Thomas continuing his service with Cricket.

Cricket is wrong as a matter of Missouri law that Thomas's inaction was assent.  No reasonable person in Thomas's position would have understood that by doing nothing he was agreeing to arbitration, particularly so given that the text message did not indicate that it is an offer that required action, it did not say to click on the link, and it did not provide any context as to why the short text message was being sent.  Tellingly, Cricket fails to mention, much less distinguish, the most compelling and on-point authorities, *Kunzie v. Jack-In-The-Box, Inc.*, 330 S.W.3d 476 (Mo. App. E.D. 2010), *Shockley v. PrimeLending*, 929 F.3d 1012 (8th Cir. 2019), and *Hobbs v. Tamko Building Products, Inc.*, 479 S.W.3d 147 (Mo. App. S.D. 2015), *reh'g and/or t'fer denied* (Nov. 10, 2015), *t'fer denied* (Jan. 26, 2016), *cert. denied*, 137 S.Ct. 2156 (May 22, 2017).  Instead, Cricket cites two readily distinguishable cases, as explained below.  Thomas did not assent to arbitration.

Next, Cricket contends that Sarah Waters' and Kamilah Riddick's decisions to open new lines of service with AT&T in 2018 and 2020, respectively, somehow meant that they agreed to arbitrate their disputes against Cricket, which arose at least four years earlier, before Cricket was acquired by AT&T.  But, again, no reasonable person in their position would have understood that they were agreeing to arbitrate disputes with Cricket.  The agreement does not identify Cricket.  It does not state that AT&T owns Cricket.  And it does not directly state that disputes that arose at a time when Cricket

was not an affiliate of AT&T would be covered. Given the terms in the AT&T agreement, a reasonable person reading the arbitration provision would need to understand that (a) AT&T's intent was to bind her (or him) to arbitration of any dispute with AT&T and *any company that it owned*, (b) AT&T now owns Cricket; and (c) even disputes that occurred when AT&T and Cricket were competitors were intended to be covered by the language in the agreement. Waters and Riddick did not assent to arbitration.

Given that there was no agreement to arbitrate, Cricket cannot now coerce the three named plaintiffs to arbitration. "One of the cardinal principles of arbitration, whether under the FAA or California law, is that 'arbitration ... 'is a matter of consent, not coercion.' Thus, 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Marenco v. DirecTV LLC*, 233 Cal. App. 4th 1409, 1417, 183 Cal. Rptr. 3d 587, 593–94 (2015) (internal citations omitted). Indeed, the FAA explicitly limits itself to agreements "to settle by arbitration a controversy thereafter *arising out of such contract or transaction, or the refusal to perform the whole or any part thereof*." *Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 505 (E.D.N.Y. 2016) (emphasis added) (quoting 9 U.S.C. § 2). Because Cricket has failed to come forth with evidence to show that any plaintiffs agreed to arbitrate their claims against Cricket, the Court should deny Cricket's Motion.

## ARGUMENT

I.   **Jermaine Thomas Did Not Agree to Arbitrate this Dispute Through His Inaction Because It Would Not Have Been Clear to a Reasonable Person in His Position That Action Was Needed to Avoid Arbitration.**

   a. **Under Missouri law, arbitration cannot be compelled in absence of a contract.[1]**

When faced with a motion to compel arbitration, the Court considers three factors: (1) whether a valid arbitration agreement exists; (2) if a valid arbitration agreement exists, whether the specific

---

[1] Plaintiff Thomas does not dispute that Missouri law applies to this issue.

dispute falls within the scope of the agreement; and, (3) whether the arbitration provision is revocable under applicable contract principles. *M & I Marshal & Illsley Bank v. Sader & Garvin, LLC.,* 318 S.W.3d 772, 776 (Mo. App. W.D. 2010).

Whether an agreement to arbitrate exists is a threshold question because "arbitration is a matter of contract, and a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 (Mo. Banc 2003); *see also Theroff v. Dollar Tree Stores, Inc.*, 591 S.W.3d 432, 439-40 (Mo. Banc 2020) (noting that one cannot be "forced into arbitration by a contract to which one is a stranger."); *Baier v. Darden Restaurants*, 420 S.W.3d 733, 737 (Mo. App. W.D. 2014).

Thus, when presented with a motion to compel arbitration, the Court must first determine whether an agreement to arbitrate exists. *Id.* "Without a contract to arbitrate, no party has the unilateral right to impose arbitration as the sole procedure for resolving a dispute." *Morrow v. Hallmark Cards, Inc.,* 273 S.W.3d 15, 21 (Mo. App. W.D. 2008). And "[w]hile a presumption in favor of arbitration may exist when interpreting the scope of disputes falling within an arbitration clause, no such presumption applies to the antecedent question [of] whether an enforceable agreement to arbitrate even exists." *Johnson v. Vatterott Education Centers, Inc.,* 410 S.W.3d 735, 741 n.3 (Mo. App. W.D. 2013).

To form a valid contract in Missouri, there must be "offer, acceptance, and bargained for consideration." *Whitworth v. McBride & Son Homes, Inc.*, 344 S.W.3d 730, 737 (Mo. App. W.D. 2011) (*quoting Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. Banc 1988)). The party asserting the existence of a valid and enforceable agreement to arbitrate bears the burden of proof. *Id.* (*citing U.S. Bank v. Lewis*, 326 S.W.3d 491, 495 (Mo. App. S.D. 2010)). As such, Cricket has the burden to prove there is a valid and enforceable contract. It has not met that burden.

      **b. Text messages sent to Thomas do not create a contract because Cricket cannot show that there was a meeting of the minds.**

To accomplish an offer and acceptance, there must be a *mutual* agreement, also referred to as a meeting of the minds. *Baier*, 420 S.W.3d at 738 (Mo. App. W.D. 2014). "A meeting of the minds occurs when there is *a definite offer* and *unequivocal acceptance*." *Id.* at 738 (emphasis added). Whether there is mutual assent is determined by analyzing the intention of the parties, demonstrated through their words or actions. *Women's Care Specialists v. Troupin*, 408 S.W.3d 310, 316 (Mo. App. E.D. 2013).

For an offer to be valid, it must "include the ability to accept through some affirmative words or action." *Shockley*, 929 F.3d at 1017. For acceptance to be effective, it "must be positive and unambiguous." *Kunzie*, 330 S.W.3d at 484 (*quoting* 2 WILLISTON ON CONTRACTS § 610 (4th ed.2007); *see also Shockley*, 929 F.3d at 1017. The critical question is whether the words and actions of the offeree signal an objective manifestation of intent to be bound by the contract. *Id.* An offeree cannot manifest an intent to be bound to a contract he does not know exists. As is clear, a reasonable person in Thomas's position would have had no reason to suspect that there was any purported contract and, thus, could not consent. Irrespective, Thomas took no affirmative action to suggest he assented. And contrary to Cricket's contention, Thomas's silence did not constitute assent. *Kunzie*, 330 S.W.3d at 484 ("Silence generally cannot be translated into acceptance.") (*citing Guidry v. Charter Communications, Inc.*, 269 S.W.3d 520, 528 (Mo. App. E.D. 2008). "Absent a duty to speak, silence may not be translated into acceptance merely because the offeror attaches that effect to it." *Pride v. Lewis*, 179 S.W.3d 375 (Mo. App. W.D. 2005). Cricket fails to put forth any evidence that silence by a reasonable person in Thomas's position demonstrates that the person was aware that Cricket believed a contract existed and action was needed to avoid being bound.

The Missouri Court of Appeals further addressed the question of what may constitute assent in the context of an arbitration provision in *Hobbs*, 479 S.W.3d 147. There, plaintiffs brought a class action following the purchase of defective shingles from defendant. *Id.* Defendant responded by filing a motion to compel arbitration. *Id.* The Court of Appeals upheld the trial court's denial of

defendant's motion to compel arbitration, finding the plaintiffs "did not accept the arbitration agreement by merely purchasing the shingles." *Id.* at 149 (*citing PCS Nitrogen Fertilizer, L.P. v. The Christy Refractories, LLC*, 225 F.3d 974, 980 (8th Cir. 2000). In reaching this decision, the Court found it critical that 1) plaintiffs did not sign any document in which they agreed to arbitration; and 2) the arbitration provision was contained in fine print the purchaser would likely not see. *Id.*

Similarly, in this case, plaintiffs did not sign any document to demonstrate assent. And while not determinative on its own, Missouri courts have found that a "party's signature on a contract remains the 'common though not exclusive, method of demonstrating agreement.'" *Baier*, 420 S.W.3d at 738 (*quoting Morrow*, 273 S.W.3d at 22-23. In the absence of a signature, the party claiming the existence of a contract must establish assent through other evidence. *Id.* Cricket has not met this burden, pointing only to Thomas's silence as their alleged manifestation of assent.

Further, as in *Hobbs*, the purported contract Cricket now tries to create was not published in a way that a reasonable person in Thomas's position could receive notice of its existence. On that basis, Thomas was unable to manifest assent to (or reject) any purported contract.

Cricket suggests Thomas's continued use of Cricket's service after receiving two text messages that included a hyperlink to new terms was tantamount to his acceptance of those terms. This argument is directly contradicted by Missouri law. Missouri courts have been confronted with the question of whether silence in response to new terms of a contractual relationship can constitute assent. *Kunzie*, 330 S.W.3d at 476. In *Kunzie*, the Eastern District of Missouri Court of Appeals considered whether "an employee's continued employment after being presented with an arbitration agreement from his employer stating that alternative dispute resolution is a condition of continued employment, decisively evidences the employee's intention to be bound by the arbitration agreement." *Id.* at 482. After noting that silence generally does not constitute acceptance of a contract, the Court found that the employee's conduct "only evinced his intent to maintain the status quo." *Id.* at 484. In other words, the Court was not convinced that the employee's continued

employment alone was a manifestation of his assent to be bound by the new terms and conditions. *Id.* Similarly, at best, a reasonable person in Thomas's position was only interested in maintaining the status quo, which at that time was wireless service without a contract.  His continued use of the service did not constitute assent to be bound.  *See Hobbs*, 479 S.W.3d at 150 ("Plaintiffs' retention and use of the shingles does not prove that they accepted the terms to arbitrate their disputes in this case.").

Indeed, in *Shockley*, where an arbitration clause was included in an employee handbook, the employee "was presented with two opportunities to review [the] Handbook through an optional hyperlink on the company network," and "she was advised that by entering into the system she thereby acknowledged her review of these materials," the Eighth Circuit still found that the employee's "document review, and the subsequent system-generated acknowledgment, does not create an unequivocal acceptance; therefore, no contract was created."  *Shockley*, 929 F.3d at 1019.  Thomas' case is even stronger because the text messages sent to him did not advise him that continuing to pay for his service would constitute a review or acceptance of Cricket's terms.

Cricket attempts to rely on *Citibank (S.D.), N.A. v. Wilson*, 160 S.W.3d 810 (Mo. Ct. App. 2005), to claim that its two text messages to Thomas created a valid agreement to arbitrate. Cricket Br. at 13.  However, that case is clearly distinguishable from the one at hand. First, in *Wilson*, the plaintiff "signed an acceptance certificate, agreeing to be bound by the terms and conditions of the credit card agreement."  *Wilson*, 160 S.W.3d at 811.  Here, Thomas did not sign any document agreeing to be bound by Cricket's terms and conditions.  Further, as we know from *Barraza*, the only mention of any terms and conditions was in the Quick Start Guide, which "lack[s] *any* indication of its contractual nature" and cannot be said "as a matter of law" to have created a contract between the parties.  *Barraza*, 2015 WL 6689396 at *5 (emphasis in original); *Hobbs*, 479 S.W.3d at 147 (no agreement to arbitrate is formed by putting fine print on packaging the purchaser "will likely never see").  Second, in *Wilson*, Citibank sent the entire modified agreement to the plaintiff with her

monthly statement. *Wilson*, 160 S.W.3d at 811. Citibank also presented that revised agreement in the form of an offer, communicating "to Wilson that the revised agreement was binding unless she cancelled her account within thirty days and did not use her credit card." *Id.* at 813. Here, Cricket did not present the arbitration agreement as an offer and did not communicate to Thomas that the agreement was binding if he continued to use and pay for his Cricket service. Rather, the messages stated only:

> See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at http://mycrk.it/1kmlTEn.

Declaration of Nicole E. Garcia (ECF No. 50-1) ("Garcia Decl.), ¶ 16. These texts, framed as a mere notification, are not analogous to the offer presented in *Wilson*. Thus, the Court should find that Thomas did not manifest assent to be bound to the arbitration agreement in this case.

Based on the foregoing Missouri precedent, the Court should deny Cricket's Motion. It is worth noting, however, that Missouri law is in accord with federal cases in other jurisdictions. *Norcia*, 845 F.3d at 1279; *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2d Cir. 2012) (offer must make clear that terms are being presented for acceptance and "[w]e do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, *and* that a failure to act affirmatively to cancel the membership will, alone, constitute assent); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016) (click-wrap agreements are acceptable, "as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement"); *Int'l Foodsource, LLC v. Grower Direct Nut Co.*, No. 16CV3140WHWCLW, 2016 WL 4150748, at *11 (D.N.J. Aug. 3, 2016) ("If a party wishes to bind in writing another to an agreement to arbitrate future disputes, such purpose should be accomplished in a way that each party to the arrangement will fully and clearly comprehend that the agreement to arbitrate exists and binds the parties thereto.").

1

2

3

**II.      Sarah Waters and Kamilah Riddick Did Not Agree to Arbitrate this Dispute By Signing Up for New Service From AT&T Because It Would Not Have Been Clear to a Reasonable Person in Their Position That They Were Assenting to Arbitrate a Dispute with Cricket that Has No Connection to Their AT&T Service Agreement.**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

Sarah Waters' and Kamilah Riddick's claims are based on similar facts.  Both Waters and Riddick purchased wireless phones from Cricket that were purportedly 4G/LTE-capable between May 1, 2012 and October 1, 2014.  Their claims stem directly from those purchases. Specifically, the fact that Cricket did not actually provide 4G/LTE service on those phones.  Years later, in a completely unrelated sequence of events, Waters and Riddick purchased lines of cell phone service with AT&T.  Waters did so on December 18, 2018, and Riddick on February 10, 2020.  Declaration of Paula Berg (ECF No. 50-8) ("Berg Decl."), ¶¶ 6-17; Garcia Decl., Exs. 1-5; Declaration of Lara Schnieber (ECF No. 50-33) ("Schnieber Decl."), ¶¶ 3-5.  Cricket alleges that both Waters and Riddick "agreed to AT&T's Wireless Customer Agreement" via an electronic signature capture device as part of their 2018 and 2020 purchases.  Cricket Br. at 6.  Cricket now claims the AT&T agreement somehow applies to the disputes with Cricket that arose in 2012-2014, before Cricket was even acquired by AT&T.[2]  However, under both California and North Carolina law, this argument fails.[3] No agreement to arbitrate the claims against Cricket was ever formed.

19

20

21

22

"The court's role in addressing a question of arbitrability is "'limited to determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue.'" *Revitch v. DirecTV, LLC*, No. 18-CV-01127-JCS, 2018 WL 4030550, at *5 (N.D. Cal. Aug. 23, 2018) (*citing Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130

23

24

25

26

27

28

---

[2]      AT&T closed on the acquisition of Cricket on March 13, 2014. https://about.att.com/story/att_completes_acquisition_of_leap_wireless.html.

[3]  Waters and Riddick do not dispute that California and North Carolina law apply to them, respectively, on this issue.  Cricket does not identify any difference in these states' laws on the question of contract formation.

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION      No. 3:19-cv-07270-WHA

(9th Cir. 2000)); *Register v. White*, 160 N.C. App. 657, 587 S.E.2d. 95 (N.C. App. 2003), *aff'd*, 358 N.C. 691, 599 S.E.2d 549 (2004). Only if both requirements are met, does the FAA require enforcement of the provision in accordance with its terms. *Id.* As noted above, courts apply state contract law to determine the validity and scope of an arbitration agreement. *Id.* (*citing Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998)). Thus, the Court must "apply ordinary state-law principles that govern the formation of contracts." *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). The burden to prove the existence of an arbitration agreement falls on the party seeking arbitration. *Marenco*, 233 Cal. App. 4th at 1416, 183 Cal. Rptr. 3d at 593; *Slaughter v. Swicegood*, 162 N.C. App. 457, 461, 591 S.E.2d 577, 581 (N.C. App. 2004).

The first question the Court must ask is whether there is a valid agreement to arbitrate between Cricket and plaintiffs Waters and Riddick. To address this inquiry, courts consider whether the parties intended to enter into an agreement to arbitrate the claims asserted in the case. *Revitch*, 2018 WL 4030550 at \*7. And, if the court finds that the parties did intend to enter into an agreement to arbitrate, then California law requires the additional step of asking if the agreement is rendered invalid under the California Supreme Court's decision in *McGill* because the agreement prohibits class actions. *Id.*

To determine whether the parties intended to enter into an agreement to arbitrate the asserted claims, courts consider (1) the language of the agreement and (2) the circumstances surrounding the agreement. *Id.* at \*10. Here, the agreement stated, in relevant part: "AT&T and you agree to arbitrate **all disputes and claims between us**" and defined "us" as including "respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services of Devices under this or prior Agreements between us." Berg Decl. Ex. 17 § 2.2(1).

Multiple courts have cast doubt on the idea that such a provision could *ever* be understood by a reasonable person to bind him or her to arbitration of disputes unconnected to the AT&T line of service being purchased. For example, in *In re Jiffy Lube International, Inc., Text Spam Litigation*,

847 F.Supp.2d 1253 (S.D. Cal. 2012), the arbitration provision at issue also purported to apply to "any and all disputes" between the parties and was "not limited to disputes arising from or related to the transaction or contract at issue." *Id.* at 1262. The court noted that if the defendant attempted to argue "that the agreement can truly encompass 'any and all disputes' between the parties…such a clause would clearly be unconscionable." *Id.* at 1263. Tellingly, the *Jiffy Lube* defendant did not even attempt to argue that the clause *actually* governed "any and all disputes" between the parties, presumably knowing that such a clause would be unenforceable. As Judge Posner persuasively explained in *Smith v. Steinkamp*, allowing truly unlimited arbitration clauses yields absurd results, such as arbitration of wrongful death claims if the defendant murdered the plaintiff to discourage defaults on a contract. 318 F.3d 775, 777 (7th Cir. 2003). Yet this is exactly what Cricket does by seeking to compel arbitration of claims that have absolutely nothing to do with Waters' and Riddick's agreement with non-party AT&T.

Another case that addressed a "materially identical" arbitration clause to the one at issue in this case is *Wexler*, 211 F. Supp. 3d 500. *See* Cricket Br. at 8 (noting that the arbitration clause at issue here is "materially identical" to the one addressed in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740, 179 L.Ed.2d 742 (2011)); *see also Wexler*, 211 F. Supp. 3d at 502-03 (noting that *Concepcion* and *Wexler* addressed the same clause). There, the court first noted that while "*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011)…dealt with the same clause at issue in this case… the breadth of the clause was not discussed." *Id.* at 502–03. The court then cited to *Jiffy Lube*, stating that "[t]he Court agrees with its colleague in the Southern District of California that such clauses are cause for concern" and that, in fact, the results of enforcing the AT&T Mobility clause would be "even more absurd than those posited in *Jiffy Lube* because the clause would not just cover disputes with Mobility, but would also include any dispute with any of Mobility's affiliates." *Id.* at 503.

However, rather than holding that such clauses are simply unconscionable, which would arguably be in tension with *Concepcion*, the court in *Wexler* noted that "an arbitration clause that is unlimited in scope presents a question of contract *formation*." *Id.* at 504. Judge Spero agreed with this categorization in *Revitch*. 2018 WL 4030550 at *14. Therefore, the unreasonably broadly worded arbitration clause at issue here is a question of contract formation. Both *Revitch* and *Wexler* describe the standard for analyzing such clauses as follows:

> "[i]t is black-letter law that an essential element of any contract is a mutual intent to be bound ... and that there can be no contract absent a mutual intent to be bound." Further, while courts look to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds," "***the words expressed must be judged according to what an objective, reasonable person would have understood them to convey***."

*Id.* (quoting *Wexler*, 211 F. Supp. 3d at 504) (emphasis added). The *Wexler* court applied this standard to the exact clause at issue here and found that:

> Notwithstanding the literal meaning of the clause's language, *no reasonable person* would think that checking a box accepting the "terms and conditions" necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT & T Inc.'s corporate umbrella… Rather, a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes ***connected in some way to the service agreement with Mobility***. As explained above, Wexler's claims are not so connected. If a company wishes to bind its costumers [sic] to something broader, it must take steps to secure something that a reasonable person would understand as an objective expression of his or her agreement.

*Wexler*, 211 F. Supp. 3d at 504 (emphasis added). *Wexler* nearly mirrors the facts of this case and addresses the exact arbitration clause at issue here. The Court should come to the same conclusion in this case.

*Wexler* is not alone in rejecting strained arguments such as Cricket's. In *Mey v. DirecTV, LLC*, DirecTV sought to compel arbitration via an arbitration agreement with AT&T Mobility—the same agreement that was at issue in *Wexler*. No. 5:17-cv-179, 2018 WL 7823097, at *5 (N.D. W. Va. Apr. 25, 2018). The claims in *Mey* against DirecTV were for violations of the Telephone Consumer Protection Act. Arguing that DirecTV is an "affiliate" of AT&T, DirecTV sought to

compel those claims to arbitration. *Mey* rejected that motion, placing import on the fact that the "agreement was made with AT&T Mobility LLC, not with DirecTV," finding *Wexler* (and by extension, *Jiffy Lube*) persuasive, and ultimately concluding that AT&T's arbitration clause "is susceptible of a construction limiting the duty to arbitrate to disputes arising under or relating to the provision of cellular telephone service [by AT&T], this Court concurs that a construction which does not so limit the scope of the arbitration clause would be unconscionably overbroad." *Id.* at *5-*6. This Court has also denied a motion to compel arbitration on similar grounds because "reading the clause as applying to any and every claim arising between SmartPay and its customers, even including unemployment and tort claims, with no limiting principle would render the clause impermissibly overbroad, and therefore inoperable." *Esparza v. SmartPay Leasing, Inc.*, No. C 17-03421 WHA, 2017 WL 4390182, at *3 (N.D. Cal. Oct. 3, 2017) (citing *Jiffy Lube*, 847 F. Supp. 2d at 1263), *aff'd*, 765 F. App'x. 218 (Memo.) (9th Cir. Mar. 21, 2019).

Here, AT&T took no steps to secure anything that "a reasonable person would understand as an objective expression of his or her *agreement*" to arbitrate all disputes with AT&T or any of the companies that it owns, including claims based on the conduct of a company that was not an affiliate at the time of the disputed conduct, but later became one. Instead, AT&T followed essentially the same procedure as in *Wexler*, requiring that the customer check a box or sign to accept the "terms and conditions" as part of opening a line of service with the provider. *See Wexler*, 211 F. Supp. 3d at 501 (noting that Wexler ordered an iPhone from Mobility online and "[t]o complete the order, the customer would have had to check a box acknowledging, 'I have read and agree to the Service Agreement under the terms and conditions listed above beginning today.'").

The process used by AT&T in this case is simply the in-person equivalent of the process used in *Wexler* and is in fact the same as was used in *Mey*. *Mey*, 2018 WL 7823097 at *1. Years after their disputes with Cricket arose, Waters and Riddick decided to purchase phones from AT&T and were required to agree to the terms and conditions as part of that process. However, AT&T took no

additional steps to secure an objective expression of either Waters' or Riddick's agreement to arbitrate literally any dispute with AT&T or the companies it owns. Further, AT&T certainly did not take any steps to obtain a reasonable manifestation of assent from Waters or Riddick to arbitrate their prior claims against Cricket specifically, which AT&T happened to acquire in the time period between the relevant conduct and Waters' and Riddick's purchases. Therefore, and just as in *Wexler*, *Mey*, and *Revitch*, Waters and Riddick could not have agreed to arbitrate their present claims because no reasonable person could have understood that AT&T's terms and conditions obligated them to arbitrate any claim against Cricket that arose when Cricket was AT&T's competitor.

The **most** that a reasonable person in Waters' and Riddick's position would have understood is that they were agreeing to arbitration of claims arising out of the AT&T line of service contract that they signed. *See Wexler*, 211 F. Supp. 3d at 504; *see also Mey*, 2018 WL 7823097 at *5–*6. Neither of the claims here fit that standard. Rather, both Waters and Riddick's claims arose out of entirely separate conduct—by a company that was at the relevant time *not* an affiliate of AT&T— which took place over four years before the purported contracts at issue were signed.

Cricket claims that *Revitch* is "distinguishable" because the "affiliate" in that case became an affiliate after the purported contract at issue was signed, rather than before, as is the case here. This argument misses the mark. First, Cricket's argument does nothing to address *Wexler*, where the relevant "affiliates"—AT&T Corp. and AT&T Mobility—were affiliated for the entire relevant period. Second, the line that Judge Spero draws in *Revitch* is not a hard one based merely on timing. Rather, the court there focuses on the reasonable expectations of the parties and the circumstances surrounding the contract at issue. Certainly, the fact that one of the relevant companies was not acquired until after the contract was signed made it obvious that the parties did not expect that their agreement to arbitrate would apply to the future acquired company. But that was merely one factor in the court's decision. The crux of the court's reasoning revolved around the fact that "the relationship…between AT&T Mobility and DirecTV **resulted from the completely fortuitous fact**

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION        No. 3:19-cv-07270-WHA

that a holding company that indirectly owns AT&T Mobility acquired DirecTV." *Revitch*, 2018 WL

4030550 at *12 (emphasis added).  The same is true here.  It was merely a coincidence that, after

Cricket wronged Waters and Riddick, it happened to be acquired by AT&T.  It was an even further

coincidence that over four years after Cricket's wrongful conduct, both Waters and Riddick opted to

open new lines of service with AT&T.

This point is further evidenced by Cricket's and Judge Spero's citation to *Adams v. AT&T*

*Mobility, LLC*, 816 F.Supp.2d 1077, 1080 (W.D. Wash. 2011), *aff'd* 524 F. App'x. 322 (9th Cir.

2013).  Cricket claims that *Adams* supports its argument, however, *Revitch* makes it clear that the

case is inapposite here.  In *Adams*, the plaintiff's "service agreement was subsequently acquired by

New Cingular Wireless PCS, LLC ("New Cingular"), which was at all relevant times a subsidiary of

AT&T Mobility." *Revitch*, 2018 WL 4030550 at *12.  *Revitch* specifies the narrow point that *Adams*

stands for:

> "The Court concludes that *Adams*…, at most, support[s] the conclusion that an entity
> may become an affiliate subject to the arbitration contract after the time of contracting
> ***where that relationship arises from an assignment of the underlying agreement or***
> ***a related entity becomes a successor to the original contracting entity.***"

*Id.* at *13 (emphasis added).[4]  That is not the case here.  AT&T did not "take over" or "acquire" some

service agreement that Waters or Riddick signed with Cricket as part of AT&T's acquisition of

Cricket.  Rather, after their relevant contracts with Cricket expired, Waters and Riddick opted to open

---

[4] Although not addressed in *Revitch*, the other California case Cricket attempts to rely on—*Kaselitz v. hiSoft Tech. Int'l, Ltd.*, 2013 WL 622382 (N.D. Cal. Feb. 15, 2013)—is inapposite for the same reason. It too involved a single contract that was essentially passed from one entity to another as part of an acquisition. *Id.* at *1-*4. It is also distinguishable because the clause at issue there included the limiting language "arising out of, relating to, or resulting from [their] employment." *Id.* at *5. *See Brown v. DIRECTV, LLC*, No. CV 12-08382 DMG EX, 2013 WL 3273811, at *6 (C.D. Cal. June 26, 2013) (finding that an arbitration clause was enforceable because of its limiting language, noting that "[t]he facts of *Jiffy Lube* are not analogous to the situation at hand. The arbitration clause at issue in this case is not as broad as that in *Jiffy Lube*. Instead of a reference to "any and all disputes," it contains the more limited "relating to" language that was absent from the arbitration clause in *Jiffy Lube*.").

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION        No. 3:19-cv-07270-WHA

new lines of service with AT&T.  A reasonable person in their position cannot be assumed to be aware that AT&T had acquired Cricket.  Cricket still existed.  *See e.g.* https://www.cricketwireless.com.  Waters and Riddick could have opted to maintain their relationship with Cricket but chose AT&T instead.  Their signing of a completely new service agreement with AT&T does not bind them to arbitrate claims against a company acquired by AT&T.  As such, like Thomas, they did not agree to arbitration with Cricket.

Because it is clear that none of the three named plaintiffs agreed to a provision that would compel arbitration of this dispute with Cricket, plaintiffs do not need to rely on *McGill,* but all plaintiffs reserve the right to do so should the court allow Cricket to assert arguments for arbitration in the future (which all plaintiffs oppose).

### III.   The Court Should Rule as a Matter of Law That No Agreement Was Formed to Arbitrate this Dispute.

The Court can rule as a matter of law that there was no agreement to arbitrate.  In *Barraza*, the plaintiffs submitted declarations in support of their opposition to the motion to compel arbitration. *Barraza*, 2015 WL 6689396 at *5.  The Court's order noted: "Defendants dispute the credibility of plaintiffs' declarations that they never reviewed any of the promotional materials in the Cricket store and so lacked inquiry notice." *Id*.  In that situation, with disputed factual issues that could not be decided as a matter of law, the Court ruled that a trial was necessary to resolve the dispute. *Id*.  Here, plaintiffs need no evidence to withstand Cricket's Motion to compel arbitration because Cricket has not met its burden by coming forward with evidence to show that any of the plaintiffs assented to arbitrate this dispute.  And the Ninth Circuit applies an objective test evaluating what "a reasonable person in the plaintiff's position would … understand," rather than a subjective standard. *Norcia*, 845 F.3d at 1289.  Accordingly, the Court should rule as a matter of law on Cricket's Motion.

### CONCLUSION

For all the foregoing reasons, the Court should deny Cricket's Motion.

Dated: May 18, 2020

*/s/ Daniel T. LeBel*

**CONSUMER LAW PRACTICE**
Daniel T. LeBel (SBN 246169)
PO Box 720286
San Francisco, CA 94172
Tel: 415-513-1414
Fax: 877-563-7848
danlebel@consumerlawpractice.com

**WADDELL LAW FIRM LLC**
A. Scott Waddell (admitted *pro hac vice*)
2600 Grand Blvd., Suite 580
Kansas City, Missouri 64108
Tel: 816-914-5365
Fax:  816-817-8500
scott@aswlawfirm.com

**BELL LAW, LLC**
Bryce B. Bell (admitted *pro hac vice*)
Mark W. Schmitz (admitted *pro hac vice*)
Andrew R. Taylor (admitted *pro hac vice*)
2600 Grand Blvd., Suite 580
Kansas City, Missouri 6410
Tel: 816-886-8206
Fax:  816-817-8500
Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice* pending)
Eric D. Barton (*pro hac vice* pending)
Melody R. Dickson (*pro hac vice* pending)
Austin Brane, CA Bar #286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
T: 816-701-1100
F: 816-531-2372
thudson@wcllp.com
ebarton@wcllp.com
mdickson@wcllp.com
abrane@wcllp.com

*Attorneys for Plaintiffs*