Archis A. Parasharami (State Bar No. 321661)
Daniel E. Jones (*pro hac vice*)
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.5000
Email:  aparasharami@mayerbrown.com
        djones@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone:  +1.212.506.2373
Facsimile:  +1.212.849.5973
Email:  mingber@mayerbrown.com

Attorneys for Defendant
CRICKET WIRELESS LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JERMAINE THOMAS, JERMAINE MILLER, JAMIE POSTPICHAL, RONALD ELLISON, SARAH WATERS, KAMILAH RIDDICK, FELICIA REDDICK, TIARA CROMWELL, LYSHA ENCARNACION, LANI HALE, MELIZZA WEAVER, ALFREDO SANCHEZ, and CLARISSA KELLY, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CRICKET WIRELESS LLC,<br><br>Defendant. | Case No. 3:19-cv-07270-WHA<br><br>**CRICKET WIRELESS LLC'S REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION OF THE CLAIMS OF PLAINTIFFS JERMAINE THOMAS, SARAH WATERS, AND KAMILAH RIDDICK**<br><br>Date: June 18, 2020<br>Time: 8:00 a.m.<br>Courtroom: 12, 19th Floor<br><br>Judge: Hon. William H. Alsup |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

ARGUMENT .............................................................................................................................. 1

    A.    Thomas Formed An Arbitration Agreement With Cricket Under Missouri Law. ................................................................................................................... 1

    B.    The Scope Of Waters's And Riddick's Arbitration Agreements With AT&T Covers Their Claims Against Cricket. ...................................................... 5

        1.    The question here is the scope of plaintiffs' arbitration agreements, not their formation. ................................................................................. 5

        2.    The plain language of the arbitration agreement covers plaintiffs' claims. ................................................................................................... 8

        3.    It is proper to enforce plaintiffs' agreements according to their terms. .................................................................................................... 9

CONCLUSION ........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*14 Penn Plaza LLC v. Pyett*,
 556 U.S. 247 (2009) ............................................................................................................. 11

*Adams v. AT&T Mobility LLC*,
 524 F. App'x 322 (9th Cir. 2013) ................................................................................. 6, 8, 9

*Andermann v. Sprint Spectrum L.P.*,
 785 F.3d 1157 (7th Cir. 2015) ...................................................................................7, 12, 13

*AT&T Mobility LLC v. Concepcion*,
 563 U.S. 333 (2011) ....................................................................................................... 10, 11

*Barraza v. Cricket Wireless LLC*,
 2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) ........................................................................ 1

*Barros v. UBS Trust Co. of Puerto Rico*,
 915 F. Supp. 2d 226 (D.P.R. 2012) ....................................................................................... 7

*Bd. of Tr. of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup
 Glob. Mkts., Inc.*,
 622 F.3d 1335 (11th Cir. 2010) ........................................................................................... 14

*Bond v. Cricket Commc'ns, LLC*,
 2016 WL 153036 (D. Md. Jan. 12, 2016) ............................................................................. 6

*Brown v. ITT Consumer Fin. Corp.*,
 211 F.3d 1217 (11th Cir. 2000) ........................................................................................... 10

*Caley v. Gulfstream Aerospace Corp.*,
 428 F.3d 1359 (11th Cir. 2005) ............................................................................................. 3

*Cara's Notions, Inc. v. Hallmark Cards, Inc.*,
 140 F.3d 566 (4th Cir. 1998) ............................................................................................... 10

*Carbajal v. H&R Block Tax Servs., Inc.*,
 372 F.3d 903 (7th Cir. 2004) ............................................................................................... 11

*Citibank (S.D.), N.A. v. Wilson*,
 160 S.W.3d 810 (Mo. Ct. App. 2005) ............................................................................... 2, 3

*Clarke v. Alltran Fin., LP*,
 2018 WL 1036951 (E.D.N.Y. Feb. 22, 2018) ....................................................................... 7

*CompuCredit Corp. v. Greenwood*,
 565 U.S. 95 (2012) ......................................................................................................... 10, 15

*Cooks v. AN Regional Mgmt., Ltd.*,
 2015 WL 9583806 (N.D. Tex. Dec. 30, 2015) ..................................................................... 7

*Cordoba v. DIRECTV, LLC*,
 801 F. App'x 723 (11th Cir. 2020) ..................................................................................... 14

*Craddock v. Beats Music, LLC*,
 2015 WL 4960041 (N.D. Ill. Aug. 19, 2015) ...........................................................................13

*Doctor's Assocs., Inc. v. Casarotto*,
 517 U.S. 681 (1996) ................................................................................................................10

*Epic Sys. Corp. v. Lewis*,
 138 S. Ct. 1612 (2018) ............................................................................................................10

*Esparza v. SmartPay Lending*,
 2017 WL 4390182 (N.D. Cal. Oct. 3, 2017) ...........................................................................13

*Franse v. Sandlapper Secs., LLC*,
 2018 WL 4051742 (E.D. Cal. Aug. 24, 2018) ..........................................................................7

*Genesco, Inv. v. Takiuchi & Co.*,
 815 F.2d 840 (2d Cir. 1987) .....................................................................................................3

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
 561 U.S. 287 (2010) ..................................................................................................................6

*Hobbs v. Tamko Bldg. Products, Inc.*,
 479 S.W.3d 147 (Mo. Ct. App. 2015) ......................................................................................4

*Hollingsworth v. Jackson Hewitt, Inc.*,
 2016 WL 6778380 (N.D. Ill. Nov. 16, 2016) .........................................................................13

*Int'l Foodsource, LLC v. Grower Direct Nut Co.*,
 2016 WL 4150748 (D.N.J. Aug. 3, 2016) ................................................................................5

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
 847 F. Supp. 2d 1253 (S.D. Cal. 2012) ..................................................................................11

*Kunzie v. Jack-In-The-Box, Inc.*,
 330 S.W.3d 476 (Mo. App. 2010) ............................................................................................4

*Lamps Plus, Inc. v. Varela*,
 139 S. Ct. 1407 (2019) .......................................................................................................5, 10

*Marmet Health Care Center, Inc. v. Brown*,
 565 U.S. 530 (2012) ..........................................................................................................14, 15

*Martinez v. Carnival Corp.*,
 744 F.3d 1240 (11th Cir. 2014) ................................................................................................6

*Mey v. DIRECTV, LLC*,
 2018 WL 7823097 (N.D. W. Va. Apr. 25, 2018) ................................................................9, 11

*Parm v. Bluestem Brands, Inc.*,
 898 F.3d 869 (8th Cir. 2018) .................................................................................................13

*Pride v. Lewis*,
 179 S.W.3d 375 (Mo. App. 2005) ............................................................................................3

*Rent-A-Center, West, Inc. v. Jackson*,
   561 U.S. 63 (2010)............................................................................................................10

*Revitch v. DIRECTV, LLC*,
   2018 WL 4030550 (N.D. Cal. Aug. 23, 2018) ........................................................... *passim*

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
   490 U.S. 477 (1989)............................................................................................................11

*Schnabel v. Trilegant Corp.*,
   697 F.3d 110 (2d Cir. 2012)..................................................................................................5

*Seawright v. Amer. Gen. Fin. Servs.*,
   507 F.3d 967 (6th Cir. 2007) ................................................................................................3

*Sgorous v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016) ..............................................................................................5

*Shearson/Am. Express, Inc. v. McMahon*,
   482 U.S. 220 (1987)............................................................................................................15

*Shockley v. PrimeLending*,
   929 F.3d 1012 (8th Cir. 2019) .........................................................................................3, 4

*Smith v. Steinkamp*,
   318 F.3d 775 (7th Cir. 2003) .......................................................................................12, 13

*Stinson v. Best Buy Co., Inc.*,
   2018 WL 3850739 (D. Minn. June 26, 2018).....................................................................13

*Tinder v. Pinkerton Security*,
   305 F.3d 728 (7th Cir. 2002) ................................................................................................3

*Wexler v. AT&T Corp.*,
   211 F. Supp. 3d 500 (E.D.N.Y. 2016) ......................................................................... *passim*

**Statutes**

9 U.S.C. § 3............................................................................................................................3

Plaintiffs' resistance to arbitration boils down to two arguments. Neither has merit.

*First*, Thomas argues that he did not form a contract under Missouri law. But he continued to pay for and use Cricket service after receiving two text messages alerting him to "Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions"—and providing a link to the terms. Mem. 2, 5; Decl. of Nicole Garcia ¶ 16. Those linked terms say that paying for and using Cricket service—which is month-to-month—equals acceptance. Under Missouri law, that process amounts to a valid offer and acceptance of contract terms.

*Second*, Waters and Riddick argue that the arbitration clause in their service agreements with AT&T Mobility does not encompass their claims against Cricket. But the clause expressly covers these claims: Waters and Riddick signed up for wireless service with AT&T Mobility long after AT&T had acquired Cricket; they agreed to "arbitrate all disputes and claims" with AT&T Mobility and its "affiliates"—which undisputedly covers Cricket—and the clause specifically includes "claims that arose before" plaintiffs entered into their agreements with AT&T. Mem. 6-7. As explained below, the cases on which plaintiffs rely are distinguishable, wrongly decided, and contravene the FAA and Supreme Court precedent.[1]

### ARGUMENT

**A. Thomas Formed An Arbitration Agreement With Cricket Under Missouri Law.**

The issue on which this Court ordered a summary trial in *Barraza v. Cricket Wireless LLC*, 2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) was whether the plaintiffs in that case had adequate notice of the contract terms governing their Cricket service. *See id.* at *4-5. As our opening brief demonstrated (at 2, 5), Thomas is in a much different situation because he received two text messages: (1) directly alerting him to "Cricket's updated Terms and Conditions of Service"; (2) explaining that the Terms "include[] your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions"; and (3) linking to the full text of those Terms. Thomas asserts in a single sentence that the "purported contract Cricket now tries to create

---

[1] While plaintiffs purport to "reserve the right" to "rely on *McGill*" (Opp. 17), they offer no response to our showing (Mem. 17-20) that *McGill* does not apply here for multiple reasons.

was not published in a way that a reasonable person in Thomas's position could receive notice of its existence" (Opp. 7), but that disregards the content of the text messages themselves, which highlight Cricket's updated Terms—calling out the arbitration clause and its key provisions—and placed those terms a click away. Tellingly, Thomas does not deny receiving or reviewing the texts.

Instead, Thomas pivots to the issue of assent, arguing that continuing to pay for and receive Cricket service after receiving the text messages does not constitute assent to the Terms. Opp. 3, 6-9. But Missouri law says otherwise: It permits acceptance of an offer "by the offeree's conduct or failure to act" when that is the form of assent specified in the terms that have been offered. Mem. 12 (quoting *Citibank (S.D.), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005) (citation omitted)). That is the case here: Cricket's updated Terms inform the customer that "you accept these Ts&Cs by . . . paying for Service . . . [or] using or attempting to use the Service in any way . . . . If you do not want to accept these Ts & Cs, do not take any of these actions." Decl. of Dan Northington Ex. 1. And that clear language undermines Thomas's contention (Opp. 7) that he lacked an opportunity to accept or reject the updated Terms.

Thomas ignores two of the three cases we cited in our opening brief (at 13) holding that, under Missouri law, a plaintiff agreed to contract terms through continued use of a product or service after receiving notice that continued use constitutes assent. Instead, Thomas addresses only *Wilson*, but his attempts at distinctions (Opp. 8-9) fall flat.

*First*, Thomas points out that the plaintiff in *Wilson* signed to accept the *initial* terms offered by the defendant. Opp. 8 (citing *Wilson*, 160 S.W.3d at 811). But he fails to explain why that factual distinction has any relevance, given that the issue in *Wilson* was whether the plaintiff accepted the *revised* terms, which the plaintiff did by continuing to use her credit card after receiving notice of the revised terms, rather than by signing any document. 160 S.W.3d at 813 ("Wilson accepted the revised agreement by her conduct with regard to her credit card"). And as Thomas elsewhere recognizes (Opp. 7), a signature is not required to demonstrate assent under Missouri law.[2] Similar to Cricket's updated terms here, the revised agreement in *Wilson* "was

---

[2] Similarly, while the FAA requires that arbitration agreements be "in writing" (9 U.S.C. § 3), it does not require that they be signed. Every circuit court to address this issue has so held.

binding unless [plaintiff] cancelled her account within thirty days and did not use her credit card." 160 S.W.3d at 813. Contrary to Thomas's implication, *Wilson* did not turn on whether the plaintiff had previously accepted the original terms. Even if Thomas were correct that his original relationship with Cricket was not subject to the terms in the cell phone box, *Wilson* requires enforcement of the terms provided via the text messages.

*Second*, Thomas notes that the defendant in *Wilson* mailed the full text of the revised terms to the customer. Opp. 8-9. But that claimed distinction makes no difference. He simply ignores our explanation (Mem. 13) that a short text message highlighting the arbitration clause and linking to the full terms provides a smartphone user like Thomas at least the same degree of notice of the clause as including printed terms in a mailing.

The other cases that Thomas relies upon are inapposite. First, Thomas cites *Pride v. Lewis*, 179 S.W. 3d 375, 379 (Mo. App. 2005) for the "general rule" that "silence or inaction cannot constitute acceptance of an offer." But he neglects to mention that *in the very next paragraph*, the court explained that "[t]his general rule does have exceptions, however," citing *Wilson* in observing that "[a]n offer may be accepted by conduct or failure to act." *Id.* at 379-80. True, the circumstances in *Pride* did not fit that exception. But there, *unlike Cricket's terms here*, the proposed terms did not specify assent by payment for or continued use of a service.[3]

*Shockley v. PrimeLending*, 929 F.3d 1012 (8th Cir. 2019) (cited at Opp. 3, 6, 8) is distinguishable for much the same reasons. The Eighth Circuit held that "mere continuation of employment" or having an opportunity for "mere review" of the contractual terms was not enough to demonstrate assent under Missouri law *unless* the agreement "clearly states that continued employment constitutes acceptance, and the employer informs all employees that continued

---

*See Seawright v. Amer. Gen. Fin. Servs.*, 507 F.3d 967, 978 (6th Cir. 2007); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005); *Tinder v. Pinkerton Security*, 305 F.3d 728, 736 (7th Cir. 2002); *Genesco, Inv. v. Takiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987).

[3] *Pride* involved a real estate contract. The defendants changed the closing date and initialed the change; and the issue was whether the plaintiffs accepted the counteroffer represented by the change in closing date even though they did not similarly initial the change or take any other action to manifest their agreement to the new closing date in accordance with the manner specified in the contract. *Id.* at 380.

employment constitutes acceptance." 929 F.3d at 1019.  Indeed, the *Shockley* Court recognized that, under Missouri law, "[a]cceptance of an offer is a manifestation of assent to the terms thereof made by the offeree *in a manner invited or required by the offer*." *Id.* (quotation marks omitted; emphasis added).  That is what happened here: Thomas accepted Cricket's proposed terms in the precise manner invited and required by those terms.

The circumstances in *Kunzie v. Jack-In-The-Box, Inc.*, 330 S.W.3d 476 (Mo. App. 2010) are meaningfully different as well.  The defendant pointed to what purported to be an arbitration agreement signed by the plaintiff, but the plaintiff responded with an affidavit asserting that the signature was a sham and that he never signed the agreement—noting inaccuracies in the spelling of his name and in his personal information.  *Id.* at 479.  Rather than resolve this factual dispute, the trial court compelled arbitration based on the plaintiff's continued employment.  *Id.* at 482. The court of appeals reversed, noting that if the plaintiff never signed an arbitration agreement that called for his signature, that "reasonably supports a finding that Appellant rejected Employer's condition of arbitration."  *Id.* at 486.  Here, by contrast, Cricket's terms did not require a signature to manifest assent, but instead expressly stated that a customer like Thomas accepts by, among other things, continuing to pay for and use Cricket service.  *See* Mem. 12; Northington Decl. Ex. 1.  Unlike in *Kunzie*, Thomas's conduct amounted to assent to the updated Cricket Terms.

Finally, *Hobbs v. Tamko Bldg. Products, Inc.*, 479 S.W.3d 147 (Mo. Ct. App. 2015) offers Thomas no help.  The court there declined to enforce an arbitration agreement printed on the wrappers of roofing-shingle packages.  The court viewed the purchase of shingles as distinguishable "from the purchase of computer software or use of credit cards" (*id.* at 150 & n.4)—situations (like the purchase of wireless service) in which the purchaser reasonably expects that there will be terms and conditions governing the product or service.  Moreover, the plaintiffs in *Hobbs* submitted affidavits disclaiming any awareness of the contractual terms, and the court noted that "[u]nlike computer documentation, the packaging for shingles is not an item typically kept by a consumer after the shingles are unbundled and used."  *Id.* at 150.  Here, by contrast, Thomas has not submitted an affidavit claiming to be unaware of Cricket's updated terms—nor could he, given the clarity of the text messages and the availability of the full text of Cricket's

updated Terms only a click away. *Hobbs* is therefore inapplicable here.[4]

### B. The Scope Of Waters' And Riddick's Arbitration Agreements With AT&T Covers Their Claims Against Cricket.

#### 1. The question here is the scope of plaintiffs' arbitration agreements, not their formation.

Plaintiffs Waters and Riddick do not deny that they accepted AT&T's Wireless Customer Agreement. *See* Mem. 4-7, 13-14. They do not deny that the arbitration clause in that agreement covers "all disputes and claims between us," with "us" defined to include AT&T Mobility's "affiliates." They also do not deny (*see* Mem. 14-15) that Cricket is an "affiliate[]" of AT&T Mobility under the plain meaning of that term. And, finally, they do not dispute that, as discussed in our opening brief (at 16-17), the FAA and the Supreme Court's decision in *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418-19 (2019) require that any uncertainties regarding the interpretation of the scope of an arbitration agreement be resolved *in favor of* arbitration—and the FAA preempts any state-law rule to the contrary.[5]

Plaintiffs nevertheless insist that "[n]o agreement to arbitrate the claims *against Cricket*

---

[4] The few non-Missouri cases Thomas cites (Opp. 9) are inapplicable as well. Unlike the e-mail in *Schnabel v. Trilegant Corp.*, 697 F.3d 110 (2d Cir. 2012), which failed to "put[] recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled" (*id.* at 123), here the text messages specifically informed recipients of the updated terms governing their Cricket service, *including the arbitration provision in particular*. *See also id.* at 127 ("there is nothing in the record to suggest that the email to the plaintiffs appeared to be a contract or that the terms were called to the attention of the plaintiffs") (quotation marks and alterations omitted).

In *Sgorous v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016), the website at issue "actively misle[d] the customer" by stating that clicking a box authorized the defendant to obtain the customer's personal information rather than saying anything about agreeing to contractual terms. *Id.* at 1035. Accordingly, *Sgorous* just stands for "the sensible conclusion that where a website specifically states that clicking means one thing, that click does not bind users to something else." *Id.* at 1036.

Finally, the court in *International Foodsource, LLC v. Grower Direct Nut Co.*, 2016 WL 4150748 (D.N.J. Aug. 3, 2016), in fact *granted* the defendant's motion to compel arbitration. While the court noted that the arbitration contracts in that case were signed, it did not hold (or even suggest) that a signature is the only way to manifest assent to an agreement. *Id.* at *11-12.

[5] Notably, the conclusion in *Revitch v. DIRECTV, LLC*, 2018 WL 4030550, at *16 (N.D. Cal. Aug. 23, 2018), *appeal pending*, No. 18-16823 (9th Cir.), that ambiguities should be resolved against the drafter under state law was subsequently rejected by the Supreme Court in *Lamps Plus*. Plaintiffs fail to mention that part of the opinion in *Revitch*.

was formed." Opp. 10 (emphasis added). They rely on *Revitch*, which in turn embraced a decision of a district court in New York "finding that the 'unlimited scope' of the arbitration agreement presented a question of contract formation." 2018 WL 4030550, at *14 (quoting *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016)). Similar to plaintiffs here, the decision in *Revitch* erroneously viewed the formation issue as being whether "the parties intend[ed] to enter into an agreement to arbitrate *the claim asserted in this case*." *Id.* at *7 (emphasis added). That formulation confuses two distinct concepts: (1) whether the parties entered into an arbitration agreement (formation); and (2) whether that agreement covers the claims plaintiffs are asserting in this lawsuit (scope).

Only the first of those issues relates to contract formation. Indeed, the distinction between the two concepts has been recognized by the Supreme Court, the Ninth Circuit, and numerous other courts across the country. As the Supreme Court has made clear, once a defendant has established the existence of an agreement "to arbitrate *some* matters pursuant to an arbitration clause," the court must then move on to determining the *scope* of arbitral issues. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010) (quotation marks omitted); *id.* at 299 (distinguishing between "the formation" of an arbitration agreement and "its enforceability or applicability to the dispute"); *see also, e.g.*, *Martinez v. Carnival Corp.*, 744 F.3d 1240, 1246 (11th Cir. 2014) ("When parties agree to arbitrate some matters pursuant to an arbitration clause, the 'law's permissive policies in respect to arbitration counsel that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration.'") (quoting *Granite Rock*, 561 U.S. at 298); *Bond v. Cricket Commc'ns, LLC*, 2016 WL 153036, at *3 (D. Md. Jan. 12, 2016) ("Because the parties have agreed to arbitrate *some* matters pursuant to the Arbitration Clause, the Court must decide whether Bond's claims are within its scope.") (quotation marks and alterations omitted).

The Ninth Circuit recognized in *Adams v. AT&T Mobility LLC* that the question of whether plaintiffs agreed to arbitrate their claims with related corporate entities under the language of their arbitration agreements is a question of the agreements' scope. The issue in *Adams* was whether AT&T Mobility could compel arbitration under an agreement between the plaintiff and her former wireless carrier Unicel that covered both Unicel and "various additional parties, such as assignees,

parent companies, successors, subsidiaries, and affiliates." 524 F. App'x 322, 324 (9th Cir. 2013). The court described the issue as whether the plaintiff's "dispute with ATTM is within the *scope* of the arbitration clause in her wireless contract." *Id.* (emphasis added); *see also id.* (applying the rule that "ambiguities as to the *scope* of the arbitration clause must be resolved in favor of arbitration") (emphasis added; quotation marks omitted).

Similarly, the Seventh Circuit treated the issue of whether a couple's claims against an affiliate of the assignee of their Sprint wireless contracts were subject to arbitration as "one of interpreting the [arbitration] clause to see whether it covers the dispute." *Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157, 1159 (7th Cir. 2015). And as we discussed in our opening brief (at 15-16), the decision in *Clarke v. Alltran Fin., LP*, 2018 WL 1036951 (E.D.N.Y. Feb. 22, 2018) held that a third-party collections company could enforce the plaintiff's arbitration agreement with Citibank "under the plain language of the card agreement," applying "basic principles of contract interpretation." *Id.* at *4 (emphasis added). Plaintiffs ignore *Clarke* and the similar cases it relies upon. Other courts have likewise concluded that whether a defendant that falls within the group of entities covered by an arbitration provision—such as "affiliates" or "subsidiaries"—can compel arbitration is a question of scope.[6]

In short, the meaning of the term "affiliates" and the reach of plaintiffs' agreements to arbitrate "all disputes and claims" are questions of interpretation—*i.e.*, scope—not formation.

   *2.   The plain language of the arbitration agreement covers plaintiffs' claims.*

Plaintiffs acknowledge that they agreed to AT&T's arbitration provision, and that the provision requires them to arbitrate "all disputes and claims between us." Opp. 11 (quoting Berg Decl. Ex. 17 § 2.2(1)). They also acknowledge that "us" is defined to include the parties' "respective subsidiaries, *affiliates*, agents, employees, predecessors in interest, successors, and

---

[6] *See, e.g.*, *Franse v. Sandlapper Secs., LLC*, 2018 WL 4051742, at *3 (E.D. Cal. Aug. 24, 2018) ("[I]n assessing the *scope* of the arbitration clause here, the Court must determine whether it can be construed to encompass the dispute between Plaintiff and Defendant Sandlapper Securities, LLC, despite the fact that the clause itself … uses the phrase 'the Affiliates' rather than identifying Sandlapper specifically.") (emphasis added); *Cooks v. AN Regional Mgmt., Ltd.*, 2015 WL 9583806, at *2 (N.D. Tex. Dec. 30, 2015); *Barros v. UBS Trust Co. of Puerto Rico*, 915 F. Supp. 2d 226, 229-31 (D.P.R. 2012).

assigns, as well as all authorized or unauthorized users or beneficiaries of services of Devices under this or prior Agreements between us." *Id.* (emphasis added). They do not deny that Cricket is an "affiliate[]" of AT&T Mobility because both are commonly owned by AT&T Inc.

In response to the plain language of the agreement, plaintiffs argue that AT&T must satisfy a test of plaintiffs' own making: "(a) AT&T's intent was to bind her (or him) to arbitration of any dispute with AT&T and *any company that it owned*, (b) AT&T now owns Cricket; and (c) even disputes that occurred when AT&T and Cricket were competitors were intended to be covered by the language in the agreement." Opp. 4 (emphasis plaintiffs'). But—although there is no basis for the test—all three criteria are in fact satisfied.

First, the arbitration provision's definition of "us" to cover the waterfront of related corporate entities, including "affiliates" such as Cricket, clearly shows the intention to cover claims other than those brought against (or by) AT&T Mobility itself. Plaintiffs' contrary approach would render that definition surplusage.

Second, plaintiffs do not deny that AT&T owns Cricket and that it acquired Cricket long before Waters and Riddick entered into their Wireless Customer Agreements with AT&T. Plaintiffs assert that AT&T should have "identif[ied] Cricket" by name or "state[d] that AT&T owned Cricket" in the arbitration provision. Opp. 3. But there is no support for the novel assertion that contracts must name each corporate relative rather than using descriptors like "affiliates," "subsidiaries," "successors," and "assigns"—a requirement that would stand in sharp contrast to cases like *Adams*, 524 F. App'x 322, that have enforced arbitration agreements on the basis of those corporate relationships. *See* Mem. 15-16. Accordingly, plaintiffs' assertion that AT&T "did not take any steps to obtain a reasonable manifestation of assent from Waters or Cricket to arbitrate their prior claims against Cricket specifically" (Opp. 15) is simply false. Plaintiffs signed to accept their service agreements—an act that undisputedly formed a contract—including the provision requiring arbitration of disputes against AT&T Mobility's "affiliates."[7] Indeed, plaintiffs concede

---

[7] Plaintiffs, following the court in *Revitch*, assert that *Adams* is limited to its precise facts, which involved the assignment of the plaintiffs' wireless service agreements to a subsidiary of AT&T Mobility. Opp. 16. But the Ninth Circuit in *Adams* did not rely on the *nature of the transaction* by which the companies became related. Instead, it looked to the plain language of

8

(Opp. 17) that the inquiry is an objective one based on the contract's text, not plaintiffs' subjective understanding of, for example, what companies AT&T owns.

Finally, nothing supports plaintiffs' contention that the arbitration provision does not cover disputes that arose against Cricket prior to its acquisition by AT&T. The provision's coverage of "all disputes and claims between us" "includes, but is not limited to," "claims *that arose before* this or *any* prior Agreement (including, but not limited to, claims relating to advertising)." Berg Decl. Ex. 17 § 2.2(1) (emphasis added). That covers all past claims against both AT&T Mobility and its affiliates, with no language supporting the hair-splitting plaintiffs urge here. In addition, the arbitration provision expressly covers claims against AT&T Mobility's "predecessors in interest." *Id.* Such claims, by definition, would necessarily arise prior to the formation of the relationship between AT&T Mobility and that predecessor entity. Plaintiffs offer no explanation why the term "affiliates" should be read any differently.

Even if the agreement were ambiguous on this score, the Supreme Court's decision in *Lamps Plus* confirms the FAA's mandate that all ambiguities be resolved in favor of arbitration. Because plaintiffs' agreements *can* reasonably be interpreted to cover their claims here, the FAA dictates that they *must* be interpreted in that way.

       3.    *It is proper to enforce plaintiffs' agreements according to their terms.*

Rather than confront the text of their arbitration agreements, plaintiffs' principal argument is that the plain language of those agreements should not be enforced as written. Relying on *Revitch*, *Wexler*, and *Mey v. DIRECTV, LLC*, 2018 WL 7823097 (N.D. W. Va. Apr. 25, 2018), *appeal pending*, No. 18-1534 (4th Cir.), they insist that the provision must be limited "to claims arising out of the AT&T line of service contract that they signed." Opp. 15.

That manufactured limitation has no basis in the text of their agreements. Instead,

---

the contract, noting that "[t]he arbitration clause redefines the subject pronoun 'we' to include various additional parties, such as assignees, parent companies, successors, subsidiaries, and affiliates." *Adams*, 524 F. App'x at 324. And the Court deemed it "unlikely that the object pronoun 'us,' used in the same sentence, was intended to denote different parties than 'we'" and therefore held that the term included AT&T Mobility. *Id.* Here, for example, the text of the arbitration agreement separately covers both "assigns" *and* "affiliates," and the applicability of the latter term does not depend on whether there is also an assignee relationship at issue.

arbitration agreements must be enforced as written. Indeed, few refrains are more consistent in the Supreme Court's FAA decisions than the directive that Section 2 requires courts to enforce arbitration agreements "according to their terms." *E.g.*, *Lamps Plus*, 139 S. Ct. at 1412; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 688 (1996).

Unsurprisingly, other courts have enforced similarly broad arbitration agreements according to their terms, rather than manufacturing limitations on the agreements' plain language. For example, the Eleventh Circuit affirmed an order compelling arbitration of an employee's Title VII claims under an "unequivocal and all-encompassing" provision that required arbitration of "any dispute between [the parties] or claim by either against the other." *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000). The court explained that, "[b]y using this inclusive language, the parties agreed to arbitrate any and all claims against each other, *with no exceptions*." *Id.* (emphasis added). And the court further *rejected* the plaintiff's argument that the provision "is too broad" because it "address[es] not just those claims arising out of the employment contract, but all claims between the parties, including statutory violations." *Id.* at 1222. As the court explained, such an argument is just an "attempt to argue that Title VII and other statutory claims are not arbitrable," which is foreclosed by Supreme Court precedent. *Id.* The Fourth Circuit has similarly enforced an arbitration clause that "applies to '[a]ny controversy or claim' relating to 'any aspects of the relationship'" between the parties, explaining that "[t]he breadth of the language clearly establishes that the arbitration clause was intended to apply to *all conflicts between the parties* and not only to conflicts regarding [one contract] in particular." *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 571 (4th Cir. 1998) (emphasis added; some alterations in original).

The Court should reject plaintiffs' arguments to the contrary for several reasons.

**1.** As an initial matter, *Revitch* is distinguishable for the reasons discussed in our opening brief, because it held only that AT&T's arbitration agreement did not apply to "*future* affiliates." Mem. 16 (emphasis added). The district court in *Mey* similarly held that "[e]ven though the parties

are affiliated, it is important to note that at the time the arbitration clause was accepted, the companies were not affiliated." 2018 WL 7823097, at *5. That is not the case here, and plaintiffs' assertion that *Revitch* did not turn on this distinction (Opp. 15) is contradicted by the opinion itself, which rested on the conclusion that "the arbitration provision in the Customer Agreement does not expressly authorize a *future* affiliate to compel arbitration." *Revitch*, 2018 WL 4030550, at *13 (emphasis added); *see also id.* at *10 ("The Court concludes that although the term "affiliate" as commonly understood and as used in the Wireless Agreement includes sibling corporations, it was not the parties' intent to enter into an arbitration agreement that would cover claims against an entity (like DirecTV) that became affiliated with AT&T Mobility years *after* Plaintiff entered into the contract with AT&T Mobility") (emphasis added).

**2.** Next, the suggestion that it would be "absurd" for a party to agree to arbitrate a broad range of disputes (*Revitch*, 2018 WL 4030550, at *14-15; *Wexler*, 211 F. Supp. 3d at 503) both contradicts the FAA's mandate to enforce arbitration agreements according to their terms and impermissibly treats arbitration as "second-class adjudication." *Carbajal v. H&R Block Tax Servs., Inc.*, 372 F.3d 903, 906 (7th Cir. 2004); *see also Concepcion*, 563 U.S. at 341-42. Any such state-law rule would therefore be preempted by the FAA.

Indeed, the Supreme Court has warned that the "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants" is "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481 (1989); *see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 266 (2009).

For that reason, plaintiffs' reliance (Opp. 11-12) on *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) is misplaced. That court held that an arbitration provision was unconscionable because (in its view) the scope was overbroad. But declaring it unreasonable to arbitrate a broad range of disputes is precisely the type of hostility to arbitration that the FAA rejects. That is likely why both *Revitch* and *Wexler* recognized that *Jiffy Lube* is in tension with *Concepcion*. *Revitch*, 2018 WL 4030550, at *14; *Wexler*, 211 F. Supp. 3d at 504-05. Instead, those courts' basis for avoiding the FAA was their (erroneous) view of the issue as one of

contract formation rather than scope. *See* pages 5-7, *supra*.

**3.** Moreover, the *Wexler* court—and by extension, the courts in *Revitch* and *Mey*—erred in focusing on fanciful hypotheticals rather than the actual allegations in the case.

In denying AT&T's motion to compel arbitration, the court in *Wexler* refused to apply "the literal meaning of the clause's language" and instead concluded that, "at most," the claims subject to arbitration are those "connected in some way to the service agreement with [AT&T] Mobility." 211 F. Supp. 3d at 504. The *Wexler* court reached this narrowing construction—divorced from the broad language of the arbitration agreement—by expressing "concern" about arbitration clauses that are written to cover a broad range of disputes because they could cover hypothetical situations in which a company and its affiliates seek to enforce the arbitration provision against "any claim whatsoever"—such as "[i]f [the plaintiff] were hit by a Mobility delivery van, or if she tripped over a dangerous condition in a Mobility store," or if "she bought shares of stock in Mobility and later" brought a securities-fraud claim. *Id.* at 502-03.

To support the notion that hypothetical concerns can support the denial of arbitration, the court in *Wexler* (211 F. Supp. 3d at 503) relied heavily on *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003). In *Smith*, the Seventh Circuit, in an opinion by Judge Posner, colorfully imagined that a payday loan company might murder customers in order to discourage defaulting on debts and then attempt to compel arbitration of a wrongful-death suit. *Id.* at 777.

But in *Andermann* Judge Posner himself made clear that applying *Smith*'s reasoning in a less extreme context is unwarranted. The plaintiffs in *Andermann* had argued that *Smith* stands for the proposition that it would be an "absurd result" to apply an arbitration provision to "statutory and tort claims" that do not seek to enforce the terms of the underlying contract. *Andermann*, 785 F.3d at 1159. The *Andermann* court rejected that argument, explaining that the plaintiffs' interpretation of *Smith* was "untenable":

> What we said, which differs totally from the Andermanns' characterization of what we said, is that "absurd results" would ensue if the arising-from and relating-to provisions contained in a payday loan agreement, defining what disputes would have to be arbitrated rather than litigated, were cut free from the loan and applied to a *subsequent* payday loan agreement that did not contain those provisions. That is not this case. The Andermanns' contract, containing the arising-out-of or relating-to provisions, is a single contract.

785 F.3d at 1159 (emphasis added; citation omitted); *see also, e.g.*, *Hollingsworth v. Jackson Hewitt, Inc.*, 2016 WL 6778380, at *2-3 (N.D. Ill. Nov. 16, 2016) (relying on this part of *Andermann* to hold that "the *Steinkamp* issue . . . is not present" and compelling arbitration); *Craddock v. Beats Music, LLC*, 2015 WL 4960041, at *5 n.4 (N.D. Ill. Aug. 19, 2015) ("*Steinkamp* does not apply here, as Craddock's claims fall within the scope of a single dispute resolution agreement" and therefore compelling arbitration). *Wexler*, *Revitch*, and *Mey* (and *Jiffy Lube*, *see* 847 F. Supp. 2d at 1253) all rely on the same misreading of *Smith v. Steinkamp* that was rejected in *Andermann*, *Hollingsworth*, and *Craddock*.[8]

A more recent Eighth Circuit decision confirms that it is improper for courts to rely upon imagined hypotheticals to refuse to enforce an arbitration agreement as written. *See Parm v. Bluestem Brands, Inc.*, 898 F.3d 869 (8th Cir. 2018). In that case, the Eighth Circuit reversed the district court's partial denial of the defendant's motion to compel arbitration after concluding that "all of the plaintiffs' claims fall within the scope of the arbitration clauses." *Id.* at 871. Most relevant here, the Eighth Circuit rejected the parade of "hypotheticals" offered by the plaintiffs and the district court—such as "a car accident between a consumer and her neighbor or the third-party courier" delivering the items plaintiffs purchased from the defendant or another "personal injury claim"—because those hypotheticals had nothing to do with the "*actual* allegations" in the case. *Id.* at 874-78; *see also, e.g.*, *Stinson v. Best Buy Co., Inc.*, 2018 WL 3850739, at *9-10 (D. Minn. June 26, 2018) (rejecting as "without merit" plaintiff's "absurd results" argument and "the proposition that an arbitration agreement can be completely invalidated because one can imagine absurd applications of the contractual language").

There is nothing absurd about requiring plaintiffs to arbitrate claims relating to wireless

---

[8] For these reasons, plaintiffs' reliance (Opp. 14) on this Court's decision in *Esparza v. SmartPay Lending*, 2017 WL 4390182 (N.D. Cal. Oct. 3, 2017) is misplaced. The clause in that case was expressly limited to disputes arising from the parties' lease agreement, and the TCPA claims there did not fit that limitation. *Id.* at *2-3. The Ninth Circuit affirmed on that basis. 765 F. App'x 218 (9th Cir. 2019). And while this Court in a final paragraph cited *Jiffy Lube* (and another case following *Jiffy Lube*) in stating that "reading the clause as applying to any and every claim arising between SmartPay and its customers, even including employment and tort claims, with no limiting principle would render the clause impermissibly overbroad, and therefore inoperable" (2017 WL 4390182), that statement is dictum that conflicts with *Concepcion*.

service offered by another member of the AT&T family of companies under their wireless service agreements with AT&T Mobility. Claims based on similar wireless service provided by an affiliate are a far cry from the fanciful hypotheticals advanced in *Wexler* or *Steinkamp*.

Indeed, although we disagree with the holding in *Wexler*, it is also distinguishable because the claims against the corporate affiliate in that case related to that affiliate's offering of television and Internet service, not, as here, wireless cell phone service. And the court relied on that fact in concluding that the plaintiff did not agree to arbitrate disputes against affiliates "who provide services *unrelated to cell phone coverage*." *Wexler*, 211 F. Supp. 3d at 514 (emphasis added). *Revitch* and *Mey* are distinguishable for the same reason: both involved claims against DIRECTV about its marketing of television service.

**4.** Finally, plaintiffs also assert that *Wexler* stands for the proposition that "the FAA explicitly limits itself to agreements 'to settle by arbitration a controversy thereafter *arising out of such contract or transaction, or the refusal to perform the whole or any part thereof*.'" Opp. 4 (quoting *Wexler*, 211 F. Supp. 3d at 504 (emphasis in *Wexler*)). They neglect to mention, however, that the Eleventh Circuit recently reversed a decision holding that the FAA requires a claim to arise out of a contract to be arbitrable. *Cordoba v. DIRECTV, LLC*, 801 F. App'x 723 (11th Cir. 2020). The Eleventh Circuit's holding was based on the specific "facts of [the] matter," but the court reiterated the established principle that parties may agree to arbitrate "'more than just those matters set forth in the contract.'" *Id.* at 725 (quoting *Bd. of Tr. of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Mkts., Inc.*, 622 F.3d 1335, 1343 (11th Cir. 2010)). That is what the parties did here, and in the cases cited above (at 10).[9]

Indeed, this overly narrow reading of the FAA most resembles one that the Supreme Court summarily reversed in *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530 (2012) (per

---

[9] Plaintiffs' reading of *Wexler* is wrong on its own terms. That court stated elsewhere that "[i]f a company wishes to bind its [customers] to something broader [than 'claims connected in some way to the service agreement'], it must take steps to secure something that a reasonable person would understand as an objective expression of his or her agreement." 211 F. Supp. 3d at 504. That language makes clear that the *Wexler* court believed that it ***is*** permissible to draft an arbitration provision that extends beyond the underlying agreement; it simply believed (incorrectly) that AT&T Mobility had not done so.

curiam). In *Marmet*, West Virginia's highest court declared as a matter of state public policy that personal injury and wrongful death claims are categorically inarbitrable. *Id.* at 532. In seeking to insulate its public policy rule from FAA preemption, the state court concluded that "'Congress did not intend for the FAA to be, in any way, applicable to personal injury or wrongful death suits that only collaterally derive from a written agreement that evidences a transaction affecting interstate commerce.'" *Id.* (quoting the state court). The U.S. Supreme Court rejected that "interpretation of the FAA [as] both incorrect and inconsistent with clear instruction in the precedents of this Court." *Id.* "The statute's text includes no exception for personal-injury or wrongful-death claims," the Court continued, but instead "requires courts to enforce the bargain of the parties to arbitrate." *Id.* at 532-33. While *Marmet* involved state common-law claims, the Supreme Court has long held that the "duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (compelling arbitration of RICO claims); *accord CompuCredit*, 565 U.S. at 98.

## CONCLUSION

The Court should grant Cricket's Motion to Compel Arbitration.

Dated: May 26, 2020

Respectfully submitted,

**MAYER BROWN LLP**

*/s/ Archis A. Parasharami*
Archis A. Parasharami

Counsel for Defendant
CRICKET WIRELESS LLC

15
CRICKET WIRELESS'S REPLY ISO MOT. TO COMPEL ARBITRATION;
CASE NO. 3:19-CV-07270-WHA