UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JERMAINE THOMAS, JEREMAIN
MILLER, JAMIE POSTPICHAL,
RONALD ELLISON, SARAH WATERS,
KAMILAH RIDDICK, FELICIA
REDDICK, TIARA CROMWELL, LYSHA
ENCARNACION, LANIE HALE,
MELIZZA WEAVER, ALFREDO
SANCHEZ, and CLARISSA KELLY, on
behalf of themselves and other similarly
situated,

        Plaintiffs,

  v.

CRICKET WIRELESS, LLC,

        Defendant.

No. C 19-07270 WHA

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO COMPEL
ARBITRATON**

## INTRODUCTION

In this putative class action arising out of defendant's alleged false advertising of its

wireless services, defendant moves to compel arbitration of three of the named plaintiffs. One

of the plaintiff has since voluntarily dismissed herself from this action. Accordingly, this order

considers defendant's motion only as to the other two plaintiffs, Jermaine Thomas and Sarah

Waters. This order finds that Thomas must arbitrate his claims against Cricket, but not Waters.

To the extent stated herein, therefore, defendant's motion to compel arbitration is **GRANTED IN**

**PART AND DENIED IN PART**.

**STATEMENT**

At all relevant times, defendant Cricket Wireless, LLC, sold wireless telephone service as well as cellular telephones to consumers. Plaintiffs allege that, between 2012 to 2014, Cricket advertised that if offered "unlimited 4G/LTE" services throughout the United States and "required consumers to purchase a 4G/LTE-capable phone from Cricket" to access those services (Dkt. No. 16 ¶¶ 1, 144, 151). They allege that Cricket did not actually have the capability to provide "unlimited" and "nationwide" 4G/LTE services, however. Accordingly, they brought this action, alleging that Cricket's conduct violated various state false advertising laws, as well as the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq.* They also bring claims for unjust enrichment and negligence.

In 2015, the plaintiffs in *Barraza v. Cricket Wireless LLC*, 2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) (Judge William Alsup), made nearly identical allegations against Cricket. There, Cricket moved to compel arbitration of two of the plaintiffs based on the arbitration provision within a booklet — called "Quick Start Guide" — that Cricket enclosed inside of the plaintiffs' phones boxes. *Id*. at *1. Until May 2014, when it was acquired by AT&T, Inc., Cricket advertised that it offered "No Contract" wireless service. After that acquisition, Cricket began advertising that its service had "No Annual Contract." *Ibid*. The plaintiffs had purchased wireless service with accompanying phones from Cricket-owned stores in 2013. The phones came in boxes, but when the plaintiffs selected their phones, the Cricket employees helping them went to the back of the store and returned with the boxes already open, and the employees activated the phones. One panel on those boxes provided, in relevant part, that "By activating Cricket® service, you agree to the enclosed terms and conditions of the service." *Ibid*. The full terms and conditions for Cricket's service were included in a 3x4 inch booklet, which was titled "Quick Start Guide." The front cover of that booklet included the title of the booklet, with the subtitle "A Simple Guide to Activating Your Phone." *Ibid*. It also included the instruction "Read Me First." The first page of the "Quick Start Guide" described Cricket as "the home of no contract, no hassle wireless," and did not mention that the booklet

contained terms and conditions for the use of Cricket's service.  *Ibid*. But Section 20(a) of the "Quick Start Guide" included an arbitration provision and class-action waiver.  *Id*. at *2.

In *Barraza*, Cricket contended that when the plaintiffs there began using its wireless services, they accepted the terms and conditions set forth in the "Quick Start Guide," including the arbitration provision.  The plaintiffs argued that they never agreed to a contract with Cricket because they lacked notice of the terms and condition in the "Quick Start Guide."  *Ibid*. The plaintiffs submitted declarations in support of their contentions.  Applying Missouri law, the undersigned denied Cricket's motion to compel arbitration, finding that a summary trial was necessary under Section 4 of the Federal Arbitration Act to determine whether the parties had formed a contract.  *Id*. at *3–6.

Here, in its current motion to compel arbitration, Cricket contends that "[r]ather than relitigate *Barraza* and put the parties and the Court to the burden of a jury trial in this case, Cricket limits this motion to [two] plaintiffs whose circumstances are readily distinguishable from the ones at issue in *Barraza*" (Dkt. No. 50 at 2).  Those plaintiffs are Jermaine Thomas and Sarah Waters.  Unlike Cricket, Thomas and Waters do not submit any evidence herein. They argue that Cricket has failed to meet its burden to show that they have agreed to arbitrate their claims herein, and the submission of evidence on their part is thus unnecessary (Opp. at 17).

### 1.    JERMAINE THOMAS.

"[L]ured" by Cricket's promise of "no contract," Thomas became a customer of Cricket in 2006 (Dkt. No. 16 ¶ 54–55).  In late 2012, he purchased a Samsung Galaxy S3, a phone that had 4G/LTE capability from a Cricket store in Kansas City, Missouri.  He began paying Cricket sixty dollars a month for "unlimited 4G/LTE service," so that he could utilize his phone's capability (*id*. at ¶¶ 56–59).  Similar to the plaintiffs' phones in *Barazza*, at the time Thomas purchased his Samsung Galaxy 3S phone, Cricket included its "Quick Start Guide" booklet — which included its arbitration agreement — in Galaxy 3S phone boxes (Garcia Decl. ¶ 12).  That arbitration provision gave customers a sixty day opt-out window (*Ibid*.). Cricket does not have any record of Thomas opting out (Phillips Decl. ¶ 7).  The complaint

United States District Court
Northern District of California

alleges that Thomas did not open the Samsung phone box himself.  Instead, the complaint alleges that a Cricket employee opened and activated the phone for him.  In 2013, Thomas purchased another 4G/LTE-capable phone from the same Cricket store.  Again, it is alleged that a Cricket employee, not him, opened the phone box (Dkt. No. 16 ¶¶ 60–64).

In 2014, AT&T Inc. acquired Cricket., leading Cricket to update its terms and conditions. According to Cricket's records, on May 22, 2014, it sent two text messages to Thomas, which hyperlinked Cricket's updated agreement.  Both text messages provided (Garcia Decl. ¶ 16):

> See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at http://mycrk.it/1km1Ten.

Clicking on the hyperlink would have taken Thomas to the full updated agreement, which was also published on Cricket's website.  As relevant here, the updated agreement contained the following two provisions (Northington Decl. ¶ 4, Exh. 1 at 1, 9) (emphasis in original):

> **Your Agreement with Cricket begins when you accept the Ts&Cs by doing any of the following: (a) giving us a written or electronic signature or telling us orally that you accept, or by otherwise accepting through any other printed, oral, or electronic statement; (b) paying for Service; (c) activating the Service; (d) attempting to use or in any way using the Service; (e) upgrading or modifying the Service; or (f) opening any Device packaging, or starting any application, program or software that says you are accepting.  If you do not want to accept the Terms and Conditions, do not do any of these things.**
>
> *       *       *
>
> Cricket and you agree to arbitrate **all disputes and claims** between us.  This agreement to arbitrate is intended to be broadly interpreted.  It includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

Thereafter, Thomas continued to use Cricket's service and continued to make payments to it until 2015 (Garcia Decl. ¶¶ 17–18).  By doing so, Cricket argues that, as a matter of

Missouri law, Thomas agreed to the terms of the *updated* agreement, including the arbitration provision therein (Dkt. No. 50 at 12–13).

### 2.   SARAH WATERS.

Waters became a Cricket customer in 2013 when she purchased a Samsung Galaxy S4 and accompanying 4G/LTE services from it.  At the time, she was a resident of California, though she now resides in Missouri (Dkt. No. 16 ¶¶ 86–89).  While not much else is known about Waters from the complaint, Cricket submits the following evidence (*see* Berg Decl. ¶¶ 1–25, Exhs. 1–18).

In December 2018, Waters became a customer of AT&T Mobility's wireless services. She signed the AT&T Wireless Customer Agreement at an AT&T retail store.  The entire agreement was displayed to her on a digital device.  The device gave her the option of printing the entire agreement.  In addition to clicking the "Accept" button on the device displaying the agreement, Waters also signed the agreement.  Right above the signature line provided: "I have reviewed and agreed to the rate, terms, and conditions for the wireless products and services described in the Wireless Customer Agreement (including limitation of liability and arbitration provisions) and . . . which were made available to me prior to my signing" (*id*. at Exh. 9).  In May 2019, Waters opened another line of service with AT&T Mobility.  Following the same described process, she again signed the AT&T Wireless Customer Agreement.  Both agreements contained a materially identical arbitration provision.

Both the 2018 and the 2019 agreement contained AT&T Mobility's arbitration provision. Indeed, the first page of both agreements informed customers of the existence of the arbitration provision.  Both agreements contained a materially identical arbitration provision.  The arbitration provisions provided that: "AT&T and you agree to arbitrate **all disputes and claims between us**"; including but not limited to "claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising" (*id*. at Exhs. 17–18) (emphasis in original).  According to those agreements: "[r]eferences to 'AT&T,' 'you,' and 'us' include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successor, and

assigns as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us" (*Ibid.*).

In November 2019, AT&T Mobility closed Waters' account for non-payment (Berg Decl. ¶ 23, Exh. 16).  Cricket, an *affiliate* company of AT&T Mobility, argues that it can invoke AT&T Mobility's arbitration provision to compel arbitration of Waters' claims herein.

## ANALYSIS

The Federal Arbitration Act dictates that arbitration agreements are "a matter of contract," and "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Under the FAA, a federal court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  In determining the former, "federal courts apply ordinary state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quotation and citation omitted).  In determining the latter, "any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration[.]" *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

If both questions are answered in the affirmative, then the FAA requires a court to enforce the agreement according to its terms, "leav[ing] no place for the exercise of discretion by a district court." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  But "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" Section 2 of the FAA. *Dr. Associates, Inc. v. Casarotto*, 517 U.S. 681, 682 (1996).

### 1.   THOMAS FORMED A VALID AGREEMENT TO ARBITRATE HIS CLAIMS AGAINST CRICKET.

Unlike in *Barraza*, Cricket does not argue that Thomas agreed to its *original* terms and conditions — contained in the "Quick Start Guide" booklet encased in the phone box — when he purchased his phone from Cricket.  Rather, it contends that, under Missouri law, Thomas'

United States District Court
Northern District of California

1    continued use of its services after he received two text messages with a hyperlink to its updated

2    terms and services constituted his acceptance of the *updated* agreement, which contained an

3    arbitration provision.  Thomas disagrees.  He does not dispute that Missouri law governs.

4    Instead, he argues that Cricket has not adduced "any evidence that silence by a reasonable

5    person in [his] position demonstrates that the person was aware that Cricket believed a contract

6    existed and action was needed to avoid being bound" (Opp. at 6).  For the following reasons,

7    this order agrees with Cricket.

8         Under Missouri law, contract formation requires an offer, acceptance of that offer, and

9    bargained for consideration.  The only issue here is acceptance.  "An acceptance is present

10   when the offeree signifies assent to the terms of the offer in a 'positive and unambiguous'

11   manner."  *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019) (quoting *Kunzie v.*

12   *Jack-In-The-Box, Inc.*, 330 S.W.3d 476, 484 (Mo. Ct. App. 2010).  Generally, silence or

13   inaction is insufficient to furnish the offeree's assent to the terms of an offer.  "This general

14   rule does have exceptions, however.  Acceptance of an offer or counteroffer does not always

15   have to be made through explicit spoken or written word."  *Pride v. Lewis*, 179 S.W.3d 375,

16   379–80 (Mo. Ct. App. 2005) (citing *Citibank (South Dakota), N.A. v. Wilson,* 160 S.W.3d 810,

17   813 (Mo. Ct. App. 2005).  "An offer may, instead, be accepted by the offeree's conduct or

18   failure to act."  *Citibank*, 160 S.W.3d at 813 (citation omitted).

19        In *Citibank*, Wilson applied for a credit card in 1999, agreeing to be bound by Citibank's

20   terms and conditions.  Then, in 2001, Citibank mailed Wilson her credit card statement, which

21   informed her that the bank was updating the terms of their agreement that would be binding on

22   her "unless she cancelled her account within thirty days and did not use her credit card."  The

23   full updated agreement was enclosed with her credit card statement.  Thereafter, Wilson

24   continued to use her credit card.  When Wilson failed to pay her credit card balance, Citibank

25   sued, attempting to enforce the updated agreement.  Following a trial wherein Citibank only

26   introduced the updated agreement into evidence, the lower court dismissed the case, finding

27   that Citibank had not proved that Wilson had accepted the terms of the updated agreement.

28   The Missouri Court of Appeals reversed.  It held that "there was sufficient evidence that

United States District Court
Northern District of California

7

Wilson had, in fact, accepted the *revised* agreement through her conduct, *i.e.*, her continued use of the credit card after receiving the July 2001 credit card statement that included the terms of the revised agreement." *Id*. at 813 (emphasis added). So too here.

Here, Cricket sent two text messages to Thomas, which notified him of Crickets' updated agreement. At the very least, therefore, Thomas had constructive notice of Cricket's terms, if not actual. *See Major v. McCallister*, 302 S.W. 3d 227, 230 (Mo. Ct. App. 2009) (Under Missouri law, a party must have reasonable notice, whether actual or constructive, of an agreement in order to assent to it). Importantly, despite opportunity to do so, Thomas does not submit a declaration disclaiming that he received the text messages and/or that he read their contents. Both text messages stated:

> See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at http://mycrk.it/1km1Ten.

The text messages hyperlinked the full terms of the agreement, including the terms that continued use and payment for Cricket's services constituted acceptance of Cricket's updated agreement (*see* Northington Decl. ¶ 4, Exh. 1) ("[Y]ou accept these Ts&Cs by . . . paying for Service . . . [or] using or attempting to use the Service in any way . . . . If you do not want to accept these Ts & Cs, do not take any of these actions"). Here, as in *Citibank*, therefore, Thomas' continued use of Cricket's services after he received Cricket's text messages containing Cricket's updated agreement manifested his acceptance thereto.

Thomas' attempts to distinguish *Citibank* are in vain. *First*, he argues that, unlike in *Citibank*, he never signed any document agreeing to be bound by Cricket's terms. *Second*, he argues that, unlike in *Citibank*, "Cricket did not present the arbitration agreement as an offer and did not communicate to Thomas that the agreement was binding if he continued to use and pay for his Cricket service" (Opp. at 9). Correspondingly, he points to the fact that Cricket text messaged the full agreement via a hyperlink, as opposed to mailing it to him. Thomas' arguments are unavailing.

To start, in *Citibank*, Wilson's signature to the *original* agreement was irrelevant to the decision's analysis regarding the formation of the *revised* agreement, which Wilson had not signed.  Indeed, the court treated the mailed revised agreement as a separate and independent offer, and analyzed acceptance accordingly.  Put differently, the formation of the *original* agreement — and Wilson's signature thereto — did not bear on the court's analysis of whether or not Wilson had accepted the *revised* agreement.  To the extent that *Citibank* mentioned the original agreement, it was confined to the facts section as context.  *See* 160 S.W.3d at 811 (stating that Wilson had agreed to the original agreement and that Citibank had not introduced it into evidence at trial).  It was Wilson's *continued use* of her credit card — not any signature — which the court held signified her manifestation of assent to the terms of the revised agreement.  Thus, Thomas' argument that the absence of his signature herein negates the import of *Citibank* is unpersuasive.

Thomas argues that *Citibank's* rule is inapplicable here because Cricket hyperlinked its full agreement in text messages instead of mailing it to him like in *Citibank*.  *First*, "[t]he legal effect of online agreements may be an emerging area of the law, but courts still apply traditional principles of contract law and focus on whether the plaintiff had reasonable notice of and manifested assent to the online agreement."  *McCallister*, 302 S.W. 3d at 229 (citations and quotations omitted).  In today's world, text messaging has become an acceptable medium of effecting notice.

*Second*, this order is unpersuaded that *Citibank's* import hinges on the medium of communication.  Rather, as *Citibank* noted, its rule that conduct or failure to act can furnish the offeree's acceptance applies "where services are rendered under circumstances such that the party benefited thereby knows the terms on which they are being offered.  If this party receives the benefit of the services in silence, when there was a reasonable opportunity to reject them, this party is manifesting assent to the terms proposed and thus accepts the offer."  160 S.W.3d at 813 (quoting 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.21, p. 415 (Rev. ed.1993)).

Here, Cricket conferred the benefit of its wireless services on Thomas under circumstances where he had — at least constructive notice — of Cricket's terms of service and the arbitration clause therein.  Indeed, Thomas would not even have had to click on the hyperlink to be made aware of the presence of an agreement to arbitrate, as such agreement was conspicuously stated in the substance of the text messages themselves.  Moreover, Cricket notified Thomas that if he did "not want to accept the Terms and Conditions," then he must not, among other things, pay for or use Cricket's wireless services (Northington Decl. ¶ 4, Exh. 1) (emphasis omitted).  Cricket thus gave him a reasonable opportunity to reject its terms.

Accordingly, the facts here present the scenario where *Citibank* held that its rule that an offer may be accepted by an offeree's conduct or failure to act has particular force.  Thus, Thomas' continued use and payment for Cricket's wireless services after he received notice of Cricket's terms manifested his acceptance to those terms.

For the foregoing reasons, the decisions Thomas relies on are inapposite.  For example, in *Pride v. Lewis*, 179 S.W.3d 375, the court refused to extend *Citibank* to an offer for the sale of real estate.  It reasoned that the rule in *Citibank* applied to cases that "involve benefits or services being conferred or actions taken in accordance with the proposed agreement in such a manner that the other party is justified in assuming the offer has been accepted"; and to "instances where services are rendered and the party benefited by the services is aware of the terms upon which the services are offered." *Id*. at 380 (citing *Citibank*, 160 S.W.3d at 813). As already discussed, the facts here encapsulate this circumstance.  Thus, *Shockley v. PrimeLending*, 929 F.3d 1012, and *Kunzie v. Jack-In-The-Box, Inc.*, 330 S.W.3d 476, are similarly inapposite because they involved an employer-employee relationship, not the more analogous consumer-servicer relationship herein and, as in *Citibank*.

Lastly, Thomas' reliance on *Hobbs v. Tamko Building Products, Inc.*, 479 S.W.3d 147 (Mo. Ct. App. 2015), is also misplaced.  The issue presented there was more analogous to the issue presented in *Barraza*, 2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) (Judge William Alsup) — *i.e.*, whether or not buyers of roofing shingles were bound to the arbitration

provision printed on the outside of the wrapper of the shingles.  *Hobbs*, 479 S.W.3d at 148–49. That is not the issue here.

Having found that Thomas *formed* an agreement with Cricket to arbitrate, this order now considers whether or not the *scope* of said agreement covers Thomas' claims herein.  *See Chiron*, 207 F.3d at 1130.  Cricket's arbitration provision provides for the arbitration of "all disputes and claims between" them, including those related to "advertising" (*see* Northington Decl. ¶ 4, Exh. 1) (emphasis omitted).  Because the thrust of Thomas' claims against Cricket arise out of Cricket's advertising of its wireless services, this order finds that his claims fall within the scope of their agreement to arbitrate, and thus must be arbitrated.  *See Byrd*, 470 U.S. at 218.  Indeed, Thomas provides no argument to the contrary.  Accordingly, this order **GRANTS** Cricket's motion to compel arbitration of Thomas' claims against it.

### 2. WATERS NEED NOT ARBITRATE HER CLAIMS AGAINST CRICKET.

Waters does not dispute that she formed valid agreements with AT&T Mobility in 2018 and 2019 when she signed AT&T's terms of service, which contained arbitration clauses. Rather, the issue is whether or not Cricket can enforce someone else's arbitration clauses and whether the claims asserted herein fall within the clauses' aegis.  While this order finds that Cricket — an affiliate of AT&T Mobility at the time of the agreements — may enforce the arbitration agreements, and that Waters' claims against it fall within their scope, it holds that said arbitration agreements are unenforceable here.  More specifically, this order finds that the scope of AT&T Mobility's arbitration clause is inoperably broad and thereby unconscionable. Here follow the details.

### A. CRICKET CAN INVOKE AT&T'S ARBITRATION PROVISION.

To repeat, there is no dispute that Waters entered into two agreements to arbitrate with AT&T Mobility.  As relevant here, those agreements provided that: "AT&T and you agree to arbitrate all disputes and claims between us" (Berg. Dec. 17–18) (emphasis omitted).  Importantly, the agreement stated that (*ibid*.) (emphasis added):

> References to "AT&T," "you," and "us" include our respective
> subsidiaries, *affiliates*, agents, employees, predecessors in interest,

successors, and assigns, as well as all authorized or unauthorized
users or beneficiaries of services or Devices under this or prior
Agreements between us.

It is also undisputed that at the time Waters signed the agreements with AT&T Mobility,

Cricket was an affiliate company because both companies were owned by AT&T Inc. *See also*

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (noting that "affiliate"

means, among other things, a company that is "associated with others under common

ownership or control."). Indeed, Cricket and AT&T Mobility became affiliate companies in

2014. Thereafter, in 2018 and 2019, Waters signed AT&T Mobility's wireless services

agreements.

The parties also agree that California law is controlling. Under California law, "[a]

contract must be so interpreted as to give effect to the mutual intention of the parties as it

existed at the time of contracting." Cal. Civ. Code § 1636. The mutual intent of the parties is

typically determined "from the written terms [of the contract] alone," so long as the "contract

language is clear and explicit and does not lead to absurd results." *Kashmiri v. Regents of*

*Univ. of Cal.*, 156 Cal.App.4th 809 (2007).

Here, applying basic contract interpretation and giving 'affiliates' its ordinary meaning,

there can be no question that Cricket, an affiliate company of AT&T Mobility at the time of the

agreements, was intended to be covered in the arbitration agreements Waters signed with

AT&T Mobility. *See also Kaselitz v. hiSoft Technology Intern., Ltd.*, 2013 WL 622382, at *6–

7 (N.D. Cal. Feb. 15, 2013) (Judge Maxine M. Chesney) (holding that the defendant could

enforce the arbitration provision the plaintiff had signed with the defendant's affiliate company

where the arbitration clause explicitly extended to "affiliates").

In her opposition brief, Waters relies mainly on *Revtich v. DirecTV, LLC*, 2018 WL

4030550 (N.D. Cal. Aug. 23, 2018) (Judge Joseph C. Spero), which our court of appeals has

subsequently affirmed. *See* 977 F.3d 713 (9th Cir. 2020). *Revtich* is distinguishable on its

facts, however, as it presented the inverse of the situation presented herein. Namely, DirecTV,

which became an affiliate company of AT&T Mobility in 2015, tried to compel the plaintiff to

arbitrate his TCPA claim against it by piggybacking on the arbitration agreement he had signed

for wireless services with AT&T Mobility in 2011.  There, too, the arbitration agreement covered 'affiliates' of AT&T Mobility.

In *Revtich*, our court of appeals expressed concern with the "absurd result" of forcing the plaintiff "to arbitrate any dispute with any corporate entity that happens to be acquired by AT&T, Inc., even if neither the entity nor the dispute has anything to do with providing wireless services to [the plaintiff] — and even if the entity becomes an affiliate years or decades in the future." *Id*. at 717.  Rather than interpret the meaning of the word 'affiliate' alone, therefore, our court of appeals invoked the absurdity canon and looked at the reasonable expectation of the plaintiff at the time he signed the arbitration agreement with AT&T Mobility in 2011.  It thus framed the question to be one of *formation* instead of *scope*, and held that a valid agreement between the plaintiff and DirecTV had not been formed.  In so holding, it reasoned that:

> When Revitch signed his wireless services agreement with AT&T Mobility so that he could obtain cell phone services, he could not reasonably have expected that he would be forced to arbitrate an unrelated dispute with DIRECTV, a satellite television provider that would not become affiliated with AT&T until years later.

*Id*. at 718.  Our court of appeals thus concluded that DirecTV was not an appropriate party to enforce the arbitration agreement therein.  By doing so, it acknowledged that its holding created a circuit-split with the Fourth Circuit, which, when confronted with indistinguishable facts, framed the issue to be one of *scope*.  *See Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020) (holding that DirecTV could compel arbitration of the plaintiff's unrelated TCPA claim against it based on an arbitration agreement that the plaintiff had signed with AT&T Mobility before Mobility became an affiliate of DirecTV); *But see Wexler v. AT&T Corp.*, 211 F.Supp.3d 500 (E.D. N.Y. Sep. 30, 2016) (Judge Frederic Block) (framing the issue as one of formation where an affiliate company of AT&T Mobility tried to compel arbitration of the plaintiff's TCPA claim against it pursuant to the plaintiff's wireless services agreement with AT&T Mobility, even though the companies were affiliates at the time of the agreement).

Waters implores us to follow the path taken in *Revtich* and *Wexler*; that is, to frame the issue to be one of contract formation and assess whether or not it would have been objectively

United States District Court
Northern District of California

reasonable for her to expect that she would be agreeing to arbitrate her claims against Cricket by signing arbitration agreements with AT&T Mobility years after she used Cricket's wireless services. This order is unpersuaded that Waters' approach is warranted here. Again, under California law, the mutual intent of the contracting parties must be ascertained from the written terms of the contract alone unless it would lead to absurd results. In *Revtich*, Judge Spero — and on appeal, our court of appeals — deviated from this fundamental canon of contract interpretation because of the absurdity of allowing a *future* affiliate company — offering unrelated services — to compel arbitration. Here, by contrast, allowing Cricket — an affiliate of AT&T Mobility at the time Waters signed AT&T's wireless services agreements — to compel arbitration of her claims against Cricket does not give rise to that same absurdity. Thus, the usual canons of interpretation apply here.

Accordingly, the use of the word "affiliates" in the arbitration agreements here must be given their ordinary meaning, which certainly included AT&T Mobility's then-present affiliates. Any other interpretation would render the inclusion of "affiliates" completely meaningless and thus superfluous. Unlike in *Revtich*, therefore, Cricket was an affiliate of AT&T Mobility within the meaning of the agreements at the time they were signed.

Indeed, this conclusion is bolstered by the language in *Revtich* that:

> Had the wireless services agreement stated that "AT&T" refers to "any affiliates, both present and future," we might arrive at a different conclusion. However, absent this or similar forward-looking language, we are convinced that the agreement does not cover entities that became affiliated with AT&T Mobility years after the contract was signed in an unrelated corporate acquisition. *See Unova, Inc. v. Acer Inc.*, 363 F.3d 1278, 1282 (Fed. Cir. 2004) (interpreting California law and holding that a release from liability provision "written in the present tense . . . most naturally does not refer to [a party's] future parents"; *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 997 N.Y.S.2d 339, 21 N.E.3d 1000, 1004 (2014) ("Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed.").

*Id*. at 718.

In short, Cricket can invoke the arbitration agreements Waters signed with AT&T Mobility because it falls within those agreements' scopes. Having decided that Cricket can

14

enforce the arbitration agreements, this order now turns to whether or not Waters' claims against it fall within their scope.

### B. WATERS' CLAIMS AGAINST CRICKET FALL WITHIN THE ARBITRATION CLAUSES' SCOPES.

Waters agreed to arbitrate "all disputes and claims" between herself and AT&T Mobility and its "affiliates" (Berg. Dec. 17–18) (emphasis omitted).  Thus, she agreed to arbitrate all disputes and claims between herself and Cricket — including "claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising)" (*ibid.*).  Moreover, the thrust of Waters' claims against Cricket are based on Cricket's alleged fraudulent advertising of its wireless services between 2012 and 2014 (Dkt. No. 16 ¶ 1).  As Waters puts it, her "claims stem directly from" her purchase of a 4G/LTE phone and accompanying wireless service from Cricket in 2013; and from the allegation "that Cricket did not actually provide 4G/LTE service on th[e] phone[]" she purchased (Opp. at 10), in contravention of its ads that touted "unlimited" and "nationwide" 4G/LTE service (Dkt. No. 16 ¶¶ 144, 151).

Given the arbitration clauses' broad scopes, their specific mention to "advertising" and claims stemming from "prior [a]greement[s]," one would be hard pressed to argue that Waters' claims against Cricket arising out of its allegedly false advertising of its wireless services do not fall within their broad scope.  And, to the extent there is any ambiguity, the directive is clear that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses,* 460 U.S. at 24–25.  Thus, Waters' claims fall within the scope of the agreements to arbitrate.  Their incredibly broad scope, however, render them unconscionable, as now discussed.

### C. THE AGREEMENTS TO ARBITRATE ARE UNENFORCEABLE DUE TO UNCONSCIONABILITY.

Under Section 2 of the FAA, agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  One such ground is the "generally applicable contract defense[]" of "unconscionability." *See AT&T Mobility LLC v. Conception*, 563 U.S. 333, 340 (2011).

United States District Court
Northern District of California

1   "Under California law, courts may refuse to enforce any contract found to have been

2   unconscionable at the time it was made, or may limit the application of any unconscionable

3   clause." *Id.* (internal quotation and citation omitted).

4       Citing *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F.Supp.2d 1253 (S.D. Cal. Mar.

5   9, 2012) (Judge Jeffrey T. Miller), and *Esparza v. SmartPay Leasing, Inc.*, 2017 WL 4390182

6   (N.D. Cal. Oct. 3, 2017) (Judge William Alsup), Waters contends that the arbitration

7   agreements she signed are unenforceable.  Specifically, she argues that the scopes of AT&T

8   Mobility's arbitration agreements are so overly broad that they are unconscionable under

9   California law.  For the following reason, this order agrees.

10      As at least one other court has observed, the scope of AT&T Mobility's arbitration

11  agreement is "unusually broad as to the subject matter it purports to cover.  Even agreements

12  traditionally classified as 'broad' because they cover all disputes 'arising out of' or 'relating to'

13  the underlying agreement evidences only the parties' intent 'to have arbitration serve as the

14  primary recourse *for disputes connected to the agreement containing the clause*.' "  *Wexler*,

15  211 F.Supp.3d at 502 (citation omitted) (emphasis in original).  AT&T Mobility's arbitration

16  provision, however, is not just limited to disputes concerning its wireless services agreement.

17  Instead, it goes further and purports to cover "all disputes and claims" between Waters and

18  Mobility's affiliates, no matter how unrelated those claims are to the wireless services

19  agreements Waters signed with Mobility in 2018 and 2019.  Cricket is not even coy about the

20  overbreadth of the Mobility's arbitration provision.  In fact, it contends that the arbitration

21  agreements Waters signed "require[] arbitration of '***all*** disputes and claims,' with no

22  exceptions" (Dkt. No. 50 at 14) (emphasis in original).

23      But as the undersigned noted in *Esparza*, reading an arbitration provision as applying to

24  any and every claim between the parties, "even including employment and tort claims, with no

25  limiting principle would render the clause impermissibly broad, and therefore inoperable."

26  2017 WL 4390182, at *3.  Similarly, in *In re Jiffy Lube*, Judge Miller refused to enforce the

27  defendant's "incredibly broad" arbitration clause, which provided "that any and all disputes,

28  controversies or claims . . . will be resolved by mandatory arbitration."  847 F.Supp.2d at 1262.

United States District Court
Northern District of California

1    There, the plaintiff had signed an oil change contract that contained said arbitration provision.

2    Thereafter, the plaintiff happened to join an unrelated putative class action against the

3    defendant for unsolicited and mass marketed text messages in violation of the TCPA.  The

4    defendant tried to compel arbitration of the plaintiff's TCPA claim based on the arbitration

5    provision contained within the oil change contract.  Judge Miller observed that the language of

6    the arbitration agreement was "not limited to disputes arising from or related to the transaction

7    or contract at issue" and that the defendant had not identified a single decision "involving an

8    arbitration agreement that is so unlimited[.]" *Ibid*.

9         Unlike here, the defendant in *In re Jiffy Lube* did not attempt to argue that the arbitration

10   provision truly encompassed any and all disputes between the parties no matter how unrelated

11   to the underlying contract.  As Judge Miller noted, "a suit by [the plaintiff] against [the

12   defendant] regarding a tort action arising from a completely separate incident could not be

13   forced into arbitration — such a clause would clearly be unconscionable." *Id*. at 1262–63.

14   Yet, that is precisely what Cricket is arguing here.  After all, Cricket is trying to compel

15   arbitration of Waters' claims against it for the alleged false advertising of its wireless services

16   between 2012 and 2014 — before it became an affiliate of AT&T Mobility — based on an

17   entirely separate wireless service agreement that Waters signed with a different wireless

18   service provider — AT&T Mobility — years after she purchased a phone from Cricket.

19        While courts in this district regularly enforce arbitration clauses with respect to claims

20   that arise directly out of or are somehow connected to the service agreement containing the

21   arbitration clauses, *see e.g., Trout v. Comcast Cable Communications, LLC*, 2018 WL 4638705

22   (N.D. Cal. Mar. 15, 2018) (Judge Richard Seeborg), Cricket has not cited to and this order is

23   not aware of any controlling authorities allowing for arbitration of claims, like here, that are

24   wholly divorced from the underlying service contract.  To the contrary, the arbitration

25   agreements in the decisions Cricket relies on either contained limiting language, or the claims

26   asserted so clearly related to the underlying contracts containing the arbitration provisions that

27   overbreadth of those provisions were not discussed.

28

17

1    For example, in *Adams v. AT&T Mobility, LLC*, 524 F.App'x. 322 (9th Cir. 2013)

2  (unpublished), the plaintiffs had signed wireless services agreements with Unicel, which

3  contained agreements to arbitrate.  As relevant here, they provided that:

4    We (including our assignees, agents, employees, officers, directors,
     shareholders, ***parent companies***, subsidiaries, affiliates,

5    predecessors and successors) or you may elect to have any claim,
     dispute, or controversy ("Claim") of any kind (whether in contract,

6    tort or otherwise) ***arising out of or relating to your Service or this***
     ***agreement*** (including any renewals or extensions), any goods or

7    services provided to you, any billing disputes between you and us,
     or any prior or ***future dealings*** between you and us resolved by

8    binding arbitration.

9  *Adams v. AT&T Mobility, LLC*, 816 F.Supp.2d 1077, 1083 (W.D. Wash. Sep. 20, 2011) (Judge

10  Richard A. Jones) (emphasis added).  Subsequently, AT&T Mobility, through its subsidiary

11  New Cingular, acquired the plaintiffs' services agreement from Unicel, and Unicel became

12  defunct.  New Cingular thus stepped into the shoes of Unicel as the servicer of the plaintiffs'

13  wireless services agreements.  Then, AT&T Mobility sent text messages to the plaintiffs whose

14  service agreements it had acquired through its subsidiary, touting its services, hoping they

15  would enter new agreements with it.  *Id*. at 1080.  The plaintiffs then sued AT&T Mobility,

16  alleging its text messages violated the Federal Communications Act; and Mobility moved to

17  compel arbitration based on the plaintiffs' assent to Unicel's arbitration clause.  Judge Jones

18  first held that Mobility, the *parent company* of New Cingular — the party which had stepped

19  into the shoes of Unicel — could invoke the plaintiffs' agreements to arbitrate with Unicel.  *Id*.

20  at 1084.  Indeed, this order is consistent with *Adams* in that it finds that Cricket can invoke

21  Mobility's arbitrations agreements as an affiliate company provided for in Waters' agreements

22  to arbitrate.

23    Moving on to scope, Judge Jones held that the plaintiffs' "unsolicited-text-messaging

24  claims against [AT&T Mobility] arise out of 'future dealing' with [AT&T Mobility]."  *Id*. at

25  1086.  He thus granted Mobility's motion to compel arbitration.  *Id*. at 1092, *aff'd* 524

26  F.App'x. 322.  *Adams*, however, is distinguishable.

27    To start, it involved Unicel's arbitration agreement, not Mobility's.  In contrast to

28  Mobility's arbitration clause, Unicel's was not so unlimited, as it provided for arbitration of

United States District Court
Northern District of California

18

claims "arising out of or relating to your [s]ervice or this agreement."  Furthermore, in *Adams*, Mobility had actually taken over the plaintiffs' wireless services contracts, which contained the arbitration provisions it was attempting to enforce.

Here, by contrast, Mobility never acquired Waters' wireless service contract with Cricket. Rather, Waters happened to sign unrelated wireless services agreements with Mobility years after her relationship with Cricket had ended, and Cricket is now trying to take advantage of this happenstance.  Unlike in *Adams*, therefore, Waters' claims against Cricket — arising out of Cricket's advertising between 2012 and 2014 — have nothing to do with the wireless services agreements containing the agreements to arbitrate that she signed with Mobility in 2018 and 2019.

All the other non-controlling decisions Cricket cites to are inapposite for similar reasons. For example, in *Clarke v. Alltran Financial, LP*, 2018 WL 1036951 (E.D. N.Y. Feb. 22, 2018) (Joseph F. Bianco), the plaintiff's asserted claim under the Fair Debt Collection Practices Act related to and arose out of his credit card agreement, which contained the arbitration provision. Similarly, in *Brown v. ITT Consumer Financial Corp.*, 211 F.3d 1217 (11th Cir. 2000), the court compelled arbitration of the plaintiffs' employment discrimination claims based on an arbitration provisions contained in their employment contracts.  To repeat, Cricket does not cite a single decision that has enforced an arbitration clause as broad as Mobility's against a plaintiff that has raised claims completely untethered to underlying contract that contains it. While this order is aware of the Fourth Circuit's unbinding decision in *Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020), decided after the parties here filed their briefs, as the only decision that has enforced Mobility's incredibly broad arbitration clause in analogous facts to those herein, it finds that decision to be unpersuasive.

Lastly, Cricket states, without elaborating, that the undersigned's language in *Esparza*, as well as a finding herein that AT&T Mobility's arbitration provision is unconscionable would be in tension with the Supreme Court's decision in *AT&T Mobility LLC v. Conception*, 563 U.S. 333.  This order disagrees.  Though it appears that *Conception* involved Mobility's same broad arbitration clause, its scope was not at issue.  *See id.* at 336.  Rather, the issue there was

whether or not the FAA preempted the California Supreme Court's decision in *Discover Bank v. Superior Court*, 36 Cal.4th 148 (1005), which had held that class waivers in consumer arbitration agreements were unconscionable under a certain set of conditions.  The Supreme Court found the FAA did preempt the rule elucidated in *Discover Bank* because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 352 (citation and quotation omitted).  It noted that Section 2 of the FAA "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as . . . unconscionability, but not by defenses that apply only to arbitration or derive their meaning from the fact that an agreement to arbitrate is at issue." *Id*. at 339 (citation and quotation omitted).  Thus, to the extent Cricket argues that *Conception* stands for the proposition that an arbitration provision cannot be deemed unenforceable based on state unconscionability law, it is incorrect.  The general doctrine of unconscionability, unlike the arbitration-specific rule in *Discover Bank*, does not derive its meaning from the fact that an agreement to arbitrate is at issue.  Rather, it applies to all contracts, not just agreements to arbitrate.

In short, *Conception* did not disrupt the Supreme Court's longstanding principle that "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" Section 2 of the FAA. *Dr. Associates, Inc. v. Casarotto*, 517 U.S. 681, 682 (1996).

Importantly, moreover, the ruling in *Conception* was unrelated to the *scope* of Mobility's arbitration clause.  Indeed, its discussion of the scope of Mobility's arbitration provision was relegated to the facts section only.  *See* 563 U.S. at 336 (noting that "the contract provided for arbitration of all disputes between the parties, but required that claims be brought in the parties' 'individual capacities, and not as a plaintiff or class member in any purported class or representative proceedings.'").  Furthermore, because the plaintiff's claim there so clearly related to the underlying service agreement — containing the arbitration clause — the Supreme Court had no occasion to address its overbreadth.  Accordingly, this order sees no tension between *Conception* and its holding herein or with *Esparza*. *But see Wexler*, 211 F.Supp.3d at

504 ("Although the Court shares the concerns voiced in *Jiffy Lube*, holding that Mobility's arbitration clause is unconscionably broad would be in tension with *Conception*.").

## CONCLUSION

For the foregoing reasons, Cricket's motion to compel arbitration as to Thomas is **GRANTED**, and its motion to compel arbitration as to Waters is **DENIED**.  Pursuant to Section 3 of the FAA, this action is hereby stayed as to Thomas only, pending the outcome of his arbitration.

**IT IS SO ORDERED.**

Dated:  December 10, 2020.


_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE