REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (admitted *pro hac vice*)
Eric D. Barton (admitted *pro hac vice*)
Melody R. Dickson (admitted *pro hac vice*)
Austin Brane, CA Bar #286227
4740 Grand Ave., Suite 300
Kansas City, MO  64112
Tel. (816) 701-1100
Fax (816) 531-2372
thudson@wcllp.com
ebarton@wcllp.com
mdickson@wcllp.com
abrane@wcllp.com
[additional counsel on signature page]

Attorneys for Plaintiffs JAMIE POSTPICHAL, SARAH WATERS, and URSULA FREITAS individuals, on behalf of themselves and others similarly situated,

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **JAMIE POSTPICHAL, SARAH WATERS, and URSULA FREITAS individuals, on behalf of themselves and others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**CRICKET WIRELESS, LLC,**<br><br>Defendant. | ) Case No. 19-07270 WHA<br>)<br>)<br>) **THIRD AMENDED CLASS ACTION COMPLAINT**<br>) 1. Consumer Legal Remedies Act (Cal. Civ. Code § 1750 et seq.)<br>) 2. Racketeering Influenced and Corrupt Organizations Act.<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs, JAMIE POSTPICHAL, SARAH WATERS, and URSULA FREITAS on behalf of themselves and all others similarly situated, sue Defendant Cricket Wireless, LLC for selling 4G/LTE phones and service plans to customers when Cricket had no ability to provide 4G/LTE services to those customers on its network or any through any roaming partnership and allege as follows:

## **NATURE OF THE ACTION**

1.      This proposed class action arises from a fraudulent scheme by Defendant Cricket Wireless, LLC ("Cricket") who, from 2012 to 2014, duped hundreds of thousands of customers into paying for a highly touted new feature 4th Generation/Long Term Evolution ("4G/LTE") cellular smartphones and service plans that Cricket "aggressively" promoted in consumer-facing marketing when Cricket had no intent to provide 4G/LTE services to those customers.

2.      That Cricket engaged in such deception during this time period (2012-2014) was not a coincidence: the wireless industry was then witnessing an intensive period of mergers and acquisitions. In 2013, Sprint merged with Softbank, T-Mobile merged with MetroPCS, and AT&T acquired Alltel's wireless operations.  Meanwhile, as the fifth-largest U.S. wireless carrier, Cricket was bleeding cash, failing to build 4G capabilities, and facing obsolescence as the industry evolved.

3.      Wireless carriers can secure access to a 4G/LTE network for its customers by building a 4G/LTE network or buying access to another carrier's network through a roaming agreement. Cricket could not afford to build or buy.  As a result, Cricket knew that it was unable to provide 4G/LTE service to the vast majority of its markets.  At the same time, Cricket also knew that consumers demanded 4G/LTE service to send and receive data more quickly and reliably.

4.      Putting profits over principles, Cricket developed a scheme it internally referred to as "4G in non-4G markets".  Cricket's scheme entailed selling more expensive 4G/LTE-capable smartphones with high-priced plans for service while concealing from consumers that it did not in

1  fact have the ability or intent to provide 4G/LTE service in these markets.  The scheme targeted low-

2  income consumers and minorities in non-4G markets across the country.

3      5.      The focus of the scheme was to promote 4G/LTE and "message LTE aggressively

4  even in non-4G markets" to allow Cricket to charge premium prices for its Android smartphone

5  devices and plans for service.  For example, here a Cricket advertisement in a Non-4G market reads,

6  "**4GLTE SPEED MEETS UNLIMITED EVERYTHING: Now get the latest smartphones from**

7  **Cricket with unlimited data, talk and text at 4G LTE speed, plus *no contract.*"** (emphasis added):

8



22      6.      While Cricket charged premium prices for these 4G/LTE devices and service plans,

23  Cricket had no ability to provide 4G/LTE service to these customers.  In fact, Cricket knew that these

24  devices, locked to Cricket's network, would *never* provide the promised 4G/LTE.

25      7.      In order for its "4G in non-4G markets" scheme to be successful, Cricket knew that it

26  needed to make it appear that it had 4G/LTE or had a plan to soon provide  4G/LTE in all of its

27  markets.  Cricket entered into what it described as a "nationwide" roaming agreement with Sprint that

28

*could have* provided Cricket customers with 4G/LTE in all of Sprint's 4G/LTE markets nationwide. Cricket used this agreement to market and promote 4G/LTE capability in all of its distribution outlets and in all stores, including in Non-4G markets, but Cricket had no intention of actually paying Sprint for 4G/LTE roaming nationwide. The cost would have been more than $790 million. (CRICKET0049357; CRICKET00016884.) Cricket used the roaming agreement as a marketing ploy while secretly programming customer devices to block connections to Sprint's 4G/LTE network inside Cricket's 4G/LTE network where nearly all of Cricket's customers lived. (CRICKET00008293; CRICKET02504887; CRICKET02508426; CRICKET02508436; (Donckels Depo at 204:4–25; 210:8–21; 270:23–272:12.)

8.      Cricket sold at least 700,000 4G/LTE Android smartphones and as many as a million service plans in Non-4G Markets during the relevant time period. By promoting 4G/LTE, Cricket was able to impose premium pricing but without having to pay hundreds of millions of dollars to actually be able to provide 4G/LTE service in Non-4G Markets.

9.      Cricket overcharged Plaintiffs and other members of the proposed classes through uniform and systematic actions by promoting 4G/LTE and imposing 4G/LTE pricing without any ability to provide 4G/LTE service. Cricket's scheme depended on taking affirmative steps to conceal information and avoid detection of this scheme. In fact, even in this litigation Cricket told this court that Cricket had made a "heavy investment in a 4G/LTE roaming partnership with Sprint." That was false. Cricket had secretly programmed its customers' smartphones to avoid making a heavy investment in a 4G/LTE roaming partnership with Sprint. By doing so, Cricket avoided paying high roaming costs to Sprint, yet it charged its customers 4G/LTE premium prices. This action seeks compensation for Plaintiffs and class members damaged by Cricket's deceptive, fraudulent, and unlawful conduct.

10.      Cricket's parent company, Leap Wireless International, Inc. ("Leap"), was a spinoff of Qualcomm and publicly traded. As such, it was required to file with the Securities and Exchange

Commission ("SEC").  Such SEC filings confirm the extremely limited coverage of Cricket's 4G/LTE network: "[T]o date, **we [Leap] have covered approximately 21 million POPs with next-generation LTE network technology**. . . ."[1]  For frame of reference, the U.S. Census Bureau estimated that there were nearly 319 million residents of the United States in 2014.[2]  Thus, Cricket's network covered only 6.5% of the United States.

11.    Further, Cricket's limited 4G/LTE deployments were significantly inefficient, meaning that an additional user would have an outsized slowing impact on the network relative to more developed 4G/LTE networks.  This means that even customers in an area with some 4G/LTE coverage did not obtain the same quality of service as those customers on developed networks.

12.    Plaintiffs bring this lawsuit in federal court on behalf of themselves, individually, and all other similarly situated consumers, to hold Cricket accountable for its wrongdoing.

13.    Cricket has filed a motion attempting to compel arbitration, as it did in the prior case before this Court.  However, Ninth Circuit law now clearly asserts that this lawsuit should remain in federal court because no reasonably prudent smartphone user was put on notice of Cricket's arbitration provision, which was buried in the middle of a "Quick Start Guide" that initially described Cricket as "the home of no contract, no hassle wireless" and did not mention that the booklet contained terms and conditions for the use of Cricket's service.[3]

---

[1] "POPs" is a term that refers to the customers that a network could *potentially* cover.  Specifically, it is defined as "information relating to population and potential customers, or 'POPs,' [that] is based on 2012 population estimates provided by Claritas, Inc., a market research company." LEAP WIRELESS INTERNATIONAL, INC., Form 10-K ("2013 10-K") for the Period Ending December 31, 2013 (filed with the SEC on Mar. 6, 2014), at 1.

[2] U.S. CENSUS BUREAU, 2014 Population Estimate, https://data.census.gov/cedsci/all?q=2014%20population%20estimates&hidePreview=false&table=DP05&tid=ACSDP1Y2014.DP05&t=Counts,%20Estimates,%20and%20Projections&y=2014&lastDisplayedRow=15 (last visited Nov. 1, 2019).

[3] *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1287 (9th Cir. 2017); *Dang v. Samsung Electronics Co., Ltd.*, No. 15-16768, 2017 WL 218896 (9th Cir. Jan. 19, 2017); *Velasquez-Reyes v. Samsung Elecs. Am.*, No. 17-56556, 777 Fed. App'x 241 (9th Cir. Sept. 17, 2019); *Samsung Elecs. Am. v. Ramirez*, No. 18-16094, 777 Fed. App'x 243 (9th Cir. Sept. 17, 2019).

14.   Cricket's marketing was focused on the underlying principle that customers were NOT entering into any contract with Cricket.

15.   Cricket did not have a policy of informing customers of an arbitration provision.

16.   Cricket did not set up a contract formation process with customers that required a purchaser to take any affirmative action to acknowledge acceptance of an arbitration provision.

17.   Without obtaining affirmative consent to the arbitration provision, Cricket cannot now claim an agreement to arbitrate was formed with Cricket customers.  The Ninth Circuit has rejected that a company like Cricket can put "terms in a box" and contend that despite only silence and inaction, all purchasers consented to the arbitration provision.[4]

18.   Because of Cricket's fraudulent scheme, Plaintiffs and thousands of other consumers seeking faster Internet and data speeds purchased high-end, expensive 4G/LTE-capable mobile cellular phones and service plans.

19.   Such 4G phones purchased from Cricket could only be used on Cricket's network as "unlocking" phones was illegal during the relevant period.  Cricket had engineered its phones to be network-reliant and not portable to other networks.  It was not until August 1, 2014, that the Unlocking Consumer Choice and Wireless Competition Act, which legalized the unlocking of phones, was passed into law.[5] Even then, carriers were not required to unlock devices for their customers, and Cricket had a practice of refusing to unlock customer devices.  Therefore, at all times relevant to this lawsuit Cricket customers could not legally switch their 4G-capable phones to another carrier's 4G/LTE network.

20.   Not long after the deception at issue in this case occurred, the Chairman of the FCC stated that "**consumers deserve to get what they pay for.  Broadband providers must be upfront and transparent about the services they provide**.  The FCC will not stand idly by while consumers are deceived by misleading marketing materials and insufficient disclosure."[6]

---

[4] *See id.*
[5] *See* 17 U.S.C. § 1201(a)(1)(A) (Pub. L. 113-144, "Unlocking Consumer Choice and Wireless Competition Act"); 37 C.F.R. § 201.40(b)(5)(i).
[6] FEDERAL COMMUNICATIONS COMMISSION, Press Release, *FCC Plans to Fine AT&T $100 Million for Misleading Consumers* (June 17, 2015).

**JURISDICTION AND VENUE**

21.     Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

22.     As outlined below, Cricket has since been acquired by AT&T, Inc., but at all times mentioned in this complaint, Defendant was, and is, an entity doing business in California.

23.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d) because it includes a federal statutory claim and many members of the proposed class are citizens of states different from those of Defendant and the amount in controversy greatly exceeds $5 million.

24.     This Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint took place in California, Defendant was authorized to do business in California, Defendant had sufficient minimum contacts with California, Defendant intentionally availed itself of the markets in California through the promotion, marketing, and sale of mobile cellular products and services in California, and/or Defendant was headquartered in California during the germane timeframe.

25.     In addition, venue is proper pursuant to 28 U.S.C. 1391(b)(2) and (d) because Defendant was a resident of this District at the time of the conduct alleged herein and the decision to deploy the false advertising campaigns described in more detail herein were made at Defendant's then-principal place of business in this District.  Also, venue for the RICO cause of action exists pursuant to both 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b)(1) for the same reasons.

**PARTIES**

26.     Plaintiff Jamie Postpichal is a resident of Missouri.

27.     Plaintiff Sarah Waters is a resident of Missouri who was a resident of California during the proposed class period.

28.     Plaintiff Ursula Freitas is a resident of Washington.

29.     Defendant is a wholly owned subsidiary of AT&T, Inc. ("AT&T") which, at all times relevant since the merger described below, has directly owned and controlled various entities including, but not limited, to Cricket Wireless, LLC.

30.     Plaintiffs have dismissed from this matter Cricket Communications, Inc. without prejudice.

31.     Cricket Wireless, LLC is/was a Delaware Limited Liability Company (File No. 5125642).  As a Limited Liability Company, it is/was domiciled in each state in which its members reside(d).  At the time, Cricket Wireless, LLC's only member was Leap, which is and was domiciled in California.  Since the merger, Cricket Wireless' only member has become AT&T Mobility Corporation, which has a principal place of business in Georgia.

32.     In July of 2013, AT&T and Leap entered into an Agreement and Plan of Merger ("Merger Agreement").

33.     In March of 2014, the Merger Agreement was formally consummated after approval by the FCC.

34.     Pursuant to the Merger Agreement, Mariner Acquisition Sub, Inc. (a Delaware corporation and a wholly owned subsidiary of AT&T) merged with and into Leap, with Leap surviving as a wholly owned subsidiary of AT&T (the "Merger").[7]

35.     As a result of the Merger, Cricket Communications remained a subsidiary of Leap, which itself became a subsidiary of AT&T.

---

[7] On March 13, 2014, Leap made the following statement to the SEC in its Form 8-K: "Pursuant to the Agreement and Plan of Merger, dated as of July 12, 2013 (the "Merger Agreement"), by and among Leap Wireless International, Inc., a Delaware corporation (the "Company"), AT&T Inc., a Delaware Corporation ("AT&T"), Laser, Inc., a Delaware corporation (the "Stockholder's Representative"), and Mariner Acquisition Sub Inc., a Delaware corporation and a wholly owned subsidiary of AT&T ("Merger Sub"), on March 13, 2014, Merger Sub merged with and into the Company with the Company surviving as a wholly owned subsidiary of AT&T (the "Merger")". LEAP WIRELESS INTERNATIONAL, INC., Form 8-K, Introduction (filed with the SEC on Mar. 14, 2014).  AT&T noted that it closed its acquisition of Leap Wireless Intl., Inc. on March 13, 2014. AT&T, INC., Form 10-Q (filed with the SEC on Aug. 1, 2014), at 7.

36.     Leap still maintains its principal place of business in San Diego, California.[8]

## THE ATT – LEAP MERGER: TIMELINE AND FACTS

37.     In July 2013, Cricket's parent company, LEAP, signed an agreement to sell Cricket to AT&T (LAZARD0000007), which operated a nationwide 4G/LTE network.  The 4G/LTE Android smartphones that Cricket sold from 2012 to 2014 were not compatible with AT&T's network.  (*See* CRICKET00078396.)

38.     On or about August 1, 2013, Cricket License Company, LLC, Leap Wireless International, Inc., and AT&T filed an Application for Assignments and Transfers of Control ("the Application") with the FCC.

39.     In the Application, AT&T sought permission to purchase Cricket and Leap's wireless communication rights and licenses.

40.     Included in the Application were the following statements made by the joint applicants AT&T and Leap:

a.     "Leap's financial resources and limited spectrum depth make it uneconomic to upgrade its current 3G CDMA platform to LTE throughout its network; **to date it has deployed LTE technology in only 11 metropolitan areas** covering approximately 21 million people and has little prospect today of financing significant upgrades to cover the remainder of its network footprint" (emphasis added);

b.     "Leap had deployed LTE technology in only 11 metropolitan areas . . . **offers only slower, less spectrally efficient 3G CDMA EVDO elsewhere to 65 percent of its subscribers**"; and

---

[8] *See, e.g.,* https://www.bloomberg.com/profile/company/LEAP:US (Address: 7337 Trade Street, San Diego, CA 92121) (last visited Nov. 1, 2019); https://www.linkedin.com/company/leap-wireless/about/ ("Headquarters: San Diego, CA" … "Corporate Headquarters: 5887 Copley Drive, San Diego, CA 92111") (last visited October 25, 2019). On October 25, 2019, Plaintiffs also conducted a search of the Georgia Corporations Division Business Search (https://ecorp.sos.ga.gov/BusinessSearch, using "contains" filter) for "Leap Wireless," but that search returned zero results.  The same day, Plaintiffs also utilized the "Service of Process Search" (https://ecorp.sos.ga.gov/SOPSearch), with the same search criteria.  That search also returned zero results.

c.      "Leap primarily deployed its spectrum to support CDMA EVDO technology, which is far less spectrally efficient than AT&T's 4G network.  **To the extent that Leap has deployed LTE, it has done so in 3x3 MHz and 5x5 MHz block configurations.  In contract, AT&T is typically deploying spectrum to support LTE in 10x10 MHz blocks, with 5x5 MHz configuration as a minimum**".

41.      In March of 2014, the FCC approved the Merger and AT&T purchased Cricket.

42.      On or about May 18, 2014, the "New Cricket" re-launched under AT&T

43.      Instead of trying to develop a plan for more 4G/LTE coverage on Cricket's network through roaming or development, AT&T and Cricket focused on trying to transition customers to AT&T's network even though Cricket's 4G/LTE phones (other than iphones) were not compatible with the new network. (CRICKET00005602–CRICKET00005603; CRICKET00078396.)

44.      Instead of allocating resources to provide Cricket customers in Non-4G markets with 4G/LTE service, AT&T's directive was to convert as many Legacy Cricket customers to AT&T as possible.   (CRICKET00005603;  CRICKET00078396;  CRICKET00049194.)   This meant that Cricket would never provide 4G/LTE service to its customers in Non-4G markets.

45.      Cricket shut down its entire wireless network, including 4G/LTE service, in 2015.

### PLAINITFFS' EXPERIENCES

### Plaintiff Jamie Postpichal

46.      Plaintiff Jamie Postpichal ("Postpichal") was a customer of Cricket from approximately September 2011 to approximately June 2014.

47.      On November 30, 2013, Postpichal visited a Cricket store located in Kansas City, Missouri with the intention of purchasing a 4G/LTE-capable phone so that she could have better Internet access, faster download speeds, and more reliable wireless coverage.

48.      Upon information and belief, the store she visited has since closed and/or moved.

49.      Kansas City, Missouri was internally categorized by Cricket as a Non-4G Market; however, at the time of Postpichal's visit, the Kansa City Cricket store, like all Cricket non-4G

stores, had many signs prominently advertising 4G/LTE and Cricket used the 4G/LTE logo throughout the store.

50.     While there, she purchased two 4G/LTE-capable phones at premium prices; each was a Samsung Galaxy S4.

51.     Upon purchasing these Galaxy S4 phones, a Cricket employee opened the boxes and activated the phones while Postpichal waited.

52.     She also began paying approximately $60.00 per line per month for unlimited 4G/LTE service, which Cricket never intended to provide.

53.     Despite Postpichal paying a premium to purchase 4G/LTE-capable phones and paying a premium for a4G/LTE service plan, Cricket never provided 4G/LTE service to her or any customers in the Cricket Non-4G markets.

54.     On or about March 2016, an agent or employee of Cricket named Gary contacted her and attempted to convince her to return to Cricket.

55.     Gary and she spoke on two or three more occasions shortly thereafter; however, Postpichal still had a contract with Sprint, so she could not switch over.[9]

56.     Gary asked her to contact him after her Sprint contract expired and has not spoken with her since.

### **Plaintiff Sarah Waters**

57.     Plaintiff Sarah Waters ("Waters") became a Cricket customer in 2013, when she was a resident of Sacramento, California.

58.     Sacramento, California was internally categorized by Cricket at a Non-4G Market; however, during that period, Waters saw numerous advertisements for Cricket 4G/LTE service.

59.     Sometime during 2013, she purchased a Samsung Galaxy S4 from Cricket at a store in Sacramento, California.

60.     Waters paid a premium price for her Samsung Galaxy S4, approximately $500.

---

[9] This was before cell phone companies began their assorted advertising campaigns wherein they offered to buy consumers out of their cell phone contracts.

61.     She also paid premium prices for one of Cricket's monthly 4G/LTE service plans.

62.     Waters had previously experienced poor coverage and purchased Cricket 4G with the belief that it would represent an improvement over her previous carrier.

63.     Despite selling 4G/LTE devices and services plans in Sacramento, Cricket did not provide 4G/LTE service to Sarah Waters or its other customers who purchased 4G/LTE devices and service plans in Sacramento.

### Plaintiff Ursula Freitas

64.     Plaintiff Ursula Freitas ("Freitas") is a resident of the State of Washington and was a resident of the State of Washington from 2012-2014.

65.     On October 22, 2013, she purchased (and paid a premium for) an Admire 2, a 4G-capable smartphone, from a Cricket store located at 12010 NE 4th Plain Blvd., Vancouver, WA 98682.

66.     She also purchased what she believed to be a 4G service plan for $60/month.

67.     Vancouver, Washington was internally categorized by Cricket as a Non-4G Market; however, Freitas recalls seeing multiple Cricket advertisements related to 4G.

68.     Despite paying for a 4G phone and a 4G service plan, she did not receive 4G coverage.

69.     Despite selling 4G/LTE devices and services plans in Vancouver, Washington, Cricket did not provide 4G/LTE service to Ursula Freitas or its other customers who purchased 4G/LTE devices and service plans in Vancouver or any other Cricket Non-4G markets.

### COMMON FACTUAL ALLEGATIONS
### 4G/LTE Development Changed the Telecommunications Industry

70.     The launch of 4G/LTE technology forever changed the telecommunications industry. Consumers demanded more data and faster download speeds.  The wireless industry raced to provide the fastest and most expansive 4G/LTE networks heavily investing in spectrum, infrastructure, and new technologies to improve the customer data experience.

71.     By 2012, the major wireless carriers had commercially launched 4G/LTE and began

selling 4G/LTE-capable smartphones.

72.     By 2013, most smartphones were 4G/LTE-capable.   Consumer data usage skyrocketed, with data consumption in 2016 more than 35 times higher than in 2010.[10]

**Cricket Fell Behind Its Competition and Its Total Subscribers Declined**

73.     Prior to 2010, Cricket had developed a successful business model selling pre-paid feature phones with service plans.   Offering unlimited, contract-free services, Cricket's subscriber based continued to grow through 2011.

74.     With 4G/LTE technology at the forefront of wireless sales and marketing, Cricket knew that "LTE is essential" (CRICKET00509258) and "critical to meeting…customers' appetite for more and more data services." (CRICKET00458767.)   In 2013, Cricket's COO stated: "We definitely know that we . . . need to provide 4G services to the customers." (PLTF00012683.)

75.     Beginning in early 2012, Cricket began to lose subscribers as customers shifted to carriers with commercially launched 4G/LTE services.

76.     Internally, Cricket knew that attrition would increase without LTE.   "[W] continue to experience increases in data demand…that consume or require additional network resources (capex and opex) to meet service quality expectations.   Additionally, the competitive climate requires, and our Customers expect us to offer 4G technology if we want to maintain, let alone grow market share."  (CRICKET02504926.)

77.     Cricket represented to the SEC that "[t]he evolving competitive landscape negatively impacted [Cricket's] financial and operating results in 2012, including in the second, third and fourth quarters of 2012 when [Cricket] experienced net customers losses." (CRICKET00427549.)

78.     In 2013, it represented to the FCC that Cricket had "seen its customer base shrink dramatically [and] . . . its share of prepaid subscribers fall even faster than its rapidly declining share of the wireless market." (CRICKET01644931.)

---

[10] https://www.ctia.org/news/report-the-4g-decade-quantifying-the-benefits#:~:text=the%204G%20era.-,4G%20Produces%20Faster%20Speeds.,innovation%20and%20other%20consumer%20benefits.

79.     JP Morgan financial analysts, Philip Cusick and others, anticipated in April 2013 that Cricket would not meet its capital expenditure guidance for 2013: "Capex guidance for 2013 is $250-300m (including up to $100m for LTE), or just ~9.6% of revenue, but we wouldn't be surprised to see spending come in below the low-end." (CRICKET00003756.)

80.     Due to Cricket's financial struggles, Cricket was "trailing behind the nationwide providers in upgrading to 4G/LTE technology." (PLTF00010654.)

81.     As Cricket's investors questioned the future of the company's 4G/LTE development, Cricket's President and COO, Jerry Elliot suggested that the "build versus buy" decision would be made on a "market by market" basis.  (PLTF00012683.)

### Cricket Stops Investing in 4G/LTE Infrastructure

82.     Cricket launched its first LTE service in December 2011.  (CRICKET00012279.)

83.     As of December 31, 2012, Cricket reported providing talk and text service in 48 states and the District of Columbia covering approximately 292 million POPs and had over 5.3 million customers.  (PLTF00008411.)  Cricket's own network covered 96 million POPs.  However, Cricket had only deployed LTE across approximately 21 million POPs, leaving the majority of its network without LTE.  (PLTF00008411.)

84.     By comparison, AT&T reported that it covered "all major metropolitan areas and nearly 280 million people" with its LTE technology in its 2013 10-K.[11]

85.     Cricket understood the importance of offering customers 4G/LTE service.  "If we are unable to offer our customers cost-effective LTE services, such failure would have a material adverse effect on our competitive position and our business, financial condition and results of operations." (PLTF00008411.)

86.     But, developing LTE infrastructure was not cheap.  In 2012, Cricket acknowledged that further expansion of its LTE network would require "significant capital investment" estimated at $10 per covered POP.  (PLTF00008411.)  For a network covering 96 million POPs, that would

---

[11] AT&T, INC., Form 10-K for the Fiscal Year Ended December 31, 2013 (filed with the SEC on Feb. 21, 2014), at 2.

require approximately $960 million of investment just for the deployment of the network technology.

87.     Other internal Cricket documents also suggested that building out and operating Cricket's own LTE network would cost the company in excess of $2.4 billion. (CRICKET00020771; CRICKET00021816.)

88.     Cricket's capital expenditures in 2012 were already in excess of $430 million with the deployment of LTE in a handful of markets. Capital expenditures for 2013 were estimated between $275 million and $325 million for ongoing infrastructure maintenance and related LTE costs.

89.     Cricket also faced significant technological barriers to expand all its markets to LTE. The LTE speeds of AT&T, Verizon, and T-Mobile were 3-4 times faster than Cricket's LTE. (CRICKET01749244.) Even Cricket's 3G speeds paled in comparison to the 3G offerings of the national carriers. (CRICKET01749244.)

90.     Cricket's spectrum capacity was extremely limited. Cricket's competition had "greater spectrum capacity than [Cricket did] in the markets in which we would launch LTE. Because the efficiency of an LTE network and the peak speeds that it can deliver depend upon the amount of contiguous spectrum that is available, competitors who have access to more spectrum than we do are likely to offer faster speeds for their next-generation services or operate those networks more efficiently than we could." (PLTF00008411.)

91.     Cricket made the decision to stop investing in and developing its 4G/LTE infrastructure. In 2013, Cricket's President and COO confirmed that Cricket only had LTE in 11 metropolitan markets and was "reversing an ambitious expansion plan." (PLTF00002317.)

92.     Internal documents further confirmed that Cricket had no future plans of expanding its LTE. "[C]urrently there's no plan to expand our LTE footprint…" (CRICKET00294033.) "For the 4G Data Network, the current strategy is to simply maintain it." (CRICKET00438201.)

93.    Leap's SEC filings at the end of 2013 also made the following public statements concerning its lack of 4G/LTE capabilities and accordant worries about its inability to compete in the 4G marketplace:

    a.    "Many of our competitors also offer LTE services over a significantly larger geographic area than we do";[12]

    b.    "Given the significant decrease in the size of our customer base in recent quarters, our high level of indebtedness, and high cost of LTE deployment, **we have generally determined not to deploy LTE network technology in additional markets at this time**" (emphasis added);[13] and

    c.    "[O]ur ability to compete effectively against wireless carriers with nationwide networks and significantly greater deployment of 4G . . ." was a significant risk factor for Cricket's business.[14]

94.    By Cricket's own admissions, it made a conscious decision not to expand its 4G/LTE coverage—none of which was divulged in its nationwide advertising campaign for nationwide coverage and unlimited 4G/LTE service.

95.    Indeed, not only were Cricket's national advertisements of 4G/LTE service inconsistent with the service Cricket intended to provide customers, but the company persisted in that campaign even though it was clear that it would not be able to, and had no intent to, offer such service.

96.    Ultimately, Cricket was **REDACTED**

█████████████████████████████████████████████

(CRICKET01644898.)  Cricket eventually admitted to the FCC that its **REDACTED**

█████████████████████████████████████████████

---

[12] LEAP WIRELESS INTERNATIONAL, INC., Form 10-K for the Fiscal Year Ended Dec. 31, 2013 (filed with the SEC on Mar. 6, 2014), at 8.

[13] *Id.* at 5.

[14] *Id.* at 1.

**REDACTED**

(CRICKET01644896.)

## Sprint 4G/LTE Roaming Agreement

97.    In early 2013, Cricket knew that it was not going to continue investing in its 4G/LTE expansion, yet Cricket needed a mechanism to attract new customers and allow the company to charge premium prices for new smartphone devices and higher-priced service plans that needed 4G/LTE.

98.    Cricket internally discussed "smart investments" noting that "[i]nstead of launching own LTE network, use Sprint network.  Avoid Capex and Opex cost of building or own LTE network." (CRICKET02441744.)

99.    In February 2013, Cricket's CEO announced to investors Cricket's "nationwide" 4G/LTE roaming partnership.  (CRICKET00000842; PLTF00012679; PLTF00012689.)

100.    The "[k]ey [s]elling [p]oint[]" of the Sprint-LTE roaming agreement was the "ability to market a nationwide LTE footprint" and sell 4G/LTE devices and plans in Cricket's markets that did not have 4G/LTE. (CRICKET00469419.)

101.    The Sprint Roaming Agreement made Cricket feel "comfortable" with "advertising and marketing 4G LTE phones and plans in all of its markets" and "to market 4G more readily," even in areas where Cricket had no intent to provide 4G to customers. (Towster Depo at 208:25–208:9; 209:16–24).

102.    Cricket claimed that this "nationwide 4G roaming agreement" would provide the "supplement" needed "both in an existing market or outside of an existing market" to provide customers with 4G/LTE.  (PLTF00012679; PLTF00012689.)

103.    Cricket further claimed that the "national footprint," "would include [Sprint's] entire available footprint available," and "there [was] a lot of 4G activity for [Cricket]." (PLTF00012637.)

104.    Contrary to Cricket's repeated assertions that the Sprint roaming agreement gave Cricket the ability and contractual right to provide all its customers 4G/LTE roaming coverage in Cricket's markets, Cricket had no intent to provide those services.

105.   Behind closed doors, Cricket calculated that LTE roaming at $10.24/GB would have short-term costs over $449 million.  (CRICKET0049357.) And, Cricket's negotiations with Sprint ultimately resulted in a much higher per/GB price of $18/GB, further inflating the anticipated costs of LTE roaming to more than $790 million.   (CRICKET0049357; CRICKET00016884.)

106.   Cricket acknowledged Cricket "can't afford to use Sprint LTE as a supplement to our own LTE network." (CRICKET00479336.) In a February 2013 email, Tim Ostrowski, Vice President of Business Development, confirmed that customers in Cricket's non-4G markets would not have access to Sprint 4G roaming in their home market because "it is too expensive". (CRICKET00012601.)

107.   While it was "obvious" that providing Cricket customers Sprint 4G/LTE roaming would provide "the best possible customer experience," the cost of actually paying for Sprint 4G/LTE roaming was "a non-starter."  (CRICKET00477215.)

108.   Cricket internally forecasted demand for "3G and 4G data to reach 6,500 Terabytes per month by EOY 2013, an increase of almost 50%."  (CRICKET02504926.)  Also, "4G data usage per customer [would] be twice that of a typical 3G subscriber." (CRICKET02504926.)

109.   Cricket had "no concrete 4G investment strategy."  (CRICKET02504926.)

110.   Ensuring that Cricket did not lose the ability to charge premium prices for 4G/LTE devices and service plans, Cricket concocted a scheme to keep its roaming agreement with Sprint in place while "restrict[ing] usage" by secretly programming customer devices to "stay on Cricket" "3G and 1X" even when Sprint's 4G was available.  (CRICKET00008293.)  As one executive simply stated, "we will just continue to offer 3G services in our non-LTE markets." (CRICKET00017944.)

111.   "When they are in their HOME Market, which is not LTE, we do not want them to roam onto Sprint LTE, that would be at $18 / GB.  In other Cricket markets, they should roam on Cricket." (CRICKET00479333.)

112.   Cricket knew that its "typical smartphone customer doesn't travel out of their home market very often and only 4% of total data traffic is outside the home market."

(CRICKET02508433.) Therefore, by secretly programming devices to exclude 4G/LTE roaming data unless customers were outside of their home market, Cricket knew customers would rarely, if ever, access Sprint's 4G/LTE.

113.   Cricket's senior leadership team in California was involved in deciding which customers were able to access Sprint-LTE roaming.  (CRICKET00606418.)

114.   A June 2013 presentation entitled "Cricket Roaming with Partner" explained internally that "LTE nationwide roaming with Sprint [would be] available ONLY to those customers who reside within a Cricket LTE market" and roaming capabilities were limited to customers with Band 25-capable[15] phones.  (CRICKET00060544,  CRICKET00010916; CRICKET00061417; CRICKET00273033; CRICKET00377444.)

115.   Cricket did not publicly disclose information regarding the Sprint-LTE roaming agreement.  In Cricket's second quarter 2013 earnings call, after being asked for details regarding Cricket's "roaming costs and partnerships," Cricket's CEO stated that "[w]e don't release details on our roaming…But I don't think we're in a position to give a lot of detail on that right now." (PLTF00012649–PLTF00012650.)

116.   In April 2013, JP Morgan financial analysts, Philip Cusick and others, regarded the possibility of no in-market LTE roaming to be harmful to the customer experience at Cricket:

> While management expects to launch nationwide 4G LTE roaming through a partner in 2H13, we think the relationship between marketing and customer experience remains a question….Marketing 4G LTE roaming services in non-4G markets could be problematic….The company expects to launch nationwide 4G LTE roaming in 2H13, but hasn't clarified whether this will include in market data use.

(CRICKET00003756-CRICKET00003757.)

117.   Mr. Cusick suspected that the alternative of providing in-market LTE roaming to be financially harmful for Cricket:

> In a Leap [Cricket] non-LTE market like Chicago, for example, we don't see how customers can see the speed of LTE while Leap maintains full network utilization.

---

[15] Cricket only sold three device models during the class period that were Band 25-capable: (1) The Galaxy S4, (2) the Samsung Admire II, (3) and the ZTE Source.

While this initiative could potentially improve branding, customers who upgrade to an LTE smartphone with no increase in ARPU pose a margin risk as data is offloaded to the wholesale partner.

(CRICKET00003757.)

118. To avoid these adverse economic consequences, Cricket secretly programmed its service plans so that customers living outside of Cricket's 4G/LTE footprint would never access Sprint's 4G/LTE roaming. (Donckels Depo at 204:4–25; 210:8–21; 270:23–272:12.)

119. As high data users increased, Cricket secretly blocked their access to services on LTE. (CRICKET02504887, CRICKET02508426, CRICKET02508436.)

120. As the table below demonstrates, Sprint had 4G/LTE coverage in 59 of Cricket's 62 Non-4G markets by 2014. Thus, Cricket had the ability to provide 4G/LTE coverage to almost all of its Non-4G markets if it allowed customers to access Sprint 4G/LTE roaming. (CRICKET01644896.)

**Cricket's Non-4G Markets and Sprint 4G/LTE Coverage**

| Cricket Market | Sprint 4G/LTE in Market? | Sprint 4G/LTE Launch Date |
|---|---|---|
| Albuquerque, NM | YES | > September-14 |
| Baltimore, MD | YES | August-12 |
| Beaumont/Port Arthur, TX | YES | December-12 |
| Boise, ID | YES | December-13 |
| Bryan-College Station, TX | YES | September-12 |
| Buffalo, NY | YES | July-14 |
| Burlington, NC | YES | July-14 |
| Charleston, SC | YES | > September-14 |
| Charlotte, NC | YES | September-12 |
| Chattanooga, TN | YES | September-12 |
| Chicago, IL | YES | September-12 |
| Cincinnati, OH | YES | > September-14 |
| Colorado Springs, CO | YES | January-14 |
| Columbus, GA | YES | January-13 |
| Dayton, OH | YES | > June-14 |
| Denver, CO | YES | > December-14 |
| El Paso, TX | YES | April-13 |
| Eugene, OR | YES | April-13 |
| Fayetteville, AR | YES | July-13 |
| Fort Smith, AR | YES | November-12 |

| | | |
|---|---|---|
| Fresno, CA | YES | > December-14 |
| Ft. Collins, CO | YES | > September-14 |
| Greeley, CO | YES | > September-14 |
| Hot Springs, AR | YES | January-13 |
| Jonesboro, AR | YES | September-12 |
| Kansas City, MO | YES | July-12 |
| Knoxville, TN | YES | September-12 |
| Lake Charles, LA | YES | December-12 |
| Las Cruces, NM | NO | N/A |
| Lexington, KY | YES | October-13 |
| Lincoln, NE | YES | April-13 |
| Little Rock, AR | YES | December-12 |
| Louisville, KY | YES | December-13 |
| Macon, GA | YES | April-13 |
| Madison, WI | YES | September-12 |
| Merced, CA | NO | N/A |
| Milwaukee, WI | YES | > June-14 |
| Modesto, CA | YES | > June-14 |
| Nashville, TN | YES | September-12 |
| Oklahoma City, OK | YES | December-12 |
| Omaha, NE | YES | > September-14 |
| Pine Bluff, AR | YES | December-12 |
| Pittsburgh, PA | YES | June-13 |
| Portland, OR | YES | April-13 |
| Provo, UT | YES | > June-14 |
| Pueblo, CO | NO | N/A |
| Raleigh-Durham, NC | YES | December-12 |
| Reno, NV | YES | January-14 |
| Rochester, NY | YES | > June-14 |
| Rocky Mount-Wilson, NC | YES | September-12 |
| Salem, OR | YES | September-13 |
| Salt Lake City, UT | YES | January-14 |
| San Diego, CA | YES | December-13 |
| Santa Fe, NM | YES | June-13 |
| Savannah, GA | YES | > June-14 |
| Spokane, WA | YES | April-13 |
| St. Louis, MO | YES | December-13 |
| Syracuse, NY | YES | > June-14 |
| Tulsa, OK | YES | December-12 |
| Visalia, CA | YES | > June-14 |
| Washington, DC | YES | September-12 |
| Wichita, KS | YES | September-12 |

121. "There's a big difference between the on-air Sprint LTE markets (service they provide to their customers) and the markets where they've enabled LTE roaming for Cricket customers." (CRICKET02508429.)

122. While Cricket continued to use the Sprint Roaming Agreement to market a "nationwide" 4G/LTE service and sell 4G/LTE devices and plans at premium prices across the country, Cricket knew that its 4G/LTE footprint was "not really nationwide" and most customers would not receive any 4G/LTE service. (CRICKET00608082; CRICKET02508427.)

123. Only 10,649 Cricket customers – or less than 2 percent of Cricket's customers – obtained more than .5GBs of Sprint LTE roaming in a given month. Ninety-eight percent of Cricket customers received no meaningful access to Sprint roaming. By secretly programming its 4G/LTE devices, Cricket saved hundreds of millions of dollars in Sprint roaming charges while successfully and fraudulent charging its customers premium prices for 4G/LTE devices and service plans. (CRICKET00013218.)

**Cricket Locked Its Devices So That They Could Not Be Used On Other Carriers' Networks**

124. Cricket guaranteed that customers would continue buying Cricket's premium service plans month-after-month by systematically locking the devices to Cricket's own network. "[F]rom 2012 to 2014 …Cricket's policy was to have all phones locked at the time of purchase." (Towster Depo 25:21–26:4). Unless the customer wanted to and had the money to buy a new device, he/she could not change wireless carriers.

125. For example, Cricket would inform its customers who wanted to switch carriers that it "cannot unlock" the device and it was Cricket's policy that it does not "unlock CDMA phones." (CRICKET00900263.)

**Cricket's 4G/LTE Advertising and Marketing to Consumers**

126.   Cricket described itself as providing "innovative, high-value wireless services to a fast-growing, young, and ethnically diverse customer base."[16] However, Cricket targeted low-income communities.  (Towster Depo at 189:24–25.)  The company sent "targeted mailers focused around when lower-income communities would be receiving government benefits, like SSI delivery." (Towster Depo at 190:17–21.)  In its marketing campaigns, Cricket also specifically targeted Latinx communities using "Ricardo" to represent a "Hispanic male" in internal marketing materials.  (Towster Depo at 191:11–12; 197:21–198:2; 198:25–199:3.)

**From:** Melina Fleming
**Sent:** Tuesday, September 11, 2012 11:17 PM
**To:** Patrick Jones
**Cc:** Timothy Towster; Becky Ralston
**Subject:** Q412 Lifeline Recommendation
**Importance:** High

Patrick,

Attached please find the Q4 Lifeline recommendations for each of your markets.

A reminder of how the plans were constructed:
- Funded with two weeks of October TV
- Plans consist of targeted media in varying combinations based on market rates, availability, logistics, prioritized as follows:
  - **Shared Mail** targeted to zip codes with >50% HHI < $25K
  - **Currency Jackets** targeted to low-income areas
  - **Targeted OOH** including 8-sheets, bus interiors, etc. based on demographic make-up of neighborhoods, bus routes, etc.
- Target date is 10/15, to capitalize on payday and SSI delivery

(CRICKET00368224/Towster Depo Exhibit 109.)

---

[16]   PR Newswire, Press Release, *Leap Announces Expanded Availability of Cricket Products and Services Through Key National Retail Outlets* (Sept. 22, 2011), http://www.prnewswire.com/news-releases/leap-announces-expanded-availability-of-cricket-products-and-services-through-key-national-retail-outlets-130327813.html (last visited Nov. 1, 2019).

(CRICKET00354344.)

127.   Cricket specifically targeted Latinx and African American communities and low-income populations nationwide in its internal presentations. (CRICKET00519283–CRICKET00519284; CRICKET00519292; CRICKET00519313; CRICKET00519323; CRICKET00519380–CRICKET00519382; CRICKET00519388–CRICKET00519389.)



(CRICKET00519323.)



(CRICKET00519381.)



(CRICKET00519382.)



(CRICKET00519380.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

128.   Beginning in 2012, Cricket advertised to many consumers across the United States the opportunity to purchase a 4G/LTE-capable phone with 4G/LTE services without distinction, clarification, or disclosure that such 4G/LTE coverage was extremely limited in size, scope, and strength and, in most cities, nonexistent.

129.   Cricket launched its 4G/LTE marketing campaign in 2012.   "[O]n or around November of 2012… Cricket made the decision to begin marketing, advertising, and selling 4G LTE phones and service plans." (Towster Depo at 71:18–71:25.)   In September 2013, Cricket decided to expand its marketing of 4G/LTE smartphones and services plans to reach every Cricket market, including markets without 4G/LTE available to Cricket's customers (Non-4G Markets). (Towster Depo at 209:16–20.)   This marketing strategy included a "companywide directive to talk about LTE even in non-LTE markets and push LTE capable handsets." (CRICKET00793602) and to "message LTE aggressively – including [in] non-4G markets." (CRICKET00877821.)

130.   Cricket centralized its marketing decision-making process, with executives ultimately making decisions from the company's headquarters in San Diego.   (Towster Depo at 126:12–127:15.)   The Chief Operating Officer (COO) was the head of the company's marketing and advertising department.   (Towster Depo at 126:12–127:15.)   As head of marketing and advertising, the Chief Marketing Officer and sales, sales operations, and customer care departments all reported to the COO.   (Towster Depo at 126:12–127:15.)   In the end, marketing decisions were "made by some combination of the executive leadership team and their direct reports." (Towster Depo at 130:10–130:14.)   Mr. Hutcheson, Cricket's CEO, involved himself directly in the decision to market 4G/LTE smartphones and plans in non-4G/LTE markets.   (Towster Depo at 269:18–23.)

131.   Early in Cricket's 4G/LTE development process, the company created a "set of guiding principles" regarding its "plans to deploy 4G/LTE services."   These principles included being "consistent" and "transparent" to its consumers "in-network and out" concerning its "pricing plan,   network   policy   controls,   and   device   performance."   (CRICKET00458766– CRICKET00458767.)  However, these "guiding principles" were quickly abandoned when Cricket faced imminent collapse and profit motives became the company's primary if not sole motivation.

132. Cricket "aggressively" launched its "4G in Non-4G Markets" scheme. This included advertising its 4G/LTE services via a variety of methods including, but not limited to, in-store advertising, printed marketing materials, radio, television, billboards, and the Internet.

133. Cricket has deleted or discarded the majority of its advertisements used during the class period; however, the advertisements that still exist clearly demonstrate that Cricket's advertisements included statements that Cricket's 4G/LTE services provided unlimited 4G/LTE in the United States without noting any areas of limited or nonexistent coverage. Importantly, Cricket never disclosed to customers that Cricket was no longer investing in 4G/LTE, customers in Non-4G markets would never be given access 4G/LTE, and that Cricket was actively programming their 4G/LTE devices to prevent customers from getting 4G/LTE service.

134. Cricket's scheme to sell 4G/LTE devices and 4G/LTE plans in Non-4G Markets was directly contrary to the representations of 4G/LTE utilized throughout Cricket's advertising.

135. In a 2012 marketing presentation, Cricket directed its "[s]upport" to "[f]ocus" on "[n]ationwide / 4G," even though Cricket's 4G/LTE footprint was not nationwide. (CRICKET00428362.) Posters displayed in Cricket's stores, inside and outside of Cricket's 4G areas, contained slogans that indicated to consumers that purchasing an 4G/LTE device from Cricket would result in 4G/LTE speeds from a 4G/LTE network:

**"YOUR NEXT PHONE IS HERE WITH THE SPEED OF 4GLTE."**



(CRICKET00444892.)

**"FASTER 4G LTE SMARTPHONES"**



(CRICKET007947451; Towster Depo Exhibit 113.)

136.   4G/LTE device packaging was "the same for all of the devices sold across the country." (Towster Depo at 307:8–14.)  All 4G/LTE device packaging had 4G/LTE logos on them. (Towster Depo at 308:7–13.)

 

137.    Cricket created companywide "brand guidelines", which ensured the "4G-LTE logo" was "always…placed next to…4G LTE-enabled device[s]." (CRICKET00851425.)  This policy applied to Cricket's nationwide marketing materials for 4G/LTE-capable devices, which was deceiving, especially in markets without Cricket's 4G/LTE coverage.



(CRICKET00388918;      CRICKET00354778;      CRICKET00352570;      CRICKET00388918; CRICKET00388919.)

138.    Radio advertisements that aired specifically to "Non 4G Markets" touted Cricket's "4G smartphones like the Samsung Galaxy S4," while also advertising Cricket's "Unlimited Nationwide Plan plus Smartphone Data." (CRICKET00866955.)

139.   While Cricket has since tried to claim that its advertisements were only device-focused and did not represent that any 4G/LTE service would be provided, its own corporate representative admitted that "when Cricket developed … digital marketing campaigns with the advertising in the banners, they did so with an eye towards presenting an overall story or overall picture." (Towster Depo at 86:4–86:17.)  As Cricket's corporate representative admitted: "You have to have a handset to have service, so, yes, handset and service go hand in hand and ads typically would have handsets and some sort of rate plan offer." (Towster Depo at 104:3–104:6.)

140.   Moreover, Cricket Brand Guidelines confirmed that "**[t]he 4G LTE logo is used** to indicate that a device is 4G LTE-enabled, **to indicate 4G LTE coverage in a given market**, and when developing 4G LTE benefit-driven advertising in 4G LTE markets. The logo should always be placed next to the 4G LTE-enabled device." (CRICKET02503936, emphasis added.)

141.   Cricket's advertisements clearly intertwined the message of 4G/LTE with the plans Cricket was offering.  Cricket advertised "UNLIMITED PLANS" with "4GLTE" printed in large font at the bottom of the advertisement indicating that its plans included 4G/LTE services as customers could "HAVE IT ALL."  (CRICKET00428388.)







143.    To increase the likelihood that Cricket's pricing scheme would be a success, in September 15, 2013, Cricket began to sell all its smartphones plans under the same names and with the express representation that they provided LTE.  (Donckels Depo at 205:5–18.)

144.    The service plan descriptions were the same for 3G and 4G/LTE markets.  (Towster Depo at 309:7–17; Towster Depo at 311:14–18.) "At the time when 4G was rolling out … there was no real discussions [sic.] as it related to dividing plans.  We moved to a single-plan structure." (Towster Depo 226:1–7.)  However, for more than 700,000 customers Cricket had no ability or intent to provide them 4G/LTE services.  While Cricket would successfully charge these customers premium prices for devices and service plans, it would secretly program their phones to prevent any meaningful access to a 4G/LTE network.

145.    In light of Cricket's "aggressive[]" advertising of 4G/LTE in Non-4G Markets and sale of 4G/LTE devices and 4G/LTE plans in those markets, Cricket had an obligation to disclosure to customers in Non-4G Markets that they would not receive 4G/LTE service.

146.    Not everyone at Cricket supported its fraudulent scheme.  "[F]rom the beginning, [in] November of 2012,…certain market leaders had concerns" about "why Cricket was advertising and promoting 4G LTE products in non-4G LTE markets." (Towster Depo at 235:9–17.)   Cricket employees were concerned about selling and marketing 4G/LTE-capable smartphones and plans outside of Cricket's 4G/LTE footprint because they thought it was "important to avoid customer confusion." (Towster Depo at 271:8–20.)

147.   After review of Cricket's proposed 4G/LTE advertising one Cricket employee said:

```
-----Original Message-----
From: John Wagstaff
Sent: Tuesday, November 06, 2012 4:37 PM
To: Jeffrey Hutcheson; Angelina Kennedy
Cc: David Ryan
Subject: FW: 4g Posters

Guys,
Not sure we should be using these as we may be setting the wrong expectations to our
customers with 4G. Thoughts?
```

In response the marketing director advised that it was a "companywide directive to talk about LTE
even in non-LTE markets and push LTE capable handsets."

```
Correct. This was a companywide directive to talk about LTE even in non-LTE markets and
push LTE capable handsets.

Talk about LTE

Thanks,

Timothy Towster

East Area Marketing Director
```

**EXHIBIT**

Towster 114

148.   One executive noted in a 2012 email, "Why does everything say 4G LTE when we
don't have 4G LTE?  This is an extremely confusing message to send our customers."

**From:** Jeffrey Hutcheson
**Sent:** Friday, November 09, 2012 10:06 AM
**To:** Angelina Kennedy
**Subject:** RE: IMPORTANT***Holiday Kit Items In Stores

So far the feedback is "Why does everything say 4G LTE when we don't have 4G LTE? This is an extremely
confusing message to send our customers."

Jeff Hutcheson
**cricket** Communications
Marketing Specialist II
BaWa Market
South Office                     North Office
8515 Georgia Ave Suite 800       6021 University Blvd Suite 490
Silver Spring, MD 20910          Ellicott City, MD 21043
                 Office # 703-272-4532
NEW CELL # 301-395-8320
Jhutcheson@cricketcommunications.com

149.   Even Cricket's marketing director, Timothy Towster, knew that Cricket's scheme was a big "LIE."

---

| | |
|---|---|
| **From:** | Timothy Towster </O=CRICKET COMMUNICATIONS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TTOWSTER> |
| **To:** | Deborah Jourdan; Dave Wasby |
| **CC:** | Wendee G. DeBusk |
| **Sent:** | 10/28/2013 6:48:50 PM |
| **Subject:** | RE: iPhone 5c/5s price tags :: COS |
| **Importance:** | High |

**EXHIBIT**

**Towster 116**

Deborah and David-

I have a REAL issue with this...We are displaying items that we can't see in store and then we are going to LIE to customers?  Is that a good customer experience?  I don't think this is the right feedback.  If we aren't going to carry the products fine but we need a better response than to LIE.

---

150.   Cricket's dealers in Non-4G markets knew Cricket did not intend to provide 4G/LTE services in their market areas.  While some dealers provided "pushback" against Cricket's scheme, they ultimately participated in the enterprise, utilized Cricket's advertising, and sold Cricket 4G/LTE devices and services plans at premium prices, sharing in the profits of the fraudulent scheme.  (Towster Depo at 211:4–212:9; CRICKET00434098; CRICKET00527484).

151.   Cricket and its Independent Dealers had exclusive knowledge of the fraudulent scheme to charge premium prices for 4G/LTE devices and service plans while preventing customers from receiving 4G/LTE service, the plan to retract investments in LTE, and Cricket's programing of customer devices to block access to 4G/LTE service.  Accordingly, Cricket was obligated to disclose these facts to its customers but failed to do so.

152.   In June 2013, Cricket's executives internally touted the success of its scheme: "4G in non 4G is going strong." (CRICKET00013352.)

153.   Continuing to message the false premise that Cricket would be providing 4G/LTE services to its customers, Cricket compared its plans to other major carriers that had much larger 4G/LTE networks and actually provided 4G/LTE service to their customers on a nationwide basis. (Sixteenth Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Federal Communications Commission, March 2013 (Paragraphs 185–190), https://docs.fcc.gov/public/attachments/FCC-13-34A1_Rcd.pdf.)  In March 2013, Cricket planned advertisements for its T-Mobile "attack plan," which claimed that Cricket had "20X MORE 4G DATA than T-Mobile." (CRICKET00043718.)



154.   Then, in May 2013, Cricket ran its "Half is More" advertising campaign, effectively comparing its plans to Verizon's and AT&T's plans.   (*See, e.g.*, CRICKET00003102; CRICKET00003086; CRICKET00355010.)







155.   4G/LTE was the most advanced type of network currently available to the general public.

156.   4G/LTE had/has several significant advantages over conventional 3G service.

157.   Advantages for consumers include but are not limited to: exponentially faster data and Internet/data services (approximately eight times faster than 3G).

158.   Cricket's own current "Acceptable Use Policy" described data speeds as follows:[17]

a.   Cricket's 4G LTE service currently offers download speeds up to 8 Mbps;[18] and,

b.   3G service as providing download speeds from 700 Kbps up to 1.7 Mbps.

159.   4G/LTE services allow a consumer to get the best and highest use out of a 4G/LTE-capable phone.  This includes, but is not limited to:

a.   Ability to download or stream music and videos;

b.   Greatly enhanced speed of downloading or streaming music and video;

---

[17] CRICKET   WIRELESS,   *Acceptable   Use   Policy*   (Revised   May   18,   2014), https://www.cricketwireless.com/legal-info/acceptable-use-policy.html (further updated since).
[18]   "Mbps" = Megabytes per second.

c. Ability to use mobile applications that have practical, safety-enhancing features such as turn-by-turn GPS directions;

d. The use of other mobile applications that would require 4G/LTE services as advertised by Cricket (such as MUVE); and

e. In general, the ability of a consumer to have the full functionality of a 4G/LTE-capable phone.

160.    Cricket charged a premium for its 4G/LTE devices and 4G/LTE service plans, and it sold these devices and plans in areas where Cricket knew it would never provide 4G/LTE service to the customers in that market.

161.    Consumers complained that Cricket deceived them into buying 4G/LTE-capable devices, believing they would have 4G/LTE service.  Some examples of complaints submitted to Cricket concerning misrepresentations of 4G/LTE service include the following:

- "I thought that I would have 4g coverage but the best that I have seen is 3G. I had [V]erizon and I always had 4g… I am disappointed in this." (CRICKET00441063.);
- "They said it was 4g and it[']s not[.] [I]t[']s 3g and half the time it.. [was] really slow and has a 1 x where the 3 g is." (CRICKET00441063.);
- "[I]t['s]s suppose[d] to be 4g[, but] it took 45 mins only to download one app." (CRICKET00441063.);
- "I have horrible coverage and no 4g." (CRICKET00441063.);
- "[W]here is the 4G[?]" (CRICKET00441063.);
- "4G was promised. Not provided in my area." (CRICKET00441063.);
- "The phone[']s great but it[']s supposed to be 4g." (CRICKET00441063.);
- "Because you lied selling me a 4[G] phone wi[th] no 4g service any[]where near my house I could have stayed with boost mobile[,] which I will probably do[.] They don[']t false advertise[.] I want a discount[.] Keep the phone and [give me] my money back." (CRICKET00441063.);
- "I don[']t get my 4g and can[']t watch videos since it will only go to 3g." (CRICKET00441063.);
- A Cricket representative reported that a "customer was upset about having a phone ad. as 4g when it was not 4g in her market." (CRICKET00441063.);
- A Cricket representative reported that a customer was "a little upset that she has [a] 4g capable phone but does not get 4g [service]." (CRICKET00441063.);
- "My reception [is] horrible[.] My s4 is suppose[d] to be a 4g [device] but it[']s still operating … [on] 3g[.] I[']m paying for garbage every month[.] I feel cheated[.] I would switch to another[ ]Company but I spent all my money… [I] wasted all my money on Crick[et]." (CRICKET00441063.);
- "I cannot send picture messages. I have no 4G." (CRICKET00441063.);

- "No 4g network. Sales associates haven[']t been telling the truth." (CRICKET00441063.);
- "I bought a 4G phone[,] but it[']s only working at 3G speed"; (CRICKET00441063.);
- "[T]he service is crappy and my 600 dollar phone is no good without good service." (CRICKET00441063.);
- "There is no 4G lte service yet for my Samsung s4 phone...I could have [gone] to another phone service [provider]." (CRICKET00441063.);
- "I have…never had the supposed 4G LTE signal or service[e]." (CRICKET00441063.);
- "Y[']all sold me a 4g Lte phone[,] but [it] has no 4g Lte service." (CRICKET00441063.);
- "No 4G service...anywhere." (CRICKET00441063.);
- "[Bec]ause I[']m payin[g] for 4g and not getting it[,] … [Cricket is practicing] false advertising"; (CRICKET00441063.);
- ""I thought my phone was 4g [a]nd the internet is just a little slow." (CRICKET00441063.);
- "My brand new phone is junk and it[']s supposed to be 4g[,] but it[']s always in 3g and it[']s slow and [I am] really unhappy with the service." (CRICKET00441063.);
- "I have 3g when the s4 clearly [was] explained to me as 4g. I feel ripped off…I was lied to." (CRICKET00441063.);
- ""No service ...no 4g nothing." (CRICKET00441063.);
- "[The] internet… really lag[]s even when loading vid[eo]s[.] I think th[ere] [i]s no … 4g with your services." (CRICKET00441063.);
- "Dropped calls…No 4g." (CRICKET00441063.);
- "No unlimited 4g lte." (CRICKET00441063.);
- ""I pa[id] for a 70 dollar plan[,] which comes with 4g…[I] still [g]ot 3g…[I] can only send short messages[,] not pictures messages." (CRICKET00441063.);
- "I bought a 4G LTE phone but cannot enjoy it as the service is lacking here." (CRICKET00441063.);
- "I should have 4g lte but I barely have 3g." (CRICKET00441063.);
- "[P]eople are being misled" by "stores advertising 4G plans in the area but [there is] no coverage yet." (CRICKET01647479.);
- A Highlands Ranch, CO customer complained about not getting 4G, and was upset because there was a billboard saying Cricket offers 4G in her area. (CRICKET01654078.);
- A Greenwood Village, CO customer complained that he was not told that he would not have 4G/LTE service and requested a refund. (CRICKET01656278.);
- A customer was very upset, because Cricket sells 4G phones in areas where there is no 4G coverage. (CRICKET01658865.);
- An Illinois customer complained that he was told he would get 4G/LTE service, but he did not. He voiced concerns about Cricket's "misleading advertisements." (CRICKET01660961.);
- A customer from Omaha, NE complained about being charged for a 4G/LTE-capable smartphone where there was no 4G/LTE coverage. The customer said that the local store advertised that Cricket had 4G/LTE coverage when the customer made the smartphone purchase. (CRICKET01662527.);

- A customer stated that Cricket's 4G/LTE representations constituted "fraud advertisement." (CRICKET01663118.);
- A customer complained that he was sold a 4G/LTE device, but his location does not have 4G/LTE coverage. He stated the store did not tell him that. (CRICKET01670893.);
- A Memphis, TN customer was very mad "about the commercial that [C]ricket lied to her about the 4g."; (CRICKET01674670.);
- A Virginia customer complained about not getting 4G/LTE service, but is paying for it. (CRICKET01653745.);
- A Milwaukee customer was very upset that he bought a 4G/LTE-capable smartphone if Cricket does not have 4G/LTE coverage in his area. (CRICKET01665105.);
- A Baltimore customer complained about not getting 4G/LTE coverage with a 4G/LTE smartphone. (CRICKET01671239.);
- A Centennial, CO customer complained that they purchased a new 4G/LTE smartphone and cannot use it. (CRICKET01671822.);
- An Elk Grove Village, IL customer was upset that they bought 4G/LTE capable smartphone but cannot get 4G/LTE service.  (CRICKET01672932.)

### **Cricket's 4G/LTE-Capable Phones**

162.   To access Cricket's 4G/LTE services, Cricket required consumers to purchase a 4G/LTE-capable phone from Cricket.

163.   From 2012 to the present, Cricket has offered a variety of high-end, 4G/LTE-capable phones, such as various versions of the Apple iPhone and Samsung Galaxy.

164.   Cricket offered these high-end 4G/LTE-capable phones for sale at premium prices, generally between $399.99 and $599.99.

165.   Cricket sold hundreds of thousands of these 4G/LTE-capable phones throughout the country during the proposed class period, as defined below.

166.   4G/LTE-capable phones were the most expensive kind of mobile wireless phones that Cricket offered for sale and were purchased by Plaintiffs and the putative classes.

167.   As stated above, Cricket locked these phones such that they could only be used with Cricket service.

### **Cricket's Packaging of Its 4G/LTE-Capable Phones**

168.   The 4G/LTE-capable phones offered for sale by Cricket and purchased by Plaintiffs and the putative class members were branded with a "4G/LTE" symbol.

169.   These measures were so significant and widespread that an objectively reasonable

consumer, having purchased a 4G/LTE-capable phone from Cricket, would believe that the phone would receive 4G/LTE coverage; this is especially true when coupled with Cricket's advertisements of nationwide 4G/LTE.

170.    Such 4G/LTE branding included the packaging of the phone itself—for example:



171.    Such 4G/LTE branding also included in the "Quick Start Guide: A Simple Guide to Activating Your Phone":



172.    Such 4G/LTE branding also included the Subscriber Identification Module ("SIM") card holder contained in the box provided by Defendant. The SIM card holder had a large moniker stating "4G/LTE" and a notation stating "4G/LTE Technology – Lets you live, work, and play

**faster than with 3G**" (emphasis added).  For example:



173.    Such 4G/LTE branding also included the 4G/LTE-capable phone itself.

174.    This type of branding (SIM card, phone, booklet, etc.) is not typically found with any other major carrier that has 4G/LTE coverage.

175.    Cricket took these actions in furtherance of its fraudulent scheme to allow Cricket to use the 4G/LTE logo and pricing to sell Plaintiffs and the putative class members in non-4G Markets Cricket's high-priced 4G/LTE devices and plans because Cricket could provide 4G/LTE coverage.

**NO CONTRACT OR AGREEMENT WAS OR EVER COULD HAVE BEEN FORMED; THUS, ANY PURPORTED AGREEMENT TO ARBITRATE IS UNENFORCEABLE AS A MATTER OF LAW**

176.    Any purported arbitration clause that Defendant may allege exists is unenforceable because no contract or agreement between Cricket and consumers was ever formed.

**Cricket's "No Contract" Representations**

177.    During all relevant time periods in this Complaint, Cricket marketed itself to all consumers, including Plaintiffs and the putative class, as the "Home of the **No Contract,** No Hassle Wireless Carrier" (emphasis added).

178.    For example, the "Quick Start Guide" that Defendant provided to Plaintiffs and the putative class members welcomed them to Cricket Wireless includes this slogan:



179.   In addition, from approximately May 1, 2012, to June 1, 2014, Cricket advertised on its website that its services had Unlimited Data, Talk, Text & Music with "**No Contracts**." (emphasis added).  For example, this was posted on Cricket's website in 2013:

180.   Significantly, after AT&T finalized its acquisition of Leap/Cricket (on or about May 18, 2014), the marketing and advertising messages conveyed to consumers changed to "No *Annual* Contract" (emphasis added) instead of its prior message of "No Contract". The clear implication is that AT&T knew the "No Contract" advertisement campaign was problematic and changed the advertising message accordingly.

181.   Thus, Defendant cannot enforce an arbitration clause or other contractual provision against any class-member consumers in this case since no contract or agreement, including any arbitration provision, was ever offered or formed due to Defendant's prior representations to consumers (through marketing, advertisements, printed materials, etc.) that Cricket's 4G/LTE services had "no contract."

### Cricket's Failure to Meaningfully
### Disclose Any Arbitration Provision

182.   Upon information and belief, Defendant provided the same or similar "Quick Start Guide" to all consumers that purchased 4G/LTE-capable phones from 2012 to mid-2014.

183.   The arbitration provision was included in a booklet titled "Quick Start Guide" with the subtitle "A Simple Guide to Activating Your Phone" (herein, "Quick Start Guide: Simple Activation Guide").

184.   The title of the booklet alone would not put a reasonably prudent consumer on inquiry notice that the booklet contained important terms or conditions relating the customers' relationship with Cricket and, in fact, would suggest the opposite to a reasonably prudent consumer.

185.   There is no statement or description on the front of the booklet about anything being contained or included in the "Quick Start Guide: Simple Activation Guide" relating to additional agreements, contracts, terms of service, or arbitration clauses.

186.   Because Cricket failed to meaningfully and conspicuously notify consumers of the existence of any "terms of service" that contained an arbitration provision, no contract or agreement was or could have been formed due to the following:

i.     First, the "Quick Start Guide: Simple Activation Guide" could only be accessed *after* the deal to purchase a 4G/LTE-capable phone.

ii.    Second, Cricket included an arbitration clause in a "Quick Start Guide: Simple Activation Guide," which was described as a "***simple way of activating your phone,***" (emphasis added), a misnomer designed to mislead consumers about what was contained therein.

iii.   Third, the arbitration provision was buried on the final pages of the "Quick Start Guide: Simple Activation Guide."

iv.      Fourth, the entire "Terms of Service" included in the "Quick Start Guide: Simple
Activation Guide" was printed in extremely small font (either 5 or 6-point character size) that is very
difficult, if not impossible, for an average consumer to read or understand. Each page contained within
the "Quick Start Guide: Simple Activation Guide" was approximately 3x4 inches.  A sample page
from the "Quick Start Guide" used by Cricket—***in actual size***—is listed below:



v.      Fifth, because Cricket advertised that its services had "no contract," an objectively
reasonable consumer would have no reason to believe that the "Quick Start Guide: Simple Activation
Guide," designed to guide a consumer through the process of activating the 4G/LTE-capable phone,
would contain any contractual provisions.

vi.      Sixth, ***Cricket's own employees activated Plaintiffs' phones*** in the store, leaving
Plaintiffs with no reason to even look at the "Quick Start Guide: Simple Activation Guide."

## CRICKET'S BUSINESS MODEL DEPENDED ON FORMING A BROADER ENTERPRISE WITH INDEPENDENTLY OWNED COMPANIES

187.   Cricket entailed multiple related entities held by the parent, Leap.

188.   Cricket phones were distributed through an expansive network of Independent Dealers that would sell Cricket 4G/LTE devices and service plans at premium prices.

189.   Without Cricket's decision to associate with and act through a broader enterprise that included a network of Independent Dealers owned by other companies, it could not have effectively carried out its scheme to sell 4G/LTE devices and service plans at premium prices across the country.

190.   Cricket owned less than 200 stores, but it associated with other companies that owned more than 2,000 stores that operated independently of Cricket.

191.   Cricket's relationships with Independent Dealers were formalized by Non-Exclusive Dealer Agreements.

192.   Cricket's Dealer Agreement confirms that Cricket and its dealers are distinct and independent entities.   Cricket's agreement described Cricket's relationship with the dealers as follows:

> It is the parties' intention that Dealer will be an independent contractor for all purposes.  Dealer will retain sole and absolute discretion over the manner and means of carrying out its responsibilities hereunder.  Dealer agrees that it is a separate and independent enterprise from Cricket.  Dealer is not a partner, agent, or employee or other legal representative of Cricket for any purpose whatsoever, and Dealer has no legal right or authority to make any representations, promises or agreements in the name of or for the account of Cricket or any affiliate or shareholder of Cricket. Dealer shall conduct its business for its own interest and all persons employed in the conduct of Dealer's business shall be Dealer's employees or agents.  Dealer shall be solely responsible for the withholding and payment of all federal, state, and local taxes, social security, unemployment, sickness, disability, and worker's compensation insurance other payroll taxes with respect to its business.  Dealer has the sole responsibility for directing its own day-to-day business operations.  Dealer shall pay its own business expenses.

(CRICKET00434098, Exhibit 89).

193.   Cricket's corporate representative further confirmed that the dealers were wholly "independent companies that did not have any Cricket employees working in their locations." (Donckels Depo at p. 227).

194.   As stated above, Cricket maintained relationships with over 2,000 independent, *Cricket-only* dealers; these dealers were naturally concentrated in urban areas.  Cricket directly stated that a network of "independent" dealers was essential to its business model.

195.   Specifically, in Cricket's own words: "Our indirect channel consists of our authorized dealers and distributors, including premier dealers and local market authorized dealers.  Premier dealers are **independent** dealers that sell Cricket products exclusively in stores that **look and function similar to our company-owned stores**, enhancing the in-store experience and the level of customer service and expanding our brand presence within a market.  **Premier dealers tend to generate significantly more business than indirect dealers**.  As of December 31, 2013, we had approximately 2,530 indirect dealer locations, of which approximately 2,100 were premier dealer locations."[19] (emphasis added).

196.   Further, as that same statement intimates, these independent dealers were also bound, as is typical with franchisees, to a significant level of homogeneity in their offerings and marketing.  These offerings and marketing directives came on a "top-down" basis and were adopted by the independent dealers.

197.   For example, these independent dealers would receive standardized marketing media, including various ones representing unlimited 4G/LTE coverage.

198.   4G/LTE device and plan pricing were established by Cricket and was uniform across all markets and Independent Dealer locations.

199.   Cricket would regularly provide Independent Dealers with advertising materials and "planograms" that mapped out the 4G/LTE advertising materials to be used throughout the stores. (e.g.  CRICKET00444885.)  The advertising was uniformly and consistently displayed in Independent Dealer locations.  (CRICKET00444885, CRICKET00434098, CRICKET00527484.)

200.   Independent Dealers utilized the 4G/LTE advertising materials provided by Cricket referenced herein.  (CRICKET00434098; CRICKET00527484; CRICKET00444885.)

201.   Independent Dealers were also the recipients of group emails, which emanated from

---

[19]*Id.* at 6.

a Cricket corporate entity and pertained to various aspects of the business, including marketing.

202.   Independent Dealers were given access to Cricket's internal records, databases, and "back-office systems", were aware of premium pricing of 4G/LTE devices and plans, and knew whether their store was located in a 4G or Non-4G Market.   (CRICKET00434098, CRICKET00527484, CRICKET00444885.)

203.   Further, because employees of Cricket *and* the independent dealers would commonly activate phones for customers, they would have had occasion to see firsthand the weakness or nonexistence of 4G/LTE signals on the phones they were selling.

204.   Independent Dealers and Cricket shared in the profits obtained by selling 4G/LTE devices and service plans at premium prices.  Specifically, Independent Dealers would "receive a percentage of the total Customer Payment Amount collected from the customer at the time of activation" and "after initial activation".  (CRICKET00527484.) The Customer Payment Amount shared between Cricket and Independent Dealers included the premium rates charged for 4G/LTE service plans and 4G/LTE devices.  (CRICKET00527484.)

205.   In some markets, dealers would get as much as 40% of the sale price for a 4G/LTE device and as much as 12% of the sale price for 4G/LTE service plans.  (CRICKET00527484.)

206.   As detailed above, Cricket's 4G/LTE coverage was extremely sparse or nonexistent in many urban areas.

207.   On information and belief, a number of independent dealers received numerous complaints about the quality and/or absence of 4G/LTE coverage.

208.   Employees of independent dealers would commonly ascribe the poor quality or absence of 4G/LTE coverage to some Cricket-controlled medium—for example, "the network is down" or "a tower is down."

209.   Per the above-cited 10-K, Cricket specifically stated that its competitors' capacities, including the ability to "***offer LTE services over a significantly larger geographic area than we do***," also allowed them to "***better attract and retain third-party dealers and distributors***."[20]

---

[20] *Id.* at 8.

(emphasis added).

210.   It follows logically that Cricket's false claims of 4G/LTE coverage would have been important, if not essential, to retaining its independent dealer network, as well as inducing new individuals to invest in Cricket franchises.

211.   Likewise, from the viewpoint of an independent dealer who had already invested in a Cricket store, it would obviously be valuable to offer potential customers 4G/LTE service.

212.   It also follows logically that existing dealers, who had already committed to the national 4G/LTE ad campaign and more expensive 4G/LTE-capable phones, continued to market such phones and services even when it was obvious that Cricket could not actually provide such services.

213.   As stated above, independent dealers were essential in marketing these false claims regarding 4G/LTE coverage to consumers.

214.   Likewise, independent dealers were responsible for selling 4G/LTE-capable phones and/or "4G/LTE" plans to consumers at premium prices.

## CLASS ACTION ALLEGATIONS

215.   Plaintiffs, pursuant to Federal Rules of Civil Procedure 23(a), and (b)(3), bring this action on behalf of all others similarly situated (the "Class") from May 1, 2012, to October 1, 2014 (the "Class Period"), initially defined as[21]:

> **All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE-capable Android smartphone with a 4G/LTE monthly plan for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network.**

---

[21] Plaintiff's original class definition was "All persons in the United States who purchased a 4G/LTE-capable phone from Cricket (including its affiliates and subsidiaries) during the Class Period." The amendment above revises and narrows that definition to only include customers with an "address in a geographic market with no Cricket 4G/LTE network coverage". However, immediately prior to filing this amended complaint, Defendant disclosed that it has been withholding critical documents from the primary executives at Legacy Cricket and, despite Plaintiffs' timely requests for this information, Cricket has failed to produce the same.  Accordingly, Plaintiffs preserve the full scope of its original class definition and reserve the right to seek certification of a class involving customers that are not included in the revised definition (i.e. customers in a geographic market with Cricket 4G/LTE network coverage) at a later date.

216.   Plaintiffs, pursuant to Federal Rules of Civil Procedure 23(a), and (b)(3), also bring this action on behalf of all similarly situated California citizens and citizens of states with consumer protection laws similar to the State of California (the "California Class") from May 1, 2012 to October 1, 2014 (the same Class Period), initially defined as:

> **All persons in California or other states with similar consumer protection laws with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE-capable Android smartphone with a 4G/LTE monthly plan for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network.**

217.   The following persons shall be excluded from any Class: (1) Defendant and its officers, directors, managers, employees, subsidiaries and affiliates; (2) Any person with a customer address outside of Cricket's network footprint but in a market with Sprint LTE coverage; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

218.   A Cricket 4G/LTE-capable Android smartphone is defined as a device that is designed to provide 4G/LTE service.

219.   A 4G/LTE service plan is defined as a plan offering high-speed data.

220.   Plaintiffs reserve the right to modify these definitions if additional discovery comes to light.

221.   The claims for relief asserted herein satisfy the prerequisites for certification as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3):

a.   There are common questions of law or fact common to the Class and California Class;

b.   The claims or defenses of the representative parties are typical of the claims or defenses of the respective class;

c.   The representative party will fairly and adequately protect the interests of the respective class;

d.  The questions of law or fact common to the respective class members predominate over any questions affecting only individual members; and

e.  A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

222.  **Numerosity.**  The members of the Classes are so numerous that individual joinder of all the members is impracticable.   The class is estimated to exceed 500,000 individuals. Defendant's internal documents have confirmed that Defendant sold more than 1.5 million 4G/LTE devices during the class period, over 700,000 of those devices were sold in a geographic markets with no Cricket 4G/LTE network coverage.  (CRICKET01644896-77.) This information is readily available from Defendant.

223.  **Commonality and Predominance.**  This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including, but not limited to, the following:

a.  Whether Cricket engaged in a scheme to conceal material information from the class;

b.  Whether Cricket engaged in a uniform pricing scheme related to 4G/LTE in non-4G markets;

c.  Whether Defendant advertised "No Contract";

d.  Whether Defendant advertised and/or provided 4G/LTE-capable phones;

e.  Whether Defendant advertised and/or provided "4G/LTE" service;

f.  Whether Plaintiffs and Class members purchased 4G/LTE-capable phones from Defendant;

g.  Whether Plaintiffs and Class members purchased 4G/LTE wireless phone plans from Defendant;

h.  Whether and to what extent Defendant failed to provide 4G/LTE service;

i.  Whether Cricket's pricing in Non-4G LTE markets included a premium for 4G/LTE;

j.  Whether Cricket overcharged customers in Non-4G LTE markets for 4G/LTE;

k.  Whether Defendant's Terms of Service were adequately disclosed to and were consented to by Plaintiffs and Class members;

l.  Whether Defendant acted in bad faith by falsely advertising the scope of its 4G/LTE coverage;

m.  Whether Defendant's claim of "no contract" was likely to mislead objectively reasonable consumers;

n.  Whether Defendant's "4G/LTE" advertisements and marketing were likely to mislead an objectively reasonable consumer;

o.  Whether Defendant engaged in deceptive and unfair business and trade practices; and

p.  Whether Plaintiffs and Class members are entitled to damages, and/or other relief.

224.  **Typicality.**  The named Plaintiffs' claims are typical of the claims of the Classes because, among other things, Plaintiffs, like all members of the respective classes, purchased 4G/LTE-capable phones and 4G/LTE service plans anticipating to receive 4G/LTE services. Cricket never provided 4G/LTE services or provided only extremely limited 4G/LTE services in most cities across the United States.  In addition, named Plaintiffs have the same or similar remedies as the members of the putative classes.

225.  **Adequacy of Representation.**  Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the classes that they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the classes will be fairly and adequately protected by Plaintiffs and their counsel.

226.  **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy, including, but not limited to, the following reasons:

a.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Cricket, so it would be impracticable for the members of the classes to individually seek redress for Cricket's wrongful conduct;

b.      Even if the members of the classes could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, a class action presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court; and

c.      No unusual difficulties are likely to be encountered in the management of this class action.

227.   **Ascertainability.**  Defendant is in possession of the necessary records in the form of receipts and billing statements to identify members of the classes; as such, the Classes will be ascertainable.  (e.g. CRICKET01644897).

### STATUTES OF LIMITATIONS AND REPOSE

228.   The statute(s) of limitations and statute(s) of repose for these claims, relating to the purchase of 4G/LTE-capable phones and 4G/LTE service plans "up through October 1, 2014," were tolled by prior agreement with Defendant.  That tolling agreement runs "up to and including November 4, 2019."

229.   Further, Defendant's conduct was inherently deceptive, concealing the damage from the consumers, as more fully outlined herein.  Accordingly, any and all applicable statutes of limitations are and were equitably tolled.

### CAUSES OF ACTION

230.   Plaintiffs do not plead, and hereby disclaim, any causes of action under the Federal Communications Act and regulations promulgated by the FCC.

### CHOICE OF LAW

231.   At all times relevant to this Complaint, Defendant's (and Leap's) principal place of business and principal executive offices were located in California; in addition, Leap owned and controlled Defendant and various other Cricket entities.

232.   All major business and marketing decisions, including decisions to not expand 4G/LTE coverage and continue to market "4G/LTE" even in Non-4G markets, were made at Leap/Cricket's offices in California.

233.   As such, California law applies to Plaintiffs' and the putative Class members' claims because:

    a.   A substantial part of the alleged misleading and deceptive conduct emanated from California; and

    b.   The bad faith, unfair, and unlawful conduct occurred in California.

## COUNT ONE:
## VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT
### Cal. Civ. Code § 1750, et. seq.

234.   Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

235.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, et seq. ("CLRA").

236.   Plaintiff and other proposed Class members purchased from Defendant "goods" (specifically, Cal. Civ. Code § 1761(a)) and "services" (specifically, Cal. Civ. Code § 1761(b)).

237.   Defendant's actions, representations, and conduct have violated the CLRA because they extended to transactions that are intended to result, or which resulted in, the sale or lease of goods or services to consumers.

238.   Plaintiffs and other Class members are "consumers" as that term is defined by the CLRA, specifically, Cal. Civ. Code § 1761(d).

239.   By engaging in the conduct described above, Defendant violated the CLRA as follows:

    a.   By representing that goods or services have sponsorship, approval, characteristics, etc. which they do not have, in violation of Cal. Civ. Code § 1770(a)(5);

b.   By representing that goods or services are of a particular standard, quality, or grade if they are of another, in violation of Cal. Civ. Code § 1770(a)(7); and

c.   By advertising goods or services with intent not to supply them as advertised, in violation of Cal. Civ. Code § 1770(a)(9).

240.   Specifically, Defendant's acts and practices led customers to falsely believe that its "goods" and "services" would allow consumers to have access to a 4G/LTE network when they knew such representations to be false and/or misleading.  Defendant's fraudulent, misleading, and deceptive acts and practices were material to a reasonable consumer because of the importance of 4G/LTE to the consumer wireless experience, particularly for those consumers who, like each of the plaintiffs and everyone in the proposed class in this case, purchased 4G/LTE-compatible phones and high-speed data plans from Cricket. Further, Defendant knew or had reason to know that these consumers regarded or were likely to regard 4G/LTE as important in making their purchases.

241.   On or about May 1, 2015, former plaintiff Flor Barraza, upon filing these claims in a prior action, put Defendant on notice of her allegations and demanded that Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein within thirty days.

242.   Prior Plaintiff Thomas and Plaintiff Postpichal also additionally put Defendants on notice of their allegations and similarly demanded correction, repair, replacement, and/or other rectification via their own prior lawsuit that was filed on behalf of the putative class.

243.   Defendant has refused to correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein.

244.   Defendant was also provided notice of these claims by way of letter dated March 14, 2015, on behalf of the proposed putative class, that Defendant violated the above-referenced sections of the California Legal Remedies Act.  At the beginning, the letter stated: "Please take notice that we believe you are in violation of the California Legal Remedies Act (California Civil Code Section 1750 et seq.,) because, you have represented to consumers, from approximately 2012 to 2014, that the 4G/LTE-capable phones sold by LEAP and Cricket ("you") would have 4G/LTE

coverage when the vast majority of the consumers could not and did not have access to such 4G/LTE coverage." The letter further stated that it served as a "demand on behalf of anyone who purchased Cricket mobile cellular phones and/or services in California within the last three years, which were sold in locations where consumers could not realistically expect to receive 4G/LTE coverage, to replace, refund, or otherwise rectify the violations specified above by June 15, 2015, and to institute written and verifiable internal procedures to ensure that such products and services are not advertised in the future when they are not truly available." Upon receipt of this correspondence, and after more than 30 days' notice, Defendant did not make an appropriate correction, repair, replacement, or other remedy.

245.    After receipt of the above-referenced notices, Defendant attended mediations, engaged in settlement discussions, and entered into multiple tolling agreements in favor of the putative class with full knowledge and notice of its violations of the California Legal Remedies Act set forth herein and that a lawsuit on behalf of the class would be forthcoming if Defendant failed to timely correct, repair, or remedy its conduct/violations.  Defendant nonetheless failed to take any such action.

246.    Moreover, Plaintiffs' initial Complaint, filed November 4, 2019, put Defendant on valid notice of its violations of the California Legal Remedies Act.  Plaintiffs' initial Complaint outlined Defendant's specific violations of the statute and sought only injunctive relief (not damages).  More than thirty days passed, and Defendant did not correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of therein.  Accordingly, Plaintiffs amended their Complaint to add the claim for damages in compliance with the statute.

247.    Cricket's conduct alleged herein caused substantial injury to Plaintiffs and members of the proposed classes, as well as the public generally, because they paid a premium for 4G/LTE service when they did not in fact any 4G/LTE service, resulting in an overpayment.

248.    If consumers are to pay more for a given service—and they do—then terms like "4G" and "5G" must have some substantive meaning or else the notion of "misrepresentation," a bedrock of consumer protection law, is likewise rendered meaningless.

249.   Plaintiffs provided notice to Defendant of its violations of the Consumers Legal Remedies Act concurrent with the filing of the complaint in this action.  More than 30 days since Plaintiffs provided notice passed and Defendant failed to remedy its conduct pursuant to the notice, therefore Plaintiffs and the Class are entitled to recover their actual monetary damages as a result of Cricket's conduct.

250.   The Consumers Legal Remedies Act, § 1750, et seq., is designed to protect consumers against unfair and deceptive business practices.  It applies to Defendant's conduct because it covers transactions that are intended to result or that result in the sale or lease of goods and services to consumers.

251.   At the time of Defendant's violations of the Consumers Legal Remedies Act, Defendant was headquartered in California.  Defendant's fraudulent scheme and violations of the Consumers Legal Remedies Act arise out of conduct and decisions made in California.  The Chief Operating Officer and other executives that had ultimate decision-making authority for the sales, advertising, marketing, and operations related to Defendant's alleged misconduct was located in California.  (Towster Depo, 125:12-130:14.)

### COUNT TWO:
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

252.   Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

253.   The RICO defendants are all "persons" under 18 U.S.C. § 1961(3) because they are and were, and actually do/did, capable of holding "a legal or beneficial interest in property."

254.   The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**A.    Plaintiffs and Class Members Have Suffered Injuries Sufficient to Support RICO Claims**

255.   Plaintiffs and Class members have suffered harm to business and/or property interests because of Defendant's actions.

256.   Specifically, as described above, Plaintiffs and Class members overpaid for 4G/LTE-capable phones, and/or "4G/LTE" service plans.  They suffered a concrete financial loss at the point of sale by paying a premium for 4G/LTE.  In doing so, they paid Cricket extra for nothing in return.

257.   Cricket engaged in a pricing scheme to charge a premium for 4G/LTE devices and 4G/LTE services when it had no ability to provide the associated 4G/LTE service.

258.   A Cricket 4G/LTE-capable phone was only useful on Cricket's network or those of its partners; more expensive 4G/LTE-capable phones were able to be priced at a premium only because they could provide  4G/LTE service on those networks..

259.   When Cricket finally secured a roaming agreement that could have offered 4G/LTE service to its customers, Cricket did not actually offer 4G/LTE service in Non-4G markets.  Instead, it used the agreement as a marketing ploy to charge premium prices for 4G/LTE devices and 4G/LTE service plans while secretly programming customer devices to block 4G/LTE service.

260.   Plaintiffs and Class members also overpaid for "4G/LTE" service; a plan offering such service was priced higher than 3G service plans.

261.   The 4G/LTE-capable phones and "4G/LTE" service sold by Cricket to Plaintiffs and putative Class members had a fair market value below what was paid because Cricket's network offered no-4G service in non-4G markets  and Cricket was secretly programming the 4G/LTE devices to ensure they would not receive 4G/LTE service from Sprint within Cricket's footprint, even where it was available.

262.   The overpayment charged and premium paid for such phones and service constituted property interests for the purposes of RICO.

263.   Because of such overpayment or premium paid, Plaintiffs and proposed Class members suffered a concrete financial loss.

**B. Pattern of Racketeering**

264.   18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

265.   Plaintiffs allege that Defendant conspired to commit, and did in fact commit, mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) so as to satisfy RICO's predicate acts requirement.

266.   As noted above, Cricket's 4G/LTE advertisements were disseminated nationwide in Cricket markets through TV, radio, mail, and the Internet—including via Cricket's website at the time.  During the relevant period, Cricket was the fifth-largest wireless carrier in the country and its 3G network and its retail distribution footprint were likewise deployed in interstate commerce. Thus, its activities clearly impacted interstate commerce.

267.   Plaintiffs have discovered and now allege that Cricket engaged in a fraudulent scheme to sell 4G/LTE in non-4G markets in November 2012.  The RICO 4G/LTE Pricing Scheme is alleged to have involved Cricket's uniform conduct to both price and promote 4G/LTE through the 4G/LTE logo and other advertising medium in all Cricket markets, in all Cricket stores, and on Cricket's website.

268.   Plaintiffs know that Cricket had begun advertising 4G/LTE plans nationwide in all Cricket markets in November 2012.

269.   These advertisements and prominent 4G/LTE logo were displayed/aired/televised/etc. countless times in non-4G markets during 2013 until the time Cricket could actually offer nationwide 4G/LTE services—when it was migrated to AT&T's network following the Merger in, approximately, May 2014.

270.   As stated, the wires and mails were used to perpetuate this fraudulent scheme on a near-constant basis during, especially, 2013 and early 2014.  As such, there were many thousands, if not millions, of instances of this fraud.

271.   The physical advertisements—which included posters and large banners—were delivered to the storefronts through the use of the mails and/or a common courier in interstate

commerce.  Cricket also appears to have delivered 4G/LTE logo material directly to consumers. For instance, some advertisements, such as the "4G/LTE Meets Unlimited Everything" advertisement displayed above (at ¶ 3), appear to have also been delivered to consumers directly through the mail.

272.   Cricket's other 4G/LTE advertisements that were used in Non-4G Markets are set forth herein in are incorporate herein by reference.

273.   The common purpose of this racket, as described, was to perpetuate the illusion of expanding 4G/LTE network coverage and service on a nationwide basis in order to profit.

274.   Cricket and the independently owned companies with whom it associated for purposes of forming an enterprise broader and more expansive than Cricket, wanted to sell 4G/LTE devices and 4G/LTE service plans at premium prices in its Non-4G Markets for enhanced profits.

275.   Cricket's leadership was well aware of the greatly limited nature of the company's 4G/LTE offerings.  For example, in its "Updated Business Outlook" contained in the Form 8-K filed on April 30, 2013 (thus, at least four months after it had debuted the nationwide "4G/LTE" campaign), Cricket announced that ". . . up to $100 million . . . **may** be spent to deploy next-generation LTE network technology [during the 2013 business year]" and "The Company **may** elect to cover up to approximately 10 million additional POPs with LTE in 2013 . . ."[22] (emphasis added).

276.   As cited above, Cricket ultimately did *not* deploy substantial capital expenditure on its 4G/LTE network during 2013 because of significant financial constraints.

277.   Then, Cricket entered into a roaming agreement with Sprint that, if properly utilized by Cricket, would have extended 4G/LTE services to Cricket's customers in Cricket Non-4G Markets; however, Cricket did not want to pay for roaming charges and secretly programmed customer's 4G/LTE devices to ensure they would not get access to Sprint 4G/LTE either.  Cricket concealed these actions from its customers, which were directly contrary to the 4G/LTE logo and other advertisements Cricket disseminated widely in Non-4G markets.

---

[22] LEAP WIRELESS INTERNATIONAL, INC., Form 8-K, Updated Business Outlook (filed with the SEC on Apr. 30, 2013).

278.    Without the willing participation of Defendant and the Independent Dealers in the association-in-fact enterprise, this scheme and common course of conduct would not have been successful because the enterprise, as a franchise network, relied upon national advertising combined with meaningfully homogenous in-store advertising and local distribution of phones and wireless services.

279.    For example, this photo of a Rockford, Illinois Cricket dealer was uploaded to a website in March 2013; it shows a range of marketing materials of the sort availed to dealers by the corporate parent, including the ad for the 4G/LTE-capable HTC One phone and "Nationwide Unlimited" plans:



280.    Cricket offered no 4G/LTE coverage in Rockford, Illinois proper *as of December*

*2014*, while its partner purportedly offered such coverage in some nearby, highly rural areas.

281.   Cricket formulated its scheme which employed a nationwide 4G/LTE marketing campaign in all Cricket non-4G markets, even as it was evident that the company would not have the financial resources to construct its own viable 4G/LTE network in those markets and it did not intent to pay the price for Sprint 4G/LTE roaming (its only viable option for 4G/LTE roaming).

282.   Defendant utilized this racket to intentionally and systematically defraud consumers. Specifically, as described above, Cricket had no good-faith basis on which it could roll out its nationwide 4G/LTE campaign, particularly understanding its plan to secretly program customer devices to block 4G/LTE.  Rather than, for example, simply admit *to consumers* that its 4G/LTE plans had stalled due to lack of capital and spectrum and offered steep discounts on its 3G services plans when paired with 4G/LTE-capable smartphones.  Instead, Cricket opted to deceive its own customers in an effort to construct a viable but deceptive business model over the short term to extract extra profits while providing nothing in return for the extra payments.

283.   There could have been no legitimate purpose for advertising Cricket "4G/LTE" service and Cricket selling 4G/LTE-capable phones on a nationwide basis in all Cricket markets, including non-4G markets, because Cricket did not have the ability to ever offer 4G/LTE service in these non-4G markets —the scheme was inherently fraudulent.

284.   And, again, rather than halting the  "4G/LTE" campaign in non-4G markets at some point, Cricket simply stuck with it even though it was not able to ever offer such service in non-4G markets who had purchased 4G/LTE Android smartphones locked to Cricket's network.

285.   This scheme was, logically, formulated at the senior executive levels given the top-down nature of the campaign, the cost of running a national ad campaign, and the strategic importance of such a campaign.

286.   As described, the Cricket enterprise went ahead with its fraudulent "4G/LTE" marketing/pricing scheme even as Cricket's most senior management expressly recognized that the company possessed only a nascent 4G/LTE network and could not afford to provide 4G/LTE in non-4G markets.

287.   Cricket told a more honest story to the SEC and FCC about its own network capabilities while it deliberately deceived its own customers; however, only Cricket and its Independent Dealers knew the truth about the full nature of Cricket's scheme.  And, Cricket never informed any regulatory or any customers about its plans to program 4G/LTE smartphones to always stay on Cricket's network, even though the internal documents trace that plan back to early 2013.

288.   The interstate mails and wires, as well as the Internet, were utilized by the Cricket enterprise for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

**C. Association-in-Fact Enterprise**

289.   An enterprise includes any individual, partnership, organization, corporation, association, or other entity, and also includes any union or group of individuals associated in fact, even if they do not comprise a formal legal entity.  Accordingly, there are generally two varieties of RICO enterprises: (1) one or more corporate entities being used as a vessel by one or more bad actor(s) to commit acts of racketeering; and (2) an association-in-fact enterprise.

290.   Plaintiffs allege that Cricket and its independently owned, authorized dealers formed an association-in-fact enterprise for the purpose of selling Cricket-branded products to the public.

291.   These authorized dealers are not Cricket's agents.  In fact, Defendant, as described above, did not own and operate many (over 2,000) Cricket-branded stores; rather, these were owned and operated by independent dealers.

292.   This association-in-fact enterprise therefore consists of Cricket and each independently owned, authorized dealer who operated a Cricket store that deployed the 4G/LTE advertisements in a market where Cricket could not provide 4G/LTE service.

293.   Like virtually all RICO enterprises, the ultimate purpose of the Cricket-independent dealer enterprise was to profit.

294.   Here, as described above, the common purpose of the enterprise as it pertains to this suit was to profit by marketing 4G/LTE service that was much desired by consumers in non-4G

markets.

295.   Cricket sold 4G/LTE devices and 4G/LTE services plan at premium prices in non-4G markets when Cricket would not be providing nay 4G/LTE services.

296.   This common purpose was, in large part, literally common—that is, business entities that were owned by Cricket and business entities that were controlled by many different, independent entities displayed and otherwise marketed the same messages and materials pertaining to "4G/LTE" service.

297.   This association-in-fact enterprise profited, as described above, using fraudulent means.  Specifically, the 4G/LTE advertisements were known or should have been known by all parties to this enterprise to be false.

298.   Cricket knew such advertisement was false.

299.   The Independent Dealers also knew of this falsity given the fact that they activated customers' phones in-store, Cricket communicated with them regarding Cricket's business plans, and they received persistent complaints about lack of 4G/LTE coverage.  To the extent that any number of independent dealers and their employees actually owned Cricket 4G/LTE-capable phones, they would have had firsthand experience as such.

300.   This knowledge was further informed by Cricket emails that were sent to all indirect dealers.

301.   Cricket and its Independent Dealers knew that the 4G/LTE devices and 4G/LTE service plans were being sold at premium prices and that Cricket did not intend to provide 4G/LTE services to customers in Non-4G LTE Markets.

302.   Independent Dealers also knew if their stores were in Cricket 4G or Non-4G Markets.

303.   The enterprise's fraud can be traced along a particular timeline.  As alluded to above, Cricket—including its Independent Dealers—began advertising 4G/LTE plans in November 2012. These advertisements appeared on Cricket's website, in stores, and elsewhere.

304.   As averred above, Cricket and its dealers did not inform *consumers* with regard to the greatly limited availability of 4G/LTE coverage – and no coverage in non-4G markets.  Cricket

and its dealers did not inform customers that Cricket had stopped developing its 4G/LTE infrastructure.   Cricket and its dealers did not inform consumers that Cricket was secretly programming devices to block access to 4G/LTE.  That is, Cricket made an executive decision sometime before the beginning of 2013 to begin marketing nationwide 4G/LTE services in all Cricket markets and sell 4G/LTE devices and service plans when they had not intent to offer them and the dealers participated in such fraud.

305.   This fraud was ongoing and can be documented via any number of sources, many of which are preserved online.  For example, the following poster was hanging in a Columbus, Georgia Cricket store on or about February 5, 2013:



306.   Meanwhile, Cricket's records from late December 2014—*nearly two years later*— showed no 4G/LTE coverage in the area even then.

**D. Defendant's Conduct Caused These Injuries**

307.   Defendant's unlawful conduct was both the direct and proximate cause of the concrete losses suffered by the Plaintiffs and Class members.

308.   Specifically, Defendant, as described above, were aware of the state of its 4G/LTE capabilities and misrepresented them on a national basis in all Cricket non-4G markets.

309.   As stated above, Cricket rolled out a national "4G/LTE" ad campaign in all markets

months before it had even secured a wholesale deal for such services.

310.    Then, when Cricket secured a roaming agreement with Sprint, it secretly programmed customer devices to block access to 4G/LTE roaming services in Cricket's network coverage areas.

311.    Cricket supplied its stores, including the independent dealers, across the country with a variety of "4G/LTE" logo marketing materials before it could offer 4G/LTE service in non-4G markets and when it had no intent to provide 4G/LTE services to these customers in non-4G markets.

312.    Cricket utilized the Internet, television, radio, and/or mail system to fraudulently advertise its "4G/LTE" service and distribute such materials to its dealers.

313.    Cricket misrepresented its own 4G/LTE capabilities and consumers reasonably paid more for 4G/LTE-capable phones and Defendant's "4G/LTE" service because of these misrepresentations.

314.    Further, there were no significant discontinuities in this causal relationship as Cricket was misrepresenting its own capabilities to its own customers.  That is to say, Plaintiffs and the class members were the direct and intend targets of this scheme.  Thus, Defendant's conduct was the direct and proximate cause of Plaintiffs' and Class members' injuries.

315.    These damages could include the difference in the cost between a 4G/LTE-capable phone and a 3G phone, as well as the difference in cost per line per month between a 4G/LTE plan and a 3G plan.

316.    These damages could include the premium charged and paid for 4G/LTE devices and 4G/LTE service plans.

317.    Under 18 U.S.C. § 1964(c), defendants are each jointly and severally liable to Plaintiffs and the Class members for three times the damages sustained plus the costs of bringing this suit, including reasonable attorneys' fees.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and those similarly situated request that the Court order relief and enter judgment against Defendant as follows:

1. Approving of the Class, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

2. Declaring that Defendant committed the violations alleged herein;

3. Granting damages, restitution, treble damages, and/or disgorgement to Plaintiffs and Class members;

4. Granting compensatory damages, the amount of which is to be determined at trial;

5. Granting punitive damages;

6. Granting pre- and post-judgment interest;

7. Granting attorneys' fees and costs; and

8. Granting further relief as this Court may deem proper.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and others similarly situated, demand a trial by jury for all issues so triable under the law.

                                        **WAGSTAFF & CARTMELL LLP**

Dated: March 4, 2020                            */s/ Tyler W. Hudson*
                                        ***Attorneys for Plaintiffs***

1

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice*)

2
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)

3
Austin Brane, CA Bar #286227
4740 Grand Ave., Suite 300

4
Kansas City, MO  64112

5
Tel. (816) 701-1100
Fax (816) 531-2372

6
thudson@wcllp.com
ebarton@wcllp.com

7
mdickson@wcllp.com
abrane@wcllp.com

8

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
matt@guptawessler.com
jon@guptawessler.com

Jennifer Bennett
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
jennifer@guptawessler.com

9

10

11
**CONSUMER LAW PRACTICE OF DANIEL T. LEBEL**
PO Box 720286

12
San Francisco, CA 94172
Tel: 415-513-1414

13
Fax: 877-563-7848

14
danlebel@consumerlawpractice.com

15
**WADDELL LAW FIRM LLC**
A. Scott Waddell (*pro hac vice*)

16
1900 W. 75th Street, Suite 220
Prairie Village, Kansas 66208

17
Tel: 816-914-5365

18
scott@aswlawfirm.com

**BELL LAW, LLC**
Bryce B. Bell (*pro hac vice*)
Mark W. Schmitz (*pro hac vice*)
Andrew R. Taylor (*pro hac vice*)
2600 Grand Blvd., Suite 580
Kansas City, Missouri 6410
Tel: 816-886-8206
Fax:  816-817-8500
Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com

19

20

21
***Attorneys for Plaintiffs***

22

23

24

25

26

27

28