1   Tyler W. Hudson (*pro hac vice*)           Matthew W.H. Wessler (*pro hac vice*)
2   Eric D. Barton (*pro hac vice*)            Jonathan E. Taylor (*pro hac vice*)
    Melody R. Dickson (*pro hac vice*)         **Gupta Wessler PLLC**
3   Austin Brane (State Bar No. 286227)        1900 L Street NW, Suite 312
    **Wagstaff & Cartmell LLP**                Washington, DC 20036
4   4740 Grand Ave., Suite 300                 (202) 888-1741
    Kansas City, MO 64112                      *matt@guptawessler.com*
5   (816) 701-1100                             *jon@guptawessler.com*
    *thudson@wcllp.com*
6   *ebarton @wcllp.com*                       Jennifer Bennett (SBN 296726)
    *mdickson@wcllp.com*                       Neil K. Sawhney (SBN 300130)
7   *abrane@wcllp.com*                         **Gupta Wessler PLLC**
8                                              100 Pine Street, Suite 1250
                                               San Francisco, CA 94111
9                                              (415) 573-0336
10                                             *jennifer@guptawessler.com*
                                               *neil@guptawessler.com*
11  *Attorneys for Plaintiffs*

12              **UNITED STATES DISTRICT COURT**
13           **NORTHERN DISTRICT OF CALIFORNIA**
                 **SAN FRANCISCO DIVISION**
14

15  JAMIE POSTPICHAL, SARAH
    WATERS, and USULA FREITAS, *on*
16  *behalf of themselves and others similarly*     Case No. 3:19-cv-07270-WHA
    *situated,*
17                                                  Hon. William H. Alsup
18          *Plaintiffs,*
    v.                                              Date:        May 13, 2021
19                                                  Time:        8:00am
    CRICKET WIRELESS, LLC,                          Courtroom:   12, 19th floor
20
21          *Defendant.*
22

23

24              **PLAINTIFFS' OPPOSITION TO**
    **DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**
25

26

27

28

**TABLE OF CONTENTS**

Table of Authorities ..................................................................................................................ii

Introduction ...........................................................................................................................1

Argument ...............................................................................................................................3

     I.    The plaintiffs have sufficiently alleged that Cricket developed a scheme to sell 4G/LTE phones and data plans to consumers at premium prices in markets where, unbeknownst to them, Cricket did not provide any access to 4G/LTE service. ............................................................................................. 3

    II.   The plaintiffs have complied with the CLRA's pre-suit notice requirement two times over. ........................................................................................................ 6

    III.  The non-California plaintiffs can bring CLRA claims because Cricket developed and coordinated the alleged fraudulent scheme at its California headquarters. ........................................................................................................ 8

    IV.  The plaintiffs have plausibly alleged that Cricket and its independent dealers constituted an "enterprise" for purposes of RICO. ..................................... 12

Conclusion.............................................................................................................................17

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Abcarian v. Levine,*
    972 F.3d 1019 (9th Cir. 2020) ......................................................................12

4

*Anderson v. Apple Inc.,*
    2020 WL 6710101 (N.D. Cal. Nov. 16, 2020) ...............................................11

5

6

*Bias v. Wells Fargo & Co.,*
    942 F. Supp. 2d 915 (N.D. Cal. 2013) .........................................................15

7

8

*Boyle v. United States,*
    556 U.S. 938 (2009) .................................................................................13, 16

9

10

*Bruno v. Eckhart Corp.,*
    280 F.R.D. 540 (C.D. Cal. 2012) ..................................................................12

11

*Castagnola v. Hewlett–Packard Co.,*
    2012 WL 2159385 (N.D. Cal. June 13, 2012)..................................................9

12

13

*Clancy v. The Bromley Tea Co.,*
    308 F.R.D. 564 (N.D. Cal. 2013) ..................................................................11

14

15

*Clark v. Westbrae Natural, Inc.,*
    2020 WL 7043879 (N.D. Cal. Dec. 1, 2020) ...................................................7

16

*Concha v. London,*
    62 F.3d 1493 (9th Cir. 1995)............................................................................4

17

18

*Corra v. Energizer Holdings, Inc.,*
    962 F. Supp. 2d 1207 (E.D. Cal. 2013) ..........................................................7

19

20

*Donohue v. Apple, Inc.,*
    871 F. Supp. 2d 913 (N.D. Cal. 2012) .........................................................11

21

*Downey Surgical Clinic, Inc. v. Ingenix, Inc.,*
    2013 WL 12114069 (C.D. Cal. Mar. 12, 2013) .............................................15

22

23

*Ehret v. Uber Technologies, Inc.,*
    68 F. Supp. 3d 1121 (N.D. Cal. 2014) ...........................................................9

24

25

*Feld Entertainment Inc. v. American Society for the Prevention of Cruelty to Animals,*
    873 F. Supp. 2d 288 (D.D.C. 2012).............................................................15

26

*Forcellati v. Hyland's, Inc.,*
    2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) .............................................11, 12

27

28

*Frenzel v. AliphCom,*
   76 F. Supp. 3d 999 (N.D. Cal. 2014) ........................................................................... 11

*Friedman v. 24 Hour Fitness USA, Inc.,*
   580 F. Supp. 2d 985 (C.D. Cal. 2008) ......................................................................... 14

*Gonzales v. CarMax Auto Superstores, LLC,*
   845 F.3d 916 (9th Cir. 2017) ......................................................................................... 7

*Humana Inc. v. Mallinckrodt ARD LLC,*
   2020 WL 3041309 (C.D. Cal. Mar. 9, 2020) ............................................................... 15

*In re Apple & AT&T iPad Unlimited Data Plan Litigation,*
   802 F. Supp. 2d 1070 (N.D. Cal. 2011) ...................................................................... 10

*In re ClassicStar Mare Lease Litigation,*
   727 F.3d 473 (6th Cir. 2013) ................................................................................. 15, 16

*In re Clorox Consumer Litigation,*
   894 F. Supp. 2d 1224 (N.D. Cal. 2012) ...................................................................... 11

*In re Insurance Brokerage Antitrust Litigation,*
   618 F.3d 300 (3d Cir. 2010) ......................................................................................... 15

*In re JUUL Labs, Inc., Marketing, Sales Practices, & Products Liability Litigation,*
   2020 WL 6271173 (N.D. Cal. Oct. 23, 2020) ............................................................. 14

*In re Mattel, Inc.,*
   588 F. Supp. 2d 1111 (C.D. Cal. 2008) ....................................................................... 10

*In re National Western Life Insurance Deferred Annuities Litigation,*
   635 F. Supp. 2d 1170 (S.D. Cal. 2009) ....................................................................... 14

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation,*
   433 F. Supp. 2d 172 (D. Mass. 2006) ......................................................................... 14

*In re Toyota Motor Corp.,*
   785 F. Supp. 2d 883 (C.D. Cal. 2011) ........................................................................... 9

*In re Wells Fargo Insurance Marketing & Sales Practices Litigation,*
   2018 WL 4945541 (C.D. Cal. June 18, 2018) ............................................................. 15

*In re Takata Airbag Products Liability Litigation,*
   2015 WL 9987659 (S.D. Fla. Dec. 2, 2015) ................................................................ 16

*Jabbari v. Farmer,*
   965 F.3d 1001 (9th Cir. 2020) ..................................................................................... 12

*Junod v. NWP Services Corp.,*
   2015 WL 12712309 (C.D. Cal. Apr. 2, 2015) ............................................................... 9

*Mazza v. American Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ......................................................................... 2, 10, 11

*McMillan v. Connected Corp.*,
  2010 WL 11549680 (C.D. Cal. Dec. 6, 2010) ....................................................... 6

*Meyer v. Sprint Spectrum L.P.*,
  45 Cal. 4th 634 (2009) ....................................................................................... 7

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) ................................................................... 1, 4, 5, 6

*Morgan v. AT&T Wireless Services, Inc.*,
  177 Cal. App. 4th 1235 (2009) ........................................................................... 7

*N.V.E., Inc. v. Palmeroni*,
  2015 WL 13649814 (D.N.J. Feb. 23, 2015) ......................................................... 15

*Norwest Mortgage, Inc. v. Superior Court*,
  72 Cal. App. 4th 214 (1999) ............................................................................... 9

*Nunez v. Saks Inc.*,
  771 F. App'x 401 (9th Cir. 2019) ....................................................................... 5

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) ................................................................... 2, 13, 15

*Precht v. Kia Motors America, Inc.*,
  2014 WL 10988343 (C.D. Cal. Dec. 29, 2014) ..................................................... 10

*Shank v. Presidio Brands, Inc.*,
  2018 WL 510169 (N.D. Cal. Jan. 23, 2018) ......................................................... 12

*Stearns v. Select Comfort Retail Corp.*,
  2009 WL 1635931 (N.D. Cal. June 5, 2009) ..................................................... 7, 8

*Stitt v. Citibank, N.A.*,
  748 F. App'x 99 (9th Cir. 2018) ......................................................................... 17

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) ....................................................................................... 9

*Swearingen v. Late July Snacks LLC*,
  2017 WL 1806483 (N.D. Cal. May 5, 2017) ..................................................... 9, 10

*TRC & Associates v. NuScience Corp.*,
  2013 WL 6073004 (C.D. Cal. Nov. 18, 2013) ....................................................... 9

*United States v. Cianci*,
  378 F.3d 71 (1st Cir. 2004) ............................................................................... 14

*United States v. Feldman,*
    853 F.2d 648 (9th Cir. 1988) .................................................................................. 14

*United States v. Rozet,*
    183 F.R.D. 662 (N.D. Cal. 1998) ........................................................................... 12

*United States v. Turkette,*
    452 U.S. 576 (1981) .......................................................................................... 13, 14

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ............................................................................. 3, 4

*Vizcarra v. Unilever United States, Inc.,*
    2020 WL 4016810 (N.D. Cal. July 16, 2020) ...................................................... 2, 8

*Waller v. Hewlett-Packard Co.,*
    2011 WL 6325972 (S.D. Cal. Dec. 16, 2011) ........................................................ 7

*Wang v. OCZ Technology Group, Inc.,*
    276 F.R.D. 618 (N.D. Cal. 2011) .......................................................................... 9

*Washington Mutual Bank v. Superior Court,*
    24 Cal. 4th 906 (2001) ........................................................................................ 11

*Williams v. Apple, Inc.,*
    449 F. Supp. 3d 892 (N.D. Cal. 2020) .................................................................. 6

*Wilson v. Frito-Lay North America, Inc.,*
    961 F. Supp. 2d 1134 (N.D. Cal. 2013) ........................................................... 9, 10

*Won Kyung Hwang v. Ohso Clean, Inc.,*
    2013 WL 1632697 (N.D. Cal. Apr. 16, 2013) ..................................................... 11

*Young v. Wells Fargo & Co.,*
    671 F. Supp. 2d 1006 (S.D. Iowa 2009) ......................................................... 15, 17

**Statutes**

18 U.S.C. § 1961(4) .......................................................................................................... 13

Cal. Civ. Code § 1782(a) .................................................................................................. 6

Cal. Civ. Code § 1782(d) ............................................................................................... 1, 7

**Other Authorities**

Gregory P. Joseph, *Civil RICO: A Definitive Guide* (3d ed. 2010) ............................ 15

# INTRODUCTION

After months of intransigence and hard-fought discovery practice, Cricket Wireless has produced email after email revealing that the company "message[d] LTE aggressively—including [in] non-4G markets." Third Am. Compl. (Dkt. 184) ("TAC") ¶ 129 (citing CRICKET00877821). These internal communications demonstrate that Cricket developed a nationwide marketing strategy based on a "companywide directive to talk about LTE even in non-LTE markets and push LTE capable handsets." *Id.* (citing CRICKET00793602). Cricket pushed this marketing over the objections of some of its employees and dealers, fully aware that the vast majority of its customers would never be able to access 4G/LTE service. And it actively concealed the truth—not just that it was never going to build out its 4G/LTE infrastructure, but that it had even *secretly locked* its subscribers' phones to prevent them from accessing 4G/LTE service from partner carriers—so that it could charge premium prices for 4G/LTE phones.

Despite all this, Cricket now argues that the Court should dismiss the operative complaint because it somehow fails to provide the company with adequate notice of its fraudulent conduct. That argument would have been meritless even if it had been made immediately after the plaintiffs filed their initial complaint. But now—after the evidence that has been produced shows that Cricket actively developed and concealed its fraudulent scheme for years—it is laughable. Cricket's blinkered focus on the particular circumstances of the named plaintiffs' purchases misapprehends the plaintiffs' theory of liability here: Cricket overcharged its customers by selling them "4G/LTE" phones and service plans when the company knew that it did not—and would not ever be able to—offer 4G/LTE service. The Ninth Circuit recently held that analogous allegations in a challenge to a fraudulent price-premium scheme satisfied Rule 9(b)'s particularity requirement. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019–20 (9th Cir. 2020). This Court should hold the same.

The Court should also reject Cricket's three other arguments for dismissal. *First*, the plaintiffs have complied with the CLRA's pre-suit notice in two different ways. Because their initial complaint sought only injunctive relief under the CLRA, they did not have to provide Cricket with notice. *See* Cal. Civ. Code § 1782(d). Along with that complaint, the plaintiffs sent notice to Cricket that, if the

company did not remedy the alleged violations, they would include a claim for damages after the required waiting period—as the statute expressly allows. That is exactly what the plaintiffs did. And if that weren't enough, Cricket was already on notice when it received a demand letter from the named plaintiff in a lawsuit alleging precisely these CLRA violations on behalf of a proposed class that included the plaintiffs here. This Court has held that such notice satisfies the CLRA's requirements. *See Vizcarra v. Unilever U.S., Inc.*, 2020 WL 4016810 (N.D. Cal. July 16, 2020).

*Second*, Cricket is wrong in asserting that the non-California named plaintiffs, Jamie Postpichal and Ursula Freitas, are not authorized to raise CLRA claims. California courts, as well as this Court, have repeatedly recognized that out-of-state plaintiffs can bring CLRA claims when, as here, the defendant is headquartered or has a principal place of business in California, and when the alleged misconduct occurs or originates in California. Cricket simply ignores this case law. Instead, it draws this Court's attention to the Ninth Circuit's decision in *Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012). But *Mazza* was a case about analyzing choice of law at the class-certification stage. It says nothing about dismissal at the pleading stage. So, even if this Court wishes to engage in a choice-of-law analysis (and Cricket makes no effort to brief that issue), it should wait until it rules on class certification.

*Third* and finally, the plaintiffs have plausibly alleged for purposes of RICO that Cricket and its independent dealers formed an "enterprise" with a "common purpose"—a fraudulent scheme to sell 4G/LTE devices and data plans at premium prices in non-4G/LTE markets, despite knowing that subscribers in these markets would not be able to access 4G/LTE service. The Ninth Circuit has held this kind of association is sufficient to state a RICO claim. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc). Ignoring this decision, Cricket asserts that entities pursuing their individual economic interests and business activities cannot form a RICO enterprise. This assertion, however, conflicts with case law holding that an enterprise's "common purpose" need not be fraudulent or illegal, and that the individual entities' interests and enterprise's interests can overlap. In any event, the plaintiffs have alleged that the independent dealers knew of Cricket's fraudulent misconduct and active concealment. Cricket's motion to dismiss should therefore be denied.

**ARGUMENT**

**I.    The plaintiffs have sufficiently alleged that Cricket developed a scheme to sell 4G/LTE phones and data plans to consumers at premium prices in markets where, unbeknownst to them, Cricket did not provide any access to 4G/LTE service.**

Cricket's lead argument is that the plaintiffs' allegations—that Cricket undertook a multi-year, nationwide scheme to defraud consumers by charging a premium for a service that it never intended to provide to them, while actively concealing its true aim—do not satisfy Rule 9(b)'s pleading requirements. That is bold.

The plaintiffs allege that Cricket embarked on a scheme to sell expensive 4G/LTE-compatible smartphones and high-speed data plans to hundreds of thousands of consumers in geographic markets in which Cricket had no intention of providing any 4G/LTE service. TAC ¶¶ 1, 4, 6–9 (Dkt. 184). Cricket knew that consumers wanted 4G/LTE devices and service and that they would pay premium prices to get them. TAC ¶¶ 9, 74–76, 97, 160, 164, 188–189. So Cricket launched a nationwide marketing campaign in 2012 to sell 4G/LTE phones, including a "companywide directive to talk about LTE even in non-LTE markets and push LTE capable handsets" and to "message LTE aggressively—including [in] non-4G markets." TAC ¶ 129; *see id.* ¶ 147. This marketing—"including, but not limited to, in-store advertising, printed marketing materials, radio, television, billboards, and the Internet"—represented to consumers "that Cricket's 4G/LTE services provided unlimited 4G/LTE in the United States without noting any areas of limited or nonexistent coverage." TAC ¶¶ 132–33; *see also id.* ¶¶ 135–54, 168–75. But Cricket had a secret: It did not (and had no plan to ever) have 4G/LTE service in these markets. TAC ¶¶ 40.a–.b, 44–45, 80, 83, 86, 91–94. And even worse, it actively concealed from consumers that it had programmed subscribers' phones to prevent them from accessing 4G/LTE coverage in non-4G markets from partner carriers. TAC ¶¶ 97–125.

These allegations easily satisfy Rule 9(b)'s "demands that, when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (cleaned up). Indeed, what is remarkable about Cricket's argument here is that the non-public evidence that has

come to light through discovery (and that Cricket has repeatedly tried to keep secret) does not just confirm the plaintiffs' allegations—it reveals a *far more* extensive scheme of active concealment and fraudulent conduct than what they initially alleged. As we detail in greater length in our class-certification motion (Dkt. 177, at 2–7), numerous internal communications show that Cricket (1) knew it needed to sell 4G/LTE phones at premium prices to remain attractive to a prospective buyer; (2) had no plans to build 4G/LTE infrastructure for most of its subscriber base; (3) "aggressively" marketed 4G/LTE service in non-4G/LTE markets, over employees' and dealers' express concerns that this messaging was misleading; (4) locked 4G/LTE phones to its (mostly 3G) network; and (5) blocked its subscribers in non-4G/LTE markets from accessing 4G/LTE service from other carriers, despite claiming it had a nationwide "roaming" agreement with Sprint, to avoid paying more than $400 million in roaming fees. It is hard to understand how Cricket can claim that it lacks adequate "notice of [its] particular misconduct" when its own internal communications— communications that were not available until the plaintiffs engaged in months of contentious discovery proceedings—make clear that it has had such notice for nearly a decade. *See Vess*, 317 F.3d at 1106; *cf. Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Even in cases where fraud is alleged, we relax pleading requirements where the relevant facts are known only to the defendant.").

Nevertheless, Cricket asserts that the plaintiffs cannot satisfy Rule 9(b) because the named plaintiffs do not sufficiently identify when and where they bought their Cricket devices, nor which specific advertisement deceived them. *See* Mot. to Dismiss 13–15 (Dkt. 213). But these assertions fundamentally misunderstand the plaintiffs' legal theory of liability in this case. The plaintiffs allege that Cricket overcharged its customers by selling them "4G/LTE" phones and service plans, when the company knew that it did not—and would not ever be able to—offer 4G/LTE service. In other words, they allege that they paid a premium for 4G/LTE products that Cricket could not have charged but for its active concealment and fraudulent conduct. Such allegations, the Ninth Circuit recently recognized, include "sufficient detail to put [a defendant] on notice as to the fraud claim." *Moore*, 966 F.3d at 1019–20.

In *Moore*, for instance, the plaintiffs alleged that various pet-food manufacturers and retailers violated California's consumer-protection laws by selling and marketing so-called "prescription pet food," which led "reasonable consumers falsely to believe that [their] food ha[d] been subject to government inspection and oversight, and ha[d] medicinal and drug properties." *Id.* at 1012. As their theory of liability and injury, the plaintiffs alleged that they "paid more for the prescription pet food than they would have in the absence of the prescription requirement, had they purchased it at all." *Id.* at 1014–15; *see also id.* at 1019 (noting that the plaintiffs' "state law claims are based in part on a theory of fraud: that prescription pet food is not materially different from non-prescription pet food and therefore does not justify the higher cost"). The Ninth Circuit held that the plaintiffs satisfied Rule 9(b) because they described what pet food they purchased and alleged how the purportedly unique ingredients in the defendants' pet food "[we]re not drugs and [we]re not sufficient to justify one product being sold by prescription for a significantly higher price." *Id.* at 1019–20. Notably, this holding did not turn on the specific marketing or advertising that any of the plaintiffs saw before purchasing the pet food. *See id.*; *see also Nunez v. Saks Inc.*, 771 F. App'x 401, 403 (9th Cir. 2019) (holding that plaintiff satisfied Rule 9(b)'s particularity requirement claims where he brought CLRA claims alleging that Saks Fifth Avenue "used a uniform pricing scheme for its price tags" that "include[d] a fictious 'Market Price' alongside a 'You Pay' price at which the product is sold," which was "likely to mislead a reasonable consumer into believing he is purchasing a discounted product").

*Moore*'s analysis should control the Rule 9(b) question here. Like the *Moore* plaintiffs, the plaintiffs in this case allege that Cricket and its independent dealers developed a scheme to lead "reasonable consumers falsely to believe that" they would be able to access 4G/LTE service. *See Moore*, 966 F.3d at 1012. And, as in *Moore*, the plaintiffs here allege that they "paid more" for 4G/LTE phones and data plans "than they would have in the absence" of Cricket's deceptive marketing and active concealment of key material facts—or that they would not have bought the phones at all if they had known the truth about Cricket's fraudulent scheme. *See id.* at 1014–15. Moreover, after the pleading stage, Cricket will have the opportunity to "submit[] evidence . . . to justify the price

differentials"—and "[t]he fact that [the] [p]laintiffs [have] placed [Cricket] on sufficient notice to respond to the alleged fraud reflects how their allegations meet Rule 9(b)." *See id.* at 1020.

Cricket's basic misunderstanding of the plaintiffs' legal theory and the controlling Ninth Circuit case law infects all of its other arguments about Rule 9(b). For instance, they fault Waters (at 13) for not alleging the specific date of her Cricket purchase. But its own cited cases make clear that such allegations are only necessary "when the timing of a transaction is relevant to a claim"—for example, when "some or all of plaintiff's purchases may fall outside the statute of limitations" or "specified class period." *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 911 (N.D. Cal. 2020) (internal citation omitted). But there is no suggestion that this is the case for Waters' purchase, which occurred in 2013—squarely in the middle of the proposed class period. TAC ¶¶ 57, 59. Similarly, Cricket attacks the plaintiffs (at 14–15) for "fail[ing] to allege what store employees told them about 4G/LTE coverage." But, unlike in the case that Cricket cites, the plaintiffs' claims here are not premised on any "oral representations" by Cricket's "sales team." *McMillan v. Connected Corp.*, 2010 WL 11549680, at *1, *5 (C.D. Cal. Dec. 6, 2010). Instead, as described, the plaintiffs' claims are based on their allegations that Cricket actively concealed the fact that they would not have access to 4G/LTE service, and that they would not have purchased 4G/LTE phones and plans at premium prices if they had known the truth. And those allegations, for the reasons already explained, are sufficiently particularized for purposes of Rule 9(b). Cricket's arguments to dismiss the complaint on this basis, therefore, should be rejected.

## II. The plaintiffs have complied with the CLRA's pre-suit notice requirement two times over.

Before commencing "an action for damages" under the CLRA, the statute requires that a consumer provide notice to the defendant and demand that the defendant correct or otherwise rectify its alleged CLRA violation. Cal. Civ. Code § 1782(a). Cricket's argument that the plaintiffs did not satisfy this procedural requirement is meritless, for at least two reasons.

*First*, Cricket entirely fails to mention that the plaintiffs' initial complaint sought only injunctive relief under the CLRA. And the statute's "notice requirement does not apply where the action is for injunctive relief." *Clark v. Westbrae Nat., Inc.*, 2020 WL 7043879, at *5 (N.D. Cal. Dec. 1,

2020) (citing Cal. Civ. Code § 1782(d)); *see, e.g.*, *Gonzales v. CarMax Auto Superstores, LLC*, 845 F.3d 916, 918 (9th Cir. 2017); *Meyer v. Sprint Spectrum L.P.*, 45 Cal.4th 634, 644 (2009). Moreover, section 1782(d) expressly provides that a plaintiff who brings a CLRA injunctive relief action "may amend his or her complaint without leave of court to include a request for damages" so long as she does so (1) at least thirty days after filing the initial complaint, and (2) after providing notice pursuant to subdivision (a).

That is precisely what happened here. The plaintiffs notified Cricket when they filed their first complaint—which included solely a CLRA injunctive-relief claim—and only after Cricket failed to correct its violation did they then file an amended complaint including a CLRA damages claim. *See* First Am. Compl. ¶ 277 (Dkt. 16); Second Am. Compl. ¶ 230 (Dkt. 158). As this Court has recognized, the CLRA's "statutory scheme expressly allows for an amendment in those circumstances." *Waller v. Hewlett-Packard Co.*, 2011 WL 6325972, at *5 (S.D. Cal. Dec. 16, 2011) (finding CLRA notice requirement satisfied "when a plaintiff originally seeks only injunctive relief under § 1750, for which no notice is required, and later sends a notice letter and amends his complaint to seek damages under the statute"); *see also, e.g.*, *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1260 (2009) (noting that the plaintiffs "were not required to provide notice before filing the original or first amended complaints because they did not seek damages under the CLRA in those complaints"); *Corra v. Energizer Holdings, Inc.*, 962 F. Supp. 2d 1207, 1221 (E.D. Cal. 2013) (rejecting argument that "if the [notice] requirement is not met before suit is commenced, the complaint cannot subsequently be amended to request CLRA damages").

*Second*, as the plaintiffs allege in their complaint, Cricket *already* received adequate notice about the CLRA violations at issue here. TAC ¶ 264. The company does not (and cannot) dispute that it received this notice. Instead, it argues (at 15–16) that this notice cannot satisfy section 1782(a) because the letter was sent on behalf of Flor Barazza, the named plaintiff in the dismissed 2015 lawsuit. Cricket contends that she is nothing more than a "third party"—even though that case involved identical claims as those here, brought by other members of the same proposed class.[1]

---

[1] For this reason, Cricket's reliance (at 16) on *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931 (N.D. Cal. June 5, 2009), is misplaced. There, the plaintiff tried to satisfy the CLRA's pre-notice requirement merely by alleging that Select Comfort was *generally* "aware of customer

But this Court has already rejected that understanding of section 1782(a) as "contrary to the text and purpose of" the CLRA. *Vizcarra v. Unilever U.S., Inc.*, 2020 WL 4016810, at *4. In *Vizcarra*, this Court found that a demand letter from counsel for Nunez, a named plaintiff in a separate lawsuit against Unilever pending in the Central District of California, "satisfie[d] the notice requirements" for Vizcarra's CLRA damages claim. *Id.* at *3. That letter was sufficient, the Court explained, because it "provided Unilever with notice, not only of his individual claims, but of the claims he sought to assert on behalf of other similarly situated consumers," which included both Vizcarra and the proposed class of consumers that Vizcarra sought to represent. *Id.* "Because Nunez's letter provided Unilever with the opportunity to resolve the individual and proposed class claims for damages under the CLRA asserted here, such claims cannot be dismissed for failure to comply with section 1782(a)." *Id.*

So too here: Barazza's counsel sent Cricket a demand letter on behalf  of "anyone who purchased Cricket mobile cellular phones and/or services in California [between May 2012 and May 2015], which were sold in locations where consumers could not realistically expect to receive 4G/LTE coverage"—a class that includes Waters, a named plaintiff here. *See* Ex. A to Cricket Mot to Dismiss (Dkt. 213-1). And that letter said that Cricket violated subdivisions (a)(5), (a)(7), and (a)(9) of the CLRA—the precise violates alleged in the Third Amended Complaint. *See id.*; TAC ¶ 239.a–c. Indeed, this Court has already observed that "allegations in the Barraza complaints largely mirror those in the operative complaint here." Dkt. 25 at 3. Thus, even if the plaintiffs had to provide Cricket with notice before filing their initial complaint (and they did not), the 2015 demand letter is sufficient under the statute.

## III.   The non-California plaintiffs can bring CLRA claims because Cricket developed and coordinated the alleged fraudulent scheme at its California headquarters.

Cricket is simply wrong that non-California plaintiffs Postpichal and Freitas cannot raise claims under the CLRA. Courts have repeatedly held that where, as here, the defendant is a

complaints." *Id.* at *15.

California corporation and the alleged fraudulent scheme flows from California, application of California's consumer-protection laws is appropriate. And, to the extent it is not, that choice-of-law question is best suited for resolution at class certification—not the motion-to-dismiss stage.

**A.** It is true that "the California Supreme Court has recognized a general 'presumption against extraterritorial application' of state law, including the UCL and CLRA." *Swearingen v. Late July Snacks LLC*, 2017 WL 1806483, at *9 (N.D. Cal. May 5, 2017) (quoting *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011)). But that is all it is—a presumption. And, as Cricket's own cited cases explain, it applies to bar non-Californian plaintiffs' UCL and CLRA claims primarily "where *none* of the alleged misconduct or injuries occurred in California." *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1147 (N.D. Cal. 2013) (emphasis added).

By contrast, California courts have made clear that "the application of California law" is "justified" where, as here, the defendant's "unlawful conduct that formed the basis of the out-of-state plaintiffs' claims (i.e., fraudulent misrepresentations made to induce consumer transactions) . . . occurred in California." *Sullivan*, 51 Cal. 4th at 1208 n.10; *see, e.g.*, *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 224–25 (1999) (noting that "state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California"). Indeed, courts have repeatedly permitted out-of-state plaintiffs to bring UCL and CLRA claims where the defendant is "headquartered in California" and where its "misconduct allegedly originated in California." *Wang v. OCZ Tech. Grp., Inc.*, 276 F.R.D. 618, 630 (N.D. Cal. 2011); *see Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1131 (N.D. Cal. 2014) (collecting cases).[2]

---

[2] *See also, e.g.*, *Junod v. NWP Servs. Corp.*, 2015 WL 12712309, at *2 (C.D. Cal. Apr. 2, 2015) (permitting out-of-state plaintiff to bring UCL claims against a "scheme [the defendant] allegedly conducted from its California headquarters"); *TRC & Assocs. v. NuScience Corp.*, 2013 WL 6073004, at *5 (C.D. Cal. Nov. 18, 2013) ("[T]he alleged fraudulent conduct occurred in California. The Complaint is not based solely on a commercial transaction outside of California, but is instead based on material misrepresentations originating in California with NuScience, traveling through Florida, and ending up in Ohio."); *Castagnola v. Hewlett–Packard Co.*, 2012 WL 2159385, at *4 (N.D. Cal. June 13, 2012) ("A non-California resident may bring claims under the UCL and the CLRA, if they can allege misconduct that occurs within or emanates from California."); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011) ("In determining whether the UCL and CLRA apply to non-California residents, courts consider where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which

This unbroken chain of case law is fatal to Cricket's arguments. As this Court recognized when denying Cricket's motion to dismiss for lack of personal jurisdiction, "the parties agree that Cricket maintained its principal place of business in California for the entire period during which the alleged wrongful conduct occurred." Dkt. 35 at 2. And this Court expressly concluded "that Cricket's activities in California while headquartered in San Diego demonstrate a substantial connection between Cricket, the forum, and the remaining plaintiffs' claims at this stage in the litigation." *Id.* at 6. Indeed, this Court found that the plaintiffs have sufficiently alleged that "Cricket authorized a nationwide marketing campaign based on allegedly false statements with the intent to profit"—all "*from its California headquarters.*" *Id.* at 7–8 (emphasis added). At the pleading stage, this is far more than what Postpichal and Freitas need to allege to plausibly state a CLRA claim.[3]

**B.** Nevertheless, Cricket urges this Court to dismiss Postpichal's and Freitas' CLRA claims based solely on the Ninth Circuit's decision in *Mazza v. American Honda Motor Co.*, 666 F.3d at 581. *See* Mot. to Dismiss 16–17. But Cricket's reliance on *Mazza* is misplaced. The Ninth Circuit in "*Mazza* did not analyze statutory standing under the UCL or CLRA"—"it conducted a choice-of-law analysis." *Precht v. Kia Motors Am., Inc.*, 2014 WL 10988343, at *6 (C.D. Cal. Dec. 29, 2014). And it did so at the *class-certification* stage, based on the particular "facts and circumstances of th[at] case." *Mazza*, 666 F.3d at 594.

---

advertising and other promotional literature decisions were made."); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) ("Plaintiffs have adequately alleged that Mattel and Fisher-Price's conduct occurred, if at all, in—or had strong connections to—California. … Plaintiffs complain of misrepresentations made in reports, company statements, and advertising that are reasonably likely to have come from or been approved by Mattel corporate headquarters in California.").

[3] Tellingly, none of the cases that Cricket cites (at 16) for the "routine[] dismiss[al]" of "CLRA claims brought by residents of other states suing over purchases in their home states" actually alleged misconduct *in* California by a California-based defendant. In *Wilson*, 961 F. Supp. 2d at 1148, the "[d]efendant [wa]s located in Texas, and Plaintiffs [did] not allege[] any activity within California except their own purchase of the Purchased Products." In *Swearingen*, 2017 WL 1806483, at *9, the plaintiffs simply "made no allegations that they purchased products outside of California, and no allegations supporting a nexus between California law and any out of state purchases." And in *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1076 (N.D. Cal. 2011), the Court refused to apply California law because the defendant's forum-selection clause "select[ed] the law of each consumer's respective home state."

For good reason. Courts have recognized that they should generally "defer the choice-of-law analysis in a proposed class action until the class certification stage." *Anderson v. Apple Inc.*, 2020 WL 6710101, at *8 (N.D. Cal. Nov. 16, 2020). That is because this analysis is ordinarily "a fact-specific inquiry which requires a more developed factual record than is generally available on a motion to dismiss." *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1007 (N.D. Cal. 2014); *see Won Kyung Hwang v. Ohso Clean, Inc.*, 2013 WL 1632697, at *21 (N.D. Cal. Apr. 16, 2013) (explaining that the choice-of-law "inquiry is most appropriate at the class certification stage of the case, after the parties have engaged in discovery"). Accordingly, if this Court is inclined to undertake such an analysis, doing so at this stage would be "premature." *Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 573 (N.D. Cal. 2013); *see, e.g.*, *In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237 (N.D. Cal. 2012); *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 922 (N.D. Cal. 2012).[4]

In any event, Cricket has made no showing for why Postpichal and Freitas cannot seek recourse against Cricket's fraudulent scheme through California's consumer-protection laws. Under California's choice-of-law rules, Cricket has the burden of showing that a foreign state's law, rather than California's law, should apply. *See Mazza*, 666 F.3d at 590 (citing *Wash. Mut. Bank v. Superior Ct.*, 24 Cal. 4th 906 (2001)). Cricket has not "exhaustively detailed the ways in which California law differs from the laws" of Missouri and Washington, nor has it "demonstrate[ed] that any of these differences [a]re material." *Id.* at 591. Nor does it dispute that, "in a false advertising case the state from which the misrepresentation was disseminated"—here, California—"often has the predominant interest." *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *3 (C.D. Cal. Apr. 9, 2014). In fact, Cricket makes *no* argument about why California law does not apply—all it does is say that *Mazza* compels this conclusion. *See* Mot. to Dismiss 17. But courts have made clear that a defendant cannot "satisfy their

---

[4] All the more so because regardless of how the Court resolves Cricket's argument, the CLRA class claim will remain in the case. As Cricket admits (at 16), named plaintiff Waters indisputably can bring a CLRA claim on behalf of the proposed class because she alleges that she purchased a Cricket phone in Sacramento. Moreover, even if its CLRA claims were dismissed, Postpichal and Freitas will continue to serve as named plaintiffs on behalf of the nationwide class by virtue of their RICO claims. Cricket's arguments are, therefore, not actually about Rule 12(b)(6) dismissal, but class-action management and class definitions—questions that should be addressed at class certification.

burden of demonstrating the existence of a 'true conflict'" between California's laws and those of other states' simply with "a citation to *Mazza*." *Forcellati*, 2014 WL 1410264, at *3. That is because *Mazza* could not (and did not purport to) rewrite California's fundamental choice-of-law test to hold that "*as a matter of law* that California and other states' consumer laws materially differ *in all cases* and other states have a greater interest in the application of their law *in all cases*." *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 548 (C.D. Cal. 2012) (emphasis in original). Indeed, the Ninth Circuit has made clear that *Mazza* did not even "hold that no class could exist" in *that case*, "especially given the possibility of subclasses, but only that the class as certified was the result of an erroneous choice-of-law analysis." *Jabbari v. Farmer*, 965 F.3d 1001, 1006 (9th Cir. 2020). In its motions to dismiss, Cricket has entirely defaulted on its burden to show why California law should not apply to the out-of-state plaintiffs' claims here. Its arguments should therefore be rejected.[5]

## IV.   The plaintiffs have plausibly alleged that Cricket and its independent dealers constituted an "enterprise" for purposes of RICO.

To state a civil RICO claim, "a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Abcarian v. Levine*, 972 F.3d 1019, 1028 (9th Cir. 2020) (cleaned up). Cricket disputes only one of these five elements: It contends that the plaintiffs have not plausibly alleged that the existence of an "enterprise." Mot. to Dismiss 18–19. That's incorrect.

The plaintiffs have alleged that Cricket distributed its products through an extensive network of more than 2,000 dealers, which "operated independently of Cricket." TAC ¶¶ 188–95. And they have alleged Cricket and these independent dealers furthered Cricket's fraudulent scheme for the "common purpose" of charging premium prices for 4G/LTE phones and service plans. *See id.* ¶¶ 188–89, 292–97. Although "an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise," *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir.

---

[5] Nor can Cricket try to remedy this deficiency by "attempt[ing] to present a choice-of-law analysis in its reply," because this Court "need not address legal issues raised for the first time in a reply brief." *Shank v. Presidio Brands, Inc.*, 2018 WL 510169, at *11 n.2 (N.D. Cal. Jan. 23, 2018) (citing *United States v. Rozet*, 183 F.R.D. 662, 667 (N.D. Cal. 1998)).

2007) (en banc), the alleged association between Cricket and its independent dealers forms a prototypical RICO "enterprise" under 18 U.S.C. § 1961(4). Specifically, Cricket and the independent dealers qualify as "a group of persons associated together for a common purpose of engaging in a course of conduct"—here, to sell 4G/LTE phones to customers in non-4G/LTE markets at premium prices. *United States v. Turkette*, 452 U.S. 576, 583 (1981). The alleged association here falls within the "obviously broad" and "expansive" definition of enterprise set out in the RICO statute. *Boyle v. United States*, 556 U.S. 938, 944 (2009).

Indeed, the Ninth Circuit's analysis in *Odom v. Microsoft*—a decision that Cricket fails to even mention in its motion—should control this case. There, the plaintiffs alleged that Best Buy and Microsoft "had the common purpose of increasing the number of people using Microsoft's Internet Service, and doing so by fraudulent means." *Odom*, 486 F.3d at 552. In particular, they alleged that "Best Buy furthered this common purpose by distributing Microsoft Internet Trial CD's and conveying its customers' debit and credit card information to Microsoft," and that "Microsoft then used the information to activate customer accounts." *Id.* "These allegations," the Ninth Circuit held "are more than adequate to establish, if true, that Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means." *Id.* So too here: Cricket and its independent dealers had a common purpose of selling more 4G/LTE phones to consumers through their fraudulent scheme, and the dealers "furthered this common purpose" by selling the phones and distributing Cricket's false advertising. Those are sufficient allegations of a RICO association-in-fact enterprise. Cricket's arguments to the contrary seem to reflect the rule proposed by Judge Silverman's separate opinion in *Odom*—that "the existence of a marketing contract and the performance of that contract by two parties [cannot] constitute an enterprise." *Odom*, 486 F.3d at 555 (Silverman, J., concurring in result). Of course, the en banc majority expressly rejected that rule.

Cricket nevertheless resists this result by arguing (at 18–19) that an enterprise cannot be working toward a "common purpose" where the entities are "pursuing their individual economic interests" or "primary business activities." Its argument, in other words, is that entities cannot

associate for a common purpose unless they formed an enterprise (1) *solely* to achieve unlawful ends (2) that are *separate* from their individual economic interests. But that's wrong on both counts.

First, Cricket's contention "comes dangerously close to conflating the elements of a pattern of racketeering activity and the existence of an enterprise, something … the Supreme Court … ha[s] admonished courts not to do." *In re Neurontin Mktg., Sales Pracs. & Prods. Liab. Litig.*, 433 F. Supp. 2d 172, 181 (D. Mass. 2006). In *Turkette*, the Supreme Court made clear that under RICO, " the 'enterprise' is not the 'pattern of racketeering activity'; it is an entity *separate and apart* from the pattern of activity in which it engages." 452 U.S. at 583 (emphasis added). "While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other." *Id.* In short, "[t]he 'common purpose' does not itself have to be fraudulent." *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2020 WL 6271173, at *22 (N.D. Cal. Oct. 23, 2020). The Ninth Circuit elaborated on this point in *United States v. Feldman*, 853 F.2d 648 (9th Cir. 1988), explaining that "RICO does not require intentional or 'purposeful' behavior by corporations charged as members of an association-in-fact." *Id.* at 657. That is, "[i]ndividual corporations may be entirely legitimate and need not benefit from the racketeering; in fact, the criminal activity charged may harm each individual corporation by looting it, or a corporation may be used by the defendant to line his or her pockets." *Id.*; *see also, e.g.*, *United States v. Cianci*, 378 F.3d 71, 83 (1st Cir. 2004) (holding RICO's "common purpose" requirement to be met where the defendants "controlled the corporate or municipal entities' activities and manipulated them to the desired illicit ends"); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009) ("The common purpose element . . . does not require the enterprise participants to share all of their purposes in common.").

Numerous other courts in this Circuit have reached the same conclusion. Plaintiffs "need not allege that [entity participants] share[] [the defendant's] fraudulent purpose in order for there to be a sufficient allegation of an association-in-fact enterprise." *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 992 (C.D. Cal. 2008). "This logically follows from the basic principle that RICO enterprises may include 'entirely legitimate' entities that are exploited by wrongdoers and the companion principle that not every member of an enterprise need be a co-defendant." *Id.*; *see, e.g.*,

*Humana Inc. v. Mallinckrodt ARD LLC*, 2020 WL 3041309, at *7 (C.D. Cal. Mar. 9, 2020); *In re Wells Fargo Ins. Mktg. & Sales Pracs. Litig.*, 2018 WL 4945541, at *4 (C.D. Cal. June 18, 2018); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013); *Downey Surgical Clinic, Inc. v. Ingenix, Inc.*, 2013 WL 12114069, at *12 (C.D. Cal. Mar. 12, 2013); *see also, e.g., Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009); *In re: Takata Airbag Products Liab. Litig.*, 2015 WL 9987659 (S.D. Fla. Dec. 2, 2015).

*Second*, the fact that the enterprise may *also* benefit the individual entities comprising the enterprise is irrelevant to the "common purpose" analysis. Of course, "[i]t will often be the case that the interests of the enterprise are congruent with those of its members; such congruence presumably provides the incentive for members to participate in the enterprise." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 378 (3d Cir. 2010); *see also Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 314 (D.D.C. 2012). In *Odom* itself, the alleged fraudulent scheme benefited Microsoft and Best Buy in their individual capacities. *See* 486 F.3d at 543.[6] What is needed to plausibly allege an enterprise is that the enterprise entities "played different roles from each other . . . to accomplish their purpose" and that those different roles were critical to accomplishing that purpose. *Bias*, 942 F. Supp. 2d at 941; *see, e.g., In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013) (explaining that "defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity"); *N.V.E., Inc. v. Palmeroni*, 2015 WL 13649814, at *8 (D.N.J. Feb. 23, 2015) (noting that plaintiffs must allege that "the goals of the alleged enterprises could not be accomplished in the absence of collaboration among the defendants"); Joseph, *Civil RICO: A Definitive Guide* 332 (3d ed. 2010) ("[I]f defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact enterprise's affairs, and not [simply] their own affairs.").

---

[6] Indeed, in *Odom*, there were no allegations that Best Buy "directly benefit[ed] from the improper billing for MSN" or that "Best Buy received a kickback"; Best Buy simply profited from the increased promotions and sales that resulted from the fraudulent scheme. *Humana*, 2020 WL 3041309, at *7. That is true here, too: as a result of the fraudulent scheme, the individual dealers benefited by selling more 4G/LTE phones and service plans.

The plaintiffs have alleged precisely that here—Cricket's fraudulent scheme could not work without the independent dealers' participation. *See, e.g.*, TAC ¶¶ 189, 278. Cricket could have acted alone through, for example, a direct-sales model. But it did not. Instead, it chose to associate with independent dealers—entirely separate companies—for the common purpose of selling 4G/LTE phones at premium prices in non-4G/LTE markets. *Cf. ClassicStar*, 727 F.3d at 493 ("GeoStar and each of its subsidiaries performed distinct roles that helped facilitate the fraudulent scheme."). The enterprise here, therefore, meets the three requirements that the Supreme Court has identified as necessary under RICO: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 446 U.S. at 946. By contrast, Cricket's position "is that a RICO enterprise must have structural features *in addition* to those that … can be fairly inferred from the language of the statute." *Id.* at 947–48 (emphasis added). That position, however, simply has "no basis." *Id.* at 948.

*Finally*, even if the plaintiffs had to allege that Cricket and the individual dealers formed an enterprise specifically for a common *fraudulent* purpose (and they do not), they have sufficiently done so here. The operative complaint alleges that the independent dealers knew that customers in non-4G/LTE markets were not able to access 4G/LTE service "given the fact that they activated customers' phones in-store, Cricket communicated with them regarding Cricket's business plans, and they received persistent complaints about lack of 4G/LTE coverage." TAC ¶ 299; *see also id.* ¶¶ 300–06. And the evidence referenced in the complaint has borne this out: Cricket's business model depended on acting through independent dealers; Cricket provided these dealers with confidential information; these dealers were incentivized to sell 4G/LTE through profit sharing; and Cricket's internal communications with these dealers shows knowledge of Cricket's "4G in non-4G" scheme. TAC ¶¶ 150–51, 188–208 (citing internal emails and deposition testimony). *See, e.g., In re: Takata Airbag Prods. Liab. Litig.*, 2015 WL 9987659, at *1 (S.D. Fla. Dec. 2, 2015) (finding plaintiffs sufficiently alleged "association-in-fact that engaged in a collaborative scheme to defraud consumers" where they alleged "specific communications [showing] that the defendants, acting as an enterprise, knew" about the scheme). Consequently, this is not a case where, for instance, the only connection between the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

defendant and the other enterprise entities is merely "a servicing contract." *Stitt v. Citibank, N.A.*, 748 F. App'x 99, 101 (9th Cir. 2018). Instead, the plaintiffs have alleged that Cricket "[c]onducted the affairs of the enterprise by" telling the independent dealers to use certain marketing and advertising and to sell its 4g/LTE phone at premium prices, "used its association-in-fact business arrangement with the [independent dealers] to conduct its unlawful practice[s]," and "engaged in mail and wire fraud to collect payments for the enterprise's benefit." *See Young*, 671 F. Supp. 2d at 1028. That is enough to "conclude[] that the RICO enterprise as pleaded [here] satisfies the requirements set forth under 18 U.S.C. § 1962(c)." *See id.*

## CONCLUSION

Cricket's motion to dismiss the Third Amended Complaint should be denied.

Dated: April 22, 2021

Respectfully submitted,

**WAGSTAFF & CARTMELL LLP**

/s/ *Tyler W. Hudson*
Tyler W. Hudson

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane, SBN 286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton @wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

**GUPTA WESSLER PLLC**
Jennifer Bennett, SBN 296726
Neil K. Sawhney, SBN 300130
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

ATTESTATION: The filer attests that concurrence in the filing of this document has been obtained from the signatory.