Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane (State Bar No. 286227)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton@wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
**GUPTA WESSLER PLLC**
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

Jennifer Bennett (State Bar No. 296726)
Neil K. Sawhney (State Bar No. 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAMIE POSTPICHAL, SARAH WATERS, and USULA FREITAS, *on behalf of themselves and others similarly situated*,<br><br>*Plaintiffs*,<br>v.<br><br>CRICKET WIRELESS, LLC,<br><br>*Defendant*. | Case No. 3:19-cv-07270-WHA<br><br>Hon. William H. Alsup<br><br>Date:      May 19, 2021<br>Time:     9:00am<br>Courtroom: 12, 19th floor |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR EVIDENTIARY HEARING**

**TABLE OF CONTENTS**

Table of authorities ................................................................................................................ ii

Introduction ............................................................................................................................ 1

# TABLE OF AUTHORITIES

**Cases**

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*,
    151 F.R.D. 346 (N.D. Cal. 1993) .................................................................................................13

*Gentec Enterprises Inc. v. Transistor Devices Inc.*,
    2012 WL 13005868 (C.D. Cal. Mar. 29, 2012) ............................................................................10

*Waymo v. Uber*,
    Case No. 17-cv-939, Docket No. 2261 (Nov. 23, 2017) ..............................................................13

*Wyle v. R.J. Reynolds Industries, Inc.*,
    709 F.2d 585 (9th Cir. 1983).........................................................................................................13

**INTRODUCTION**

The declarations this Court ordered Cricket to provide have now clarified several important facts concerning its under oath misrepresentations that it destroyed key executive files and late-breaking disclosure that it had suddenly found those and other documents shortly after being warned by this Court about the class-wide consequences it would face for spoliating evidence.

It is now clear that AT&T has dedicated e-discovery databases that are used to catalog and preserve information for litigation purposes. Back in 2015-16, we now know that the company preserved a massive amount of Legacy Cricket information—at least 10 hard drives of data consisting of more than 16 terabytes of information that included marketing material, and 85 custodial files including Legacy Cricket's former CEO, COO, CTO, and the other top executives—on these databases. All of this information appears to be directly responsive to plaintiffs' initial document requests served in April 2020. Yet Cricket did not collect or produce any of this material. In fact, it appears that Cricket did not collect and produce any responsive documents from its e-discovery databases, even though Cricket's in-house counsel sent more than 70 litigation hold letters directing that Legacy Cricket information be saved and preserved. Instead of searching for and producing these documents, Cricket flooded plaintiffs with other documents: files from lower-level employees, unintelligible marketing materials from a third-party, and a host of other records with little connection to the key allegations that Cricket's high-ranking executives carried out a fraudulent scheme to overcharge more than 500,000 of its customers.

But beyond this, Cricket's response comes nowhere close to satisfying this Court's order or answering—in any meaningful way—the questions that lie at the heart of these developments. For instance, it provides no justification for how it supposedly was able to pinpoint—down to the month and year—the specific dates that Cricket's key executives' custodial files were destroyed, when those documents turned out not to have been destroyed at all. It likewise opts not to address why it has assiduously refused, even now, to provide the plaintiffs with complete chain of custody information regarding those individuals who had accessed these newly found documents since they were transferred in 2015. And although it claims to have saved all of the relevant data back in 2015 on its "e-discovery" database—a server designed to house documents collected for pending litigation—it

never explains why it saved all the documents there given that, in Cricket's telling, there was no relevant "pending or anticipated litigation."

Worse, those explanations that Cricket does offer are hard to take seriously. It insists that it failed to find any Legacy Cricket documents, including from the key executives, during its "robust" and "reasonable" searches using its "standard protocol" because none of those individuals remained employees at AT&T after the Cricket merger and so were never assigned an "AT&T User ID"—the only way, according to Cricket, that it runs standard document searches. But to finally find the entire group of executives' custodial files, all one employee had to do was type into the search box "the first initial and last name of each custodian." Are we to believe that a sophisticated company like AT&T did not do that even once when "robust[ly]" searching for responsive documents from the specific executives we identified at the beginning of discovery in this case? And even if it did not do so then, did it not think to do that after it failed to collect *any* documents from these custodians? What about before it decided to testify under oath that it had destroyed these documents? If not, Cricket's discovery conduct was, at a minimum, grossly negligent. If it did, then it has falsely testified under oath once more.

Scratch the surface and Cricket's lone explanation for why it went back to its search again after testifying that it had destroyed documents also falls apart. Paula Phillips, in her declaration, says the turning point was a specific "unanswered question" raised during her deposition about why one Cricket executive's data "appeared to have been treated differently than that of the other custodians." "[I]n response," she says, the company performed "additional searches" in the database which, "[a]s it turned out," identified the custodial files. But not three paragraphs before saying this, Ms. Phillips testified that she *knew before the deposition* the reason why this one executive had been "treated differently"—because he remained at AT&T and was assigned an AT&T User ID. So what is this, really, other than a poorly constructed dodge designed to avoid the simplest explanation for why Cricket went back to search: five days earlier it was warned by this Court about spoliation.

Ultimately, Cricket's response just raises more unanswered questions. To date, Cricket has produced none of the documents it purports to have only recently discovered—even though we were

ready to move forward with a supplemental production on March 8—because it will not agree to provide the chain of custody information showing which individuals have, since 2015, accessed the relevant files. Ordering Cricket to provide that basic information, plus any metadata and search/log-in history for these files, would go a long way to corroborating or contradicting Cricket's version of events. Perhaps the hearing in several weeks will shed some light on the circumstances surrounding Cricket's conduct here. But unless the company is willing (or is forced) to produce those who called the shots, its internal communications regarding key decisions, and confirmatory data, it will likely be more of the same.

\* \* \* \*

***1. Cricket's explanation for its failure to find responsive documents is both incomplete and makes no sense.*** Cricket's explanation for its initial failure to find responsive documents boils down to a basic claim: That its "standard protocol" for conducting responsive document searches involves using unique AT&T User IDs that most of the relevant Cricket executives "lacked" because "none . . . were AT&T employees." Opp. 2-7. As a result, Cricket says, back in 2015, one of the company's employees, Curtis Read, used different "placeholder" IDs for these executives and then forgot about them. When Cricket went to search its databases for this case, it did so using only the AT&T User IDs it and so turned up no documents from them.

That makes no sense. This case, of course, doesn't involve AT&T or any of its employees, but instead a major predecessor company that became a subsidiary only after the allegedly illegal conduct took place. Is it really the company's position that its "standard" search process for responsive documents in a litigation involving a separate subsidiary, separate employees, and conduct that pre-dated any merger is to limit its searches to only those custodians who are assigned AT&T User IDs because they become AT&T employees? That on its own would be shocking, and likely constitutes gross negligence, given the likelihood—or near certainty, really—that it would miss any former employee, like those executives here, who did not stay on with the company post-merger and so "lacked" the relevant IDs.

It also defies common sense to limit a search in this way, as Cricket's own evidence shows. For example, as Mr. Read now explains, he was able to locate the relevant custodial files this time around by simply entering the "first initial and last name of each custodian" into the company's electronic document database. Dkt. 215-8 at 6. So after Cricket's search of its databases with the AT&T User IDs turned up nothing for these key executives, why did it not simply perform the same basic search—last name, first initial—that it claims to have done now? The most Cricket can muster is the weak claims that performing such a search would be "impractical and inaccurate," apparently because it might "return false negatives" or "false positives." Opp. 5. But Mr. Read was seemingly able to successfully search this way without incident. And even if such a search was, in theory, "non-standard," why wouldn't the company at least try it before asserting, under oath, that the documents had been permanently destroyed?

These are not the only questions left unanswered by Cricket's purported explanation. Why, for instance, were AT&T's e-discovery professionals even creating haphazard placeholders with User IDs and custodians unconnected to Cricket or any particular litigation? *See, e.g.*, Opp. 12 (confirming that it "stored the files in an ad hoc manner" that was "unconnected to any litigation and lacked the usual identifiers that enable custodial data to be found"). Is that really AT&T's "standard" approach for data from acquired companies? Can AT&T's e-discovery professionals really create fictious placeholders for huge volumes of information, not connect that information to any particular legal case or AT&T User ID associated with a case, and then claim years later that it complied with its discovery obligations because a search for AT&T User IDs yielded no results? If so, it calls into question the company's entire approach to litigation holds and its document retention practices for all sorts of litigation matters.[1]

---

[1] Although Cricket appears to take the position that this approach *is* standard, Opp. 5, there is a way to test it: Given that AT&T has made numerous acquisitions through the years, the company can testify, under oath, and provide documentation showing that it has done the same thing for other litigation matters involving conduct that pre-dates the acquisitions. Of course, Cricket has provided no such testimony.

But even putting all that aside, this explanation is incomplete on its face. It doesn't account for how Ms. Hwang, Mr. Russell, and Ms. Phillips came to pinpoint the specific dates—which varied by month and year—of the Cricket executives' document destruction. *See* Dkt. 192-1 at 8. On that question, Cricket offers nothing—just the bare confirmation that "Ms. Phillips worked with outside counsel to prepare a table listing the former Cricket custodians and indicating whether data was found and the approximate date when the data was deleted." Opp. 9. It also doesn't account for the company's failure to find responsive documents in all the other locations it has now identified. On this, all it says is that, after certain requests were made to "collect" and "store[]" these additional materials, they were also copied onto the P8 server as well. Opp. 6.

Nor does it explain *why* all of this data was placed on the company's e-discovery database in the first place. According to Cricket, the key executives' custodial files were all found in a folder labeled "CRI1" on the company's "P8" server. Dkt. 215-8 at 4. This server, Cricket tells us, is "for e-discovery purposes"—i.e., data collected for "pending" litigation matters—and data is stored there "[a]t the direction of the Legal Department." Opp. 4; Dkt. 215-8 at 2. According to Mr. Read, however, the relevant data here "was not associated with any specific pending or anticipated litigation" and so was not associated "with a specific existing case name." *See* Dkt. 215-8 at 4. If true, then why would the Legal Department have directed that the data be copied and stored unconnected on the P8 server? A possible answer was that there actually *was* relevant litigation. For instance, the *Bond* litigation, which involved related allegations involving pre-merger conduct by Cricket, was filed in March 2015—almost exactly at the same time Mr. Read has said the data was transferred to the P8 server. *See* Dkt. 215-8 at 4 (explaining that the transfer began approximately in March 2015). Was that just coincidence, or were these documents initially preserved on this server as part of that litigation? If they were (and Cricket has chosen not to provide any explanation one way or the other), then that would only raise an additional set of highly troubling questions, since both Mr. Read and Ms. Phillips were involved in the collection of documents and litigation holds notices for *Bond*.

**2. Cricket's explanation for its sudden discovery of these documents is not credible.** Cricket also offers up Ms. Phillips' declaration to explain why it went searching for

documents after she was deposed on January 25, 2021. Her explanation is not credible. She asserts (at ¶ 17) that the "IT Department performed additional searches" for data "stored in an unexpected location" after she realized, after her deposition, that there was an "unanswered question of why Mr. Strickland's data appeared to have been treated differently than that of the other custodians." Dkt. 215-9 at 4. (Recall that, in the spreadsheet that she had prepared with Ms. Hwang and Mr. Russell, Cricket claimed that Mr. Strickland's data had been preserved until 2018 even as most of the other executives' custodial files had not.) But three paragraphs before offering up this explanation as the prompt to go searching, Ms. Phillips admits that she *already knew* why Mr. Strickland's data was "treated differently"—"the IT Department informed [her] that there [was] a record of collection in EDDMS for his associated AT&T User ID (rs361j)." *Id.* at 3–4. In plain English, Mr Strickland was treated differently because he became an AT&T employee after the merger and was given a unique User ID. But as her declaration makes clear, Ms. Phillips knew this fact before her deposition—"the IT Department informed [her]" of it during her initial preparation. *Id.* at 3. And, if she knew about Mr. Strickland's AT&T User ID before her deposition, and AT&T's e-discovery team really did perform a search for documents in its relevant servers using AT&T User IDs affiliated with the key executives from whom plaintiffs were seeking documents—as it now claims that it did under its "standard approach"—then it would have found Mr. Strickland's custodial files sitting on the database long before Ms. Phillips' deposition. So it's not an explanation at all—the question was not left "unanswered" after her deposition and doesn't explain at all why anyone would independently feel the need to go searching for documents in late January 2021, after her deposition was completed and she had provided testimony under oath.

Unless this proffered explanation is a sham. Outside of Ms. Phillips's internally inconsistent attempt to craft a post-deposition "new question," Cricket offers nothing to justify its decision to renew its search. That is not surprising. By late January 2021, Cricket had already represented to the Court that it had substantially completed its document production, and it had prepared witnesses for depositions in which it was known that plaintiffs would be asking questions about document retention and spoliation of evidence. Cricket's searches for responsive documents would have occurred before

these depositions because Cricket knew that it would be providing sworn statements on the record, and to the Court, that needed to be truthful and accurate. So what changed? The simplest explanation is the one Cricket all but ignores: This Court's clear warning—four days before Ms. Phillips' deposition—that the company would potentially face serious consequences for spoliating evidence. Indeed, Ms. Phillips' deposition confirmed that Cricket had discarded material information even after multiple litigation holds were in place. *See* Dkt. 192-11 at 289–91. After the Court's warning, did Cricket direct its employees to renew a search for documents it previously either refused to produce or claimed had been destroyed? Cricket has carefully avoided answering that question, but an *in camera* review of its relevant communications shortly after that January 21 hearing, and under oath testimony from its key decisionmakers on this topic, would almost certainly provide one.

Other aspects of Cricket's account are no more credible. For instance, in her declaration, Ms. Phillips' claims that a folder on the P8 database was an "unexpected location" but offers no explanation for why that would be the case. *See* Dkt. 215-9 at 4. It is hard to see how it could be: As we now know, the P8 database is a repository for litigation hold documents. Did Cricket just not search this database at all before 2021? If true, that in itself is evidence of gross negligence—a company can't segregate documents in a separate database for other pending litigation and not search it as part of its obligations in another case. And that is all the more true here, given that at least several of Cricket's existing litigation holds—and so presumably responsive documents—came from cases that were indisputably related to this one. *See, e.g.*, Dkt. 135 at 2–3. So, the question remains: Why was Cricket hunting for documents and information in this database in late January 2021, unless it knew that it had never conducted a real search the first time or that other documents likely existed but it intentionally ran narrow searches to avoid an obligation to collect and produce the information?

And why would such a search be either "non-standard" or "unconventional," as Cricket claims? *See* Opp. 3. Indeed, both Mr. Read and Ms. Phillips have admitted that they *knew* that other documents existed, yet no one at the company had apparently done any searching for them. For example, Ms. Phillips knew about the 10 hard drives, but claims she thought they only contained arbitration opt-out notices. *See* Dkt. 215-9 at 2–3. But in April 2020, Plaintiffs asked for all document

related to arbitration, meaning that even if that was all those hard drives contained, they *still* should have been searched and those responsive documents produced. *See* Dkt. 192-2 at 1. That they were not is symptomatic of the real problem at the heart of these developments.

***3. Cricket's identification of two new individuals who played a role raises more unanswered questions.*** Cricket's response also identifies two new individuals who purportedly played a role in the late-breaking discovery of responsive documents—Susan Kennedy and Lito Fernando. Opp. 6–8. Cricket claims that Ms. Kennedy was responsible for allegedly performing searches and manually reviewing company records for relevant documents. Opp. 8. But if so, why did Cricket not submit a declaration from Ms. Kennedy to explain her role, as this Court ordered? Cricket does not say. Nor does Cricket explain why Ms. Kennedy, an e-discovery manager in the IT Department, suddenly decided to try a different search approach in the company's document database in late January 2021. *See* Opp. 10 (noting only that Ms. Kennedy "implemented a non-standard search methodology"). What matters here isn't just *what* Ms. Kennedy did, it is *why* she did it. Was she directed to perform this new search by Ms. Hwang (or someone else) out of a concern that spoliation was now a real possibility? And how did her search differ from those she had previously performed? On these key questions, Cricket provides no explanation.

The same goes for Mr. Fernando—the other new employee Cricket has now identified. According to Cricket, it was Mr. Fernando who (1) collected all three categories of recently discovered information back in 2015-16, (2) transferred the key custodial data to the CR1 folder on the company's P8 database, and (3) was in possession of the 10 hard drives of Cricket material sitting in his lab in New Jersey. If so, why did he not submit a declaration? And, once again, what matters isn't just the step-by-step chronology of what he did—which is all that Cricket has offered. It is, more importantly, the details and context explaining why he did it: Did Cricket contact him at the outset of discovery to assist with its discovery and production obligations in this case, or did it only do so after this Court's spoliation warning? Were the categories of documents he was holding tied to his name in AT&T's EDDMS tracking database? Did he set up the CRI1 folder in the P8 database? Why did AT&T call that folder CRI1 instead of assigning an actual litigation case name? And if CRI1 is short for "Cricket

1," then how is it possible that nobody identified that folder as a source of potentially responsive information? Who has accessed the CRI1 folder since it was established in P8 in 2015? Cricket's response makes no attempt to provide answers to any of these questions.

These unanswered questions explain why, on March 8, 2021, plaintiffs' counsel asked Cricket to provide both a chain of custody and the source information for the relevant categories of documents before beginning any production. Cricket feigns surprise (at 1) that we would not "welcome the news" that it had, in fact, preserved documents or "immediately" agree to "an accelerated production." But without the basic information confirming the integrity of these documents—not just Cricket's self-serving representations—evaluating whether anyone at Cricket engaged in document tampering or an effort to hide evidence would be impossible.[2] To date, it *still* has refused to provide any of this basic information. Maybe it will reconsider at next month's hearing.

***4. Cricket's conduct throughout discovery was, at a minimum, grossly negligent and not the product of good faith.*** Cricket's discovery misconduct and delay in this case is not a product of one person's failure to "recall" where a few files were located. It is—at best—a systemic failure of Cricket's litigation team to meet basic discovery obligations dating back to 2015 when Cricket's fraudulent LTE scheme first became the focus of litigation. Cricket attempts to defend its conduct in this case, repeatedly claiming that "[a]t all times, [it] has operated in good faith, not bad" and that the only issue on the table is "the discovery of data, not the destruction of it." Opp. 1; *id.* at 7 (asserting that, "since the service of plaintiffs' first set of document requests on May 26, 2020, Cricket has acted in good faith and has been robust in fulfilling its discovery obligations in a timely manner"). That is rich. As Magistrate Judge Tse found, Cricket has *already* admitted that it "destroyed information and documents from the putative class period after the resolution of *Barraza*." And when

---

[2] Cricket falsely claims that we have "shown no interest in reviewing the newly discovered data." Opp. 2. The record speaks for itself. *See* Evid. Mot. 13-15; Dickson Decl., Ex. A. *All* we asked for, before Cricket unilaterally began its production, was (1) a "complete chain of custody for all new data sources," (2) an agreed-on set of search terms, and (3) an agreed-on deadline for the production. Dickson Decl. Ex. A, at 1. Instead of agreeing to these requests, Cricket simply began another unilateral search and production—following the same noncompliant approach that led to at least some of the issues we're facing now.

instructed to come clean about the circumstances surrounding that destruction, Cricket repeatedly "refused to answer through written discovery and now two Rule 30(b)(6) depositions" questions raised "about Cricket's document retention and preservation efforts" in an effort to thwart the plaintiffs' ability to "investigate and possibly prove spoliation." Dkt. 185 at 8.

And Cricket's misconduct goes well beyond the issues before Magistrate Judge Tse. As we have explained, *see* Dkt. 192 at 4-6, Cricket assiduously resisted producing virtually any documents for months in this case. Then, after it unilaterally produced only a small subset of handpicked documents (less than 80,000 in total), it told this Court that it had "essentially complete[d]" its document production and had met this Court's "substantial completion" deadline. Dkt. 94 at 5–6. But the selection of handpicked documents Cricket produced included *only* the custodial files of lower-level employees, plus a smattering of other information that the plaintiffs had never even requested. Dkt. 192-6 at 1. For context, Cricket's recent discovery of 16 TBs of data is more than 40 times the size of Cricket's current productions, and that doesn't even account for the 85 custodial files that have also been discovered. That was by design: Telling this Court that it had produced essentially all of the relevant information allowed it to press for a quick resolution on class certification while potentially depriving the plaintiffs of the key information they might need to meet their burden. *See, e.g.,* Dkt. 94 at 2 (insisting that the plaintiffs had "all of the discovery needed to move for class certification" and that, given the supposed "weakness of plaintiffs' case, the resolution of plaintiffs' class-certification motion should be hastened, not delayed"). But Cricket went even further: To make sure that it could credibly claim to have produced everything, it (falsely) claimed to have destroyed the relevant custodial files from those Cricket executives who were at the company during the relevant time periods. That this strategy ultimately proved unsuccessful does not absolve Cricket from accountability for its misconduct. *See, e.g.*, *Gentec Enters. Inc. v. Transistor Devices Inc.*, 2012 WL 13005868, at *4-5 (C.D. Cal. Mar. 29, 2012) (rejecting a "no harm, no foul" defense to a party's violations of the federal discovery rules and a court's scheduling and case management orders).

Cricket's claims of good faith also fundamentally ignore the timing of its recent disclosures and productions. We've said it before, but it deserves repeating: Cricket swore under oath that it had

destroyed key documents—even going so far as to provide the specific months and years of those destructions—and maintained this position for months. It was only after (1) it claimed to have substantially completed its document production, and (2) it was specifically warned by this Court about the class-wide consequences for spoliation that it suddenly discovered them. That is neither "good faith" nor a "robust" approach to "fulfilling its discovery obligations in a timely manner." It is, at a minimum, evidence of a grossly negligent discovery process. Cricket should not be permitted to re-write history.

***5. Cricket's response confirms the need for more information and an evidentiary hearing.*** The new information in Cricket's response raises important unresolved questions and confirms that Cricket's handling of discovery in this case has, at a minimum, been grossly negligent and will warrant severe sanctions. But the question remains whether Cricket's actions were intentional. Cricket's response fails to provide this court with the factual information needed to answer that question. It provided no under oath declaration from AT&T's in-house counsel Ms. Hwang—the individual who until recently had primary responsibility for overseeing this case[3]—or Mr. Russell (or anyone, for that matter, at Mayer Brown) providing answers to the questions raised in our motion.[4] Instead, Cricket has followed the same playbook that it used when responding to requests to waive privilege and produce litigation hold letters in front of Magistrate Judge Tse—offer to put forth additional witnesses for depositions. Opp. 2. But we already know that this strategy is designed with one goal in mind—to delay providing meaningful answers for as long as possible. Last time Cricket offered additional depositions, its deponents either would not or could not answer the relevant questions. It was only after Magistrate Judge Tse found that "Cricket's witnesses could not or would not answer questions specifically seeking information about the 'basic

---

[3] Cricket recently informed plaintiffs' counsel that Ms. Hwang is now retiring and the company is shifting responsibility for this case to someone else. The troubling timing of this announcement—several weeks before the upcoming hearing in front of this Court—only raises additional questions.

[4] Mr. Russell did submit a declaration, but it is limited to a factual account of the discovery in this case that omits entirely any discussion of document custodians and search locations—the core issues in dispute here. *See, generally,* Dkt. 215-1.

details' surrounding the hold letters that the Court outlined in its prior order" that he then granted our request to produce the litigation hold communications—even though Cricket claimed they were privileged. Dkt. 185 at 6. As Magistrate Judge Tse recognized, because Cricket's witnesses—most notably the same one who Cricket now offers up here, Ms. Phillips—and lawyers repeatedly engaged in a "question-objection-refusal to answer" strategy, "the only way plaintiffs will get the information they need" is to force Cricket to produce it regardless of any privilege-based objections. Dkt. 185 at 7–8.

So it is here. No one—other than Cricket—would benefit from a replay of that sham process. Given Cricket's history of discovery abuse, the plaintiffs propose that the best way to learn whether Cricket engaged in an intentional effort to hide evidence would be for the Court to order the following:

(1) Cricket shall immediately provide to plaintiffs a chain of custody for each of the three categories of documents recently disclosed that states under oath who has accessed these documents since they were transferred by the e-discovery team in 2015-16;

(2) Cricket shall immediately produce the metadata data and a screen capture of P8 and EDDMS for the three categories of documents so plaintiffs can see how they were logged into and tracked in these databases, including information for all fields and the metadata for these three categories of documents to be able to evaluate the search history;

(3) Cricket shall immediately produce all communications between Ms. Hwang, Ms. Phillips, Mr. Read or any other member of the e-discovery team from 2015 to present, including any communications with outside counsel, related to Legacy Cricket's document retention for this case, *Barraza*, *Bond*, *Mobile Telecommunications Technologies, LLC v. Leap Wireless*, No. 2:13-cv-885 (E.D. Tex.), and *Intellectual Ventures I LLC v. Cricket Communications*, No. 1:13-cv-1669 (D. Del.);[5]

---

[5] Magistrate Judge Tse ordered Cricket to produce its litigation hold letters for this case, *Barraza*, and *Bond*, and Cricket has voluntarily produced the litigaiton hold letters from the other two cases, but plaintiffs now know that Cricket and its counsel had other communications that Cricket never included on its privilege log. These communcations would be covered by Magistrate Judge Tse's prior ruling and for the independent reason that these communcations will shed light on Cricket

(4) Cricket's outside counsel shall immediately collect and submit to the Court for *in camera* review Ms. Hwang's, Ms. Phillips', and Mr. Read's emails relating to Cricket's document collection efforts in this case, including but not limited to all communications with Mayer Brown and AT&T's e-discovery group from April 2020 to present. Cricket should be prepared at the May 19, 2021, hearing to show cause why the Court should not conclude that the attorney-client privilege is waived as to communications relating to Cricket's document collect and preservation in this case; and

(5) Key witnesses shall be present for questioning under oath by the Court and plaintiffs' counsel at the May 19 evidentiary hearing, including, at a minimum, Ms. Wang, Mr. Russell, Mr. Read, Ms. Phillips, Ms. Kennedy, and Mr. Fernando.[6]

Dated: April 27, 2021

Respectfully submitted,

/s/ *Tyler W. Hudson*
Tyler W. Hudson

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane, SBN 286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton@wcllp.com*

---

and its counsel's awareness of these Legacy Cricket documents that it now claims to have only recently found.

[6] *See, e.g.*, *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 592 (9th Cir. 1983) (evidentiary hearing "best determines the appropriate sanctions while protecting a party's due process rights"); *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 151 F.R.D. 346, 347–48 (N.D. Cal. 1993), aff'd, 69 F.3d 337 (9th Cir. 1995) (holding evidentiary hearing to investigate "what [defendant] knew and when she knew it" in case, like this one, where defendant failed to produce document, claiming it had been destroyed, when in fact, it had not); *Waymo v. Uber*, Case No. 17-cv-939, Docket No. 2261 (Nov. 23, 2017) (requiring witnesses to appear at final pretrial conference to discuss late-breaking discovery of possible misconduct).

-13-
Reply in support of Plaintiffs' Motion for Evidentiary Hearing (Case No. 3:19-cv-07270-WHA)

1 | **GUPTA WESSLER PLLC**
  | Jennifer Bennett, SBN 296726
2 | 100 Pine Street, Suite 1250
3 | San Francisco, CA 94111
  | (415) 573-0336
4 | *jennifer@guptawessler.com*

*mdickson@wcllp.com*
*abrane@wcllp.com*

6 *Attorneys for Plaintiffs*