UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE POSTPICHAL, et al., | No. C 19–07270 WHA |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTION TO DISMISS RICO CLAIM** |
| CRICKET WIRELESS, LLC, | |
| Defendant. | |

**INTRODUCTION**

In this putative class action, plaintiffs allege a RICO claim against a phone retailer and cellular service provider for overcharging customers for 4G phones and wireless plans in areas without 4G coverage. Defendant moves to dismiss.

**STATEMENT**

Plaintiffs allege that Cricket put profits over principles by selling 4G LTE plans and phones despite knowing full well that its service fell far short of providing 4G LTE coverage to most customers (TAC ¶ 1). Cricket's designation of its wireless service plans as "4G" stands for fourth generation — successors to second and third generation networks — that offer users faster speeds on devices capable of connecting to the next generation network. "LTE" stands

for long-term evolution, a designation used to indicate improving wireless speeds that can adapt to increasing demand. These terms appeared together on Cricket's marketing materials and packaging in the form of logos and statements.

Cricket had its own 3G network and a more limited 4G LTE network, but faced obsolescence if it could not keep up with consumer demand for faster 4G coverage in more areas (TAC ¶ 2–3). Cricket acknowledged "the competitive climate require[d], and our Customers expect[ed] us to offer 4G technology if [it] want[ed] to maintain, let alone grow market share" (Compl. ¶ 76).

But expanding its 4G network to reach more customers presented significant obstacles. Cricket lacked the resources to either buy or build network capabilities to increase its 4G coverage (TAC ¶¶ 87–88, 91, 96). Cricket also lacked the capacity, reliant on its spectrum holdings, to make its wireless coverage as fast and efficient as its competitors (TAC ¶ 40, 90). Spectrum holdings refer to the portions of the radio wave spectrum (the waves of energy that transmit wireless cellular service) used to provide wireless coverage. Spectrum is a limited resource which must be licensed through the Federal Communications Commission and bought through FCC auctions or acquired on the secondary market from other private entities. Cellular service providers must have a sufficient portion of the spectrum and, typically, some combination of low-, mid-, and high-range frequency spectrum in order to provide high speed wireless connectivity and broad coverage. Cricket admitted that its competitors had "greater spectrum capacity than [Cricket did] in the markets in which [Cricket] would launch LTE," acknowledging that "competitors who have access to more spectrum [than Cricket] . . . are likely to offer faster speeds for their next-generation services or operate those networks more efficiently than [Cricket] could" (TAC ¶ 90).

While its competitors quickly evolved to provide 4G, Cricket trailed behind (TAC ¶ 77, 80, 96). In 2012, Cricket reported to the SEC that its inability to compete had "negatively impacted [Cricket's] financial and operating results in 2012 . . . when [Cricket] experienced net customers losses" (TAC ¶ 77). Cricket's reports to the SEC became more dire in 2013, as Cricket admitted it had "seen its customer base shrink dramatically [and] . . . its share of

prepaid subscribers f[e]ll even faster than its rapidly declining share of the wireless market" (TAC ¶ 77).

Though Cricket did provide 4G to eleven metropolitan areas, it lacked 4G coverage everywhere else. So Cricket executives created a marketing scheme — internally dubbed "4G in non-4G markets" — to keep its sinking ship afloat. This strategy involved a "company[-]wide directive to talk about [4G] LTE even in non-[4G] LTE markets and push [4G] LTE capable handsets" and to "message [4G] LTE aggressively – including [in] non-4G markets" (TAC ¶ 129). Plaintiffs allege that a 2012 marketing presentation directed Cricket agents to "focus" on "[n]ationwide / 4G," even though Cricket did not and never planned to provide 4G service to most customers (TAC ¶ 135). Plaintiffs allege Cricket's 4G advertising campaign began on or around November 2012 and by September 2013 the campaign had been expanded to reach all of Cricket's markets, including all of its non-4G markets (TAC ¶ 129). In May 2014, AT&T acquired Cricket (TAC ¶ 2, 180).

Plaintiffs allege that Cricket executives made centralized decisions about the "4G in non-4G markets" strategy to create a uniform marketing plan to be followed by Cricket stores, including authorized dealers. Though authorized dealers were technically considered independent businesses from Cricket itself, the in-store experience for customers visiting Cricket-owned stores and independent authorized dealers remained indistinguishable (TAC ¶ 130, 199). Cricket also sold its phones through big-box stores such as Walmart and Best Buy.

Cricket's marketing strategy used radio, television, and internet advertisements, in-store marketing, and mailers to push its 4G messaging. Cricket's authorized independent dealers received their marketing materials from Cricket, including banners and posters with 4G logos and claims (TAC ¶ 200, 271). Marketing materials broadcasted messages, like "Your next phone is here with the speed of 4G LTE." (TAC ¶ 135) Cricket touted 4G speeds using advertisements like those below:

3





Plaintiffs allege Cricket sold hundreds of thousands of 4G phones and millions of 4G plans (more expensive than their 3G counterparts) to customers in non-4G markets with misrepresentations about Cricket's 4G coverage (TAC ¶ 8). Cricket continued this marketing strategy despite numerous complaints from customers that they were not getting 4G despite paying for 4G plans. A sampling of these complaints follows (TAC ¶ 161):

- "4G was promised. Not provided in my area."
- "My reception [is] horrible[.] My s4 is suppose[d] to be a 4g [device] but it[']s still operating … [on] 3g[.] I[']m paying for garbage every month[.] I feel cheated[.] I would switch to another Company but I spent all my money . . . wasted all my money on Crick[et]."
- "I have 3g when the s4 clearly [was] explained to me as 4g. I feel ripped off . . . I was lied to."
- "No 4g network. Sales associates haven[']t been telling the truth."
- "I pa[id] for a 70 dollar plan[,] which comes with 4g…[I] still [g]ot 3g…[I] can only send short messages[,] not pictures messages."

Even Cricket's own employees objected to selling 4G to customers who could not access it (TAC ¶¶ 146–149):

- "So far the feedback [from employees] is 'Why does everything say 4G LTE when we don't have 4G LTE? This is an extremely confusing message to send our customers.'"

4

- A Cricket representative reported that "[a] customer was upset about having a phone ad as 4g when it was not 4g in her market."

- "I have a REAL issues with this . . . We are displaying items we can't see in store and then we are going to LIE to customers? Is that a good customer experience? . . . If we aren't going to carry the products fine but we need a better response than to LIE."

- "Not sure we should be using these [advertisements] as we may be setting the wrong expectations to our customers with 4G. Thoughts?"

Responding to the last statement above, a Cricket marketing director reiterated: "This was a company[-]wide directive to talk about [4G] LTE even in non-[4G] LTE markets and push [4G] LTE capable handsets. Talk about [4G] LTE." (TAC ¶ 147).

Plaintiffs further allege that Cricket added insult to injury by entering into a roaming agreement with Sprint that it used as another marketing ploy to tout nationwide 4G (TAC ¶ 7). Roaming allows customers to access cellular data service away from the geographical area of their home network. Though Cricket could have used the Sprint agreement to provide 4G to non-4G markets, this would have cost Cricket a fortune (TAC ¶ 7). So, plaintiffs claim, Cricket programmed devices to block access to Sprint's 4G network in the areas surrounding customers' home address so customers would not rack up data charges on Cricket's dime (TAC ¶ 7). This meant that very few customers benefitted from Cricket's 4G partnership with Sprint (TAC ¶ 7).

Once acquired, the "New Cricket" relaunched under AT&T's ownership and Cricket and AT&T began pushing customers to transfer their plans and devices to AT&T's 4G network (TAC ¶¶ 41, 42). Only customers using an iPhone device were able to transition onto AT&T's 4G network without buying a new device, as other devices were not compatible with AT&T's network (TAC ¶ 43). In 2015, Cricket shut down its network entirely ("4G" and all), rendering useless any devices that had not transferred to AT&T's network (TAC ¶ 43, 45).

The named plaintiffs in this putative class action brought claims under CLRA and RICO based on a theory of overpricing. A prior order dismissed plaintiffs' CLRA claim for failure to show that proper notice had been given under California Civil Code Sections 1782(a) and (d). After dismissal of the CLRA claim, California plaintiff Waters withdrew.

This order follows full briefing and a telephonic hearing.

**ANALYSIS**

**1. RULE 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that defendants are liable for the misconduct alleged. "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As further demonstrated below, plaintiffs satisfy the Rule 12(b)(6) standard because their allegations of mail and wire fraud under RICO are plausibly pled and rely on factual allegations that, taken as true, raise the right to relief above mere speculation.

**2. RULE 9(b)**

Because the predicate acts that plaintiffs allege under RICO are mail and wire fraud, plaintiffs must meet the Rule 9(b) standard. Rule 9(b) creates a higher bar for claims involving fraud, stating that:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

In a RICO action alleging wire and mail fraud, our court of appeals issued an en banc decision explaining the Rule 9(b) standard in *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (citations and quotations omitted):

> Rule 9(b) requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations. The pleader must state the time,

6

> place, and specific content of the false representations as well as
> the identities of the parties to the misrepresentation.

Plaintiffs' allegations satisfy Rule 9(b) because the complaint lays out these details: Between 2012 and 2014 Cricket carried out a plan to shine on customers as to Cricket's ability to provide 4G in certain areas so they would pay more for 4G plans and phones than they would for the slower 3G service they actually received. The named plaintiffs sufficiently plead the general time and location of their purchases and well as their reasons for buying premium 4G phones and plans:

- Postpichal alleges that on November 30, 2013, she visited a Kansas City, Missouri store (now since closed or relocated) hoping to purchase a 4G phone and plan so that she would get faster internet access, better download speeds, and more reliable wireless signal. Postpichal claims the Cricket store she visited had prominently displayed advertisements with 4G logos. Postpichal bought two premium-priced 4G phones and started paying $60.00 a month for what she believed to be 4G service. The complaint alleges she never got 4G coverage because Cricket's 4G network did not reach Kansas City (Compl. ¶¶ 46–53).

- Freitas alleges that she was a resident of Washington state between 2012 and 2014 (and still is). On October 22, 2013, she visited a Cricket store located at 12010 NE 4th Plain Blvd., Vancouver, Washington and bought a 4G smartphone and what she believed to be a 4G plan for $60.00 per month. Freitas recalls sees multiple advertisements related to 4G, but she never received 4G coverage because Vancouver was a non-4G market (Compl. ¶¶ 66–69).

Though these allegations include a tinge of ambiguity, the records clarifying the exact timing and location of purchases remain in Cricket's hands. Further, as laid out in *Odom*, it is enough that plaintiffs allege that they transacted with Cricket, *i.e.*, their allegations do not need to be so specific as to conjure up the nametag of the employee who sold them a phone. 486 F.3d at 554.

To reiterate, Rule 9(b) exists so a "defendant can prepare an adequate answer from the allegations." *Ibid.*, *citing Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986). Rule 9(b) is not designed to serve as a barrier to bringing a suit whenever a plaintiff cannot recreate every minute detail about the alleged misconduct. The complaint supports the contentions that Cricket knew about the 4G disparity because it had been designed by Cricket itself and Cricket learned through employee and customer complaints about specific instances of harm caused by the unfulfilled expectation of 4G. Plaintiffs allegations satisfy the notice purpose of Rule 9(b).

### 3. RICO

To state a claim under RICO plaintiffs must allege facts of sufficient substance and particularity to plausibly satisfy these elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property. *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 837 (9th Cir. 2014).

#### A. CONDUCT

RICO's conduct requirement derives from 18 USC 1962(c)'s clause that one must "participate, directly or indirectly, in the conduct of such enterprise's affairs." The provision requires that defendants have "some part in directing those affairs" — in other words, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993). Here, plaintiffs provide factual allegations including internal communications and marketing presentations showing that Cricket's executive and management level agents carried out the "4G in non-4G markets" plan. This ranks as "management" because Cricket directed subsidiaries to uniformly implement the 4G marketing campaign (even over objections) and supplied in-store marketing materials. Cricket's advertising directors created advertisements with 4G claims and executives approved their distribution via "TV, radio, mail, and the Internet — including via Cricket's website" (TAC ¶ 266).

### B. ENTERPRISE

Plaintiffs assert an association-in-fact enterprise comprised of Cricket plus its network of dealers who sold phones to consumers. An associated-in-fact enterprise is merely "a group of persons associated together for a common purpose of engaging in a course of conduct." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007), *citing United States v. Turkette*, 452 U.S. 576, 583 (1981). To form an enterprise, there must be (1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose. *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

Our court of appeals has not settled the question of whether finding an association-in-fact enterprise requires a fraudulent purpose, but sister district courts have found associated-in-fact enterprises lacking a shared fraudulent purpose. *See*, *e.g.*, I*n re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 598 (N.D. Cal. 2020) (Orrick, J.); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 992 (C.D. Cal. 2008) (Matz, J.).

Cricket points to cases which have declined to find an association-in-fact enterprise between legitimate business entities connected by a servicing agreement, however these cases are distinguishable (Br. 18–19). Here, independent dealers did not merely provide a service to Cricket (*i.e.*, a payment processing partner) that was incidental to its "4G in non-4G market" scheme. Rather, plaintiffs allege that authorized independent dealers acted in concert with Cricket by following a company-wide directive and forming a continuous entity (similar to a franchisor-franchisee structure). Cricket and dealers' common scheme became selling Cricket devices and plans that they knew could not deliver on the 4G promise. Plaintiffs have alleged that the scheme had longevity because it ran continuously between 2012 and 2014.

### C. PATTERN

RICO has a relaxed requirement for predicate acts to constitute a "pattern." All that is required is that the defendant commits two predicate acts within a ten-year span. 18 U.S.C. §

9

1961(5). Here, thousands (potentially millions) existed (TRA ¶ 270). Plaintiffs sufficiently allege a pattern with regard to mail and wire fraud because the complaint accuses Cricket of using the mail, internet, television, and radio over countless instances between 2012 and 2014 to continuously market its 4G devices and plans nationwide (Compl. ¶ 312).

### D. RACKETEERING ACTIVITY

"Racketeering activity" includes "any act indictable under" any of a list of dozens of criminal statutes. 18 U.S.C. § 1961(1). Here, the alleged predicate acts under RICO are mail fraud and wire fraud. 18 U.S.C §§ 1341, 1343. The mail and wire fraud statutes contains three parallel elements: (a) the formation of a scheme to defraud, (b) the use of interstate wires or mail in furtherance of that scheme, and (c) the specific intent to defraud. *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Plaintiffs contend that the pattern of racketeering here consisted of the marketing plan internally coined "4G in non-4G markets," which relied on the distribution of marketing materials through a wide variety of media.

Cricket disputes that any misrepresentations were made. Cricket argues that plaintiffs have not alleged that 4G phones were incapable of connecting to a 4G network (if the phone was taken to an area with 4G coverage) and points to the existence of publicly-available coverage maps and disclosures (Br. 5, 10). Cricket contends that packaging including 4G logos did not represent to consumers that Cricket would provide *local* 4G coverage (Br. 7).

This matters not. Our court of appeals clarified in *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (citations and quotations omitted):

> If a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial. It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail . . . was used and intended to be used in the execution of the scheme.
>
> Put another way, the fraudulent nature of the scheme or artifice to defraud is measured by a non-technical standard. Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.

10

Whether these representations were actually intended to mislead reasonable consumers or otherwise violate public policy remains a question of fact. However, it has been sufficiently alleged that Cricket's intent was to mislead customers to profit using its 4G representations.

Cricket also disputes that consumers ever relied on its representations as to 4G service, for instance, arguing that plaintiffs have not sufficiently alleged that the roaming agreement with Sprint was publicized to consumers (having only been disclosed to the SEC and to internal analysts) (Br. 4–5). Plaintiffs take issue with the slogan "nationwide unlimited" and Cricket's advertisement claiming "20X MORE DATA Than T-Mobile," among others. Cricket counters that plaintiff did not specifically allege that Cricket showcased these representations in a non-4G market (Br. 7–9).

Once again, defendant's arguments are beside the point. A RICO claim requires no reliance allegations for the predicate acts of mail and wire fraud: "RICO's text provides no basis for imposing a first-party reliance requirement . . . . a RICO claim predicated on mail fraud need not show . . . as an element of its claim . . . that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008). Instead, plaintiffs must show that the defendant's fraudulent scheme was a but-for and proximate cause of plaintiff's harm. *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010).

The but-for and proximate cause requirements sufficiently track plaintiffs overpricing theory: regardless of whether customers relied on any specific advertisement before purchase, they would not have incurred a financial detriment but for Cricket's decision to sell 4G plans and phones in markets that lacked 4G service. Further, but for Cricket's (allegedly) programming phones not to access 4G through Sprint's network, plaintiffs would have gotten what they paid for. That the plaintiffs paid more without getting more, the complaint alleges, is exactly what Cricket aimed to do with its marketing scheme. This satisfies proximate causation as Cricket achieving its intended result suffices to allege a "direct relationship between the injury asserted and the injurious conduct alleged." *Ibid*.

### E.   INJURY

"[A] consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008), *citing Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). Plaintiffs rely on an overcharging theory of harm based on Cricket's premium pricing of 4G phones and plans. In other words, the injury alleged amounts to the difference in price between 3G and 4G phones and plans. Without a 4G-capable phone, customers would not be able to access 4G networks, incentivizing customers who bought 4G plans to also buy a 4G phone (or vice versa). Given the stated reasons for plaintiffs' decision to buy these plans and devices, the complaint sets forth plausible factual allegations that 4G characteristics motivated plaintiffs purchase of premium-priced phones and plans, resulting in financial injury.

## CONCLUSION

For the foregoing reasons, Cricket's motion to dismiss plaintiffs' RICO claim is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 21, 2021

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE