MAYER BROWN LLP
Archis A. Parasharami (SBN 321661)
aparasharami@mayerbrown.com
Kevin S. Ranlett (pro hac vice)
kranlett@mayerbrown.com
Daniel E. Jones (pro hac vice)
djones@mayerbrown.com
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

MAYER BROWN LLP
Matthew D. Ingber (pro hac vice)
mingber@mayerbrown.com
Jarman D. Russell (pro hac vice)
jrussell@mayerbrown.com
Richard A. Spehr (pro hac vice)
rspehr@mayerbrown.com
Jason I. Kirschner (pro hac vice)
jkirschner@mayerbrown.com
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

*Attorneys for Defendant*
*Cricket Wireless, LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| JAMIE POSTPICHAL and URSULA FREITAS, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRICKET WIRELESS, LLC,<br><br>Defendant. | Case No. 3:19-cv-07270-WHA<br><br>**DEFENDANT CRICKET WIRELESS, LLC'S SUPPLEMENTAL BRIEF REGARDING EVIDENTIARY HEARING**<br><br>Judge:      Hon. William Alsup<br>Referred to: Hon. Alex G. Tse<br><br>Complaint filed: November 4, 2019 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND ........................................................................................................... 3

III.   ARGUMENT .................................................................................................................. 7

    A.    Cricket's Fact Witnesses Can Adequately Testify As To All Relevant
         Factual Issues. ................................................................................................. 7

    B.    Plaintiffs Have Failed To Establish A Compelling Basis To Depart From
         The Advocate-Witness Rule And Compel Attorney Testimony. ...................... 8

    C.    Cricket's Disclosure Of Non-Privileged Facts Does Not Constitute A
         Waiver Of The Attorney-Client Privilege. ................................................... 12

    D.    Plaintiffs Fail To Identify A Legitimate Basis For Conducting *In Camera*
         Review ........................................................................................................... 14

        i.     Plaintiffs' "Unfounded Suspicion" Is Not A Factual Basis For *In
            Camera* Review ................................................................................. 15

        ii.    None Of The *Zolin* Factors Support Plaintiffs' Request For *In
            Camera* Review ................................................................................. 16

IV.   CONCLUSION ............................................................................................................ 17

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

*Anderson v. Hartley*,
  2011 WL 6012200 (E.D. Cal. Dec. 1, 2011)............................................................................8

*Bittaker v. Woodford*,
  331 F.3d 715 (9th Cir. 2003)..............................................................................................13

*Cave Consulting Grp. v. OptumInsight, Inc.*,
  2020 WL 127612 (N.D. Cal. Jan. 10, 2020) ........................................................................10

*Chevron Corp. v. Pennzoil Co.*,
  974 F.2d 1156 (9th Cir. 1992)........................................................................................14, 15

*City of Colton v. Am. Promotional Events, Inc.*,
  2011 WL 13223880 (C.D. Cal. Nov. 22, 2011)....................................................................14

*Colby v. Newman*,
  2012 WL 12887688 (C.D. Cal. Oct. 5, 2012) ........................................................................9

*Eaton v. Siemens*,
  2007 WL 2318531 (E.D. Cal. Aug. 10, 2007) ......................................................................10

*England v. Doyle*,
  281 F.2d 304 (9th Cir. 1960)..............................................................................................15

*Export Development Canada v. ESE Electronics Inc.*
  2017 WL 3122157 (C.D. Cal. July 10, 2017) ........................................................................9

*GERS, Inc. v. Atl. Mut. Ins. Co.*,
  2003 WL 27386128 (S.D. Cal. June 23, 2003) ....................................................................12

*In re Grand Jury Investigation*,
  974 F.2d 1068 (9th Cir. 1992)......................................................................................14, 15, 16

*Hazel-Atlas Glass Co. v. Hartford Empire Co.*,
  322 U.S. 238 (1944) ..........................................................................................................15

*Kelly v. Roker*,
  2012 WL 851558 (N.D. Cal. Mar. 13, 2012) ........................................................................9

*Kennedy v. Eldridge*,
  201 Cal. App. 4th 1197 (2011)..........................................................................................8, 9

*Laboy v. Bd. Of Trs. Of Bldg. Serv. 32 BJ SRSP*,
  2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012) ........................................................................16

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Landmark Screens, LLC v. Morgan, Lewis & Bockius LLP*,
  2009 WL 3415375 (N.D. Cal Oct. 21, 2009)..................................................................13

*Lewis v. Delta Air Lines*,
  2015 WL 9460124 (D. Nev. Dec. 23, 2015)...................................................................17

*In re Napster, Inc. Copyright Litig.*,
  479 F.3d 1078 (9th Cir. 2007)........................................................................................17

*Nyerges v. Hillstone Rest. Grp. Inc.*,
  2020 WL 5846606 (D. Ariz. Oct. 1, 2020) ....................................................................14

*Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*,
  2019 WL 1950377 (N.D. Cal. May 1, 2019) ............................................................2, 16

*Rock River Commc'ns, Inc. v. Univ. Music Grp.*,
  745 F.3d 343 (9th Cir. 2014).....................................................................................13, 14

*United States v. Amlani*,
  169 F.3d 1189 (9th Cir. 1999)..................................................................................12, 13

*United States v. Bauer*,
  132 F.3d 504 (9th Cir. 1997)..........................................................................................12

*United States v. Estate of Stonehill*,
  660 F.3d 415 (9th Cir. 2011)..........................................................................................15

*United States v. Johnston*,
  690 F.2d 638 (7th Cir. 1982)............................................................................................9

*United States v. Prantil*,
  764 F.2d 548 (9th Cir. 1985)............................................................................................9

*United States v. Tamura*,
  694 F.2d 591 (9th Cir. 1982)............................................................................................9

*United States v. Zolin*,
  491 U.S. 554 (1989) ...........................................................................................2, 16, 17

*Waymo LLC v. Uber Tech., Inc.*,
  319 F.R.D. 284 (N.D. Cal. 2017) (Alsup, J.) .................................................................17

*White v. General Motors Corporation, Inc.*,
  908 F.2d 675 (10th Cir. 1990)..........................................................................................9

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION

3

Cricket welcomes the opportunity to answer the questions raised by the Court at the June

4
25th conference, including (a) why Cricket originally believed that certain legacy data (the "Legacy

5
Data") was not available and made representations to that effect; (b) what searches it initially

6
undertook for that data; (c) why it redoubled its efforts to locate the data, and (d) how that data was

7
ultimately located.   Although Cricket answered these questions in good faith in the declarations

8
previously submitted, it is fully prepared to make available each of the fact witnesses referenced

9
by the Court: namely, Paula Phillips, Chris Read, and Lito Fernando, and, if the Court believes that

10
their testimony might be useful, Susan Kennedy and Susan Palmisano.

11
Plaintiffs, however, have gone beyond seeking the testimony of the knowledgeable fact

12
witnesses on the topics listed above.   Instead, in their 34-page submission (Dkt. 288), plaintiffs start

13
with the unfounded premise that Cricket has committed "discovery misconduct," based on a

14
distorted telling of the history of discovery in this case, and assert that it is necessary for the Court

15
to hear testimony from attorneys and review privileged documents *in camera* in order to answer

16
the more than 80 sweeping questions that plaintiffs pose.   Plaintiffs' stated reasons for demanding

17
privileged communications and information through testimony, and for the disclosure of privileged

18
documents, are inconsistent and unavailing.

19
*First*, plaintiffs assert that testimony from counsel is necessary because they can testify to

20
the "facts of what happened" without violating the attorney-client privilege.   However, advocate-

21
witness testimony is disfavored absent a "compelling need," and plaintiffs have failed to

22
demonstrate any such need given that the fact witnesses who managed the Legacy Data and

23
facilitated the at-issue searches are best equipped to testify on those topics—not the attorneys who

24
are one step removed from that process.   Moreover, at least some of plaintiffs' proposed questions

25
appear to be pretextual.   For example, plaintiffs repeatedly claim that attorney testimony is needed

26
to explain why there were "specific dates" of "destr[uction]" listed in an exhibit to Ms. Phillips'

27
deposition (*see, e.g.,* Dkt. 288 at 26-27), even though plaintiffs' counsel stated at that very

28
deposition that she understood those approximate dates to generally be "when particular individuals

stopped working with Cricket Wireless" (Decl. of Richard A. Spehr, dated July 23, 2021 ("Spehr Decl.") Ex. A (Phillips Dep. Tr.) at 76:9-14).  Finally, although plaintiffs allege that "[o]ver and over again, Cricket employees have stated that they acted at the direction of counsel" (Dkt. 288 at 1), Cricket has never attempted to use that obvious fact—this is a litigation, after all—to shield Mr. Read or Ms. Phillips from testifying as to the "facts of what happened" in the declarations they submitted.

*Second,* after stating that counsel can testify without breaking the privilege, and that, "just to be clear, we're not asking [Cricket] to waive the privilege" (Spehr Decl. Ex. B (Tr. of June 25, 2021 conference before Magistrate Judge Tse) at 23:17-19), plaintiffs reverse course and assert that, in any event, the privilege has been or should be waived.  However, since plaintiffs concede that Cricket has only "made specific *factual* assertions about what it did, when, and why" (Dkt. 288 at 32) (emphasis added), and has not affirmatively used the privilege as a sword (such as by invoking the "advice of counsel" defense), there is no basis to take the extraordinary step of deeming the privilege waived.

*Third,* plaintiffs' request for *in camera* review based on the crime-fraud exception is equally unavailing because plaintiffs' unsupported claim about a potential "fraud on the court" amounts to nothing more than "unfounded suspicion," which "is insufficient to justify in camera review." *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 2019 WL 1950377, at *2 (N.D. Cal. May 1, 2019).  As plaintiffs are well aware, since Cricket disclosed the existence of the Legacy Data, and has now produced it, there is no factual basis to conclude that any "fraud" occurred. Moreover, each of the discretionary factors set out in *United States v. Zolin* heavily weigh against *in camera* review, since plaintiffs' hypotheticals and innuendo do not warrant having the Court sift through what could be thousands of irrelevant, privileged documents.

At the very least, although Cricket is confident that its fact witnesses will answer any questions that this Court may have, any decision about whether the attorneys should testify—or whether an *in camera* review is necessary—should come *after* the fact witnesses testify, not before. *See* Spehr Decl. Ex. B at 22:6-16 ("One possibility is we could bifurcate and we could have this

1    evidentiary hearing be of the four noncontroversial witnesses first and see what they testify under

2    oath.  And if I'm not satisfied and they're pointing their fingers at the lawyers . . . then I'll evaluate

3    then, you know, whether or not I need to hear testimony" from the lawyers.).  Cricket has

4    demonstrated its commitment to full disclosure throughout this process, and its fact witnesses

5    intend to continue in the same vein.  It is not necessary for attorneys to testify to understand the

6    facts of what transpired.

7    ## II.    BACKGROUND

8    In response to the Court's request for briefing concerning which witnesses should testify

9    and the "proposed topics" or "categor[ies]" for questioning (Spehr Decl. Ex. B at 14:17-22, 16:19-

10   20)—not "something that's incredibly descriptive" (*id*. at 16:18-19)—plaintiffs submitted a 34-

11   page brief, including a 12-page "Background" purporting to recount the history of discovery in this

12   matter.  Since much of plaintiffs' "Background" is duplicative of their motion for an evidentiary

13   hearing (Dkt. 192-1) and irrelevant to the questions posted by the Court, Cricket respectfully refers

14   the Court to the "Background" section of its opposition to the motion for an evidentiary hearing

15   (Dkt. 215 at 3-14), as well as the accompanying declaration of Jarman Russell, dated April 14, 2021

16   (Dkt. 215-1), for an accurate summation of the events leading up to the motion for an evidentiary

17   hearing.  Nevertheless, Cricket will correct the record with respect to several misstatements made

18   by plaintiffs.

19   As an initial matter, plaintiffs' assertion that Cricket engaged in a "concerted effort to

20   obstruct disclosure of documents" for "more than five years" (Dkt. 288 at 2) is simply false.  Indeed,

21   given that plaintiffs' first set of document requests was not served until April 23, 2020 (Dkt. 215-

22   1 ¶ 26), plaintiffs' reference to events before that date is a bit of a mystery.  Contrary to plaintiffs'

23   claims, since the service of those requests, the record amply demonstrates that Cricket has acted in

24   good faith and has been robust in fulfilling its discovery obligations in a timely manner.  *Id.*  ¶¶ 25-

25   35.  As of April 2021, Cricket had made 41 productions totaling over 570,000 documents

26   comprising over 2.7 million pages and made seven witnesses available for 25 hours of

27

28

depositions. *Id*. ¶¶ 24, 55.   And since that time, Cricket has produced more than 1.5 million additional pages.

Plaintiffs' accusations of obstruction are particularly unfounded given that it was plaintiffs, not Cricket, who refused to engage in the negotiation of search terms, creating needless delays. Dkt. 215-1 at ¶¶ 9-22.  Specifically, Cricket provided proposed search terms on July 30, 2020 and requested that plaintiffs provide any comments on August 5, 2020, August 12, 2020, and August 13, 2020, but plaintiffs refused.  *Id*. at ¶¶ 10-12.  Plaintiffs failed to provide any substantive feedback on the initial search terms proposed by Cricket until after Cricket ran its initial searches. *Id*. at ¶¶ 13-17.

In addition, contrary to the allegation that Cricket "refused to negotiate with the plaintiffs on its designation of relevant custodians" (Dkt. 288 at 2), Cricket voluntarily agreed to expand the scope of discovery in a variety of ways, including by adding custodians.  Specifically, in response to plaintiffs' belated provision of proposed search terms, Cricket agreed to apply the terms and promptly produced the resulting documents.  Dkt. 215-1 at ¶ 21.  And when plaintiffs requested that Cricket produce data for additional custodians in September, October, and November of 2020, Cricket searched for the custodial data and produced the documents it located.  *Id*. at ¶¶ 18-22. Similarly, while plaintiffs claim that Cricket "resisted the plaintiffs' efforts to understand how Cricket was searching for responsive material" (Dkt. 288 at 3),  that assertion is belied by the over 55 meet-and-confers in which Cricket engaged and the detailed letters from its counsel explaining what it had searched and found.  *See, e.g.,* Dkt. 215-1 at ¶¶ 18, 23; Dkt. 215-2, 215-3, 215-5; Dkt. 288-11.

Indeed, Cricket's commitment to disclosure continued with respect to the Legacy Data, when it voluntarily disclosed the existence of the data and how it was identified, invited plaintiffs to discuss how to expedite the review and production of the data, and offered to extend the briefing schedule on the motion for class certification.  Dkt. 215-3.  But to Cricket's surprise, plaintiffs insisted that Cricket refrain from processing and reviewing the Legacy Data based on vague concerns about the "integrity" of the data and the associated metadata.  Dkt. 215-1 at ¶ 107 & Dkt.

215-6.  Despite plaintiffs' lack of cooperation, Cricket voluntarily undertook an expedited review of the Legacy Data and has produced the responsive data it identified—hardly the actions of a party "attempt[ing] to obstruct discovery."  Dkt. 288 at 4.

Cricket's commitment to disclosure is evident not merely from its expedited production of the Legacy Data (which consists of a massive amount of data), but also from the declarations submitted in opposition to plaintiffs' motion for an evidentiary hearing.   While plaintiffs disparagingly assert that Cricket "self-selected two employees" to provide an explanation (Dkt. 288 at 7), plaintiffs fail to explain why it was unreasonable to submit declarations from the two individuals who are most knowledgeable about the searches at issue here: namely, the Director of Legal Discovery, who has directly managed all of Cricket's e-discovery efforts in this case (Ms. Phillips); and a Senior Business Manager from the IT Department who oversees the e-discovery managers at AT&T (Mr. Read).  As evidenced from their comprehensive declarations, Ms. Phillips and Mr. Read addressed each of the topics referenced in plaintiffs' motion for an evidentiary hearing, including (a) "the circumstances that led Cricket to testify under oath that it had destroyed documents"; (b) "how [the Legacy Data] came to be stored where" it did; (c) "why [Cricket] failed to find" the Legacy Data in the first instance, (d) "what led to [Cricket's] recent discovery" of the Legacy Data, and (e) "what led Cricket . . . to provide [the Legacy Custodian Table][listing the dates of the[] destruction" of certain custodial data.  Dkt. 192-1 at 3.[1]

Now that Cricket has addressed those topics, plaintiffs have shifted the goalposts, demanding answers to over 80 questions, and disingenuously claiming that "by its own admission,

---

[1] Contrary to plaintiffs' assertions, there are no "inconsistencies" in Ms. Phillips' testimony that Cricket performed additional searches in response to the "unanswered" question about Mr. Strickland's data.  *See* Dkt. 288 at 21.  Plaintiffs claim that Ms. Phillips "already knew why Mr. Strickland's data was 'treated differently'" because the IT Department had informed her that there was a record of collection for his AT&T User ID.  *See id.* at 8 (emphasis omitted).  But as Mr. Read stated in his declaration, it was not until *after* Ms. Phillips' deposition that he recalled his use of placeholder User IDs in connection with certain legacy custodians, so the fact that Mr. Strickland had a record of collection under his AT&T User ID did not answer any questions about why he was "treated differently" at that time.  *See* Dkt. 215-8 at ¶ 33.  Indeed, as Ms. Phillips noted in her declaration, the determination that Mr. Strickland had data retained until 2018 was the *cause* of the question, not the answer.  *See* Dkt. 215-9 at ¶ 16.

Cricket's discovery conduct implicates both its in-house lawyers and outside law firm," merely because Ms. Phillips and Mr. Read stated that certain activities were at the request or direction of counsel in their declarations. Dkt. 288 at 10-11. But the obvious fact that counsel was involved in Cricket's e-discovery efforts in connection with litigation does not "implicate" such counsel. To the contrary, the declarations of Ms. Phillips and Mr. Read lack *any* of the statements that the Court noted may indicate the need for attorney testimony, such as "pointing their fingers at the lawyers" or claiming that "they're not allowed to testify because everything is cloaked within attorney-client" (Spehr Decl. Ex. B at 22:9-10, 12-13). *See also infra* at 8-12.

Finally, plaintiffs imply that a recent disclosure by Cricket is further evidence of "misconduct" (Dkt. 288 at 12), even though it demonstrates an intent to be forthcoming with both plaintiffs and the Court. Specifically, when Cricket determined that the Microsoft Exchange mailbox associated with the custodian Julie Dexter Berg had been inadvertently deleted before the commencement of this case, Cricket promptly disclosed that information. Dkt. 288-10.[2] Although Cricket explained that the deletion was due to a "routine, periodic deletion of P8 [*i.e.,* Cricket's file server for e-discovery collections] data in 2018," and that the e-mails saved to Ms. Berg's computer had been retained (*id.*), plaintiffs accuse Cricket of "offer[ing] no meaningful explanation." Dkt. 288 at 12. Cricket has determined that, despite this inadvertent deletion, its production includes over 6,000 e-mails to/from Ms. Berg, providing an alternative source of at least some of the deleted data. Additionally, its witnesses will be prepared to answer any questions the Court may have about this issue.

In short, any time that Cricket has identified new information in responding to plaintiffs' discovery demands, it has disclosed that information. Moreover, Cricket has taken all reasonable steps in its power to ensure that plaintiffs have not been prejudiced from the disclosure of the

---

[2] Although not relevant to the Legacy Data, Cricket also disclosed that it had identified pricing data for a minority of stores that had previously been thought not to exist. *Id.* After voluntarily disclosing this information, Cricket offered to extend the expert discovery deadlines (*id.*), but plaintiffs declined the offer. In their brief, plaintiffs argue, without any evidence, that "it's unlikely that all of Cricket's counsel could have been unaware [that the pricing data] existed"—just one of numerous unfounded personal attacks on the integrity of Cricket's counsel. Dkt. 288 at 13.

Legacy Data, including offering to extend court deadlines and producing the data in expedited fashion, without any cooperation from plaintiffs. Accordingly, Cricket looks forward to the evidentiary hearing to demonstrate, once and for all, that it has acted in good faith.

**III.    ARGUMENT**

   **A.    Cricket's Fact Witnesses Can Adequately Testify As To All Relevant Factual Issues.**

At the June 25th conference, the Court identified a number of topics on which it would like to hear testimony, including (a) the "genesis" of the legacy custodian table introduced at Ms. Phillips' deposition; (b) the searches that led Cricket to believe that it no longer possessed certain legacy custodial files; (c) the searches that occurred after Ms. Phillips' deposition; (d) the identification of the legacy marketing materials; and (e) the integrity of the legacy documents (collectively, the "Relevant Topics"). Spehr Decl. Ex. B at 9-13. As evidenced by the detailed nature of their declarations, Ms. Phillips and Mr. Read are best situated to testify as to the Relevant Topics, due to their direct involvement in nearly all of the critical events relating to the Legacy Data. Moreover, although much of what Mr. Fernando can testify to may be duplicative of Mr. Read's testimony (which is why Cricket did not submit a declaration from him), the fact that he had direct access to both the physical media housing the Legacy Data and the copies on P8 makes him well-suited to discuss the integrity of the data.

With respect to Susan Kennedy and Susan Palmisano, their limited and ministerial involvement in the relevant events will likely limit the probative value of their testimony.[3] Moreover, Cricket believes that Mr. Read and Ms. Phillips can adequately testify as to the details of any searches performed by Ms. Kennedy, Ms. Palmisano, and other e-discovery managers. That said, Cricket is happy to make Ms. Kennedy and Ms. Palmisano available if the Court would prefer to hear their testimony directly.

With respect to the topics of testimony, while Cricket's witnesses will testify as to any factual issues that the Court deems relevant, plaintiffs' proposed topics—which include more than

---

[3] Contrary to plaintiffs' assertion (Dkt. 288 at 23-24), Ms. Kennedy performed some, but not all, of the searches for custodial data in this matter. *See* Dkt. 215-8 at ¶ 24.

80 questions—will transform the evidentiary hearing into the "mini trial" that we understand the Court hopes to avoid.  Spehr Decl. Ex. B. at 25:15.  For instance, although Cricket believes that its conduct was reasonable, asking Cricket's witnesses to opine as to whether their conduct was "standard, reasonable, or responsible" (Dkt. 288 at 15) will not aid the Court in determining the *facts* of what occurred.  Nor are generalized questions about AT&T's "standard approach for storing documents from acquired companies" (*id.*) or "standard procedure . . . to decide . . . whether specific data is responsive" (*id.* at 17) likely to shed light on the specific events that occurred in this case.  Accordingly, although Cricket defers to the Court as to which questions may be useful, Cricket believes that the Relevant Topics outlined by the Court, rather than the dozens of fishing questions proffered by plaintiffs, constitute a far more constructive road map for the evidentiary hearing.

### B.   Plaintiffs Have Failed To Establish A Compelling Basis To Depart From The Advocate-Witness Rule And Compel Attorney Testimony.

As discussed *supra*, Cricket's fact witnesses are the best and most direct source of information regarding the facts of what transpired with respect to the Legacy Data.  Yet Plaintiffs focus a significant portion of their brief on the individuals who are one step removed from the process: Catherine Hwang, an attorney at Cricket, and Jarman Russell, outside counsel.  Plaintiffs claim that "Cricket's counsel can testify to the facts of what happened . . . without implicating privilege at all" (Dkt. 288 at 2).  But even if it were possible to draw a neat line between privileged and non-privileged testimony—an extremely difficult task in practice—plaintiffs have not demonstrated that there is a compelling need for these attorneys' testimony.

It is well-settled that "there is a general disfavor for allowing attorneys to act as witnesses in their own cases."  *Anderson v. Hartley*, 2011 WL 6012200, at *1 (E.D. Cal. Dec. 1, 2011); *see also Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1209 (2011) ("The 'advocate witness rule,' which prohibits an attorney from acting both as an advocate and a witness in the same proceeding, has long been a tenet of ethics in the American legal system, and traces its roots back to Roman Law.").  Indeed, allowing an attorney to testify in their own case "is a situation that should be avoided if possible" and will only "be permitted in extraordinary circumstances and for compelling

CRICKET'S SUPPLEMENTAL BRIEF
REGARDING EVIDENTIARY HEARING;
CASE NO. 3:19-CV-07270-WHA

reasons, usually where the evidence is not otherwise available." *United States v. Johnston*, 690 F.2d 638, 644 (7th Cir. 1982).  There are good policy reasons for this general rule, including that (i) the lawyer-witness is more easily impeachable for interest and is therefore a less effective witness and (ii) the lawyer-witness takes on the "unseemly and ineffective position of arguing [their] own credibility." *Kennedy*, 201 Cal. App. 4th at 1209 (quoting former ABA Model Code of Prof. Responsibility, EC 5-9); *see also id.* ("The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.").

Notably, the policy concerns of the advocate-witness rule are present regardless of whether "the attorney's testimony will be given in front of a jury or a judge." *Id.* at 555.  Additionally, since the party seeking attorney testimony often also seeks that attorney's disqualification from the case (as plaintiffs have done here), compelling advocate-witness testimony is particularly disfavored. *See Colby v. Newman*, 2012 WL 12887688, at *5 (C.D. Cal. Oct. 5, 2012) (denying motion to disqualify and holding that "Plaintiffs' conclusory allegations fail to persuade the Court that [opposing counsel] will be a necessary witness").[4]

In the Ninth Circuit, the party seeking to compel the testimony of an advocate-witness must demonstrate that there is a "compelling need" for the testimony.  *See, e.g.*, *United States v. Prantil*, 764 F.2d 548, 553 (9th Cir. 1985); *United States v. Tamura*, 694 F.2d 591, 601 (9th Cir. 1982). The burden to demonstrate this "compelling need" "must [] be [] somewhat higher than the standard

---

[4] Despite conceding that "it is not yet clear what Mayer Brown knew and when," plaintiffs ask the Court to "consider the potential conflict between Mayer Brown and Cricket." Dkt. 288 at 14-15. However, "[a]n order of disqualification of counsel is a drastic measure which courts should hesitate to impose except in circumstances of absolute necessity."  *Kelly v. Roker*, 2012 WL 851558, at *2 (N.D. Cal. Mar. 13, 2012).  This is because "[m]otions for disqualification are often tactically motivated and they tend to derail the efficient progress of litigation . . . . Because of the potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny."*Id.*  Indeed, plaintiffs' innuendo does not come close to meeting this heavy burden, and the cases they cite only serve to prove this point.  Unlike here, the court in *Export Development Canada v. ESE Electronics Inc.* found that the client and attorney were "finger-pointing" at one another, and even so the court still refused to order a full disqualification.  2017 WL 3122157, at *5-6 (C.D. Cal. July 10, 2017).  And in *White v. General Motors Corporation, Inc.*, the issue of a conflict of interest arose in connection with the entry of sanctions for a frivolous court filing, which is far from the circumstances here.  908 F.2d 675, 685 (10th Cir. 1990).

CRICKET'S SUPPLEMENTAL BRIEF
REGARDING EVIDENTIARY HEARING;
CASE NO. 3:19-CV-07270-WHA

for other witnesses." *Cave Consulting Grp. v. OptumInsight, Inc.*, 2020 WL 127612, at *17 (N.D. Cal. Jan. 10, 2020). While the "compelling need" standard is most often applied in the criminal context, at least one Northern District of California court has applied it in a civil case. *See id.* ("The Court assumes for the sake of argument that the 'compelling need' standard that the Ninth Circuit has applied in criminal cases applies equally to civil cases."). For several reasons, Plaintiffs have fallen far short of demonstrating that there is a "compelling need" for either Ms. Hwang's or Mr. Russell's testimony at this stage.

*First*, the fact witnesses can more than adequately address the three key categories referenced by plaintiffs, which, when shorn of rhetoric, are as follows: (a) "what [Cricket] did before January 2021 to fulfill Cricket's discovery obligations"; (b) "the circumstances by which Cricket came to make its . . . representations" regarding the retention of the Legacy Data "to the Court and to the plaintiffs"; and (c) "what actions the company took, beginning in late January 2021, that resulted in the eventual 'discovery' of files Cricket had [] claimed it did not have." Dkt. 288 at 15. If plaintiffs just want the facts with respect to these categories, the individuals who actually stored, searched for, and collected the data are the best source of information, not the attorneys. Indeed, the primary non-duplicative evidence that can be provided by attorneys consists of privileged communications and work product, not facts.

*Eaton v. Siemens* is illustrative of why Ms. Hwang and Mr. Russell should not be compelled to testify here. 2007 WL 2318531, at *6 (E.D. Cal. Aug. 10, 2007). In that case, the plaintiff sought to disqualify the defendant's counsel based on the allegation that he was a material witness who fraudulently manipulated a document. *Id.* The Eastern District of California rejected this argument, holding that the plaintiff "offer[ed] no evidence in support of this serious allegation." *Id.* The court concluded that the defendant's attorney was "not a necessary witness to this [action]" because he was "not a percipient witness to the creation, dating or contents of the [documents in question]," any information he had was "protected by the attorney-client privilege," and "other means exist[ed] to obtain the desired information." *Id.* at *8. The same holds true with respect to Ms. Hwang and Mr. Russell.

CRICKET'S SUPPLEMENTAL BRIEF
REGARDING EVIDENTIARY HEARING;
CASE NO. 3:19-CV-07270-WHA

*Second,* plaintiffs misleadingly claim that attorney testimony is necessary because "Mr. Read testified that the IT Department's collection, storage, and review of Cricket's records—both pre- and post-merger—were all conducted at the 'direction' of" attorneys. Dkt. 288 at 25. But as plaintiffs are well aware, Mr. Read did not use that statement as a basis to shield any information from disclosure in his declaration; he merely stated the (obvious) fact that Cricket's e-discovery activities were conducted at the direction of attorneys. If that fact were a basis for attorney testimony, then attorney testimony would be necessary in connection with *every* evidentiary hearing regarding discovery issues. That is clearly not the case.

*Third*, the specific questions for which plaintiffs claim attorney testimony is necessary are either pretextual or are best addressed by the fact witnesses. For instance, with respect to the legacy custodian chart introduced at Ms. Phillips' deposition, plaintiffs repeatedly claim that the testimony of Ms. Hwang is necessary to understand (1) "who prepared that document"; (2) "what went into the preparation for that document"; (3) "how is it that those dates were determined"; and (4) "what was the reasoning[.]"*Id*. at 26.[5] But plaintiffs' singular focus on the dates in the chart is disingenuous, because their counsel learned at Ms. Phillips' deposition that those dates are generally the *approximate* dates "when particular individuals stopped working with Cricket Wireless" (Spehr Decl. Ex. A at 76:9-14)—not the "*specific* dates . . . for when the records were supposedly destroyed," as plaintiffs misleadingly write. Dkt. 288 at 27 (emphasis added). And although Cricket appreciates that the Court has additional questions regarding the creation of that chart, plaintiffs fail to explain why the witness who actually provided the factual information set out in the chart is not best situated to answer questions about the document.

Similarly, although plaintiffs claim that Mr. Russell's testimony is needed to answer questions about Cricket's representations with respect to its "complet[ion of] document production" and "document deletion," plaintiffs start from the unfounded premise that Cricket and its outside counsel made "false representations" and work backwards (*id*.)—the exact opposite of how an

---

[5] Plaintiffs also allege that Mr. Russell "can answer . . . how he . . . was able to come up with specific dates in the table," even though it defies logic that the dates would come from outside counsel rather than Cricket. *Id*. at 27.

evidentiary hearing should proceed.  And Mr. Russell's purported involvement in "every discovery dispute" and "every meet-and-confer" (*id.*) is hardly a basis to call him to the stand and risk invading "the most sacred of all legally recognized privileges." *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997).  If plaintiffs truly want to obtain the facts regarding the Legacy Data, their focus should be on the individuals who actually facilitated the searches at issue and made the determination that the sought-after documents were unavailable, not Cricket's outside counsel.

Because plaintiffs have failed to allege any "compelling need" for Ms. Hwang's or Mr. Russell's testimony, the general presumption that attorneys should not testify in their own cases should apply.

### C.    Cricket's Disclosure Of Non-Privileged Facts Does Not Constitute A Waiver Of The Attorney-Client Privilege.

In an implicit concession that testimony from Ms. Hwang and Mr. Russell would likely implicate the privilege, plaintiffs assert that "to the extent privileged information is necessary to assess Cricket's explanations[,] . . . Cricket has waived the privilege." Dkt. 288 at 30.  However, given that plaintiffs concede that Cricket has done nothing more than state non-privileged facts, plaintiffs fall far short of satisfying the stringent standard for implied waiver.

"The attorney client privilege is recognized as vital to the legal system and should not be easily invaded." *GERS, Inc. v. Atl. Mut. Ins. Co.*, 2003 WL 27386128, at *5 (S.D. Cal. June 23, 2003); *see also Bauer*, 132 F.3d at 510 ("It is important to note that the attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system.").  In light of the critical importance of the privilege, a party seeking implied waiver of the privilege must satisfy a heavy burden.  *See United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999).  Specifically, the Ninth Circuit has set out a three-part test:

> First, the court considers whether the party is asserting the privilege as the result of some affirmative act, such as filing suit. Second, the court examines whether through this affirmative act, the asserting party puts the privileged information at issue.  Finally, the court evaluates whether allowing the privilege would deny the opposing party access to information vital to its defense.

1   *Id.* (internal citations and quotation marks omitted).

2        None of these three prongs are met here.  In fact, plaintiffs' argument collapses at prong

3   one (and, for the same reason, two and three), because Cricket has not taken any affirmative act

4   that puts privileged information at issue, such as "abus[ing] the privilege by *asserting claims* the

5   opposing party cannot adequately dispute unless it has access to the privileged materials."  *Bittaker*

6   *v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003) (emphasis added); *see also Rock River Commc'ns,*

7   *Inc. v. Univ. Music Grp.*, 745 F.3d 343, 353 (9th Cir. 2014) ("A party who *affirmatively* places its

8   *attorney-client communications* at issue in a litigation implicitly waives the privilege.") (emphasis

9   added).  Rather, as plaintiffs concede, Cricket has merely "made specific *factual* assertions about

10  what it did, when, and why."  Dkt. 288 at 32 (emphasis added); *see also id*. at 30 ("Cricket has

11  made several affirmative representations in an attempt to defend its conduct, such as when it

12  discovered documents, why and when it conducted particular searches, [and] who conducted those

13  searches").  Plaintiffs cannot reasonably assert on the one hand that "facts about how a corporation

14  conducted discovery" are not privileged (*id*. at 29) and then argue on the other that Cricket has

15  waived the privilege by disclosing facts about how it conducted discovery.[6]

16       Indeed, it is *plaintiffs*, not Cricket, who has asserted, without evidence, that privileged

17  communications are "necessary to evaluate [Cricket's] representations."*See* Dkt. 288 at 30.  But

18  affirmative statements by *plaintiffs* about the potential relevance of privileged communications are

19  not a basis to waive Cricket's privilege.  *See Rock River Commc'ns*, 745 F.3d at 353 (affirming

20  district court's denial of *in camera* review of defendant's communications where "it is [plaintiff]

21  that has alleged the sham exception . . . that requires an inquiry into whether [defendant] sent the

22  cease-and-desist letters in good faith").Plaintiffs' misleading citation to *Landmark Screens, LLC v.*

23  *Morgan, Lewis & Bockius LLP* only further proves this point, since that case concerned a potential

24  waiver by a plaintiff who "allege[d] facts tolling the statute of limitation for its fraud claim"—a

25  _____

26  [6] These facts include the nearly self-evident statement in Cricket's declarations that its e-discovery

27  teams work at the direction of counsel.  Like the other factual assertions in the declarations, this
    statement does not constitute the affirmative use of an *attorney-client communication* in support of
    a claim or defense, such as the invocation of the advice of counsel defense.  *See Rock River*

28  *Commc'ns*, 745 F.3d at 353.

quintessential affirmative act, and the exact opposite of the circumstances here.  2009 WL 3415375, at *2 (N.D. Cal Oct. 21, 2009).

In short, since Cricket has not invoked an "advice of counsel" defense or otherwise used an attorney-client communication "both as a sword and a shield" (*Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)), there is no basis to deem the privilege waived.  *See* Spehr Decl. Ex. B at 22:3-5 ("I am mindful that we are treading on very touchy issues here, issues of waiver that I'm not sure we have to do right now.").[7]

### D.   Plaintiffs Fail To Identify A Legitimate Basis For Conducting *In Camera* Review.

Based on nothing more than raw suspicion and conjecture, plaintiffs also request that this Court review *in camera* potentially thousands of communications among Cricket's employees dated between January 21, 2021 and February 26, 2021.  Dkt. 288 at 31.  Plaintiffs justify this intrusive and burdensome request by alleging that an *in camera* review is appropriate to determine whether Cricket committed a "fraud on the court."  *Id*. at 32.  Because plaintiffs do not identify a single fact in the record indicating the existence of any such scheme, plaintiffs' argument fails.

"Although *in camera* review of documents does not destroy the attorney-client privilege, *it is an intrusion which must be justified*."  *In re Grand Jury Investigation,* 974 F.2d 1068, 1074 (9th Cir. 1992) (first emphasis in original).  To obtain such a review, the requesting party must first demonstrate "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that [an] exception applies."  *Id.* at 1072 (upholding denial of *in camera* review) (internal citation and quotation marks omitted).  An "unfounded suspicion," lacking any basis in fact, cannot "justify *in camera* review."  *Rock River Commc'ns*, 745 F.3d at 353; *see Nyerges v. Hillstone Rest. Grp. Inc.*, 2020 WL

---

[7] Although plaintiffs also make a passing reference to the Court's "inherent authority to waive the attorney-client privilege" (Dkt. 288 at 30 n.6), the case they cite stands for the narrow principle that "[e]ven if particular *litigation hold communications* are privileged, the court has an inherent power to order their production in connection with a spoliation claim."  *City of Colton v. Am. Promotional Events, Inc.*, 2011 WL 13223880, at *2 (C.D. Cal. Nov. 22, 2011) (emphasis added).  Here, plaintiffs are seeking the wholesale disclosure of *all* privileged communications relating to e-discovery, unlike the limited production of hold notices compelled in *City of Colton*.

5846606, at *1 (D. Ariz. Oct. 1, 2020) (denying request for *in camera* review) ("[T]he requesting party must show more than a 'hunch' that privileged communications may contain additional facts subject to disclosure." (citation omitted)).  Moreover, even if the moving party is able to make the first showing, the choice "to conduct the review rests within the discretion of the district court." *In re Grand Jury Investigation,* 974 F.2d at 1075.  Neither prong supports plaintiffs' request here.

### i.  Plaintiffs' "Unfounded Suspicion" Is Not A Factual Basis For *In Camera* Review.

In seeking *in camera* review, plaintiffs make two arguments: Cricket has waived the attorney-client privilege, or, alternatively, the crime-fraud exception likely applies.  Dkt. 288 at 32. Neither argument is persuasive.  As discussed *supra*, there is no basis to find a waiver because Cricket has not affirmatively asserted a claim "pursuant to the advice of [Cricket's] lawyers," or argued that an action was "reasonable because it was based on advice of counsel."  *Chevron Corp.*, 974 F.2d at 1162-63.

Plaintiffs' second argument—invoking the crime-fraud exception—is equally flawed. Plaintiffs claim that the crime-fraud exception may apply because Cricket and its counsel may have perpetrated a "fraud on this Court."  Dkt. 288 at 32.  When fraud on the court is alleged, the relevant inquiry is "whether [one party] harmed the integrity of the judicial process."  *United States v. Estate of Stonehill,* 660 F.3d 415, 444 (9th Cir. 2011) (internal citation and quotation marks omitted).  But rather than identify any *facts* indicating that Cricket may have intentionally "harmed the integrity of the judicial process," plaintiffs merely pose a series of hypotheticals.  *See* Dkt. 288 at 31 ("If this account is true, one would expect . . . "); *id.* ("if Cricket's sudden scramble to find documents was triggered by Judge Alsup's spoliation warning . . . "); *id.* ("[e]ven the absence of relevant communications would shed light . . ..").  These questions fall far short of indicating that Cricket "deliberately planned and carefully executed" a nefarious scheme to defraud the Court.  *See Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 245 (1944); *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960) ("[I]t is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.").

Ultimately, plaintiffs' "fraud" claim boils down to the allegation that Cricket identified the existence of the Legacy Data within the fact discovery period but later than plaintiffs would have liked.  That is certainly not a basis for a "fraud" claim.  Moreover, here, in addition to producing voluminous documents totaling in the millions of pages, Cricket has voluntarily disclosed in its declarations each and every fact on which plaintiffs rely in their brief, demonstrating a commitment to transparency.  And Cricket's decision to perform additional searches evidences a good faith effort to fulfill discovery obligations, not a scheme to defraud.  *Cf. Laboy v. Bd. of Trs. Of Bldg. Serv. 32 BJ SRSP*, 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence[.]").  Accordingly, plaintiffs' reference to a potential fraud on this Court is little more than an "unfounded suspicion," which "is insufficient to justify in camera review." *Planned Parenthood Fed'n of Am.*, 2019 WL 1950377, at *2 (denying *in camera* review); *see id.* at *3-4 ("Defendants have not cited any evidence that Plaintiffs actually engaged in a criminal conspiracy," offering only "conclusory" declarations to support their request.).[8]

### ii.     None Of The *Zolin* Factors Support Plaintiffs' Request For *In Camera* Review.

In addition to plaintiffs' failure to provide "a factual basis" to justify its request for an *in camera* review, none of the discretionary *Zolin* factors support plaintiffs' request.  It is well-settled that the decision to hold an *in camera* review must be "guided by the factors enumerated in [*United States v.*] *Zolin*." *In re Grand Jury Investigation*, 974 F.2d at 1075.  These factors consist of "the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that [an] exception does apply." *Zolin*, 491 U.S. at 572.  Each factor weighs against the plaintiffs' request.

Given the size and pace of this case, plaintiffs' self-described "narrow request" is nothing of the sort.  Dkt. 288 at 31.  Indeed, plaintiffs' vague request that this Court review over a month's

---

[8] For the same reasons, plaintiffs' assertion that Ms. Hwang and Mr. Russell should be compelled to testify to privileged matters due to the crime-fraud exception (Dkt. 288 at 30 n.6) lacks merit.

CRICKET'S SUPPLEMENTAL BRIEF
REGARDING EVIDENTIARY HEARING;
CASE NO. 3:19-CV-07270-WHA

worth of emails "between and among Cricket's employees" (*id*.) would likely require the perusal of thousands of documents.  Moreover, in light of the significant e-discovery activities undertaken by AT&T—both generally and in connection with this case—the vast majority of the documents are likely to be unresponsive to the Relevant Topics identified by the Court (and have *no* relevance to the merits of this case).  Accordingly, the first two *Zolin* factors weigh heavily against plaintiffs' request.

But perhaps most importantly, plaintiffs barely attempt to satisfy the final, critical *Zolin* factor by demonstrating that an exception to the privilege likely applies.  To prove that the crime-fraud exception applies, plaintiffs must show "by a preponderance of the evidence" not only that Cricket engaged in fraud but that "the attorney-client communications . . . sought are 'sufficiently related to' and were made '*in furtherance of* [the] intended'" scheme.  *Lewis v. Delta Air Lines*, 2015 WL 9460124, at *2 (D. Nev. Dec. 23, 2015) (quoting *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007)) (emphasis added).  As discussed *supra*, plaintiffs have failed to identify a single fact indicating a scheme to defraud, let alone that an attorney-client communication was made in furtherance of such fraud.  Accordingly, plaintiffs have provided no legitimate basis to intrude on the attorney-client privilege.[9]

## IV.   CONCLUSION

For the foregoing reasons, Cricket respectfully submits that the evidentiary hearing should feature testimony from the witnesses who are best-equipped to explain the *facts*: Chris Read, Paula

---

[9] Since plaintiffs seek a wholesale waiver of the attorney-client privilege and have not identified a specific privilege assertion that they wish to "test," their request for a privilege log is unavailing and premature.  *See Waymo LLC v. Uber Tech., Inc.*, 319 F.R.D. 284, 292 (N.D. Cal. 2017) (Alsup, J.) ("[T]he very purpose of a privilege log is to allow a fair way to test a claim of privilege."); *see also* Spehr Decl. Ex. B at 23:5-8 ("[I]nstead of immediately going to generate a privilege log, let me first see how you tee it up and then—but I might not be making this final call until after I hear some of the witnesses provide the facts before counsel come testify.").  Indeed, plaintiffs openly concede that they intend to use the log not to "test" the privilege but in a fishing expedition.  *See* Dkt. 288 at 33 (claiming that "if a lawyer at [external counsel] received a relevant communication" on certain dates, "it *could* directly implicate Cricket's outside counsel in the discovery abuse") (emphasis added).  As plaintiffs' counsel are well aware, in a case of this size, it would not be surprising to find e-mails between external counsel and Cricket on each business day (and many non-business days) during the requested time period.  Thus, the presence of e-mails on a privilege log would show nothing more than a law firm doing its job.

1   Phillips, Lito Fernando, and if the Court deems it useful, Susan Kennedy and Susan Palmisano.

2   Plaintiffs' request to intrude on the privilege by requiring testimony from Ms. Hwang and Mr.

3   Russell and the *in camera* review of privileged documents should be denied.

4

5   Dated: July 23, 2021                                    Respectfully submitted,

    **MAYER BROWN LLP**

6

7   */s/ Richard A. Spehr*
    Richard A. Spehr

8

9   Counsel for Defendant
    CRICKET WIRELESS LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CRICKET'S SUPPLEMENTAL BRIEF
REGARDING EVIDENTIARY HEARING;
CASE NO. 3:19-CV-07270-WHA