UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE POSTPICHAL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CRICKET WIRELESS, LLC, <br><br> Defendant. | No. C 19–07270 WHA <br><br> **ORDER DENYING MOTIONS TO EXCLUDE AND DISQUALIFY PLAINTIFFS' EXPERTS AND GRANTING MOTION FOR CLASS CERTIFICATION** |

## INTRODUCTION

Plaintiffs move to certify a class of customers who paid premium prices for 4G phones and plans in markets that had no 4G service despite advertisements that suggested otherwise. Defendant wireless cellular service provider moves to exclude and disqualify plaintiffs' experts and opposes class certification. To the extent stated herein, the motions to exclude and disqualify plaintiffs' experts are **DENIED** and the motion to certify a class is **GRANTED**.

## STATEMENT

**1.    CRICKET'S 4G SALES STRATEGY**

In the early 2010's, 4G ranked as the newest development in the cellular services industry. Cellular service providers other than Cricket Wireless, LLC, quickly developed their 4G

capabilities to meet the rising demand for faster cellular and data services. Cricket, however, lagged behind (Dickson Decl., Exhs. C at 2, F at 1–2).

In 2011, Cricket attempted to build out its 4G capabilities by partnering with LightSquared, "but the FCC rejected LightSquared's plans to launch its network over concerns that it would interfere with GPS technology" (Donckels Decl. ¶ 5). Cricket attempted a similar third-party 4G network agreement with Clearwire, but that, too, fell through when Sprint acquired Clearwire (Donckels Decl. ¶5). In the face of $2.8 billion in debt by mid-2013, Cricket's CEO admitted to the FCC that Cricket had "no current plans to expand its . . . spectrum holdings in any significant way or to build commercial facilities outside of its current network" (Dickson Decl., Exh. C at 6).

Cellular service companies needed 4G to stay current, yet most of Cricket's customer base lacked 4G coverage in their area — in fact, as much as 77 percent of individuals living in an area with Cricket coverage fell outside of Cricket's 4G footprint (Dickson Decl., Exh. I, Donckels Dep. at 171:4–24). Well aware of rising consumer demand for faster 4G services, Cricket made an economic decision to sell 4G phones and 4G plans nationwide despite its nascent 4G LTE footprint (Dickson Decl., Exhs. C at 2, E at 6; Exh. J, Towster Dep. at 275:12–16).

Cricket's executive and marketing teams crafted new, 4G-centric sales and customer conversion strategies to turn the tide on their declining customer base (Dickson Decl., Exh. D at 3–4; Exh. H at 10). Though Cricket amped up 4G advertising across America, it did little to differentiate its messaging across geographic regions, regardless of its ability to provide 4G service. For instance, marketing materials used in non-4G markets had prominently displayed 4G logos near claims about Cricket's "unlimited plans" (Dickson Decl., Exh. J, Towster Dep. at 277:7–280:7).

To keep its promotion accurate, Cricket claims its marketing materials distinguished phones in non-4G markets as "4G capable" (Towster Dep., 87:20–99:4). Cricket contends this designation would not cause confusion because customers understood that a "4G capable" phone did not necessarily mean that Cricket actually provided 4G coverage locally (Dickson Decl., Exh. J, Towster Dep. at 274:23–277:16). Customers needed a both a 4G plan and a 4G-capable

2

phone in order to receive 4G service even within Cricket's 4G footprint. Coverage maps depicted Cricket's 3G versus 4G footprints and customers could reference coverage maps in Cricket's website and in stores (though it is unclear the extent to which stores consistently displayed coverage maps) (Dickson Decl., Exh. I, Dep. Donckels at 68:19–71:7, 74:22–73:21, Exhs. A–Q; Russell Decl., Exhs. R, S, T).

By September 2013, Cricket's "newest project: 4G in non-4G [was] going strong" (Dickson Decl., Exh. U at CRICKET00013352). This strategy's success led Cricket's Senior Manager of Business Development to suggest that Cricket "may not need any other programs" to increase Cricket's customer base (Dickson Decl., Exh. U at CRICKET00013352). Cricket higher-ups "recognize[d] that without [a] clear path to 4G/LTE home market coverage" the 3G in 4G discrepancy was "not an easy story to explain" (Dickson Decl., Exh. U at CRICKET00513221).

Complaints started to pour in. Cricket representatives recognized the lack of 4G access conflicted with Cricket's messaging about 4G phones and 4G plans. South-East Area Marketing Director Towster explained in an email to several other Cricket employees (Dickson Decl., Exh. U at CRICKET00513222):

> I covered the extended roaming coverage stickers on the GM call and I got a ton of push back from 3G markets. The team doesn't think that it provides any benefit to talk about this in 3G markets as it actually hurts us as it opens the conversation up when is this market going to be 4G. The team doesn't want to make these stickers mandatory items instead they would prefer to make it optional and a market decision.

Another employee on Cricket's field marketing team responded with her similar experience, explaining that employees "push[ed] back and questioned whether or not the [4G extended roaming] stickers were mandatory" and that "[e]ach and every day when I'm in non-4G markets, I'm begged to remove 4G LTE references in advertising and on merchandising materials" (Dickson Decl., Exh. U at CRICKET00513221; Towster Dep. at 181:18–23). In response to Cricket employees' emails expressing concern that 4G posters (that had 4G logos without the "4G capable" qualifier) would "be setting the wrong expectations to our customers with 4G,"

3

Cricket's East Area Marketing Director confirmed "this was a companywide directive to talk about [4G] even in non-[4G] markets and push [4G] capable handsets" (Dickson Decl., Exh. L at 1–2, CRICKET00793602–03). Cricket management insisted that representatives [t]alk about [4G] LTE" regardless of the confusion it might cause (Dickson Decl., Exh. L at 1, CRICKET00793602).

Cricket partnered with Sprint in February 2013 to provide 4G roaming. This meant that Cricket could have provided access to the 4G network that its customers expected with their 4G phones and 4G plans. Instead, Cricket saved money by blocking access to Sprint's 4G network for customers within their home markets. Cricket internal documents acknowledged that allowing access to Sprint's network to customers located in 3G markets might have provided "true nationwide [4G]" and that withholding access risked "disappointment from [customers] who paid a lot of money for an [4G]-capable device" (Dickson Decl., Exh. S at 2, 5). Nevertheless, Cricket programmed 4G phones bought in non-4G markets to prevent customers from using available Sprint 4G service in their home market (Towster Dep. 117:3–13). This limited the use of Sprint's 4G drastically because "only 4% of total data traffic [was] outside [customers'] home market" (Dickson Decl., Ex. O at 1).

Cricket used the 4G roaming agreement with Sprint to create coverage maps that depicted a broader 4G roaming network than prior maps that showed only "a few different isolated areas" with 4G. Though Cricket now denies using Sprint's roaming agreement to advertise 4G, Cricket's East Area Marketing Director explained that the roaming agreement allowed Cricket "to market 4G more readily" and to "market to customers that they did now have an expanded footprint to utilize their 4G phone" (Towster Dep. 208:6–211:22).

By late 2013, Cricket removed the distinction between 3G and 4G plans, creating a single "Smart Plan" (Dickson Decl., Exh. I, Donckels Dep. at 208:16–209:10; Mallinson Rep. at 21). Even the most expensive Smart Plans would not allow customers that bought a 4G phone in a non-4G market to access 4G service from their area (Dickson Decl., Exh. I, Donckels Dep. 212:3–13). Offering an undated return policy document, Cricket asserts that unhappy customers could return a phone within seven days at the store where they purchased the phone. However,

4

fees for plans could not be refunded (Dickson Decl., Exh. G at CRICKET00509266; Cricket [Unspecified] Exh. A).

In 2014, the FCC approved a merger agreement between Cricket and AT&T. Once AT&T and Cricket effectuated the merger, Cricket began transferring its customers from Cricket's previous network to the "New Cricket" network which used AT&T's network to provide broad 4G coverage (Donckels Decl. ¶ 6–7).

### 2. NAMED PLAINTIFFS

#### A. URSULA FREITAS

Between 2012 and 2014, Ursula Freitas lived in Vancouver, Washington, a non-4G market. Freitas testified in her deposition that she saw numerous Cricket advertisements including TV commercials as well as advertisements on the outside of more than one Cricket store (Freitas Dep. 109:6–111:13). Seeking the improved capability she expected from a 4G phone and 4G plan, Freitas visited a Cricket store and purchased a 4G-capable Admire 2 phone (Freitas Dep. 111:7–16). Freitas recalls being told that Cricket offered 4G and that she needed a specific plan to receive 4G (Freitas Dep. 111:13–16, 180:1–21). She ended up selecting a plan priced at $60 a month, though Freitas conceded that her actual payments may have decreased sometime thereafter due to a low-income rebate and a discount for using autopay (Freitas Dep. 178:8–25). Freitas viewed coverage maps in the Cricket store with yellow dots representing covered areas but does not remember what kind of service the dots represented (Freitas Dep. 109:21–110:13). Nor did she recall whether any Cricket employee directed her attention to or explained the coverage map (Freitas Dep. 110:14–22). Freitas never received the 4G speeds she expected from her phone and plan.

#### B. JAMIE POSTPICHAL

Jamie Postpichal lived in St. Louis, Missouri, during the proposed class period. She wanted to upgrade her service from 3G to 4G and bought a new 4G capable smartphone thinking she would receive 4G service (Russell Decl., Postpichal Dep. 78:5–79:22). Postpichal recalls Cricket promoting the most recent version of Android on a Samsung Galaxy S4 smartphone (Russell Decl., Postpichal Dep. 90:12–17). Prior to visiting the Cricket store, Postpichal sought

5

to upgrade to a 4G phone for faster data and better service (Russell Decl., Postpichal 91:12–18). In the store, Postpichal discussed the benefits of 4G compared to 3G with a Cricket salesperson, a conversation that reinforced her idea that 4G equated to "faster speed, faster downloads, better quality picture, [and a] better phone" (Russell Decl., Postpichal Dep. 91:6–11). After purchasing a 4G phone, Postpichal recalls a Cricket salesperson activating her phone in the store, but once the salesperson handed it to her, the screen only showed a detectable 3G signal (Russell Decl., Postpichal Dep. 92:4–93:11). When Postpichal asked the salesperson why the phone only said 3G despite her purchasing a 4G phone, the salesperson told her that she would be getting 4G service in two to three months due to a merger with AT&T (Russell Decl., Postpichal Dep. 92:4–21). Postpichal decided to keep her new phone and wait for the 4G rollout (Russell Decl., Postpichal Dep. 92:17–21). After months passed without any new 4G service, Postpichal sought to return her phone but was refused (Russell Decl., Postpichal Dep. at 97:1–8).

### 3. PROCEDURAL HISTORY

Plaintiffs filed this putative class action (the third in a series of related lawsuits) with over a dozen claims, including CLRA and RICO claims, concerning events that occurred between 2012 and 2014. Plaintiffs avoided running afoul of the statute of limitations based on a tolling agreement with Cricket that expired on November 4, 2019, the day our plaintiffs filed this putative class action. In February 2020, plaintiffs amended the complaint by adding several new plaintiffs. Cricket moved to dismiss for lack of personal jurisdiction and improper venue, but a March 2020 order denied the motion to transfer and found, without prejudice, proper personal jurisdiction. After the motion to dismiss failed, Cricket moved to compel arbitration.

The attempt to compel arbitration spiraled into a series of discovery disputes. Various plaintiffs sought voluntary dismissal (Dkts. 92, 156, 158). In December 2020, the motion to compel arbitration succeeded as to one plaintiff and failed as to another (Dkt. 130). The order found that, under Missouri law, plaintiff Jermaine Thomas assented to arbitration by continuing to use Cricket's service after receiving two text messages containing links to Cricket's updated Terms and Conditions and a warning that the updates included an agreement to arbitrate disputes (Dkt. 130). Plaintiff Waters' situation, on the other hand, did not show consent to arbitrate

6

where Cricket attempted to enforce AT&T's arbitration agreement in relationship to events that occurred long before AT&T acquired Cricket (Dkt. 130). The breadth of AT&T's arbitration clause rendered it unconscionable and unenforceable (Dkt. 130).

In December 2020, after the order on the motion to compel arbitration, plaintiffs sought leave to file an amended complaint with new plaintiffs and just as many claims as the first complaint (Dkts. 136, 158). Cricket sought dismissal of the second amended complaint (Dkt. 165). A January 2021 order dismissed three plaintiffs with prejudice, excluded a plaintiff from any potential future class, and granted leave to file a third amended complaint (Dkt. 182). The number of named plaintiffs dwindled to three and only two claims under CLRA and RICO remained (Dkt. 184). Cricket filed a motion to dismiss yet again (Dkt. 213). Plaintiff's CLRA claim garnered a dismissal for lack of notice, but the RICO claim survived (Dkts. 261, 277). After the CLRA claim's dismissal and a dispute over her status as a class member, California plaintiff Waters' withdrew herself from this litigation via voluntary dismissal (Dkt. 270). So, we are down to two plaintiffs and one RICO claim.

*      *      *

The pending motions still before us include motions to exclude and disqualify plaintiffs' experts and a motion for class certification. Plaintiffs seek to certify the following class of consumers (with certain exclusions):

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE monthly plan for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network.

**ANALYSIS**

Certification under FRCP 23(b)(3) is a two-step process. Plaintiffs must first show that the class meets the following four requirements of FRCP 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the

7

1  class; (3) the claims or defenses of the representative parties are typical of the claims or defenses
2  of the class; and (4) the representative parties will fairly and adequately protect the interests of
3  the class. Plaintiffs must next establish "that the questions of law or fact common to class
4  members predominate over any questions affecting only individual members, and that a class
5  action is superior to other available methods for fairly and efficiently adjudicating the
6  controversy." FRCP 23(b)(3).

"[P]laintiffs wishing to proceed through a class action must actually prove — not simply plead — that their proposed class satisfies each requirement of Rule 23. . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)); *Comcast Corp. v. Behrend*, 569 U.S. 27, 32–33 (2013). Analysis of a motion for class certification must be "rigorous" and will "frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id*. at 33–34 (citations and quotations omitted). "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013).

1. **NUMEROSITY**

Under Rule 23(a)(1) a proposed class must be "so numerous that joinder of all members is impracticable." Cricket does not contest numerosity. The proposed class contains hundreds of thousands of consumers and easily satisfies the numerosity requirement. Joinder would be impossible.

2. **ADEQUACY**

An adequate class representative will fairly and adequately protect the interests of the class. Our court of appeals has explained that a representative meets this standard if they (1) have no conflicts of interest with other class members, and (2) will prosecute the action competently vigorously on behalf of the class. *Espinosa v. Ahearn* (*In re Hyundai and Kia Fuel Econ. Litig.*),

8

926 F.3d 539, 566 (9th Cir. 2019) (en banc) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n.20 (1997)); *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Our court of appeals warns against denying class certification on the basis of speculative conflicts — particularly one tangential from the thrust of the suit. See *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 942 (9th Cir. 2015). "Nor does a district court abuse its discretion [in certifying a class] when conflicts are trivial." *Ibid*. "Only conflicts that are fundamental . . . prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *Ibid*. "A conflict is fundamental when it goes to the specific issues in controversy." *Ibid*.

This order finds that plaintiff Freitas may serve as a class representative, but that Postpichal may not. Plaintiff Postpichal's lengthy criminal history disqualifies her. The criminal history is as follows.

Postpichal's unlawful gun possession at the age of eighteen lead to a misdemeanor conviction. In 1993, Postpichal received a conviction of driving under the influence and endangering the life of a child. Thereafter, Postpichal received another conviction for driving with a revoked license and operating an unregistered vehicle. Postpichal admits to being arrested multiple times for failing to appear for court hearings and probation appointments related to her DUI charge. In 2001, Postpichal pled guilty to felony conspiracy to manufacture and distribute methamphetamine, which resulted in an eleven-year prison sentence. Five years' worth of parole followed Postpichal's 2011 release from prison (Russel Decl., Exhibit O; Postpichal Dep. 56:11–61:21, 237:5–246:16).

Rule 23 class representatives owe fiduciary duties to absent class members and are responsible for critical litigation decisions on the class's behalf. The class representative must be trusted in selecting counsel, responding to discovery, attending hearings, and guiding settlement negotiations, among other duties. Postpichal lacks suitability to shoulder this fiduciary role given her past criminal history, including a history of failing to show up for court hearings.

Class counsel is adequate in all respects. Under Rule 23(g)(1)(A), the court considers the following criteria: (1) counsel's work in identifying and investigating potential claims in the action; (2) counsel's experience in handling class actions; (3) counsel's knowledge of the

particular law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). The court also "considers any other matter pertinent to counsel's ability to fairly and adequately represent the class." Fed. R. Civ. P. 23(g)(1)(B). Counsel have extensive experience in litigating class actions, are proficient in the applicable law, and they have the necessary resources to prosecute this action to the end.

Cricket argues that plaintiffs' counsel's retainer agreement warrants a finding of inadequacy. The retainer agreement contains the requirement plaintiffs seek the written consent of class counsel before settling and a clause that the contingency agreement will evaporate if a class is not certified or if the plaintiff settles as an individual only. Cricket cites no authority suggesting that these arrangements make counsel inadequate to represent the class.

### 3. COMMONALITY AND PREDOMINANCE

Commonality requires "questions of law or fact common to the class." Rule 23(a)(2). "A common contention need not be one that will be answered, on the merits, in favor of the class. It only must be of such nature that it is capable of class-wide resolution." *Alcantar v. Hobart Servs.*, 800 F.3d 1047, 1053 (9th Cir. 2015). There need only be "a single significant question of law or fact." *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).

Superseding commonality, predominance under Rule 23(b)(3) asks whether a putative class is "sufficiently cohesive to warrant adjudication by representation." Predominant questions make up "a significant aspect of the case" and clearly justify "handling the dispute on a representative rather than on an individual basis." Predominance isn't a counting game, though. "Rather, more important questions apt to drive the resolution of the litigation" carry greater weight than less significant individualized questions. So, "even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)). An "assessment of predominance begins, of course, with the elements of the underlying cause of action." *Walker v. Life Ins. Co. of the Southwest*, 953 F.3d 624, 630 (9th Cir. 2020) (quotation omitted).

10

*First*, Cricket argues that proposed class members lack of a "uniform classwide experience" and that plaintiffs' RICO claim "turn[s] on individualized inquiries," warranting denial of class certification (Opp. at 1, 9). Cricket points to differences in marketing materials across different regions, unscripted conversations between employees and customers, whether or not customers viewed coverage maps (Opp. at 10). But neither commonality nor predominance require that plaintiffs' have the same exact experience leading up to the harm.

Nor does RICO. The order on the motion to dismiss decided the reliance requirement and the Court is of the view that the issue was correctly decided. This order rejects Cricket's contention that this case devolves into individualized issues. The Supreme Court has said that RICO plaintiffs need not prove first-party reliance but do need to prove proximate cause and that in most cases this requires reliance *by someone*. In this case it would be acceptable for plaintiffs to try to prove that while not everyone relied on Cricket's representations, on their fraudulent scheme theory, a critical mass of consumers relied on Cricket's representations about 4G so as to artificially support a higher price for both phones and plans. Therefore, all customers paid more than they should have because they purchased 4G phones and plans supposedly worth more than they actually were.

Such a theory finds some support in *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, where consumers and a health insurer sued Takeda, a pharmaceutical company, for its failure to warn about associated with its diabetes drug. 943 F.3d 1243 (9th Cir. 2019), *cert. denied sub nom. Takeda Pharm. Co. Ltd. v. Painters & Allied Trades Dist. Council 82 Health Care Fund*, 141 S. Ct. 86, (2020). The plaintiffs put forth product liability and RICO theories. There, our court of appeals explained that allegations of RICO mail fraud (elements of which parallel wire fraud), do not require reliance. *Id*. at 1250–1251 (citing *Bridge v. Phoenix Bond & Indemnity Co*, 553 U.S. 639 (2008)). Relying on the holding from *Bridge*, the *Takeda* court stated,:

> [T]he Supreme Court has explained [in Bridge] that if there is a direct relationship between a defendant's wrongful conduct and a plaintiff's alleged injury, a RICO plaintiff who did not directly rely on the defendant's omission or misrepresentation can still satisfy the requirement of proximate causation. . . . [T]he civil RICO

11

> statute has no reliance requirement on its face, and a person may be injured "by reason of" another person's fraud even if the injured party did not rely on any misrepresentation. Nonetheless, . . . it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least indirect reliance in order to prove causation. This is because, logically, a plaintiff cannot even establish but-for causation if no one relied on the defendant's alleged misrepresentation.

943 F.3d at 1259 (citations and quotations omitted). *Takeda* ultimately held that the plaintiffs had adequately alleged proximate cause sufficient to warrant class certification even though plaintiffs had not shown that all patients who took Takeda's diabetes drug directly relied on information about associated risks. *Id*. at 1259. Instead, the patients had relied on statements from doctors who in turn had relied on information provided by Takeda. *Id.* at 1260. *Takeda* makes explicit that a lack of evidence that consumers relied on a RICO defendant's misrepresentations does not foreclose a RICO theory, as long as the plaintiffs establish proximate clause somehow. *Ibid*.

*Takeda* also recognized that "prescribing physicians serve[d] as intermediaries between Defendants' fraudulent omission . . . and Plaintiffs' payments" for the drug but that "physicians [did] not constitute an intervening cause to cut off the chain of proximate cause," because the drugs required a prescription, making doctors a foreseeable step in the chain of causation. *Id.* at 1257.

Therefore, *Takeda* also leaves open the possibility that Cricket dealers and subsidiaries could, like the doctors prescribing Takeda's diabetes drug, have served as a necessary middlemen in the causal chain connecting Cricket's representations to customer purchases.

Cricket also offers *Poulos v. Caesars World, Inc.* for the proposition that where "individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis," a class should not be certified because predominance cannot be shown. 379 F.3d 654 (9th Cir. 2004). In *Poulos*, plaintiffs alleged a RICO claim against a cruise ship that offered patrons electronic slot machines operated by computer-programming that did not produce pure chance outcomes. *Id*. at 661. The slot machines, plaintiffs claimed, created the misperception of higher-than-actual odds of winning (*i.e.*, by

showing near misses of winning a jackpot more often than on truly random mechanical slots machines). *Ibid*. There, the misrepresentations alleged included the casino "affirmatively mislabel[ing] the video poker machines with statements like '52–card deck,' 'shuffle,' and 'draw,'" terms suggesting pure random chance that the electronic slot machines did not actually provide. *Id*. at 667. *Poulos* held that class members' varying reasons for plaintiffs' gambling defeated the needed causal nexus:

> [T]here may be no single, logical explanation for gambling — it may be an addiction, a form of escape, a casual endeavor, a hobby, a risk-taking money venture, or scores of other things. The vast array of knowledge and expectations that players bring to the machines ensures that the "value" of gambling differs greatly from player to player, with some people playing for "entertainment value" or for any number of other reasons as much as to win. Consequently, we conclude that classwide circumstantial evidence would not suffice to prove causation in this case.

*Id*. at 668. This order declines Cricket's invitation to treat cellular service plans and phones like gambling. Though consumers vary in their reasons for buying phones and plans, most reasonable consumers don't pay more for nothing if given options. Here, Cricket withheld options from customers by obfuscating the true availability of 4G in most markets. This hindered customers' ability to make informed choices about their purchases and, as a result, Cricket could charge more for phones and plans than the price warranted by the value of their offerings.

Cricket points out that plaintiffs' mail and wire fraud claims require an "affirmative representations." While "[m]ail and wire fraud can be premised on either a non-disclosure or an affirmative misrepresentation," non-disclosure "can support a fraud charge only when there exists an independent duty that has been breached by the person so charged." *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015) (citations and quotations omitted). "Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a RICO fraudulent scheme." *Ibid*. But affirmative misrepresentations abound in our case: plaintiffs offer numerous advertisements and marketing materials touting 4G phones and plans, testimony from Freitas and Postpichal establish that the presence of Cricket's 4G

13

advertisements in their non-4G home markets, consumer complaints suggest that Cricket representatives and advertisements led customers to believe they would receive 4G outside Cricket's 4G footprint, and internal communications reiterate that Cricket intended to push 4G messaging nationwide regardless of coverage-related complaints. And, omissions are actionable where they were necessary to make the half-truths accurate.

Cricket also argues that this order should follow *In re Countrywide* to deny class certification on the grounds that plaintiffs' scheme must be "supported by evidence of standardized or uniform fraudulent conduct." *In re Countrywide*, 277 F.R.D. 586, 601 (S.D. Cal. 2011) (Judge Sabraw). The facts there were different. There, plaintiffs alleged that defendant mortgage lender intentionally steered consumers toward toxic terms and subprime loans through misleading sales tactics. *Id.* at 590. The "nationwide scheme [was] not sufficiently supported by evidence of standardized or uniform fraudulent conduct," in large part, because Countrywide had four divisions, each of which had a distinct loan origination process. Certain divisions had no contract with customers, while others worked through separate borrower groups and independent brokers. *Id.* at 601. A large number of class members interacted with Countrywide representatives that did not rely on scripts or standardized marketing. *Ibid.*

Here, all Cricket-affiliated stores relied on Cricket's 4G-related advertising materials, as Cricket had a top-down approach to marketing that ensured consistency from store to store. Various Cricket stores had far more uniformity in their sales and marketing than did the divisions considered in *In re Countrywide*. That Cricket owned some stores but not others did not change the general top-down process used to market 4G phones and plans. Customers came to the same understanding about Cricket's 4G service in the same way based on substantially similar marketing materials.

In fact, most evidence will be classwide proof by both sides. Even defendant's principal proof is the classwide theory that no classwide scheme existed — *i.e.*, that Cricket's executives did not craft a nationwide deceptive marketing campaign, that class members in non-4G markets were not exposed to misleading messages, that class members had access to coverage maps, etc. Similarly, plaintiff relies on the top-down nature of Cricket's marketing process, consistent

14

advertising across 4G and non-4G markets, the assertion that Cricket used its nationwide roaming plan to give the impression of a broader 4G LTE footprint, pre-programming on class members' phones, etc.

Cricket also contests plaintiffs' ability to prove classwide damages in a way that tracks their theory of liability, as required by *Comcast Corp. v. Behrend*. 569 U.S. 27, 37 (2013). Plaintiffs' overcharging theory, however, provides at least one clear route to classwide damages: namely, the amount that Cricket overcharged customers based on the actual value of the plans and phones. Though individual class members' damages may entail some variation based on the type of phone and plan purchased, these amounts can be discerned from Cricket's internal records and comparisons to non-4G phones and plans. Though plaintiffs offer two experts to provide methods of damages calculation based on the overcharging theory, this order relies upon common sense (not the expert reports) in finding that a feasible classwide methods of damages calculation exists in our case.

### 4. TYPICALITY

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." This ensures that "the interest of the named representative aligns with the interests of the class." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016). Typical claims are those that "are reasonably coextensive with those of absent class members but "they need not be substantially identical." *Ibid.* "[T]ypicality refers to the nature of the claim or defense and not to the specific facts from which it arose or the relief sought." *Ibid.* "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ibid.* Put another way, "[t]ypicality is present when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *In re Qualcomm*, 328 F.R.D. at 295 (citations and quotations omitted).

Here, plaintiff Freitas (the last viable class representative) does present claims typical of the class. She lived outside Cricket's 4G footprint and bought a 4G phone and plan in order to

15

get faster service that she never received. Even if her situation presents some differences from some other class members — for instance, receiving a low-income rebate or viewing a coverage map — Freitas shares the same theory of liability with other proposed class members who purchased a 4G phone and 4G plan that did not deliver 4G. Cricket's conduct stands in the same relation to Freitas as it does to all other class members who could have paid for less expensive plans or gone with other carriers but-for Cricket's misleading marketing around 4G coverage.

Beside raising arbitration as a barrier to typicality (discussed below), Cricket contends that Freitas and Postpichal's circumstances create unique defenses. Because Postpichal has been found inadequate, we need only consider Freitas. She states that she looked at a coverage map, but that an employee told Freitas that she would receive 4G. Cricket argues that its entitlement to test the veracity of these assertions requires focusing on specific circumstances (Opp. at 22). But plaintiffs' RICO claim does not necessarily require delving into the conversations that class members had with Cricket representatives because plaintiff's RICO claim can be based on the Cricket's intent to carry out the alleged 4G marketing scheme. In the absence of a first-party reliance requirement and based on plaintiffs' overcharging theory, employee-customer conversations do not foreclose plaintiff's RICO theory.

### 5. SUPERIORITY

Even if common questions predominate, a Rule 23(b)(3) class must also be the superior method of adjudication, considering:

> A. the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> B. the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> C. the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> D. the likely difficulties in managing a class action.

These factors weigh in favor of certifying the class.

*First*, a class action provides a superior route to resolution in our case because the claims of individuals would be relatively small, likely in the range of hundreds of dollars. This makes it

highly unlikely that individual litigants would pursue damages. Preserving the option for widespread individual cases does little good where individual damages would not motivate individuals to bring their own claims.

*Second*, while there has been prior litigation around Cricket's 4G in non-4G markets scheme, those cases are no longer pending. Neither party suggests those prior cases have either foreclosed or resolved the claims here at issue.

*Third*, concentrating the litigation in the state of Cricket's headquarters also makes sense logistically because certain key witnesses, such as Cricket executives and employees, likely live in-state. No other state provides a more obvious hub for this litigation.

*Fourth*, the rights of class members can be vindicated as a group and nothing here suggests that individual class members would have vastly different or conflicting claims based on our facts. Though some variability presents itself, *i.e.* in the amount of damages incurred by each class member, these minor inconsistencies do not pose enough difficulty to warrant forcing individuals to pursue independent claims.

### 6. ARBITRATION

Cricket lays out four means by which class members could have been bound to arbitrate:

- Up until May 2014, Cricket provided customers a Quick Start guide inside phone boxes that included an arbitration provision (Moses Decl. ¶¶ 6–7, 9). Cricket argues that the fact that certain customers opted out of the arbitration clause after reading it creates an issue of fact as to which class members read the Quick Start guide and agreed to the arbitration provision by not opting out (Moses Decl. ¶ 10).

- After May 2014, Cricket began putting its arbitration provision in a "Terms and Conditions" booklet inside the phone box (Decl. of R. Mahn ¶¶ 6–8).

- On or around May 22, 2014, Cricket sent 3.4 million customers text messages warning about Cricket's arbitration agreement. The messages included a link to Cricket's Terms and Conditions, which had a retroactive effect (Decl. Blandino ¶¶ 4–13).

- Customers who activated a new line of service or returned to Cricket after May 2017 executed an electronic signature to accept Cricket's terms of service, including an arbitration clause (Moses Decl. ¶¶ 11–12).

17

1          Cricket suggests that arbitration provides a superior method of resolving this dispute
2   because "every class member has the option to engage in cost-free arbitration" as "they may use
3   AT&T's arbitration clause."  Many class members may, however, never have been bound to
4   arbitrate nor desired to (Opp. at 24).  Class members may have stopped using Cricket's services
5   after learning about the arbitration agreement or may have chosen to opt out.  Cricket also argues
6   that because many absent class members must arbitrate their claims, this poses a barrier to
7   typicality (Opp. at 21).

          This order finds that the various arbitration agreements here do not defeat typicality or
superiority.  Our case presents common classwide issues as to whether booklets in phone boxes
constituted a legally effective means of imposing an arbitration agreement on class members, a
finding that cuts against Cricket's typicality argument.  Determination may require state-by-state
consideration, but the Court will try to group sub-issues.

          Consumers who agreed to arbitrate based on later iterations of Cricket's disclosure of
arbitrations clause warrant carve outs from the class.  Significantly, this order finds convincing
that the vast majority of those with accounts on or after May 22, 2014, will be bound to arbitrate
claims, including those arising even earlier in the class period.  Therefore, no one who had an
account after May 22, 2014, may participate in the class.  The same reasoning applies to later
revisions to the arbitration provision in 2017.  Those who fell within the class period but were
customers in 2017 and electronically signed terms and conditions containing an arbitration
clause must arbitrate.  This order adjusts the class definition to reflect this ruling.

          **7.    MOTION TO EXCLUDE EXPERTS MALLINSON AND BROWNE**

          This order declines to consider the challenges to plaintiffs' experts Browne and Mallinson
because their reports are not needed to decide the class certification issue.  This order **DENIES AS
MOOT** defendant's motion to exclude Mallinson and Browne.  The admissibility of final expert
reports may be reraised at a later stage.

## CONCLUSION

          This order **CERTIFIES A NATIONWIDE CLASS** but modifies the proposed class definition to
account for customers that must be excluded based on Cricket's arbitration agreements.

The nationwide class is composed of:

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE monthly plan for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network.

The class excludes:

> (1) any Cricket customer who continued to use Cricket receiving the May 22, 2014 text message notification regarding Cricket's arbitration clause;
>
> (2) any Cricket customer who agreed to Cricket's arbitration provision via electronic signature after May 2017;
>
> (3) Any class member that defendant proves is subject to an arbitration agreement.
>
> (4) the defendant and its officers, directors, managers, employees, subsidiaries, and affiliates;
>
> (5) any person with a customer address outside of Cricket's network footprint but in a market with Sprint LTE coverage;
>
> (6) governmental entities; and
>
> (7) the judge(s) to whom this case is assigned and any immediate family members thereof.

Within **14 CALENDAR DAYS**, counsel shall submit a proposed form of notice and a proposed plan of distribution that includes first class mail.

**IT IS SO ORDERED.**

Dated: August 4, 2021

　　　　　　　　　　　　　　　　　　／s／
　　　　　　　　　　　　　　　　　　WILLIAM ALSUP
　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

19