1  Tyler W. Hudson (*pro hac vice*)
   Eric D. Barton (*pro hac vice*)
2  Melody R. Dickson (*pro hac vice*)
   Austin Brane (State Bar No. 286227)
3  **WAGSTAFF & CARTMELL LLP**
   4740 Grand Ave., Suite 300
4  Kansas City, MO 64112
   (816) 701-1100
5  *thudson@wcllp.com*
   *ebarton @wcllp.com*
6  *mdickson@wcllp.com*
   *abrane@wcllp.com*
7

   Matthew W.H. Wessler (*pro hac vice*)
   Jonathan E. Taylor (*pro hac vice*)
   **GUPTA WESSLER PLLC**
   2001 K Street NW, Suite 850 North
   Washington, DC 20006
   (202) 888-1741
   *matt@guptawessler.com*
   *jon@guptawessler.com*

   Jennifer Bennett (State Bar No. 296726)
   Neil K. Sawhney (State Bar No. 300130)
   **GUPTA WESSLER PLLC**
   100 Pine Street, Suite 1250
   San Francisco, CA 94111
   (415) 573-0336
   *jennifer@guptawessler.com*
   *neil@guptawessler.com*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAMIE POSTPICHAL, *individually*, and URSULA FREITAS, *on behalf of herself and others similarly situated*, <br><br> *Plaintiffs*, <br> v. <br><br> CRICKET WIRELESS, LLC, <br><br> *Defendant*. | Case No. 3:19-cv-07270-WHA <br><br> Hon. William Alsup <br><br> Date: October 7, 2021 <br> Time: 8:00 a.m. <br> Courtroom: 12, 19th floor |

**OPPOSITION TO DEFENDANT CRICKET WIRELESS, LLC'S MOTION TO EXCLUDE REPORTS AND OPINIONS OF PLAINTIFFS' EXPERTS KEITH MALLINSON AND STEVE BROWNE**

# TABLE OF CONTENTS

Table of authorities ................................................................................................................................ ii

Introduction ............................................................................................................................................ 1

Argument ................................................................................................................................................ 3

    I.    None of Cricket's objections to the experts' classwide damages conclusions provides any basis for excluding their testimony from the jury. ................................. 3

        A.    The experts' testimony is relevant, reliable, and fully consistent with both their previous testimony and the plaintiffs' liability theory. ........................................................................................................................... 3

        B.    Cricket's objections to the experts' classwide damages conclusions go to the weight of the experts' testimony, not to their admissibility. ............ 8

    II.    Cricket's remaining arguments are meritless. ............................................................. 12

Conclusion ........................................................................................................................................... 14

i

Opposition to Defendant Cricket Wireless, LLC's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne (Case No. 3:19-cv-07270-WHA)

**TABLE OF AUTHORITIES**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
    738 F.3d 960 (9th Cir. 2013) ................................................................................... 2, 3, 9

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
    — F. Supp. 3d —, 2021 WL 1792394 (N.D.N.Y. 2021) ...................................... 2, 10

*BCS Services, Inc. v. BG Investments, Inc.*,
    728 F.3d 633 (7th Cir. 2013) ........................................................................................ 11

*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946) ...................................................................................................... 11

*Brazil v. Dole Packaged Foods*
    2014 WL 5794873 (N.D. Cal.2014) .............................................................................. 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ........................................................................................................ 3

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) ................................................................................. 10

*In re Glumetza Antitrust Litigation*,
    2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) ............................................................. 3

*In re Glumetza Antitrust Litigation*,
    336 F.R.D. 468  (N.D. Cal. 2020) ........................................................................ 11, 13

*In re POM Wonderful LLC*,
    2014 WL 1225184 (C.D. Cal. 2014) ............................................................................. 8

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ...................................................................................................... 11

*Manpower, Inc. v. Insurance Co. of Pennsylvania*,
    732 F.3d 796 (7th Cir. 2013) ......................................................................................... 9

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) ......................................................................................... 3

*United States v. Sandoval–Mendoza*,
    472 F.3d 645 (9th Cir. 2006) ......................................................................................... 3

**Rules**

Fed. R. Evid. 702 ..................................................................................................................... 3

ii
Opposition to Defendant Cricket Wireless, LLC's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne (Case No. 3:19-cv-07270-WHA)

**INTRODUCTION**

This is a certified class action of "customers who paid premium prices for 4G phones and plans in markets that had no 4G service." ECF No. 298, at 1. As this Court explained in certifying the class, 4G/LTE "ranked as the newest development in the cellular services industry" from 2012 to 2014, and "[c]ellular service providers other than Cricket Wireless, LLC, quickly developed their 4G capabilities to meet the rising demand for faster cellular and data services." *Id.* at 1–2. Cricket, however, had no 4G/LTE coverage in the vast majority of its network during this period—and no ability to add any. Yet it knew that it "needed 4G to stay current." *Id.* at 2. At risk of being left behind, and aware that consumers were willing to pay a premium of up to $200 (or more) for a 4G-compatible phone, Cricket turned to fraud. It embarked on a scheme to sell expensive 4G/LTE-compatible phones and data plans to hundreds of thousands of consumers in geographic markets where Cricket had no intention of providing any 4G/LTE service. *Id.* Cricket referred to this scheme internally as "4G in non 4G," and carried it out through a "companywide directive" to market "4G even in non-4G markets," and by "program[ing] 4G phones bought in non-4G markets to prevent customers from using available . . . 4G service" from a partner carrier. *Id.* at 3–4 (brackets omitted).

The certified class consists of the victims of this scheme—the consumers who purchased both a 4G/LTE phone and plan without receiving 4G/LTE service in return. In certifying that class and authorizing it to prosecute a RICO claim, this Court recognized that the plaintiffs can "prove classwide damages in a way that tracks their theory of liability" because all class members paid for something that they did not receive. *Id.* at 15. This "overcharging theory," the Court explained, "provides at least one clear route to classwide damages: namely, the amount that Cricket overcharged customers based on the actual value of the plans and phones." *Id.* "Though individual class members' damages may entail some variation based on the type of phone and plan purchased, these amounts can be discerned from Cricket's internal records and comparisons to non-4G phones and plans." *Id.*

The plaintiffs' experts have done just that. Drawing on his extensive experience in the telecommunications industry, Keith Mallinson has carefully selected the most comparable model 3G phones and plans to serve as benchmarks. By comparing the prices of Cricket's 4G/LTE phones and plans to the prices of those benchmarks, Mallinson determined the portion of the price paid by class members that was likely attributable to 4G/LTE—producing a fair approximation of the value of what each class member paid for but did not receive. Steve Browne then took those amounts and calculated the classwide damages based on the phones and plans that class members purchased.

Cricket now moves to exclude their testimony in its entirety. Cricket does not appear to take issue with their methodology of calculating a price premium using benchmark comparisons. Cricket's argument, rather, is that Mallinson has estimated only a "price *difference*" between 4G/LTE phones and plans and their benchmarks, and not a "price *premium*." Mot. 3. But Mallinson explained why, in his professional opinion, the price difference between a 4G phone and the relevant 3G benchmark *is* the price premium: because none of the minor additional differences has any significant value without 4G/LTE. He also explained why, in his opinion, a non-4G/LTE plan offered by Cricket's rivals at the time offers the best evidence of the market value of such a plan (and of what Cricket would have offered had it no committed fraud). The record evidence, moreover, amply supports these opinions.

Cricket's disagreements "all go to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 970 (9th Cir. 2013).; *see AngioDynamics, Inc. v. C.R. Bard, Inc.*, — F. Supp. 3d —, 2021 WL 1792394, *47 (N.D.N.Y. 2021) ("[A]rguments regarding the comparability or appropriateness of a particular benchmark go to the weight, not the admissibility, of a benchmarking analysis."). But they are also wrong even on their own terms. Although Cricket's misconduct has made absolute precision and certainty impossible, Mallinson and Browne have provided a fair and reasonable approximation of the damages. Their testimony is relevant and reliable, and there is no basis for preventing the jury from hearing it.

## ARGUMENT

### I. None of Cricket's objections to the experts' classwide damages conclusions provides any basis for excluding their testimony from the jury.

In determining the admissibility of expert testimony, the district court assumes the role of "a gatekeeper, not a fact finder." *United States v. Sandoval–Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). The "court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car*, 738 F.3d at 969–70.

Two questions guide the inquiry. The court must make sure "that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)); *see* Fed. R. Evid. 702. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.

As this Court has observed, "while the proponent of expert testimony bears the burden of demonstrating its admissibility, the *Daubert* inquiry should be applied with a liberal thrust favoring admission." *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, *2 (N.D. Cal. Aug. 25, 2021) (Alsup, J.). This is in keeping with the court's limited role: "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Primiano*, 598 F.3d at 565.

### A. The experts' testimony is relevant, reliable, and fully consistent with both their previous testimony and the plaintiffs' liability theory.

Under this framework, there is no basis for excluding the plaintiffs' expert testimony. Keith Mallinson is a highly qualified expert whose testimony is both relevant and reliable. As we explained in opposing Cricket's motion to exclude his testimony at the class-certification stage, Mallinson "has been an industry expert in the field of telecommunications for over 25 years," and has long been "recognized as a leader in the industry," particularly with respect to the subject matter of this case—

"next generation mobile broadband network technology adoption." ECF No. 216, at 6–7. Based on his extensive expertise and examination of the record, Mallinson has offered his opinions that:

- "4G/LTE was [a] revolutionary" technological development that "unlocked the potential of mobile applications by connecting consumers to the internet at much faster data speeds, allowing them to play videos, stream music, and access all kinds of other content through their smartphones";
- as a result of this technological revolution, "wireless carriers were able to, and did, charge a substantial premium during the class period for 4G-LTE capable smartphones" and "monthly service plans that provided 4G/LTE service, which could be paired with the smartphones to provide the full potential of the major 4G/LTE technological innovation";
- "Cricket's 4G/LTE network on average provided data speeds of as much as eight-times faster than Cricket's 3G network";
- "Cricket had no economically viable plan to ever provide 4G/LTE service in what it internally described as its non-4G markets";
- "Cricket priced its 4G/LTE-capable smartphones and plans for 4G/LTE service the same in all its markets, even though it did not ever provide any 4G/LTE to its non-4G/LTE markets";
- "Cricket priced its 4G/LTE-capable smartphones and plans for 4G/LTE service comparable to other wireless carriers, even though Cricket was not spending the hundreds of millions of dollars necessary to evolve to 4G/LTE or to provide 4G/LTE to customers located in its non-4G/LTE markets";
- "Cricket's conduct during the 4G/LTE evolution deviated from all of its competitors";
- "any wireless carrier that disclosed that it was not spending hundreds of millions of dollars to evolve to a 4G/LTE network or buy 4G/LTE service would not have been able to sell 4G/LTE-capable smartphones or plans for 4G/LTE service at a price comparable to the other wireless carriers that were collectively spending billions to evolve to 4G/LTE";

- class members likely "did not ever obtain any material amount of 4G/LTE service"; and

- "all members of the class were overcharged by Cricket for a 4G/LTE smartphone because they paid a premium for 4G/LTE-capability and a plan for 4G/LTE service that was not provided"—and instead "received a hobbled device with a reduced value because it was locked to Legacy Cricket's network and had no ability to obtain the 4G/LTE service needed to provide the value the customer paid for."

ECF No. 311-2, Ex. C ("Mallinson Merits Report"), at 5–8.

Cricket does not contend that any of this testimony—or the many dozens of pages of analysis and opinions supporting it—is irrelevant or unreliable. Nor could it: These opinions are not only relevant, but are also amply supported by the record evidence. A jury would undoubtedly be aided by hearing this testimony in deciding whether Cricket engaged in a RICO scheme to defraud the class, and whether that scheme caused injury to class members.

Instead, Cricket seeks to exclude Mallinson's testimony—and by extension, the testimony of damages expert Steve Browne—based on their assessment of the best measure of the damages that were caused by Cricket's fraud. Cricket argues that "neither Mallinson nor Browne isolated the price premium caused by Cricket's alleged wrongdoing, as they originally said they would do" at the class-certification stage, which makes their testimony unreliable and inconsistent with the plaintiffs' liability theory. Mot. 16. But Mallinson did exactly what he said he would do: He used benchmarks to isolate the price premium that was "attributable to 4G/LTE-capability" for both 4G/LTE phones and 4G/LTE plans, so there is no inconsistency between his testimony and the plaintiffs' liability theory.

As for the 4G/LTE phones: Mallinson opined that a "reliable way to determine the value premium in 4G/LTE smartphones and thus [the] overcharge damages is to compare various the 4G/LTE smartphones purchased by Class Members with equivalent 3G smartphones." Mallinson Merits Report 90. He "then determin[ed] how much of the difference was attributable to 4G/LTE capability," Mot. 8, as he said he would do in his class-certification report, and concluded that the entire difference was attributable to 4G/LTE. That is because, "[i]n [his] opinion, a 4G/LTE-capable smartphone is severely disadvantaged over a 3G smartphone unless it is paired with 4G/LTE

service," and there are even "advantages to a 3G-only smartphone if the user does not have access to 4G/LTE service," so a "4G/LTE capable device without 4G/LTE service offered no material benefit to a consumer over 3G-only smartphones." Mallinson Merits Report 8. He elaborated on this point in his expert report, deposition testimony, and rebuttal report, carefully laying out his "core opinion" that "the interconnectedness of smartphones means that the value of the phone's functions and features are substantially diminished without 4G/LTE connectivity data speeds." ECF No. 311-3, Ex. D ("Mallinson Rebuttal Report"), at 33. He explained that, in his opinion, it is "not possible to isolate the value of features such as displays and batteries from the value of cellular connectivity including 4G/LTE . . . because those features are so heavily dependent upon the cellular connectivity in a cellphone." *Id.*; *see also* Dickson Dec., Ex. A at 3–5 ("[Y]ou cannot simply isolate these different features and ascribe distinct separate value[s to] them."); Mallinson Merits Report 8–9 (opining that, without 4G/LTE, "the technological innovations and benefit[s] were negligible"). He based this opinion on his extensive experience in the industry and noted that it cohered with the views of other industry experts, including "an article cited by Cricket's testifying expert witness," which concluded: "If you live in an area that doesn't have 4G coverage, there's no advantage to a 4G phone. In fact, you'll have serious battery life problems if you buy an LTE phone and don't disable 4G LTE, as the radio's search for a non-existent signal will drain your battery quickly." Mallinson Merits Report 88. Mallinson further explained that, "[i]n addition to higher rates of battery depletion, other drawbacks with 4G/LTE versus 3G smartphones during the class period were the resulting need for larger batteries and form factors (i.e. size/volume), resulting in undesirable additional weight." *Id.* at 89.

For these reasons, Mallinson concluded that "a comparison between 4G/LTE smartphone prices and a comparable 3G-only smartphone benchmark prices provide a reasonable estimation of the overcharge damages suffered by the members of the class on their smartphone purchases," and that "[t]he 4G premium can be derived from this comparison, which provides a rough approximation of the value paid for but not received." *Id.* at 9; *see also id.* at 90. Mallinson then went through each 4G/LTE smartphone purchased by class members during the class period and, where applicable, identified an appropriate 3G benchmark. *Id.* at 90–92. And where he determined that no comparable

3G benchmark was available, as was the case for two smartphones, Mallinson, "in consultation with Mr. Browne," extrapolated from the premiums for the phones with comparable benchmarks "to calculate the weighted average overcharge percentage that is apparent from the available data"—a price premium of 36%, which represents the value paid (but not received) for 4G/LTE service. *Id.* at 92. Browne then applied that percentage to two different data sets to arrive at an overcharge range.

As for the 4G/LTE plans: Mallinson explained that "[t]he economic harm and overcharge damages suffered by these customers who paid for 4G/LTE but obtained no 4G/LTE service can be determined by isolating the market value of 4G/LTE at th[e] time." *Id.* at 98. "One benchmark that exists for approximating that value," he opined, "is comparing Cricket's $50, $60, and $70 plans offering 2.5 GB, 5 GB and 10 GB of data per month, respectively, to plans offered by other carriers providing much smaller allocations of 4G/LTE data at that time." *Id.* He then looked to "comparable rate plans" offered by "other pre-paid carriers in the market at the time," and concluded that those plans provide the best approximation of what Cricket would have needed to offer customers in non-4G markets had it not engaged in fraud. *Id.* Those plans were $40 per month, and even provided a small amount of 4G/LTE service (up to 1 GB, which is more 4G/LTE service than class members in this case received). *Id.* Mallinson bolstered his opinion by pointing to evidence showing that "Cricket internally discussed the possibility of also introducing a similar a $40 smart phone plan with 500MB of 4G/LTE speed data," but chose to commit fraud instead. *Id.* at 100–01. Mallinson thus concluded that, "[b]ut for Cricket's fraud scheme, in my opinion, Cricket would have been able to charge customers no more than $40 per month for plans that were not going to provide any 4G/LTE service in the customer's home market." *Id.* at 104. Using this $40 plan "as a conservative benchmark," he found that "an estimate of the 4G/LTE premium and the overcharge damages suffered by each customer in the class, starting September 15, 2013, is either $10, $20 or $30 per month, depending on the plan that class member purchased" ($50, $60, or $70). *Id.* at 103.

In reaching these conclusions, Mallinson did not in any way "change[] his analysis." Mot. 9. Neither of his premium calculations is the least bit inconsistent with his earlier report or with the plaintiffs' liability theory. To the contrary, Mallinson isolated the amount of the premium that, in his

opinion, is attributable to 4G/LTE connectivity, and hence to Cricket's RICO scheme. Dickson Dec., Ex. A at 11 ("Q. ·[S]o you believe and would testify to the fact that your report isolates the price premium attributable to the RICO violations; is that correct? A. It[] isolates the price premium both for devices and for—for plans that then support the claims, the RICO claims of harm and damages, yes."). And Browne then calculated classwide damages based on Mallinson's assessment of the relevant premiums, which is likewise consistent with the plaintiffs' liability theory.[1]

### B. Cricket's objections to the experts' classwide damages conclusions go to the weight of the experts' testimony, not to their admissibility.

Cricket's real complaint isn't with Mallinson's method of calculating the 4G/LTE premium using benchmark comparisons, but with his selection of the best benchmarks and his opinions about the relative value of other smartphone features independent of 4G/LTE connectivity. Specifically, Cricket argues that the 4G/LTE premium for phones should be smaller (it doesn't say by how much) to account for other features that Cricket believes had independent value even on an antiquated 3G network that could not support video streaming or high-speed downloads. And Cricket argues that the premium for plans should likewise be smaller because Cricket takes a different view of "[t]he most analogous service plan that Mallinson should have selected as a benchmark." Mot. 17.

---

[1] Because the plaintiffs' expert reports are fully consistent with their liability theory, there is no basis to Cricket's oblique suggestion that this Court decertify the class. *See* Mot. 21–24. The expert testimony in *Brazil v. Dole Packaged Foods, LLC,* for example, involved a regression model that sought to isolate the value of the claim "All Natural Fruit" on food labeling, and yet compared the product with other products without even knowing whether they made the same claim, and without making any attempt to determine whether other variables—including other labeling claims—could have affected the price. 2014 WL 5794873, *11–*13 (N.D. Cal.2014); *see also In re POM Wonderful LLC*, 2014 WL 1225184 (C.D. Cal. 2014) (finding that the plaintiffs's expert "made no attempt, let alone an attempt based upon a sound methodology, to explain how Defendant's alleged misrepresentations caused any amount of damages" or to "answer the critical question why [a] price difference existed" between the price for a high-end pomegrante juice and some "average of refrigerated orange, grape, apple, and grapefruit juice prices," and thus that the report could not support class certification in a case brought under the CLRA, which—unlike RICO—requires individualized reliance). Here, by contrast, none of the benchmark phones or plans identified by Mallinson provided any 4G/LTE connectivity, and Mallinson explained why, in his view, none of the minor differences in phone features between a particular 4G/LTE phone and the relevant 3G benchmark would have affected the price independent of 4G/LTE connectivity. Further, he concluded that, if a jury were to find that Cricket engaged in a scheme to defraud class members, the entire class suffered economic injury as a result given the tremendous market value that 4G/LTE connectivity had at the time.

These arguments, however, "all go to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car*, 738 F.3d at 970; *see, e.g.*, *AngioDynamics*, 2021 WL 1792394, at *47 ("[T]he general rule is that arguments regarding the comparability or appropriateness of a particular benchmark go to the weight, not the admissibility, of a benchmarking analysis." (citing cases)). They are objections to Mallinson's *conclusions*, which are to be made to the jury. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury."). And contrary to Cricket's unsupported assertion (at 16), there is nothing "obviously wrong" about his conclusions, either as to phone damages or plan damages.

Mallinson's determination that "a comparison between 4G/LTE smartphone prices and a comparable 3G-only smartphone benchmark prices provide[s] a reasonable estimation" of the amount of the "4G premium" is a perfectly sensible conclusion given the integral importance of 4G/LTE connectivity. Mallinson Merits Report 9. As Mallinson explained, Cricket's own expert relied on an article that reached the same conclusion, which is further supported by a "comparison between the pricing and demand for Apple's iPod Touch (with WiFi but no cellular) and Apple's iPhone 5C (with WiFi and 4G/LTE)"—a $251 difference as of May 2015. Mallinson Rebuttal Report 22–23. Mallinson's conclusion is also well in line with what Cricket's own internal communications revealed—that many consumers were "willing to pay between $100 to $200 more for an 4G enabled Smartphone." ECF No. 177-13, at 2 (discussing Nielsen's 4G Consumer Insights Report). And his conclusion makes sense: Smartphone manufacturers designed 4G/LTE phones to be used on 4G/LTE networks, and the phones offered little benefit to consumers absent such service. A slightly bigger screen or battery, for example, has value to consumers if the device can connect to the internet at high speeds and be used for streaming videos, loading webpages, and displaying other content for which high-speed connectivity is necessary. But take that connectivity away, and there is little value (even *negative* value) in having a device that is bulkier in the pocket, and that burns through battery life faster, without any ability to receive the very thing for which those features were designed.[2]

---

[2] It is for this reason that Cricket is mistaken in relying (at 11) on a 2012 survey to show that

-9-

Nor is there anything "totally unrealistic" about Mallinson's selection of the benchmark plans. Mot. 21. He chose comparable plans from similar carriers as the relevant benchmark because those plans offer the best evidence of the market value of a 3G plan offered by a carrier that wasn't engaging in fraud. And Cricket itself considered adopting such a plan, but instead chose to maximize profits by offering more expensive 4G/LTE plans without providing any 4G/LTE service in return. There is nothing unreasonable about using this $40 plan as the benchmark that Cricket likely would have offered to stay competitive in a hypothetical world in which it did not engage in a scheme to defraud.

Of course, this does mean that Cricket *necessarily* would have done so. That is a question to which we can never know the answer. But "a benchmark need not be perfectly comparable, so long as it allows the jury to calculate a reasonable estimate of damages," and that "is particularly true where a Defendant's [unlawful] conduct has rendered selection of a perfectly comparable benchmark difficult or impossible." *AngioDynamics*, 2021 WL 1792394, at *47.; *see also Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118–19 (S.D.N.Y. 2015) (explaining that arguments about a benchmark's comparability go to the weight given to an expert's testimony, not its admissibility, particularly when the defendant's unlawful conduct made "the selection of perfectly comparable benchmark[s]. . . impossible").

Which leads to a broader point. Although Cricket tries to make something of Mallinson's statement that his calculations are only a "rough approximation" of the damages caused by its RICO scheme, Mot. 2, that is no reason to exclude his testimony. The impossibility of precision is *Cricket's* fault, not Mallinson's. "Plainly, we can't know exactly what would have happened in [a] but-for

---

consumers valued other features in their phones over 4G connectivity in isolation. This conclusion does not follow. As Mallinson explained, it "presupposes that these features operate independently of cellular connectivity including 4G/LTE," when "[t]hey do not." Mallinson Rebuttal Report 33. "While it might be possible conduct surveys on consumer preferences on a feature-by-feature basis, or attempt to derive implicit price increments per feature from the inherent bundling of features in a smartphone, these will tend to overstate the value of such features that are dependent upon the network technology." *Id.* In addition, the survey on which Cricket relies "was fielded in March 2012—eight months before the beginning of the Class Period"—and "[c]onsumer awareness about and desire for 4G and LTE was increasing rapidly over the entire period from March 2012 until October 2014, as illustrated by the exponential increase in 4G/LTE smartphone penetration and service subscriptions over that extended period." *Id.* at 12. And the same survey, in any event, makes clear that many consumers placed a significant premium of $100 to $200 on 4G capable phones.

world" in which Cricket complied with the law; Cricket "saw to that." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 479 (N.D. Cal. 2020) (Alsup, J.). "So this is a case in which defendants' misconduct prevented the plaintiffs from calculating damages accurately—and in such cases damages can be estimated by methods that would be deemed impermissibly speculative in other contexts." *BCS Servs., Inc. v. BG Inv., Inc.*, 728 F.3d 633, 639–40 (7th Cir. 2013). Indeed, as this Court has noted, "[t]he Supreme Court has repeatedly explained that courts should afford plaintiffs relatively broad leeway in constructing a damages model," because "'[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's [illegality].'" *In re Glumetza Antitrust Litig.*, 336 F.R.D. at 479 (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981), citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)); *see also BCS Servs.*, 728 F.3d at 640 ("[B]road latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification."). "Because the "element of speculation" is "unavoidable" in a case like this, "[e]ven speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer"—not the victims. *BCS Servs.*, 728 F.3d at 640 (quotation marks omitted).[3]

Cricket's criticism of Mallinson's data set suffers from a similar problem. In a footnote (at 9), Cricket accuses Mallinson and Browne of "cherry-picking the high-end of the [price] ranges" for 4G/LTE phones instead of using the "point-of-sale pricing data for 4G/LTE phones" that Cricket belatedly—and inexplicably—produced on the same day that Mallinson finalized his merits report.[4]

---

[3] By making *the victims* pay the price of any uncertainty—and even imposing on them a "duty to mitigate" damages from a *concealed* scheme to defraud them, despite their phones being locked to Cricket's network, Mot. 21—Cricket turns this principle entirely on its head.

[4] As explained in more detail in the evidentiary-sanctions briefing currently proceeding before Judge Tse, "Cricket repeatedly stated in discovery responses and court filings that it had destroyed the legacy custodial data and marketing materials, that its document production was 'complete,' and that it never even received point-of-sale pricing data." ECF No. 299, at 5. These representations were false. Cricket then suddenly changed course and produced point-of-sale pricing data on the day that the plaintiffs' expert reports were due. "Cricket has never explained how it happened to locate pricing data"—"after stating in its discovery responses, under penalty of perjury, that it never had that data." *Id.* at 4 (citing ECF No. 288-7, at 3). "Nor has it squared this late discovery with the testimony of one of its managers, Gary Braxton, who knew about the pricing data all along but refused to produce it because he thought it wasn't 'complete.' *Id.* (quoting ECF No. 285-2, ¶¶ 25–26).

But the prices that Mallinson used are the best available evidence. They are based on Cricket's internal market assessments, which were created contemporaneously by a third-party consultant, Brightstar, and used by Cricket to make its pricing decisions during the class period. *See* Mallinson Merits Report 92–94. The data set belatedly provided by Cricket, by contrast, is self-evidently unreliable. Among other things, it contains several hundred thousand zeros and multiple inconsistent data points to do not match up with other record evidence, and it applies only to a subset of the class. Further, Cricket's own corporate representative testified that he had "not seen any evidence that [4G/LTE devices] sold [for] less than the maximum price." ECF No. 177-16, at 94–95. So it is entirely permissible for Mallinson and Browne to have relied on this best-available data in setting the baseline prices under which the premiums (and hence damages) for the phones would be calculated.

## II.     Cricket's remaining arguments are meritless.

Cricket makes two other arguments for excluding the export reports. Neither is meritorious.

*First*, Cricket takes issue with the way that Mallinson calculated the plan damages for named plaintiff Ursula Freitas. It claims (at 24) that he "miscalculated the damages due to named plaintiff Freitas by awarding her damages for plan purchases allegedly incurred well after the date the class period closes," and by failing to account for "a monthly autopay discount of $5" and "other discounts" that she received. But Mallinson did not miscalculate her damages. For starters, Cricket is wrong to assert that the Freitas is entitled to damages only for the months covered by the class definition. That class period simply defines who is in the class; it does serve to limit the damages to which class members are entitled should they prevail on their claims. Rather, class damages are calculated based on the duration of the misconduct. The duration of the misconduct here extended past the class period because class members like Freitas continued to pay premium prices for 4G/LTE plans without receiving any 4G/LTE service in return. Mallinson therefore correctly calculated her damages based on 14 months, not 11. *See* Mallinson Merits Report 82.

Cricket also ignores the fact that Mallinson's calculation of Freitas's damages is based on a spreadsheet that Cricket itself produced and cited in response to the plaintiffs' discovery requests. ECF No. 203-3. Cricket's spreadsheet lists the payment amount under a $50 plan as $50. *Id.* Yet now Cricket says that the amount is actually less than that for customers who, like Freitas, received an autopay discount. But Mallinson squarely addressed this argument in his rebuttal: "Auto bill pay entitles the customers to a discount in exchange for giving up flexibility on payment. Cricket has provided no evidence that it offered auto bill pay on only its higher priced plans. Instead, Cricket offered this option for all customers who were willing to allow Cricket to automatically collect from them each month. Cricket has provided no evidence that these customers would not have also opted for auto bill pay in a world in which Cricket did not commit fraud." Mallinson Rebuttal Report 27. In short, the availability of small discounts for reasons unrelated to network coverage does not affect the analysis because there is no reason that they would not apply equally to a $40 benchmark plan.

Nor do Mallinson's calculations of Freitas's phone-based damages show any "absurd results." Mot. 17. Cricket says that "Freitas purchased a Samsung Galaxy Admire for $269.99," and then complains that Mallinson's model entitles her "to the use of what was then a cutting-edge 4G/LTE-capable Samsung SIII smartphone" for less than the $199 "Samsung Galaxy SII." As Cricket notes, however, Freitas had a Samsung Galaxy Admire, not a Samsung SIII, and she purchased that phone for less than half the price of a Samsung SIII (~$550). *See* ECF No. 311-2 (Browne Merits Report), at 10. Applying a 36% reduction to the amount charged for that phone results in a payment of over $350 for a phone that lacked 4G/LTE service—well above the $199 price for the Galaxy SII (which itself was much higher than many other 3G phones sold by Cricket). If anything, then, this shows the reasonableness of Mallinson's calculations. And at any rate (and once again), "[c]alculations need not be exact," particularly when it comes to a case like this one. *In re Glumetza*, 336 F.R.D. at 479.

*Second*, Cricket faults Mallinson for limiting his classwide plan damages to the period between September 2013 and September 2014. *See* Mot. 25. But Mallinson made a conservative estimate of the plan damages based on his review of the record and experience in the industry. He concluded that "the market data from September 2013 forward shows that a market value for 4G/LTE had solidified, and that carriers were consistently charging premiums for larger data allowances at 4G/LTE speeds." Mallinson Merits Report 103. "By September 2013, Cricket would have been the only network-based prepaid wireless service provider trying to sell service plans for smartphone users with service limited only to 3G," and the evidence shows that it was considering a $40 plan around this time. *Id.* at 101–04. Mallinson determined that the evidence of a premium for 4G/LTE plans was particularly strong from this point forward, and the benchmark was particularly well settled. He therefore calculated the plan damages to being at that point. *See* Mallinson Rebuttal Report 29 ("In response to Cricket's claim that 4G/LTE service was not widely available under other carriers' plans at the start of the class period in 2012, I took a conservative approach to calculating the aggregate damages by assigning no premium to customers' plan damages from November 2012 to September 15, 2013."). His decision to limit the plan damages in this way is conservative but defensible, and it does not in any way suggest that benchmark plans "had to be actually available (or at least known) to class members in order for them to have been harmed." Mot. 25. Individual class members don't have to show that they would have purchased a different product but for the fraud—only that they paid money for 4G/LTE service and yet didn't receive any. Nor does Mallinson's decision to limit the plan damages result in any uninjured class members. Mallinson Rebuttal Report 30. If accepted by a jury, it would just reduce the damages that Cricket would owe as a result of its RICO scheme.

## CONCLUSION

Cricket's motion to exclude the plaintiffs' expert reports should be denied.

1  Dated: September 16, 2021                             Respectfully submitted,

2                                                        */s/ Tyler W. Hudson*
                                                         Tyler W. Hudson
3

4  **GUPTA WESSLER PLLC**                                **WAGSTAFF & CARTMELL LLP**
   Matthew W.H. Wessler (*pro hac vice*)                 Tyler W. Hudson (*pro hac vice*)
5  Jonathan E. Taylor (*pro hac vice*)                   Eric D. Barton (*pro hac vice*)
   2001 K Street NW, Suite 850 North                     Melody R. Dickson (*pro hac vice*)
6  Washington, DC 20006                                  Austin Brane, SBN 286227
   (202) 888-1741                                        4740 Grand Ave., Suite 300
7  *matt@guptawessler.com*                               Kansas City, MO 64112
   *jon@guptawessler.com*                                (816) 701-1100
8                                                        *thudson@wcllp.com*
                                                         *ebarton @wcllp.com*
9  **GUPTA WESSLER PLLC**                                *mdickson@wcllp.com*
   Jennifer Bennett, SBN 296726                          *abrane@wcllp.com*
10 Neil K. Sawhney, SBN 300130
   100 Pine Street, Suite 1250
11 San Francisco, CA 94111
   (415) 573-0336
12 *jennifer@guptawessler.com*
   *neil@guptawessler.com*
13
   *Attorneys for Plaintiffs*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-15-
Opposition to Defendant Cricket Wireless, LLC's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne (Case No. 3:19-cv-07270-WHA)