Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane (State Bar No. 286227)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton @wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
**GUPTA WESSLER PLLC**
2001 K Street NW, Suite 850 N
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

Jennifer Bennett (State Bar No. 296726)
Neil K. Sawhney (State Bar No. 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| JAMIE POSTPICHAL, *individually*, and URSULA FREITAS, *on behalf of herself and others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> CRICKET WIRELESS, LLC, <br><br> Defendant. | Case No. 3:19-cv-07270-WHA <br><br> Hon. William H. Alsup <br><br> Date: October 7, 2021 <br> Time: 1:30pm <br> Courtroom: 12, 19th floor |

## OPPOSITION TO CRICKET'S MOTION FOR SUMMARY JUDGMENT

1

**TABLE OF CONTENTS**

2

Table of authorities.................................................................................................................ii

3

Introduction..............................................................................................................................1

4

Background...............................................................................................................................2

5

Argument..................................................................................................................................9

6

      I.      Cricket is not entitled to summary judgment on the existence of a RICO

7

              enterprise. .................................................................................................9

8

      II.     Cricket is not entitled to summary judgment on the issue of proximate

9

              causation. ...............................................................................................14

10

      III.    Cricket's renewed attempt to exclude the experts should be rejected. ....................18

11

      IV.   Cricket is not entitled to partial summary judgment on the damages claim

12

              for alleged wireless services overcharges..................................................19

13

Conclusion .............................................................................................................................21

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
    738 F.3d 960 (9th Cir. 2013) ................................................................. 18

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
    — F. Supp. 3d —, 2021 WL 1792394 (N.D.N.Y. 2021) ........................... 18

*Bias v. Wells Fargo & Co.*,
    942 F. Supp. 2d 915 (N.D. Cal. 2013) .................................................... 14

*Boyle v. United States*,
    556 U.S. 938 (2009) ......................................................... 9, 10, 12

*Bridge v. Phoenix Bond & Indemnity Co.*,
    553 U.S. 639 (2008) .................................................................... 18

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) .......................................................... 10, 11, 12

*Downey Surgical Clinic, Inc. v. Ingenix, Inc.*,
    2013 WL 12114069 (C.D. Cal. Mar. 12, 2013) ...................................... 14

*Fitzgerald v. Chrysler Corp.*,
    116 F.3d 225 (7th Cir. 1997) .................................................................. 12

*Friedman v. 24 Hour Fitness USA, Inc.*,
    580 F. Supp. 2d 985 (C.D. Cal. 2008) ........................................... 13, 14

*Hemi Group, LLC v. City of New York, New York*,
    559 U.S. 1 (2010) ................................................................... 18

*Humana Inc. v. Mallinckrodt ARD LLC*,
    2020 WL 3041309 (C.D. Cal. Mar. 9, 2020) ...................................... 14

*In re Chrysler–Dodge–Jeep Ecodiesel Marketing, Sales Practices, & Products Liability Litigation*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................. 16

*In re JUUL Labs, Inc., Marketing, Sales Practices, & Products Liability Litigation*,
    2020 WL 6271173 (N.D. Cal. Oct. 23, 2020) ........................................ 13

*In re National Western Life Insurance Deferred Annuities Litigation*,
    635 F. Supp. 2d 1170 (S.D. Cal. 2009) ................................................. 13

*In re Wells Fargo Insurance Marketing & Sales Practices Litigation*,
    2018 WL 4945541 (C.D. Cal. June 18, 2018) ...................................... 14

*In re: Takata Airbag Products Liability Litigation,*
    2015 WL 9987659 (S.D. Fla. Dec. 2, 2015)................................................................ 14

*Odom v. Microsoft Corp.,*
    486 F.3d 541 (9th Cir. 2007)................................................................... 9, 10, 12, 14

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.,*
    185 F.3d 957 (9th Cir. 1999)................................................................................. 16

*Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharmaceuticals Co.,*
    943 F.3d 1243 (9th Cir. 2019)........................................................................ 12, 17

*Sedima, S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985)........................................................................................... 9, 12

*Sever v. Alaska Pulp Corp.,*
    978 F.2d 1529 (9th Cir. 1992)................................................................................ 11

*Torres v. S.G.E. Management, LLC,*
    838 F.3d 629 (5th Cir. 2016)................................................................................. 18

*United States v. Benny,*
    786 F.2d 1410 (9th Cir. 1986)................................................................................ 11

*United States v. Christensen,*
    828 F.3d 763 (9th Cir. 2015)................................................................................. 10

*United States v. Feldman,*
    853 F.2d 648 (9th Cir. 1988)................................................................................. 13

*United States v. Turkette,*
    452 U.S. 576 (1981)............................................................................................. 10

*Young v. Wells Fargo & Co.,*
    671 F. Supp. 2d 1006 (S.D. Iowa 2009)................................................................ 14

**Statute**

18 U.S.C. § 1961(4) ........................................................................................................ 10

**INTRODUCTION**

This is a certified class action of "customers who paid premium prices for 4G phones and plans in markets that had no 4G service." Dkt. 298, at 1. As this Court explained in certifying the class, 4G/LTE "ranked as the newest development in the cellular services industry" from 2012 to 2014, and "[c]ellular service providers other than Cricket Wireless, LLC, quickly developed their 4G capabilities to meet the rising demand for faster cellular and data services." *Id.* at 1–2. Cricket, however, had no 4G/LTE coverage in the vast majority of its network during this period—and no ability to add any. Yet it knew that it "needed 4G to stay current." *Id.* at 2. At risk of being left behind, and aware that consumers were willing to pay a premium of up to $200 (or more) for a 4G-compatible phone, Cricket turned to fraud. It embarked on a scheme to sell expensive 4G/LTE-compatible phones and data plans to hundreds of thousands of consumers in markets where Cricket had no intention of providing any 4G/LTE service. *Id.* Cricket referred to this scheme internally as "4G in non 4G," and carried it out through a "companywide directive" to market "4G even in non-4G markets," and by "program[ing] 4G phones bought in non-4G markets to prevent customers from using available . . . 4G service" from a partner carrier. *Id.* at 3–4 (brackets omitted).

The certified class consists of the direct victims of this scheme—the consumers who purchased both a 4G/LTE phone and plan without receiving 4G/LTE service in return. As this Court has recognized, "internal communications and marketing presentations show[] that Cricket's executive and management level agents carried out the '4G in non-4G markets' plan" and "directed subsidiaries to uniformly implement the 4G marketing campaign (even over objections) and supplied in-store marketing materials." Dkt. 277 at 8. It also has explained that, as a result of the scheme, "all customers paid more than they should have because they purchased 4G phones and plans supposedly worth more than they actually were." Dkt. 298 at 11.

Cricket now attacks virtually every aspect of the plaintiffs' claim. It argues there is no evidence of a RICO enterprise; no evidence of proximate causation; and no evidence (if one ignores the experts) of injury or damages. It is wrong across the board. As we explain below, the record evidence is overwhelming and the law under RICO is clear. A jury should be entitled to decide, once and for all, whether Cricket engaged in a fraudulent price-premium scheme and whether, as a result of this

scheme, it defrauded its customers to the tune of more than $125 million. Cricket's motion for summary judgment should be denied.

## BACKGROUND

**The early 2010s: The 4G revolution.** Since it was first introduced over a decade ago, fourth-generation cellular-network technology has revolutionized the consumer wireless experience and helped make smartphones a ubiquitous feature of modern life. Dkt. 177-8 at 7–8. The advancements that 4G made on its predecessor technology (3G) were profound: By connecting consumers to the internet at much faster speeds, 4G technology, including 4G long-term evolution (or 4G/LTE), unleashed the alluring potential of mobile apps and broadband, allowing consumers to stream video and music and to instantly access all manner of other content while on the go. *Id.*

Because of the vastly superior consumer experience, demand for 4G connectivity surged when it hit the market in the early 2010s. This demand could be satisfied, however, only if wireless carriers had the necessary infrastructure in place—meaning, a network that could actually deliver high-speed 4G service. For that reason, many carriers had been working to build out their 4G/LTE networks in advance so that they could compete in the new market for high-speed phones and plans. Dkt. 174-1 at 2. By 2012, most carriers—including Verizon, AT&T, Sprint, and T-Mobile—had networks that could support 4G/LTE speeds (or close to it) and sold 4G/LTE phones and devices. Dkt. 177-8 at 53–55. The result was a fundamental shift away from slower, antiquated 3G networks, which could not support high-speed data, toward 4G/LTE networks and smartphones equipped with 4G/LTE technology. *Id.*

**Late 2012: At risk of being left behind, Cricket hatches a scheme aimed at "non-4G markets."** This shift to 4G/LTE posed an existential threat to Cricket. In 2011, it could see that "demand for data [was] exploding," setting off "a trend that [would] continue for the foreseeable future." Dkt. 177-9 at 2. Cricket thus understood that "LTE [was] critical to meeting [its] customers' appetite for more and more data services." *Id.* But because Cricket could not yet offer a 4G/LTE network by the middle of 2012, it could not yet sell 4G/LTE phones or plans to customers, and it

1   began "experienc[ing] net subscriber losses" as its products and services became outdated. Dkt. 177-

2   10 at 2.

3       Cricket recognized that it "c[ould]n't stay competitive" by selling a "3G network only," Dkt.

4   177-11 at 3—particularly one that was an "evolutionary dead end," as Cricket's network was. Dkt.

5   177-8 at 54. Without a 4G/LTE network to offer customers who were looking to buy 4G/LTE

6   phones and plans, Cricket would be left with even "fewer subscribers" and forced to lower its prices

7   to stay afloat. Dkt. 177-11 at 3; *see id.* at 14 ("If Cricket doesn't offer 4G service, it might not have the

8   ability to offer its customers the latest iconic devices."). The prospect of continuing to lose subscribers

9   was especially alarming to Cricket because it was positioning itself to be acquired by a larger carrier,

10  and a dwindling subscriber base would make it less attractive in the eyes of a potential buyer. Dkt.

11  177-15 at 10. Hence, the "status quo [was] not an option." Dkt. 177-11 at 4.

12      Cricket also knew that the rapidly "increasing[] demand [for] 4G service," Dkt. 177-10 at 2,

13  made 4G "LTE devices" and "LTE markets . . . known attributes" for which consumers were willing

14  to pay a premium. Dkt. 177-12 at 6. It was aware of studies showing that many consumers were

15  "willing to pay between $100 to $200 more for an 4G enabled Smartphone." Dkt. 177-13 at 2

16  (discussing Nielsen's 4G Consumer Insights Report). And Cricket itself had been testing consumers'

17  "willingness to pay more for 4G" plans as well as phones, proposing different ways to incorporate a

18  premium price for providing high-speed data service on a 4G/LTE network. Dkt. 177-14 at 55–56,

19  96. In short, Cricket knew where it needed to go: To charge premium amounts for 4G/LTE phones

20  and plans, and to avoid having to lower its prices, it needed a 4G/LTE network.

21      But Cricket also knew that it had no way to get there. By the fall of 2012, Cricket had been

22  unable to build any 4G/LTE network for the vast majority of its customers. Dkt. 177-37 at 8; Dkt.

23  174-1 at 2. Nor did it have any plans to provide them with one at any point in the future. What

24  Cricket had instead was a 4G/LTE network in fewer than a dozen cities—a fraction of its footprint

25  nationwide—and even that network, as its CEO would later admit, was not "a robust and competitive

26  LTE network." Dkt. 177-10 at 4–5. Nevertheless, "facing increasing pressure to provide LTE services

27  to its customers in order to meet expanding consumer demand for data speed," *id.*, Cricket decided

28

to launch its 4G/LTE network in November 2012 so that it could begin selling 4G/LTE phones and plans to consumers and (it hoped) start to reverse the decline in its subscriber base and avoid falling further behind. Dkt. 177-15 at 10; Dkt. 177-34 at 1; Dkt. 174-1 at 27.

Yet Cricket did not stop there. Although it has claimed in this litigation that it "always sold its 4G product in a 4G market," Dkt. 177-16 at 191, and "only market[ed] it in those areas that we had service," Dkt. 177-17 at 208, newly discovered evidence shows that this is not true. When Cricket launched its 4G/LTE network, it also made the decision to "message LTE aggressively" even in "non-4G markets," Dkt. 177-18 at 1—home to 65% of its subscribers, Dkt. 177-10 at 4—so that consumers in those markets would buy premium 4G/LTE smartphones and full-speed data plans. Dkt. 177-38 at 42; Dkt. 177-36 at 1; Dkt. 174-1 at 27. Cricket devised and carried out this scheme in collaboration with its authorized dealers, which were independently owned stores that contracted with Cricket to sell Cricket-brand products and services.

Overruling the concerns of its own employees, Cricket issued a "companywide directive to talk about LTE even in non-LTE markets and push LTE capable handsets." Dkt. 177-19 at 1; *see also* Dkt. 177-20 at 1 (Nov. 2012 email summarizing feedback: "Why does everything say 4G LTE when we don't have 4G LTE?"); Dkt. 177-19 at 2 ("[T]he new marketing materials . . . have 4g all over them. [T]hey do not say 4g capable."); Dkt. 174-1 at 27. Cricket created nationwide "brand guidelines," to ensure that the "4G-LTE logo" would "always be placed next to [a] 4G LTE-enabled device"—even those devices sold in non-4G/LTE markets—just as the logo would be used "to indicate 4G LTE coverage in a given market." Dkt. 177-21 at 10; Dkt. 174-1 at 29. For example:



Cricket also made the decision to lock its 4G/LTE phones to its network, engineering them so that they would work only with Cricket and not with other networks. Dkt. 177-8 at 13, 19–21.

This meant that purchasing a 4G/LTE phone would effectively bind a consumer to Cricket's coverage, even as Cricket touted its phones and plans as flexible "no contract" options. *Id.* Further, Cricket adopted this scheme even though it knew that its "typical smartphone customer [didn't] travel out of their home market very often," so the only geographic network that mattered to Cricket customers was their home market. Dkt. 177-22 at 1; Dkt. 174-1 at 18. And Cricket directed its scheme primarily at low-income consumers and people of color, especially Latinos, which Cricket viewed as "bulls eye target[s]" because they were "most likely to switch for [the] latest technology"—4G/LTE phones—and buy "better plans" as a result. Dkt. 177-23 at 18. Or as Cricket put it: "target Ricardo." *Id.*

**2013: Cricket trumpets a "nationwide 4G roaming agreement"—while secretly preventing customers in non-4G markets from being able to use it.** What Cricket hid from these consumers is that it had no plans to ever provide them with 4G/LTE. And yet it continued to charge them a premium for phones and plans whose defining feature had been rendered meaningless.

In February 2013, Cricket announced a "nationwide 4G roaming agreement" with Sprint, which Cricket billed as a significant investment in 4G/LTE. Dkt. 177-24 at 9. It told its investors: "We definitely know that we . . . need to provide 4G services to the customers. So we're going to do that one-way or another"—"whether that's building LTE or . . . buying LTE." *Id.* at 13.

Privately, however, Cricket had other ideas. Although it claimed that the "Sprint roaming [agreement] provided a significant benefit to consumers," Dkt. 177-17 at 209-10, in truth, Cricket had actively intervened to ensure that the agreement would be worthless to the very customers who would most need it. Internal emails reveal that, while Cricket was negotiating the agreement in February 2013, it made clear that it did not want customers in non-4G/LTE markets to be able to use Sprint's 4G/LTE network *at all*, because that would be "too expensive" for Cricket. Dkt. 177-25 at 1; *see* Dkt. 177-12 at 5 ("This is a non-starter."); Dkt. 174-1 at 18. From the beginning, Cricket planned to secretly block all of its customers who lived in non-4G/LTE markets from being able to access Sprint's 4G/LTE network, coding their phones to receive Cricket's slower 3G network even

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

when Sprint 4G/LTE was available. Dkt. 174-1 at 20. Specifically, Cricket devised a plan to embed the following "preferred roaming list" in each phone: "For customers who live[d] in Cricket LTE markets," Cricket would "ensure that Sprint LTE is in first position while [they are] roaming in Cricket, non-LTE markets," thereby "allow[ing] for a true nationwide LTE offering for customers in Cricket LTE markets." Dkt. 177-26 at 5–6. But for "non LTE market customer[s]," Cricket would covertly program their phones to receive "Cricket 3G"—not Sprint LTE—even while there were in non-LTE markets. *Id.* at 5; *see also id.* at 7. Cricket knew that this strategy, were customers to find out about it, would cause "disappointment from those who paid a lot of money for an LTE-capable device" and would receive no 4G/LTE service in return. *Id.* at 2. But Cricket did not want to jeopardize its desired "strategic outcome": an "M&A" with a larger carrier (soon to be AT&T). Dkt. 177-11 at 2. And because Cricket had calculated that "only 4% of total data traffic [was] outside [a subscriber's] home market," it could be confident that it would owe little under the new agreement. Dkt. 177-22 at 1; Dkt. 174-1 at 18.

The result was an LTE roaming agreement in name only. Cricket would use the agreement not as a way to actually provide 4G/LTE services to those who paid for them, but as a way to make it *seem* like it would—that is, to "market 4G more readily" and "show a different coverage map than a few different isolated areas." Dkt. 177-17 at 209; Dkt. 174-1 at 17. Whereas actually delivering on its promises would have cost Cricket over $200 million in roaming fees to Sprint in 2015 alone (according to a confidential presentation), pretending to do so was a steal—costing Cricket a paltry $440,000 per month in fees. *See* Dkt. 177-27 at 3.

This roaming agreement was especially important to Cricket because the company had given up on being able to build out its own existing 4G/LTE network. Cricket's deteriorating financial condition meant that it lacked the resources to invest in its network, leaving it with no "clear path to 4G/LTE home market coverage." Dkt. 177-28 at 1. Thus, as its CEO would tell the FCC in a sworn affidavit in mid-2013, Cricket had "no current plans to expand its current spectrum holdings in any significant way or to build commercial facilities outside of its current network." Dkt. 177-10 at 6.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Late 2013–2014: After the LTE roaming agreement takes effect, Cricket sells hundreds of thousands of 4G/LTE phones and plans in non-4G/LTE markets.** With the fig leaf of LTE roaming in place, and no plans to add to its network, Cricket was even more aggressive in "advertising and marketing 4G LTE phones and plans in all of its markets," Dkt. 177-17 at 209—including the markets where Cricket had prevented consumers from receiving 4G/LTE service. According to one high-level employee, the scheme of "4G in non 4G [was] going strong" even before the roaming agreement went into effect. Dkt. 177-29 at 2; Dkt. 174-1 at 34. But it really kicked into gear once the agreement took effect in September 2013. Cricket not only continued to sell 4G/LTE phones at much higher prices than its 3G models, and to offer full-speed data plans at the same prices throughout the country, but also it clearly indicated to consumers that a 4G-compatible phone would receive 4G/LTE service under its full-speed data plans. *See* Dkt. 177-36 at 1 ("4G LTE" is "available on supported devices."); Dkt. 174-1 at 58.

Over the next year, hundreds of thousands of customers in non-4G/LTE markets flocked to Cricket's stores (and those of its independently owned authorized dealers) and paid premium prices for both a 4G/LTE phone and full-speed data plan, with Cricket and its independent dealers sharing in the profits. Yet none of these customers ever received 4G/LTE service. Cricket would soon merge with AT&T, and its network—the only network on which Cricket customers' 4G/LTE phones could operate—would be shut down. Dkt. 177-8 at 5, 19–20; Dkt. 177-35 at 1; Dkt. 174-1 at 1, 10. In the meantime, Cricket was flooded with countless complaints from customers about its 4G/LTE phones. Dkt. 177-8 at 47–52. And rather than come clean to customers, Cricket continued to conceal the truth from them: It said that its acquisition by AT&T would provide access to ATT's 4G/LTE network—while failing to tell them that, because AT&T's network used a different technology, they would need to purchase an entirely new phone to access it. *Id.*

All told, Cricket's scheme caused nearly 500,000 people who lived in non-4G/LTE markets to overpay for 4G/LTE-compatible phones and high-speed data plans. Dkt. 174-1 at 51.

**This Court's decisions.** This Court has already rejected many of the same legal and factual arguments Cricket makes here. *See generally* Dkt. 277. In an earlier decision denying Cricket's

1    motion to dismiss, it recognized that "internal communications and marketing presentations showing

2    that Cricket's executive and management level agents carried out the '4G in non-4G markets' plan."

3    *Id.* at 8. As the Court explained, "[t]his ranks as 'management' because Cricket directed subsidiaries

4    to uniformly implement the 4G marketing campaign (even over objections) and supplied in-store

5    marketing materials." *Id.* In this same decision, it likewise held that Cricket's arguments related to

6    enterprise were unpersuasive, because, here, "independent dealers did not merely provide a service

7    to Cricket (i.e., a payment processing partner) that was incidental to its '4G in non-4G market'

8    scheme," but instead "authorized independent dealers [to] act[] in concert with Cricket by following

9    a company-wide directive and forming a continuous entity (similar to a franchisor-franchisee

10   structure)." *Id.* at 9. It also made clear that Cricket's focus on reliance issues was "beside the point"

11   because "[a] RICO claim requires no reliance allegations for the predicate acts of mail and wire

12   fraud." *Id.* at 11. And, finally, it rejected Cricket's attack on causation, holding that both but-for and

13   proximate causation were satisfied in this case because customers "would not have incurred a

14   financial detriment but for Cricket's decision to sell 4G plans and phones in markets that lacked 4G

15   service" and because, "but for Cricket's (allegedly) programming phones not to access 4G through

16   Sprint's network, plaintiffs would have gotten what they paid for." *Id.* "That the plaintiffs paid more

17   without getting more," is "exactly what Cricket aimed to do with its marketing scheme"—and that,

18   this Court explained, "satisfies proximate causation as Cricket achieving its intended result suffices

19   to allege a 'direct relationship between the injury asserted and the injurious conduct alleged.'" *Id.*

20        It has also certified the class. After dismissing one of the claims, this Court certified a class of

21   Cricket customers to pursue a single claim under RICO. As the court explained, this case involves a

22   single claim that Cricket pursued a nationwide scheme to defraud subscribers who lived in markets

23   where Cricket had no 4G/LTE service by engaging in a pattern of active concealment and

24   widespread deception about its inability to provide 4G/LTE service—and that fraud enabled Cricket

25   to charge *all* customers in non-4G markets a premium for 4G/LTE phones and service it otherwise

26   could not have charged. Dkt. 298 at 13–14. Proving that claim, the court concluded would not

27   "devolve[] into individualized issues" because the elements were all common across the class—the

28

scheme was uniform, its lawfulness is a common question, and Cricket adopted uniform pricing. *Id.* at 11. So "all customers paid more than they should have because they purchased 4G phones and plans supposedly worth more than they actually were." *Id.* Indeed, even the evidence relied on by Cricket was "classwide." *Id.* at 14–15. Its "principal proof" was "the classwide theory that no classwide scheme existed—*i.e.*, that Cricket's executives did not craft a nationwide deceptive marketing campaign." *Id.* After finding that the plaintiffs had met both Rule 23(a)'s and 23(b)'s requirements, the court certified the class while modifying the class definition to account for those customers that Cricket contended were subject to arbitration. *Id.* at 18–19.

## ARGUMENT

### I.     Cricket is not entitled to summary judgment on the existence of a RICO enterprise.

As both the Supreme Court and the Ninth Circuit have repeatedly emphasized, "RICO is to be read broadly." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)).[1] In passing the statute, Congress itself "admonished" that RICO must "be liberally construed to effectuate its remedial purposes." *Id.* Thus, the Supreme Court has repeatedly rebuked lower courts' attempts to impose limitations on RICO liability that are not present in the text of the statute itself. *See id.* (citing several examples); *Boyle v. United States*, 556 U.S. 938, 945 (2009). The Court has recognized that these attempts to impose extratextual limitations stem from courts' policy concern that RICO's text is broad; and if interpreted according to its plain text, the statute can be used by civil litigants to target not just "mobsters" but corporate fraud. *Sedima*, 473 U.S. at 499. But that result, the Court has explained, "is inherent in the statute as written." *Id.* If Congress would prefer otherwise, it may amend the statute. *See id.* "It is not for the judiciary to eliminate the private action in situations where Congress has provided it." *See id.* at 499-500; *accord Odom*, 486 F.3d at 546.

Cricket asks this Court to do precisely what the Supreme Court and the Ninth Circuit have

---

[1] Unless otherwise specified, internal quotation marks, citations, and alterations omitted from quotations throughout.

prohibited: impose limitations on RICO liability that are found nowhere in the text of the statute. The definition of an enterprise under RICO is "obviously broad." *Boyle*, 556 U.S. at 944. An enterprise includes—but is not necessarily limited to—"*any* individual, partnership, corporation, association, or other legal entity, and *any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added); *Boyle*, 556 U.S. at 944 & n.2. "This expansive definition is not very demanding." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015). Thus, an associated-in-fact enterprise requires nothing more than "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *accord Boyle*, 556 U.S. at 944.

There is more than sufficient evidence of such a group here. Indeed, there's no real dispute that Cricket and a network of independent dealers "associated together for a common purpose of engaging in a course of conduct"—to sell 4G/LTE phones to customers in non-4G/LTE markets at premium prices, *Turkette*, 452 U.S. at 583; *see* Dkt. 311-2, Ex. C ("Mallinson Merits Report"), at 21-25 (describing Cricket's independent dealer business model and the evidence showing its conduct in acting through independent dealers to promote and sell 4G/LTE nationwide with uniform advertising and pricing); Dkt. 312-20. RICO requires nothing more. *See Boyle*, 556 U.S. at 944; *Odom*, 486 F.3d at 553 ("In *Turkette,* the Supreme Court carefully articulated the criteria for an associated-in-fact enterprise under RICO. We do not believe that we are at liberty to add to them."). In arguing to the contrary, Cricket attempts to graft limitations onto the enterprise definition that are not there. It may not do so.

**1.** The vast majority of the dealers in the enterprise are so-called "premier" dealers—dealers that exclusively sold Cricket phones. Cricket cannot dispute that these dealers satisfy the requirements of a RICO enterprise. So instead, the company argues that this enterprise is not distinct from Cricket itself. This argument fails on both the facts and the law.

RICO's distinctiveness requirement is minimal. All that's necessary is that there be "two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). This requirement

is not onerous. As the Ninth Circuit has explained, "the only important thing is that the enterprise be either formally (as when there is a corporation) or practically (as when there are other people beside the proprietor working in the organization) separable from the" RICO person. *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) (cleaned up). Indeed, both the Ninth Circuit and the Supreme Court have rejected efforts to require anything more than a formal legal distinction between the RICO person and the enterprise. *See, e.g.*, *Cedric Kushner Promotions*, 533 U.S. at 161; *United States v. Benny*, 786 F.2d 1410, 1415−16 (9th Cir. 1986).

The enterprise here easily satisfies this standard. Cricket concedes (at 11) that the "premier" dealers are "independently-owned" businesses. They are not part of Cricket in any way. Indeed, Cricket's contract with the "premier" dealers emphasizes their independence, expressly stating that a dealer "is *not* a partner, agent, or employee or other legal representative of Cricket." *See* Dkt. 312-20 at 3 (emphasis added). Under longstanding Supreme Court and Ninth Circuit case law, that is sufficient.

Cricket's sole argument to the contrary is that a RICO enterprise cannot "consist of a corporate defendant and its agents." Dkt. 312 at 10. Even if that were true (and it's not), it wouldn't matter here. Cricket's own agreements expressly state that the "premier" dealers are *not* agents. Dkt 174-1 at 47; *see also* Dkt. 312-20 at 5.[2] They also state that each dealer "agrees that it is a separate and independent enterprise from Cricket." Dkt. 174-1 at 46. And they add: "Dealer shall conduct its business for its own interest and all persons employed in the conduct of Dealer's business shall be Dealer's employees or agents." *Id.* Thus, unlike the cases cited by Cricket, this case involves a "person" company, Cricket, that associated with independently owned companies, dealers, to function as an "enterprise" that promoted and sold Cricket branded products and services. Cricket is alleged to have participated in the conduct of this enterprise's affairs through a pattern of racketeering activity:  namely, the alleged 4G in non-4G fraudulent scheme.

In arguing otherwise, Cricket relies heavily on *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th

---

[2] If Cricket seeks to contest the characterization of its relationship with the premier dealers in its contracts, that raises a dispute of fact, which itself is sufficient to deny summary judgment.

Cir. 1997), a decades-old case from the Seventh Circuit. But *Fitzgerald* questioned whether applying RICO to alleged corporate fraud was consistent with the underlying purpose of RICO. The Ninth Circuit has squarely rejected that concern. *See, e.g., Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1248 (9th Cir. 2019) ("Although the RICO statute was originally enacted to combat organized crime, 'it has become a tool for everyday fraud cases brought against respected and legitimate enterprises.'").

Indeed, the Seventh Circuit in *Fitzgerald* was explicit that the agency exception it carved out of the statute was not in the text of RICO itself, but instead was necessary to avoid the application of RICO too far outside of what that court viewed as "the prototypical case." *Fitzgerald*, 116 F.3d at 227. That is precisely the kind of analysis the Supreme Court—and, for that matter, the Ninth Circuit—has rejected. *See, e.g., Sedima*, 473 U.S. at 497–99; *Boyle*, 556 U.S. at 938; *Odom*, 486 F.3d at 547, 553 (en banc); *Takeda*, 943 F.3d at 1248. The Supreme Court in *Cedric Kushner* also expressly stated that RICO is intended to protect "the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which unlawful activity is committed."533 U.S. at 159.  Here, Cricket is alleged to have committed unlawful activity *not* through its own company-owned stores using only its own agents, but through an association of independently owned stores that acted as an enterprise. As this Court's motion to dismiss order explained, that is sufficient. *See* Dkt. 277 at 9–10 (rejecting Cricket's argument that there is no enterprise here because Cricket used its "network" of "independent dealers" to "form[] a continuous entity" that pursued a "common scheme" and recognizing that, "[h]ere, independent dealers did not merely provide a service to Cricket (*i.e.*, a payment processing partner) that was incidental to is '4G in non-4G market' scheme").

Furthermore, even if *Fitzgerald* were good law, it does not apply here. *Fitzgerald* held that where a corporation sells its product through *agents*, which are *franchisees* of the corporation, the corporation and the enterprise are not distinct. *See* 116 F3d. at 227. Here, again, the premier dealers are not agents of Cricket. Nor are they franchisees—the agreement between Cricket and the premier dealers expressly disavows any franchise relationship. *See* Dkt. 312-20 at 3. They are entirely independent

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

businesses. That is more than sufficient to satisfy the distinctiveness requirement. Cricket has cited no cases involved similar fact patterns or evidence.

**2.** Falling back, Cricket rehashes the argument in its motion to dismiss that it lacked common purpose with its non-exclusive dealers. Cricket has not, however, come forward with any evidence to show that it sold 4G/LTE phones and service plans through national retailers during the class period. Regardless, this Court need not address this argument. Cricket does not dispute that the "premier" dealers—the vast majority of dealers that sold Cricket products—shared a common purpose with Cricket. Through its enterprise with those dealers, Cricket fraudulently inflated the price for its phones and service for all customers in non-4G areas. Whether the non-premier dealers were part of this enterprise is irrelevant.

And, in any event, Cricket's common purpose argument is wrong. Cricket cannot seriously dispute that there's evidence in the record that its non-exclusive dealers shared with Cricket a common purpose of selling Cricket phones. After all, the fact that the dealers sold these phones is itself evidence of their purpose to do so. So instead, Cricket argues (at 13–15) that this common purpose is not enough—that this Court should add to RICO additional requirements that the common purpose be fraudulent and that it be separate from the entities' "primary business activities." But, again, both the Ninth Circuit and the Supreme Court have rejected the argument that courts should require anything other than what the statute says. *See supra* page 9–10.

Nothing in RICO requires that an enterprise's common purpose be fraudulent. *See, e.g.*, *In re JUUL Labs, In*c., *Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2020 WL 6271173, at *22 (N.D. Cal. Oct. 23, 2020); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 992 (C.D. Cal. 2008). As the Ninth Circuit has explained, "[RICO] does not require intentional or purposeful behavior by corporations charged as members of an association in fact." *United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988). To the contrary, "[i]ndividual corporations may be entirely legitimate" and yet be members of a RICO enterprise—so long as they have *some* common purpose. *Id.*; *see also In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009) ("The common purpose element . . . does not require the enterprise participants to share *all* of their purposes in common." (emphasis

added)). Cricket's contrary argument violates "the basic principle that RICO enterprises may include 'entirely legitimate' entities that are exploited by wrongdoers and the companion principle that not every member of an enterprise need be a co-defendant." *Friedman*, 580 F. Supp. 2d at 992. Numerous courts in this Circuit have come to the same conclusion. *See, e.g.*, *Humana Inc. v. Mallinckrodt ARD LLC*, 2020 WL 3041309, at *7 (C.D. Cal. Mar. 9, 2020); *In re Wells Fargo Ins. Mktg. & Sales Pracs. Litig.*, 2018 WL 4945541, at *4 (C.D. Cal. June 18, 2018); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013); *Downey Surgical Clinic, Inc. v. Ingenix, Inc.*, 2013 WL 12114069, at *12 (C.D. Cal. Mar. 12, 2013); *see also, e.g.*, *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009); *In re: Takata Airbag Prods. Liab. Litig.*, 2015 WL 9987659 (S.D. Fla. Dec. 2, 2015).

Nor can Cricket point to anything in the statute that allows courts to disregard an enterprise simply because the entities' common purpose is a business one—or because each entity might, individually, profit from that purpose. To the contrary, in *Odom*, the Ninth Circuit, sitting en banc, held that Microsoft and Best Buy constituted an associated-in-fact enterprise based on an agreement between them for Best Buy to market Microsoft products. *See Odom*, 486 F.3d at 545. To be sure, a few judges disagreed, making essentially the same argument Cricket makes here—that "the existence of a marketing contract and the performance of that contract by two parties" should not "constitute an enterprise." *Id.* at 555 (Silverman, J., concurring in the result). But those judges were in the minority; the majority opinion rejected that view. There simply is no exception from RICO for entities that profit from business agreements.

Ultimately, Cricket's argument boils down to the same argument the Supreme Court and Ninth Circuit have rejected over and over again: Without this exception, RICO will apply to too much corporate fraud. *See* Dkt. 312 at 14. Cricket's desire to exempt itself from RICO is understandable, but that doesn't change the actual scope of the statute. If Cricket believes that RICO should not cover corporate fraud, it must take that concern up with Congress—not this Court.

## II. Cricket is not entitled to summary judgment on the issue of proximate causation.

Cricket's basis for seeking summary judgment on proximate causation is once again

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

predicated on a basic mischaracterization of the plaintiffs' legal theory. In its view, the plaintiffs' claim turns on the subjective experience of each consumer when purchasing a 4G/LTE phone and plan and so requires proof of facts about whether each plaintiff "relied on Cricket's representations about 4G so as to artificially support a higher price for both phones and plans." Dkt. 312 at 18. That fundamentally misunderstands the nature of this case. Here, the plaintiffs' claim turns on Cricket's uniform decision to overcharge all class members by selling them both a 4G/LTE phone and 4G/LTE plan when it knew that it did not, and would never, offer 4G/LTE service. This theory does not depend on the particular statements made to each class member. Cricket's scheme enabled it to charge a premium for all 4G/LTE phones and plans it sold in non-4G markets. Regardless of what Cricket said to any particular class member—or what any particular class member believed— they paid this premium. So properly understood, there's no question that there's evidence of proximate causation: Everyone suffered exactly the same harm by paying a premium for a phone or plan they would not have had to pay but for Cricket's fraud. As even Cricket is eventually forced to concede, its argument for summary judgment boils down to the claim that the "plaintiffs have submitted no evidence of proximate causation other than their . . . overcharge theory." Dkt. 312 at 22. But because there is evidence to support the "overcharge theory"—which is, in fact, the plaintiffs' actual theory—Cricket's motion here must be denied. *See* Dkts. 311-2, Exs. A-C, 311-3, Ex. D.

Crickets' arguments to the contrary are meritless. Cricket insists that there is an insufficiently "tight linkage" between its "alleged fraud" and the plaintiffs' injury. Dkt. 312 at 19. But it provides virtually no explanation to support this claim—other than to refer back to its misguided reliance argument. *See id.* at 20 (arguing the existence of an "attenuated causal chain[]" because of the possibility that some consumers "were never exposed" to certain 4G marketing). That is not surprising. There is a clear and direct connection between Cricket's alleged fraud—a scheme to sell expensive 4G/LTE-compatible smartphones and high-speed data plans to consumers in geographic markets where Cricket had no intention of providing any 4G/LTE service—and the harm that all the plaintiffs in this case suffered—paying more than they should have because they purchased 4G phones and plans that were worth less than their cost. *See, e.g., In re Chrysler–Dodge–Jeep Ecodiesel Mktg.,*

*Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 960 (N.D. Cal. 2018) (explaining the difference, under RICO, between a subjective "expectation-based injury" and an objective "overpayment injury"). As courts within this circuit have explained, where "the damage claimed . . . is the *difference* in price," the "alleged overpayment . . . is tied directly to the loss of value caused by [the defendant]." *Id.* at 967.

In fact, this Court has already recognized this basic point, and explained why this case is different from those cases that Cricket focuses on. *See* Dkt. 277 at 11 ("That the plaintiffs paid more without getting more" is "exactly what Cricket aimed to do with its marketing scheme" and, as a result, "satisfies proximate causation as Cricket achieving its intended result suffices to allege a 'direct relationship between the injury asserted and the injurious conduct alleged.'"); *see also* Dkt. 298 at 11–14. For instance, Cricket claims (at 22) that this case is "more like" *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957 (9th Cir. 1999). But even Cricket's own description of that case shows why it doesn't have any relevance here. The company says that proximate causation failed there because "the alleged injury to the plaintiff health plans was 'indirect' because it depended "on alleged injury to smokers—without any injury to smokers, [the] plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers." Dkt. 312 at 22. There was, in other words, a third-party intermediary (smokers) who disrupted the chain of causation and thus no direct link between "the alleged misconduct of defendants and the alleged damage to plaintiffs." *Oregon Laborers*, 185 F.3d at 963–64.

That is not the case here. The plaintiffs' theory is an objective "overpayment" theory based on "fraudulent concealment" of highly material information that negatively affected consumers directly—there is no third-party intermediary. *In re Chrysler–Dodge–Jeep Ecodiesel*, 295 F. Supp. 3d at 960, 1012. Instead, the plaintiffs argue that Cricket charged a premium for 4G/LTE service, built into the prices of its 4G/LTE phones and 4G/LTE plans, and yet Cricket concealed from class members that it had no plans to *ever* provide 4G/LTE service where they lived. This scheme was aided by Cricket's misrepresentations and half-truths, but it was not limited to them. *See* Dkts. 177-1-177-39; *supra* pages 2–7. Under RICO, proximate causation is satisfied where there is evidence

that a defendant "actively concealed" material facts in order to "sell more [of a product] to unsuspecting persons, thereby increasing [its] revenue" and where plaintiffs' injury "is that they purchased [the product]" and paid more than they would otherwise have. *Takeda*, 943 F.3d at 1251. Because the plaintiffs here "were immediate victims" of Cricket's "fraudulent scheme to conceal" its plan to never provide 4G/LTE service, the RICO violation "has a direct relation to Plaintiffs' alleged harm." *Id.*

Cricket nevertheless seizes on this Court's statement in its class certification order that "a critical mass of consumers relied on Cricket's misrepresentation about 4G" as proof that the plaintiffs' theory here turns on whether consumers personally relied on Cricket's misstatements." Dkt. 312 at 20. That is wrong. The Court's statement, read in context, was simply a statement about basic economics—made in response to Cricket's self-serving claim that *no one* relied on Cricket's fraudulent scheme to promote non-existent 4G/LTE service in paying extra for a 4G/LTE phone and 4G/LTE service plan. *See, e.g.*, Dkt. 277 at 11 ("Cricket also disputes that consumers ever relied on its representation as to 4G service."). Because Cricket defrauded consumers, it was able to prop up demand for its 4G/LTE phones and service that enabled it to set a higher price for those products (for all customers) than a non-4G market would otherwise support. Indeed, it's why Cricket was able to charge more for 4G and why Cricket, as even the company itself admitted, needed to sell its phones and plan as 4G even where it did not offer 4G service. *See, e.g.*, Dkt. 177-1 at 2-3 (identifying record evidence including Cricket's own internal survey results showing that many consumers were "willing to pay between $100 to $200 more for an 4G enabled Smartphone" and testing consumers' "willingness to pay more for 4G" plans and phones); *id.* (quoting internal Cricket communications demonstrating that Cricket understood that 4G/LTE was "critical to meeting [its] customers' appetite for more and more data services"; that it "c[ould]n't stay competitive" with a "3G network only"; and that the "increasing[] demand [for] 4G service" made 4G "LTE devices" and "LTE markets . . . known attributes" for which consumers would pay a premium).

The law could not be clearer: "plaintiff[s] asserting a RICO claim predicated on … fraud need not show, either as an element of [their] claim or as a prerequisite to establishing proximate

causation, that [they] relied on the defendant's alleged misrepresentations." *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 661 (2008). They need only show that they were injured "by reason of" the scheme, which includes both but-for and proximate causation. *Hemi Grp, LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 9 (2010). And proximate causation is plainly satisfied here because all class members were the targets of Cricket's "4G in non-4G" scheme, and their overpayments were the "direct and foreseeable consequence" of that scheme. *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 640 (5th Cir. 2016) (en banc). Cricket's motion for summary judgment on proximate causation should be denied.

### III.    Cricket's renewed attempt to exclude the experts should be rejected.

Falling back, Cricket simply recycles the arguments it made in support of its motion to exclude our experts, arguing that their "methodology is unreliable—and hence inadmissible" and, as a result, that it is entitled to summary judgment. *See* Dkt. 312 at 17. That is wrong for all the reasons we explained in our separate response to Cricket's motion. *See* Dkt. 322 at 2–12. In short, Cricket does not take issue with the experts' methodology of calculating a price premium using benchmark comparisons. Cricket's argument, rather, is that Mallinson has estimated only a "price *difference*" between 4G/LTE phones and plans and their benchmarks, and not a "price *premium*." Dkt. 312 at 17. But Mallinson explained why, in his professional opinion, the price difference between a 4G phone and the relevant 3G benchmark *is* the price premium: because none of the minor additional differences has any significant value without 4G/LTE. He also explained why, in his opinion, a non-4G/LTE plan offered by Cricket's rivals at the time offers the best evidence of the market value of such a plan (and of what Cricket would have offered had it no committed fraud). The record evidence, moreover, amply supports these opinions.

At bottom, Cricket's disagreements "all go to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013); *see AngioDynamics, Inc. v. C.R. Bard, Inc.*, — F. Supp. 3d —, 2021 WL 1792394, *47 (N.D.N.Y. 2021) ("[A]rguments regarding the comparability or appropriateness of a particular benchmark go to the weight, not the admissibility, of a benchmarking analysis."). But they are also wrong even on their own terms. Although Cricket's misconduct has made absolute precision and certainty impossible,

1    Mallinson and Browne have provided a fair and reasonable approximation of the damages. They

2    have, for instance, identified benchmarks and used contemporaneous evidence from *Cricket's own files*

3    to isolate the extra charges (i.e., the premium) that Cricket was able to extract from the class members

4    as a result of the scheme to defraud. *See* Dkts. 311-2, Exs. A–C, 311-3, Ex. D. And even if Cricket

5    believes (wrongly) that other differences exist between the 4G/LTE purchases and the benchmarks

6    that are not accounted for by plaintiffs' experts, that is a classic factual dispute about the extent of

7    the damages and not the proper subject of a summary judgment motion. Ultimately, their testimony

8    is relevant and reliable, and there is no basis for preventing the jury from hearing it. Given this,

9    Cricket's bid for summary judgment based on the exclusion of experts also fails.

10   **IV.    Cricket is not entitled to partial summary judgment on the damages claim for**
11        **alleged wireless services overcharges.**

12        Finally, Cricket argues that, even if the expert reports are not excluded, it is entitled to partial

13   summary judgment because "Freitas herself never paid an overcharge for wireless service." Dkt. 312

14   at 22. And, barring that, Cricket suggests that the Court should at least enter partial summary

15   judgment denying the class claims "for damages from sales of Smart plans before September 15,

16   2013" because "it is undisputed that buyers of those plans did not pay a price premium." *Id.* at 23.

17   Both arguments—which simply repeat the arguments it made in support of its motion to exclude—

18   are wrong.

19        *First*, as it did in its motion to exclude (*see* Dkt. 311 at 3), Cricket contends that Mallinson

20   miscalculated the damages due to named plaintiff Freitas by awarding her damages for plan

21   purchases allegedly incurred well after the date the class period closed, and by failing to account for

22   a monthly autopay discount of $5 and other "various discounts" that she received. Dkt. 312 at 23.

23   But Mallinson did not miscalculate her damages. For starters, Cricket is wrong to assert that Freitas

24   is entitled to damages only for the months covered by the class definition. That class period simply

25   defines who is in the class; it does not serve to limit the damages to which class members are entitled

26   should they prevail on their claims. Instead, class damages are calculated based on the duration of

27   the misconduct. The duration of the misconduct here extended past the class period because class

28

members like Freitas continued to pay premium prices for 4G/LTE plans without receiving any 4G/LTE service in return. Mallinson therefore correctly calculated her damages based on 14 months, not 11. See Dkt. 311-32 Ex. C at 82.

Cricket also ignores the fact that Mallinson's calculation of Freitas's damages is based on a spreadsheet that Cricket itself produced and cited in response to the plaintiffs' discovery requests. Dkt. 203-3. Cricket's spreadsheet lists the payment amount under a $50 plan as $50. *Id.* Yet now Cricket says that the amount is actually less than that for customers who, like Freitas, received an autopay discount. But Mallinson squarely addressed this argument in his rebuttal: "Auto bill pay entitles the customers to a discount in exchange for giving up flexibility on payment. Cricket has provided no evidence that it offered auto bill pay on only its higher priced plans. Instead, Cricket offered this option for all customers who were willing to allow Cricket to automatically collect from them each month. Cricket has provided no evidence that these customers would not have also opted for auto bill pay in a world in which Cricket did not commit fraud." Dkt. 311-3, Ex. D at 27. In short, the availability of small discounts for reasons unrelated to network coverage does not affect the analysis because there is no reason that they would not apply equally to a $40 benchmark plan.

*Second*, Cricket faults Mallinson for limiting his classwide plan damages to the period between September 2013 and September 2014. *See* Dkt. 312 at 24. But Mallinson made a conservative estimate of the plan damages based on his review of the record and experience in the industry. He concluded that "the market data from September 2013 forward shows that a market value for 4G/LTE had solidified, and that carriers were consistently charging premiums for larger data allowances at 4G/LTE speeds." Dkt. 311-2, Ex. C at 103. "By September 2013, Cricket would have been the only network-based prepaid wireless service provider trying to sell service plans for smartphone users with service limited only to 3G," and the evidence shows that it was considering a $40 plan around this time. *Id.* at 101–04. Mallinson determined that the evidence of a premium for 4G/LTE plans was particularly strong from this point forward, and the benchmark was particularly well settled. He therefore calculated the plan damages to being at that point. *See* Dkt. 311-3, Ex. D at 29 ("In response to Cricket's claim that 4G/LTE service was not widely available under other

carriers' plans at the start of the class period in 2012, I took a conservative approach to calculating the aggregate damages by assigning no premium to customers' plan damages from November 2012 to September 15, 2013."). His decision to limit the plan damages in this way is conservative but defensible, and it does not in any way suggest that benchmark plans "had to be actually available (or at least known) to class members in order for them to have been harmed." Dkt. 311 at 25. Individual class members don't have to show that they would have purchased a different product but for the fraud—only that they paid money for 4G/LTE service and yet didn't receive any. Nor does Mallinson's decision to limit the plan damages result in any uninjured class members. Dkt. 311-3, Ex. D at 30. If accepted by a jury, it would just reduce the damages that Cricket would owe as a result of its RICO scheme.

## CONCLUSION

Cricket's motion for summary judgment should be denied.

Dated: September 23, 2021

Respectfully submitted,

/s/ *Tyler W. Hudson*
Tyler W. Hudson

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

**GUPTA WESSLER PLLC**
Jennifer Bennett, SBN 296726
Neil K. Sawhney, SBN 300130
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane, SBN 286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton @wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*