Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane (State Bar No. 286227)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton @wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
**GUPTA WESSLER PLLC**
2001 K Street NW, Suite 850 N
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

Jennifer Bennett (State Bar No. 296726)
Neil K. Sawhney (State Bar No. 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| JAMIE POSTPICHAL, *individually*, and URSULA FREITAS, *on behalf of herself and others similarly situated*, <br><br>    *Plaintiff*, <br><br> v. <br><br><br> CRICKET WIRELESS, LLC, <br><br>   *Defendant*. | Case No. 3:19-cv-07270-WHA <br><br> Hon. William H. Alsup <br><br> Date:   October 7, 2021 <br> Time:   1:30pm <br> Courtroom: 12, 19th floor |

## OPPOSITION TO CRICKET'S
## MOTION TO COMPEL ARBITRATION

# TABLE OF CONTENTS

Table of authorities.................................................................................................iiii

Introduction..............................................................................................................1

Background...............................................................................................................3

    I.    Cricket markets and sells "no contract" prepaid phone and service plans to consumers. ..................................................................................................3

        A.    By selling prepaid phones and service, Cricket did not require a contract that bound customers to terms and conditions. ..............................3

        B.    Cricket marketed and advertised its products nationwide as "no contract." ..................................................................................................4

        C.    Cricket's customers expected and understood that the purchase of a Cricket phone or plan did not require any contract or bind them to any terms or conditions. ............................................................5

        D.    Cricket places a purportedly binding contract in the back of a booklet labeled "Quick Start Guide" inside the phone box. ........................6

        E.    After Cricket merges with AT&T, it replaces the Quick Start Guide with a different set of terms and conditions inside the box that bars customers from opting out.................................................7

Argument..................................................................................................................8

    I.    Cricket has now admitted that it "operated under a 'no contract' policy" and imposed no contractual obligations whatsoever on customers who purchased phones and plans within the class period. ..................................8

    II.    Under the settled rules of contract law that apply in every jurisdiction, Cricket's contract-in-the-box theory of formation should be rejected. ...................10

    III.    Cricket has offered no evidence to support its claim that customers signed any contract or received any text message. ..........................................19

        A.    Cricket claimed that customers were required in 2017 to provide an electronic signature assenting to a contract but has now failed to produce any evidence to show which customers, if any, did this. ...............19

        B.    Cricket has also failed to produce any evidence establishing that it sent purportedly binding text messages to its customers or that any customers actually received such messages, let alone that a reasonable customer would view such a text as binding them to a contract Cricket promised it did not have. ..................................20

Opposition to Cricket's Motion to Compel Arbitration (Case No. 3:19-cv-07270-WHA)

IV.     This Court should strike the exhibits Cricket failed to produce in discovery. ..........24

Conclusion ...................................................................................................................................25

Opposition to Cricket's Motion to Compel Arbitration (Case No. 3:19-cv-07270-WHA)

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Alarcon v. Vital Recovery Services, Inc.,*
    706 F. App'x 394 (9th Cir. 2017) ............................................................................. 23

4

*Barraza v. Cricket Wireless LLC,*
    2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) ........................................................ 8, 9

5

6

*Benjamin v. B & H Education, Inc.,*
    877 F.3d 1139 (9th Cir. 2017) ................................................................................. 25

7

8

*Bigger v. Facebook, Inc.,*
    947 F.3d 1043 (7th Cir. 2020) ................................................................................. 23

9

*Brower v. Gateway 2000, Inc.,*
10     676 N.Y.S.2d 569 (1st Dep't 1998) .......................................................................... 18

11

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC,*
    816 F.3d 1208 (9th Cir. 2016) ................................................................................. 11

12

13

*Defontes v. Dell Computers Corp.,*
    2004 WL 253560 (Sup. Ct. R.I. Jan. 29, 2004) ....................................................... 16

14

*Fitzhenry-Russell v. Keurig Dr. Pepper Inc.,*
15     345 F. Supp. 3d 1111 (N.D. Cal. 2018) .................................................................... 10

16

*Grandoe Corp. v. Gander Mountain Co.,*
    761 F.3d 876 (8th Cir. 2014) ................................................................................... 12

17

18

*Hill v. Gateway 2000, Inc.,*
    105 F.3d 1147 (7th Cir. 1997) .................................................................... 13, 16, 18

19

*Imperial Industrial Supply v. Thomas,*
20     825 Fed. App'x 204 (5th Cir. 2020) ......................................................................... 12

21

*J.A though Allen v. Microsoft Corp.,*
    2021 WL 1723454 (W.D. Wash. Apr. 2, 2021) ........................................................ 16

22

23

*Kanellakopoulos v. Unimerica Life Insurance Co.,*
    2018 WL 984826 (N.D. Cal. Feb. 20, 2018) .............................................................. 9

24

*Knutson v. Sirius XM Radio Inc.,*
25     771 F.3d 559 (9th Cir. 2014) ............................................................................. 10, 19

26

*McManigal v. Medicis Pharmaceutical Corp.,*
    2008 WL 618909 (N.D. Cal. Mar. 3, 2008) .............................................................. 22

27

28

*National Federation of the Blind v. The Container Store, Inc.*,
  904 F.3d 70 (1st Cir. 2018) ............................................................................ 12

*Noble v. Samsung Electronics America, Inc.*,
  682 Fed. App'x 113 (3d Cir. 2017) ...................................................... 11, 12, 13, 15

*Norcia v. Samsung Telecommunications America, LLC*,
  845 F.3d 1279 (9th Cir. 2017) ........................................................... 12, 13, 14, 15

*ProCD, Inc. v. Zeidenberg*,
  86 F.3d 1447 (7th Cir. 1996) ....................................................................... 16, 18

*Schabel v. Trilegiant Corp.*,
  2011 WL 797505 (D. Conn. Feb. 24, 2011) ............................................................ 16

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ................................................................. 11, 13, 16

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ...................................................................... 12, 13

*Soo v. Lorex Corp.*,
  2020 WL 5408117 (N.D. Cal. 2020) ................................................................. 17, 19

*Specht v. Netscape Communications Corp.*,
  306 F.3d 17 (2d Cir. 2002) .......................................................................... 12, 13

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
  559 U.S. 662 (2010) ..................................................................................... 24

*Thomas v. National Collectors Mint*,
  2018 WL 6329841 (S.D. Tex. 2018) .................................................................. 14, 16

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
  259 F.3d 1101 (9th Cir. 2001) ............................................................................ 25

*Zhang v. American Gem Seafoods, Inc.*,
  339 F.3d 1020 (9th Cir. 2003) ............................................................................ 25

**Other Authorities**

Restatement (Second) of Contracts § 17 (1981) ........................................................ 11

Restatement (Second) of Contracts § 19 (1981) ........................................................ 11

Restatement (Second) of Contracts § 2 (1981) ......................................................... 11

**Rules**

Fed. R. Civ. P. 26 ...................................................................................... 24

Fed. R. Civ. P. 37 ................................................................................................................. 25

Fed. R. Evid. 602 ................................................................................................................. 21

Fed. R. Evid. 803 ................................................................................................................. 22

1

## INTRODUCTION

Throughout the class period in this case, Cricket exclusively marketed and sold prepaid phones and plans that Cricket expressly promised involved "no contract." Customers who purchased these phones and plans did not enter into any contract with Cricket and were not bound by any contractual terms or obligations whatsoever. Instead, they paid for the phones and cellular service up front—no different from any common consumer good, like fruit at a grocery store or a razor at Target. Cricket, in fact, bet its entire business on this key point. It recognized that "customers were looking for other options" beyond those offered by other carriers that locked consumers into a contract. As Cricket saw it, the "no-contract value proposition" would allow the company to "exploit a weakness shared by AT&T and Verizon"—contractual relationships—to amass "a larger and more profitable customer base." As Cricket's own witnesses have testified, the company's "no contract policy" meant that beyond paying up front for a phone and plan, a customer had "no further obligations either on the handset or service side." As Cricket's witnesses have confirmed "[t]he expectation for a Cricket customer would be that there would be no contract of any kind related to their wireless service."

Customers flocked to Cricket for precisely this reason. The company specifically targeted customers who "understand what no contract wireless plans mean"—an understanding that Cricket's own witnesses testified meant that there would be no contractual terms whatsoever—and it launched a massive nationwide marketing campaign promoting the "constant" message that it was "willing to provide service with no contract." It told consumers that Cricket was "Easy to do business with: No hassles, no surprises, no contract." The company's "no contract" advertising worked. Customers "vot[ed] with their feet" and "their pocketbooks" by leaving other carriers for Cricket.

Now, however, Cricket seeks to kill this class action by asserting that every Cricket customer actually assented to a contract with the company, including mandatory arbitration. The company offered four theories for why it could compel consumers to arbitration based on a supposed contract, when it had repeatedly promised that there was no such contract. *First*, that the inclusion of a "Quick Start Guide" in the box at the time customers purchased their phones created a binding contractual relationship; *second*, that the later inclusion of a "terms and conditions" document in the box did the

same; *third*, that, even if neither of these documents was sufficient to form a contract, the company's purported decision to send a single text message with a link to terms and conditions created a contract; and *finally*, that some customers in late May 2017—years after the class period—executed an electronic signature to accept Cricket's terms of service.

It has now offered admissible evidence to support only the first two theories. That is not surprising. From the beginning of this case, Cricket has categorically failed to produce *any* admissible evidence to support its text-message or electronic-signature contract-formation theories. Although it falsely claimed at class certification to have such evidence, *see* Dkt. 309 at 1–2, it has now become clear that it does not. Cricket has come forward with no records to show that any customer assented to a contract by electronic signature—its own corporate witnesses have now admitted it has none. Cricket has likewise admitted it has no records establishing that any class member received a text message from the company or produced admissible evidence establishing that it ever even sent such a text message back in 2014. The lack of admissible evidence on these two theories defeats any attempt to exclude absent class member from the class on these grounds.

So Cricket is left to argue that it bound people to a contract it said it did not have by including a booklet in the phone box. This argument fails under any state's law. Every state requires clear and conspicuous notice and assent to form a binding contract. The Quick Start Guide, the first booklet Cricket relies on, provided no notice; and the later terms and conditions provided no means to reject it—that is, no way of ascertaining assent. But beyond that, Cricket's cynical bid to foist a contract on its customers—after having sold them phones and plans on the explicit promise that "Cricket customers were not bound by a contract and had no continuing obligation[s]"—should be rejected. Settled rules of contract law applicable everywhere prohibit exactly the type of bait and switch from which Cricket now seeks to profit. No Cricket customer in this class entered into any contract with Cricket. The motion to compel should be denied.

## BACKGROUND

### I. Cricket markets and sells "no contract" prepaid phone and service plans to consumers.

#### A. By selling prepaid phones and service, Cricket did not require a contract that bound customers to terms and conditions.

Prepaid cell-phone service does not require a contract. In contrast to "postpaid" service—which is "contract-based," Dkt. 312-2 at 9 n. 39 and requires longer-term commitment—prepaid service "can be subscribed to without a credit check or contract." Dkt. 312-13 at 84; *see also* Hudson Decl., Ex. G at 171:22-24–72:9-15 (noting that "postpaid product[s] at that period relied on a contract of services" but that for "prepaid customers" there "is typically no contract"). "Many customers, including those with limited cash or credit, prefer[] prepaid services to postpaid services." Dkt. 312-13 at 84–85. That is because, although prepaid plans are considered of "inferior quality," the "distinctive" no-contract features of the service are "key drivers" for price-sensitive customers. Dkt. 312-2 at 3 n. 15; *see also* Dkt. 312-3 at ¶ 19 (explaining that "consumers opting for prepaid service generally were more cost-conscious, or could not qualify for postpaid contracts due to poor or no credit").

Cricket's prepaid service—which covered all of the phones and plans at issue in this case—did not require a consumer to enter into a contract of any kind. The company's phones and plans were entirely "prepaid," "meaning that there w[ere] no contracts"—a key point of distinction from the arrangement that "postpaid carriers had at the time." Dkt. 177-17 at 250:13-23. As Cricket's corporate representative testified, "Cricket operated under a no contract policy." *Id*. As a result, the company "had no contract requirements on monthly service" and, beyond paying up front for a phone and plan, a customer had "no further obligations either on the handset or service side." *Id*. Cricket's own experts have testified that "Cricket customers were not bound by a contract and had no continuing obligation[s]." Dkt. 312-2 at 10; *see also* Dkt. 312-3 at ¶¶ 20, 30 (noting that Cricket customers were "not bound" by any contract).

**B.      Cricket marketed and advertised its products nationwide as "no contract."**

Cricket's offer of "contract-free" phones and plans was by design. As Cricket's corporate witness has explained, Cricket was not "looking [] to form any sort of a contract" with its customers. Hudson Decl., Ex. H at 17:2-4. It offered its customers cheaper "no contract" plans and phones that imposed "no contract requirements on monthly service." Dkt. 177-17 at 250:13-23. As Cricket saw it, the "no-contract value proposition" would allow the company to "exploit a weakness shared by AT&T and Verizon"—contractual relationships—and potentially allow it to amass "a larger and more profitable customer base." Hudson Decl., Ex. E at 5.

Cricket therefore developed a nationwide "no contract" "strategic marketing" campaign. Dkt. 177-17 at 293:7-23. Its marketing in this respect was "uniform . . . across the country" *Id.* at 308:14-20, and "convey[ed] to its customers" the "constant" "message of no-contract service." Hudson Decl., Ex. H at 22:6-18, 39:15-22. As one of Cricket's corporate witnesses recently acknowledged, the company "regularly indicated to its customers . . . that it was willing to provide service with no contract." *Id.* at 18:20-24. Cricket blanketed media outlets—in print, through the airwaves, and over the internet—with advertisements that promoted its "no contract" phones and plans. Animating Cricket's campaign was the slogan "Easy to do business with: No hassles, no surprises[,] no contracts." Hudson Decl., Ex. E at 11; *see also* Hudson Decl., Ex. D at 42 (promising "Faster 4G LTE Smartphones" with "No Contract"). It also generated "facts" that could be shared with customers about its phones and plans, including this one: "Cricket provides nationwide unlimited, data, talk and text plans with no contract." Hudson Decl., Ex. D at 71.

Cricket also promoted its "no contract" phones and plans throughout its stores. The company tightly "controlled the marketing materials and the messaging that was in place inside [its] stores," and one of the constant themes of this in-store marketing was that Cricket's phones and plans did not impose any contractual obligations whatsoever. Hudson Decl., Ex. H at 39:21-22 ("No contract [] was part of our advertising."). A customer walking up to a Cricket store would immediately be confronted with advertisements "on the windows on the exterior of the store" informing them of this feature and, once in the store, Cricket plastered its walls with similar "no contract" advertisements.

Dkt. 177-17 at 204:22-24, 310:6-12. As Cricket's own corporate witness in this case has recognized, the phrase "no contracts" was both "typical" and a "staple" of Cricket's in-store advertising campaign. *See id*. at 204:22–05:6. The packaging on the Cricket phone box itself likewise bore this "no contract" promise—and was uniform throughout the country. *See id*. at 280:1-7; 307:13-14 (noting that, "per the brand guidelines," there was "one box for one device across the company").

### C. Cricket's customers expected and understood that the purchase of a Cricket phone or plan did not require any contract or bind them to any terms or conditions.

Cricket's marketing worked. Its "no contract" advertising caused customers to "vot[e] with their feet" and "their pocketbooks"—they came "into [Cricket] stores from AT&T and Verizon" to purchase Cricket's contract-free phones and plans. Dkt. 177-17 at 293:14–95:1; Hudson Decl., Ex. G at 360:18–61:3 (recognizing that "anyone walking into a Cricket store" would understand—before "even entering the store"—that their purchase of Cricket products would not require any contract).

None of this was surprising. Indeed, Cricket executives specifically targeted customers who "understand what no contract wireless plans mean." Hudson Decl., Ex. E at 8. And Cricket's own corporate and expert witnesses repeatedly testified that Cricket customers "expect[ed] there to be no contract" for their phones and plans and expressly confirmed that "[t]he expectation for a Cricket customer would be that there would be no contract of any kind related to their wireless service." Hudson Decl., Ex. G at 360:18–61:15. They also specifically agreed that it "would not be the expectation of a Cricket customer that there was some secret separate arbitration agreement that they were binding themselves to in a relationship" with Cricket. *Id*. That was true for several reasons. For starters, it "is the very nature of prepaid service." *Id*. at 360:18-24. So, as one of Cricket's own witnesses made clear, "prepaid customers . . . do expect there to be no contract." *Id*. In addition, Cricket's marketing was, according to its corporate witness, "clear, concise, and transparent"—it specifically told customers that they could purchase "4G LTE smartphones and they're at no contract." Dkt. 177-17 at 82:13-19, 249:16–50:650 (insisting that this was "the way" a customer "would read" Cricket's ads). Although Cricket deposed every plaintiff in this case, none—not a single one—ever testified that they believed they were entering into a contractual relationship with Cricket.

**D.     Cricket places a purportedly binding contract in the back of a booklet labeled "Quick Start Guide" inside the phone box.**

When a customer made a purchase of a Cricket phone and plan, the company was careful not to say anything that would have suggested that the customer was binding themself to a contract. *See* Hudson Decl., Ex. H at 26:6-16, 28:21-25 (acknowledging that Cricket had no "policy or practice" of providing customers with any terms and conditions "at the point of sale" or "of informing customers" of the existence of any contractual requirement at the time of their purchase). That, of course, was entirely consistent with Cricket's clear promise that "Cricket customers were not bound by a contract and had no continuing obligation[s]." Dkt. 312-2 at 10.

But it was not consistent with what Cricket attempted to do after customers made their purchase. Cricket inserted into the phone box a document that, it now claims, in fact bound all customers to an expansive set of contractual obligations. Cricket labeled this document, which was actually a booklet, "Quick Start Guide" on the cover and described it as "A simple guide to activating your phone." Dkt. 50-6 at 2. Here is what it looked like:



*Id.* at 2–3. The booklet included no notice on the cover advising customers that it contained a purported contract or any terms and conditions. Instead, any customer opening the booklet would encounter, on the first page, the following statement: "Welcome to Cricket Wireless, the home of no

contract, no hassle wireless." *Id.* at 3. And then, right after that, in bold, the booklet said "**This guide includes information to program your Cricket phone and start your service.**" *Id.*

Nevertheless, at the back of this Quick Start Guide, Cricket included 10 pages of dense, tiny-font language that the company labeled "Terms and Conditions." *Id.* at 6–10. This part of the Quick Start Guide claimed to "constitute an agreement [] between you and the provider of your Cricket service" and, among other things, claimed to contain "an arbitration clause and other clauses which may affect your legal rights." *Id.* at 6.

The small-print terms hidden in the back of the Quick Start Guide also purported to *automatically* bind customers without requiring any affirmative indication of their assent. It stated that, "When you start service or use the service by, for example, placing a call, sending a message or transmitting data on the Cricket Wireless system or another system that's agreed to carry our services, you indicate your acceptance of this agreement. In addition, each time you pay for service from us, you confirm your acceptance of this agreement." *Id.* It also stated that, "If you do not want to accept this agreement, do not start service or use the service and return your wireless device, unused, and with the original receipt and all packaging and accessories, to the store where purchased within the return period set by that store for a refund." *Id.* But the first pages of the Quick Start Guide itself— before a customer would have reached any terms and conditions—told customers how to start and activate their service. So if any customer opened the booklet and followed its instructions, they would already have bound themselves to the purported contract before reaching the actual terms with no way to return the device and reject those terms.

> **E.    After Cricket merges with AT&T, it replaces the Quick Start Guide with a different set of terms and conditions inside the box that bars customers from opting out.**

In March 2014, Cricket merged with AT&T. At that point, the company (New Cricket) replaced the original terms and conditions with a new set. This time, the terms and conditions were

included in the box as a stand-alone document and claimed to be "part of your Wireless Customer

Agreement" and purported to "form a contract" with the customer. Dkt. 206-4 at 5.

In this version of the document, Cricket prohibited customers from rejecting the terms by

returning the phone. The "acceptance" clause stated that:

> Your Agreement with Cricket begins when you accept the T&Cs by doing any of the following: (a) giving us a written or electronic signature or telling us orally that you accept, or by otherwise accepting through any printed, oral, or electronic statement; (b) paying for Service; (c) activating the Service; (d) attempting to use or in any way using the Service; (e) upgrading or modifying the Service; or (f) opening any Device packaging, or starting any application, program or software that says you are accepting.

*Id.* at 6. It then stated that "If you do not want to accept the Terms and Conditions, do not do any

of these things." *Id.* So, according to these terms, a customer is immediately and irrevocably bound

by this purported contract the minute the device packaging is opened—even though the document

that says this is itself in the box that must be opened before a customer would ever see it.

Cricket also eliminated the opt-out provision its previous arbitration clause had contained,

meaning that customers had no way to reject the purported arbitration requirements once the box

was opened. *Id.* at 23-28. Any customer purchasing a Cricket phone and plan, according to this new

document, was irrevocably bound to mandatory arbitration the minute they paid for the device and

plan or the second the box was opened.

## ARGUMENT

**I. Cricket has now admitted that it "operated under a 'no contract' policy" and imposed no contractual obligations whatsoever on customers who purchased phones and plans within the class period.**

Six years ago in a separate case, Cricket told this Court that, when customers purchased its

phones and plans within the class period, they entered into "contracts for wireless service." *Barraza v.

Cricket Wireless LLC*, 2015 WL 6689396, Dkt. 34 at 9 (N.D. Cal. Nov. 3, 2015). And it dismissed any

suggestion that its use of the phrase "no contract" could "reasonably be understood to mean[]" that

Cricket offered phones and plans that did not bind customers to any contractual obligations. *Id.* at

15–16 (claiming that "it is impossible to infer" that a reasonable person who receives wireless service "would believe that" her relationship with Cricket would not impose contractual obligations).

But we now know that these assertions were false. Cricket's own handpicked corporate witnesses have definitively testified in this case that Cricket "operated under a no contract policy." Dkt. 177-17 at 250:13-14. And, they've testified, what that meant was clear: When customers purchased phones and plans from the company, they "had no contract requirements on monthly service" and, beyond paying up front for a phone and plan, had "no further obligations either on the handset or service side." *Id*. Cricket was, in the words of another corporate witness, "[not] looking . . . to form any sort of a contract" with its customers. Hudson Decl., Ex. H at 17:2-4.

This policy went well beyond simply advertising "to distinguish services with annual commitments from those that do not require such commitments." *Barraza*, 2015 WL 6689396, at *6. Cricket's own experts have made this clear. One testified, without qualification, that "Cricket customers were not bound by a contract and had no continuing obligation[s]." Dkt. 312-2 at 10. And another explained that Cricket offered its customers "the consumer-friendly option to get a contract-free, prepaid" phone and plan and that customers who purchased these products were "not bound" by any contract. Dkt. 312-3 at ¶¶ 4, 30. This record evidence flatly contradicts Cricket's earlier claims about the limited nature of its "no contract" advertisements, and it is conclusive in this case. *See Kanellakopoulos v. Unimerica Life Ins. Co.*, 2018 WL 984826, at *7 (N.D. Cal. Feb. 20, 2018) (Rule 30(b)(6) witness statements "constitute party admissions").

Cricket's earlier claims regarding a reasonable consumer's expectations were also false. Both Cricket's corporate and expert witnesses repeatedly testified in this case that Cricket customers "expect[ed] there to be no contract" "of any kind" Hudson Decl., Ex. G at 360:18–61:15 (agreeing that "[t]he expectation for a Cricket customer [was] that there would be no contract *of any kind* related to their wireless service" (emphasis added)). That was because, as Mr. Towster put it, Cricket's

advertising was "as clear, concise, and transparent as possible" and told customers that their purchase of Cricket phones and plans would not require any contract. Dkt. 177-17 at 82:13-19. It was also because Cricket exclusively offered *only* prepaid phones and plans—"meaning that there [were] no contracts." *Id.* at 250:13-16; *see also* Hudson Decl., Ex. G at 360:18-24. And, lest there was any doubt, Cricket's expert also explicitly confirmed that it "would not be the expectation of a Cricket customer that there was some secret separate arbitration agreement that they were binding themselves to in relationship to th[eir] wireless service." *Id.* at 361:9-15.

It is Cricket, as the party seeking to compel arbitration, that bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). But the actual evidence in this case is, standing alone, all that's necessary to reject as a matter of law Cricket's claim (at 2) that a "reasonable consumer" would have understood both of "the existence of a contract" and that they would be bound by its terms. *See, e.g.*, *Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*, 345 F. Supp. 3d 1111, 1119 (N.D. Cal. 2018) (judgment warranted where "evidence that is available refutes" party's "reasonable consumer" theory).

## II. Under the settled rules of contract law that apply in every jurisdiction, Cricket's contract-in-the-box theory of formation should be rejected.

Notwithstanding what Cricket told its customers, and what it admits they reasonably understood, Cricket now claims that its customers all in fact knowingly agreed to mandatory arbitration when they purchased their phones and plans. Cricket did not require any customer to sign a contract or even review one before purchasing its prepaid phones—after all, the company's entire pitch was that purchasing Cricket phones and plans did not require any contract. So instead, the company now says that its customers formed a contract (and agreed to arbitration) the minute they purchased their phones and plans because Cricket had placed a contract in the phone box. Dkt. 313 at 5–6.

But Cricket's contract-in-the-box theory of contract formation flunks a fundamental rule of contract law: Mutual assent. This basic requirement—which applies uniformly across jurisdictions—prohibits companies from doing exactly what Cricket attempts to do here. Cricket affirmatively told its customers there would be no contract but then it surreptitiously stuck a document—labeled as something other than a contract—into the box purporting to automatically bind customers to contractual terms before they could even read them. No court in any jurisdiction would hold that this constitutes a validly formed contract. This Court should reject Cricket's cynical attempt to bind consumers to contracts Cricket said didn't exist.

**1.** It is a fundamental cornerstone of modern contract law that the formation of a contract requires the "manifestation of mutual assent" by both parties. Restatement (Second) of Contracts § 17 (1981). Indeed, "[t]he mutual intention to be bound" by contractual terms "is the *sine qua non* of legally enforceable contracts and recognition of this requirement is nearly universal." *Casa del Caffè Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1212 (9th Cir. 2016). "Thus, under federal common law—or, indeed, under any law of which we are aware—where the parties to a 'contract' have not mutually consented to be bound by their agreement, they have not formed a true contract." *Id.*

The touchstone of any inquiry into whether parties consented to be bound by a contract is "an external or objective standard for interpreting conduct." Restatement (Second) of Contracts § 2 cmt. B. As a result, a party's conduct is not effective to establish assent unless he "knows or has reason to know that the other party may infer from his conduct that he assents." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012) (quoting the Restatement (Second) of Contracts § 19(2)). To satisfy its burden to prove mutual assent, therefore, a party seeking to enforce a contract must show, by objective evidence, the existence of "reasonable notice to each contracting party of the contractual terms." *Noble v. Elecs. Am., Inc.*, 682 Fed. App'x 113, 116 (3d Cir. 2017). That is because a meeting of the minds "requires that the parties have an understanding of the terms to which they have agreed."

*Id.* Were it otherwise, a party could improperly be bound "by inconspicuous contractual provisions of which he was unaware." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1285 (9th Cir. 2017). It is for this reason that, as a general rule, "silence or inaction does not constitute acceptance of an offer." *Norcia*, 845 F.3d at 1284; *see also Imperial Indus. Supply v. Thomas*, 825 Fed. App'x 204, 206 (5th Cir. 2020) ("Tacit acquiescence between relative strangers ignores the basic tenets of contract law"); *Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d 876, 888 (8th Cir. 2014) ("Ordinarily, mere silence does not amount to an acceptance.").

Of course, courts have crafted several exceptions to this general rule. *See Norcia*, 845 F.3d at 1284-85. But these exceptions are tightly circumscribed, especially in the consumer marketplace. For instance, "courts have rejected the argument" that a customer's "silence constitutes consent to a contract when the offeree reasonably did not know that an offer had been made." *Id.* at 1285; *see also Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 84 (1st Cir. 2018) (holding consumer's silence did not constitute assent where there was "'zero hint' that terms and conditions (specifically, an arbitration agreement)" applied to in-store purchase); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (holding consumer had not agreed to contract "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient"); *Noble*, 682 Fed. App'x at 116-17 (same). And that is especially true where a company's conduct "actively misleads the customer" into thinking there is no contract. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016). At bottom, the question at the heart of the inquiry is whether a "reasonable person" would have understood that doing nothing would result in a binding contract with the company, because "a contract is ineffective where the customer does not receive adequate notice of its existence." *Norcia*, 845 F.3d at 1289.

Courts have thus identified two key requirements that companies must meet before a customer's silence can be taken as assent and used, in turn, to bind them to a contract. *First*, the

company must provide "clear" and "reasonably conspicuous" advance notice informing the consumer of the existence of binding contractual terms. *Specht*, 306 F.3d at 30, 35 ("Clarity and conspicuousness of arbitration terms are important in securing informed assent."). What's required, in other words, is a "clear prompt" directing consumers to read contractual terms. *Sgouros*, 817 F.3d at 1035 (recognizing that this requirement applies across jurisdictions and prohibits "actively mislead[ing]" customers); *see also Noble*, 682 Fed. App'x at 116 (to meet this requirement, terms may not be "proffered unfairly, or with a design to conceal or de-emphasize" them). *Second*, the consumer must also be given a meaningful right to decline those terms—they must be told how they will be bound and what they can do if they don't agree. *See, e.g.*, *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ) (holding in-the-box contracts may be enforceable where they provide consumers with an "opportunity to read the terms and to reject them by returning the product").

These requirements apply with equal force to companies seeking to enforce in-the-box contracts like those Cricket purportedly imposed on its customers here. Courts have—again, uniformly—applied these basic principles to determine whether a valid contract was formed. For example, if a company intends to bind customers to an in-the-box contract, it must show that the consumer was "on notice of the existence of a term before he or she can be legally held to have assented to it." *Norcia*, 845 F.3d at 1289. And that includes making clear that the document containing the contractual terms in the box is itself contractual in nature. *See Noble*, 682 Fed. App'x at 116 (explaining that no in-the-box contract can be formed "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient"); *Schnabel*, 697 F.3d at 123 (consumer "is not bound" by "inconspicuous" in-the-box "contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious"). And, if opening the box constitutes acceptance, a company must likewise "notify the consumer that opening the box would be considered agreement to the terms set forth" within, *Norcia*, 845 F.3d at 1287, and provide

the customer with clear instructions for declining to be bound and a meaningful opportunity to do it, *e.g., Thomas v. Nat'l Collectors Mint*, 2018 WL 6329841, at *8 & n.9 (S.D. Tex. 2018) (holding contract validly formed where customer "had notice of the terms contained in the Agreement," had "an opportunity to review" and decline them by "return[ing] the product within a certain time frame").

**2.** Cricket is unable to satisfy this standard here, for either of its two in-the-box documents. Its "Quick Start Booklet" easily fails the first of these requirements. The document actively misled customers into thinking it was not a contract—Cricket called it a "Quick Start Guide" and neither its cover nor its introductory pages informed customers that it contained purported contractual terms.[1] Instead, any customer opening the booklet would encounter, on the first page, the following statement: "Welcome to Cricket Wireless, the home of no contract, no hassle wireless." Dkt. 50-6 at 3. And then, right after that, in bold, the booklet said "**This guide includes information to program your Cricket phone and start your service.**" *Id*. It made no mention of any contract. That is insufficient to bind a consumer to a valid contract.

The Ninth Circuit's recent decision in *Norcia* illustrates the point. There, Samsung argued that "terms and conditions included in a brochure in a product box constitute a binding contract between the manufacturer and the consumer." *Norcia*, 845 F.3d at 1288. The Ninth Circuit rejected this theory. As the court explained, "even if a customer may be bound by an in-the-box contract under certain circumstances, such a contract is ineffective where the customer does not receive adequate notice of its existence." *Id*. at 1289. In Samsung's case, the company had included the purportedly binding terms in a brochure entitled "Product Safety & Warranty Information" which

---

[1] Cricket attempts to sidestep this defect by suggesting (at 6) that either language on the back of the phone box or in store pamphlets informed customers of the existence of binding contractual terms. But just looking at the tiny, fine-print language Cricket used in both places, *see* Dkt. 206-3 (back of box); Dkt. 313-11 at 2, shows how inconspicuous this supposed "notice" is. Even considered on its own, that is insufficient—because it does not serve as a "clear prompt"—to alert a reasonable consumer to the existence of a purported contract located in the box.

indicated "that it contains safety information and the seller's warranty." *Id.* But "[a] reasonable person . . . would not be on notice" that the brochure *also* contained a freestanding obligation outside the scope of the warranty because Samsung nowhere told customers it would. *Id.* Swap in Cricket for Samsung and "Quick Start Guide" for "Product Safety & Warranty Information" and that could be this case.

Except this case is worse than *Norcia*. Unlike Samsung, which offered postpaid, contractual wireless service, Cricket's prepaid products were non-contractual in nature, meaning a customer would not expect the products to come with binding contractual obligations. And that is exactly what Cricket told its customers—not just in nationwide marketing, not just on the windows or walls of its stores, but right up front *in the very booklet* Cricket now says is a contract. On page one of the Guide, Cricket welcomed its customer "to Cricket Wireless, the home of no contract, no hassle wireless." Dkt. 50-6 at 3. That is sufficient to reject Cricket's contract theory. Hiding terms in a quick start guide is not a binding contract (even without the no contract promises). Because Cricket actively misled its customers, telling them the document had no contract when in fact it contained one, it cannot now rely on that same document to bind customers to a contract.

Cricket does not really dispute any of this. Instead, it simply argues that *Norcia* and others like it are outliers. *See* Dkt. 313 at 24–25. But other jurisdictions are in accord with this understanding.[2] *See, e.g.*, *Noble*, 682 Fed. App'x at 116 (no validly formed in-the-box contract under New Jersey law where "the document in which the Clause was included did not appear to be a bilateral contract," referred to itself as a "manual," gave "no indication" on the cover or in the table of contents that it was a contract, and "the terms were buried in a manner that gave no hint to a consumer that an

---

[2] Cricket insists (at 24) that "*Norcia*'s holding is limited to California law" but the Ninth Circuit explicitly considered Samsung's contract formation theory regardless of whether some California-specific rule would categorically bar it. *See* 845 F.3d at 1289–90 (analyzing whether Samsung's theory was valid "even if a customer may be bound by an in-the-box contract under certain circumstances").

arbitration provision was within"); *Defontes v. Dell Computs. Corp.*, 2004 WL 253560, at *7 (Sup. Ct. R.I. Jan. 29, 2004) (no validly formed contract under Rhode Island law where in-the-box contract did not expressly "mention the customer's ability to return based on their unwillingness to comply with the terms"); *J.A through Allen v. Microsoft Corp.*, 2021 WL 1723454, at *6 (W.D. Wash. Apr. 2, 2021) (recognizing that "[i]n Washington and elsewhere, an in-the-box contract may be found effective so long as the consumer receives adequate notice"); *Thomas*, 2018 WL 6329841, at *8 n.9 (same, under Texas law, and noting that the rules are the same as in California); *cf. Schabel v. Trilegiant Corp.*, 2011 WL 797505, at *5 (D. Conn. Feb. 24, 2011) *affirmed* 697 F.3d 110 (2d Cir. 2012) (no validly formed contract under Connecticut law where consumers "received no notice" and "were never given the opportunity to 'reject'" the terms).

The two principal cases on which Cricket relies—the pair of Seventh Circuit decisions in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) and *Hill*, 105 F.3d at 1147—do not adopt a different rule. Although the law governing in-the-box contracts has evolved in the twenty-five years since these two decisions came out, these cases do not fundamentally differ when it comes to the two basic requirements that companies must meet to enforce an in-the-box contract. In *Hill*, for instance, the product packaging contained a stand-alone "statement of terms" and explicitly gave the customer a right to reject those terms by returning the product "within 30 days." 105 F.3d at 1148-49. And in *ProCD*, the box itself explicitly told consumers—in a conspicuous manner—that binding terms were contained in an enclosed agreement and likewise gave the customer "a right to return . . . if the terms are unacceptable." 86 F.3d at 1451.

Cricket identifies *no* case in any jurisdiction enforcing an in-the-box contract in a case like this one. Its cases—all of them—stand only for the uncontroversial proposition that, in Cricket's own words, "in-the-box terms accepted through retention of a seller's product are fully enforceable." Dkt. 313 at 12. That is, of course, true, but only if the contract satisfies the relevant notice and right-to-

refuse conditions. Cricket's Quick Start Guide does not, and no case Cricket identifies would enforce an in-the-box contract where (1) the product itself was non-contractual by nature, (2) customers were affirmatively told that there would be no contract, (3) customers were *not* conspicuously told ahead of time that, by opening the box, they would be bound by contractual obligations, including an arbitration requirement, (4) the actual purportedly binding contractual terms were inconspicuously placed at the back of a booklet claiming not to be a contract at all, and (5) there was no meaningful right to reject the terms after review. Nor has Cricket identified any case in any jurisdiction where a court enforced a contract despite the existence of record evidence establishing that consumers did not expect a contract when purchasing the product. That is because there is none. Under these facts, the settled rules of contract law do not allow a company to bind customers to contractual obligations.[3]

**3.** Cricket's later decision to swap out the Quick Start Guide for a Terms and Condition booklet fares no better. Although this document, unlike the Quick Start Guide, doesn't affirmatively mislead customers into thinking it contains no terms, it suffers from a different flaw—it prevents a customer from rejecting the purportedly binding contractual terms before being forced to accept them and thus violates the second requirement for an enforceable in-the-box contract. As explained above, to be effective, a company must give a consumer a meaningful right to review and decline supposedly binding in-the-box terms. *See supra* page 13. This often occurs, for instance, where the terms give "the customer the 'unqualified right'" to return the product within a reasonable period of time and state that such a return will constitute a rejection of the terms. *See Soo v. Lorex Corp.*, 2020 WL 5408117, at *3 (N.D. Cal. 2020).

---

[3] Although Cricket suggests (at 25) that some customers might have had actual notice of its purported contract because "at least some absent class members affirmatively opted out of arbitration," it does not seriously dispute that the contract-formation questions here are governed by an inquiry notice standard. Of course, if Cricket had evidence that any individual class member did, in fact, agree to be bound by its arbitration requirement, it could have come forward with that evidence. It has not.

But the terms and conditions booklet explicitly prohibit customers from opting out by returning the phone. It stated that: "Your Agreement with Cricket begins when you accept the T&Cs by doing any of the following: (a) giving us a written or electronic signature or telling us orally that you accept, or by otherwise accepting through any other printed, oral, or electronic statement; (b) paying for Service; (c) activating the Service; (d) attempting to use or in any way using the Service; (e) upgrading or modifying the Service; or (f) opening any Device packaging, or starting any application, program or software that says you are accepting." Dkt. 206-4 at 6. It then informed customers that the only way to opt out would be to not "do any of these things." *Id.* That is impossible; because the terms were in the box and one of the ways Cricket forced its customers into acceptance was by "opening any Device packaging," a customer had no opportunity to review, let alone reject the potentially binding contractual obligations without being irrevocably bound.[4]

Nor did the terms and conditions provide any other means of opting out. Any customer purchasing a Cricket phone and plan, according to this new document, was irrevocably bound to mandatory arbitration the minute they paid for the device and plan or the second the box was opened.

No court, in any jurisdiction, permits this type of one-sided, automatically-bound form of contracting and, in fact, Cricket's own cases reject it. *See Hill*, 105 F.3d at 1148 (enforcing in-the-box contract specifically because the terms told customer they would "govern unless the customer returns the computer within 30 days"); *ProCD*, 86 F.3d at 1451 (holding that terms inside a box could bind consumers because it gave them an opportunity to read the terms and to reject them by returning the product); *Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 572 (1st Dep't 1998) (same); *Thomas*,

---

[4] To the extent that Cricket takes the position that it had some other return policy, or would have allowed a customer who opened the box to nonetheless return the product and reject the terms, the document it placed in the box would explicitly override that informal policy. *See* Dkt. 206-4 at 5 (making clear that, "[i]n the event of any conflict" between the terms contained in the document and other materials, "these [terms and conditions] shall control").

2018 WL 6329841, at *8 (enforcing in-the-box contract because terms allowed customer "to return the product within a certain time frame or be bound by the Agreement's terms"); *Soo*, 2020 WL 5408117, at *3 (refusing to enforce in-the-box contract because terms "did not give the customer any amount of time to examine the product, and the included written materials did [not] give the consumer the right to return the [product]"). This Court should reject Cricket's in-the-box theory of contract formation for its later amended terms and conditions as well.

### III.   Cricket has offered no evidence to support its claim that customers signed any contract or received any text message.

At class certification, Cricket claimed that certain Cricket customers "executed an electronic signature to accept Cricket's terms of service and its 'arbitration clause.'" Dkt. 195 at 19. It also claimed that some class members assented to a contract "by continuing service after receiving text notifications of the updated terms." *Id.* Cricket has failed to produce admissible evidence to substantiate either of these two claims. To the extent Cricket seeks to compel arbitration on these alternative grounds, it should not be allowed to force any customers out of this class given such a basic failure of proof. *See Knutson*, 771 F.3d at 565 (party seeking to compel arbitration bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence").

### A.   Cricket claimed that customers were required in 2017 to provide an electronic signature assenting to a contract but has now failed to produce any evidence to show which customers, if any, did this.

This past April, Cricket produced an employee, Michael Moses, who claimed to have "personal knowledge" that, "starting in May 2017," certain Cricket customers who "would have been required to sign an electronic signature acknowledging that they accept Cricket's Terms and Conditions." Dkt. 207 at ¶ 12. Cricket produced no actual records of customers within this class who electronically signed such a document; instead, it attached only what it called a "copy of a sample signature capture" from its records. *Id.* Based entirely on this witness's assertion, Cricket argued in that it could prove that some class members had "accept[ed] Cricket's terms of service and its

'arbitration clause'" by producing these electronic signatures. Dkt. 195 at 19; *see also* Dkt. 293 at 8–9. Consistent with this claim, the Court's order on class certification held that "[t]hose who fell within the class period but were customers in 2017 and electronically signed terms and conditions containing an arbitration clause must arbitrate." Dkt. 298 at 18.

But as Cricket's own witness on this topic has now confirmed, Cricket has no records of customers from the class period who electronically signed a document accepting any contract. *See* Hudson Decl., Ex. H at 60:3-7; *see also id.* at 79:5-13 (acknowledging that Cricket could not provide any "specific names of customers" who "may have" electronically assented to a contract). Fact discovery is now closed and Cricket has failed to produce any actual records showing which customers within the class, if any, provided an electronic signature in 2017.

**B.    Cricket has also failed to produce any evidence establishing that it sent purportedly binding text messages to its customers or that any customers actually received such messages, let alone that a reasonable customer would view such a text as binding them to a contract Cricket promised it did not have.**

Cricket made a similar representation at class certification when it came to its text-message theory of contract formation. It argued that "some class members accepted New Cricket's arbitration clause by continuing service after receiving text notifications of the updated terms." Dkt. 195 at 19. But Cricket's sole support for that claim is a declaration from a witness who has now testified that she has no personal knowledge of whether any such text messages were ever sent; and a spreadsheet that appears to have been created a year after the text messages were sent—that is, after Cricket had already been sued—and that Cricket cannot identify who created it, when, or under what circumstances. In other words, Cricket has no admissible evidence whatsoever to support this contention.

Over and over again, Cricket has led this Court to believe that Ann Marie Blandino, an AT&T employee, can testify that, in 2014, Cricket sent text messages to 3.4 million legacy Cricket

1  subscribers. *See, e.g.*, Dkt. 293, at 18; Dkt. 195, at 19. But she cannot do so. Although Ms. Blandino

2  swore in her declaration to have "personal knowledge" that Cricket sent these messages, Dkt. 202 at

3  ¶¶ 1, 5, that testimony is indisputably false. To the contrary, at her deposition, Ms. Blandino

4  repeatedly admitted that she did *not* have personal knowledge of Cricket's supposed text message

5  campaign. Dkt. 309-2 at 21:18-25. She testified that she had no involvement in sending any

6  arbitration text messages; that she did not become aware of Cricket's supposed text message

7  campaign until 2021, when she was approached by Cricket's counsel in this case; and that the only

8  basis for her testimony was a spreadsheet she could not authenticate and did not know anything

9  about. *See id.* at 21:22–25 ("Q So you had no direct involvement with any of the text messages back

10  in 2015? A No."); *id.* at 82:8-12 ("Q You cannot confirm that it is, in fact, the official log; correct? . .

11  . A I can't."); *id.* at 81:6-9 (stating that she did not "know where this data came from. I don't know if

12  it was pulled out of an agency database. I don't know where this data came from"); *id.* at 21:18-22

13  ("Q These text messages . . . that Cricket contends were sent between May and July 2014, when did

14  you first gain knowledge about those text messages? A I believe that was in January of 2021."). It's

15  black-letter law that witnesses cannot testify to events about which they have no personal knowledge.

16  Fed. R. Evid. 602. Ms. Blandino now admits she has no such knowledge of any 2014 text campaign.

17  

18  The only other evidence Cricket has offered in support of its text message claim is the

19  spreadsheet of unknown provenance Ms. Blandino claims she relied on. But that spreadsheet does

20  not identify a single specific customer (or phone number) to whom an arbitration text was sent; it

21  merely states that there was an arbitration campaign in 2014. *See* Dkt. 202-1, at 3. And, more

22  importantly, it's neither reliable nor admissible. Ms. Blandino could not authenticate any spreadsheet

23  as an "official log" of Cricket's text messages, Dkt. 309-2 at 29:12-18; she did not know who created

24  it or where the data it contained came from, *id.* at 31:22-23, 32:12-16; and the metadata on the

25  document indicates that it was created a year after Cricket supposedly sent the text messages—that

is, Cricket did not create this purported log of its arbitration text campaign until after it had already been sued, *id.* at 48:4-6.[5] A document of unknown origin, created under unknown circumstances by an unknown author from unknown data, a year after the event it purports to describe is not admissible—or credible—evidence that that event actually happened. *See* Fed. R. Evid. 803(6) (to fall within business records exception to hearsay rule, a "qualified witness" must be able to testify that the record is contemporaneous or nearly so with the event it reflects, made by someone with knowledge, and kept within the ordinary course of business; and neither the source nor method of preparation may "indicate a lack of trustworthiness). Indeed, this Court has rejected efforts to compel arbitration based on similar documents. *McManigal v. Medicis Pharm. Corp.*, 2008 WL 618909, at *3 (N.D. Cal. Mar. 3, 2008) (document not admissible as a contemporaneous business record when it showed a "create date" of seven months after the plaintiff's "supposed acceptance" of arbitration agreement and defendant, therefore, could not compel arbitration based on that document). [6]

---

[5] At the hearing on the motion for clarification, Cricket's counsel argued that, even though Ms. Blandino knew nothing about this spreadsheet and could not testify that it was an "official log" of Cricket's text campaigns, she could nevertheless authenticate it because she "has familiarity with Cricket's text campaigns." Dkt. 330 at 8:12-14. But there's no evidence she had any familiarity with Cricket's 2014 campaigns (or any records that might have been kept about them). And, in any event, a business record is only admissible if the custodian can testify that the record is both contemporaneous and made by someone with knowledge of the events. Fed. R. Evid. 803(6). Ms. Blandino admitted she could testify to neither.

[6] At the hearing on the motion for clarification, Cricket contended that in a brief in opposition to its motion to compel Jermaine Thomas to arbitration, we conceded on behalf of the class that Cricket sent a text message to 3.4 million customers. Dkt. 330 at 11:3-4. Not so. In that motion, Cricket asserted that it had sent two text messages to Jermaine Thomas specifically. Dkt. 50-1 ¶¶15-16. It did not argue—let alone provide any evidence—that these were part of a text message campaign or that any texts were sent to anyone other than Mr. Thomas. And even with respect to Mr. Thomas, Cricket provided no documentary evidence that these text messages were actually sent. It relied entirely on a brief declaration from an employee stating that she reviewed a search of records that had been conducted four years earlier, and somehow concluded from that review that Mr. Thomas had received two arbitration text messages. Dkt. 50-1 ¶¶15-16. She did not specifically identify which records were searched, provide a copy of those records or the results of this supposed search, or explain why she was relying on a years-old search she apparently could not provide to the Court. *See id.* Based on this meager showing as to a single specific customer, it would not be possible for us to have conceded on behalf of the yet-to-be-certified class that Cricket had sent the entire class text messages; Cricket hadn't yet even asserted that it did so. So Cricket's counsel instead seized on

Beyond a "witness" who was not actually there and a spreadsheet created after litigation began that is not a contemporaneous business record, Cricket has produced no evidence that its text campaign actually ever happened. *Cf.* Dkt. 330 at 12:9-11 (when asked what evidence Cricket had that the text message was sent to the entire customer base, Cricket's counsel answered with only the spreadsheet). In other words, it has no actual admissible evidence at all. At the recent hearing on the motion for clarification, Cricket asserted that its failure to produce admissible evidence was irrelevant because it was not required to do so. Dkt. 330 at 12:19-20. But a company cannot compel its customers to arbitration without admissible evidence that they agreed to arbitrate. *See, e.g.*, *Alarcon v. Vital Recovery Servs., Inc.*, 706 F. App'x 394, 395 (9th Cir. 2017) (reversing order compelling arbitration because "there was no admissible evidence of an agreement to arbitrate between the parties"). Nor can it exclude class members based on an arbitration defense it does not actually have.[7] Cricket vaguely asserted that it could fill this gap at trial by calling unnamed other witnesses—witnesses it has not previously disclosed—and providing unspecified additional evidence. *See, e.g.*, Dkt. 330 at 12:3-4, 12:23-25. But discovery is now long closed. And the Federal Rules prohibit Cricket from attempting to rely on evidence and witnesses it did not produce during discovery. *See infra* section IV.

Despite having no admissible evidence that anyone actually agreed to arbitration, Cricket claimed at the hearing on the motion for clarification that it would somehow violate due process for

---

a sentence that refers to the agreement "*supposedly*" formed through text messages Cricket purported to send Mr. Thomas and "*presumably*" to other Cricket customers. Dkt. 61 at 8 (emphasis added). Although perhaps inartfully drafted, that is not a concession. To the contrary, it clearly indicates that we did not know—"presumably," "supposedly"—whether Cricket had sent messages to Mr. Thomas or anyone else. And in fact, in his deposition, Mr. Thomas denied receiving any text messages. Hudson Decl., Ex. J at 235:17-19. While we did not know then whether Cricket had admissible evidence that it sent the class text messages, we know now that it does not.

[7] At the hearing, Cricket argued that it's the plaintiff's burden to demonstrate that class certification is warranted. That's, of course, true. But defendants cannot oppose class certification merely by asserting without evidence that it might have individualized defenses. If a defendant wants to exclude class members based on arbitration, it has to at least show that class members agreed to arbitrate. *See Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1047 (7th Cir. 2020). Cricket cannot do so.

1
2
3
4
5
6
7
8
9
10
11
12

this Court *not* to exclude from the class any customer who *could have* received the 2014 text message had Cricket actually sent it. *See* Dkt. 330 at 26:14-15. That's absurd. Cricket has pointed to—and we have found—no authority whatsoever for the proposition that due process requires a court to exclude potential class members just because a defendant *asserts* there's an arbitration clause, without any admissible evidence to support that assertion. Cricket's argument amounts to the claim that because the company doesn't have any records that show who (*if anyone*) it might have sent a text message to, it is entitled—as a matter of constitutional law—to force *everyone* to arbitrate. That's not just wrong; it's precisely backwards. "[A]rbitration is a matter of consent." *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). And the party seeking to compel arbitration has the burden to demonstrate that consent. Cricket cannot do so here. It is not, therefore, entitled to compel arbitration (or exclude anyone from the class) based on text messages it cannot prove it sent.[8]

13

## IV. This Court should strike the exhibits Cricket failed to produce in discovery.

14
15
16
17
18
19
20
21
22
23
24
25

    In support of its motion to compel arbitration, Cricket has submitted the testimony of a witness it has never previously disclosed, Katie Keser; and it relies on over one hundred exhibits it never produced in discovery. *See* Hudson Decl., Ex. I (listing exhibits). Cricket was required to identify Ms. Keser and produce these documents as part of its initial disclosures. *See* Fed. R. Civ. P. 26(a)(1)(A). The documents are also responsive to several of the plaintiffs' discovery requests. *See* Hudson Decl., Ex. B. Yet Cricket never produced them in discovery. To this day, the company has not supplemented either its initial disclosures or its discovery responses with these documents. *See* Hudson Decl. ¶¶ 4, 13. And discovery is now long closed. Cricket's failure to timely identify Ms. Keser and its failure to produce these documents violates Rule 26(a) and Rule 26(e). *See* Fed. R. Civ. P. 26(a); Fed. R. Civ. P. 26(e).

26
27
28

---

    [8] At the hearing, Cricket also claimed to be concerned about potential class members who might prefer to arbitrate. But any such class member can simply opt out.

The law is clear that if a party fails to comply with these rules, it "is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). This is an "'automatic' sanction." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). A party's failure to comply with Rule 26 *requires* exclusion unless the party can show it was "substantially justified" or "harmless." *See id.*

Here, Cricket has not even attempted to demonstrate that its failure to identify Ms. Keser or to produce over a hundred arbitration-related documents was either substantially justified or harmless. It's hard to see how it could. Even if Cricket could show that its failure to identify Ms. Keser or to produce documents it intended to use in support of its defense—and that were responsive to direct discovery requests—was inadvertent, inadvertence is not a substantial justification. *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028 (9th Cir. 2003). And the Ninth Circuit has made clear that the failure to disclose information or witnesses until after the close of fact discovery—making it impossible to investigate the information or depose witnesses about it—is not harmless. *See, e.g., Benjamin v. B & H Educ., Inc.*, 877 F.3d 1139, 1150 (9th Cir. 2017). Rule 37, therefore, requires that this Court strike Ms. Keser's declaration in its entirety (including the accompanying exhibits, as Cricket has not offered any other means of authenticating those exhibits). In addition, this Court should strike all of the documents Cricket failed to produce in discovery—listed in Exhibit I to the attached Hudson declaration.

## CONCLUSION

Cricket's motion to compel should be denied.


Dated: September 23, 2021                    Respectfully submitted,

                                            */s/ Tyler W. Hudson*
                                            Tyler W. Hudson

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
2001 K Street NW, Suite 850 N
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

**GUPTA WESSLER PLLC**
Jennifer Bennett, SBN 296726
Neil K. Sawhney, SBN 300130
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane, SBN 286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton@wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*