```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4
 5   JERMAINE THOMAS, et al.,    )  Case No.:
                                 )  3:19-cv-07270-WHA
 6              Plaintiffs,      )
                                 )
 7   vs.                         )
                                 )
 8   CRICKET WIRELESS, LLC,      )
                                 )
 9              Defendants.      )
     _____)
10
11
12
13       VIDEOTAPED DEPOSITION OF PMK - MICHAEL MOSES
14                         Volume I
15                 APPEARING REMOTELY FROM
16                    ATLANTA, GEORGIA
17              TUESDAY, FEBRUARY 2ND, 2021
18
19
20
21   REPORTED BY:
     MONICA LEPE-GEORG
22   CSR No. 11976
23
24   PAGES 1 - 100
25
```

```
 1   to those terms and conditions or does not agree to
 2   those terms and conditions?
 3       A.   So, if you started a -- a Cricket account
 4   or started Cricket service during that time period
 5   of 2012 and 2014, again, if you made one phone call,
 6   sent one text message, used any data on the device
 7   and/or paid for service, you were then considered
 8   bound by those terms and conditions and we would
 9   have -- we have data showing if a device, you know,
10   was used or not by a customer.
11       Q.   So Cricket's -- Cricket's view is -- is --
12   is from 2012 to 2014 --
13            THE STENOGRAPHER:  I'm sorry.  "So
14   Cricket's"...
15   BY MR. HUDSON:
16       Q.   So, Cricket's view is that any customer who
17   used a device that was purchased between 2012 and
18   2014 necessarily agreed to all of Cricket's terms
19   and conditions, including agreeing to arbitration?
20       A.   If they used the device and/or paid any
21   service monies to Cricket Wireless.
22            THE STENOGRAPHER:  I'm sorry?  "If they
23   used a device or paid any service"...
24            THE WITNESS:  To Cricket Wireless.
25   ///
```

```
 1              MR. INGBER:  Same objection.
 2              THE WITNESS:  I can't say -- you know, I
 3   can't say that Cricket was looking to -- to form any
 4   sort of a contract.
 5              MR. HUDSON:  And let's, if we could,
 6   Caitlin, go to -- pull up 48, please.
 7   BY MR. HUDSON:
 8       Q.   And as she's doing that, Mr. Moses, in 2012
 9   and 2013, what was your role at Cricket Wireless?
10       A.   In 2012, I was a company-owned store
11   manager in 20- -- early 2013, I took on a -- a
12   different role as a quality manager.
13       Q.   And Mr. Moses, as a store manager, are you
14   familiar with what we've -- what we've pulled up on
15   the screen?  It's a planogram.  Are you familiar
16   with that?
17       A.   Yes, that looks familiar.
18              MR. HUDSON:  Okay.  We'll -- we'll mark
19   this exhibit as exhibit -- excuse me, Exhibit 90.
20              (Exhibit 90 was marked for identification.)
21              MR. HUDSON:  And if we could, Caitlin,
22   scroll to page 14, please, of the PowerPoint.  And
23   if you could, just zoom in on that middle -- yeah,
24   just maybe one more on the B1, B2, B3, please.
25   Thank you.
```

Michael Moses

```
 1   BY MR. HUDSON:
 2       Q.   Mr. Moses, from your time as a Cricket
 3   store manager, do you rep- -- did you recognize this
 4   poster that's got the B1, B2, and B3 next to it?
 5       A.   I do, yes.
 6       Q.   And this -- this was part of the -- the
 7   Cricket "Half is More" advertising, right?
 8       A.   I don't recall the specific advertising
 9   from that time.
10       Q.   Okay.  But the poster itself indicates,
11   right, Cricket "Half is More"; do you see that?
12       A.   Correct.
13       Q.   And -- and you remember that campaign, I'm
14   assuming, right?
15       A.   I'm sorry.  What was that?  What was the
16   last question?
17       Q.   Do you remember that campaign, sir?
18       A.   I don't recall the particular details of
19   the campaign, no.
20       Q.   Okay.  But one -- one of the things that
21   Cricket regularly indicated to its customers is that
22   it was willing to provide service with no contract,
23   right?
24       A.   That is correct.
25       Q.   And that's what's reflected here on this
```

```
 1              MR. INGBER:  Objection.  Asked and
 2    answered.
 3              THE WITNESS:  I would say that's -- I would
 4    say that's fair, yes.
 5    BY MR. HUDSON:
 6         Q.   And -- and here, what Cricket has decided
 7    to convey to its customers, is half is more,
 8    unlimited plans, half the price of the AT&T and
 9    Verizon, all with no contract, right?
10         A.   Correct.
11         Q.   So, sir, this would be another example of
12    Cricket, in stores, indicating to customers that its
13    plans involved no contract, right?
14              MR. INGBER:  Objection.  Vague.
15              THE WITNESS:  It specifically states the
16    words "no contract," yes, but what we were trying to
17    convey to the customers, you know, exactly, I can't
18    speak to that.
19    BY MR. HUDSON:
20         Q.   But the words that Cricket chose to use are
21    "no contract."  That's fair, right?
22              MR. INGBER:  Objection.  Asked and
23    answered.
24              THE WITNESS:  That's fair, yes.
25              MR. HUDSON:  Caitlin, let's go to Tab 2, if
```

1 and conditions could have been provided to the

2 customer at the point of sale based on how that

3 individual transaction or interaction with the

4 customer went.

5 BY MR. HUDSON:

6  Q. As you sit here today, sir, you're not

7 aware of any policy or practice that Cricket had

8 between 2012 and 2014 that provided that the

9 customer would be presented with the terms and

10 conditions at the point of sale, correct?

11  A. I -- I don't recall.

12  Q. You don't know one way or the other?

13   MR. INGBER:  Objection.  Mischaracterizes

14 testimony.

15   THE WITNESS:  No, I can't -- I can't recall

16 specifically.

17 BY MR. HUDSON:

18  Q. It's not something, Mr. Moses, that you --

19 you looked into and tried to figure out in

20 preparation for this deposition?

21  A. I did not look into that.

22  Q. Is that something that, if you had more

23 time, you could look into?

24  A. Could look into, yes.  Yes, it could be

25 looked into.

```
 1        A.    That's correct.
 2        Q.    And you testified that if Cricket corporate
 3   had a policy or practice, you would expect someone
 4   to have informed you of it, right?
 5        A.    They wouldn't have informed me personally,
 6   no.
 7        Q.    They would have informed someone in your
 8   store, right?
 9        A.    Not necessarily, no.
10        Q.    Well, sir, how -- how would you implement
11   the policy or practice if no one at Cricket
12   corporate made you aware of it?
13        A.    Policies or procedures were not
14   necessarily, you know, verbally spoken down to
15   anybody at the store.  There could have -- we had an
16   online kind of information tool that would house a
17   lot of our, you know, in-store, kind of, procedures
18   and something along those lines could have led to
19   there.  It may not have been proactively sent to the
20   store.
21        Q.    In your stores, sir, that -- that you
22   managed between 2012 and 2014, you didn't have a
23   practice of informing customers of the terms and
24   conditions, correct?
25        A.    That's correct.
```

1    "presented."

2            THE WITNESS:  Again, we -- we had no

3    control over what the customer chose or chose not

4    to -- not to read either in the store or outside of

5    the store.

6    BY MR. HUDSON:

7        Q.   You did, though, have the ability to

8    control what information you put in front of the

9    customer, right?

10           MR. INGBER:  Objection.  Vague.

11           THE WITNESS:  Yes, we controlled -- we

12   controlled the marketing materials and the messaging

13   that was in place inside of our stores.

14   BY MR. HUDSON:

15       Q.   And one of the constant themes in your

16   marketing between, really, 1999 and 2014, when

17   Cricket was acquired by AT&T, was the message of

18   no-contract service, right?

19           MR. INGBER:  Objection.  Outside the scope.

20   Vague as to con- -- the term "constant theme."

21           THE WITNESS:  That's correct.  No contract

22   was part -- was part of our advertising.

23           MR. HUDSON: Let's, if we could, go to --

24   have -- 7D, please.

25           THE STENOGRAPHER:  Was that last document

1    one of these invoices that captured their signature?

2        A.   It's certainly possible that they did, yes.

3        Q.   But -- but as you sit here today, do you

4    have any evidence to -- to support the fact that any

5    particular customers actually did do that?

6        A.   Not at a particular or individual customer

7    level, I do not.

8        Q.   Okay.  And in advance for -- of your

9    preparation for your deposition today, is there any

10   reason why you or others affiliated with Cricket

11   could not have attempted to do that?

12       A.   It was -- it was not discussed.

13            MR. INGBER:  I just want to be clear, Ty,

14   about expectations for this.  Are you -- are you

15   asking whether Mr. Moses could have come to the

16   deposition today and identified, by name, every

17   single Cricket customer who would have signed

18   something post May of 2017?  That is, a customer,

19   who was a Cricket customer between 2012 and 2014,

20   who also signed something indicating agreement to

21   terms and conditions after May of 2017?

22            MR. HUDSON:  I'm -- I'm just asking

23   questions.  The witness seemed to understand it, has

24   answered it.  So I think -- I think we've --

25   we've -- we've covered it.

1    the time period after 2014, sir, you've talked about
2    a process that Cricket initiated in 2017 or forward
3    that related to signature capture, correct?
4         A.   Yeah, that's correct.
5         Q.   And is the contention that certain Cricket
6    customers agreed to arbitrate their disputes through
7    that process, but as you sit here today, you cannot
8    say whether or not any of the Cricket -- the legacy
9    Cricket customers from 2012 to 2014 did so, correct?
10             MR. INGBER:  Objection.  Asked and
11   answered.
12             THE WITNESS:  I cannot give you specific
13   names of customers that -- that may have done that.
14   BY MR. HUDSON:
15        Q.   Okay.  And so are those -- are those, sir,
16   the two processes, then, that Cricket contends
17   resulted in customers agreeing to arbitration?
18        A.   That's correct.
19        Q.   There's nothing else, that you're aware of,
20   that -- that Cricket points to, in terms of
21   processes or policies or practices, that resulted in
22   customers agreeing to arbitration, correct?
23        A.   Outside of, again, using your device, the
24   new process of signing the signature capture device
25   in May of 2017 forward, the text messages that we

```
 1

 2

 3

 4

 5         I, Monica Lepe-Georg, a Certified Shorthand

 6   Reporter, do hereby certify:

 7            That prior to being examined, the witness

 8   in the foregoing proceedings was by me duly sworn to

 9   testify to the truth, the whole truth, and nothing

10   but the truth;

11            That said proceedings were taken remotely

12   before me at the time and places therein set forth

13   and were taken down by me in shorthand and

14   thereafter transcribed into typewriting under my

15   direction and supervision;

16            I further certify that I am neither counsel

17   for, nor related to, any party to said proceedings,

18   not in anywise interested in the outcome thereof.

19            IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21   Dated:  February 16th, 2021

22

23                          _____

                              MONICA LEPE-GEORG, No. 11976

24

25
```