1

2 MAYER BROWN LLP
Archis A. Parasharami (SBN 321661)
3 aparasharami@mayerbrown.com
Kevin S. Ranlett (*pro hac vice*)
4 kranlett@mayerbrown.com
Daniel E. Jones (*pro hac vice*)
5 djones@mayerbrown.com
1999 K Street, N.W.
6 Washington, D.C. 20006-1101
Telephone: (202) 263-3000
7 Facsimile: (202) 263-3300

8 MAYER BROWN LLP
Matthew D. Ingber (*pro hac vice*)
9 mingber@mayerbrown.com
Jarman D. Russell (*pro hac vice*)
10 jrussell@mayerbrown.com
1221 Avenue of the Americas
11 New York, New York 10020-1001
Telephone: (212) 506-2500
12 Facsimile: (212) 262-1910

13

14 *Attorneys for Defendant*
*Cricket Wireless, LLC*

15

CROWELL & MORING LLP
Kristin J. Madigan (SBN 233436)
KMadigan@crowell.com
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

CROWELL & MORING LLP
Christopher A. Cole (*pro hac vice*)
CCole@crowell.com
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

16                    **UNITED STATES DISTRICT COURT**

17                   **NORTHERN DISTRICT OF CALIFORNIA**

18

19 URSULA FREITAS, individual, on behalf of
herself and others similarly situated,

20                         Plaintiffs,

21 vs.

22 CRICKET WIRELESS, LLC,

23                         Defendant.

24

25

26

27

28

Case No. 3:19-cv-07270-WHA

**CRICKET WIRELESS, LLC'S REPLY
IN SUPPORT OF ITS MOTION TO
COMPEL ARBITRATION OF CLASS
MEMBERS**

Date: October 7, 2021
Time: 1:30 p.m.
Location: Courtroom 12, 19th Floor
Judge: Hon. William H. Alsup

Complaint Filed: November 4, 2019

`.

# TABLE OF CONTENTS

**Page**

ARGUMENT ..................................................................................................................... 2

I.  Absent class members agreed to arbitrate their claims in this case .................................. 2

    A.  Cricket's "No Contract" tagline in its advertising does not eliminate absent class members' assent to Cricket's Terms ............................................................. 2

    B.  Cricket has not "admitted" that it has no contracts with customers ..................... 3

    C.  Reasonable customers were on either inquiry or actual notice of Cricket's Terms ....................................................................................................................... 5

        1.  Under *Hill*, consumers are bound by terms they could have, through reasonable diligence, discovered and rejected............................. 6

        2.  The title of the Quick Start Guide does not preclude inquiry notice here ....................................................................................................... 7

        3.  Plaintiffs' cases accepting "conspicuousness" challenges are distinguishable ................................................................................. 9

        4.  Cricket's Quick Start Guide Terms were also enforceable under *Norcia* ...................................................................................... 10

    D.  Customers had a meaningful opportunity to reject the Terms in New Cricket's Terms and Conditions booklets ...................................................... 11

II.  Plaintiffs' challenges to arbitration agreements formed by electronic signatures or text messages should be rejected .................................................................................. 13

III.  Plaintiffs' request to exclude evidence should be denied ............................................... 14

1
2

# TABLE OF AUTHORITIES

**Page(s)**

3

**Cases**

4
5

*Am. Bankers Ins. Co. of Fla. v. Tellis*,
   192 So. 3d 386 (Ala. 2015) ..............................................................................................12

6
7

*Arellano v. T-Mobile USA, Inc.*,
   2011 WL 1362165 (N.D. Cal. Apr. 11, 2011) ....................................................................8

8

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ..........................................................................................................11

9
10

*Athon v. Direct Merchants Bank*,
   2007 WL 1100477, at *5 (M.D. Ga. Apr. 11, 2007) ........................................................13

11

*Bank One, N.A. v. Coates*,
   125 F. Supp. 2d 819 (S.D. Miss. 2001) ..............................................................................8

12
13

*Barraza v. Cricket Wireless LLC*,
   2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) (Alsup, J.) ...........................................2, 3, 8

14
15

*Bess v. DirecTV, Inc.*,
   885 N.E.2d 488 (Ill. App. Ct. 2008) .................................................................................12

16

*Chamberlain v. LG Elecs. U.S.A., Inc.*,
   2017 WL 3084270 (C.D. Cal. June 29, 2017) ....................................................................7

17
18

*Citizens Telecomms. Co. of W. Va. v. Sheridan*,
   799 S.E.2d 144 (W. Va. 2017) ............................................................................................3

19
20

*Cleveland v. The Behemoth*,
   2021 WL 2184852 (S.D. Cal. May 28, 2021) ...................................................................15

21

*Crandall v. AT & T Mobility, LLC*,
   2008 WL 2796752 (S.D. Ill. July 18, 2008) .......................................................................7

22
23

*Cuadras v. MetroPCS Wireless, Inc.*,
   2011 WL 11077125 (C.D. Cal. Aug. 8, 2011) ....................................................................3

24
25

*Davis Mobile Homes, L.L.C. v. U.S. Bank Nat'l Ass'n*,
   2012 WL 5356132 (Iowa Ct. App. 2012) .........................................................................13

26

*Defontes v. Dell, Inc.*,
   984 A.2d 1061 (R.I. 2009) ................................................................................................10

27
28

*Everett v. Am. Gen. Life Ins. Co.*,
   703 F. App'x 481 (9th Cir. 2017) .....................................................................................15

ii

**TABLE OF AUTHORITIES**
(CONTINUED)

**Page(s)**

*Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*,
    345 F. Supp. 3d 1111, 1119 (N.D. Cal. 2018) ............................................................4

*Frontline Med. Assocs., Inc. v. Coventry Health Care*,
    263 F.R.D. 567 (C.D. Cal. 2009) ............................................................14

*Estate of Gonzalez v. Hickman*,
    2007 WL 3237635 (C.D. Cal. June 28, 2007) ............................................15

*Grandoe Corp. v. Gander Mountain Co.*
    761 F.3d 876, 888 (8th Cir. 2014) ............................................................10

*Hill v. Gateway 2000, Inc.*,
    105 F.3d 1447 (7th Cir. 1997) .......................................................... *passim*

*Imperial Indus. Supply Co. v. Thomas*,
    825 F. App'x 204 (5th Cir. 2020) ............................................................10

*J.A. through Allen v. Microsoft Corp.*,
    2021 WL 1723454 (W.D. Wash. Apr. 2, 2021).......................................10

*Jialu Wu v. iTalk Glob. Commc'ns, Inc.*,
    2020 WL 8461696 (C.D. Cal. Oct. 21, 2020).....................................3, 11

*Joaquin v. DIRECTV Grp. Holdings, Inc.*,
    2016 WL 4547150 (D.N.J. Aug. 30, 2016) ..............................................7

*Kanellakopoulos v. Unimerica Life Ins. Co.*,
    2018 WL 984826 (N.D. Cal. Feb. 20, 2018) ............................................4

*Kara Tech., Inc v. Stamps.com, Inc.*,
    2008 WL 11338711 (C.D. Cal. Apr. 3, 2008) ........................................15

*Leslie v. First Premier Bank*,
    2017 WL 8186854 (N.D. Ga. Oct. 13, 2017) ..........................................13

*Marsh v. First USA Bank, N.A.*,
    103 F. Supp. 2d 909 (N.D. Tex. 2000) ......................................................8

*McNamara v. Samsung Telecomms. Am., LLC*,
    2014 WL 5543955 (N.D. Ill. Nov. 3, 2014) ..............................................7

*MetroPCS v. Pesina*,
    190 F. Supp. 3d 688 (S.D. Tex. 2016) ......................................................7

iii

1

**TABLE OF AUTHORITIES**
(CONTINUED)

2

**Page(s)**

3

*Moran v. Charter Commc'ns, Inc.*,

4
     2020 WL 5833640 (C.D. Cal. June 11, 2020) ..................................................3, 11

5
*Nat'l Fed'n of the Blind v. The Container Store*
     904 F.3d 70, 83 (1st Cir. 2018)................................................................................9

6

7
*Norcia v. Samsung Telecomms. Am., LLC*,
     845 F.3d 1279 (9th Cir. 2017) ....................................................................... *passim*

8
*O'Quin v. Verizon Wireless*,

9
     256 F. Supp. 2d 512 (M.D. La. 2003).......................................................................8

10
*ProCD, Inc. v. Zeidenberg*,
     86 F.3d 1447 (7th Cir. 1996) ....................................................................................8

11
*Rapp v. Dime Sav. Bank of N.Y.*,

12
     408 N.Y.S.2d 540 (App. Div. 1978)........................................................................12

13
*Schafer v. AT & T Wireless Servs., Inc.*,
     2005 WL 850459 (S.D. Ill. Apr. 1, 2005)...............................................................7, 8

14

15
*Schmidt v. Samsung Elecs. Am., Inc.*,
     2017 WL 2289035 (W.D. Wash. May 25, 2017).......................................................7

16

17
*Schnabel v. Trilegiant Corp.*,
     697 F.3d 110 (2d Cir. 2012).....................................................................................9

18
*Schultz v. AT & T Wireless Servs., Inc.*,

19
     376 F. Supp. 2d 685 (N.D. W. Va. 2005) .................................................................7

20
*Schwartz v. Comcast Corp.*,
     256 F. App'x 515 (3d Cir. 2007) ..........................................................................6, 7

21

22
*Sgouros v. TransUnion Corp.*,
     817 F.3d 1029 (7th Cir. 2016) ..................................................................................9

23
*Shupe v. Cricket Commc'ns, Inc*,
     2013 WL 68876 (D. Ariz. Jan. 7, 2013) ..................................................................3

24

25
*Snapp v. United Transp. Union*,
     889 F.3d 1088 (9th Cir. 2018) ..................................................................................4

26
*Specht v. Netscape Commc'ns Corp.*,

27
     306 F.3d 17 (2d Cir. 2002).......................................................................................9

28

iv

1

2

### TABLE OF AUTHORITIES
#### (CONTINUED)

Page(s)

3

4

*Taylor v. Samsung Elecs. Am.*,
   2018 WL 3921145 (N.D. Ill. Aug. 16, 2018) ............................................................7

5

*Unionamerica Ins. Co. v. Fort Miller Grp., Inc.*,
   2009 WL 275104 (N.D. Cal. Feb. 4, 2009) ...........................................................15

6

7

*United States v. Perkins*,
   937 F.2d 1397 (9th Cir. 1991) ................................................................................5

8

9

*Wendt v. Host Int'l, Inc.*,
   125 F.3d 806 (9th Cir. 1997) .................................................................................16

10

**Other Authorities**

11

Fed. R. Civ. P. 26(a) ....................................................................................14, 15

12

Fed. R. Civ. P. 26(a) .........................................................................................15

13

Fed. R. Civ. P. 37(c)(1) ....................................................................................15

14

7 James W. Moore et al., Moore's Federal Practice (3d ed. 2016) .................................4

15

Restatement (Second) of Contracts (1981) ...............................................................12, 13

16

17

18

19

20

21

22

23

24

25

26

27

28

v

Plaintiffs do not dispute that all of the Cricket phones purchased by class members were packaged with booklets containing arbitration clauses that cover the claims in this case. And plaintiffs largely ignore the authorities in Cricket's Motion holding that consumers are on notice of, and bound by terms enclosed with, products. Instead, they assert three theories as to why the Court should depart from this overwhelming precedent. All are misguided.

First, plaintiffs argue (without citing a single case) that no jurisdiction would enforce Cricket's terms because it advertised its prepaid wireless service as "no contract" service. Opp. 8–10. But every court to consider that argument has rejected it. As those courts have explained, the only reasonable understanding of "no contract" statements in advertising for services, including Cricket service, is that there are no time commitments (*i.e.*, the customer may cancel anytime). "No contract" does *not* mean that there aren't any contract terms whatsoever.

Second, plaintiffs assert that the cover of Cricket's Quick Start Guide did not make the contractual nature of the terms enclosed in that guide sufficiently "conspicuous." They rely on a handful of cases, most notably *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017). Opp. 10–16. But plaintiffs overlook the other forms of notice that were provided to customers (including in separate pamphlets and store receipts). Those notices were absent in *Norcia*. Moreover, even setting aside those other forms of notice, plaintiffs are dead wrong in asserting that all states "uniformly" accept *Norcia*'s approach to inquiry notice. Opp. 12–13. In fact, a number of courts have expressly rejected *Norcia*, while others analyze the question of notice in a manner that implicitly rejects *Norcia*'s reasoning. Plaintiffs have nothing to say about these authorities, even though they were discussed in Cricket's Motion (at 11–21, 24 & nn. 6–12). Indeed, as to the vast majority of jurisdictions, plaintiffs either cite no authority at all or point to authorities that *support* Cricket's position. As to these jurisdictions, plaintiffs have failed to rebut Cricket's showing that customers are bound by Cricket's Terms. At absolute minimum, therefore, the Court should grant Cricket's Motion and enforce the arbitration agreements of absent class members who purchased Cricket phones or service in the following **44 jurisdictions** whose law plaintiffs do not address in their Opposition: Alabama, Alaska, Arkansas, Arizona, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa,

Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

Third, although plaintiffs concede that the contractual nature of New Cricket's "Terms and Conditions" booklet was clear from the cover (Opp. 17), they argue that those Terms are nonetheless unenforceable because (in their view) customers could not reject them. That is incorrect. Customers had a seven-day window to return their phone. That is a meaningful opportunity to decide whether to accept Cricket's Terms. And even if it wasn't, each time customers chose to buy a new month's service, they were again agreeing to Cricket's Terms. Plaintiffs do not challenge the validity of those subsequent contract acceptances, nor could they, as class members freely chose to renew their prepaid service on a month-to-month basis.

The rest of plaintiffs' Opposition rehashes arguments that are beyond the scope of Cricket's Motion and lobs baseless evidentiary objections. Those arguments should be rejected.[1]

## ARGUMENT

**I.**    **Absent class members agreed to arbitrate their claims in this case.**

**A.**    **Cricket's "No Contract" tagline in its advertising does not eliminate absent class members' assent to Cricket's Terms.**

Plaintiffs are unable to find a single case supporting their assertion that Cricket's "No Contract" marketing slogan means that consumers are not bound by any contract terms. That is because courts, including this one, uniformly have rejected that argument, recognizing that "'No Contract' in the context of advertisements for telecommunications services is meant to distinguish services with annual commitments from those that do not require such commitments"—not to "trick consumers into unknowingly asserting to arbitration[.]" *Barraza v. Cricket Wireless LLC*, 2015 WL 6689396, at *6 (N.D. Cal. Nov. 3, 2015) (Alsup, J.); *see also*, *e.g.*, *Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, 2020 WL 8461696, at *3 (C.D. Cal. Oct. 21, 2020)

---

[1] As Cricket has explained (Mot. 1 n.1), any ruling on this Motion must be delayed until after class members have received notice and the opt-out period has ended.

("'No Contract' . . . simply means Plaintiff is not bound to a service contract for a specific period of time," and "*does not mean, as Plaintiff suggests, that there are no terms and conditions whatsoever[.]*"); *Moran v. Charter Commc'ns, Inc.*, 2020 WL 5833640, at *5 (C.D. Cal. June 11, 2020) (following *Barraza*); *Cuadras v. MetroPCS Wireless, Inc.*, 2011 WL 11077125, at *6 n.2 (C.D. Cal. Aug. 8, 2011) ("The Court is not persuaded by plaintiff's argument that the T & Cs cannot be a contract because MetroPCS advertises that it is a 'no contract' wireless service provider."); *Citizens Telecomms. Co. of W. Va. v. Sheridan*, 799 S.E.2d 144, 150 (W. Va. 2017) ("'No contract' . . . advertisements . . . do not imply that the service is governed by no terms whatsoever."). Indeed, two courts, including this one, have enforced Cricket's Terms specifically, over precisely the objection that plaintiffs raise here. *Barraza*, 2015 WL 6689396, at *6; *Shupe v. Cricket Commc'ns, Inc.*, 2013 WL 68876, *5 (D. Ariz. Jan. 7, 2013).

In resisting this unbroken line of cases, plaintiffs also ignore well-known industry practice. At least a dozen vendors advertised "no contract" prepaid wireless services during the class period, including Virgin Mobile ("NO CONTRACT PLANS"); Boost Mobile ("No Contract Plans"); Tracfone ("No Contract Monthly Plans"); FreedomPop ("No Contracts"); PagePlus ("No Contract Prepaid Plans"); Consumer Cellular ("no contracts"); Pure Talk ("No Contracts"); Republic Wireless ("No Contracts"); Ting ("No contracts"); Amazon.com ("No-Contract Cell Phones"); Bestbuy.com ("No-Contract Mobile Phones"); and Walmart.com ("No Contract Smartphones"). Declaration of Lindsay Osso, Exs. 1–16. The "no contract" terminology is also used regularly in media descriptions of prepaid wireless carriers. *Id.* Exs. 17–19.

Plaintiffs' argument would jettison literally millions of contracts between these wireless companies and their customers. It comes as no surprise that courts have rejected that view. And plaintiffs cite no evidence that any consumer has ever interpreted Cricket's "No Contract" tagline to mean that customers have no contract whatsoever with Cricket.

### B.    Cricket has not "admitted" that it has no contracts with customers.

Plaintiffs falsely assert that Cricket's "own handpicked corporate witnesses have definitively testified . . . that Cricket 'operated under a no contract policy'" (and that this meant "no contractual obligations whatsoever"), and that this purported admission "is conclusive in this

case." Opp. 8–9. That argument misrepresents the facts and misstates the law.

To start, Cricket's corporate witnesses did not so testify. Cricket's 30(b)(6) witness, Michael Moses, *rejected* plaintiffs' attempts to equate the phrase "no contract" with no "terms and conditions." Supplemental Declaration of Jarman Russell, Ex. C (Moses Tr. 30:9–10). Instead, he explained that "by signing up for Cricket service, and using the phone . . . or making a service payment" customers would "be agreeing to [Cricket's] terms and conditions." *Id.* (Tr. 29:23–30:3); *see also id.* (Tr. 14:16–15:21; 78:10–13) (same). He also testified that "[t]he only exception would be if they followed the optional opt-out procedure [for legacy Cricket's arbitration clause]." *Id.* (Tr. 30:11–12). Tim Towster similarly testified (in his personal capacity) that Cricket's "no contract policy" was meant to distinguish "prepaid" service from the "post paid carriers" that imposed "typically [] 24 month[]" commitments; in contrast, Cricket "had no contract requirements on monthly service. You could activate a phone and service in month one and decide not to be with us in month two and there was no further obligations either on the handset or service side." ECF 177-17 (Towster Tr. 250:14–23).[2]

And contrary to plaintiff's contention, a corporation can be precluded from contradicting Rule 30(b)(6) witness testimony "only where the purportedly conflicting evidence truly, and without good reason or explanation, is in conflict, *i.e.*, where it cannot be deemed as clarifying or simply providing full context for the Rule 30(b)(6) deposition." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018). Here, Moses's testimony was entirely *consistent* with Cricket's arguments that absent class members are bound by Cricket's arbitration clauses.[3]

Plaintiffs' reliance on cherry-picked excerpts from Cricket's *expert* witnesses (Wilkins

---

[2] This testimony fundamentally distinguishes this case from *Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*, where the court granted summary judgment to the defendant because the plaintiff offered no evidence to support its theory of consumer expectations except its expert's unsupported "*ipse dixit*." 345 F. Supp. 3d 1111, 1119 (N.D. Cal. 2018).

[3] Even if Moses had testified that Cricket's "no contract" statements meant that Cricket provided service without any enforceable contract terms whatsoever, those statements would not be binding. "[A] Rule 30(b)(6) deponent's own interpretation of the facts or legal conclusions do not bind the entity." *Snapp*, 889 F.3d at 1103 (quoting 7 James W. Moore et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)). Indeed, the case plaintiffs cited held that a Rule 30(b)(6) witness's testimony about "the meaning of policy provisions" was not binding because such legal questions are "the exclusive province of the Court." *Kanellakopoulos v. Unimerica Life Ins. Co.*, 2018 WL 984826, at *7 (N.D. Cal. Feb. 20, 2018).

and Rarrick) are also taken out of context. Wilkins opined that Cricket customers "were not bound by a contract" in the sense that they "had no continuing obligation *to migrate to New Cricket*" after the AT&T merger (*i.e.*, because there were no monthly term commitments). Dkt. 312-2 ¶ 23 (emphasis added). And Rarrick opined that "[s]ince prepaid customers are not bound by 2-year contracts, they typically have shorter tenure in the customer lifecycle with prepaid brands." Dkt. 312-3 ¶ 20. Moreover, neither expert was retained to opine nor rendered an opinion as to the existence of a contract as a matter of law. The testimony on which plaintiffs rely derives from cross-examination of Rarrick that goes far "beyond the witness's area of expertise" and would be properly excluded. *United States v. Perkins*, 937 F.2d 1397, 1405 (9th Cir. 1991).

## C.   Reasonable customers were on either inquiry or actual notice of Cricket's Terms.

Although plaintiffs do not dispute that class members who received New Cricket's Terms and Conditions booklets (provided starting in May 2014) had sufficient notice of the Terms, plaintiffs argue that legacy Cricket's Quick Start Guide (provided until May 2014) did not give sufficiently "clear" notice of its Terms under *Norcia* and a handful of outlier or off-point cases (discussed *infra* pp. 8–10). Plaintiffs contend that *Norcia* reflects a "settled" and "uniform[]" approach to inquiry notice across all jurisdictions. Opp. 13. That's false: Many courts have parted ways with *Norcia*, instead selecting the approach set out in the landmark decision in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1447 (7th Cir. 1997). *See* Mot. 24 n.12 (discussing split between *Norcia* and *Hill*). And *Norcia* itself "reject[ed]" Samsung's invitation to follow *Hill* and hold that, under California law, "consumers expect that products will come with additional terms"— *specifically because* "California courts have not adopted the principle set forth in *Hill*." 845 F.3d at 1290. Tellingly, plaintiffs simply ignore this discussion and most of Cricket's authorities. At absolute minimum, Cricket's Motion should be granted as to the 44 jurisdictions that plaintiffs' Opposition simply doesn't mention, and therefore has conceded. *See supra*, pp. 1–2.

### 1.   Under *Hill*, consumers are bound by terms they could have, through reasonable diligence, discovered and rejected.

As explained in Cricket's Motion (at 11–21), the overwhelming majority of courts agree

that reasonable consumers expect (and are therefore on inquiry notice) that sophisticated products and services—like telecommunications services—come with terms and conditions. *See*, *e.g.*, *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 519–20 (3d Cir. 2007) (finding it "impossible to infer that a reasonable adult" making "monthly payments" for services would believe that his contract consisted of a "single promise" that the service would be "always on," rather than the full terms posted on the seller's website).

These courts' decisions rely on the Seventh Circuit's decision in *Hill*, in which Judge Easterbrook explained that even if a product box did not disclose that "additional terms were within," that fact would have no "legal" consequence, because "[s]hoppers have three principal way to discover" a seller's terms: (i) "they can ask the vendor to send a copy before deciding whether to buy," (ii) "consult public sources," or (iii) "inspect the documents [that come with a product]." 105 F.3d at 1150. Consumers who rely on the "third option"—the opportunity to inspect terms provided with a product—and then retain the seller's product beyond the return window, thereby validly assent to the seller's terms, "including the arbitration clause." *Id.* Under *Hill*, customers who fail to avail themselves of these options cannot later assert ignorance as a reason to avoid the binding force of their conduct.

Cricket customers had the same opportunities identified in *Hill* to view Cricket's Terms:

(1) Class members could have asked store employees to see the Terms before buying a phone: The My Cricket Guide included a full-sized page devoted to highlighting Cricket's key terms (including its arbitration provision), along with a link to Cricket's full terms (Dkt. 313-10). This Guide was readily "available in [Cricket] stores." Dkt. 177-17 (Towster Tr. 324:10–11). "If a customer wanted to walk away with information about Cricket, this was given to them." *Id.* (Tr. 324:10–14).

(2) Class members could have viewed Cricket's Terms online. Mot. 8; Garcia Decl. ¶ 8.

(3) Customers could have inspected the booklets enclosed with their phones. Had they done so, they would have easily discovered the Terms starting on page 6 of the Quick Start Guide (Dkt. 206-1, at CRICKET00426087) and the beginning of the Terms and Conditions booklet (Dkt. 314-2, at 3).

### 2. The title of the Quick Start Guide does not preclude inquiry notice here.

Plaintiffs object that, unlike in *Hill*, the contractual nature of the Quick Start Guide was not obvious from its title. Opp. 14. But courts following *Hill* have enforced contracts in booklets bearing equivalent titles. *See, e.g.*, *Crandall v. AT & T Mobility, LLC*, 2008 WL 2796752, at *2 (S.D. Ill. July 18, 2008) ("Welcome Guide"); *Schafer v. AT & T Wireless Servs., Inc.*, 2005 WL 850459, at *5 (S.D. Ill. Apr. 1, 2005) (same); *Schultz v. AT & T Wireless Servs., Inc.*, 376 F. Supp. 2d 685, 692 (N.D. W. Va. 2005) (same); *see also Taylor v. Samsung Elecs. Am.*, 2018 WL 3921145, at *3 (N.D. Ill. Aug. 16, 2018) ("Health & Safety and Warranty Guide"); *McNamara v. Samsung Telecomms. Am., LLC*, 2014 WL 5543955, at *2 (N.D. Ill. Nov. 3, 2014) (same); *Schmidt v. Samsung Elecs. Am., Inc.*, 2017 WL 2289035, at *1 (W.D. Wash. May 25, 2017) ("Product Safety and Warranty Information"); *Chamberlain v. LG Elecs. U.S.A., Inc.*, 2017 WL 3084270, at *1, 5 (C.D. Cal. June 29, 2017) (same, and distinguishing *Norcia* as limited to California law).

Indeed, courts have enforced contracts that the customer claimed were not provided with the product *at all* (making the titling on printed documents irrelevant), when, as here, the terms were otherwise available online or by contacting customer service. *See, e.g.*, *Schwartz*, 256 F. App'x at 520 (enforcing terms customer claimed were never provided but were "at all times . . . posted on [the defendant's] web site").[4] Moreover, unlike in *Hill*, Cricket notified consumers of

---

[4] *See also, e.g.*, *Taylor*, 2018 WL 3921145, at *4 ("A cell phone company's posting of its terms and conditions on its website provides users of its products a reasonable opportunity to read them."); *Joaquin v. DIRECTV Grp. Holdings, Inc.*, 2016 WL 4547150, at *1, 3 (D.N.J. Aug. 30, 2016) (enforcing arbitration agreement based on customer's "continuing to accept defendants' services" even though plaintiff claimed "that the only documents she ever received in connection with [her TV service] were monthly invoices"); *MetroPCS v. Pesina*, 190 F. Supp. 3d 688, 691 (S.D. Tex. 2016) ("by purchasing or opening the package, activating, using or paying for MetroPCS service, the purchaser [validly] agrees to the MetroPCS Terms and Conditions posted on www.metropcs.com"—but never provided to the customer); *Schafer*, 2005 WL 850459, at *5 (enforcing arbitration clause even though contract terms were purportedly missing from phone box because "Plaintiff could have obtained [the terms] by contacting the seller in the same manner that she did when she ordered [her] phone"); *cf. Arellano v. T-Mobile USA, Inc.*, 2011 WL 1362165, at *3 (N.D. Cal. Apr. 11, 2011) (terms and conditions "readily available" when they were "included in the box with the telephones sold" and also "available online at www.T-Mobile.com or by calling T–Mobile's toll-free Customer Care number"); *O'Quin v. Verizon Wireless*, 256 F. Supp. 2d 512, 516 (M.D. La. 2003) (enforcing terms over objection that customer never received them); *Bank One, N.A. v. Coates*, 125 F. Supp. 2d 819, 831, 834 (S.D. Miss. 2001) (similar), *aff'd sub nom. Bank One NA v. Coates*, 34 F. App'x 964 (5th Cir. 2002);

7

the existence of its Terms in the My Cricket Guides—a full-sized booklet that was "heavily utilized during the sales process" and handed to the customer at the end of the transaction. Dkt. 177-17 (Tr. 164:23–165:2; 324:10–14, 327). Although this Court disregarded that additional notice in *Barraza* because the plaintiffs submitted declarations attesting that "they were never given those materials and never reviewed them" (2015 WL 6689396, at *2), plaintiffs here have submitted no evidence contesting Cricket's evidence that the materials were provided to customers as a general matter. Dkt. 177-17.

As a fallback, plaintiffs argue that *Hill* and its predecessor, *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996), did not address the specific circumstances here (Opp. 16). But later case law confirms that the manner in which Cricket disclosed its Terms was more than sufficient to put absent class members on inquiry notice—given the nature of cellular phone service, the accessibility of Cricket's terms (online, in stores, and in phone boxes), and the other notices of the Terms provided (such as in the My Cricket Guide). *Supra* pp. 2–3, 7 & n. 5.

Plaintiffs have not disputed that any customer *genuinely* interested in reading Cricket's Terms had an opportunity to do so. Nor could they: The evidence of *actual* opt-outs (Dkt. 207 ¶ 10) demonstrates that a meaningful number of Cricket customers had actual notice of the arbitration provision, and plaintiffs have offered no countervailing evidence that absent class members were unable to locate or read Cricket's Terms. In any event, plaintiffs' theory that *all* consumers lacked noticed of Cricket's Terms fails as a matter of law.

### 3.    Plaintiffs' cases accepting "conspicuousness" challenges are distinguishable.

None of plaintiffs' cases establish that the Terms in the Quick Start Guides are unenforceable. For example, they cite *National Federation of the Blind v. The Container Store*, which involved a class of blind customers who "had *no way of accessing* the terms of [defendant's] loyalty program, including the arbitration agreement" because of the defendant's failure to use tactile keypads on point-of-sale devices. 904 F.3d 70, 83 (1st Cir. 2018) (emphasis added) (Texas law). That situation is very different from the facts presented here. Moreover,

*Marsh v. First USA Bank, N.A.*, 103 F. Supp. 2d 909, 918 (N.D. Tex. 2000) (similar).

unlike here, the *Container Store* defendant submitted no evidence that customers had any idea that there even were contract terms. *Id.* at 83 & n.17.

Plaintiffs also rely on the inapposite decisions in *Specht* and *Sgouros*. Both dealt with online browsewrap transactions, and hold merely that a customer does not "assent" to an agreement by clicking a button that appears to "serve[] a particular purpose unrelated to [that] Agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016) (Illinois law) (click authorizing defendant to "obtain [customer's] personal information" does not show assent to separate, undisclosed contract); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (California law) (click on "free download" button is not assent to unseen terms at bottom of webpage). In fact, *Specht* specifically distinguished *Hill*, recognizing that the receipt of "printed [] terms . . . with the product" "is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on inquiry notice of those terms." *Id.* at 31, 33.

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012), is similarly inapposite. It held merely that customers do not assent by inaction to terms referenced in an "unsolicited email from an online" discount "service in which the recipients had previously enrolled," because customers would have no reason to expect "terms later by email." *Id.* at 123, 126 (California and Connecticut law). Again, though, the court *specifically* distinguished "shrinkwrap cases" like *Hill*, where contracts enclosed with products "become enforceable [] upon the customer's purchase and . . . failure to return the product after reading, or at least having a realistic opportunity to read, the terms and conditions … included with the product." *Id.* at 122, 125.

Plaintiffs' remaining cases are even further afield. In one case, the *customer* sent a purported "acceptance" and contract to the *seller* of a power generator, but no contract was formed because the seller had *never offered a contract in the first place. Imperial Indus. Supply Co. v. Thomas*, 825 F. App'x 204, 205, 207 (5th Cir. 2020) (Mississippi law). *Grandoe Corp. v. Gander Mountain Co.* involved a dispute between two merchants with a long history of verbal dealings. 761 F.3d 876, 888 (8th Cir. 2014) (Minnesota law). A jury found that, when one merchant emailed a written contract purporting to supersede all verbal contracts, and the other never responded, no new contract was formed. *Id.* The reviewing court agreed that, "[g]iven the

9

[long] course of dealing between [the parties]," a "reasonable jury" could have found it unreasonable to infer consent to a contract that "fundamentally changed the way the parties did business" from "silence." *Id.* at 888–89.[5] No similar history of verbal dealings is present here. Finally, *J.A. through Allen v. Microsoft Corp.*, 2021 WL 1723454 (W.D. Wash. Apr. 2, 2021), and *Defontes v. Dell, Inc.*, 984 A.2d 1061 (R.I. 2009) (cited at Opp. 16) support *Cricket's* position for the reasons described in the Motion (at 14 n.6, 16–17 & n.9).

### 4. Cricket's Quick Start Guide Terms were also enforceable under *Norcia.*

Cricket already explained in its Motion why *Norcia* (applying California law) and *Noble* (applying New Jersey law) are distinguishable—namely, because class members here received multiple notices of Cricket's Terms, as well as actual notice in some cases. Mot. 24–25 & n.13.

Plaintiffs barely respond except to argue that the text used in these notices was small. Opp. 14 n.1. But plaintiffs ignore the use of prominent headings to flag these notices of Terms for customers. The My Cricket Guide, for example, discusses the Terms in small, but legible, text directly under a heading in much larger font: "IMPORTANT INFORMATION / Important Service/Product Specific Terms." Dkt. 313-10, at 21.[6] Moreover, customers who read the Terms do not need separate notices of the Terms' existence, and plaintiffs do not dispute Cricket's evidence that customers regularly read the Terms. *See* Dkt. 207, at ¶ 10.

Because plaintiffs do not (and cannot) contend that no class member received the My Cricket Guide, their complaints about notice at most support an argument that Cricket's arbitration clause is procedurally unconscionable. But "[u]nder California law[,] . . . [a] finding of unconscionability requires "a 'procedural' and a 'substantive' element[.]" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011). Because plaintiffs have asserted no basis for finding substantive unconscionability, plaintiffs' unconscionability objection fails as a matter of law.

---

[5] Nor did the merchant consent by placing a new order, because the record contained no evidence that the purchase order incorporated the new terms. *Grandoe*, 761 F.3d at 888–89.

[6] That notice states: "Your Agreement with Cricket . . . includes . . . the most recent Cricket Terms . . . available at www.mycricket.com. Carefully read all the Cricket Terms . . ., which include, among other things, a MANDATORY ARBITRATION of disputes provision." *Id.* This notice is sufficient to alert a reasonable consumer to Cricket's Terms.

1    Plaintiffs also argue that Cricket's "no contract" advertising dictates a finding that the

2    Quick Start Guide Terms are unenforceable under *Norcia*. Opp. 15. But even after *Norcia*,

3    federal courts in California have rejected the argument that customers understand "no contract"

4    advertisements to promise no terms whatsoever. *See, e.g.*, *Wu*, 2020 WL 8461696, at *3; *Moran*,

5    2020 WL 5833640, at *5; *see also supra* pp. 2–3.

6    **D.    Customers had a meaningful opportunity to reject the Terms in New
        Cricket's Terms and Conditions booklets.**

7

8    Plaintiffs do not dispute (nor could they) that customers who received the *legacy Cricket*

9    Quick Start Guide had ample opportunity to reject Cricket's Terms by returning their phones and

10   canceling service *or* by "opting out" of arbitration within 60 days of purchase. Mot. 5.

11   But plaintiffs argue that customers who received *New Cricket's* "Terms and Conditions"

12   starting in mid-May 2014 had no meaningful right to reject, and therefore did not validly assent

13   to the Terms. Even if plaintiffs were correct—and they are not—most class members who

14   received the New Cricket Term booklets would have *also* received the May 22, 2014 text

15   message and are therefore properly excluded from the class for that reason. Dkt. 298, at 18.[7]

16   Moreover, plaintiffs have ignored New Cricket's return policy. Under that policy,

17   customers buying from "a Cricket Store" had "seven days to return" the phone, "starting on the

18   date of purchase." Supplemental Moses Declaration, ¶¶ 4–6, Ex. 1. And so long as the device

19   was returned to the store of purchase in as-new condition with all original components, there is

20   no fee. *Id.* ¶¶ 7–9, Exs. 1–2. Courts have found contracts enforceable in these circumstances.

21   *See, e.g.*, *Bess v. DirecTV, Inc.*, 885 N.E.2d 488, 492 (Ill. App. Ct. 2008) (contract enforceable

22   despite $15 restocking fee, which customer could avoid by canceling after receiving terms).

23   Plaintiffs argue that the return policy is irrelevant because the Terms would supersede it.

24   Opp. 18 n.4. But the Terms say otherwise: They incorporate "our Policies" (defined as "our

25   business policies, practices, and procedures"). Dkt. 206-04 (CRICKET02432922–23). This

26   would include Cricket's return policy.

27   ─────────────────────

28   [7]    Of the customers who received Terms and Conditions booklets, only 7,538 did not have
     service on May 22, 2014, the day the text message campaign was sent. Dkt. 313-13, ¶ 19.

11

Alternatively, plaintiffs argue that the Terms "prohibit customers from opting out by returning the phone" because customers agree to the Terms by actions that precede reading the enclosed Terms (*e.g.*, opening device packaging). Opp. 18. But this argument, too, fails to account for the return policy, which allows customers to reject the Terms by returning the phone. Indeed, "[w]here an offer . . . invites acceptance by performance . . . , the rendering of the invited performance *does not constitute an acceptance* if before the offeror performs his promise the offeree manifests an intention not to accept." Restatement (Second) of Contracts § 53(3) (1981) (emphasis added). Moreover, plaintiffs overlook customers' ability to review the Terms before purchase, which *would* give them an opportunity to decide whether to accept the Terms before opening the box. *See Hill*, 105 F.3d at 1150. In any event, plaintiffs have not submitted any evidence that any customer actually felt constrained from rejecting the Terms by returning the phone because of the wording of the Terms.

Regardless, this alleged conflict between the Terms and the return policy is academic. Virtually all class members who received a Terms and Conditions booklet purchased monthly service plans multiple times. Each time they did so, the customer agreed again to Cricket's Terms. Those later acceptances would vitiate any defect in the original acceptance. *See*, *e.g.*, *Am. Bankers Ins. Co. of Fla. v. Tellis*, 192 So. 3d 386, 391 (Ala. 2015) (though policyholders never "execute[d] … agreements," they "ratif[ied] the policies" "by … affirmatively renew[ing] their policies and pa[ying] premiums"); *Rapp v. Dime Sav. Bank of N.Y.*, 408 N.Y.S.2d 540, 545 (App. Div. 1978) ("By voluntarily opening a checking account . . . , the plaintiffs implicitly agreed to the terms thereof. This agreement was further ratified each time the plaintiffs voluntarily deposited checks into their account."), *aff'd* 396 N.E.2d 740 (N.Y. 1979); *Leslie v. First Premier Bank*, 2017 WL 8186854, at *5 & n.9 (N.D. Ga. Oct. 13, 2017) (even if customer "did not open the account," he "ratified" it by "making payments" and "is therefore bound by the entire [Credit Card] Agreement" (quoting *Athon v. Direct Merchants Bank*, 2007 WL 1100477, at *5 (M.D. Ga. Apr. 11, 2007))); *Davis Mobile Homes, L.L.C. v. U.S. Bank Nat'l Ass'n*, 2012 WL 5356132, at *5 (Iowa Ct. App. 2012) ("customer's continued use of [bank] account after being offered access to the [revised] terms of the agreement constituted 'acceptance, adoption,

1    ratification, or the like' of the terms"); *cf.* Restatement § 70 ("A . . . defective acceptance may be

2    effective as an offer to the original offeror").

3    **II.    Plaintiffs' challenges to arbitration agreements formed by electronic signatures or text messages should be rejected.**

4

5    Plaintiffs fault Cricket for failing to present evidence that customers executed electronic

6    signatures to accept Cricket's Terms or received text messages notifying them that continued

7    service constituted acceptance of Cricket's arbitration clause. Opp. 19–24. But plaintiffs

8    overlook the obvious explanation: Cricket's Motion invoked only the Terms contained in

9    booklets packaged with Cricket phones. *See generally* Dkt. 313.

10    There was no need for Cricket to move as to customers subject to the text-message and

11    electronic-signature arbitration agreements, because the Court's class-certification order (Dkt.

12    298) excluded them from the class. The Court explained that "[o]ur case presents common

13    classwide issues as to whether booklets in phone boxes constituted a legally effective means of

14    imposing an arbitration agreement on class members." *Id.* at 18. By contrast, "[c]onsumers who

15    agreed to arbitrate based on later iterations of Cricket's disclosure of arbitration[] clause[s]

16    warrant carve outs from the class." *Id.* The Court "f[ound] convincing that the vast majority of

17    those with accounts on or after May 22, 2014"—when Cricket sent the arbitration-related text-

18    message campaign—"will be bound to arbitrate claims," and so "no one who had an account

19    after May 22, 2014, may participate in the class." *Id.* And the "same reasoning applies" to those

20    who "were customers in 2017 and electronically signed terms and conditions[.]" *Id.* Because

21    customers subject to the text-message and electronic-signature agreements are not class

22    members, Cricket's Motion did not (and could not) encompass them.[8]

23    _____

24    [8] Plaintiffs also rehash their challenges from their clarification motion to the evidence of the text-message campaign that Cricket submitted at class certification. Opp. 20–24. As Cricket explained during the argument on that motion, those challenges are baseless. For example,

25    plaintiffs suggest that Cricket declarant Ann-Marie Blandino later admitted in a deposition that she lacked personal knowledge about the text message campaign. Opp. 20–21. That is false: The deposition took place months before Ms. Blandino signed her declaration, which was based on

26    her review of business records. In any event, plaintiffs do not deny that the text message campaign actually happened. And Cricket could provide more concrete evidence regarding the

27    campaign and electronic-signature agreements if the Court reconsiders those exclusions and Cricket must move to compel absent class members to arbitrate under those agreements.

28

13

### III.    Plaintiffs' request to exclude evidence should be denied.

Finally, plaintiffs' objections to the declaration of Katie Keser in support of Cricket's Motion lack merit. They assert that 165 exhibits to that declaration constitute "new" evidence (comprised of 98 reproductions of Cricket phone boxes and 67 versions of Cricket's Terms, corresponding to each phone model sold). *See* Dkt. 334-10 (Hudson Ex. I).

As a threshold matter, plaintiffs have not shown any violation of Rule 26(e), which imposes a duty "timely" to "supplement or correct" disclosures or discovery responses when a "party learns that [they are] in some material respect . . . incomplete or incorrect." *Frontline Med. Assocs., Inc. v. Coventry Health Care*, 263 F.R.D. 567, 568 n.1 (C.D. Cal. 2009); Fed. R. Civ. P. 26(e)(1)(A). Here, each exhibit that plaintiffs seek to strike is *materially identical* to the phone boxes and booklets produced during discovery, except that the phone model is changed.[9] The "new" exhibits fall within the document "categories" already identified in Cricket's Rule 26(a) disclosures (concerning "4G/LTE-capable devices" and "4G/LTE services and network" (Dkt. 334-3)) and thus do not render those disclosures "incomplete or incorrect." *Kara Tech., Inc v. Stamps.com, Inc.*, 2008 WL 11338711, at *1 (C.D. Cal. Apr. 3, 2008) (no Rule 26 violation when party attached new "version" to post-discovery declaration, given the "similarity of functionality between versions"). Nor was Cricket obligated to supplement its discovery responses. Plaintiffs gesture vaguely at their requests as a whole, but do not identify a *single*

---

[9] *Compare* Exhibit B (CRICKET02432333); Exhibit L (CRICKET02432251); Exhibit N (CRICKET02432270); Exhibit P (CRICKET02432519); Exhibit R (CRICKET02432352); Exhibit X (CRICKET02432405); Exhibit Z (CRICKET02432519); Exhibit AB (CRICKET02432370); Exhibit AJ (CRICKET02432709); Exhibit AO (CRICKET02432919); Exhibit AS (CRICKET02433825); Exhibit AU (CRICKET02433891); Exhibit AW (CRICKET02433073); Exhibit AY(CRICKET02433150); Exhibit BF (CRICKET02433232); Exhibit BJ (CRICKET02433309); Exhibit BL (CRICKET02433375); Exhibit BP (CRICKET02433973); Exhibit BR (CRICKET02433441); Exhibit BT (CRICKET02433571); Exhibit BU (CRICKET02433629); Exhibit BX (CRICKET02434129); Exhibit BZ (CRICKET02432179); Exhibit CD (CRICKET02434201); Exhibit CG (CRICKET02434430, CRICKET02434354); Exhibit CI (CRICKET02434430); Exhibit CO (CRICKET02434463); Exhibit CY (CRICKET02434535); Exhibit DA (CRICKET02434835); Exhibit DC (CRICKET02434781); Exhibit DF (CRICKET02434962); Exhibit DH (CRICKET02434995); Exhibit DJ (CRICKET02435109); Exhibit DL (CRICKET02435182); Exhibit DN (CRICKET02435218); Exhibit DP (CRICKET02435335); Exhibit DT (CRICKET02435368); Exhibit DV (CRICKET02435458); Exhibit DX (CRICKET02435612); Exhibit DZ (CRICKET02435712); Exhibit EB (CRICKET02435765); Exhibit EE (CRICKET02435818); Exhibit EJ (CRICKET02435892, CRICKET02435874); Exhibit EL (CRICKET02435963); Exhibit ES (CRICKET02436001).

request as to which they claim any particular exhibit was responsive. There is none.

Even if supplementation was required, exclusion of evidence is not proper under Rule 37(c)(1) here because any failure was "substantially justified or harmless." *Unionamerica Ins. Co. v. Fort Miller Grp., Inc.*, 2009 WL 275104, at *1 (N.D. Cal. Feb. 4, 2009). The day before filing its Motion, Cricket's counsel learned that Roger Mahn, who plaintiffs had deposed as a Rule 30(b)(6) witness about the Terms booklets and phone packaging and on whose testimony Cricket intended to rely, had left the company. Supp. Russell Decl. ¶¶ 3, 4. Cricket therefore was "substantially justified" (Fed. R. Civ. P. 37(c)(1)) in substituting in his colleague, Ms. Keser.

The belated disclosure was also "harmless," because "plaintiff[s] w[ere] not prejudiced." *Unionamerica*, 2009 WL 275104, at *1. There is no surprise here, and no disruption to plaintiffs' ability to prepare for trial: They already took a Rule 30(b)(6) deposition on the subject of Ms. Keser's declaration (Supp. Russell Decl. ¶ 3, Ex. B), and she is merely authenticating evidence materially identical to that already produced (*Compare* Dkt. 334-10, to *supra*, p.14 n.10). *See, e.g.*, *Everett v. Am. Gen. Life Ins. Co.*, 703 F. App'x 481, 483 (9th Cir. 2017) (late disclosure of expert affidavit was not "prejudicial" when opponent previously "deposed" witness); *Cleveland v. The Behemoth*, 2021 WL 2184852, at *9 (S.D. Cal. May 28, 2021) ("late disclosure" of photographs "very similar to those previously produced[] was harmless"), *aff'd in relevant part by Cleveland*, 2021 WL 3701575, at *6 (S.D. Cal. Aug. 20, 2021); *Estate of Gonzalez v. Hickman*, 2007 WL 3237635, at *6 (C.D. Cal. June 28, 2007) ("belated disclosure of [] reports was harmless" because "their substance was available" much earlier in the case). And absent "prejudice" to the other side's "ability to prepare adequately for trial," exclusion of evidence is an "abuse of discretion." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997). Plaintiffs' evidentiary objections should be denied.


Dated: September 30, 2021                                    Respectfully submitted,

                                                             **MAYER BROWN LLP**


                                                             */s/ Archis A. Parasharami*
                                                             Archis A. Parasharami

Counsel for Defendant
CRICKET WIRELESS LLC

16