1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SIDLEY AUSTIN LLP
David L. Anderson (SBN 149604)
dlanderson@sidley.com
Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

MAYER BROWN LLP
Archis A. Parasharami (SBN 321661)
aparasharami@mayerbrown.com
Kevin S. Ranlett (*pro hac vice*)
kranlett@mayerbrown.com
Daniel E. Jones (*pro hac vice*)
djones@mayerbrown.com
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendant*
*Cricket Wireless LLC*

MAYER BROWN LLP
Matthew D. Ingber (*pro hac vice*)
mingber@mayerbrown.com
Jarman D. Russell (*pro hac vice*)
jrussell@mayerbrown.com
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

CROWELL & MORING LLP
Kristin J. Madigan (SBN 233436)
KMadigan@crowell.com
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

CROWELL & MORING LLP
Christopher A. Cole (*pro hac vice*)
CCole@crowell.com
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

*Attorneys for Defendant*
*Cricket Wireless LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| URSULA FREITAS, individual, on behalf of herself and others similarly situated,<br><br>                              Plaintiffs,<br><br>vs.<br><br>CRICKET WIRELESS, LLC,<br><br>                              Defendant. | Case No. 3:19-cv-07270-WHA<br><br>**CRICKET WIRELESS, LLC'S MOTION TO ENFORCE TEXT-MESSAGE AND ELECTRONIC-SIGNATURE ARBITRATION AGREEMENTS OF POTENTIAL CLASS MEMBERS**<br><br>Date: February 24, 2022<br>Time: 8:00 a.m.<br>Location: Courtroom 12, 19th Floor<br>Judge: Hon. William H. Alsup<br><br>Complaint Filed: November 4, 2019 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

NOTICE OF MOTION ................................................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ......................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES............................................ 1

BACKGROUND .......................................................................................................... 5

I.    Cricket customers agreed to arbitration on an individual basis. ..................... 5

    A.    Cricket notified account owners of its updated Terms and arbitration provision via text message following the 2014 merger with AT&T................... 6

    B.    Starting in 2017, Cricket customers who added new lines of service or activated new accounts executed electronic signatures to accept Cricket's arbitration provision................................................................................... 7

ARGUMENT................................................................................................................. 9

I.    Absent class members' arbitration agreements are enforceable under the FAA.............. 9

II.   The potential class members agreed to arbitrate their claims on an individual basis........................................................................................................... 10

    A.    Cricket has met its burden to show that potential class members entered into arbitration agreements............................................................................ 10

        1.    The party moving to compel arbitration need only make a *prima facie* showing that an arbitration agreement exists................................ 10

        2.    Cricket customers who are potential class members agreed to arbitration.............................................................................................. 12

            a.    Cricket has proven that 379,813 potential class members received the May 22, 2014 text-message campaign regarding arbitration and then kept purchasing Cricket service. ............................................................................... 12

            b.    Cricket has proven that 15,967 potential class members executed electronic signatures................................................... 14

    B.    The manner in which customers agreed to arbitrate is valid and enforceable............................................................................................... 14

        1.    Whether potential class members validly agreed to arbitrate is governed by the law of their home states. ............................................ 14

        2.    Customers who purchased service after receiving the May 22, 2014 text message regarding arbitration validly agreed to arbitrate. .............. 15

        3.    Cricket's electronic signature processes create binding contracts under applicable state contract law.................................................... 23

i

# TABLE OF CONTENTS
(continued)

Page

III.   Any factual dispute over whether potential class members agreed to arbitrate must
be resolved by jury trials. ............................................................................................ 25

CONCLUSION................................................................................................................................ 25

1

# **TABLE OF AUTHORITIES**

**Page(s)**

2

3

**Cases**

4

*In re 24R, Inc.*,
    324 S.W.3d 564 (Tex. 2010) ......................................................................................25

5

6

*2000 Presidential Way, LLC v. Bank of N.Y. Mellon*,
    326 So.3d 64 (Fla. Dist. Ct. App. 2021) ...................................................................24

7

*Advance Tank & Constr. Co. v. Gulf Coast Asphalt Co.*,
    968 So. 2d 520 (Ala. 2006) ........................................................................................24

8

9

*Aguilar v. Wells Fargo Bank, N.A.*,
    2021 WL 317641 (Tex. Ct. App. Jan. 29, 2021) .......................................................22

10

*Aguirre v. Aetna Res., LLC*,
    2021 WL 5771666 (E.D. Cal. Dec. 6, 2021) .......................................................12, 13

11

12

*Ahmetasevic v. Citibank, N.A.*,
    2020 WL 5146124 (E.D. Pa. Aug. 31, 2020) ............................................................21

13

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995) .....................................................................................................9

14

15

*Am. Express Bank, FSB v. Craig*,
    2019 WL 1125547 (Neb. Ct. App. Mar. 12, 2019) ...................................................20

16

17

*Andre v. Dollar Tree Stores, Inc.*,
    2019 WL 2617253 (D. Del. June 26, 2019) ...............................................................17

18

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) .....................................................................................................9

19

20

*Baldonado v. Wynn Las Vegas, LLC*,
    194 P.3d 96 (Nev. 2008) ............................................................................................20

21

22

*Baptist Health Sys., Inc. v. Mack*,
    860 So.2d 1265 (Ala. 2003) .......................................................................................16

23

*Bayberry Grp., Inc. v. Crystal Beach Condo. Ass'n*,
    964 N.W.2d 846 (Mich. Ct. App. 2020) ...................................................................24

24

25

*Bench v. Bechtel Civil & Minerals, Inc.*,
    758 P.2d 460 (Utah Ct. App. 1988) ..........................................................................22

26

*Benya v. Stevens & Thompson Paper Co.*,
    468 A.2d 929 (Vt. 1983) ............................................................................................22

27

28

*Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*,
    944 F.3d 225 (4th Cir. 2019) ...............................................................................11, 25

iii

*Blau v. AT&T Mobility*,
  2012 WL 10546 (N.D. Cal. Jan. 3, 2012)..........................................................................11

*Bolden v. AT&T Servs., Inc.*,
  350 F. Supp. 3d 1029 (D. Kan. 2018)...............................................................................18

*BOSC, Inc. v. Bd. of Cty. Comm'rs of Cty. of Bernalillo*,
  853 F.3d 1165 (10th Cir. 2017)........................................................................................11

*Brennan v. AT&T Corp.*,
  2006 WL 306755 (S.D. Ill. Feb. 8, 2006).........................................................................16

*Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund*,
  995 N.E.2d 64 (Mass. 2013).............................................................................................24

*Brigdon v. Lamb*,
  929 P.2d 1274 (Alaska 1997)............................................................................................16

*Britt v. Univ. of Louisville*,
  628 S.W.3d 1 (Ky. 2021)..................................................................................................24

*Burnett v. Pagliacci Pizza, Inc.*,
  470 P.3d 486 (Wash. 2020)..............................................................................................25

*CACH of N.J., LLC v. Diamond*,
  2014 WL 3438003 (N.J. Super. Ct. App. Div. July 16, 2014)...........................................20

*Camara v. Mastro's Rests. LLC*,
  952 F.3d 372 (D.C. Cir. 2020)..........................................................................................14

*Care Grp. Heart Hosp., LLC v. Sawyer*,
  93 N.E.3d 745 (Ind. 2018)................................................................................................24

*Cavalry SPV I, LLC v. Watkins*,
  36 Cal. App. 5th 1070, 1081 (Cal. Ct. App. 2019)...........................................................17

*Ceco Corp. v. Mid-Gulf Constr., Inc.*,
  396 So.2d 474 (La. Ct. App. 1981)...................................................................................19

*Chadwick v. CSI, Ltd.*,
  629 A.2d 820 (N.H. 1993)................................................................................................25

*Chime Inst. v. Haney*,
  2013 WL 12114616 (C.D. Cal. Oct. 28, 2013)................................................................11

*Citibank S. Dak. N.A. v. Santoro*,
  150 P.3d 429 (Or. Ct. App. 2006)....................................................................................21

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Citibank (S. Dak.), N.A. v. Wilson,*
 160 S.W.3d 810 (Mo. Ct. App. 2005)...................................................................16

*Citizens Telecomms. Co. of W. Va. v. Sheridan,*
 799 S.E.2d 144 (W. Va. 2017) ...........................................................................22

*Consol. Freightways Corp. of Del. v. Synchroflo, Inc.,*
 294 S.E.2d 643 (Ga. Ct. App. 1982)...................................................................24

*Cornell v. Desert Fin. Credit Union,*
 2021 WL 5396065 (D. Ariz. Nov. 17, 2021) .......................................................17

*Cornoyer v. AT&T Mobility Servs., LLC,*
 2016 WL 6404853 (D.N.M. Oct. 5, 2016) ...........................................................20

*Correa v. Firestone Complete Auto Care,*
 2013 WL 6173651 (N.D. Cal. Nov. 25, 2013).......................................................11

*Davis Mobile Homes, LLC v. US Bank N.A.,*
 2012 WL 5356132 (Iowa Ct. App. Oct. 31, 2012).................................................18

*Davis v. BSH Home Appliances Corp.,*
 2016 WL 2901741 (E.D.N.C. May 18, 2016).......................................................20

*Davis v. Macy's Retail Holdings, Inc.,*
 2018 WL 4516668 (D. Conn. Sept. 19, 2018) .....................................................17

*Davis v. Nordstrom, Inc.,*
 755 F.3d 1089 (9th Cir. 2014) ..........................................................................17

*Delonge v. Time Warner Cable Bus. LLC,*
 2014 WL 3890766 (E.D. Wis. Aug. 6, 2014).......................................................22

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
 961 F.2d 1148 (5th Cir. 1992)..........................................................................11

*Discover Bank v. Ray,*
 162 P.3d 1131 (Wash. Ct. App. 2007) ...............................................................22

*Dixon v. GAA Classic Cars, LLC,*
 145 N.E.3d 429 (Ill. App. Ct. 2019) ...................................................................24

*Doctor's Assocs., Inc. v. Jabush,*
 89 F.3d 109 (2d Cir. 1996)...............................................................................11

*Drain v. Bd. of Educ. of Frontier Cty. Sch. Dist. No. 46,*
 508 N.W.2d 255 (Neb. 1993).............................................................................25

*Drews Distrib., Inc. v. Silicon Gaming, Inc.*,
  245 F.3d 347 (4th Cir. 2001)......................................................................................11

*E&F Constr. Co. v. Rissill Constr. Assocs., Inc.*,
  435 A.2d 343 (Conn. 1980).........................................................................................24

*In re Estate of Atkinson*,
  231 A.3d 891 (Pa. Super. Ct. 2020)...........................................................................25

*First Intercontinental Bank v. Ahn*,
  798 F.3d 1149 (9th Cir. 2015)..............................................................................12, 15

*Fleig v. Estate of Fleig ex rel. Fleig*,
  413 P.3d 638 (Wyo. 2018)...........................................................................................25

*Fleming v. Borden, Inc.*,
  450 S.E.2d 589 (S.C. 1994).........................................................................................21

*Frost v. Suffolk Constr. Co. Inc.*,
  2020 WL 7353403 (D. Mass. Dec. 15, 2020).............................................................19

*G&G Builders, Inc. v. Lawson*,
  794 S.E.2d 1 (W. Va. 2016).........................................................................................25

*Galey v. World Mktg. Alliance*,
  510 F.3d 529 (5th Cir. 2007).......................................................................................24

*Galloway v. Santander Consumer USA, Inc.*,
  819 F.3d 79 (4th Cir. 2016).........................................................................................19

*George E. Antrim, III, PLLC v. Sabri*,
  2014 WL 4798922 (Minn. Ct. App. Sept. 29, 2014).................................................19

*Geter v. St. Joseph Healthcare Sys., Inc.*,
  2011 WL 2080244 (N.M. Ct. App. Mar. 10, 2011)...................................................25

*Gonzalez v. Comenity Capital Bank*,
  2019 WL 5596811 (E.D. Cal. Oct. 30, 2019).............................................................11

*Grasso v. First USA Bank*,
  713 A.2d 304 (Del. Super. Ct. 1998).........................................................................17

*Grove Bus. Park LC v. Sealsource Int'l, LLC*,
  443 P.3d 764 (Utah Ct. App. 2019)...........................................................................25

*Guerrero v. Equifax Credit Info. Servs., Inc.*,
  2012 WL 7683512 (C.D. Cal. Feb. 24, 2012)............................................................21

*Gupta v. Morgan Stanley Smith Barney, LLC*,
  934 F.3d 705 (7th Cir. 2019).......................................................................................18

*Haberl v. Bigelow*,
   855 P.2d 1368 (Colo. 1993)............................................................................17

*Hancock v. AT&T*,
   701 F.3d 1248 (10th Cir. 2012)..................................................... 11, 13, 14

*Hansen v. LMB Mortg. Servs., Inc.*,
   1 F.4th 667 (9th Cir. 2021).......................................... 10, 11, 14, 25

*Hardin v. First Cash Fin. Servs., Inc.*,
   465 F.3d 470 (10th Cir. 2006).....................................................21

*Harvey v. Halliburton Energy Serv., Inc.*,
   2019 WL 12497729 (D. Wyo. Apr. 1, 2019)................................22

*Hazen v. Citibank, N.A.*,
   2018 WL 3848395 (D. Idaho Aug. 13, 2018)..............................18

*Hertz Corp. v. Zurich Am. Ins. Co.*,
   496 F. Supp. 2d 668 (E.D. Va. 2007)...........................................25

*Higgs v. Auto. Warranty Corp. of Am.*,
   134 F. App'x 828 (6th Cir. 2005).................................................21

*Hoffman v. Compassus*,
   2019 WL 1791413 (E.D. Pa. Apr. 23, 2019)...............................21

*In re Holl*,
   925 F.3d 1076 (9th Cir. 2019).....................................................24

*In re Holtorf's Estate*,
   28 N.W.2d 155 (Minn. 1947).......................................................24

*Honig v. Comcast of Ga. I, LLC*,
   537 F. Supp. 2d 1277 (N.D. Ga. 2008)........................................18

*Hous. Auth. of Jackson Cty. v. Gates*,
   267 P.3d 169 (Or. Ct. App. 2011)................................................25

*Howard v. Ferrellgas Partners*,
   748 F.3d 975 (10th Cir. 2014).............................................. 11, 14

*Howard v. Oakwood Homes Corp.*,
   516 S.E.2d 879 (N.C. Ct. App. 1999)..........................................20

*Ingersoll-Rand Co. v. El Dorado Chem. Co.*,
   283 S.W.3d 191 (Ark. 2008)........................................................24

*James River Equip. Co. v. Beadle Cty. Equip., Inc.*,
   646 N.W.2d 265 (S.D. 2002)........................................................25

vii

*Jenkins v. CitiFinancial, Inc.*,
  2007 WL 9753133 (D.S.C. Jan. 16, 2007) ...............................................................21

*Jin v. Parsons Corp.*,
  966 F.3d 821 (D.C. Cir. 2020) .................................................................................25

*John J. Brennan Constr. Corp., Inc. v. City of Shelton*,
  448 A.2d 180 (Conn. 1982) .....................................................................................17

*Kauffman v. Int'l Bhd. of Teamsters*,
  950 A.2d 44 (D.C. Cir. 2008) ..................................................................................18

*Kenney Mfg. Co. v. Starkweather & Shepley, Inc.*,
  643 A.2d 203 (R.I. 1994) .........................................................................................21

*Kilberg v. Discover Fin. Servs.*,
  2017 WL 3528005 (D.N.J. Aug. 16, 2017) .............................................................17

*Kincaid v. Dess*,
  298 P.3d 358 (Kan. Ct. App. 2013) .........................................................................24

*Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*,
  137 S. Ct. 1421 (2017) .............................................................................................15

*Klein v. Verizon Commc'ns, Inc.*,
  2017 WL 5071306 (E.D. Va. Aug. 9, 2017) ...........................................................22

*Kneebinding, Inc. v. Howell*,
  201 A.3d 326 (Vt. 2018) ..........................................................................................25

*In re Kokjohn*,
  531 N.W.2d 99 (Iowa 1995) ....................................................................................24

*L&A Contracting Co. v. Ram Indus. Coatings, Inc.*,
  762 So. 2d 1223 (La. Ct. App. 2000) ......................................................................24

*Lancaster v. Comcast Comm'n Mgmt. LLC*,
  2017 WL 3616494 (E.D. Mich. Aug. 23, 2017) .....................................................19

*Lang v. Burlington N. Ry. Co.*,
  835 F. Supp. 1104 (D. Minn. 1993) ........................................................................19

*Lexington Ins. Co. v. Lindahl Constr. & Eng'g, Inc.*,
  47 P.3d 1081 (Alaska 2002) ....................................................................................16

*Little Chute Area Sch. Dist. v. Wis. Educ. Ass'n Council*,
  892 N.W.2d 312 (Wis. Ct. App. 2017) ...................................................................25

*Loewen v. Lyft, Inc.*,
  2015 WL 12780465 (N.D. Cal. June 12, 2015) .......................................................11

viii

*Looper v. Am. Ins. Co.*,
  1984 WL 1612 (Ark. Ct. App. Oct. 24, 1984)...................................................................17

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007)...............................................................................................15

*Lucien Bourque, Inc. v. Cronkite*,
  557 A.2d 193 (Me. 1989).....................................................................................................19

*Marino v. Dillard's, Inc.*,
  413 F.3d 530 (5th Cir. 2005)...............................................................................................19

*MBNA Am. Bank, N.A. v. Cohen*,
  2010 WL 4116953 (N.J. Super. Ct. App. Div. Aug. 18, 2010)...........................................20

*McHorse v. Portland Gen. Elec. Co.*,
  521 P.2d 315 (Or. 1974).......................................................................................................21

*Messih v. Mercedes-Benz USA, LLC*,
  2021 WL 2588977 (N.D. Cal. June 24, 2021)......................................................................12

*MMAWC, LLC v. Zion Wood Obi Wan Trust*,
  448 P.3d 568 (Nev. 2019).....................................................................................................25

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014)........................................................................................15, 23

*Nirvana Int'l, Inc. v. ADT Sec. Servs., Inc.*,
  881 F. Supp. 2d 556 (S.D.N.Y. 2012)..................................................................................20

*Norcia v. Samsung Telecomms. Am. LLC*,
  845 F.3d 1279 (9th Cir. 2017)..............................................................................................11

*Nuccio Family, LLC v. Cooties Corp.*,
  319 So.3d 926 (La. Ct. App. 2021).......................................................................................19

*Olsen v. Charter Commc'ns, Inc.*,
  2019 WL 3779190 (S.D.N.Y. Aug. 9, 2019)........................................................................20

*Opie v. CVS Caremark*,
  2017 WL 3641946 (D. Mont. Aug. 24, 2017) .....................................................................19

*Panto v. Moore Bus. Forms, Inc.*,
  547 A.2d 260 (N.H. 1988)....................................................................................................20

*Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*,
  636 F.2d 51 (3d Cir. 1980)..............................................................................................10, 11

*Pretka v. Kolter City Plaza II, Inc.*,
  550 F. App'x 830 (11th Cir. 2013).......................................................................................18

ix

*Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*,
  948 F. Supp. 2d 1131 (D. Haw. 2013) .................................................................. 18

*R.C. Constr. Co. v. Nat'l Office Sys., Inc.*,
  622 So. 2d 1253 (Miss. 1993) ............................................................................... 19

*Ragan v. AT&T Corp.*,
  824 N.E.2d 1183 (Ill. App. Ct. 2005) ................................................................... 18

*Rasschaert v. Frontier Commc'ns Corp.*,
  2013 WL 1149549 (D. Minn. Mar. 19, 2013) ....................................................... 11

*Reeves v. Sanderson Plumbing Prods, Inc.*,
  530 U.S. 133 (2000) .............................................................................................. 11

*Robbins v. Comcast Cable Comm'n, LLC*,
  2019 WL 4139297 (W.D. Wash. Aug. 30, 2019) ................................................. 22

*RTS Shearing, LLC v. BNI Coal, Ltd.*,
  965 N.W.2d 40 (N.D. 2021) ............................................................................ 20, 25

*Safeway, Inc. v. Nordic PCL Constr., Inc.*,
  312 P.3d 1224 (Haw. Ct. App. 2013) .................................................................... 24

*Santos v. Gen. Dynamics Aviation Servs. Corp.*,
  984 So. 2d 658 (Fla. Dist. Ct. App. 2008) ........................................................... 18

*SC Testing Tech., Inc. v. Dep't of Envtl. Prot.*,
  688 A.2d 421 (Me. 1996) ...................................................................................... 24

*Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*,
  658 S.E.2d 918 (N.C. 2008) .................................................................................. 25

*Schmitz v. Yukon-Koyukuk Sch. Dist.*,
  147 P.3d 720 (Alaska 2006) .................................................................................. 24

*Schultz v. AT&T Wireless Servs., Inc.*,
  376 F. Supp. 2d 685 (N.D.W. Va. 2005) .............................................................. 22

*Schwarzchild v. Tse*,
  69 F.3d 293 (9th Cir. 1995) ................................................................................. 1, 3

*Seawright v. Am. Gen. Fin. Servs., Inc.*,
  507 F.3d 967 (6th Cir. 2007) ................................................................................ 22

*Shannon-Vail Five Inc. v. Bunch*,
  270 F.3d 1207 (9th Cir. 2001) .............................................................................. 15

*Shearson/Am. Express, Inc. v. McMahon*,
  482 U.S. 220 (1987) ................................................................................................ 9

x

*Shell v. Swallow*,
   2016 WL 183631 (D. Colo. Jan. 15, 2016) ........................................................17

*Smelser v. Discover Bank*,
   2019 WL 5618083 (W.D. Ark. Oct. 31, 2019) ...................................................17

*Snyder v. CACH, LLC*,
   2016 WL 6662675 (D. Haw. Nov. 10, 2016) .....................................................18

*St. Luke's Hosp. v. Benefit Mgmt. Consultants, Inc.*,
   626 S.W.3d 731 (Mo. Ct. App. 2021) ................................................................24

*Stachurski v. DirectTV, Inc.*,
   642 F. Supp. 2d 758 (N.D. Ohio 2009) ..............................................................21

*Stanley-Bostitch, Inc. v. Regenerative Env't Equip. Co.*,
   786 A.2d 1063 (R.I. 2001) ...................................................................................25

*Stevens Aviation, Inc. v. DynCorp. Int'l LLC*,
   715 S.E.2d 655 (S.C. Ct. App. 2011) .................................................................25

*Stinger v. Chase Bank, USA, NA*,
   265 F. App'x 224 (5th Cir. 2008) .......................................................................22

*Swingle v. Myerson*,
   509 P.2d 738 (Ariz. Ct. App. 1973) ...................................................................16

*Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*,
   251 P.3d 1091 (Colo. Ct. App. 2010) .................................................................24

*Thompson v. Isagenix Int'l LLC*,
   849 F. App'x 712 (9th Cir. 2021) .......................................................................24

*Tillman v. Macy's, Inc.*,
   735 F.3d 453 (6th Cir. 2013) ..............................................................................19

*Tinder v. Pinkerton Sec.*,
   305 F.3d 728 (7th Cir. 2002) ..............................................................................11

*Town of Cheswold v. Cent. Del. Bus. Park*,
   188 A.3d 810 (Del. 2018) ...................................................................................24

*United States v. Clayton*,
   108 F.3d 1114 (9th Cir. 1997) ..............................................................................9

*Versmesse v. AT&T Mobility LLC*,
   2014 WL 856447 (N.D. Ind. Mar. 4, 2014) .......................................................18

*Vicki Bagley Realty, Inc. v. Laufer*,
   482 A.2d 359 (D.C. 1984) ..................................................................................24

xi

*Von Ancken v. 7 East 14 L.L.C.*,
     98 N.Y.S.3d 32 (N.Y. App. Div. 2019)..................................................................25

*Walker v. Builddirect.com Techs. Inc.*,
     349 P.3d 549 (Okla. 2015)...................................................................................25

*Wattenbarger v. A.G. Edwards & Sons, Inc.*,
     246 P.3d 961 (Idaho 2010)..................................................................................24

*Weatherguard Roofing Co. v. D.R. Ward Constr. Co.*,
     152 P.3d 1227 (Ariz. Ct. App. 2007)...................................................................24

*Wells v. Chevy Chase Bank, F.S.B.*,
     832 A.2d 812 (Md. 2003).....................................................................................24

*White v. Sunoco Inc.*,
     189 F. Supp. 3d 486 (E.D. Pa. 2016)..................................................................21

*Wilson v. Dell Fin. Servs., LLC*,
     2009 WL 2160775 (S.D.W. Va. July 16, 2009)..................................................22

*Wofford v. M.J. Edwards & Sons Funeral Home Inc.*,
     490 S.W.3d 800 (Tenn. Ct. App. 2015)...............................................................25

*Wollen v. Gulf Stream Restoration & Cleaning, LLC*,
     259 A.3d 867 (N.J. Super. Ct. App. Div. 2021)...................................................25

*Woodside Mgmt. Co. v. Bruex*,
     157 N.E.3d 295 (Ohio Ct. App. 2020)................................................................25

*Wurl v. Polson Sch. Dist. No. 23*,
     127 P.3d 436 (Mont. 2006)..................................................................................25

*Young v. Turner Specialty Servs., LLC*,
     2019 WL 2869676 (N.D. Ala. July 3, 2019).......................................................16

**Statutes**

Federal Arbitration Act,
     9 U.S.C. §§ 1-16..........................................................................................*passim*

     9 U.S.C. § 2..........................................................................................................9

     9 U.S.C. § 4...................................................................................................10, 11

15 U.S.C. § 7001................................................................................................4, 23

N.D. Cent. Code § 9-03-25.....................................................................................20

SDCL § 53-3-5.......................................................................................................21

**Other Authorities**

Fed. R. Civ. P. 56...............................................................................................................10

Fed. R. Civ. P. 56(c)(1).....................................................................................................11

Fed. R. Evid. 406...............................................................................................................13

1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS (rev. ed. 1993) ..................................16

RESTATEMENT (SECOND) OF CONTRACTS OF LAWS (1981)................................*passim*

RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) .........................................*15*

11 WILLISTON ON CONTRACTS (4th ed. Supp. 2021)...................................................24

1

**NOTICE OF MOTION**

2    Please take notice that on February 24, 2022, at 8:00 a.m., before the Honorable William

3    H. Alsup, defendant Cricket Wireless LLC ("Cricket") will and hereby does move the Court for

4    an order compelling arbitration of the claims of potential class members on an individual basis

5    pursuant to the arbitration clauses they accepted by (i) continuing to purchase and use Cricket

6    service after receiving a text message regarding Cricket's updated arbitration clause; and/or (ii)

7    executing an electronic signature to accept Cricket's terms and conditions containing an

8    arbitration clause. The motion is based on the accompanying Memorandum; the Declarations of

9    Anne-Marie Blandino, Gary W. Braxton, Luis Fuentes, Joy Ledyard, Michael Moses, and Ashish

10   Pradhan; any reply memorandum that Cricket may file; any arguments of counsel; and any other

11   matter that the Court deems appropriate.[1]

12

**STATEMENT OF ISSUES TO BE DECIDED**

13   Whether the arbitration agreements that Cricket customers formed—by (1) using and

14   paying for Cricket service after receiving notice via text message that doing so meant accepting

15   Cricket's updated arbitration provision; and/or by (2) executing an electronic signature to accept

16   that arbitration provision—must be enforced under the Federal Arbitration Act and generally

17   applicable state laws.

18

**MEMORANDUM OF POINTS AND AUTHORITIES**

19   This civil RICO class action is brought by Cricket customers who, between 2012 and

20   2014, purchased 4G/LTE-capable Android smartphones and service plans in areas without local

21   4G coverage. However, Cricket and its customers have entered into arbitration agreements, in a

22   number of different ways. Recognizing that customers who are bound by arbitration agreements

23   may not participate in this class action, this Court has excluded from the class definition all

24

---

[1]    This motion, which the Court ordered Cricket to file with respect to potential class
25   members, should not be decided until after the completion of class notice. The Ninth Circuit has
     ruled that absent members of a certified class cannot be bound by an order on a dispositive
26   motion unless the motion is decided after the class is notified of class certification and the opt-
     out period has ended. *Schwarzchild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995). Class notice has not
27   been approved, much less been completed. Accordingly, the Court's decision on this motion, as
     well as Cricket's prior motion to compel arbitration (Dkt. 313) and motion for summary
28   judgment (Dkt. 312) should be postponed until class notice has taken place.

---

1

customers who are subject to arbitration agreements.

At each stage of this case, Cricket has moved to compel arbitration—first as to some of the named plaintiffs, and subsequently as to absent potential class members. Cricket filed its first motion to compel arbitration of the claims of three former plaintiffs, including Jermaine Thomas, before the class was certified. The Court granted that motion with respect to Thomas, explaining that Thomas agreed to arbitrate because he "continued us[ing] and pay[ing] for Cricket's wireless services after he received notice of Cricket's terms," including its updated arbitration clause, via a May 22, 2014 text-message campaign to Cricket customers following its merger with AT&T, thus "manifest[ing] his acceptance to those terms." Dkt. 130 at 10. Thomas is representative of the potential class members who were sent the same text message.

Cricket filed its second motion to compel arbitration (Dkt. 313) after the Court certified the class (Dkt. 298). In certifying the class, the Court carved out customers who had agreed to arbitrate. Dkt. 298 at 18-19. One of the exclusions, a catch-all exclusion for "[a]ny class member that defendant proves is subject to an arbitration agreement," covered customers bound by the arbitration clause in booklets packaged with smartphones these customers had bought. *Id.* The Court explained that whether these "booklets in phone boxes constituted a legally effective means of imposing an arbitration agreement on class members" remained to be determined. *Id.* at 18. Cricket's second motion to compel arbitration, which is fully briefed, seeks to enforce those booklet agreements as to all potential class members. Dkt. 313.

As directed by the Court's December 17, 2021 order (Dkt. 344 at 4-5), Cricket is filing this third motion to enforce the arbitration agreements that potential class members accepted by either (1) purchasing additional prepaid service after receiving a text message regarding Cricket's arbitration provision or (2) executing an electronic signature to acknowledge assent to that provision. The Court's earlier class-certification order on August 4, 2021 had stated that the class "excludes":

(1) "any Cricket customer who continued to use Cricket [services after] receiving the May 22, 2014 text message notification regarding Cricket's arbitration clause"; and

(2) "any Cricket customer who agreed to Cricket's arbitration provision via electronic

2

1  signature after May 2017[.]" Dkt. 298 at 19.

2  With regard to exclusion (1), the Court had explained that "the vast majority of those with

3  accounts on or after May 22, 2014, will be bound to arbitrate claims," and "[t]herefore, no one

4  who had an account after May 22, 2014, may participate in the class." *Id.* at 18. The Court added

5  that "[t]he same reasoning applies" to customers in exclusion (2), who "must arbitrate." *Id.*

6      The Court's December 17, 2021 order directed Cricket to file a motion to compel

7  arbitration as to potential class members who fall into each of these two exclusions. Dkt. 344 at

8  4-5. The Court instructed Cricket to submit (1) proof that these potential class members'

9  arbitration agreements exist and are enforceable under applicable state law, and (2) a list of

10  potential class members, by "name, state, and account number," who Cricket contends must

11  arbitrate and thus fall under each exclusion from the class. *Id.* [2]

12      This motion provides the requested proof, case law support, and lists.

13      ***May 2014 text message campaign.*** With respect to the recipients of the May 22, 2014

14  text-message campaign, Cricket is submitting with this motion declarations and electronic

15  records confirming that it sent the message to virtually all of its approximately 3.469 million

16  account owners. Cricket also is submitting proof regarding which potential class members were

17  account owners on May 22, 2014 and then purchased additional prepaid service. By doing so,

18  those potential class members agreed to Cricket's updated arbitration clause. Cricket has

19  confirmed that every relevant jurisdiction agrees that this is a valid method of creating a contract,

20  as this Court already has held with respect to Missouri law (in compelling arbitration as to

21  plaintiff Thomas). Finally, Cricket is submitting the requested list of the names, states, and

22  account numbers of the potential class members who must arbitrate because of these text

23  messages. Of the 486,808 customer IDs that plaintiffs contend correspond to potential class

24  _____

25  [2]   Specifically, for exclusion (1), the Court ordered Cricket to submit a list of customers, by name, state, and account number, who "(1) had an account . . . on May 22, 2014 and (2) [were]
26  charged for [Cricket]'s services thereafter," as well as a similar list of customers who "had an account . . . on May 22, 2014 and (2) [were] NOT charged . . . thereafter." Dkt. 344 at 4-5. The Court also requested "[a] competent witness to establish, under oath, which customers were
27  charged for [Cricket]'s services after May 22, 2014." *Id.* at 5. For exclusion (2), the Court ordered Cricket to list "each individual whom it purports agreed to arbitrate via electronic
28  signature[.]" *Id.*

members, 379,813 customer IDs belong to potential class members who fall into this category.[3]

*Electronic signatures.* With respect to customers who executed electronic signatures, Cricket is submitting declarations and records proving each of the two ways in which potential class members executed electronic signatures.

1. Customers who entered into certain in-store transactions since May 2017 executed electronic signatures by signing on a signature-capture device displaying a statement that they agreed to Cricket's Terms and its arbitration clause. Cricket is submitting pictures and design schematics of the signature-capture devices, as well as a declaration confirming that these transactions could not have been completed without electronic signatures. Cricket also is submitting the actual signatures of 5,622 of these potential class members.

2. Customers who entered into certain online transactions since 2017 also executed electronic signatures by clicking a button to agree to Cricket's Terms and its arbitration clause. Cricket is submitting screenshots of the online transaction flow, including its "accept" button and its link to Cricket's Terms, as well as a declaration confirming that these online transactions could not have been completed without executing an electronic signature.

Cricket is also submitting the requested lists of the names, states, and account numbers of the 15,967 potential class members who were required to execute an electronic signature and therefore must arbitrate their claims. Finally, Cricket cites to authority, including both the federal E-SIGN Act, 15 U.S.C. § 7001, and applicable state law, confirming the enforceability of contracts accepted by electronic signatures in both of these ways.

In sum, all 486,808 potential class members must arbitrate for one or more of the following reasons:

---

[3] The customer IDs were the anonymized identification numbers assigned to potential class members in this case based on the combination of account number and phone number in order to facilitate plaintiffs' matching smartphone purchases to particular lines of service. *See* Braxton Decl. ¶ 7. A potential class member will have multiple customer IDs if he or she had multiple accounts or multiple lines of service on one account. *Id.* To be consistent with plaintiffs' calculations, which used the number of customer IDs as a proxy for the number of potential class members, this motion describes potential class members by customer ID and uses the number of customer IDs as the number of potential class members. In addition, those customer IDs are provided for each of the potential class members in the lists submitted with this motion.

4

- 379,813 potential class members must arbitrate because they purchased additional prepaid service after receiving the May 2014 text message;
- 15,529 potential class members must arbitrate because they executed an electronic signature in an in-store transaction (and Cricket is submitting the actual signatures of 5,622 potential class members);
- 438 potential class members must arbitrate because they executed an electronic signature in an online transaction; and
- as discussed in Cricket's second, pending motion to compel arbitration of absent potential class members (Dkt. 313), 480,250 potential class members must arbitrate because they received a legacy Cricket Quick Start Guide containing an arbitration provision and 247,797 potential class members must arbitrate because they received at least one New Cricket Terms and Conditions booklet containing an arbitration provision. Decl. of Gary Braxton ¶¶ 9-10.

For the convenience of the Court, Cricket is submitting a list of potential class members and the arbitration agreements applicable to each one. *See* Decl. of Ashish Pradhan Ex. 1.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, requires enforcement of these customers' arbitration agreements. Cricket therefore respectfully requests that the Court compel individual arbitration of their claims and exclude them from the class.

## BACKGROUND

### I.   Cricket customers agreed to arbitration on an individual basis.

All of Cricket's customers agreed to arbitrate their claims against the company on an individual basis. Cricket's terms and conditions—including its arbitration provision—were presented to and accepted by all of the potential class members in this case in one or more of the following ways: (1) in booklets packaged with smartphones; (2) via text message notifications of Cricket's updated terms following the merger with AT&T; and (3) by electronic signatures executed by certain customers starting in 2017. The terms in booklets are the focus of Cricket's fully-briefed second motion to compel arbitration, which discusses them at length. Dkt. 313. Accordingly, this motion focuses on the latter two methods of agreeing to arbitration.

1

**A.      Cricket notified account owners of its updated Terms and arbitration provision via text message following the 2014 merger with AT&T.**

2

Virtually all of Cricket's account owners received text messages notifying them of

3

Cricket's updated terms in May 2014. Account owners are Cricket customers who are the

4

primary users responsible for paying for service (such as the potential class members in this

5

case). An account can also have other users who use additional lines of service (if any) on the

6

account, such as family members of the account owner. Decl. of Anne-Marie Blandino ¶ 9. On

7

May 1, 2014, Cricket had 3,469,178 customers who were account owners; those accounts were

8

associated with 4,705,834 lines of service. Braxton Decl. ¶ 6.[4]

9

On May 22, 2014, following its merger with AT&T, Cricket used a software tool

10

provided by a vendor called Telescope to send a form text message to virtually all account

11

owners to inform them of Cricket's updated Terms and Conditions. Blandino Decl. ¶¶ 5-7; Decl.

12

of Luis Fuentes ¶¶ 9, 13. The updated Terms include an arbitration provision that this Court has

13

already concluded is enforceable and applies to the RICO claim asserted in this action. Dkt. 130

14

at 8-10.

15

According to system-generated records, on May 22, 2014, Cricket sent an initial wave of

16

form text messages to 3,437,214 (Fuentes Decl. ¶ 13) of its 3,469,178 total account owners at the

17

time (Braxton Decl. ¶ 6)—that is, over 99.07 percent of them. First, Cricket sent the following

18

text message to 1,933,685 account owners who had smartphones and had requested English-

19

language communications:

20

> See Cricket's updated Terms and Conditions of Service, which
> includes your agreement to dispute resolution through binding
> individual arbitration instead of jury trials or class actions at
> http://mycrk.it/1kmlTEn.

21

22

23

Blandino Decl. ¶ 11; *see also* Fuentes Decl. ¶¶ 9-12 (stating that he personally had saved the

24

system-generated records of text-message campaigns sent using the Telescope platform). As this

25

26

[4]      In the wireless industry, companies and regulators frequently refer to each user of a line of service as a "subscriber" or a "customer," regardless of whether that person is an account owner or simply a user on another's account. Blandino Decl. ¶ 9. Thus, in Leap Wireless's final 10-K annual report before the merger, it reported that it had "approximately 4.6 million customers." Dkt. 201-19, at 4.

27

28

Court has explained, "[c]licking on the hyperlink would have taken [customers] to the full updated agreement, which was also published on Cricket's website." Dkt. 130, at 4; *see also* Blandino Decl. ¶¶ 11-12; Dkt. 50-32. That same day, Cricket sent the same message in Spanish to 284,365 account owners with smartphones and a Spanish language preference. Blandino Decl. ¶¶ 10, 13.[5]

If the Telescope platform cannot deliver a text message after trying for 48 hours, the recipient is sent the same message as part of a follow-up campaign at a later date. Fuentes ¶¶ 7-8; Blandino Decl. ¶ 16. A very small percentage of account owners (about 0.6 percent) had to be sent a follow-up text message. Fuentes Decl. ¶ 14. Specifically, over the next six weeks, Cricket sent follow-up messages to 20,324 account owners. *Id.* In all, 99.66 percent of account owners were sent a text message. *See id.* ¶¶ 13-14; Braxton Decl. ¶ 6.

In short: Of the 486,808 customers who plaintiffs assert are class members, 400,448 were account owners with active accounts on May 22, 2014 who were sent text messages linking to Cricket's updated Terms. Braxton Decl. ¶ 12. Of these potential class members, 379,813 continued to pay for Cricket service. *Id.* ¶ 13. The remaining 20,635 potential class members did **not** pay again for service. *Id.* ¶ 14; *see also id.* Ex. C (listing the customers who paid again by customer ID, name, state, and account number); *id.* Ex. D (listing customers who did not pay again).

**B.  Starting in 2017, Cricket customers who added new lines of service or activated new accounts executed electronic signatures to accept Cricket's arbitration provision.**

In addition, 15,967 potential class members (including many who also were sent the text messages described above) agreed to Cricket's updated arbitration provision again by executing an electronic signature in one of two ways.

**In-store electronic signatures:** Starting in May 2017, customers creating new accounts or adding new lines of service to an existing account at a Cricket-branded store were required to

5    Cricket also sent a similar text message to 1,067,453 English-speaking and 151,711 Spanish-speaking account owners with feature phones (none of whom are members of the class in this action, which consists entirely of smartphone purchasers). *See* Blandino Decl. ¶¶ 10, 14-15.

1    sign a signature-capture device to accept Cricket's Terms. Decl. of Michael Moses ¶¶ 8, 13.

2    Before signing, the customer could review the Terms in the store, and then would sign an

3    acknowledgment that included the following language:

> **Terms & Conditions**
>
> I accept Cricket's Terms and Conditions for Cricket's wireless
> products and services. The terms (including dispute resolution by
> binding individual arbitration instead of jury trials or class actions)
> were provided to me in Cricket's Terms & Conditions booklet
> included with my phone and available online at
> www.cricketwireless.com/terms. I can also ask a store rep for a
> hard copy of the T&Cs before I sign below.

10   *Id.* ¶ 15 & Ex. B. Of the 486,808 potential class members, 15,529 activated a new account or a

11   new line of service during this period in a store and thus signed a signature-capture device.

12   Braxton Decl. ¶ 16; *see also id.* Ex. F (listing these customers by customer ID, name, state, and

13   account number). Cricket has also located the actual electronic signatures for 5,622 of these

14   customers. Decl. of Joy Ledyard (attaching signature captures); *id.* Ex. B (listing these

15   customers).[6]

16       **Online electronic signatures:** In addition, starting in the first quarter of 2017, customers

17   who used Cricket's website to activate a new account or to add a new line of service were

18   required to click a button labeled "Accept" under an acknowledgement that they "accept

19   Cricket's Terms and Conditions for Cricket's wireless products and services found at Terms and

20   Conditions. Moses Decl. ¶¶ 6, 7. The terms include dispute resolution by binding individual

21   arbitration instead of jury trials or class actions." Moses Decl. ¶ 6 & Ex. A.[7] Of the 486,808

22   potential class members, 438 followed this process to accept Cricket's arbitration provision.

23   Braxton Decl. ¶ 15; *see also id.* Ex. E (listing these customers by customer ID, name, state, and

24   account number).

---

[6]     In addition, some customers who upgraded devices at Cricket-branded stores after 2019 completed the same signature-capture process. Moses Decl. ¶ 9. The class representative, Freitas, is one such customer. Ledyard Decl. ¶ 9 & Ex. C (Freitas's 2020 signature capture).

[7]     The phrase "Terms and Conditions" is a hyperlink to Cricket's then-current Terms and Conditions, available at cricketwireless.com/terms. *See* Moses Decl. ¶ 6 & Ex. A at 4.

**ARGUMENT**

**I.     Absent class members' arbitration agreements are enforceable under the FAA.**

Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). This "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary." *Id.* at 346 (quotation marks omitted). Indeed, the Supreme Court has specifically held that the FAA requires enforcement of agreements to arbitrate RICO claims (*Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 238-42 (1987)), such as the RICO claim asserted here.

The FAA applies to any "written" agreement to arbitrate that appears in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Here, both criteria are met: (i) Cricket's arbitration provision was in writing (*see* pages 6-8, *supra*); and (ii) contracts for wireless service involve commerce because "[t]elephones are instrumentalities of interstate commerce." *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997); *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995).

The Cricket arbitration provision referenced in the May 2014 text messages and the subsequent electronic signatures requires arbitration of "all disputes and claims between us," including claims "arising out of or relating to any aspect of the relationship between us[.]" Dkt. 206-4, at CRICKET02432941. The Court already has held that this arbitration provision covers plaintiffs' RICO claim. Dkt. 130 at 11.

Accordingly, potential class members must arbitrate if (1) they either received a text message regarding Cricket's arbitration clause or executed an electronic signature to accept that clause and (2) the applicable method of contract formation is valid under generally applicable state law. As discussed below, both of these conditions are met as to more than 80 percent of potential class members.[8]

---

[8]     In addition, all potential class members must arbitrate as a result of the arbitration clauses

9

II.     **The potential class members agreed to arbitrate their claims on an individual basis.**

     A.     **Cricket has met its burden to show that potential class members entered into arbitration agreements.**

At this stage of the proceedings, the FAA requires Cricket to produce evidence from which a reasonable factfinder could find that an arbitration agreement exists. Cricket has substantially exceeded that bar: it has produced evidence proving that 379,813 potential class members must arbitrate because they bought additional prepaid service after receiving the May 2014 text messages and that 15,967 class members must arbitrate because they executed electronic signatures to acknowledge their assent to arbitration. The law of all 50 states and the District of Columbia deems both forms of acceptance valid.

     1.     **The party moving to compel arbitration need only make a *prima facie* showing that an arbitration agreement exists.**

The Ninth Circuit recently explained the procedure for deciding a motion to compel arbitration. "Under § 4 [of the FAA], in response to a motion to compel arbitration, the district court must 'hear the parties.'" *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting 9 U.S.C. § 4). "If the court is 'satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration[.]'" *Id.* Thus, unless the opposing party denies agreeing to arbitrate, the district court must compel arbitration if the agreement is enforceable as a matter of law. "But '[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.'" *Id.* And to decide whether the facts are "'in issue,'" "district courts rely on the summary judgment standard of [Federal] Rule [of Civil Procedure] 56," because an "order compelling arbitration 'is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'" *Id.* (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980), *abrogated on other grounds by Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.2d 283, 287-88 (3d Cir. 2017)).

To place the existence of the arbitration agreement "in issue" (9 U.S.C. § 4), the opposing

---

in booklets packaged with phones, as discussed in Cricket's pending motion to compel arbitration. Dkt. 313.

party must "unequivocally den[y] that an arbitration agreement exists, and show[] sufficient facts in support thereof." *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019) (internal quotation marks omitted) (cited approvingly by *Hansen* 1 F.4th at 670 n.1).[9] That is because Rule 56 requires the party opposing summary judgment to "support the assertion" that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). And although "the court must draw all reasonable inferences in favor of the nonmoving party" in determining whether material facts are genuinely disputed, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150 (2000). Instead, those credibility and other factual determinations are made by the factfinder at a trial convened "summarily" to decide the issue. 9 U.S.C. § 4; *see also Hansen*, 1 F.4th at 670. At that trial, the arbitration agreement must be proven by a preponderance of the evidence. *See Norcia v. Samsung Telecomms. Am. LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). But unless and until the other party sufficiently puts the arbitration agreement "in issue," the movant's burden is merely to present sufficient evidence that a reasonable jury could find that the parties agreed to arbitrate. *See Howard v. Ferrellgas Partners*, 748 F.3d 975, 980 (10th Cir. 2014) (cited approvingly by *Hansen*, 1 F.4th at 672); *see also, e.g., Hancock v. AT&T*, 701 F.3d 1248, 1264 (10th Cir. 2012) (evidence that "raise[s] an inference" that arbitration agreement exists is "enough" to "shift[] the

---

[9]      *See also BOSC, Inc. v. Bd. of Cty. Comm'rs of Cty. of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017) (party opposing arbitration bears "burden . . . to raise a genuine dispute of material fact") (cited approvingly by *Hansen*, 1 F.4th at 670 n.1); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (party resisting arbitration "must identify specific evidence in the record demonstrating a material factual dispute") (cited approvingly by *Hansen*, 1 F.4th at 670 n.1); *Par-Knit Mill*, 636 F.2d at 55 ("An unequivocal denial that the agreement had been made, accompanied by supporting affidavits" is "sufficient"). Other courts also agree on this requirement. *See, e.g., Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 352 n.3 (4th Cir. 2001) ("To establish a genuine issue . . ., an unequivocal denial that the agreement [to arbitrate] had been made [is] needed, and some evidence should [be] produced to substantiate the denial.") (internal quotation marks omitted); *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 114 (2d Cir. 1996) (same); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992) (party resisting arbitration "must produce at least some evidence to substantiate" denial); *Gonzalez v. Comenity Capital Bank*, 2019 WL 5596811, at *6 (E.D. Cal. Oct. 30, 2019) (same); *Loewen v. Lyft, Inc.*, 2015 WL 12780465, at *3 (N.D. Cal. June 12, 2015) (same); *Correa v. Firestone Complete Auto Care*, 2013 WL 6173651, at *2 (N.D. Cal. Nov. 25, 2013) (same); *Chime Inst. v. Haney*, 2013 WL 12114616, at *4 (C.D. Cal. Oct. 28, 2013) (same); *Rasschaert v. Frontier Commc'ns Corp.*, 2013 WL 1149549, at *7 (D. Minn. Mar. 19, 2013) (same); *Blau v. AT&T Mobility*, 2012 WL 10546, at *3 (N.D. Cal. Jan. 3, 2012) (same).

11

burden to Plaintiffs to raise a genuine factual dispute").

Here, Cricket has exceeded that burden. Because Cricket's evidence cannot reasonably be disputed, the Court should compel arbitration of the potential class members' claims.

### 2. Cricket customers who are potential class members agreed to arbitration.

Cricket's evidence shows that the vast majority of potential class members agreed to arbitrate either by continuing their Cricket service after receiving text messages regarding Cricket's updated arbitration clause, or by executing an electronic signature to accept that arbitration clause. This evidence satisfies Cricket's *prima facie* burden to prove the existence of these arbitration agreements.

#### a. *Cricket has proven that 379,813 potential class members received the May 22, 2014 text-message campaign regarding arbitration and then kept purchasing Cricket service.*

In May 2014, Cricket undertook to send text messages to all of its account owners to inform them of the updated arbitration provision. *See* pages 6-7, *supra*. This Court found that "[c]licking on the hyperlink" in the text message "would have taken [customers] to the full updated agreement, which was also published on Cricket's website." Dkt. 130, at 4; *see also* Dkt. 313-3, ¶¶ 4-10 & Ex. 3.

There is no doubt that the text-message campaign happened. The Court already has compelled former plaintiff Thomas to arbitrate based on the May 22, 2014 text message. Dkt. 130 at 8-10. And Cricket's evidence further proves that identical texts were sent to virtually all of its account owners.

*First*, Cricket has submitted a declaration from Luis Fuentes, a Cricket employee who in 2015 retrieved the system-generated records of these text-message campaigns from the Telescope tool that was used to send them. Fuentes Decl. ¶¶ 6, 9-12. Documents are routinely authenticated by employees familiar with their employers' recordkeeping policies. *See, e.g.*, *Messih v. Mercedes-Benz USA, LLC*, 2021 WL 2588977, at *3 (N.D. Cal. June 24, 2021); *Aguirre v. Aetna Res., LLC*, 2021 WL 5771666, at *7 (E.D. Cal. Dec. 6, 2021). Here, Cricket has presented evidence from the employee who personally exported the data. That data shows that

1   text messages about Cricket's updated Terms were sent to 3,457,538 recipients. Fuentes Decl.

2   ¶¶ 13-14. Because Cricket had 3,469,178 account owners in May 2014 (Braxton Decl. ¶ 6), that

3   means that the text message was sent to 99.66 percent of account owners.

4   At the hearing on the motion for class certification, plaintiffs' counsel suggested that

5   "Cricket had close to 5 million subscribers" when the text messages were sent. Dkt. 293 at 19:25.

6   The implication that there is a discrepancy between the number of customers and number of text

7   message recipients ignores two facts discussed above: (1) there are often multiple lines of service

8   on the same account (such as when multiple family members use the same account); and (2) it is

9   common industry practice to describe each user of a line of service with a separate phone number

10   as a "subscriber." Blandino Decl. ¶ 9; *see also* page 6, *supra*. In fact, because the number of text

11   messages sent reflects virtually all of the account *owners*, there is no discrepancy.[10]

12   *Second*, Cricket has submitted declarations from Cricket employees attesting that

13   Cricket's policy and procedure during this period was to send these types of legal notices to all

14   account owners. Blandino Decl. ¶¶ 7-8 ; Fuentes Decl. ¶ 5. "Evidence of . . . an organization's

15   routine practice may be admitted to prove that on a particular occasion the . . . organization acted

16   in accordance with the . . . routine practice[,] . . . regardless of whether it is corroborated or

17   whether there was an eyewitness." Fed. R. Evid. 406. Courts "accept Rule 406 evidence" at the

18   summary-judgment or motion-to-compel-arbitration stage. *Hancock*, 701 F.3d at 1261-62 (citing

19   cases).

20   *Finally*, Cricket's account records show that of the 486,808 customers who plaintiffs

21   contend are class members, 379,813 potential class members had accounts on May 22, 2014 and

22   continued paying at least one more time for Cricket service—either by continuing their legacy

23   Cricket service or by paying for service on the New Cricket network. Braxton Decl. ¶ 13; *see*

24   *also id.* Ex. C (listing customers by customer ID, name, state, and account number).

25   Cricket's evidence that these potential class members continued paying for service after

26   ───────────

27   [10]   In any event, Cricket's terms provide that both "the account holder" and "any other person who purchases, activates, or uses the Wireless Services we provide" must "agree to follow our Policies when [they] use our Services." Dkt. 50-32 at 1. The arbitration provision also

28   covers claims brought by "all . . . users or beneficiaries of Services[.]" *Id.* at 9.

13

receiving the text messages about arbitration is more than enough to meet Cricket's *prima facie* burden. *See Howard*, 748 F.3d at 980; *Hancock*, 701 F.3d at 1262.

> **b.      Cricket has proven that 15,967 potential class members executed electronic signatures.**

Cricket's evidence shows that 15,967 potential class members executed an electronic signature and accepted Cricket's arbitration clause by either signing a signature-capture device in a store or clicking a button online. Specifically, since 2017, customers who added new lines of service or activated new accounts after previously terminating service were required to execute an electronic signature to complete their transactions. Moses Decl. ¶¶ 6-8, 13. Cricket has presented pictures of the in-store signature-capture device and of the online acceptance process. *Id.* ¶¶ 6, 11, 12, 13, 14 & Exs. A, B, C, D, E. And with respect to 5,622 of those customers, Cricket has found their actual signatures. Ledyard Decl. ¶ 8 & Ex. B.

For the same reasons discussed above, Cricket's evidence that these potential class members executed electronic signatures is sufficient to meet its *prima facie* burden. *See*, *e.g.*, *Howard*, 748 F.3d at 980. For example, in a decision that the Ninth Circuit endorsed as applying the correct standard, the D.C. Circuit held that even if an employer is "unable to produce a [signed] copy," an affidavit that the employer "requires all of its employees to execute an arbitration agreement" and that "virtually every . . . employee" did so, is sufficient because "a jury could reasonably conclude that [the plaintiff] signed an agreement too." *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 373-74 (D.C. Cir. 2020) (cited approvingly by *Hansen*, 1 F.4th at 670 n.1). The same is true here.

> **B.      The manner in which customers agreed to arbitrate is valid and enforceable.**

Both of these contracting methods—either purchasing additional prepaid monthly service after receiving notice of an applicable arbitration clause, or executing an electronic signature that acknowledges assent to that clause—form a contract under the laws of all 50 states.

> **1.      Whether potential class members validly agreed to arbitrate is governed by the law of their home states.**

"[S]tate-law principles that govern the formation of contracts" determine whether an

CRICKET'S MOTION TO ENFORCE TEXT-MESSAGE AND ELECTRONIC-SIGNATURE AGREEMENTS; NO. 3:19-CV-07270-WHA

arbitration agreement was formed. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). The FAA requires courts making this determination to "place arbitration agreements on equal footing with all other contracts," both in terms of "the enforce[ment] of arbitration agreements" and in terms of "their initial valid[ity]—that is, about what it takes to enter into them." *Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*, 137 S. Ct. 1421, 1424, 1428 (2017) (internal quotation marks omitted). "To determine the law governing a contract, California courts look to the relevant statute and, for further guidance, to the choice-of-law principles outlined in the Restatement." *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001); *see also First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1154 (9th Cir. 2015) (applying the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188 (1971)).

Here, the question of contract formation is governed by the law of the states of the potential class members' residence when they agreed to arbitrate. Section 188(2) of the Restatement identifies several factors relevant to choice of law: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." Apart from Cricket's location, the remaining factors all point towards the states where class members lived, purchased their phones, and received service. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) (affirming ruling that "a state-by-state review of contract conscionability jurisprudence" for "all fifty states" is required to assess enforceability of class members' arbitration agreements); *see also* Dkt. 130, at 7, 12 (noting that parties do not "dispute that Missouri law governs" arbitration agreement of Missouri plaintiff and "California law is controlling" as to California plaintiff).[11]

### 2. Customers who purchased service after receiving the May 22, 2014 text message regarding arbitration validly agreed to arbitrate.

The Court already has held that, under Missouri law, customers who continued to use and

---

[11]     The New Cricket Terms also include a choice-of-law provision selecting the law of the customer's home state: "[t]he law of the state in which our records indicate your telephone number is located shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law." Dkt. 206-5 at CRICKET02432438.

purchase Cricket service after receiving text-message notice of Cricket's updated arbitration clause are bound to arbitrate the claim asserted here. Dkt. 130 at 10. That is because choosing to purchase additional goods or services—here, customers buy prepaid Cricket service on a month-to-month basis—constitutes agreement to the new terms the customer has been told now apply. *Id.* at 8-10 (citing *Citibank (S. Dak.), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005) (citing in turn 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.21 p. 415 (rev. ed. 1993))).

All states take the same approach that this Court did in applying Missouri law. *See*, *e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 30(1) (1981) ("An offer may invite . . . acceptance to be made . . . by performing or refraining from performing a specified act[.]"). In every state, a customer who continues to use or buy a service (or, by analogy, an employee who continues to work for her employer) after being notified of new contract terms has accepted those terms:

**Alabama:** *Baptist Health Sys., Inc. v. Mack*, 860 So. 2d 1265, 1274 (Ala. 2003) ("Mack, by continuing her employment with BHS subsequent to her receipt of the Program document, expressly assented to the terms"); *Young v. Turner Specialty Servs., LLC*, 2019 WL 2869676, at *3 (N.D. Ala. July 3, 2019) (similar).

**Alaska:** *Lexington Ins. Co. v. Lindahl Constr. & Eng'g, Inc.*, 47 P.3d 1081, 1086-87 (Alaska 2002) (recognizing that "silence" can "operate[] as acceptance") (citing RESTATEMENT § 69); *Brigdon v. Lamb*, 929 P.2d 1274, 1278 (Alaska 1997) (continued occupancy after receiving notice of a revised occupancy agreement constituted acceptance to its terms).

**Arizona:** *Swingle v. Myerson*, 509 P.2d 738, 740 (Ariz. Ct. App. 1973) ("Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance" when "the offeree with reasonable opportunity to reject offered services takes the benefit of them under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation.") (internal quotation marks omitted); *Brennan v. AT&T Corp.*, 2006 WL 306755, at *10 (S.D. Ill. Feb. 8, 2006) ("silence may constitute acceptance" under Arizona law "when there is a duty to speak," as when customers continue to "us[e] Defendant's services after receiving the [arbitration] agreement in the mail").[12]

---

[12]    A federal district court has certified the question whether "it is enough for a party seeking

**Arkansas:** *Smelser v. Discover Bank*, 2019 WL 5618083, at *2 n.2 (W.D. Ark. Oct. 31, 2019) ("Plaintiff accepted" cardholder agreements by "us[ing] his credit card."); *Looper v. Am. Ins. Co.*, 1984 WL 1612, at *2 (Ark. Ct. App. Oct. 24, 1984) (continuing to use services after notice of price change constitutes assent).

**California:** *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094 (9th Cir. 2014) ("continued employment constitutes acceptance" of arbitration agreement); *Cavalry SPV I, LLC v. Watkins*, 36 Cal. App. 5th 1070, 1081 (Ct. App. 2019) ("[A] credit card company may modify the terms of a written contract by sending new . . . terms to the cardholder and stating that . . . continued use of the card constitutes acceptance of those terms.").

**Colorado:** *Shell v. Swallow*, 2016 WL 183631, at *14 (D. Colo. Jan. 15, 2016) (plaintiff "manifested her assent to enter into a contract" by attending seminar because the "proposed contract expressly states that . . . attendance . . . constitutes agreement"); *Haberl v. Bigelow*, 855 P.2d 1368, 1374 (Colo. 1993) ("inaction will be deemed acceptance" when reasonable under the circumstances) (citing RESTATEMENT § 69).

**Connecticut:** *Davis v. Macy's Retail Holdings, Inc.*, 2018 WL 4516668, at *4-5 (D. Conn. Sept. 19, 2018) (employee assented to arbitration clause by continuing employment); *see also John J. Brennan Constr. Corp., Inc. v. City of Shelton*, 448 A.2d 180, 187 (Conn. 1982) ("[S]ilence may constitute acceptance of an offer if the offeree, by his words or conduct, leads the offeror reasonably to interpret that silence as such.").

**Delaware:** *Grasso v. First USA Bank*, 713 A.2d 304, 309 (Del. Super. Ct. 1998) (plaintiff "unequivocally manifested acceptance" to terms by making payments on her card); *Andre v. Dollar Tree Stores, Inc.*, 2019 WL 2617253, at *10 (D. Del. June 26, 2019) (consumer's "silence or inaction cons[tituted] consent or acceptance to the Arbitration Agreement"); *Kilberg v. Discover Fin. Servs.*, 2017 WL 3528005, at *4 (D.N.J. Aug. 16, 2017) (plaintiff accepted

---

to modify a [consumer] contract to send notice of the proposed modification to the" consumer to the Arizona Supreme Court. *Cornell v. Desert Fin. Credit Union*, 2021 WL 5396065, at *2 (D. Ariz. Nov. 17, 2021). Certification here is unnecessary because Cricket's customers chose to enter into new month-to-month service contracts after receiving text-message notice of new terms; Cricket did not unilaterally modify ongoing contracts, as with the bank deposit-account agreements at issue in *Cornell*. *Id.* at *1.

amended arbitration clause under Delaware law by continuing to use card).

**District of Columbia:** *Kauffman v. Int'l Bhd. of Teamsters*, 950 A.2d 44, 46-47 (D.C. Cir. 2008) (employee agreed to contract change by continuing his employment).

**Florida:** *Pretka v. Kolter City Plaza II, Inc.*, 550 F. App'x 830, 832 n.1 (11th Cir. 2013) (plaintiff agreed to updated terms by continuing to perform); *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So. 2d 658, 660-61 (Fla. Dist. Ct. App. 2008) ("Santos' continued employment with General Dynamics after receipt of the [arbitration agreement] sufficiently demonstrates his assent to the terms of the arbitration agreement.").

**Georgia:** *Honig v. Comcast of Ga. I, LLC*, 537 F. Supp. 2d 1277, 1283-84 (N.D. Ga. 2008) (user assented to arbitration clause by continuing to use cable service).

**Hawaii:** *Snyder v. CACH, LLC*, 2016 WL 6662675, at *8-9 (D. Haw. Nov. 10, 2016) (plaintiff assented to arbitration agreement by using her credit card after receiving notice of terms); *Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 948 F. Supp. 2d 1131, 1144-45 (D. Haw. 2013) (continued performance after notice of new terms was acceptance).

**Idaho:** *Hazen v. Citibank, N.A.*, 2018 WL 3848395, at *5 (D. Idaho Aug. 13, 2018) (plaintiff's "decision to continue work at Citi" after being notified of new arbitration clause constituted acceptance under Idaho law).

**Illinois:** *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 713-14 (7th Cir. 2019) (employee's silence constituted assent under Illinois law to revised arbitration agreement); *Ragan v. AT&T Corp.*, 824 N.E.2d 1183, 1188 (Ill. App. Ct. 2005) (plaintiffs' continued use of services constitutes acceptance of updated arbitration clause).

**Indiana:** *Versmesse v. AT&T Mobility LLC*, 2014 WL 856447, at *6 (N.D. Ind. Mar. 4, 2014) (employee "assented to" arbitration clause by "not opt[ing] out . . . by the deadline").

**Iowa:** *Davis Mobile Homes, LLC v. US Bank N.A.*, 2012 WL 5356132, at *5 (Iowa Ct. App. Oct. 31, 2012) ("Although Donald Davis did not review the terms and conditions and did not expressly agree to them, we charge the customer with knowledge from the notice on the bank statement and his continued use of the account as an agreement to the terms.").

**Kansas:** *Bolden v. AT&T Servs., Inc.*, 350 F. Supp. 3d 1029, 1036 (D. Kan. 2018)

18

(employee's "silence" was "an agreement to arbitrate her disputes" under Kansas law).

**Louisiana:** *Nuccio Family, LLC v. Cooties Corp.*, 319 So. 3d 926, 931 (La. Ct. App. 2021) ("[C]ontract modifications can be accepted by implication, silence, or inaction."); *Ceco Corp. v. Mid-Gulf Constr., Inc.*, 396 So. 2d 474, 478 (La. Ct. App. 1981) (holding that failure to object to invoice escalation charge constituted acceptance of new charge); *see also Marino v. Dillard's, Inc.*, 413 F.3d 530, 531-32 (5th Cir. 2005) (continued employment constitutes acceptance under Louisiana law of arbitration clause).

**Maine:** *Lucien Bourque, Inc. v. Cronkite*, 557 A.2d 193, 196 (Me. 1989) (silence can constitute contract acceptance) (citing RESTATEMENT § 69).

**Maryland:** *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 87 (4th Cir. 2016) (consumer accepted revised terms by "continuing to make . . . payments").

**Massachusetts:** *Frost v. Suffolk Constr. Co. Inc.*, 2020 WL 7353403, at *7 (D. Mass. Dec. 15, 2020) (renter accepted terms by choosing to keep equipment).

**Michigan:** *Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013) ("Tillman's conduct following the communication of the offer objectively suggests that she accepted the arbitration agreement [under Michigan law] by continuing her employment without returning an opt-out form."); *Lancaster v. Comcast Comm'n Mgmt. LLC*, 2017 WL 3616494, at *5 (E.D. Mich. Aug. 23, 2017) (same).

**Minnesota:** *George E. Antrim, III, PLLC v. Sabri*, 2014 WL 4798922, at *4 (Minn. Ct. App. Sept. 29, 2014) (continuing to pay after receiving notice of rate increase constituted acceptance of rate increase); *Lang v. Burlington N. Ry. Co.*, 835 F. Supp. 1104, 1105 (D. Minn. 1993) (employee accepted arbitration policy added to employee manual under Minnesota law by continuing to work).

**Mississippi:** *R.C. Constr. Co. v. Nat'l Office Sys., Inc.*, 622 So. 2d 1253, 1255-56 (Miss. 1993) ("Silence may operate as acceptance where . . . the offeree has given the offeror reason to understand that silence is intended as a manifestation of assent.").

**Montana:** *Opie v. CVS Caremark*, 2017 WL 3641946, at *3 (D. Mont. Aug. 24, 2017) ("Opie undisputedly consented to the Arbitration Agreement by not opting out and by continuing

her employment").

**Nebraska:** *Am. Express Bank, FSB v. Craig*, 2019 WL 1125547, at *4-5 (Neb. Ct. App. Mar. 12, 2019) (consumer "did agree to the terms of the 2011 updated Cardmember Agreement" by "subsequent use of the account").

**Nevada:** *Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 105 n.39 (Nev. 2008) ("The employee's continued employment" after notice of contract modification "constitutes acceptance of, and consideration for, what is essentially a new employment arrangement.").

**New Hampshire:** *Panto v. Moore Bus. Forms, Inc.*, 547 A.2d 260, 261-62 (N.H. 1988) ("continued performance of his duties" was "acceptance" by employee of new terms).

**New Jersey:** *CACH of N.J., LLC v. Diamond*, 2014 WL 3438003, at *2 (N.J. Super. Ct. App. Div. July 16, 2014) ("[T]he consumer's use of a credit card constitutes the formation of a contract and signifies the consumer's acceptance of, and acquiescence to, the terms therein."); *MBNA Am. Bank, N.A. v. Cohen*, 2010 WL 4116953, at *3 (N.J. Super. Ct. App. Div. Aug. 18, 2010) (similar).

**New Mexico:** *Cornoyer v. AT&T Mobility Servs., LLC*, 2016 WL 6404853, at *13 (D.N.M. Oct. 5, 2016) (employee "manifested his acceptance" to new arbitration clause by "not tak[ing] action to opt out").

**New York:** *Olsen v. Charter Commc'ns, Inc.*, 2019 WL 3779190, at *6 (S.D.N.Y. Aug. 9, 2019) (plaintiffs "manifested their assent to the Updated Terms [of Service]" under New York law by continuing to use service); *Nirvana Int'l, Inc. v. ADT Sec. Servs., Inc.*, 881 F. Supp. 2d 556, 562 (S.D.N.Y. 2012) (similar).

**North Carolina:** *Davis v. BSH Home Appliances Corp.*, 2016 WL 2901741, at *4 (E.D.N.C. May 18, 2016) (employee "manifested his assent" under North Carolina law to updated terms by "continu[ing] his employment"); *Howard v. Oakwood Homes Corp.*, 516 S.E.2d 879, 882 (N.C. Ct. App. 1999) (same).

**North Dakota:** *RTS Shearing, LLC v. BNI Coal, Ltd.*, 965 N.W.2d 40, 45-47 (N.D. 2021) (plaintiff accepted terms by choosing to perform contract); N.D. Cent. Code § 9-03-25 ("A voluntary acceptance of the benefit of a transaction is equivalent to consent to all obligations

arising from it[.]").

**Ohio:** *Higgs v. Auto. Warranty Corp. of Am.*, 134 F. App'x 828, 832 (6th Cir. 2005) ("Keeping the warranty past ten days was sufficient [under Ohio law] to demonstrate agreement to the terms of the contract[.]"); *Stachurski v. DirectTV, Inc.*, 642 F. Supp. 2d 758, 766 (N.D. Ohio 2009) ("[B]y continuing to accept Defendant's services, Plaintiffs agreed [under Ohio law] to the terms and conditions provided in the Customer Agreement.").

**Oklahoma:** *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 427 (10th Cir. 2006) (employee deemed under Oklahoma law to have accepted terms by continued employment).

**Oregon:** *McHorse v. Portland Gen. Elec. Co.*, 521 P.2d 315, 319 (Or. 1974) (employer's policy change is "an offer to the employee which can be accepted by the employee's continued employment"); *Citibank S. Dak. N.A. v. Santoro*, 150 P.3d 429, 432 (Or. Ct. App. 2006) (consumer's use of credit card "constituted an acceptance of the agreement").

**Pennsylvania:** *Ahmetasevic v. Citibank, N.A.*, 2020 WL 5146124, at *4 (E.D. Pa. Aug. 31, 2020) ("Plaintiff's use of the card and failure to reject the terms of the Card Agreement within the allotted 45 days constitutes [under Pennsylvania law] a manifestation of an intent to be bound its terms."); *White v. Sunoco Inc.*, 189 F. Supp. 3d 486, 492 (E.D. Pa. 2016) (same); *see also Hoffman v. Compassus*, 2019 WL 1791413, at *8 (E.D. Pa. Apr. 23, 2019) (same in employment context).

**Rhode Island:** *Kenney Mfg. Co. v. Starkweather & Shepley, Inc.*, 643 A.2d 203, 208 (R.I. 1994) (adopting RESTATEMENT § 69).

**South Carolina:** *Fleming v. Borden, Inc.*, 450 S.E.2d 589, 594-96 (S.C. 1994) (employee accepts modifications to employee handbook by continuing employment); *Jenkins v. CitiFinancial, Inc.*, 2007 WL 9753133, at *6 (D.S.C. Jan. 16, 2007) (employee accepted new terms "by continuing in her employment").

**South Dakota:** *Guerrero v. Equifax Credit Info. Servs., Inc.*, 2012 WL 7683512, at *6 (C.D. Cal. Feb. 24, 2012) ("Applying South Dakota law, the Court finds that Plaintiff entered into the arbitration agreement when he was mailed the 2001 Change-in-Terms . . . and continued to use the card."); SDCL § 53-3-5 ("A voluntary acceptance of the benefit of a transaction is

21

1    equivalent to a consent to all the obligations arising from it[.]").

2    **Tennessee:** *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 970 (6th Cir. 2007)

3    (plaintiffs' "continuation of employment after the effective date of the arbitration program

4    constituted acceptance [under Tennessee law] of a valid and enforceable contract to arbitrate").

5    **Texas:** *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 227 (5th Cir. 2008) ("By

6    using the cards, Stinger demonstrated an intent to be bound by the terms of the" cardholder

7    agreement); *Aguilar v. Wells Fargo Bank, N.A.*, 2021 WL 317641, at *5 (Tex. Ct. App. Jan. 29,

8    2021) (same).

9    **Utah:** *Bench v. Bechtel Civil & Minerals, Inc.*, 758 P.2d 460, 462 (Utah Ct. App. 1988)

10   (continued employment constituted acceptance of "revised compensation plan").

11   **Vermont:** *Benya v. Stevens & Thompson Paper Co.*, 468 A.2d 929, 931 (Vt. 1983)

12   ("[A]cceptance . . . may be accomplished either expressly or by conduct.").

13   **Virginia:** *Klein v. Verizon Commc'ns, Inc.*, 2017 WL 5071306, at *4 (E.D. Va. Aug. 9,

14   2017) ("By continuing to use the internet services provided by Verizon, Klein manifested his

15   assent [under Virginia law] to the 2012 modification[.]").

16   **Washington:** *Discover Bank v. Ray*, 162 P.3d 1131, 1132-33 (Wash. Ct. App. 2007)

17   (using credit card constituted acceptance of terms); *see also Robbins v. Comcast Cable Comm'n,*

18   *LLC*, 2019 WL 4139297, at *5 (W.D. Wash. Aug. 30, 2019) (same in employment context).

19   **West Virginia:** *Citizens Telecomms. Co. of W. Va. v. Sheridan*, 799 S.E.2d 144, 149 (W.

20   Va. 2017) (continued service was acceptance of updated terms); *see also Schultz v. AT&T*

21   *Wireless Servs., Inc.*, 376 F. Supp. 2d 685, 691-92 (N.D.W. Va. 2005) (same); *Wilson v. Dell*

22   *Fin. Servs., LLC*, 2009 WL 2160775, at *3 (S.D.W. Va. July 16, 2009) (same).

23   **Wisconsin:** *Delonge v. Time Warner Cable Bus. LLC*, 2014 WL 3890766, at *2 (E.D.

24   Wis. Aug. 6, 2014) (plaintiffs who "continued to pay their monthly bills and to use TWC's

25   services" after receiving notice of the new arbitration clause bound under Wisconsin law).

26   **Wyoming:** *Harvey v. Halliburton Energy Serv., Inc.*, 2019 WL 12497729, at *3-4 (D.

27   Wyo. Apr. 1, 2019) (continued employment constituted acceptance of new arbitration clause).

28   These authorities confirm that the 379,813 potential class members who continued

22

buying Cricket service after receiving text-message notice regarding Cricket's arbitration clause must arbitrate their claims, regardless of where they lived.

### 3. Cricket's electronic signature processes create binding contracts under applicable state contract law.

After noting in the class-certification order that the arbitration agreements formed because of the text messages would be enforceable, the Court concluded that the "same reasoning applies" to customers who "electronically signed terms and conditions containing an arbitration clause": they "must arbitrate." Dkt. 298 at 18. That conclusion is correct.

As the Ninth Circuit has explained, the development of electronic contract formation did "not fundamentally change[] the principles of contract," under which a "manifestation of assent, whether by written or spoken word or by conduct"—including a "click on an 'I agree' box"—"is the touchstone of contract." *Nguyen*, 763 F.3d at 1175-76. And even if a state purported to forbid electronic contracts, the federal E-SIGN Act, which specifies that a contract "may not be denied legal effect, validity, or enforceability because an electronic signature or electronic record was used in its formation" (15 U.S.C. § 7001(a)(2)), preempts contrary state law (*id.* § 7001(a)).

Both of the ways that potential class members executed electronic signatures resulted in valid acceptances of Cricket's Terms:

**In-store electronic signatures:** 15,529 potential class members executed electronic signatures in Cricket-branded stores by signing a signature-capture device under an acknowledgment that "I accept Cricket's Terms and Conditions for Cricket's wireless products and services. The terms (*including dispute resolution by binding individual arbitration instead of jury trials or class actions*) were provided to me in Cricket's Terms & Conditions booklet included with my phone and available online at www.cricketwireless.com/terms. I can also ask a store rep for a hard copy of the T&Cs before I sign below." Moses Decl. ¶ 15 & Ex. B (emphasis added).

**Online electronic signatures:** 438 potential class members clicked an online "Accept" button to execute an electronic signature next to the acknowledgment that they "accept Cricket's Terms and Conditions for Cricket's wireless products and services found at Terms and

23

Conditions. *The terms include dispute resolution by binding individual arbitration instead of jury trials or class actions.*" Moses Decl. ¶ 6 & Ex. A at 4 (emphasis added). *See* page 8, *supra.*

Because both sets of customers had access at their fingertips to Cricket's Terms when executing electronic signatures, it was unnecessary for them to execute those signatures directly on the Terms themselves. Customers accepting in stores could either review the Terms and Conditions booklet in the box that was just handed to them, review a separate printed copy that employees could provide, or use a computer in the store to read the Terms online. Moses Decl. ¶ 16. Customers accepting online could click the "Terms and Conditions" hyperlink to display Cricket's Terms (at cricketwireless.com/terms). *Id.* ¶ 6. Because the terms were readily accessible (either by hyperlink or hard copy), they were validly incorporated by reference. *See, e.g., Thompson v. Isagenix Int'l LLC*, 849 F. App'x 712, 712 (9th Cir. 2021) (consumer bound by terms "conspicuously hyperlinked immediately above" the "checkout button"); *In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019) ("consumer online agreements and consumer paper agreements . . . may incorporate documents and terms by reference"); 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. Supp. 2021). All relevant jurisdictions have adopted this doctrine.[13]

---

[13]     **Alabama**: *Advance Tank & Constr. Co. v. Gulf Coast Asphalt Co.*, 968 So. 2d 520, 524 (Ala. 2006); **Alaska**: *Schmitz v. Yukon-Koyukuk Sch. Dist.*, 147 P.3d 720, 725-26 (Alaska 2006); **Arizona**: *Weatherguard Roofing Co. v. D.R. Ward Constr. Co.*, 152 P.3d 1227, 1229 (Ariz. Ct. App. 2007); **Arkansas**: *Ingersoll-Rand Co. v. El Dorado Chem. Co.*, 283 S.W.3d 191, 196 (Ark. 2008); **California**: *Holl*, 925 F.3d at 1084; **Colorado**: *Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*, 251 P.3d 1091, 1095 (Colo. Ct. App. 2010); **Connecticut**: *E&F Constr. Co. v. Rissill Constr. Assocs., Inc.*, 435 A.2d 343, 344 (Conn. 1980); **Delaware**: *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 818-19 (Del. 2018); **D.C.**: *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 366 (D.C. 1984); **Florida**: *2000 Presidential Way, LLC v. Bank of N.Y. Mellon*, 326 So. 3d 64, 70-71 (Fla. Dist. Ct. App. 2021); **Georgia**: *Consol. Freightways Corp. of Del. v. Synchroflo, Inc.*, 294 S.E.2d 643, 645 (Ga. Ct. App. 1982); **Hawaii**: *Safeway, Inc. v. Nordic PCL Constr., Inc.*, 312 P.3d 1224, 1234 (Haw. Ct. App. 2013); **Idaho**: *Wattenbarger v. A.G. Edwards & Sons, Inc.*, 246 P.3d 961, 973 (Idaho 2010); **Illinois**: *Dixon v. GAA Classic Cars, LLC*, 145 N.E.3d 429, 436 (Ill. App. Ct. 2019); **Indiana**: *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 754-55 (Ind. 2018); **Iowa**: *In re Kokjohn*, 531 N.W.2d 99, 100-01 (Iowa 1995); **Kansas**: *Kincaid v. Dess*, 298 P.3d 358, 366-67 (Kan. Ct. App. 2013); **Kentucky**: *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 8 (Ky. 2021); **Louisiana**: *L&A Contracting Co. v. Ram Indus. Coatings, Inc.*, 762 So. 2d 1223, 1234 (La. Ct. App. 2000); **Maine**: *SC Testing Tech., Inc. v. Dep't of Envtl. Prot.*, 688 A.2d 421, 423 (Me. 1996); **Maryland**: *Wells v. Chevy Chase Bank, F.S.B.*, 832 A.2d 812, 831 (Md. 2003); **Massachusetts**: *Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund*, 995 N.E.2d 64, 70 (Mass. 2013); **Michigan**: *Bayberry Grp., Inc. v. Crystal Beach Condo. Ass'n*, 964 N.W.2d 846, 852 (Mich. Ct. App. 2020); **Minnesota**: *In re Holtorf's Estate*, 28 N.W.2d 155, 157 (Minn. 1947); **Mississippi**: *Galey v. World Mktg. Alliance*, 510 F.3d 529, 532 (5th Cir. 2007); **Missouri**: *St. Luke's Hosp. v. Benefit Mgmt. Consultants, Inc.*, 626 S.W.3d 731, 747 n.11 (Mo. Ct. App.

24

**III.     Any factual dispute over whether potential class members agreed to arbitrate must be resolved by jury trials.**

If the Court concludes that the formation of these potential class members' arbitration agreements is disputed, those individualized disputes should be resolved by jury trials. "[O]nce a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability[.]" *Hansen*, 1 F.4th at 672; *accord, e.g.*, *Jin v. Parsons Corp.*, 966 F.3d 821, 826 (D.C. Cir. 2020); *Berkeley*, 944 F.3d at 234. To the extent a trial is needed, plaintiffs have requested trial by jury. Dkt. 184, at 1, 67; *see also id.* ¶¶ 13-17, 176-86. Cricket joins in that request.

**CONCLUSION**

The Court should enter an order compelling arbitration on an individual basis of the claims of the 379,813 potential class members who must arbitrate because of the text messages regarding arbitration and the 15,967 potential class members who must arbitrate because of electronic signatures.

2021); **Montana**: *Wurl v. Polson Sch. Dist. No. 23*, 127 P.3d 436, 442 (Mont. 2006); **Nebraska**: *Drain v. Bd. of Educ. of Frontier Cty. Sch. Dist. No. 46*, 508 N.W.2d 255, 260 (Neb. 1993); **Nevada**: *MMAWC, LLC v. Zion Wood Obi Wan Trust*, 448 P.3d 568, 572 (Nev. 2019); **New Hampshire**: *Chadwick v. CSI, Ltd.*, 629 A.2d 820, 825 (N.H. 1993); **New Jersey**: *Wollen v. Gulf Stream Restoration & Cleaning, LLC*, 259 A.3d 867, 879 (N.J. Super. Ct. App. Div. 2021); **New Mexico**: *Geter v. St. Joseph Healthcare Sys., Inc.*, 2011 WL 2080244, at *3 (N.M. Ct. App. Mar. 10, 2011); **New York**: *Von Ancken v. 7 East 14 L.L.C.*, 98 N.Y.S.3d 32, 35 (App. Div. 2019); **North Carolina**: *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 658 S.E.2d 918, 921-22 (N.C. 2008); **North Dakota**: *RTS Shearing, LLC v. BNI Coal, Ltd.*, 965 N.W.2d 40, 44 (N.D. 2021); **Ohio**: *Woodside Mgmt. Co. v. Bruex*, 157 N.E.3d 295, 304-05 (Ohio Ct. App. 2020); **Oklahoma**: *Walker v. Builddirect.com Techs. Inc.*, 349 P.3d 549, 552-53 (Okla. 2015); **Oregon**: *Hous. Auth. of Jackson Cty. v. Gates*, 267 P.3d 169, 170 (Or. Ct. App. 2011); **Pennsylvania**: *In re Estate of Atkinson*, 231 A.3d 891, 899 (Pa. Super. Ct. 2020); **Rhode Island**: *Stanley-Bostitch, Inc. v. Regenerative Env't Equip. Co.*, 786 A.2d 1063, 1065 (R.I. 2001); **South Carolina**: *Stevens Aviation, Inc. v. DynCorp. Int'l LLC*, 715 S.E.2d 655, 659-60 (S.C. Ct. App. 2011), *rev'd in part on other grounds*, 756 S.E.2d 148 (S.C. 2014); **South Dakota**: *James River Equip. Co. v. Beadle Cty. Equip., Inc.*, 646 N.W.2d 265, 269 (S.D. 2002); **Tennessee**: *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800, 811 (Tenn. Ct. App. 2015); **Texas**: *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010); **Utah**: *Grove Bus. Park LC v. Sealsource Int'l, LLC*, 443 P.3d 764, 774 (Utah Ct. App. 2019); **Vermont**: *Kneebinding, Inc. v. Howell*, 201 A.3d 326, 362 (Vt. 2018); **Virginia**: *Hertz Corp. v. Zurich Am. Ins. Co.*, 496 F. Supp. 2d 668, 675 (E.D. Va. 2007); **Washington**: *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 492 (Wash. 2020); **West Virginia**: *G&G Builders, Inc. v. Lawson*, 794 S.E.2d 1, 6 (W. Va. 2016); **Wisconsin**: *Little Chute Area Sch. Dist. v. Wis. Educ. Ass'n Council*, 892 N.W.2d 312, 322 (Wis. Ct. App. 2017); **Wyoming**: *Fleig v. Estate of Fleig ex rel. Fleig*, 413 P.3d 638, 641-42 (Wyo. 2018).

25

1  Dated: January 7, 2022                     Respectfully submitted,

2                                             **SIDLEY AUSTIN LLP**

3

4                                             */s/ David L. Anderson*
                                              David L. Anderson
5
                                              Counsel for Defendant
6                                             CRICKET WIRELESS LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26