| | |
|---|---|
| SIDLEY AUSTIN LLP<br>David L. Anderson (SBN 149604)<br>dlanderson@sidley.com<br>Sheila A.G. Armbrust (SBN 265998)<br>sarmbrust@sidley.com<br>555 California Street, Suite 2000<br>San Francisco, CA 94104<br>Telephone: (415) 772-1200<br>Facsimile: (415) 772-7400<br><br>MAYER BROWN LLP<br>Archis A. Parasharami (State Bar No. 321661)<br>aparasharami@mayerbrown.com<br>Kevin Ranlett (*pro hac vice*)<br>kranlett@mayerbrown.com<br>Daniel E. Jones (*pro hac vice*)<br>djones@mayerbrown.com<br>1999 K Street NW<br>Washington, DC 20006<br>Telephone: (202) 263-3000<br>Facsimile: (202) 263-3300<br><br>*Attorneys for Defendant*<br>*Cricket Wireless, LLC* | MAYER BROWN LLP<br>Matthew Ingber (*pro hac vice*)<br>mingber@mayerbrown.com<br>Jarman D. Russell (*pro hac vice*)<br>jrussell@mayerbrown.com<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 506-2500<br>Facsimile: (212) 849-1910<br><br>CROWELL & MORING LLP<br>Kristin J. Madigan (SBN 233436)<br>KMadigan@crowell.com<br>3 Embarcadero Center, 26th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 986-2800<br>Facsimile: (415) 986-2827<br><br>CROWELL & MORING LLP<br>Christopher A. Cole (*pro hac vice*)<br>CCole@crowell.com<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2595<br>Telephone: (202) 624-2500<br>Facsimile: (202) 628-5116<br><br>*Attorneys for Defendant*<br>*Cricket Wireless, LLC* |

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| URSULA FREITAS, individual, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRICKET WIRELESS, LLC,<br><br>Defendant. | Case No. 3:19-cv-07270-WHA<br><br>**DECLARATION OF LUIS FUENTES IN SUPPORT OF CRICKET WIRELESS, LLC'S MOTION TO ENFORCE TEXT-MESSAGE AND ELECTRONIC-SIGNATURE ARBITRATION AGREEMENTS OF POTENTIAL CLASS MEMEBERS**<br><br>Date: February 24, 2022<br>Time: 8:00 am.<br>Location: Courtroom 12, 19th Floor<br>Judge: Hon. William H. Alsup<br><br>Complaint Filed: November 4, 2019 |

I, Luis Fuentes, declare as follows:

1. I have personal knowledge of the following facts, and if called as a witness I could and would testify competently as to their truth.

2. I have been employed by Cricket Wireless LLC ("Cricket") from May 2012 to the present in a variety of roles. From May 2012 to January 2015, I worked as a senior product manager. Since January 2015, I have been a senior marketing manager focusing on various aspects of customer communications.

3. Following approval of the merger between AT&T and legacy Cricket, on May 18, 2014, New Cricket launched on AT&T's GSM network.

4. I am familiar with New Cricket's policies and procedures for sending text messages to large groups of or all account owners. Sometimes these text messaging campaigns are primarily for marketing purposes. Sometimes the campaigns are service messages.

5. Messages to customers concerning legal issues or Terms and Conditions of Service would be considered service messages. Service messages are generally sent to all affected account owners. While customers could opt out of receiving promotional or marketing messages, customers could not opt out of receiving service messages pertaining to them. Cricket's policy and practice was to send service messages affecting all customers, such as notices of updated Terms and Conditions, to all account owners.

6. In 2014 and 2015, these campaigns were sent using a vendor known as Telescope. Telescope's platform provided a computerized process for sending text message campaigns to customers. Cricket would provide the message content and the desired recipients, and the Telescope platform would send the text messages. I am personally familiar with the Telescope platform.

- 2 -

7. Sometimes the Telescope platform would be unable to deliver a message to a particular recipient. If so, the platform would automatically try to resend the message to that recipient for up to 48 hours. If unsuccessful, the platform would identify recipients who did not receive the message so that they could be sent the same message as part of a follow-up campaign.

8. These follow-up campaigns are a typical part of the procedure for sending mass text campaigns and include recipients to whom the Telescope tool is unable to deliver a text message during the original distribution. As part of Cricket's regular custom and routine practice, including in the 2014 time period, Cricket would send follow-up campaigns to customers who had not received the original message. If the message was important, Cricket would try multiple rounds of follow-up campaigns in order to reach as many recipients as possible.

9. According to Cricket's records, Cricket engaged in a number of text message campaigns, starting on May 22, 2014, with follow-up campaigns in June and July 2014, that informed all account owners of Cricket's updated Terms and Conditions following AT&T's acquisition of Cricket. I did not personally participate in those campaigns. But I am personally familiar with Cricket policies governing those campaigns and the procedures that were used to send those text messages, and I personally examined the system-generated records in the Telescope platform regarding those campaigns. According to those records, a former Cricket employee named Matthew Paglusch, who left the company in July 2014, used the Telescope platform to send the text messages in connection with the May 2014, June 2014, and July 2014 campaigns.

10. In July 2015, I used the "Campaign Manager" tool associated with the Telescope platform to export the system generated records for these text message campaigns. The data I exported had been automatically generated and saved by the Telescope platform as text message campaigns were sent. The Campaign Manager tool exported the data as a spreadsheet. This

spreadsheet listed each of the data fields available in the platform associated with the campaigns, including the campaign name, the campaign start date, the campaign creator, the campaign content, and the recipient count.

11. Once I exported the spreadsheet of these campaigns, I requested that Shayna Sternberg, a Telescope employee, provide additional information that I could not extract from the Campaign Manager tool.

12. On July 28, 2015, Ms. Sternberg sent the spreadsheet back to me. She did not change any of the information about the campaigns (such as dates, message content, and recipient counts) that I had exported. I received the spreadsheet through my Cricket email address and I have retained it on Cricket's computer system since that time. I understand the spreadsheet has been produced in this action, bears Bates number CRICKET02508560, and has been filed as Exhibit A to the Declaration of Anne-Marie Blandino, Dkt. 202-1.

13. The data that I obtained through the Campaign Manager tool reflects four message distributions on May 22, 2014 concerning Cricket's updated Terms and Conditions, which were collectively sent to 3,437,214 account owners. *See* Dkt. 202-1.

14. The data also reflects an additional 16 follow-up campaigns concerning Cricket's updated Terms and Conditions, which were sent in June and July 2014. These 16 campaigns were collectively sent to 20,324 account owners. *See* Dkt. 202-1.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed at Atlanta, Georgia on January __6__, 2022.

_____

Luis Fuentes