| | |
|---|---|
| SIDLEY AUSTIN LLP<br>David L. Anderson (SBN 149604)<br>dlanderson@sidley.com<br>Sheila A.G. Armbrust (SBN 265998)<br>sarmbrust@sidley.com<br>555 California Street, Suite 2000<br>San Francisco, CA 94104<br>Telephone: (415) 772-1200<br>Facsimile: (415) 772-7400<br><br>MAYER BROWN LLP<br>Archis A. Parasharami (SBN 321661)<br>aparasharami@mayerbrown.com<br>Kevin S. Ranlett (*pro hac vice*)<br>kranlett@mayerbrown.com<br>Daniel E. Jones (*pro hac vice*)<br>djones@mayerbrown.com<br>1999 K Street, N.W.<br>Washington, D.C. 20006-1101<br>Telephone: (202) 263-3000<br>Facsimile: (202) 263-3300<br><br>*Attorneys for Defendant*<br>*Cricket Wireless LLC* | MAYER BROWN LLP<br>Matthew D. Ingber (*pro hac vice*)<br>mingber@mayerbrown.com<br>Jarman D. Russell (*pro hac vice*)<br>jrussell@mayerbrown.com<br>1221 Avenue of the Americas<br>New York, New York 10020-1001<br>Telephone: (212) 506-2500<br>Facsimile: (212) 262-1910<br><br>CROWELL & MORING LLP<br>Kristin J. Madigan (SBN 233436)<br>KMadigan@crowell.com<br>3 Embarcadero Center, 26th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 986-2800<br>Facsimile: (415) 986-2827<br><br>CROWELL & MORING LLP<br>Christopher A. Cole (*pro hac vice*)<br>CCole@crowell.com<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2595<br>Telephone: (202) 624-2500<br>Facsimile: (202) 628-5116<br><br>*Attorneys for Defendant*<br>*Cricket Wireless LLC* |

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| URSULA FREITAS, individual, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRICKET WIRELESS, LLC,<br><br>Defendant. | Case No. 3:19-cv-07270-WHA<br><br>**DECLARATION OF MICHAEL MOSES IN SUPPORT OF CRICKET WIRELESS, LLC'S MOTION TO ENFORCE TEXT-MESSAGE AND ELECTRONIC-SIGNATURE ARBITRATION AGREEMENTS OF POTENTIAL CLASS MEMBERS**<br><br>Date: February 24, 2022<br>Time: 8:00 a.m.<br>Location: Courtroom 12, 19th Floor<br>Judge: Hon. William H. Alsup<br><br>Complaint Filed: November 4, 2019 |

I, Michael Moses, declare as follows:

1. I have personal knowledge of the following facts, and if called as a witness I could and would testify competently as to their truth.

2. I am currently employed by Cricket Wireless, LLC ("Cricket") in Atlanta, Georgia as a Retail Innovations Manager. Before the merger between AT&T and Cricket, from January 2009 to February 2013, I was a Retail Business Manager in a Cricket-owned store in Atlantic City, New Jersey. From February 2013 to October 2014, I was a Quality Manager for Cricket, where I worked in the Greater Philadelphia Area, as well as Buffalo, Rochester, and Syracuse, New York. Since October 2014, I have been in my current role as a Retail Innovations Manager.

3. Given my position at Cricket, I am familiar with and have reviewed the policies and procedures applicable to Cricket-owned and Cricket-branded retail stores, including how, in the regular and ordinary course of business, customers purchase smartphones. As a Retail Business Manager, I was charged with understanding how the point-of-sale systems worked, not only to conduct transactions myself, but to train employees. As a Quality Manager, part of my role as an auditor was to ensure that Cricket-authorized stores used the point-of-sale equipment that Cricket authorized and required.

4. When the e-signature capture policy came into effect in 2017, I was in my current position as a Retail Innovations Manager. In this role, I am familiar from a front-line user functionality standpoint with all in-store technology, including point-of-sale transactions and how the e-signature capture devices work. While IT develops the technology, I understand from a sales representative and customer experience perspective how the point-of-sale technology works, and I would provide input to IT as to how the technology should work.

5. In addition, as a Retail Innovations Manager, I am familiar with and have reviewed the policies and procedures that apply to the online purchase of smartphones and service plans using Cricket's website, and the purchase experience during these transactions.

6. Cricket customers who, since March 31, 2017, either activated a new account after having terminated service or who added a new line of service onto an existing account through an online purchase, were required to accept the Terms and Conditions before placing their orders. A true and correct printout from Cricket's records of the online buy-flow process, including the acknowledgement to which a customer during this time period would click to agree, is attached as **Exhibit A** (native version of CRICKET02508450). Specifically, the customer

> accept[s] Cricket's Terms and Conditions for Cricket's wireless products and services found at Terms & Conditions. The terms include dispute resolution by binding individual arbitration instead of jury trials or class actions.

The phrase "Terms and Conditions" is a hyperlink to Cricket's then-current Terms and Conditions, available at cricketwireless.com/terms.

7. Every online transaction required such acceptance. If a customer does not click the button to accept the Terms and Conditions, the transaction cannot be completed.

8. Cricket customers who, since May 1, 2017, either returned to Cricket after having terminated service or who added a new line of service onto an existing account were required to sign an electronic signature acknowledging that they accept Cricket's Terms and Conditions. Accordingly, during this time period, all Cricket-owned and Cricket-branded stores have been required to have a certified Cricket signature capture device connected to any point-of-sale that performs activations or add-a-line transactions. A true and correct copy of a sample signature capture from Cricket's records is attached as **Exhibit B** (CRICKET02508444).

9. In addition, some customers who upgraded devices at Cricket-branded stores after 2019 completed the same signature-capture process.

10.     As a Retail Innovations Manager, I am familiar with the design and the programming of the e-signature capture devices. For example, Cricket-owned and Cricket-authorized stores were required to have a one-to-one relationship between the point-of-sale payment terminals and a credit card reader that had embedded in it the e-signature capture technology. If a point-of sale payment terminal did not have a supported or connected credit card reader with an e-signature capture device, that terminal's functionality would be limited to bill payments only, which could only be made in cash. In other words, if a payment terminal did not have the signature capture device, a customer could not add a line or activate a line of service; nor could they use a credit card for the underlying bill payment. This measure ensures that all customers are required to accept the Terms and Conditions after an opportunity to review them when completing a transaction, and the point-of-sale systems prevent a transaction from being completed unless and until the Terms and Conditions were accepted through completion of a signature capture. All store managers were instructed to train employees regarding this functionality.

11.     During the relevant time period, Cricket-owned and Cricket-branded stores used the Ingenico iSC250 payment terminal as the signature capture device, which also operated as a credit card reader. A photo of the Ingenico device is attached hereto as **Exhibit C**. As part of the Retail Innovations Team, my colleagues and I were deeply involved from an operational perspective and were responsible for working with a vendor to install the Ingenico devices. For example, I served as the liaison between the vendor and store managers regarding the scheduling of the various installs.

12.     A true and correct copy of the underlying design for the electronic signature capture, provided by Cricket's vendor, iQmetrix, is attached hereto as **Exhibit D** (CRICKET02508454). In my role at Cricket, I was involved in reviewing the design and

functionality of the e-signature capture devices before they were implemented. In particular, I would review the design schematics and make sure, from a customer-facing perspective, that the transaction experience was not overly cumbersome, and would provide feedback regarding the design.

13. As noted above, in my role at Cricket, I understand that the e-signature capture device technology was programmed to require customers to accept the Terms and Conditions in order to complete the transaction. According to the schematics (*see* Exhibit D, at CRICKET02508458), the "[c]ustomer must read, agree and sign [the] terms and conditions or the sale will not tender items on the invoice." In other words, a sales representative could not tender, or complete, the transaction unless and until the customer accepted the Terms and Conditions. *See also id.*, at CRICKET02508462 ("The solution will not allow payment to be tendered on an Activation or Add-A-Line if the customer has not signed the T&Cs."). The customer could either "Accept" the Terms and Conditions, or "Cancel" the transaction. *See* Exhibit B, at CRICKET02508448.

14. During a transaction using the Ingenico device, a customer would be prompted by the display screen on the store's signature capture device to do the following:

   a. Select preferred language (Spanish or English);
   b. Review and confirm the underlying transaction;
   c. Accept the Terms and Conditions; and
   d. Provide an e-signature.

A true and correct copy of the above-mentioned process is attached hereto as **Exhibit E** (native version of CRICKET02508446).

15. The Terms-and-Conditions-acceptance screen that the Ingencio signature-capture device would display would specify (in either English or Spanish) that the customer agreed to

[a]ccept Cricket's Terms and Conditions for Cricket's wireless products and services. The terms (including dispute resolution by binding individual arbitration instead of jury trials or class actions) were provided to me in Cricket's Terms & Conditions booklet included with my phone and available online at www.cricketwireless.com/terms. I can also ask a store rep for a hard copy of the T&Cs before I sign below.

Exhibit B, at CRICKET02508448.

16. During a transaction, a customer could request a hard copy of the underlying Terms and Conditions. The store representative could provide the customer with a pre-printed tear sheet containing the entire Terms and Conditions. A true and correct copy of the Terms and Conditions that were in place in June 2017 are attached hereto as **Exhibit F**. A true and correct copy of the current Terms and Conditions are attached hereto as **Exhibit G**. The pre-printed tear sheet containing the Terms and Conditions was identical to those available online, and in the New Cricket booklet. Alternatively, the store representative could print for the customer a copy of the Terms and Conditions from the Cricket website (at www.cricketwireless.com/terms). The customer also could review the printed version of the Terms and Conditions packaged in the smartphone box, which was opened during the transaction and the contents given to the customer. It also has been company policy during this time period that Cricket-owned and Cricket branded stores use Cricket-branded receipt paper, which referred to the Terms and Conditions. A true and correct copy of the store receipt which contained the Cricket-branded receipt paper is attached hereto as **Exhibit H** (Dkt. No. 207-4).

[Signature page follows]

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed at Atlanta, Georgia, on January 7, 2022.

_____
Michael Moses