UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

URSULA FREITAS and JAMIE POSTPICHAL,

    Plaintiffs,

v.

CRICKET WIRELESS, LLC,

    Defendant.

No. C 19-7270 WHA

**ORDER RE MOTION TO COMPEL ARBITRATION**

## INTRODUCTION

In this RICO class action, defendant moves to compel arbitration of class members' claims. This order will not order any absent class members to arbitrate, but it will modify the class definition in light of the issues raised.

## STATEMENT

Plaintiffs Ursula Freitas and Jamie Postpichal claim that defendant, Cricket Wireless, LLC, advertised 4G service and sold 4G-capable phones in markets where defendant did not actually provide 4G coverage. Thus, plaintiffs allege that they and the class members were harmed because they paid for 4G phones and coverage, but they received only 3G coverage, which was slower and cheaper than 4G coverage.

A previous order in this action certified the following class:

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who

> between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE monthly plan for service on LegacyCricket's network, or later activated a 4G/LTE plan with the device for service on LegacyCricket's network.

(Dkt. No. 298 at 19). But the order excluded certain groups from the class, including, but not limited to:

> (1) any Cricket customer who continued to use Cricket [after] receiving the May 22, 2014 text message notification regarding Cricket's arbitration clause;
>
> (2) any Cricket customer who agreed to Cricket's arbitration provision via electronic signature after May 2017;
>
> (3) [a]ny class member that defendant proves is subject to an arbitration agreement.

In the instant motion, only the third exclusion applies. Defendant argues that there are two means by which class members are subject to arbitration:

- Until May 18, 2014, defendant placed a "Quick Start Guide" inside phone boxes, which included an arbitration provision.
- From May 18, 2014 onward, defendant instead placed a "Terms and Conditions" booklet inside phone boxes, which included an arbitration provision.

Plaintiffs concede that defendant's phone boxes contained either the Quick Start Guide or the Terms and Conditions booklet throughout the class period (Opp. 6–8). Moreover, defendant states that "as a matter of company policy and practice . . . employee[s] would provide the box and its contents, including any booklets, to the customer[s]" (Dkt. No. 199-9, ¶ 7). Upon purchase of a phone, defendant provided each class member with a receipt that referred to an agreement to arbitrate and terms of purchase (Moses Decl., ¶ 7, Exh. A).

### 1. QUICK START GUIDE.

The Quick Start Guide consisted of a cover page and sixteen pages of text (Dkt. No. 199-2). The first six pages of text contained information on how to activate defendant's phones and cellular service. None of those pages referred to any terms of service. The remaining ten pages consisted of dense text that, according to the guide, constituted an agreement between

the purchaser and defendant. At the top of the seventh page of text was the phrase "TERMS AND CONDITIONS." On the same page, the guide stated:

> These Terms and Conditions of Service constitute an agreement ("Agreement") between you and the provider of your Cricket service and contain an arbitration clause and other clauses which may affect your legal rights.
>
> \*      \*      \*
>
> IMPORTANT: WHEN YOU START THE SERVICE OR USE THE SERVICE BY, FOR EXAMPLE, PLACING A CALL, SENDING A MESSAGE OR TRANSMITTING DATA ON THE CRICKET WIRELESS SYSTEM OR ANOTHER SYSTEM THAT'S AGREED TO CARRY OUR SERVICES, YOU INDICATE YOUR ACCEPTANCE OF THIS AGREEMENT.

The arbitration provision began on the fourteenth page of text and ended on the sixteenth page. It included the following statements:

> ARBITRATION MAY LIMIT RIGHTS YOU MAY HAVE . . . NO JUDGE OR JURY IS PRESENT AT AN ARBITRATION . . . YOU AND WE ARE WAIVING RIGHTS TO PARTICIPATE IN CLASS ACTIONS . . . .
>
> \*      \*      \*
>
> You may reject this arbitration clause by sending us a rejection notice ("Rejection Notice") within sixty (60) days after the date of your phone activation . . . by going to www.mycricketdisputeresolution.com.
>
> \*      \*      \*
>
> Any past, present or future claim, dispute or controversy ("Claim") by either you or us against the other . . . arising from or relating in any way to this Agreement or Services provided to you under this Agreement, including (without limitation) statutory, tort and contract Claims . . . shall be resolved, upon the election by you or us, by binding arbitration.

Defendant has records of 1,099 customers who opted out of arbitration during the class period by sending a rejection notice to defendant (Dkt. No. 199-9, ¶ 10).

2. **TERMS AND CONDITIONS BOOKLET.**

The Terms and Conditions booklet consisted of a cover page (labeled "Terms and Conditions") and 26 pages of text (Dkt. No. 199-5). The first page of text stated, in part:

> THESE TERMS AND CONDITIONS REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE

3

> DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS. THESE TERMS AND CONDITIONS LIMIT OUR LIABILITY AND THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.

The following two pages stated, in part:

> These Ts&Cs are part of your Wireless Customer Agreement ("Agreement") and form a contract between you and Cricket that applies to all Devices and Wireless Services provided to you. Your Agreement with us also includes: our Privacy Policy . . . any rate plans . . . any terms of service . . . not otherwise described in these Ts&Cs that we provide to you (collectively "Supplemental Materials") and . . . our Policies (as defined below). In the event of any conflict between these Ts&Cs and any Supplemental Materials, these Ts&Cs shall control.

>             *             *             *

> Your Agreement with Cricket begins when you accept the Ts&Cs by doing any of the following: (a) giving us a written or electronic signature or telling us orally that you accept, or by otherwise accepting through any other printed, oral, or electronic statement; (b) paying for Service; (c) activating the Service; (d) attempting to use or in any way using the Service; (e) upgrading or modifying the Service; or (f) opening any Device packaging, or starting any application, program or software that says you are accepting.

> Services are subject to our business policies, practices, and procedures ("Policies") . . . . You agree to follow our Policies when you use our Services. Our Policies are subject to change at any time. You can find them on our website at www.cricketwireless.com/support.

Additionally, a six-page arbitration clause began on the twentieth page of text. It stated, in part:

> Cricket and you agree to arbitrate all disputes and claims between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; claims that arose before this or any prior agreement (including, but not limited to, claims relating to advertising); claims that are currently subject of purported class action litigation in which you are not a member of a certified class, and claims that may arise after the termination of this Agreement.

>             *             *             *

> You agree that, by entering into this Agreement, you and Cricket are each waiving the right to a trial by jury or to participate in a class action.

4

The Terms and Conditions booklet, however, did not provide an opportunity to opt out of arbitration. Nor did it expressly provide purchasers with a right to return their phones for a refund. Defendant, however, maintained a seven-day return policy on its website at all relevant times (Moses Supp. Decl., ¶¶ 4–6, Exhs. A, B).

### 3. PHONE BOXES.

Prior to May 18, 2014, the back panels of defendant's phone boxes included the following text in fine print, which was within a longer paragraph that also discussed signal frequency and battery performance:

> Use of phone requires purchase of Cricket® service, which must be purchased separately. By activating Cricket® service, you agree to the enclosed terms and conditions of the service.

(Dkt. No. 199-4, Exh. C).

From May 18, 2014 onward, either the sides or the backs of defendant's phone boxes included substantially the following language in fine print:

> The purchase, activation, or use of this phone and wireless service is subject to the Cricket Wireless Terms and Conditions of Service inside this box or available in-store or at www.cricketwireless.com. These Terms and Conditions contain important information – including your agreement to dispute resolution by binding individual arbitration instead of jury trials or class actions. By activating and/or using this phone or phone number you acknowledge and agree to these Terms and Conditions of Service.

(Keser Decl., ¶ 6).

### 4. BARRAZA V. CRICKET WIRELESS, LLC.

In a prior action against defendant regarding false advertising, an order of ours denied defendant's motion to compel arbitration under California and Missouri law. *Barraza v. Cricket Wireless, LLC*, No. C 15-02471 WHA, 2015 WL 6689396, at *1 (N.D. Cal. Nov. 3, 2015). The order stated that defendant's Quick Start Guide "lacked *any* indication of its contractual nature." *Id.* at *5 (emphasis in original). The plaintiffs' failure to opt out did not constitute acceptance because a reasonable consumer would not have been aware of the arbitration provision buried inside the Quick Start Guide. Moreover, the plaintiffs "had no reason to review the small text printed on the [phone] box[es]" or to consult their receipts.

5

And defendant's use of the phrase "terms and conditions" rather than "contract" on boxes and receipts was not consequential. The order held that a summary trial was necessary to resolve a credibility issue of whether the plaintiffs had actually read the materials notifying them of the in-the-box terms.

This order follows full briefing and a telephonic hearing.

## ANALYSIS

### 1. RULING ON DEFENDANT'S MOTION IS PROPER.

Defendant argues that *Schwarzchild v. Tse*, 69 F.3d 293 (9th Cir. 1995), proposed that, prior to provision of class notice and the expiration of the opt-out deadline, an order compelling arbitration does not bind absent class members (Br. 1 n. 1). This order finds that it may exclude from the class definition absent class members who are likely subject to arbitration, but those excluded persons will still be free to bring suit later and litigate arbitrability issues individually. Thus, ruling on the motion to compel arbitration will help fine tune the class.

### 2. CHOICE-OF-LAW.

"The choice-of-law inquiry has two levels. First, we must determine whose choice-of-law rules govern. Second, applying those rules, we determine whose law applies." *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991).

Here, the choice-of-law rules of the Restatement (Second) of Conflict of Laws (1969) govern because there is federal question jurisdiction in this RICO action. *Ibid.* There is no California statute on choice-of-law. *See Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009). So the Restatement requires that this order analyze the factors in Section 6, as follows: the interstate system requires this order to apply the proper state substantive law to each class member to avoid abridging or enlarging rights under 28 U.S.C. Section 2072(b); California law on in-the-box contracts differs from that of other interested states; the law on in-the-box contracts is not so complex as to prevent application of different states' laws; and general contract law will provide some uniformity of result. Thus, this order shall apply the laws of

the respective class members' states of residence at the time of purchase. And the prior class certification order justifies the parties' expectation that this order do so.

### 3. VALIDITY OF THE ARBITRATION PROVISIONS.

The Federal Arbitration Act states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party seeking to compel arbitration has the burden under the FAA to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

In determining the former, "federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citation omitted). In determining the latter, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). If both questions are answered in the affirmative, then the FAA requires enforcement of the arbitration agreement according to its terms, "leav[ing] no place for the exercise of discretion by a district court." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). But "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [FAA] § 2." *Dr.'s Ass'n, Inc. v. Casarotto*, 517 U.S. 681, 682 (1996).

#### A. DEFENDANT'S ADVERTISEMENTS DID NOT DEFEAT CONTRACT FORMATION.

Plaintiffs argue that, due to defendant's "no contract" advertisements, class members did not believe that they were entering into contractual relationships with defendant (Opp. 5). So class members could not have assented to the terms accompanying their phones (*see ibid.*).

But *Barraza* stated the following:

> "No Contract" in the context of advertisements for telecommunications services is meant to distinguish services with annual commitments from those that do not require such commitments. There is no evidence that [defendant] intended its

7

> "No Contract" ads to trick consumers into unknowingly assenting to arbitration, rather than to convey [defendant]'s offer of service without an annual commitment. Defendant[] cannot now be precluded from enforcing contracts against plaintiffs . . . .

2015 WL 6689396, at *6. Other courts have agreed with this conclusion. *E.g.*, *Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, No. CV 20-7150 PSG (PJWx), 2020 WL 8461696, at *3 (C.D. Cal. Oct. 21, 2020) (Judge Philip S. Gutierrez). One of defendant's employees also stated here that defendant's "no contract" policy referred only to the time commitment for defendant's services (Dkt. No. 177-17, Towster Dep. 250). Thus, the "no contract" policy alone did not defeat contract formation, and it did not invalidate the arbitration provisions.

### B. THE QUICK START GUIDE WOULD LIKELY REQUIRE ARBITRATION IN STATES THAT FOLLOW SEVENTH CIRCUIT DECISIONS.

There are two Seventh Circuit decisions that enforce in-the-box contracts, and several states follow them. In *ProCD, Inc. v. Zeidenberg*, the plaintiff sold an encoded CD-ROM disc inside a box. 86 F.3d 1447, 1450 (7th Cir. 1996). The outside of the box warned of an enclosed license, which also appeared on the computer screen before the CD-ROM disc could be used. *Ibid.* The license expressly provided the plaintiffs an opportunity to return the disc if they found the terms unsatisfactory. *Id.* at 1453.

Under Wisconsin law, *ProCD* enforced the license because "[the defendant] extended an opportunity to reject if a buyer should find the license terms unsatisfactory; [the plaintiff] inspected the package, tried out the software, learned of the license, and did not reject the goods." *Id.* at 1452–53. It emphasized that, regarding transactions for consumer goods, "[n]otice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable (a right that the license expressly extends), may be a means of doing business valuable to buyers and sellers alike." *Id.* at 1451. *ProCD* rejected the conclusion that general contract terms must be conspicuous to be enforceable. *Id.* at 1453.

In a later Seventh Circuit case, *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997), the plaintiffs ordered and paid for a computer over the phone. The computer and a list of terms were enclosed in a box that the defendant sent to the plaintiffs. *Ibid.* The outside of the box, however, did not display a notice that additional terms were enclosed. *Id.* at 1150.

The terms stated that they would govern disputes between the parties unless the plaintiffs returned the computer within thirty days. *Id.* at 1149. The plaintiffs did not return the computer within thirty days. *Ibid.* The court followed *ProCD* and held that, under both Illinois and South Dakota law, the plaintiffs accepted the offer "by keeping the computer beyond thirty days." *Id.* at 1150.

Here, the Quick Start Guide, but not the Terms and Conditions booklet, would likely require arbitration of class members' claims in states that follow *ProCD* and *Hill*. As to the Quick Start Guide, it is enforceable as an in-the-box contract. Like in *ProCD* and *Hill*, in which the terms inside the product boxes expressly provided an opportunity to opt out of arbitration or to return the products, here, the Quick Start Guide inside defendant's phone boxes expressly provided an opportunity to opt out of the arbitration provision (Dkt. No. 199-2). Although the Quick Start Guide was not obviously contractual, and the arbitration provision was inconspicuous (*ibid.*), ultimately an arbitration provision need not be conspicuous to be enforceable under *ProCD*. 86 F.3d at 1453. Notably, because *Barraza* applied California and Missouri law — which require conspicuous terms — enforcing the Quick Start Guide here does not conflict with *Barraza*.

Thus, all class members who made a purchase prior to May 18, 2014 and who, at the time of such purchase, resided in states that follow *ProCD* and *Hill* would likely be subject to arbitration, except for those who opted out of arbitration (which could be up to 1,099 persons) (Dkt. No. 199-9, ¶ 10). These states follow *ProCD* and *Hill*:

- **Delaware**. *Westendorf v. Gateway 2000, Inc.*, No. 16913, 2000 WL 307369, at *2–3 (Del. Ch. Mar. 16, 2000); *Rinaldi v. Iomega Corp.*, No. 98C-09-064-RRC, 1999 WL 1442014, at *3–4 (Del. Super. Ct. Sept. 3, 1999).
- **Florida**. *Salco Distributors, LLC v. iCode, Inc.*, No. 8:05-CV-642-T-27TGW, 2006 WL 449156, at *2 (M.D. Fla. Feb. 22, 2006) (Judge James Whittemore); *see Dye v. Tamko Bldg. Prods., Inc.*, 908 F.3d 675, 682–84 (11th Cir. 2018); *Chamberlain v. LG Electronics U.S.A., Inc.*, No. CV 17-

   2046-MWF (PLAx), 2017 WL 3084270, at *4 (C.D. Cal. June 29, 2017) (Judge Michael W. Fitzgerald).

- **Illinois**. *Hill*, 105 F.3d at 1149.
- **Indiana**. *Sprint Sols., Inc. v. Aldridge*, 50 F. Supp. 3d 1024, 1026 (S.D. Ind. 2014) (Judge Tanya Walton Pratt).
- **Louisiana**. *O'Quin v. Verizon Wireless*, 256 F. Supp. 2d 512, 516 (M.D. La. 2003) (Judge James Brady).
- **Maine**. *Stenzel v. Dell Inc.*, No. Civ.A. CV-03-323, 2004 WL 1433657, at *3 (Me. Super. Ct. Mar. 11, 2004).
- **Maryland**. *See Sprint Nextel Corp. v. Simple Cell Inc.*, 31 F. Supp. 3d 710, 712–13 (D. Md. 2014) (Judge Catherine C. Blake).
- **New York**. *Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 572 (N.Y. App. Div. 1998); *see Chamberlain*, 2017 WL 3084270, at *3.
- **Rhode Island**. *Defontes v. Dell, Inc.*, 984 A.2d 1061, 1071 (R.I. 2009).
- **South Dakota**. *Hill*, 105 F.3d at 1149.
- **Tennessee**. *MDB, LLC v. BellSouth Advert. & Pub. Corp.*, No. 3:07-CV-126, 2007 WL 2782287, at *3–4 (E.D. Tenn. Sept. 21, 2007) (Judge Thomas W. Phillips).
- **Washington**. *M.A. Mortenson Co., Inc. v. Timberline Software Corp.*, 140 Wash. 2d 568, 583–84 (2000); *see Chamberlain*, 2017 WL 3084270, at *4.
- **West Virginia**. *Schultz v. AT & T Wireless Services, Inc.*, 376 F. Supp. 2d 685, 691–92 (N.D. W. Va. 2005) (Judge Frederick P. Stamp Jr.).
- **Wisconsin**. *ProCD*, 86 F.3d at 1450–51.

  By contrast, the Terms and Conditions booklet is not enforceable because, unlike the contracts in *ProCD* and *Hill*, it did not expressly extend a right to reject the terms. It contained neither a return provision nor an opt-out clause. Defendant counterargues that its online policies were incorporated into the Terms and Conditions booklet, and those online policies

10

contained a seven-day return provision (Reply Br. 11). But the failure to expressly state the provision in the booklet rendered it insufficient to provide an opportunity to reject the terms.

Moreover, the Terms and Conditions booklet stated that opening the phone box, activating the service, or starting an application constitutes acceptance, conflicting with the online provision that failure to return a phone within seven days constitutes acceptance (Dkt. No. 199-5). Thus, because the booklet stated that its terms control over conflicting outside terms, the return provision on defendant's website could not save it.

Additionally, even if the return policy did control, opening a phone box would not have constituted acceptance because class members could not have reviewed the terms prior to acceptance, as required under *ProCD* and *Hill*. Further, defendant's argument that class members ratified the booklet terms is meritless because ratification would not change the fact that there was never a meaningful opportunity to reject the terms.

### C.  *CLASS MEMBERS NEED NOT ARBITRATE UNDER CALIFORNIA LAW.*

In California, "[a] party who is bound by a contract is bound by all its terms, whether or not the party was aware of them." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017). This is true even when the party did not read the contract. *Ibid.*

"[T]he essential elements for a contract are (1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) '[a] lawful object;' and (4) '[s]ufficient cause or consideration.'" *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (quoting Cal. Civ. Code § 1550). "'Mutual assent may be manifested by written or spoken words, or by conduct' . . . ." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citation omitted). "Courts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented . . . ." *Ibid.*

Regarding acceptance, our court of appeals has stated the following:

> As a general rule, "silence or inaction does not constitute acceptance of an offer." California courts have long held that "[a]n offer made to another, either orally or in writing, cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, for the offerer [sic] cannot prescribe conditions of rejection so as to turn silence . . . of the offeree into acceptance."

11

*Norcia*, 845 F.3d at 1284 (citations omitted). "There are exceptions to this rule, however. An offeree's silence may be deemed to be consent to a contract when the offeree has a duty to respond to an offer and fails to act in the face of this duty." *Id.* at 1284–85. "An offeree's silence may also be treated as consent to a contract when the party retains the benefit offered." *Id.* at 1285.

But, "[e]ven if there is an applicable exception to the general rule that silence does not constitute acceptance, courts have rejected the argument that an offeree's silence constitutes consent to a contract when the offeree reasonably did not know that an offer had been made." *Ibid.* "An offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App.3d 987, 993 (1972).

Finally, California does not follow *ProCD* or *Hill* with respect to in-the-box contracts. *Norcia*, 845 F.3d at 1289.

Here, the California class members did not assent to the terms of the Quick Start Guide or the Terms and Conditions booklet, so they need not arbitrate under California law. Moreover, defendant has not shown that any class members manifested an intent to use silence or failure to opt out as assent, such as by signing either of the pamphlets. Although defendant provided each class member with a receipt that referred to an agreement to arbitrate, defendant does not state that any class members signed such receipts or read them (Moses Decl., ¶ 7, Exh. A). Thus, the class members' silence did not equal acceptance. Further, defendant does not argue that the class members had a duty to respond or retained any benefit by failing to act. Finally, the pamphlets cannot be enforced as in-the-box contracts under California law.

Defendant argues that the class members had "a wide array of notice" regarding the arbitration provisions (Br. 24). But defendant misunderstands *Norcia*. *Norcia* turned on assent — not notice. *See Norcia*, 845 F.3d at 1285–86. Even if the class members here were on notice of the arbitration provisions, there is no indication that they manifested assent to them.

12

Further, although some of defendant's phone boxes stated that purchase, activation, or use of the phones constituted agreement to the arbitration provision (Keser Decl., ¶ 6), *Norcia* did not hold that such notice creates a contract. *See Norcia*, 845 F.3d at 1286–87. Moreover, the references here to the terms were in fine print on the sides or the backs of the phone boxes. Thus, even if notices on phone boxes could create contracts in some cases, here, the notices were inconspicuous, and the phone boxes were not clearly contractual in nature. *Barraza*, 2015 WL 6689396, at *5. So there could not have been contract formation based on the phone boxes alone. *Windsor Mills*, 25 Cal.App.3d at 993.

Additionally, although *Barraza* required a summary trial to resolve the contract formation question, such a trial is unnecessary here because, unlike in *Barraza*, there is no credibility issue here.

### D. CLASS MEMBERS NEED NOT ARBITRATE UNDER THE LAWS OF THE REMAINING STATES.

Defendant has not met its burden to prove the existence of valid, written agreements to arbitrate under the laws of the remaining states.

States that apply UCC Section 2-207 to in-the-box contracts treat such contracts as additional terms to the agreement of purchase. *Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332, 1341 (D. Kan. 2000) (Judge Kathryn H. Vratil). Here, because the class members did not expressly assent to the additional terms, the arbitration provision is unenforceable in states that apply UCC Section 2-207. *See ibid.*

New Jersey follows *ProCD* and *Hill* in enforcing in-the-box contracts. *See In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig.*, No. 08-0663 (JAG), 2008 WL 5451024, at *4 n. 5 (D.N.J. Dec. 31, 2008) (Judge Joseph A. Greenaway, Jr.). But New Jersey does not enforce "'inconspicuous contractual provisions . . . contained in a document whose contractual nature is not obvious . . . .'" *Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 117 (3rd Cir. 2017) (quoting *Norcia*, 845 F.3d at 1285). Thus, here, the Quick Start Guide's arbitration provision is unenforceable because it was inconspicuous, and the Terms and Conditions

13

booklet's arbitration provision is unenforceable because it did not contain an express right of rejection, as required under *ProCD*.

Because the remaining states "have not squarely considered terms-in-the-box contracts," the decisions of those states are distinguishable and unpersuasive here (Br. 17). This order declines to interpret those jurisdictions' laws under facts that they have not yet considered.

### 4. SCOPE OF THE ARBITRATION PROVISIONS.

The arbitration provision in the Quick Start Guide applied to claims "arising from or relating in any way to this Agreement or Services provided to [the purchaser] under this Agreement" (Dkt. No. 199-2). The arbitration provision in the Terms and Conditions booklet applied to "claims arising out of or relating to any aspect of the relationship between [the purchaser and defendant] . . . including . . . claims relating to advertising . . ." (Dkt. No. 199-5). Because this dispute arises from defendant's services and advertising practices, it falls within the scope of both arbitration provisions, if enforceable.

### 5. DEFENDANT COMPLIED WITH THE DISCOVERY RULES.

Plaintiffs argue that defendant failed to identify Katie Keser in its initial disclosures, so the Keser Declaration should be stricken (Opp. 25). Moreover, plaintiffs argue that defendant did not produce the exhibits accompanying the Keser Declaration in response to plaintiffs' requests for production. Thus, plaintiffs argue that defendant was not permitted to use the declaration or its accompanying exhibits to support its motion under FRCP 37(c)(1).

But defendant's failure to identify Katie Keser in its initial disclosures was "substantially justified" under FRCP 37(c)(1) because defendant's initial witness, Roger Mahn, left his employ with defendant one day before defendant's motion was due (Russell Supp. Decl., ¶ 4). Thus, defendant did not intend for Katie Keser to support its defenses until one day before its motion was due, on which date defendant promptly substituted Katie Keser for Roger Mahn.

Moreover, although plaintiffs had requested "[d]ocuments concerning the packaging of 4G LTE capable devices sold by [defendant]," the failure to produce those documents at discovery was "harmless" under FRCP 37(c)(1) (Hudson Decl., Exh. C at 27). In *Hill*, the product box did not display a notice that additional terms were within, but the court still

14

enforced the terms inside the product box. 105 F.3d at 1150. Thus, here, even if defendant could not have used the exhibits to show that the phone boxes displayed a notice of in-the-box terms, the findings above would have been the same. Accordingly, this order does not strike the Keser Declaration or its accompanying exhibits.

**CONCLUSION**

There is one group of class members whom this order excludes from the class definition:

- All class members who made a purchase prior to May 18, 2014 and who, at the time of purchase, resided in states that follow *ProCD* and *Hill*, namely Delaware, Florida, Illinois, Indiana, Louisiana, Maine, Maryland, New York, Rhode Island, South Dakota, Tennessee, Washington, West Virginia, and Wisconsin, except for those who opted out of arbitration.

This order makes clear that the persons in the group above are not being required to arbitrate. Rather, those persons are being excluded from the class as a concession to efficient administration of this case because it is likely that they would be required to arbitrate. Those excluded persons will be free to bring suit later and litigate arbitrability issues individually.

The burden is on defendant to name each and every person excluded from the class and to do so within 21 calendar days of this order. Additionally, a notice must be sent to the excluded persons to apprise them that they are no longer in any proposed class. Counsel for the parties must meet and confer to determine the best way to provide such notice.

The class definition is now as follows:

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who purchased from Cricket a 4G/LTE monthly plan for service on LegacyCricket's network, or later activated a 4G/LTE plan with the device for service on LegacyCricket's network: (1) between November 1, 2012 and May 17, 2014, having a customer address in the state of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Vermont, Virginia, or Wyoming; or (2) between May 18, 2014 and September 30, 2014.

Finally, there is another motion to compel arbitration pending in this case, which may further alter the class definition based on the first and second exclusions in the class certification order. FRCP 23(c)(2)(B) notice will be delayed until after that motion is resolved.

**IT IS SO ORDERED.**

Dated: January 20, 2022.

WILLIAM ALSUP
SENIOR UNITED STATES DISTRICT JUDGE