Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane (State Bar No. 286227)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton@wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
**GUPTA WESSLER PLLC**
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

Jennifer Bennett (State Bar No. 296726)
Neil K. Sawhney (State Bar No. 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

JAMIE POSTPICHAL, *individually,* and URSULA FREITAS, *on behalf of herself and others similarly situated,*

    *Plaintiffs,*

v.

CRICKET WIRELESS, LLC,

    *Defendant.*

Case No. 3:19-cv-07270-WHA

Hon. William Alsup

Date: March 24, 2022
Time: 8:00 a.m.
Courtroom: 12, 19th floor

## OPPOSITION TO DEFENDANT CRICKET WIRELESS, LLC'S MOTION TO ENFORCE TEXT-MESSAGE AND ELECTRONIC-SIGNATURE ARBITRATION AGREEMENTS OF POTENTIAL CLASS MEMBERS

# TABLE OF CONTENTS

Table of authorities..................................................................................................ii

Introduction ...........................................................................................................1

Argument ...............................................................................................................4

    I.     Cricket's attempt to enforce arbitration agreements purportedly delivered to existing customers through a May 22, 2014 text message is foreclosed by this Court's prior order holding that Cricket's 2014 terms and conditions are unenforceable. ..................................................................................4

    II.    Cricket's attempt to enforce arbitration agreements under Exclusion 1 fails because it has not produced sufficient evidence to meet its burden to show that any of the 379,813 class members assented to arbitration via the May 22, 2014 text message. ..................................................................................9

        A.    In support of its motion, Cricket did not produce the minimum required evidence that this Court ordered be produced for Exclusion 1. ...........................................................................................9

        B.    Cricket's effort to meet its burden by introducing misleading declarations from witnesses with no personal knowledge and other inadmissible evidence should be rejected. ......................................12

        C.    Even if Cricket had met its evidentiary burden, Cricket's single unsolicited text message is incapable of creating a valid and enforceable contract. ...............................................................18

    III.   Cricket's attempt to satisfy its burden of proof for Exclusion 2, by producing new documents after the close of discovery that should have been produced earlier should be rejected. ...........................................................20

    IV.   Any factual disputes over whether class members agreed to arbitrate must be resolved by the Court, not a jury, in a summary trial that should be scheduled as soon as possible. ................................................22

Conclusion...........................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Andreolo v. Youngevity International, Inc.,*
    2018 WL 1470264 (S.D. Cal. Mar. 23, 2018).................................................................. 21

*Barraza v. Cricket Wireless LLC,*
    No. C 15-02471 WHA, 2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) ...................................... 23

*Benjamin v. B & H Education, Inc.,*
    877 F.3d 1139 (9th Cir. 2017)....................................................................................... 22

*Camara v. Mastro's Restaurants LLC,*
    952 F.3d 372 (D.C. Cir. 2020) ...................................................................................... 20

*Citibank (South Dakota), N.A. v. Wilson,*
    160 S.W.3d 810 (Mo. Ct. App. 2005).............................................................................. 7

*Guifu Li v. A Perfect Day Franchise, Inc.,*
    281 F.R.D. 373 (N.D. Cal. 2012).................................................................................... 21

*Higgs v. Automotive Warranty Corp. of America,*
    134 Fed. App'x 828 (6th Cir. 2005)................................................................................ 6

*Nirvana International, Inc. v. ADT Security Services, Inc.,*
    881 F. Supp. 2d 556 (S.D.N.Y. 2012) ............................................................................ 7

*Paddack v. Dave Christensen, Inc.,*
    745 F.2d 1254 (9th Cir. 1984)....................................................................................... 14

*Pretka v. Kolter City Plaza II, Inc.,*
    550 F. App'x 830 (11th Cir. 2013).................................................................................. 7

*Ragan v. AT&T Corp.,*
    824 N.E.2d 1183 (Ill. App. Ct. 2005) ............................................................................. 7

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) .......................................................................................... 6

*Schnabel v. Trilegiant Corp.,*
    697 F.3d 110 (2d Cir. 2012) .......................................................................................... 19

*Wilson v. Redbox Automated Retail,*
    448 F. Supp. 3d 873 (E.D. Ill. 2020) .............................................................................. 20

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
    259 F.3d 1101 (9th Cir. 2001)....................................................................................... 22

ii

*Zhang v. American Gem Seafoods, Inc.,*
   339 F.3d 1020 (9th Cir. 2003) ........................................................................................ 22

**Other Authorities**

2 Williston on Contracts § 6:9 (4th ed. 2021) ........................................................................ 6

Arthur Linton Corbin, Corbin on Contracts § 71 (West 1 vol. ed. 1952) ............................. 7

Restatement (Second) of Contracts § 69(1)(a) (1981) .......................................................... 6

**Rules**

Fed. R. Civ. P. 37(c) ............................................................................................................... 22

## INTRODUCTION

In this RICO action, the Court has certified a class of Cricket customers but held that Cricket may be able to exclude customers from the class if it can meet its burden to prove that a class member agreed to arbitrate. The Court ordered Cricket to move to compel arbitration for any customers whom it seeks to exclude from the class and directed Cricket to provide certain minimum evidence to try to meet its burden. Dkt. 344. Cricket has now moved to exclude 379,813 customer accounts—more than 70% of the class—based on a text message it purportedly sent in May 22, 2014 (Exclusion 1), and 15,967 customer accounts based on purported electronic signatures (Exclusion 2). Cricket's motion should be denied in its entirety. Under either exclusion, Cricket has failed to meet its burden to prove the existence of valid contracts and that any customers assented to arbitration.

Cricket's motion first seeks to enforce the terms and conditions it included in a hyperlink in a May 22, 2014 text message. But in this Court's most recent arbitration order, it held that the contract Cricket seeks to enforce—the 2014 updated terms and conditions drafted after the AT&T merger—is "not enforceable" because it failed to provide customers with "a meaningful opportunity to reject the terms." Dkt. 370 at 10-11. Cricket's attempt to enforce this same, invalid contract through different means—via text message—does not change the analysis. Cricket's contract gave customers no meaningful opportunity to review or reject the terms before acceptance when it was sent to them via hyperlink in a text. The contract irrevocably binds customers once they use Cricket's service—which they must do just to read the text or review the terms. That, standing alone, is all that's necessary to reject Cricket's attempt to exclude any customer under Exclusion 1.

But Cricket's motion fails as an evidentiary matter as well. To even have a shot at meeting its burden, this Court explicitly ordered Cricket to produce, "at minimum," specific lists "showing each person" who had an account with Cricket on May 22, 2014. Dkt. 344 at 4-5. The Court even noted that these lists would include millions of customers. Yet, by its own admission, Cricket has refused to

produce this bare minimum of required evidence. The reason is obvious: Cricket claimed that it had sent the text message to "all active Cricket Wireless customers" and that this was "approximately 3.4 million" customers. But Cricket had, at the time, more than 4.5 million customers—meaning that there is a more than a million customer difference between the number of text messages Cricket claims to have sent and the number of customers it had. Without records to show the names or mobile numbers of those customers to whom Cricket sent the text, there is no way to ascertain whether any customer did, or did not, receive the text. If Cricket would have produced a complete list of individuals who were Cricket customers in May 2014, this problem would have been obvious.

And what "evidence" Cricket has produced is woefully insufficient. Cricket has no contemporaneous records—none—of any facet of its 2014 text message campaigns. It has no records to show the names of any particular customers that it purports received a text message on May 22, 2014, other than for a single customer, Jermaine Thomas—the only named plaintiff that Cricket has ever tried to compel to arbitration on this basis. It has no records of any contemporaneous policies and procedures that would have established who would have received the May 22, 2014 text message. And it has no records of any similar text message campaigns sent to customers in 2014.

The only document Cricket has submitted to support its motion is a spreadsheet that was created more than a year after Cricket sent its text message. This document purports to summarize Cricket's text message campaigns, and Cricket claims it is an admissible business record because it contains "system-generated records of the[] text-message campaigns" and was authenticated by a Cricket employee, Louis Fuentes. But when cross-examined about this document this week, Fuentes admitted that it was not a business record at all, but rather a document created at the request of Cricket's in-house counsel shortly after the company had been sued in this litigation. And Fuentes explained that the document was created to determine whether the two named plaintiffs in that case had received the May 22, 2014 text message and could, as a result, be compelled to arbitration. He also admitted

that the document wasn't even "system-generated"—it had been condensed and altered by someone, although he couldn't recall who altered it, or when.

The absence of any relevant records has forced Cricket to ask this Court to rely on the testimony of two witnesses, Anne Marie Blandino and Fuentes. But their testimony is rife with contradictions, misrepresentations, and flat-out false statements. Blandino asserted that she had "personal knowledge" that the spreadsheet discussed above "is a true and correct copy of Cricket's records of the content and number of recipients of certain text campaigns that relate to arbitration" and that "it was standard practice for Cricket to keep a log of all of the content of text message campaigns that were sent to customers." Neither claim is true—Fuentes' testimony this week squarely contradicted both claims. For his part, Fuentes claimed, under oath in his declaration, that he was "personally familiar with Cricket policies governing [the text-message] campaigns and the procedures that were used to send those text messages." Dkt. 350 at ¶ 9. But, when cross-examined on this statement at his deposition, he admitted he was "not aware" of, and had "no personal knowledge" of, "any Cricket policies and procedures that existed in 2014." He also acknowledged that he only became aware of the text-message campaign when he saw it on the spreadsheet that either he or a vendor exported more than a year later in 2015. Given these glaring problems, Cricket's effort to exclude any customers under Exclusion 1 should be denied.

Cricket's attempt to exclude customers based on electronic signatures under Exclusion 2 should also be denied. Cricket has moved to exclude 15,529 class members but it has only produced actual signatures for 5,622 of these customers. For the other 10,345 customers, Cricket has been unable to locate their signatures. Without actual evidence of assent, Cricket can, at most, exclude only the 5,622 customers whose signatures Cricket has produced.

More fundamentally, however, the evidence of electronic signatures that Cricket has only now produced was never produced during discovery in this case. Cricket had more than a year to collect

these records, and more than six months once plaintiffs informed Cricket that these records should be collected and produced if Cricket wanted to rely on this defense. Cricket did not produce them. Yet now, months after the close of discovery, it has purported to find some. This type of gamesmanship should not be permitted. Because Cricket has clearly violated its discovery obligations, its effort to exclude customers based on this evidence should be rejected.

## ARGUMENT

In its order on clarification, this Court made clear that, before any class member may be excluded, Cricket has the burden to show, under the applicable law, "the existence of a valid, written agreement to arbitrate" and "that class members assented to arbitration via the May 22, 2014 text message," or "agreed to arbitrate via electronic signature after May 2017." Dkt. 344 at 4–5. Cricket cannot meet its burden under either its text message or electronic signature theories.

**I.    Cricket's attempt to enforce arbitration agreements purportedly delivered to existing customers through a May 22, 2014 text message is foreclosed by this Court's prior order holding that Cricket's 2014 terms and conditions are unenforceable.**

To begin, this Court has already held that the contract that Cricket now seeks to enforce—the company's 2014 post-merger updated terms and conditions—is unenforceable under every jurisdiction's applicable law. *See* Dkt. 370 at 10–11. Cricket's bid to enforce that same contract here—this time by text message—thus necessarily fails.

In its recent order on Cricket's motion to compel booklets packaged with smartphones, this Court explained that Cricket's 2014 terms & conditions—the exact same terms and conditions at issue here—were "not enforceable" because they "did not expressly extend a right to reject the terms," and "contained neither a return provision nor an opt-out clause." *Id.* at 10. Although Cricket's earlier contract allowed customers to reject the proposed terms by returning the phone and contained a specific opt-out clause for customers who wanted to refuse arbitration, when Cricket merged with AT&T in 2014 it eliminated both of these features from its updated terms and conditions. *See id.* at 3–4. As a result, customers had no "meaningful opportunity" to review or reject the terms before

acceptance. *Id.* at 11. That made the contract categorically unenforceable under any state's law because "class members could not have reviewed the terms prior to acceptance." *Id.*

These fundamental problems with the 2014 contract remain. Cricket's attempt to enforce this same, invalid contract through different means—via text message—does not change the analysis. As when it was in a box, Cricket gave its customers no meaningful opportunity to review or reject the terms before acceptance when it sent them this contract via hyperlink in a text. *See id.* at 8–9 (discussing the requirement that, to be enforceable, contracts must afford customers a reasonable right to reject or refuse terms). By its terms, acceptance is based on, among other things, a customer's "attempting to use or in any way using the Service."[1] Yet that is the very thing a customer must do—use Cricket's service—to either read the text (on Cricket's device and in Cricket's text message application) or review its terms (by clicking the hyperlink to reach an internet webpage). As a result, a customer is held to have irrevocably accepted the terms and conditions without *any* opportunity—let alone a meaningful one—to refuse them.[2]

---

[1] For the sake of completeness, here is what the "acceptance" clause said:

> Your Agreement with Cricket begins when you accept the Ts&Cs by doing any of the following: (a) giving us a written or electronic signature or telling us orally that you accept, or by otherwise accepting through any other printed, oral, or electronic statement; (b) paying for Service; (c) activating the Service; (d) attempting to use or in any way using the Service; (e) upgrading or modifying the Service; or (f) opening any Device packaging, or starting any application, program or software that says you are accepting.

Dkt. 50-32 at 2. The contract then stated that, "If you do not want to accept the Terms and Conditions, do not do any of these things." *Id.* And, it included a "Survival" clause making clear that a customer's acceptance was irrevocable: "Those provisions of these Ts&Cs that would, by their very nature, continue beyond the termination of Services (including dispute resolution by binding arbitration, warranty disclaimers, limitations on liability), shall survive termination of Services." *Id.* at 12.

[2] There can be no doubt that a customer's use of Cricket's text message application on their phone (to read the text message) or a click on the message's hyperlink (to reach the internet webpage displaying Cricket's terms and conditions) qualifies as using Cricket's "Service." The contract defines "Service" expansively to "mean[] any wireless services we provide or that reference these Ts&Cs and includes, but is not limited to, our rate and service plans, billing services, offers, promotions, applications, programs, products, software, or any Device on your account." Dkt. 50-32 at 2

And even if that weren't the case, by failing to provide its customers with any reasonable amount of time within which to review or reject the terms, Cricket's contract would bind customers even if they didn't immediately try to access the hyperlink. A customer, for instance, who chooses to review the text message and hyperlinked terms a day or two after receiving it would be held to have already accepted the terms so long as they used Cricket's service *at all* after receiving Cricket's text—even by texting friends, making calls, or using the internet. Regardless of whether Cricket delivered these terms in the box or via text message, Cricket's contract thus unavoidably holds customers to have accepted the terms without any meaningful ability to review or reject them.

No jurisdiction would enforce this type of contract. "Accept-or-reject" contracts are found "in contexts involving the sale of products and services by mail and telephone, software licensing and sales, mobile telephone service agreements, satellite television agreements, credit card agreements, and bank account agreements." *Higgs v. Auto. Warranty Corp. of Am.*, 134 Fed. App'x 828, 831–32 (6th Cir. 2005). But, to be enforceable, a contract like this must give a customer "the opportunity to reject its terms." *Id.* (citing cases throughout the country); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 430 n. 43 (2d Cir. 2004) (explaining that enforceability in this context "rel[ies] on the proposition that a contract . . . provid[es] the purchaser with an opportunity to review the proposed terms" before deciding whether to accept or reject); Restatement (Second) of Contracts § 69(1)(a) (1981) (explaining that enforceability turns on whether "an offeree takes the benefit of offered services with reasonable opportunity to reject them"); 2 Williston on Contracts § 6:9 (4th ed. 2021) ("one who accepts the benefit of services rendered may be held to have impliedly made a promise to pay for them if at the time [of acceptance] the offeree had a reasonable opportunity to reject th[e services.]"); Arthur Linton Corbin, Corbin on Contracts § 71 (West 1 vol. ed. 1952) ("The acceptance of the benefit of the services

---

[Northington Decl.].

is a promise to pay for them, if at the time of accepting the benefit the offeree has a reasonable opportunity to reject it[.]").

Even Cricket's own cases make this point clearly. *See, e.g., Citibank (S.D.), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005) (enforcing contract where "Citibank communicated to Wilson that the revised agreement was binding unless she cancelled her account within thirty days and did not use her credit card"); *Pretka v. Kolter City Plaza II, Inc.*, 550 F. App'x 830, 832 n.1 (11th Cir. 2013) (noting contract's inclusion of a provision that the customers "could cancel their contracts" by notifying contractor withing 15 days after receiving updated terms); *Ragan v. AT&T Corp.*, 824 N.E.2d 1183, 1186, 1189 (Ill. App. Ct. 2005) (specifically noting that the contract "informs the customer that it may choose not to be bound by the terms of the [contract] by cancelling its service with defendant" and therefore "provided a reasonable opportunity and mechanism for rejecting the offer"); *Nirvana Int'l, Inc. v. ADT Sec. Servs., Inc.*, 881 F. Supp. 2d 556, 561 (S.D.N.Y. 2012) (following the Restatement's rule that acceptance can be inferred from silence only where customer is provided "with reasonable opportunity to reject" terms). Because Cricket's contract denies its customers any meaningful opportunity to review and reject its terms, it is therefore unenforceable against any class members. Dkt. 370 at 11 (holding contract uniformly unenforceable regardless of jurisdiction where "class members could not have reviewed the terms prior to acceptance").

To avoid this problem, Cricket repeatedly mischaracterizes its own contract's method of acceptance. It claims that customers could accept the terms and conditions by "continuing to *purchase and use* Cricket service after receiving a text message regarding Cricket's updated arbitration clause." MTC Br. at 1 (emphasis added); *see also id.* (characterizing the contract's acceptance requirement as "*using and paying* for Cricket service after receiving notice via text message") (emphasis added). But that is not what the contract says—which explains why Cricket never actually quotes the relevant clause. The Acceptance clause (quoted in full above) conditions acceptance on a customer "doing *any* of the

following," and then lays out a disjunctive—not conjunctive—list of six actions that are joined by an "or." There is no "and" anywhere in that clause (other than one reference to "Terms *and* Conditions") as Cricket repeatedly asserts—and certainly not one linking acceptance to a customer's "using *and* paying" for Cricket service. A customer who *either* pays *or* uses the service is held to have accepted the terms. And for customers receiving a text message from Cricket and attempt to access Cricket's terms through it, use is all that matters. Cricket's position would therefore require the Court to rewrite the contract. There is no jurisdiction, anywhere, that would permit that result.

In support of its preferred interpretation, Cricket suggests that this Court previously adopted it. It quotes (at 2) this Court's statement in its order compelling Jermaine Thomas to arbitration that the contract contained "terms that *continued use and payment* for Cricket's services constituted acceptance of Cricket's updated agreement." Dkt. 130 at 8 (emphasis added). But immediately after this sentence, the Court quoted the actual language, correctly joining the acceptance triggers with an "or." *See id.* at 10. The Court's shorthand use of "and" could not have been meant to override the plain meaning of the acceptance clause; instead, it shows that both actions—payment and use—would constitute acceptance.[3] And although the Court then concluded that Thomas's "continued use of Cricket's services" manifested acceptance, Thomas never challenged this aspect of Cricket's contract, so the Court had no occasion to consider, let alone analyze, whether the contract's lack of any meaningful opportunity to reject its terms rendered it unenforceable. It has now held that it does. *See* Dkt. 370 at 10–11. Under settled rules of contract law, Cricket's effort to bind customers to contractual

---

[3] The fact that a customer could be held to have accepted after "paying for Service" doesn't matter here, just as it didn't matter in this Court's previous order invalidating this contract. That is because, in either context, a customer has no meaningful opportunity to review and reject the terms before being forced to accept. For in-store purchases, a customer could not review the in-the-box terms without opening the box; for text-message recipients, customers could not review the terms without using the service. *See* Dkt. 370 at 11.

terms without any meaningful opportunity to review or reject those terms is unenforceable. Cricket's bid to exclude all 379,813 customers based on this contract should therefore be denied.

II.     **Cricket's attempt to enforce arbitration agreements under Exclusion 1 fails because it has not produced sufficient evidence to meet its burden to show that any of the 379,813 class members assented to arbitration via the May 22, 2014 text message.**

Cricket has also failed to meet its burden to show that class members assented to arbitration via the text message. To even have a shot at meeting its burden, this Court explicitly ordered Cricket to produce, "at minimum," specific lists "showing each person" whom Cricket had an account with on May 22, 2014. Dkt. 344 at 4–5. The Court even noted that these lists would include millions of customers. As we explain below, Cricket has not only failed to meet even this minimum evidentiary requirement, but also the evidence it has produced is misleading, contradictory, and wholly insufficient to satisfy its burden. Cricket's attempt to exclude more than 70% of the existing class based on this flawed evidentiary record should be rejected.

A.     **In support of its motion, Cricket did not produce the minimum required evidence that this Court ordered be produced for Exclusion 1.**

In its clarification order, this Court explained that Cricket "has the burden of proof to show, under the applicable law, that class members assented to arbitration via the May 22, 2014 text message." *Id.* This Court thus ordered that, "*[a]t minimum*, [Cricket] must provide the following evidence in support of its motion to compel:"

- A list showing each person whom defendant purports (1) had an account with defendant on May 22, 2014 and (2) was charged for defendant's services thereafter. The list must include the name, state, and account number of each such individual.

- A competent witness to establish, under oath, which customers were charged for defendant's services after May 22, 2014.

- A list showing each person whom it purports (1) had an account with defendant on May 22, 2014 and (2) was NOT charged for defendant's services thereafter. The list must include the name, state, and account number of each such individual.

*Id.* Given Cricket's testimony that it sent text messages to roughly 3.4 million customers, the Court acknowledged "that there may be millions of such individuals," but it nevertheless ordered Cricket to produce this information. *Id.* at 5. Even so, the Court also emphasized that its order requiring these comprehensive lists does "NOT" mean "that this evidence will be sufficient to satisfy [Cricket's] burden of proof as to Exclusion 1"—only that it is the bare minimum that Cricket must do if it were to have a chance at meeting its burden. *Id.* at 5.

Despite this Court's clear instruction, Cricket has failed to meet even this minimum evidentiary requirement. The company asserts (at 3) that it has "provide[d] the requested proof," and represents that the "electronic records" that it submitted with its motion include "the requested list of the names, states, and account numbers." That is false. Instead of producing what this Court ordered—a list "showing *each person*" whom Cricket purports had an account on May 22, 2014 and then was charged for services after—Cricket has produced a list showing *only* those customers who it believes are "class members in this case." Dkt. 353 at ¶¶ 9, 13; [Braxton Dec. Ex. C] (producing a list of 379,813 purported class members who "were associated with account holders that purchased at least one more month of Cricket service"). Cricket did the same thing for this Court's second required list. Instead of producing a list "showing *each person*" whom Cricket purports had an account on May 22, 2014 and then was not charged afterward, it has produced a list showing only those customers whom it believes are class members. Dkt. 353 at ¶14; [Braxton Dec. Ex. D] (producing a list of 20,635 customers who "were associated with account holders that did not pay for an additional month of Cricket service").

To justify its disregard of this Court's order, Cricket simply misrepresents what this Court ordered. It asserts (at 3) that the "Court instructed Cricket to submit . . . a list *of potential class members*, 'by name, state, and account number,' who Cricket contends must arbitrate." That is not what this Court ordered. It ordered Cricket to produce "A list showing *each person* whom defendant purports (1) had an account with defendant on May 22, 2014 and (2) was charged for defendant's

services thereafter." Dkt. 344 at 4 (emphasis added). And, were there any doubt, this Court specifically noted that this list likely would include "millions of such individuals." *Id.* at 5. Cricket's brazen effort to selectively quote this Court's order in an effort to avoid producing the minimum records required by this Court should not be tolerated.

What's more, Cricket has also now been forced to admit that it *could have* complied with this Court's order. It simply chose not to. This week, the Court ordered a deposition—over Cricket's objection—of Cricket employee Gary Braxton. Mr. Braxton, whom Cricket tasked with collecting and producing the relevant customer lists, confirmed that (1) Cricket had a "complete list" of its customers, (2) this list could have been produced, and (3) he "only produced" a reduced list "that only included Cricket class members in this case." Hudson Decl., Ex. 1 at 23:10–12, 23:13–17; 23:16–21, 19:6–16. The difference is stark: As this Court recognized, its order would require Cricket to produce a list that includes millions of customers; Cricket's list includes only several hundred thousand.

But if Cricket had a complete list, what could explain its choice not to produce it? The answer is that, if Cricket had in fact produced a complete list of its customers in May 2014, it would have revealed a massive discrepancy in the total number of customers Cricket had in 2014. Recall that Cricket's key witness, Blandino, repeatedly testified that Cricket "sent text messages to approximately 3.4 million legacy Cricket subscribers," Dkt. 344 at 4, and that this number was "the entire legacy Cricket customer base," *see* Dkt. 387-16 at 34:19–21; *see also id.* at 34:4–14 (claiming that Cricket has a "list of mobile numbers because we know all of our customers were legacy Cricket customers at the time those messages were sent. We sent that to all of them."). But we now know that is wrong. Cricket's customer base in May 2014—as reported at the time by the company—was roughly 4.6 million customers. *See* Hudson Decl., Ex. 3 (reporting that Cricket had "4.6 million subscribers"); Hudson Decl., Ex. 4 (reporting the number as "4.57 million customers"). That is a more than a million customer difference—and makes clear that the text message was not sent to the "entire Cricket legacy customer

-11-

base." And, without any evidence of the specific customers who received the text, this difference means there would be no way for Cricket to establish who did, and did not, receive the text. Because producing a list of *all* of Cricket's customers would have brought that problem to the surface, Cricket chose instead to produce a list that just included purported class members.

At bottom, the company's failure to meet this Court's minimum evidentiary requirements means it cannot satisfy its burden of proof to exclude anyone under Exclusion 1.

> **B.** **Cricket's effort to meet its burden by introducing misleading declarations from witnesses with no personal knowledge and other inadmissible evidence should be rejected.**

Cricket's motion should be denied for another reason: The material it has introduced in an effort to meet its burden is woefully inadequate, and includes both misleading declarations and inadmissible documents. Although this Court has observed that Cricket earlier claimed that it has "records pertaining to those Cricket customers who received text messages," discovery has now confirmed that this is false. The company has produced no contemporaneous records of any kind relating to its May 22, 2014 text message campaign, no policies or procedures that would have established how Cricket would have conducted such a campaign, and no witnesses with any personal knowledge of either the specific May 22 campaign or any of Cricket's policies and procedures relating to its text messages in 2014. And what evidence does exist actually *contradicts* Cricket's multiple (and conflicting) claims about which customers it sent this text message to. On this record, Cricket has come nowhere close to meeting its burden to prove that any class members assented to arbitration via the May 22, 2014 text message.

> **1.** Discovery has now confirmed that Cricket did not retain any contemporaneous records relating to its May 22, 2014 text message campaign. It did not retain, collect, and produce any records from any Cricket employees involved in this text message campaign and did not keep a contemporaneous log of the text messages themselves. It has no records showing that it sent a text

message on this day to *any* Cricket customer—other than for a single customer, Jermaine Thomas. Instead, discovery has shown that all of Cricket's claims about this text message campaign have been based on searches of records that occurred in 2015 and 2016, after lawsuits were filed by Flor Barraza and Nikole Henson in this Court, *see Barraza v. Cricket Wireless LLC*, No. 15-02471 WHA (N.D. Cal. Nov. 3, 2015), and by Jermaine Thomas in the Western District of Missouri, *see Thomas v. Cricket Wireless, LLC*, No. 16-cv-01065-FJG (W.D. Mo.). But even from this period, the only record that Cricket kept was a spreadsheet containing the results of a search of a specific database—called TargetBase—for text messages sent just to Mr. Thomas's lines of service. Cricket has no similar records for any other Cricket customer—it did not produce any TargetBase records for any customer other than Jermaine Thomas.

   **2.** The absence of any contemporaneous records establishing that it sent the May 22, 2014 text message to its customers has forced Cricket to rely on a different document—a single spreadsheet that, Cricket maintains, was a 2015 "system-generated record[] of these text-message campaigns from the Telescope tool that was used to send them." Cricket Br. 12. That might sound like a technical and official document. It is not. As this week's deposition of Fuentes has now made clear, the spreadsheet Cricket is relying on here, Dkt. 202-1, is litigation work product created more than a year after the text messages were sent. It was created shortly after two Cricket customers—Flor Barrazza and Nikole Hanson—filed a putative class action lawsuit against the company in June 2015, and was, in Fuentes' words, "made specifically for th[e] purpose" of determining whether or not Cricket had sent the May 22, 2015 text message to these two plaintiffs' cell phone numbers. *See* Hudson Decl., Ex. 5 at 32:3–8. Fuentes also confirmed that he was asked to create this spreadsheet by Katherine Hwang, Cricket's in-house general counsel overseeing this litigation at the time. *Id.* at 32:23–33:23; Dkt. 377-4 (noting the title of the spreadsheet as "Kate File Scrubbed"). In addition, Fuentes has also now confirmed that the document Cricket produced is *not* a "system-generated record[]" that would have been created from

-13-

the Telescope tool. To the contrary, as Fuentes testified, "This spreadsheet is not the spreadsheet that—or in the format, I guess, that was downloaded from the campaign tool manager." *Id.* at 35:16–18. And although Fuentes explained that the information in the spreadsheet had been modified, he could not recall who modified it or when. *See id.* at 34:21–35:7; 36:7–11. This document is, in short, inadmissible. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984) (records "prepared in anticipation of litigation precludes their admission").

Cricket has produced no business records or other reliable documents to substantiate its claim about these text message campaigns. At a minimum, a single Cricket text message campaign should have resulted in the creation of the following records, many of which would likely show Cricket's intended recipients:

- Initiating a text message campaign to Cricket's customers started with the creation of a **Lead List**. The Lead List is a list of all Mobile Directory Numbers ("MDNs"), or phone numbers, that would receive the text message. Hudson Decl., Ex. 6.

- Lead Lists were generated by the Data Intelligence Team upon receipt of a **MDN Request Form**. The MDN Request form would identify objective criteria about the campaign's target customer base (i.e. customers in San Francisco market). Hudson Decl., Ex. 7 at p. 30.

- Using that criterion and the customer data available in Cricket's Enterprise Data Warehouse ("EDW"), the Data Intelligence Team would generate a Lead List of applicable MDNs (i.e. phone numbers for customers in San Francisco market). *Id.*

- The completed Lead List was uploaded to the Telescope platform using a **Campaign Request Form**. The Campaign Request Form contained all campaign details, including the content of the message, start date, end date, etc. The final Campaign Request Form was submitted to four different Cricket management teams for approval: (1) CRM; (2) Legal; (3) CARE; and (4) Web. Hudson Decl., Exs. 8-9.

- If the campaign passed the four-step approval process, the text campaign was initiated by third-party vendor, Telescope. Hudson Decl., Ex. 10.

- After the campaign was complete, Telescope would send a **confirmation email** outlining the results of the campaign. Campaign details and results were also codified on a **Campaign Collection Page**. Hudson Decl., Exs. 10-11.

1      Yet Cricket has been unable to locate any of these documents relating to the campaigns and

2   now claims that they're gone.[1] That is astonishing. Cricket began searching for information about these

3   text messages in 2015, and even put a litigation hold in place.

4      **3.** Without any admissible business records, Cricket attempts to fill the evidentiary gap by

5   relying on the testimony of its two witnesses, Blandino and Fuentes. But, despite the fact that both

6   witnesses worked at Cricket in 2014, neither had any involvement in Cricket's text message campaigns

7   in 2014. They both only learned about the campaigns from reviewing the litigation work-product

8   spreadsheet.

9

10      Blandino's recent declaration acknowledges that she "was not personally involved in sending

11  those text-message campaigns." Dkt. 349 at ¶ 4. Instead, she testified that, in January 2021, Cricket's

12  lawyers provided her with a single spreadsheet that, along with a conversation with Fuentes, formed

13  the only basis for her knowledge. Hudson Decl., Ex. 2 at 20:23–25, 22:9–23:10. Nonetheless, in a

14  prior declaration, Blandino asserted that she had "personal knowledge" that "it was standard practice

15  for Cricket to keep a log of all of the content of text message campaigns that were sent to customers,"

16  and that "Exhibit A (CRICKET02508560) is a true and correct copy of Cricket's records of the content

17  and number of recipients of certain text campaigns that relate to arbitration." Dkt. 202 at ¶¶ 5–6. These

18

19

20  ─────────────────────────

21      [1] Of course, Cricket may, at one point, have had other records. In November 2016, shortly
    after Thomas filed a similar lawsuit, Cricket ran searches in a database called Targetbase that its

22  marketing vendor, Pulse, used backed in 2014. As the Court's clarification order acknowledged, when
    Cricket moved to compel Thomas to arbitration in this case, Cricket provided a declaration from

23  Nicole Garcia who testified that she had "reviewed the results of a search of [Cricket's] records
    conducted in November 2016, when Thomas filed a previous lawsuit." Dkt. 50-1 at ¶ 15. Based on

24  her review, she testified that Thomas received two text messages on May 22, 2014. *Id.* at ¶ 16. In
    discovery, Cricket also produced a spreadsheet of data exported from a database called TargetBase

25  showing that Cricket sent a text message to two of Thomas's lines of service on May 22, 2014. *See* Dkt.
    377-5. The metadata confirms this record was created in November 2016, which is consistent with Ms.

26  Garcia's declaration. *See* Dkt. 377-6. But Cricket did not retain, collect, and produce these records (or
    any others) for any other customers. So, as a result, Cricket has no individual evidence for any of the

27  379,813 customers it now seeks to exclude from the class based on its purported text-message
    campaign.

28
                                            -15-

representations were false. First, Cricket did not have a standard practice of keeping a log of all of the content of text message campaigns that were sent to customers. Fuentes testified that, to obtain any information about text-message campaigns, he had to search for it through Telescope—a separate vendor that Cricket used to carry out its campaigns. Hudson Decl., Ex. 5 at 27:3–25. And second, as we've explained above, the spreadsheet is not a true and correct copy of Cricket's records of the content and number of recipients of certain text campaigns that related to arbitration. It is not a Cricket record at all. It is instead litigation work product created by altering a vendor's information to determine whether certain text messages were sent to two individual customers.

Fuentes' testimony fares no better. He claimed, under oath in his declaration, that he was "personally familiar with Cricket policies governing [the text-message] campaigns and the procedures that were used to send those text messages." Dkt. 350 at ¶ 9. But, when cross-examined on this statement at his deposition, he admitted he was "not aware" of, and had "no personal knowledge" of, "any Cricket policies and procedures that existed in 2014." Hudson Decl., Ex. 5 at 55:16–22; *see also id.* at 54:23–55:1 (admitting that he was not aware "of any Cricket policy that existed in 2014 for sending text messages"); *id.* at 55:23–56:9 (admitting that he was "unaware" of "[a]nything that had to do with sending messages to customers in 2014"). He also acknowledged that he only became aware of the text-message campaign when he saw it on the spreadsheet that either he or a vendor exported more than a year later in 2015. *Id.* at 56:10–15.

And both of these witness's testimonies are misleading in another way. Recall that Blandino had repeatedly testified that Cricket sent a text message on May 22, 2014 "to all active Cricket Wireless customers." Dkt. 344 at 4. As we've explained above, that statement cannot be true because in 2014 Cricket had more than 4.5 million customers. So Cricket produced a new declaration from Blandino in which she changed her testimony, claiming that the "intended recipients of the May 22 Messages were all 3.4 million Cricket *account owners.*" Dkt. 349 at ¶ 7 (emphasis added). Cricket has never—in

seven years of litigation—used the phrase "account owners" to describe those who purportedly received a text message. Yet now, according to Blandino, the text message was sent only to "all account owners"—which she defined as the mobile device number of the customers who "control the account and are responsible for paying for service." *Id.* at ¶ 9; *see also* Dkt. 350 at ¶ 5 (Fuentes stating that "Cricket's policy and practice was to send service messages affecting all customers . . . to all *account owners*") (emphasis added). Based on this new definition, if an account owner had multiple lines of service or if an account owner had multiple individuals (such as a parent with several kids), then Cricket would have identified a particular line of service for the account owner and then have sent a text message *only* to those lines of service. *See* Dkt. 353 at ¶ 6 (asserting that "there were 3,469,178 unique Cricket accounts, and 4,705,834 lines of service").

There are multiple flaws with this eleventh-hour shift in terminology. First, for Cricket's new definition to make sense, Cricket would have had to select a particular line of service for each account owner and then send a text message to only that one line of service. But Cricket's key data and records witness, Gary Braxton, testified that he was "not aware" of any special designation in Cricket's database for the one line of service associated with an account holder. *See* Hudson Decl., Ex. 1 at 11:23–12:2; *see also id.* at 12:9–17 (acknowledging that, although he had accessed the database "thousands of times," he had never seen such a field designating which line of service is attached to an account holder). He also testified that he "would not know" how to identify an account holder's line of service within the database. *Id.* at 13:1–12. Cricket's other witness, Fuentes, said much the same thing. *See* Hudson Decl., Ex. 5 at 12:24–13:3 (testifying that he had "never personally requested" a text message campaign to be sent to all account holders); *id.* at 20:12–17 (professing not to know whether there are any procedures at Cricket that would allow Cricket to isolate only one particular line associated with account owners and then send text message campaigns only to those particular mobile device numbers); *id.* at 45:17–22 (disclaiming any "involvement [in] or knowledge" of whether Cricket's May

-17-

22, 2014 text message was sent to all account holders). Fuentes was even unable to confirm that *any* of Cricket's text-message campaigns from 2013–2015 had been sent to all account holders. *Id.* at 46:13–47:10.

Second, Cricket's witnesses' new claim—that text messages were sent to all Cricket customers who were "account holders"—is contradicted by what evidence is in the record. Take Jermaine Thomas. The evidence that Cricket submitted for him shows that Cricket sent a text message to *both of his lines of service* that were active on May 22, 2014. Dkt. 377-5 at 6 & 13 (showing the text message was sent to both 9137131465 and 8163375159). If Cricket's newly minted "account owner" claim was true, Mr. Thomas (as an account owner) would have received just one text message on one line of service. By the same token, if Cricket actually sent a text message to each account owner, then it would have been able to produce records in 2015—before it searched for Thomas—showing that other named plaintiffs in this case had received the text. The record shows, however, that Cricket ran those searches and came up empty handed for two named plaintiffs, Flor Barraza and Nikole Henson, who were (by Cricket's own admission) Cricket account owners on and after May 22, 2014. *See* No. 3:15-cv-02471-WHA, Dkt. 34. In fact, Cricket has never produced any evidence that it sent a text message to these named plaintiffs, and it never moved to compel any of the named plaintiffs, other than Thomas, to arbitration under its text-message theory.

Any of these evidentiary defects would, standing alone, be enough to conclude that Cricket has failed to meet its burden. Taken together, they leave no doubt.

## C. Even if Cricket had met its evidentiary burden, Cricket's single unsolicited text message is incapable of creating a valid and enforceable contract.

In its order compelling Jermaine Thomas to arbitration, this Court held that, under Missouri law, Cricket's unsolicited text message constituted adequate notice of a contractual offer that was capable of binding a customer through silence. *See* Dkt. 130 at 7. In that proceeding, as this Court noted, Mr. Thomas declined to "submit any evidence" and argued that Cricket's text message would

-18-

1   not have placed "a reasonable person in Thomas's position" on notice of the existence of contractual

2   terms. *See* Dkt. 61 at 6–7. Since then, the record has changed. Cricket has now admitted that it sent

3   customers the at-issue text message using the same number it used to send customers dozens—even

4   hundreds—of promotional and marketing solicitation texts. *See* Hudson Decl., Ex. 12.[5]

5       As courts throughout the country have explained when confronting similar schemes, "an

6   unsolicited" email or text from a corporation does not "put[] recipients on inquiry notice" of the

7   existence of contractual terms, especially where the email or text comes *after* a recipient "had already

8   enrolled" in the service. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2d Cir. 2012). Where the

9   email or text is "temporally and spatially decoupled" from the customer's enrollment in or purchase

10  of a service, the transmission "lacks a critical element"—the "connection of the terms to the goods . . .

11  to which they apply." *Id.* at 127. As a result, "that someone has received an email does not without

12  more establish that he or she should know that the terms disclosed in the email relate to a service in

13  which he or she had previously enrolled and that a failure affirmatively to opt out of the service amounts

14  to assent to those terms." *Id.* at 126-27 (noting that "a reasonable person may understand that terms

15  physically attached to a product may effect a change in the legal relationship between him or her and

16  the offeror when the product is used" but that "a reasonable person would not be expected to connect

17  an email that the recipient may not actually see until long after enrolling in a service (if ever) with the

18  contractual relationship he or she may have with the service provider"); *Wilson v. Redbox Automated

19  Retail*, 448 F. Supp. 3d 873, 886 (E.D. Ill. 2020) (holding no inquiry notice where customer "never

20  previously assented to Redbox's Terms of Use when renting from Redbox," and where "her history

21  with Redbox did not suggest that she should have expected to receive an email adding new terms to

22

23

24

25

26  [5] Cricket has never relied on this spreadsheet to support its claim that its text message campaigns
    occurred. That is likely because this spreadsheet shows that Cricket also sent marketing materials to

27  customers on a regular basis, and it is inadmissible work product created by Fuentes on September 30
    2015, after litigation began. *See* Hudson Decl., Ex. 13.

28

her dealings with the company"). Cricket's attempt to bind customers to a contract based on a single unsolicited text message should be rejected.

III.   **Cricket's attempt to satisfy its burden of proof for Exclusion 2, by producing new documents after the close of discovery that should have been produced earlier should be rejected.**

In its motion, Cricket asserts that "15,529 potential class members executed electronic signatures . . . by signing a signature-capture device" and that, as a result, these class members should be excluded from the class. Cricket Br. 23. But, by its own admission, Cricket has only been able to "locate[] the actual signatures for 5,622 of these customers." Cricket Br. 5; *see also* Dkt. 354 ¶ 8. This means that—at most—Cricket can exclude 5,622 customers, not the 15,529 it claims, from the class.

To avoid this straightforward conclusion, Cricket nonetheless argues that, even if it could not find records of all the signatures, an affidavit from one of its employees that it required customers "to execute an arbitration agreement" and that "virtually every" customer did so is sufficient. Cricket Br. 14 (quoting *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 373–74 (D.C. Cir. 2020)). But in that case, the D.C. Circuit *affirmed* the district court's denial of a motion to compel, precisely because such an affidavit "is notable for what it does not say"—that the employee did not personally witness any individual sign any contract. *Id.* In cases like this one—where a party relies on the existence of a signature to compel arbitration but then fails to retain or produce records of the actual signature—courts have routinely denied the motion to compel. *See, e.g., Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 384 (N.D. Cal. 2012) (holding that, where a party has failed to retain records of signed contracts yet seeks to compel arbitration based on those contracts, the party has "not carried its burden to establish by a preponderance of the evidence" that the contract is enforceable); *Andreolo v. Youngevity Int'l, Inc.*, 2018 WL 1470264, *6 (S.D. Cal. Mar. 23, 2018) (explaining that, where a party relies on a signature as evidence of assent, the failure to submit contracts with signatures means that it has "not satisfied [its] burden of proving the existence of an agreement"). The Court should do the same here.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Beyond this failure of proof, however, Cricket's attempt to exclude any class members based on a purported electronic signature should be rejected because Cricket has submitted new evidence and documents that it never previously produced during more than 15 months of discovery. *See* Dkt. 354 (introducing exhibits of thousands of previously unproduced signature captures). Despite specifically and repeatedly asking Cricket to produce all of its evidence on this issue during fact discovery, Cricket steadfastly refused. *See, e.g.,* Dkt. 334-4 at 23 (specifically requesting that Cricket produce any documents related to "any arbitration provisions provided to Cricket customers"). Not only that: On multiple occasions, Cricket's own witnessed explicitly *denied* that the company had identified any records to support its claim that customers electronically signed any contracts. *See* 334-9 at 60:3–7 (confirming that Cricket did not have any evidence to support its electronic-signature claim "at a particular or individual customer level"); *see also id.* at 79:5–13 (acknowledging that Cricket could not provide any "specific names of customers" who "may have" electronically assented to a contract). Yet now, months after the close of fact discovery, Cricket has purportedly searched for, and found, some of the records that should have been produced long ago.

This type of gamesmanship should not be permitted. The law is clear that if a party fails to comply with its discovery obligations, it "is not allowed to use [its new] information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). This is an "'automatic' sanction." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001). A party's failure to comply with Rule 26 *requires* exclusion unless the party can show it was "substantially justified" or "harmless." *See id.*

There is no possible way Cricket could show that its failure to produce these arbitration-related documents was either substantially justified or harmless. Even if Cricket could show that its failure to identify Ms. Ledyard or to produce documents it intended to use in support of its defense—and that were responsive to direct discovery requests—was inadvertent, inadvertence is not a substantial

justification. *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028 (9th Cir. 2003). And the Ninth Circuit has made clear that the failure to disclose information or witnesses until after the close of fact discovery—making it impossible to investigate the information or depose witnesses about it—is not harmless. *See, e.g.*, *Benjamin v. B & H Educ., Inc.*, 877 F.3d 1139, 1150 (9th Cir. 2017). Rule 37, therefore, requires that this Court strike all of the documents Cricket failed to produce in discovery.

Cricket may point to this Court's previous order excusing the company's earlier failure to comply with its discovery obligations. *See* Dkt. 370 at 14–15. But that order only highlights how improper Cricket's late production is here. As this Court explained, although the documents that Cricket had previously failed to produce had been subject to discovery requests, their late production was nonetheless "harmless" under Rule 37(c)(1) because the Court's decision did not rely on them. *Id.* (noting that, "even if [Cricket] could not have used the exhibits . . . the findings would have been the same"). That cannot be the case here. The documents Cricket has produced in violation of the discovery rules are *the actual signatures* of those customers it seeks to exclude under Exclusion 2. They are, in other words, the very documents Cricket relies on to support its motion

## IV.    Any factual disputes over whether class members agreed to arbitrate must be resolved by the Court, not a jury, in a summary trial that should be scheduled as soon as possible.

For all of the reasons explained above, Cricket's motion should be denied outright. If the Court concludes, however, that there is an evidentiary dispute over whether Cricket customers assented to arbitration, then it should order a summary trial, as it did before. *See Barraza v. Cricket Wireless LLC*, No. C 15-02471 WHA, 2015 WL 6689396, at *6 (N.D. Cal. Nov. 3, 2015). Cricket claims that the plaintiffs have requested a jury trial on issues related to arbitration. That is wrong. The plaintiffs have never done so. To the extent that a summary trial should occur, it should take place before this Court as soon as possible to resolve any fact disputes.

## CONCLUSION

Cricket's motion to enforce arbitration contracts against absent class members should be denied.

Dated: February 11, 2022

Respectfully submitted,

/s/ *Tyler W. Hudson*
Tyler W. Hudson

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

**GUPTA WESSLER PLLC**
Jennifer Bennett, SBN 296726
Neil K. Sawhney, SBN 300130
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane, SBN 286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton @wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

Opposition to Defendant Cricket Wireless, LLC's Motion to Enforce Text-Messages and Electronic-Signature Arbitration Agreements
of Potential Class Members (Case No. 3:19-cv-07270-WHA)