UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

URSULA FREITAS and JAMIE POSTPICHAL,

    Plaintiffs,

v.

CRICKET WIRELESS, LLC,

    Defendant.

No. C 19-7270 WHA

**ORDER RE MOTION TO COMPEL ARBITRATION**

## INTRODUCTION

In this RICO class action, defendant moves to compel arbitration of class members' claims. This order will not order any absent class members to arbitrate, but it will modify the class definition in light of the issues raised.

## STATEMENT

Plaintiffs Ursula Freitas and Jamie Postpichal claim that defendant, Cricket Wireless, LLC, advertised 4G wireless service and sold 4G-capable phones in markets where defendant did not actually provide 4G coverage. Thus, plaintiffs allege harm on behalf of a class of Cricket customers similarly situated to themselves who paid for 4G phones and coverage but received only 3G coverage, which was slower and cheaper than 4G coverage.

A previous order in this action certified a FRCP 23(b)(3) class. Thereafter, defendant filed a motion to compel arbitration, arguing certain class members were subject to arbitration

due to contracts included inside defendant's phone boxes. Because the parties had yet to send class notice to absent class members, an order on the motion to compel arbitration merely excluded certain class members from the class definition rather than ordering them to arbitration. The class definition is currently as follows:

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who purchased from Cricket a 4G/LTE monthly plan for service on LegacyCricket's network, or later activated a 4G/LTE plan with the device for service on LegacyCricket's network: (1) between November 1, 2012, and May 17, 2014, having a customer address in the state of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Vermont, Virginia, or Wyoming; or (2) between May 18, 2014, and September 30, 2014.

But the initial class certification order identified other class members potentially subject to exclusion, including, but not limited to:

> (1) any Cricket customer who continued to use Cricket [after] receiving the May 22, 2014, text message notification regarding Cricket's arbitration clause;
>
> (2) any Cricket customer who agreed to Cricket's arbitration provision via electronic signature after May 2017;
>
> (3) [a]ny class member that defendant proves is subject to an arbitration agreement.

In the instant motion, defendant argues nearly all class members must arbitrate their claims under the first and second exclusions. After defendant filed the instant motion, plaintiffs moved to compel depositions of two of defendant's witnesses. Although the motion came seven months after the non-expert discovery cut-off date, the motion was granted at a hearing because defendant had failed to disclose the witnesses under FRCP 26. The depositions plaintiffs conducted related to the admissibility and reliability of evidence defendant proffered to support the instant motion.

This order next recounts defendant's arguments and the arbitration agreements supporting them.

2

1. **TEXT-MESSAGE ARBITRATION AGREEMENTS.**

Defendant asserts that it sent a text message to all account owners on May 22, 2014, that read:

> See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at http://mycrk.it/1kmlTEn.

Clicking the hyperlinked URL would open the Terms and Conditions on defendant's website. The Terms and Conditions stated, in part:

> THESE TERMS AND CONDITIONS REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS. THESE TERMS AND CONDITIONS LIMIT OUR LIABILITY AND THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.
>
> \*       \*       \*
>
> These Ts&Cs are part of your Wireless Customer Agreement ("Agreement") and form a contract between you and Cricket that applies to all Devices and Wireless Services provided to you.
>
> \*       \*       \*
>
> Your Agreement with Cricket begins when you accept the Ts&Cs by doing any of the following:  (a) giving us a written or electronic signature or telling us orally that you accept, or by otherwise accepting through any other printed, oral, or electronic statement; (b) paying for Service; (c) activating the Service; (d) attempting to use or in any way using the Service; (e) upgrading or modifying the Service; or (f) opening any Device packaging, or starting any application, program or software that says you are accepting.

Additionally, an arbitration clause within the Terms and Conditions stated, in part:

> Cricket and you agree to arbitrate all disputes and claims between us.  This agreement to arbitrate is intended to be broadly interpreted.  It includes, but is not limited to:  claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; claims that arose before this or any prior agreement (including, but not limited to, claims relating to advertising); claims that are currently subject of purported class action litigation in which you are not a member of a certified class, and claims that may arise after the termination of this Agreement.

3

> \* \* \*
>
> You agree that, by entering into this Agreement, you and Cricket are each waiving the right to a trial by jury or to participate in a class action.
>
> \* \* \*
>
> All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision are for the court to decide.

Defendant contends that class members who paid for its services after receiving the text message became and remain subject to arbitration.

### 2. ELECTRONIC SIGNATURE ARBITRATION AGREEMENTS.

Defendant also asserts that, on or after May 1, 2017, there were 15,529 class members who, upon making a purchase in-store, signed an electronic device to accept the Terms and Conditions. Each device would display the following notice above a signature line:

> I accept [defendant]'s Terms and Conditions for [defendant]'s wireless products and services. The terms (including dispute resolution by binding individual arbitration instead of jury trials or class actions) were provided to me in [defendant]'s Terms & Conditions booklet included with my phone and available online at www.cricketwireless.com/terms. I can also ask a store rep[resentative] for a hard copy of the T&Cs before I sign below. I acknowledge that I can find information on [defendant]'s broadband service at www.cricketwireless.com/legal-info/mobile-info.

Defendant contends that those 15,529 class members became and remain subject to arbitration.

### 3. ONLINE ARBITRATION AGREEMENTS.

Finally, defendant asserts that 438 class members accepted the Terms and Conditions upon making a purchase online. Specifically, there was an instruction at the end of every online purchase, in large font, to "[p]lease accept the terms below." Below that instruction but in smaller font was a paragraph reading, in part, "I accept [defendant]'s Terms and Conditions . . . includ[ing] dispute resolution by binding individual arbitration instead of jury trials or class actions." The phrase "Terms and Conditions" was bolded, highlighted in blue, and contained a hyperlink to defendant's terms. Below the paragraph was a checkbox that a purchaser had to click to "Accept" the Terms and Conditions before completing a purchase. A purchaser need not have read the Terms and Conditions or have even clicked the link to have

4

1  accepted them.  Defendant contends that the 438 class members who accepted the Terms and

2  Conditions online became and remain subject to arbitration.

3  This order follows full briefing and a telephonic hearing.

**ANALYSIS**

1. **RULING ON DEFENDANT'S MOTION IS PROPER.**

Defendant argues that *Schwarzchild v. Tse*, 69 F.3d 293 (9th Cir. 1995), proposed that, prior to provision of class notice and the expiration of the opt-out deadline, an order compelling arbitration does not bind absent class members (Br. 1 n. 1).  This order holds that it may exclude from the class definition absent class members who are likely subject to arbitration, but those excluded persons will not be bound by that ruling and will still be free to bring suit later and litigate arbitrability issues individually.  Thus, ruling on the motion to compel arbitration will help fine tune the class.

2. **CHOICE-OF-LAW.**

"The choice-of-law inquiry has two levels.  First, we must determine whose choice-of-law rules govern.  Second, applying those rules, we determine whose law applies." *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991).

Here, the choice-of-law rules of the Restatement (Second) of Conflict of Laws (1969) govern because there is federal-question jurisdiction in this RICO action.  There is no California statute on choice-of-law.  *See Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009).  So the Restatement requires that this order analyze the factors in Restatement Section 6, as follows:  the interstate system requires that this order apply the proper state substantive law to each class member to avoid abridging or enlarging rights under 28 U.S.C. § 2072(b); each state has an interest in applying its laws to its resident class members; and general contract law will provide some uniformity of result.  Thus, this order shall apply the laws of the respective class members' states of residence at the time of purchase.  And, the prior class certification order justifies the parties' expectation that this order do so.

3. **LEGAL STANDARDS.**

The Federal Arbitration Act states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party seeking to compel arbitration has the burden under the [Federal Arbitration Act] to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). If both questions are answered in the affirmative, then the [Federal Arbitration Act] requires enforcement of the arbitration agreement according to its terms. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). But "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the Federal Arbitration Act] § 2." *Dr.'s Ass'n, Inc. v. Casarotto*, 517 U.S. 681, 682 (1996).

In addition, Section 4 of the Federal Arbitration Act provides, in part:

> If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue.

"In applying this language, district courts rely on the summary judgment standard of [FRCP] 56 . . . ." *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).

4. **DEFENDANT HAS NOT MET ITS BURDEN OF PRODUCTION AS TO TEXT-MESSAGE ARBITRATION AGREEMENTS.**

Considering the Federal Arbitration Act and the summary judgment rules together, because the party moving to compel arbitration has the burden of persuasion at trial, the moving party must first meet its burden of production as to the existence (*i.e.*, formation) of an arbitration agreement. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 322–23 (1986). If the moving party does so, only then must the nonmoving party meet its burden to show a genuine dispute as to the existence of an arbitration agreement. *Ibid.* Whether an arbitration agreement exists is for a court to determine. *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991). If "a district court concludes that there are genuine disputes

6

of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial . . . and hold any motion to compel arbitration in abeyance until the factual issues have been resolved." *Hansen*, 1 F.4th at 672 (remanding for a trial because both parties met their respective burdens). But if the moving party does not meet its initial burden of production, a district court must deny the motion to compel. *See Houghton v. South*, 965 F.2d 1532, 1536–37 (9th Cir. 1992) (reversing grant of summary judgment where movant did not meet initial burden of production); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976) (same).

Here, defendant has not met its burden of production to show the existence of text-message arbitration agreements under the first exclusion to the class definition. In its attempt to do so, defendant has offered several items of evidence. The Declaration of Luis Fuentes, an employee of defendant from May 2012 to the present, states that "[defendant]'s policy and practice was to send service messages affecting all customers, such as notices of updated Terms and Conditions, to all account owners" (Fuentes Decl. ¶ 5). Similarly, the Declaration of Anne-Marie Blandino, an employee of defendant from May 2014 to January 2021, states:

> When [defendant] updates its Terms and Conditions, its custom and practice has been to notify all account owners by text message. I have been involved in other text-message campaigns to all [of defendant's] account owners regarding legal notices and policy changes.
>
> When [defendant] intended to send legal notices affecting all customers, such as updated Terms and Conditions, [defendant] would send the text message to all of its account owners using an automated vendor tool (at that time, the Telescope platform).

(Blandino Decl. ¶¶ 7–8). Defendant argues these statements establish its routine practice, supporting that it acted in accordance with this practice on May 22, 2014. FRE 406.

Further, the Declaration of Luis Fuentes states the following:

> I personally examined the system-generated records in the Telescope platform regarding [text-message] campaigns. According to those records, a former employee . . . used the Telescope platform to send the text messages in connection with the May 2014 . . . campaign.

7

> In July 2015, I used the "Campaign Manager" tool associated with the Telescope platform to export the system generated records for these text message campaigns. The data I exported had been automatically generated and saved by the Telescope platform as text message campaigns were sent. The Campaign Manager tool exported the data as a spreadsheet. This spreadsheet listed each of the data fields available in the platform associated with the campaigns, including the campaign name, the campaign start date, the campaign creator, the campaign content, and the recipient count.

(Fuentes Decl. ¶¶ 9–10) (cleaned up). Earlier in this litigation, defendant produced the spreadsheet referenced in the Fuentes Declaration (Dkt. No. 202-1). The spreadsheet purports to show that, of the 3,469,178 accounts owners as of May 2014 (Braxton Decl. ¶ 6), the text message was sent to 3,437,214 account owners on May 22, 2014 (Dkt. No. 202-1; Fuentes Decl. ¶ 13). It also purports to show that, on several occasions thereafter, defendant re-sent the same text message to a total of 20,324 account owners that did not receive it on May 22, 2014 (Dkt. No. 202-1). Each account could have had multiple lines of service (*i.e.*, associated phone numbers) in addition to the account owner's line (Braxton Decl. ¶ 6). There were 4,705,834 lines of service as of May 2014 (*ibid.*).

Additionally, defendant has provided a list of 379,813 class members who had lines of service with defendant on May 22, 2014, and whose associated accounts showed payment for cellular service thereafter (Braxton Decl., Exh. C). The list includes class members' names, account numbers, and states of residence (*ibid.*). Defendant argues that those 379,813 class members must arbitrate.

Defendant's evidence falls short for several reasons.

*First*, defendant's evidence of routine practice is inadmissible. Under FRE 406, "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." But our court of appeals has stated:

> [H]abit or pattern of conduct is never to be lightly established, and evidence of examples, for purpose of establishing such habit, is to be carefully scrutinized before admission . . . . It is only when the examples offered to establish such pattern of conduct or habit are "numerous enough to base an inference of systematic conduct" . . . that they are admissible to establish pattern or habit.

8

*Mathes v. The Clipper Fleet*, 774 F.2d 980, 984 (9th Cir. 1985) (citation omitted). Here, neither Fuentes nor Blandino offered any examples establishing defendant's routine practice. Moreover, in his deposition, Fuentes could not recall the date of any campaign that sent a text message to all account owners (Fuentes Dep. 13). Thus, defendant has not provided examples "numerous enough to base an inference of systematic conduct." *Mathes*, 774 F.2d at 984.

*Second*, neither Blandino nor Fuentes has personal knowledge of the text-message campaign (Blandino Decl. ¶ 4; Fuentes Dep. 45). Thus, neither Blandino nor Fuentes can confirm that, on May 22, 2014, defendant adhered to its purported practice of sending such text messages to all account owners. Nor does Declarant Braxton have personal knowledge of the text-message campaign. He declares merely that he has personal knowledge of class members associated with active accounts on May 22, 2014, and whose accounts showed payment for service thereafter (Braxton Decl. ¶ 13). He does not state that he has personal knowledge of those who *received the text message* on May 22, 2014 (*see ibid.*). Thus, none of defendant's declarants have personal knowledge of the formation of arbitration agreements via text message on May 22, 2014.

*Third*, other evidence from defendant casts doubt over whether class members actually received the text message on May 22, 2014. Defendant previously produced two items of evidence indicating that former named plaintiff Jermaine Thomas received the text message on May 22, 2014: (1) an affidavit of an employee with personal knowledge that Thomas received the text message (Dkt. No. 50-1); and (2) a list of codes and dates corresponding to text messages sent to Thomas' lines of service (Dkt. No. 377-5). Defendant should have similar evidence for all class members whom it asserts also received the text message on May 22, 2014. Defendant's failure to produce such evidence suggests the class members whom defendant seeks to exclude did not receive the text message.

*Fourth*, the spreadsheet referenced in the Fuentes Declaration is inadmissible under the Best Evidence Rule. Under FRE 1002, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." "A duplicate is admissible to the same extent as the original unless a genuine question is raised

9

about the original's authenticity or the circumstances make it unfair to admit the duplicate." FRE 1003. "A 'duplicate' means a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." FRE 1001(e). There are exceptions to the requirement of an original. FRE 1004.

The spreadsheet here was proffered to prove its content (that the text-message was sent to nearly all account owners), but it is not an original. The spreadsheet contains information originally stored in a database by a non-party (Fuentes Dep. 27). Although Declarant Fuentes "exported the data as a spreadsheet," suggesting the spreadsheet may be a machine-generated duplicate, it "[was] not . . . in the format . . . that was downloaded from the campaign tool manager" (Fuentes Dep. 35). More importantly, a different employee of defendant manually added information to the spreadsheet thereafter (Fuentes Decl. ¶ 10; Fuentes Dep. 34–35). Thus, this order finds the spreadsheet is not a duplicate and is inadmissible. *See U.S. v. Childs*, 5 F.3d 1328, 1335 (9th Cir. 1993).

Worse yet, the alterations in the spreadsheet were made to indicate whether two specific customers "received certain campaign messages," again suggesting that defendant actually kept records of those who received its text messages (Fuentes Dep. 28). Defendant's failure to produce similar data for the class members it seeks to exclude here suggests that those class members did not receive the text message on May 22, 2014.

*Fifth*, defendant did not establish that it had the ability to direct text messages solely to account owners' lines of service — as opposed to all lines of service. Specifically, defendant argues it sent the text message to over 3.4 million account owners on May 22, 2014, but Declarant Fuentes testified that he was unaware of any procedure for sending a text message to only account owners (Fuentes Dep. 20). Similarly, Declarant Braxton testified that he was unaware of any data field within defendant's electronic records that designated an account owner's line of service (Braxton Dep. 13).

Moreover, defendant previously produced a document showing that former plaintiff Thomas received the text message on May 22, 2014, at two lines of service associated with his account — rather than at only his account-owner line (Dkt. No. 377-5). In the same way, other

account owners *and* their associated lines of service may have received the text message. Those associated lines of service, therefore, would have received text messages that were meant for unrelated account owners. Thus, the 3.4 million text messages may have reached less than 3.4 million account owners.

To illustrate, for ten account owners with one additional line of service each (twenty total lines of service), if defendant sent ten text messages, then only five account owners and their associated lines (ten total lines) would have received a text, leaving five account owners and their associated lines without having received a text at all.

Defendant has not met its burden of production to show the absence of a genuine dispute of material fact regarding the existence of text-message arbitration agreements. The findings above — that defendant's evidence of routine practice is inadmissible, defendant's spreadsheet regarding the text-message campaign is inadmissible, none of defendant's declarants have personal knowledge regarding the text-message campaign, previously produced evidence suggests class members did not receive the text message, and defendant was unable to send the text message solely to account owners — demonstrate that fewer than 379,813 class members whom defendant seeks to exclude actually received the text message of May 22, 2014. And, there is no way to determine who received the text message. Thus, as to the first exclusion above, defendant's motion to compel arbitration is **DENIED**.

5. **ARBITRATION AGREEMENTS BY ELECTRONIC SIGNATURE.**

A. *DEFENDANT HAS MET ITS BURDEN OF PRODUCTION.*

Defendant argues 15,529 class members agreed to arbitrate via electronic signature under the second exclusion to the class definition (Braxton Decl. ¶ 16). To show class members agreed to arbitrate, defendant cites the Braxton Declaration and proffers copies of invoices showing 5,622 electronic signatures executed by class members after May 2017. Plaintiffs argue that the invoices constitute new evidence, contravening FRCP 26 and FRCP 37. For that reason, plaintiffs seek to exclude evidence of the 5,622 electronic signatures.

Defendant has met its burden of production as to the existence of arbitration agreements by electronic signature. The Braxton Declaration states that Braxton, an analytics manager for

11

defendant, reviewed defendant's records, and Braxton identified 15,529 class members who, on or after May 1, 2017, "either returned to [defendant] after having terminated service or who added a new line of service onto an existing account at a store" (Braxton Decl. ¶ 16). Exhibit F to the Braxton Declaration is a list of those class members' names, states of residence, and account numbers. Michael Moses, a retail manager for defendant, declares that those class members could not have returned or added a new line in-store without executing an electronic signature:

> [I]f a payment terminal did not have the signature capture device, a customer could not add a line or activate a line of service; nor could they use a credit card for the underlying bill payment. This measure ensures that all customers are required to accept the Terms and Conditions after an opportunity to review them when completing a transaction, and the point-of-sale systems prevent a transaction from being completed unless and until the Terms and Conditions were accepted through completion of a signature capture.

(Moses Decl. ¶ 10). Plaintiffs do not dispute that Braxton and Moses have personal knowledge of those facts, and this order finds no reason to question their knowledge. Thus, defendant has met its burden of production to show the absence of a genuine dispute of material fact as to the existence of arbitration agreements by electronic signature.

Because the Braxton and Moses Declarations are sufficient to meet defendant's burden of production, copies of the class members' electronic signatures are unnecessary to meet that burden. Thus, defendant's failure to produce the electronic signatures during discovery was "harmless." FRCP 37(c). Defendant may use those records to support the instant motion.

Plaintiffs cite three decisions for the proposition that the Braxton and Moses Declarations alone are insufficient for defendant to meet its burden of production (Opp. 20). Those decisions, however, are distinguishable and unpersuasive. The plaintiffs in two of those decisions provided affidavits stating that they did not sign arbitration agreements, but plaintiffs do not provide any such affidavits here. *Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 384 (N.D. Cal. 2012) (Judge Lucy Koh) (referencing a prior order); *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 375 (D.C. Cir. 2020). And, the defendant in the third decision did not produce a declarant with personal knowledge that arbitration agreements were signed, but

1  defendant has done so here. *Andreoli v. Youngevity Int'l, Inc.*, No. 16-CV-02922-BTM-JLB,

2  2018 WL 1470264, at *6 (S.D. Cal. Mar. 23, 2018) (Judge Barry Moskowitz).

3  Because plaintiffs do not dispute the personal knowledge of Braxton or Moses, plaintiffs

4  have not met their burden of production to show a genuine dispute of material fact as to the

5  existence of arbitration agreements. Thus, there is an absence of a genuine dispute of material

6  fact as to the existence of 15,529 arbitration agreements. Therefore, no trial is necessary as to

7  this exclusion.

### B. THE ARBITRATION AGREEMENTS ARE VALID.

"[T]he question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis in original). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

Here, the parties did not "clearly and unmistakably" delegate the issue of validity to an arbitrator. Rather, the parties agreed that a court would decide that issue (Dkt. No. 50-32). Thus, this order shall resolve validity issues.

Applying California law, our court of appeals has stated the following:

> A contract may incorporate documents and terms by reference. Where it is clear that a party is assenting to a contract that incorporates other documents by reference, the incorporation is valid — and the terms of the incorporated document are binding — so long as the incorporation is "clear and unequivocal, the reference is called to the attention of the other party and he consents thereto, and the terms of the incorporated document are known or easily available to the contracting parties."

*In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019). In *Holl*, the contract referred to separate terms and conditions, the contract stated that the terms were published online, and consumers had to expressly acknowledge their agreement to the terms. *Ibid.* Similarly, here, the in-store electronic agreement did the following: (1) it referred to the separate Terms and Conditions; (2) it stated that the Terms and Conditions were available online, in phone boxes, and in-store upon request; and (3) it required that consumers sign to acknowledge that they "accept

13

[defendant]'s Terms and Conditions . . . (including dispute resolution by binding individual arbitration instead of jury trials or class actions) . . . ." (Dkt. No. 51-2). These notices were clear and unequivocal. Plaintiffs do not argue against validity. Thus, this order finds the electronic signature agreements valid under California law.

Defendant provides authority from every jurisdiction showing adherence to similar incorporation by reference and notice principles (Br. 24–25 n. 13). Plaintiffs do not dispute the applicability or relevancy of these authorities. This order finds them applicable and relevant. Thus, the electronic signature agreements are valid in all jurisdictions.

All 15,529 class members would likely be required to arbitrate. Rather than compelling to arbitration those absent class members who signed electronic agreements, this order merely excludes those class members from the class definition as a concession to efficient resolution of class-wide issues. Later, those class members may pursue their claims on an individual-by-individual basis if they so choose. Plaintiffs' counsel must promptly give them notice of this exclusion so that they may cease relying on the pendency of this class lawsuit.

### 6.  ONLINE ARBITRATION AGREEMENTS.

#### A.  *DEFENDANT HAS MET ITS BURDEN OF PRODUCTION.*

Defendant argues 438 class members agreed to arbitrate under the second exclusion to the class definition by accepting the Terms and Conditions online. To support this argument, defendant again provides the Braxton Declaration and the Moses Declaration. The Braxton Declaration identified 438 class members who "activated (or reactivated) service or added a new line of service online using [defendant]'s website between April 1, 2017, and December 31, 2021" (Braxton Decl. ¶ 15). Exhibit E to the Braxton Declaration is a list of those class members' names, states of residence, and account numbers. The Moses Declaration demonstrates that those class members could not have activated or added a line of service online without agreeing to the Terms and Conditions:

> Every online transaction require[s] . . . acceptance. If a customer does not click the button to accept the Terms and Conditions, the transaction cannot be completed.

14

(Moses Decl. ¶ 7). Exhibit A to the Moses Declaration is an unaltered duplicate of the online purchase page.

Plaintiffs do not dispute the personal knowledge of Braxton or Moses as to those facts, and this order finds no reason to do so. Plaintiffs have not met their burden of production to show a genuine dispute of material fact as to the existence of online arbitration agreements. Thus, there is an absence of a genuine dispute of material fact as to the existence of 438 online arbitration agreements. Therefore, no trial is necessary as to this exclusion.

### B.  THE ARBITRATION AGREEMENTS ARE VALID.

As stated above, this order — not an arbitrator — must decide the issue of validity.

"The rules of consumer online agreements and consumer paper agreements are the same." *In re Holl*, 925 F.3d at 1084. There are two main types of online agreements:

> "clickwrap" (or "click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen.

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014) (applying California and New York law). "'Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . a party instead gives his assent simply by using the website.'" *Id.* at 1176. "'Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Ibid.* Courts are "willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement — that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.* at 1177. "Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage." *Ibid.* "[T]he conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users

15

of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Ibid.*

Here, the online arbitration agreements are valid. The agreements resembled a browsewrap agreement where users were required to affirmatively acknowledge the terms before purchase (Moses Decl. ¶ 7, Ex. A). A reasonably prudent person would have been, at least, on constructive notice of the agreement to arbitrate: the hyperlink to the Terms and Conditions was conspicuously located near the "Accept" box; the hyperlink was bolded and set apart from the surrounding text with blue font; and there was larger text prompting users to affirmatively accept the terms (*ibid.*). Thus, under California and New York law, the 438 class members who executed online agreements were, at least, on constructive notice of the arbitration clause, and the online agreements are valid as to them. And, the online agreements are valid as to class members in all other jurisdictions due to uniformity of incorporation by reference and notice standards (Br. 24–25 n. 13).

All 438 class members would likely be bound to arbitrate. Rather than compelling to arbitration those class members who formed online agreements, this order merely excludes those class members from the class definition as a concession to efficient resolution of class-wide issues. Later, those class members may pursue their claims on an individual-by-individual basis if they so choose. Plaintiffs' counsel must promptly give them notice of this exclusion so that they may cease relying on the pendency of this class lawsuit.

7. **SCOPE OF THE ARBITRATION AGREEMENTS.**

All three types of agreements discussed above contained the same arbitration provision. The arbitration provision applied to "claims arising out of or relating to any aspect of the relationship between [the purchaser and defendant] . . . including . . . claims relating to advertising . . ." (Dkt. No. 50-32). Because this dispute arises from defendant's services and advertising practices, it falls within the scope of the arbitration provision, if enforceable.

**CONCLUSION**

This order excludes the following groups of class members from the class definition:

- all 15,529 class members who, during or after May 2017, accepted the Terms and Conditions via electronic signature at one of defendant's stores; and
- all 438 class members who accepted the Terms and Conditions on defendant's website.

This order makes clear that the persons in the groups above are not being required to arbitrate. Rather, those persons are being excluded from the class as a concession to efficient administration of this matter because it is likely that they would be required to arbitrate. Those excluded persons will be free to bring suit later and litigate arbitrability issues individually.

A notice must be sent to the excluded persons to apprise them that they are no longer in any proposed class. Counsel for the parties must promptly meet and confer to determine the best way to provide such notice.

The class definition is now as follows:

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who purchased from Cricket a 4G/LTE monthly plan for service on LegacyCricket's network, or later activated a 4G/LTE plan with the device for service on LegacyCricket's network: (1) between November 1, 2012 and May 17, 2014, having a customer address in the state of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Vermont, Virginia, or Wyoming; or (2) between May 18, 2014 and September 30, 2014; excluding the 15,529 persons within either of groups (1) and (2) above who, during or after May 2017, accepted the Terms and Conditions via electronic signature at one of defendant's stores; and excluding the 438 persons within either of groups (1) and (2) above who accepted the Terms and Conditions on defendant's website.

It is important that we have an exact list of names of all who are in the class and versus those who have been excluded. Counsel shall promptly provide this.

It is time to get to the merits. There shall be no more motion practice over the arbitration agreements nor further exclusion from the class.

17

**WITHIN TWO WEEKS OF THIS ORDER**, the parties shall file a joint proposed class notice together with a plan of distribution and timeline for opt out. First-class mail should be used with plaintiffs paying for all costs and notice. The proposed notice should conform to FRCP 23(c)(2)(B).

**IT IS SO ORDERED.**

Dated: April 11, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE