# EXHIBIT F

**Jamie Postpichal, Sarah Waters, and Ursula Freitas individually, on behalf of themselves and others similarly situated,**

**v.**

**Cricket Wireless, LLC**

Case No. 19-07270 WHA

**Expert Report of Professor Justin McCrary**

**July 21, 2021**

HIGHLY CONFIDENTIAL

# Table of Contents

I.      Qualifications ................................................................................................. 1

II.     Background, Summary of Allegations, and Assignment ..................................... 3

III.    Summary of Conclusions ................................................................................. 5

IV.     Overview of Mr. Mallinson's and Mr. Browne's Damages Methodology ......................... 8

V.      Mr. Mallinson and Mr. Browne Have Overstated Damages due to an Asserted 4G/LTE Premium for 4G/LTE-capable Smartphones that Includes the Value of Many Other Features ........................................................................................................... 10

VI.     Cricket Did Not Charge Customers an Additional Sum for 4G/LTE Coverage.............. 15

VII.    Mr. Mallinson and Mr. Browne have Overstated Damages due to an Asserted 4G/LTE Premium for Cricket Phone Service Plans that Includes the Value of Many Other Features ........................................................................................................... 17

VIII.   The Proposed Class Includes Customers Who Are Likely Not Harmed ......................... 22

## I.       Qualifications

1.       I am the Paul J. Evanson Professor of Law at Columbia Law School, where I teach
antitrust, corporations, law and economics, and econometrics.  An economist by training, my
expertise lies in economic modeling, econometric and statistical methods, damages
methodologies, law and economics, and labor economics, among other subjects.  I received my
A.B. in Public Policy from Princeton University in 1996.  After working at National Economics
Research Associates in White Plains, New York, and the Federal Reserve Bank of New York
from 1996 to 1998, I began my Ph.D. in Economics at the University of California, Berkeley
("Berkeley"), completing the degree in June 2003.  After close to five years as Assistant
Professor at the University of Michigan ("Michigan"), I became Assistant Professor of Law at
Berkeley in January 2008 and was promoted to Professor in July 2010, a position I held through
June 2018.  While at Berkeley, I taught courses on introductory, intermediate, and advanced
statistics to J.D., L.L.M., and Ph.D. students; on law and economics to J.D. students as well as
undergraduates; on labor economics to Ph.D. students in economics and in other fields; and on
business law to J.D., L.L.M., and M.B.A. students.

2.       While at Berkeley, I served as the Founding Director of D-Lab, the Social Sciences Data
Laboratory at Berkeley, from July 2014 to June 2017, at which point I accepted a secondment as
the Samuel Rubin Visiting Professor of Law at Columbia for Fall 2017.  D-Lab trains graduate
students in statistical and data science techniques relevant to modern computation and modern
data collections.  In addition, the D-Lab archives major data collections, such as those associated
with the financial markets, Census Research Data Centers, birth certificate data, and other large-
scale collections of import.  At D-Lab, I lectured and advised graduate students and faculty
regarding high-performance and high-throughput computing, statistical software, and statistical
and econometric techniques.

3.       From September 2009 until July 2014, when I began to direct the D-Lab, I co-directed
the Law and Economics Program at Berkeley Law.  Since 2017, I have been a member of the
Board of Directors of the American Law and Economics Association.

4.       I have been a member of the National Bureau of Economic Research ("NBER") since
2006.  The NBER is the premier professional association of economists in the world, with over

1,400 members worldwide.  I was invited to become a Faculty Research Fellow of the NBER in 2006 and remained in that position until 2012, when I was invited to become a Faculty Research Associate, a position I hold today.  In addition, from 2008 to 2019, I co-directed the Economics of Crime Working Group ("CWG") of the NBER.  As part of my role as co-director of CWG, I co-edited a book published by the University of Chicago Press, *Controlling Crime: Strategies and Tradeoffs*.  Over that time, I reviewed papers submitted to the NBER for inclusion in the Summer Institute, and selected, along with my co-directors, the top dozen or so papers for presentation at conference.

5.      My research spans a diverse range of topics, including antitrust, deterrence theory, financial markets, income inequality, monetary policy, and econometric and statistical methodology.  Many of my articles have been published in leading journals within economics, such as the *American Economic Review*, *The Review of Economics and Statistics*, the *Journal of Economic Literature*, and the *Journal of Econometrics.*

6.      Over the years, my research has been supported by Michigan, Berkeley, Columbia, the MacArthur Foundation, the NBER, the National Institutes of Health, the National Science Foundation, the Arnold Foundation, the Spencer Foundation, and the Robert Wood Johnson Foundation.

7.      I regularly review articles for the leading peer reviewed journals within economics, including *Econometrica*, the *American Economic Review*, the *Quarterly Journal of Economics*, the *Journal of Political Economy*, *The Review of Economic Studies*, the *Journal of Econometrics*, *The Review of Economics and Statistics*, and the *American Law and Economics Review*.  Peer review specifically focuses on assessing whether submitted manuscripts are employing methodologies that are consistent with academic standards.

8.      My consulting and testifying experience spans a wide range of industries and markets.  A copy of my curriculum vitae, including a list of previous testimony and depositions, is included as **Appendix A**.

## II.     Background, Summary of Allegations, and Assignment

9.      According to the Plaintiffs, from 2012 to 2014, Defendant Cricket Wireless LLC ("Cricket") "duped hundreds of thousands of consumers into paying for a highly touted new feature 4th Generation/Long Term Evolution ('4G/LTE') cellular smartphones and service plans that Cricket 'aggressively' promoted in consumer-facing marketing when Cricket had no intent to provide 4G/LTE services to those customers."[1]

10.     Plaintiffs seek to represent the following proposed class: "[a]ll persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE-capable Android smartphone with a 4G/LTE monthly plan for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network."[2]

11.     Plaintiffs' theory of harm, according to their motion for class certification, is based on a theory of overpayment.[3]   In other words, Plaintiffs claim that all putative class members "paid a 'premium they would not have paid had [Cricket] disclosed the [lack of 4G/LTE service],'" and that "the damage claimed here is the *difference* in price attributable to [4G/LTE], so the alleged overpayment by Plaintiff[s] is tied directly to the loss of value caused by [Cricket]."[4]

12.     Plaintiffs served expert reports by Mr. Keith Mallinson and Mr. Steve Browne on July 7, 2021.[5]   Mr. Mallinson was retained to "review the evidence, apply [his] knowledge of the

---

[1] Plaintiffs' Third Amended Class Action Complaint, *Jamie Postpichal et al. v. Cricket Wireless, LLC*, Case No. 19-07270 WHA, March 11, 2021 ("Complaint"), ¶ 1.

[2] Complaint, ¶215.  The Complaint implies that "Legacy Cricket" is the network which existed prior to the March 2014 acquisition of Cricket by AT&T, which was followed by the launch of "New Cricket" under AT&T in May 18, 2014. Legacy Cricket and New Cricket co-existed for a period of time till Legacy Cricket shut down its service in 2015.  See, Complaint, ¶¶ 42, 44.

[3] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, Jermaine Thomas, et al. v. Cricket Wireless, LLC, Case No. 3:19-cv-07270-WHA, March 4, 2021 ("Motion for Class Certification"), pp. 8, 18, 21–22.

[4] Emphasis in original.  Motion for Class Certification, p. 21.

[5] Expert Report of Keith Mallinson, dated July 7, 2021 ("Mallinson Report"); Expert Witness Report (Relating to Damages) of Steve W. Browne, dated July 7, 2021 ("Browne Report").  Mr. Mallinson and Mr. Browne have previously submitted reports in support of Plaintiffs' class certification motion, both dated March 4, 2021.  On April 5, 2021, I submitted an expert report rebutting Mr. Mallinson's and Mr. Browne's expert reports.

wireless industry and provide economic and industry analysis to render certain opinions and to assist the jury in understanding the issues and evidence."[6]  Mr. Mallinson put forward, among others, opinions that "all members of the class were overcharged by Cricket for a 4G/LTE smartphone because they paid a premium for 4G/LTE-capability and a plan for 4G/LTE service that was not provided," and that "any class member who purchased a 4G/LTE smartphone and made monthly payments to Cricket of $50, $60, or $70 under a plan for 4G/LTE service on or after September 15, 2013, was overcharged by Cricket."[7]  Mr. Mallinson also put forward a methodology to evaluate damages for the proposed class members on the 4G/LTE-capable smartphones and on the 4G/LTE plans.[8]  Mr. Browne was asked to "calculate and quantify the total damages suffered in the aggregate by the proposed class, … and to provide those calculations and quantification, … using the benchmarks explained and approved by Plaintiffs' expert Keith Mallinson."[9]

13.     I was retained by counsel for Cricket to evaluate the validity and the reliability of the damages methodology advanced by Mr. Mallinson, and to opine whether Mr. Mallinson and Mr. Browne correctly assessed damages which the proposed class members allegedly incurred on the 4G/LTE-capable smartphones and 4G/LTE phone plans purchased from Cricket.

14.     In forming my opinions, I have drawn upon my training in economics and statistics, my academic research, and my experience as a consulting and testifying witness.  In addition, I have reviewed legal briefs and pleadings, Mr. Browne's and Mr. Mallinson's expert reports and deposition transcripts, Plaintiffs' deposition transcripts, and other documents produced in this matter.  A list of the materials I considered while forming my opinions is attached as **Appendix B**.

15.     I am being compensated at my standard billing rate of $950 per hour.  I have been assisted by staff at Cornerstone Research who worked under my direction.  I also receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from

---

[6] Mallinson Report, p. 5.
[7] Mallinson Report, pp. 8–9.
[8] "Section V explains why all class members were injured and explains and applies the benchmarks that exist to provide plaintiffs' damages expert, Steve Browne, with the inputs needed to perform calculations that provide a reasonable approximation of those injuries." See, Mallinson Report, p. 10.
[9] Browne Report, p. 5.

Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

16.     My work is ongoing, and I reserve the right to revise or supplement my analyses and opinions if additional information becomes available.

### III.     Summary of Conclusions

17.     Based on my evaluation of the expert reports put forth by Mr. Mallinson and Mr. Browne, I have come to the following primary conclusions:

18.     *Smartphone "Premium."*  Mr. Mallinson and Mr. Browne have overstated damages by claiming that Plaintiffs paid a 4G/LTE price premium on 4G/LTE-capable smartphones, yet failing to calculate how much of the asserted premium is attributable to the 4G/LTE-capability. *First,* Mr. Mallinson's and Mr. Browne's asserted damages methodology—which measures the price difference between Cricket 4G/LTE-capable and so-called "benchmark" 3G-capable phones and attributes 100% of the difference to 4G/LTE capability—does not, and cannot isolate, the alleged premium solely attributable to the 4G/LTE feature. 4G/LTE-capable and 3G-capable phones are different across multiple dimensions (e.g., larger screens, larger memory and storage, bigger batteries, better cameras, etc.), and 4G/LTE-capability is just one of these many distinguishing attributes.  The experts' methodology is therefore inconsistent with the claims that Plaintiffs are putting forward.  Mr. Mallinson and Mr. Browne overestimate damages on 4G/LTE-capable smartphones because their methodology fails to exclude the value of additional features, such as larger screen size, screen resolution, camera quality, memory, and battery size that 4G/LTE-capable smartphones offer but that are wholly unrelated to Plaintiffs' allegations in this matter.  *Second,* in their damages calculations, Mr. Mallinson and Mr. Browne did not account for any reimbursements putative class members may have received on the prices of their devices, such as the discounts that were offered to putative class members upon transition to the New Cricket network, or the payments they received when they resold or traded in their phones.

19.     *Service Plan "Premium."*  Mr. Mallinson's and Mr. Browne's methodology for calculating service plan damages is fatally flawed, because the most analogous service plan benchmark is Cricket's 3G service plan—not those of other competitors.  It is more appropriate to compare Cricket's 4G/LTE-capable plans to Cricket's 3G-capable plans to evaluate whether

the customers were charged additionally for the 4G/LTE plans.  This is so, because these plans were offered by the same company, which is an "apples to apples" comparison.  In fact, monthly prices for Cricket's 3G Smart plan and for Cricket's 4G/LTE plan were the same (both $50) when those plans co-existed as distinct plans until October 2013; further, from October 2013 going forward, the monthly prices also remained the same ($50) when the plans merged into a single 4G/LTE and 3G-capable plan.  Hence, ***Cricket did not charge customers an additional sum for 4G/LTE coverage.***  As a result, damages on Cricket's 4G/LTE plan purchases should be zero.

20.     Even reviewing the Mallinson/Browne methodology as proposed, I conclude that Mr. Mallinson and Mr. Browne have overstated damages due to an alleged 4G/LTE premium for Cricket phone service plans, which they measure as the difference in price between Cricket's $50, $60, and $70 4G/LTE plans, and other competitors'$40 4G/LTE plans.  *First,* Mr. Mallinson and Mr. Browne did not consider that, for at least some parts of the Class Period, Cricket customers could get a $5 monthly discount if they signed up for Auto Bill Pay, effectively reducing their plan's cost.  This problem leads Mr. Browne and Mr. Mallinson to be engaged in an inappropriate "apples and oranges" comparison.  *Second*, some customers might not have had access in their home market during part or all of the proposed Class Period to any of the $40 4G/LTE comparison plans presented by Mr. Mallinson.  *Third*, even if some customers had access to such $40 plans, phone plans are heterogeneous products, and customers in a "but-for" world could very well have still preferred Cricket's $50 plans for reasons not related to 4G/LTE coverage, such as access to the Muve Music app, which was included in the price of most Cricket 4G/LTE plans during the Class Period.  *Fourth*, Cricket's more expensive $60 and $70 plans had additional features which differentiated them from the $50 plans, such as greater data allowance, leading to Browne's estimate of damages on $60 and $70 plans being overstated by the value of such features.

21.     Putative class members' behavior during the proposed class period also demonstrates that the damages estimated by Mr. Mallinson and Mr. Browne are flawed and unreliable.  If it is true, as estimated by Mr. Browne, that the financial loss incurred by each putative class member is on average over $250, then it is difficult to explain why the vast majority of putative class members would keep their Cricket phone and plans, even though they would certainly have recognized that their phones were not connecting to a 4G/LTE network and could have returned their phones

for a full refund and cancelled Cricket service within the first week of usage.  The fact that only a small minority of putative class members decided to do so indicates that Mr. Mallinson and Mr. Browne's damages estimates are not reliable.

22.     _Unharmed Class Members._  The proposed class also includes customers who are likely not harmed.  *First,* Mr. Mallinson and Mr. Browne calculate their plan damages only for customers who activated their phones from September 15, 2013 to September 30, 2014, and not from the start of the proposed class period on November 1, 2012.[10]  This narrowing of the Class Period means that there are some putative class members for whom Mr. Mallinson and Mr. Browne do not assign any damages on the plan purchases.  Following Mr. Browne's methodology, I calculate that 6.6 percent of putative class members are assigned zero damages and therefore, presumably, had no injury.  *Second,* Mr. Mallinson and Mr. Browne have not accounted for the value of Muve Music, a feature that was included in all $50 4G/LTE plans considered, and which was sold for at least $5 per month, if not bundled with a plan.  They also have not accounted for the fact that many putative class members received a $5 discount on their monthly bill when they signed up for Auto Bill Pay.  Thus, after accounting for the Auto Bill Pay discount and for the approximate value of Muve Music, Mr. Mallinson's and Mr. Browne's asserted damages methodology would indicate that 11.4 percent of all putative class members had zero damages on plan purchases.  Adding it to the number above, 18.0 percent of putative class members were either completely excluded from plan damages calculations, or not harmed on the plan subscriptions.  In addition, as I explained in my report dated April 5, 2021, Mr. Mallinson and Mr. Browne have likely overstated damages because they did not exclude several groups of customers who likely incurred zero damage on both plans and phones purchased— namely, those who were informed about Cricket's 4G/LTE coverage, those who would buy Cricket phones and plans even in the "but-for" world, and those who moved to a Cricket 4G market after registering their phones in non-4G markets.

---

[10] For example, a subscriber with a plan subscription which started in May 2013 and continued until May 2014, would incur damages from September 2013 to May 2014, but not from May 2013 to August 2013, according to Mr. Browne's calculations.

## IV.     Overview of Mr. Mallinson's and Mr. Browne's Damages Methodology

23.     Mr. Mallinson and Mr. Browne calculated damages as the sum of alleged overcharges for each transaction in the proposed class.  They include in their proposal two types of transactions: a) 4G/LTE-capable smartphones purchased from Cricket and b) phone plans purchased from Cricket.

24.     For smartphones, Mr. Mallinson and Mr. Browne consider six 4G-capable Android models bought between November 1, 2012 and September 30, 2014, in stores located in Cricket's non-4G markets by customers with addresses in non-4G markets.[11]  For each 4G-capable device, the overcharge amount is calculated as either (1) the average price of the device, or (2) the maximum price of the device, times an overcharge percentage of 36 percent, resulting in a range of damages.[12]  This overcharge percentage of 36 percent is calculated as the percentage difference in price between 4G/LTE-capable Android models offered by Cricket and some benchmark 3G-capable Android models which Mr. Mallinson selected (shown in Exhibit 1 below).

---

[11] In addition, the customers must have activated a plan included in Mr. Browne's damages calculations, and they could not have been in a Cricket market without 3G or 4G coverage, but with Sprint 4G roaming.  See, Browne Report Backup Materials.

[12] Mr. Mallinson and Mr. Browne use weekly phone price data from various vendors (such as Walmart, RadioShack, Best Buy) provided to Cricket by Brightstar (See, Mallinson Report, p. 93).  Mr. Browne calculates average phone prices for each model across vendors within a given week, and then average prices across weeks within a month to get the monthly average price of the device (See, Browne Report, p. 8: "…we were instructed by Mr. Mallinson to perform aggregate damages calculations using monthly averages of the prices available from other documents in the record as explained below…"  See also, Browne Report, Exhibit E.).  Mr. Browne calculates "the maximum price of the subject device for each transaction based on the data provided by Cricket" in a given month (See, Browne Report, p. 8).

*EXHIBIT 1*
*Smartphone comparison pairs by Mr. Mallinson*

| 4G/LTE smartphone | 3G benchmark picked by Mr. Mallinson |
|---|---|
| Samsung Galaxy SIII | Samsung Galaxy SII |
| HTC One SV | HTC One V |
| LG Motion | LG Optimus M+ |
| ZTE Source | ZTE Engage LT |
| Samsung Galaxy SIV | - |
| Samsung Galaxy Admire II | - |

Source: Mallinson Report, pp. 90–91

Moreover, because Mr. Mallinson did not find "an equivalent 3G smartphone" for Samsung Galaxy Admire II and Samsung Galaxy SIV models, he and Mr. Browne decided that for all six phones they would use the weighted average overcharge percentage from the four phones with benchmarks identified above.[13]

25.      For phone service plans, Mr. Mallinson and Mr. Browne consider data on the prices of all monthly 4G/LTE Cricket plans purchased in or after September 2013 by customers who activated their plans between September 15, 2013 and September 30, 2014 with addresses in non-4G markets (who also purchased a 4G/LTE-capable at-issue device in a Cricket non-4G market store between November 1, 2012 and September 30, 2014).[14]  They assume the overcharge amount to be equal to the 4G/LTE Cricket plan price (which can be $50, $60, or $70) minus $40.  Mr. Mallinson claims that $40 was the price of "4G/LTE service plans from other carriers for service that would have provided class members with more utility and value," and, as such, provides a "reasonable and appropriate benchmark."[15]  He seems to suggest that specific

---

[13] Mallinson Report, pp. 91–92.
[14] "We narrowed the customer information available in the device and plan data to Cricket's non-4G markets as reflected in the class definition. We further narrowed the scope of device purchase and activation transactions to the time period of November 1, 2012 to October 1, 2014, to correspond to the class definition. We narrowed the scope of damages on 4G/LTE plan subscriptions to the time period of September 15, 2013 through September 30, 2014, to correspond to the class definition."  See, Browne Report, p. 5.
[15] Mallinson Report, p. 9.

$40 plans that should be used as the benchmarks are 4G/LTE plans offered by MetroPCS, Page Plus, Simple Mobile, Aio/New Cricket, starting in Q3 2013, and Boost starting in Q2 2014.[16]

### V.  Mr. Mallinson and Mr. Browne Have Overstated Damages due to an Asserted 4G/LTE Premium for 4G/LTE-capable Smartphones that Includes the Value of Many Other Features

26.     _Unaccounted Phone Price Differences._  Mr. Mallinson's and Mr. Browne's asserted method for calculating damages due to an alleged overcharge on 4G/LTE-capable smartphones is overbroad and cannot isolate the incremental value of the 4G/LTE-capable feature.  In fact, the devices whose prices Mr. Mallinson and Mr. Browne propose to compare are different across many dimensions—4G/LTE-capability being just one of them—and all of these dimensions jointly contribute to the price differences observed between 4G/LTE-capable smartphones and 3G devices.  By measuring damages as the difference in prices between 4G/LTE-capable smartphones and 3G devices, Mr. Mallinson and Mr. Browne do not make any attempt to isolate the difference in price in these devices (if any) that would be solely attributable to 4G/LTE capability from the difference in price attributable to other characteristics of these devices. For example, they did not even try to estimate consumer willingness to pay for 4G/LTE using techniques such as conjoint analysis, or conduct any analysis to estimate market prices for 4G/LTE capability separate from the price of such capability when bundled with other features.

---

[16] Mallinson Report, pp. 99–100.

***EXHIBIT 2***
***Mr. Mallinson and Mr. Browne fail to isolate the incremental value of the 4G/LTE-capable feature***



Note: This illustration is based on the hypothetical price of the Samsung Galaxy SIII, $500. The price of Mr. Mallinson's benchmark, the Samsung Galaxy SII, is shown to be 36 percent smaller. Some of the features which distinguish the Samsung Galaxy SIII from the Samsung Galaxy SII are as described in Exhibit 3.

27.     One of the price comparisons made by Plaintiffs' experts is between a Samsung Galaxy SII (3G-capable) and a Samsung Galaxy SIII (4G/LTE-capable). While the Samsung Galaxy SIII features the ability to connect to 4G/LTE networks, and the Samsung Galaxy SII does not, there are many other differences among these devices that potentially influence their observed price differential, such as differences in display size, battery size, and size of RAM.

28.     For example, the display of Samsung Galaxy SII measured 4.52 inches diagonally, with 480x800 pixels resolution, whereas the display of Samsung Galaxy SIII measured 4.8 inches

diagonally, with 720x1280 pixels resolution.[17]  Notably, screen size is one of the important characteristics influencing the purchase decisions of these device buyers.[18]  In addition, the Samsung Galaxy SIII model featured by Mr. Mallinson had 2GB RAM, which would provide users with a faster phone (even when operating on 3G networks or WiFi) than 1GB RAM of the Samsung Galaxy SII.[19]  Moreover, the Samsung Galaxy SIII had a larger battery size (2100 mAh) than the Samsung Galaxy SII (only 1800 mAh), corresponding to longer battery life.[20] Mr. Browne and Mr. Mallinson have made no attempt to explain why differences in these and other features of the Samsung Galaxy SIII relative to the Samsung Galaxy SII do not contribute to explaining any of the price difference between these devices.  They completely fail to account for the value of these different features, rendering their damages analysis fatally flawed.

---

[17] Mallinson Report, pp. 29–30.

[18] Expert Report of Jon Wilkins filed on April 5, 2021 ("Wilkins Report filed on April 5, 2021"), p. 22.

[19] "RAM in your phone is mostly used as a place for apps that are running [to] store their data.  In the simplest terms, that means more RAM can let more apps run in the background without slowing your phone down," "How much RAM does your Android phone actually need?" April 19, 2020, *Android Central*, https://www.androidcentral.com/ram-what-it-how-its-used-and-why-you-shouldnt-care.

[20] "…[T]he higher the mAh rating in batteries, the more electrical energy the battery can store. As a result, a rechargeable battery with a higher mAh is capable of powering a device for a longer time," "What is mAh (milliampere hour)? mAh in Batteries – Explained!" *Power Bank Expert*, May 20, 2021, https://www.powerbankexpert.com/what-does-mah-stand-for-in-batteries/.

***EXHIBIT 3***
***Comparison of Some Key Features in At-Issue Devices and in Mr. Mallinson's Benchmark Devices***

| Device | Display Size | Display Resolution | Front-Facing Camera | Rear-Facing Camera | Video Resolution | Memory | Battery |
|---|---|---|---|---|---|---|---|
| *Samsung Galaxy SIII* | | | | | | | |
| At-Issue Device | 4.80" | 720x1280p | 1.9mp[1] | 8mp | 1080p | 2GB | 2100 mAh |
| Samsung Galaxy SII Epic 4G (benchmark) | 4.52" | 480x800p | 2.0mp[1] | 8mp | 1080p | 1GB | 1800 mAh |
| *HTC One SV* | | | | | | | |
| At-Issue Device | 4.30" | 480x800p | 1.6mp | 5mp | 1080p | 1GB | 1800 mAh |
| HTC One V (benchmark) | 3.70" | 480x800p | None | 5mp | 720p | 512MB | 1500 mAh |
| *ZTE Source* | | | | | | | |
| At-Issue Device | 4.50" | 854x480p | 1.2mp | 5mp | 1080p | 1GB | 2070 mAh |
| ZTE Engage LT (benchmark) | 4.00" | 480x800p | VGA | 3mp | 480p | 1GB | 1900 mAh |
| *LG Motion* | | | | | | | |
| At-Issue Device | 3.50" | 320x480p | VGA | 5mp | 1080p | 1GB | 1700 mAh |
| LG Optimus M+ (benchmark) | 3.50" | 320x480p | None | 5mp | 480p | 512MB | 1300 mAh |

Source: Mallinson Report, pp. 29–33, "HTC One V," *Phone Scoop*, https://www.phonescoop.com/phones/phone.php?p=3684, "ZTE Engage LT / Engage MT," *Phone Scoop,* https://www.phonescoop.com/phones/phone.php?p=3909, "LG Optimus M+ MS695," *Gsmarena*, https://www.gsmarena.com/lg_optimus_m+_ms695-4649.php.

Notes:
[1] Samsung Galaxy SIII also had video capability on the front camera, while Galaxy SII did not.

29.     The arguments above are not unique to the comparison between Galaxy SIII and SII.[21] As shown in Exhibit 2, the price differences between each of the remaining 4G/LTE-capable phones and 3G-capable phones chosen by Mr. Mallinson and Mr. Browne also fail to isolate the alleged 4G/LTE premium.  For example, as evidenced in the sources used by Mr. Mallinson, the HTC One SV (4G/LTE-capable) was different from its predecessor, the HTC One V (3G-

---

[21] As Mr. Rarrick explains in his report, "4G/LTE-capable devices had, overall, newer and more desirable benefits from their 3G predecessors. These added features and benefits, including enhanced cameras, battery life and processor speeds, were attractive to the prepaid consumer and outweighed many customers' desires for 4G/LTE connections."  See, Expert Report of John Rarrick, dated July 21, 2021, p. 5.

capable), along several dimensions other than 4G/LTE capability.[22]  First, it had larger display size at 4.3 inches diagonal, compared to 3.7 inches of the HTC One V.  Second, it had larger 1800 mAh battery capacity, compared to 1500 mAh of HTC One V.  Finally, the HTC One SV had a 1.6MP front-facing camera, in addition to the usual rear-facing 5MP camera, whereas model V had only a rear-facing camera.[23]  In the case of ZTE Source and ZTE Engage LT, Mr. Mallinson again picked as a benchmark a phone with worse characteristics: a) smaller screen size (4 inches against 4.5 in the diagonal), b) worse main camera parameters (3MP against 5MP), c) lower battery capacity (1,900 mAh against 2070 mAh).[24]  On the fourth comparison, LG Motion against LG Optimus M+, the same issues are at play.  Non-4G-capable LG Optimus M+ had worse video resolution for the camera (1080p against 480p), worse RAM and processor (512MB RAM and Snapdragon S1 against 1GB RAM and Snapdragon S4 Plus of LG Motion), and lower battery capacity (1300 mAh against 1700 mAh).[25]  In all cases, Mr. Mallinson and Mr. Browne's price comparison fails to isolate any alleged price differences due to 4G/LTE capability.

30.     _Some Class Members Were Reimbursed for Their Phones (i.e., Mitigated Damages)._
Finally, putative class members who migrated to New Cricket services (AT&T GSM carrier) after the merger with AT&T on March 13, 2014 were able to obtain discounts to exchange their old CDMA phones for new GSM phones.[26]  Putative class members who had 4G/LTE smartphones were offered $50 or $75 discounts towards a new phone upon transition.[27]  Moreover, Samsung Galaxy S3 owners received discounts between $70 and $100, and Samsung Galaxy S4 owners received discounts between $120 and $150.[28]  Owners of Samsung Galaxy S3

---

[22] For HTC One SV characteristics, see, Mallinson Report, p. 33.  For HTC One V, see "HTC One V," _Phone Scoop_, https://www.phonescoop.com/phones/phone.php?p=3684.  This information is also available in one of the Competitive Reports Mr. Browne uses for the price data, CRICKET00043822.
[23] Exhibit 3.
[24] For ZTE Source characteristics, see, Mallinson Report, p. 33.  For ZTE Engage LT, see "ZTE Engage LT / Engage MT," _Phone Scoop_, https://www.phonescoop.com/phones/phone.php?p=3909.
[25] For LG Motion characteristics, see, Mallinson Report, p. 31.  For LG Optimus M+, see "LG Optimus M+ MS695," _Gsmarena_, https://www.gsmarena.com/lg_optimus_m+_ms695-4649.php.
[26] The merger was approved on March 13, 2014.  AT&T launched "New Cricket" on May 18, 2014.  Customers received various discounts and even free phone offers from August 2014 through May 2015.  See, Declaration of Timothy Towster filed on April 5, 2021 ("Towster Declaration"), pp. 3–6.
[27] The actual amount of the discount would depend on the geographic market of the customer, on the specific date of the transition, and on the date of the original Old Cricket phone purchase.  See, Towster Declaration, pp. 4–6.
[28] Towster Declaration, pp. 4–6.

and S4 models also had the option to trade-in their phones and get a new Samsung Galaxy S4 for only 99 cents in Spring 2015.[29]  Clearly, any overcharge amount calculated on an at-issue 4G/LTE-capable phone should be reduced by the discounts a putative class member received on that phone.  Such an adjustment would reduce the alleged overcharge on the phones significantly for consumers who received these discounts.  Yet, Mr. Mallinson and Mr. Browne have not taken this into consideration at all in their damages calculations.

31.     Even customers who did not migrate to New Cricket may have been at least partially reimbursed for their phones.  I understand that customers may have resold their 4G/LTE-capable devices to someone else, or traded them in.  For example, Plaintiff Postpichal and her husband traded in their Samsung Galaxy S4 phones at Verizon for a discount when they switched services.[30]  Clearly, for putative class members who resold or traded in their devices, any overcharge amount should be reduced by the amount a putative class member received back when the phone was resold or traded in.  Mr. Mallinson and Mr. Browne have not taken this into consideration at all in their damages calculations.  Furthermore, putative class members who unlocked their phones and used them to receive 4G/LTE data with carriers other than Cricket Wireless may not have been harmed.[31]  Mr. Mallinson and Mr. Browne's asserted methodology does not account for these potentially unharmed putative class members and would unduly compensate them.

## VI.     Cricket Did Not Charge Customers an Additional Sum for 4G/LTE Coverage

32.     Plaintiffs' theory is that "the damage claimed here is the *difference* in price attributable to [4G/LTE]."[32]  However, Mr. Browne and Mr. Mallinson's asserted damages method does not and cannot isolate the "difference in price attributable to 4G/LTE" because they propose to measure damages as the difference in price between **Cricket 4G/LTE** and **non-Cricket 4G/LTE** plans—hence, any difference in price observed among these plans cannot be attributed to

---

[29] Towster Declaration, p. 6.
[30] Postpichal Deposition, pp. 75, 230.
[31] I understand that Cricket phones were being unlocked during the class period and unlocked 4G/LTE phones could be used to receive 4G/LTE data with any other carrier, notwithstanding the claims made by Plaintiffs.  See, Declaration of William Tindall filed on April 5, 2021 ("Tindall Declaration"), pp. 2–3.
[32] Emphasis in original.  Motion for Class Certification, p. 21.

4G/LTE, as this feature was advertised in both of these plans.  Rather, any price difference would be due to extraneous factors that have nothing to do with Cricket's challenged conduct. As discussed below in paragraphs 36–38, Cricket plans may have been priced differently from other providers' plans for a variety of provider-specific reasons.  Hence, a cleaner comparison would be made by comparing the difference in price for 4G/LTE plans and non-4G/LTE plans that were both provided by Cricket.

a.  For example, as of November 2012, Cricket's $50 Smart Plan was a plan with CDMA (3G) technology and 1GB full-speed data.[33]  During the same time, Cricket also offered the $50 Smart LTE Plan, which offered 4G/LTE/EVDO/CDMA coverage and also provided 1GB full-speed data.[34]  The features of these plans are otherwise identical.

b.  By October 2013, these plans merged into one, the $50 Smart Plan, which listed both CDMA and 4G/LTE as its network technologies, and also provided an increased amount of full-speed data, 2.5GB.[35]

c.  In other words, starting in October 2013, Cricket increased its data allowance and kept the price of its 4G/LTE plan at $50, which is the same price that Cricket charged for both its prior 3G and 4G/LTE plans.  Thus, a comparison of prices for Cricket's 3G plans and 4G/LTE plans starting in November 2012, and of their successor 4G/LTE/CDMA plan starting in October 2013, shows that *Cricket did not charge customers an additional sum for 4G/LTE coverage*—since all plans were priced at $50—, and indicates that damages due to Cricket plans' alleged price premium "attributable to 4G/LTE" are zero.

---

[33] PLTF00012368.
[34] PLTF00012480.
[35] PLTF00012431.

**VII.    Mr. Mallinson and Mr. Browne have Overstated Damages due to an Asserted 4G/LTE Premium for Cricket Phone Service Plans that Includes the Value of Many Other Features**

33.    Even reviewing Mr. Mallinson's and Mr. Browne's alleged overcharge premium derived by comparing Cricket 4G plans with comparison $40 plans, I conclude that Mr. Mallinson and Mr. Browne overstate the alleged overcharge premium, because they fail to account for a variety of factors.

34.    _Auto Bill Pay Discount._  *First*, some Cricket 4G/LTE customers were able to get a $5 monthly discount by signing up to Auto Bill Pay.[36]  Notably, data shows that approximately 17.8 percent of all Cricket 4G-LTE plan purchasers signed up to Auto Bill Pay, and therefore received a $5 monthly discount off the cost of their 4G-LTE plan.[37]  I am not aware of any evidence in Mr. Mallinson's report indicating that the same benefit was available to customers of his benchmark $40 plans.  It is my understanding that the Cricket plan prices data Mr. Browne uses to estimate damages do not subtract the $5 discount from the monthly bills of each putative class member who was an Auto Bill Pay subscriber.[38]  Thus, for the vast majority of putative class members, Mr. Browne's overcharge calculation for each putative class member is overstated by at least $5 per month.

35.    _Availability of Mr. Mallinson's Comparison Plans._  *Second*, depending on the specific location where they lived, some putative class members may not have had access to any alternative, non-Cricket plan with some 4G/LTE coverage that would be priced at $40 during the proposed class period.  During the Class Period, there was no large national carrier which provided 4G/LTE to every market in the United States.[39]  It is even more questionable whether

---

[36] Auto Bill Pay was a feature where a customer could set up automatic payments towards their Cricket plans.  "Save time and $5 off your total bill each month when you sign up for Auto Bill Pay."  "For the ultimate convenience, pay automatically each month with Auto Bill Pay."  See, CRICKET00003031, pp. 16, 19.  See also, CRICKET00003218, CRICKET00002933, CRICKET00002969, CRICKET00352756, CRICKET00003227, pp. 3, 13.

[37] Declaration of Gary W. Braxton dated July 21, 2021 ("Braxton Declaration"), p. 3.

[38] For data which Mr. Browne uses to calculate number of plan subscriptions, see CRICKET00426014.

[39] Wilkins Report filed on April 5, 2021, p. 18 ("In fact, it is worth noting that even Verizon—which was widely acknowledged to have the most extensive 4G/LTE network—did not necessarily provide 4G/LTE coverage to every one of its customers in every geographic location…The same is true—but to a greater extent—for all of the other major wireless providers during this time. As evidence of this, Figure 2 below presents a screenshot from a 2013 Verizon commercial depicting 4G/LTE coverage maps for Verizon,

Cricket's direct competitors in the pre-paid niche were able to do so.  Mr. Mallinson and Mr.
Browne did not provide any evidence that alternative $40 plans with 4G/LTE capabilities were
available to all putative class members in all months included in their plan damages calculations.
In fact, when providing support for availability of $40 4G/LTE plans, Mr. Mallinson appeals to
several pieces of information.  He discusses an internal Cricket email about the Dallas market,
where MetroPCS allegedly provided a $40 plan with 500MB of 4G data and 3G Throttle speed.[40]
He also provides a table based on Bank of America Merrill Lynch Quarterly Wireless Pricing
Surveys which states that MetroPCS, Page Plus, Simple Mobile, and Aio/New Cricket offered
$40 4G/LTE plans starting from Q3 2013, and Boost offered $40 4G/LTE plans starting from Q2
2014.  However, these documents do not specify *where* these plans were actually offered.[41]
They also do not ever claim that Page Plus plans offered 4G connectivity.[42]  Mr. Mallinson
quotes the FCC's 16th Cellular Markets Competition Report which suggests that MetroPCS'
4G/LTE network only covered Atlanta, Boston, Dallas, Detroit, Jacksonville, Las Vegas, Los
Angeles, Miami, New York, Orlando, Philadelphia, Sacramento, San Francisco, and Tampa in
July 2012.[43]  While MetroPCS was adding 4G/LTE coverage in 2013 to other locations,[44]
Plaintiffs did not show that it entered all Cricket non-4G markets by September 2013, the starting
date for Mr. Browne's calculation of plan damages.  Hence, it is possible that some geographic
markets that Plaintiffs claim were not covered by Cricket's 4G/LTE network, such as Columbus,
GA, or Lincoln, NE were not covered by MetroPCS' 4G/LTE network either during part or all of
the proposed Class Period.[45]  Finally, Mr. Mallinson claims that New Cricket introduced small

---

AT&T, Sprint, and TMobile/MetroPCS. As these coverage maps indicate, AT&T, Sprint, and T-Mobile/MetroPCS especially did not provide 4G/LTE coverage to a large portion of the United States during the Class Period."); see also, Expert Report of Jon Wilkins dated July 21, 2021 ("Wilkins Report dated July 21, 2021"), p. 12 ("...no wireless company provided 4G/LTE coverage to every one of its customers in every geographic location during the Class Period").

[40] Mallinson Report, p. 99.

[41] Mallinson Report, pp. 99–100.  See also, PLTF00016262, PLTF00016274, PLTF00016294, PLTF00016317, PLTF00016338, PLTF00016360, PLTF00016380, PLTF00016400.

[42] See, PLTF00016262, PLTF00016274, PLTF00016294, PLTF00016317, PLTF00016338, PLTF00016360, PLTF00016380, PLTF00016400.

[43] Mallinson Report, p. 53.

[44] "MetroPCS Aggressively Expands, Adding 15 New Markets; Triples Reach to 45 Markets across the United States Just Six Months after T-Mobile-MetroPCS Combination," *T-Mobile*, https://www.t-mobile.com/news/press/metropcs-aggressively-expands-adding-15-new-markets-triples-to-t

[45] I understand that Simple Mobile was operating off T-Mobile network, so the same coverage issues as for MetroPCS apply to Simple Mobile.  See, "Simple Mobile Launches New Plans, Increases 4G Data

4G allocation plans in May 2014 on the AT&T network.[46]  Mr. Mallinson has not established that, prior to May 2014, these plans were available to customers.  In fact, Aio used to have a $40 plan in Q4 2013, however, it was not a plan for "smartphones," but rather a plan for "basic phones only."[47]  Overall, Mr. Mallinson has not established that during the entire period of September 2013 to September 2014, his comparison plans were available in all non-4G markets. Thus, for putative class members living in areas where alternative 4G-LTE plans priced at $40 were not available, Mr. Mallinson's and Mr. Browne's suggestion to use $40 4G-LTE plans as a benchmark is flawed and incorrect.

36.     *Heterogeneous Plan Characteristics.*  *Third,* even if some putative class members may have had alternative, non-Cricket $40 plans with some 4G/LTE coverage (such as MetroPCS 500MB plan) in their home markets, Mr. Browne's and Mr. Mallinson's use of these plans as a benchmark is flawed and inappropriate because phone plans are not homogeneous products.  In other words, the Cricket 4G/LTE plans include a variety of features other than data allowance and speed which differentiate them from competitors' 4G/LTE plans, such as their specific network coverage and additional features that are offered with the plan.

37.     *Detailed Coverage.*  Actual phone coverage includes talk, text and data coverage that is network-specific, and can vary at the street level.  For example, while MetroPCS data coverage with 4G/LTE may be available in one part of town, it may not be available in other parts where some putative class members might spend most of their time.  And the same may be true of MetroPCS talk and text coverage.  MetroPCS talk and text coverage may be poor in some areas where Cricket's was strong.  Hence, some putative class members could prefer a more expensive Cricket plan that was more suitable to their location, considering the full range of uses for mobile phone service (which included talk and text), to a cheaper MetroPCS 4G/LTE plan that did not provide good talk or text coverage for their location.  Mr. Browne and Mr. Mallinson have not considered this possibility.  They simply assume that all of the plans are fungible and, given this, that consumers will always opt for the plan that offers 4G/LTE connectivity where available.

---

Limits," *Android Guys*, https://www.androidguys.com/news/simple-mobile-launches-new-plans-increases-4g-data-limits/.
[46] Mallinson Report, p. 103.
[47] "No Annual Contract Plans," *AIO Wireless*,
https://web.archive.org/web/20131207115535/http://www.aiowireless.com/shop/plans.html

38.    _"Muve Music" App._  As for the differentiating features of the plans, Cricket plans offered an additional benefit—the "Muve Music" app—which benchmark plans considered by Mr. Mallinson and Mr. Browne did not offer.[48]  This app was offered for free to Cricket's 4G/LTE plan subscribers after September 2013, and it allowed customers to download and play music for free without depleting their data allowance.[49]  Mr. Mallinson claims that he does not need to account for the value of Muve Music in his damages calculations because "Cricket had previously offered an Android plan that included Muve Music and an iPhone plan that did not for the same price," and "Cricket had gone away from any marketing of this service or extra charge for it and bundled it in to plans instead."[50]  However, these statements do not prove that the value of "Muve Music" is zero.  It is possible that Cricket's Android plans would have been cheaper than iPhone plans without "Muve Music."[51]  In addition, Mr. Mallinson seems to imply that "Muve Music" stopped having value for the customers because of the availability of music streaming platforms, such as Spotify.[52]  However, the Spotify app was not equivalent to "Muve Music."  Unlike "Muve Music," Spotify would stream music while depleting data allowance.  Furthermore, the free version of the Spotify app would also contain ads, while its Premium version (with no ads) would require an additional fee.  Customers considered "Muve Music" a highly valuable feature, as evidenced by the deposition of the Former Named Plaintiff Thomas, who mentioned that he wanted to "purchase a phone that had [Muve] Music [because] before then, you know, if you wanted to download music, you had to pay."  He also claimed that he was "sold" when the attendant in the Cricket store explained to him what "Muve Music" was and that it allowed him to listen to "unlimited artists."[53]  Hence, Mr. Browne's and Mr. Mallinson's asserted damages method is inflated by the additional value of the "Muve Music" app, which their method does not account for.

---

[48] A New York Times article said that Muve was "a phone-based music plan sold through Cricket Wireless," See, "A Digital Music Option Thrives, Though Quietly," _The New York Times_, August 29, 2012, https://www.nytimes.com/2012/08/29/business/media/muve-music-for-mobile-users-thrives-in-shadow-of-competitors.html.
[49] CRICKET00003031, p. 8.  See also, CRICKET00003227, pp. 10–11.
[50] Mallinson Report, footnote 131.
[51] Mr. Rarrick notes in his report that "[iPhone] plans typically came at a premium, often priced $10 or more above [carriers'] standard plans."  See, Rarrick Report, p. 10.
[52] Mallinson Report, footnote 131.
[53] Deposition of Jermaine Thomas on November 6, 2020 ("Thomas Deposition"), pp. 79, 83.

39.    _Additional Benefits of $60 and $70 Cricket Plans._  *Fourth*, Cricket's $60 and $70 plans also offered additional benefits relative to Cricket's $50 plan, such as greater data allowance, and were preferred by some customers.  For example, as shown in Exhibit 3, Cricket's $60 Smart Plan provided 2.5GB of full-speed data, as opposed to 1GB of the $50 Smart Plan.  It also had additional features, such as visual voicemail, 5 call credits to 411 Directory Assistance, international text, picture and video messaging, data backup, and mobile hotspot.  The $70 Smart Plan had the same additional features, as well as 5GB of full-speed data.[54]  Hence, any price difference between Cricket's $60 or $70 plans and benchmark $40 plans would also include the value of the additional benefits that Cricket included in its $60 or $70 plans relative to its $50 plans.  Mr. Browne's and Mr. Mallinson's asserted damages method is therefore inflated by the value of the additional benefits of Cricket's $60 or $70 plans that they have failed to account for.

---

**EXHIBIT 4**
***Differences in characteristics between Cricket's $50, $60, and $70 Smart plans, Summer 2013***

|  | $50/month | $60/month | $70/month |
|---|:---:|:---:|:---:|
| **Unlimited Voice** | ✓ | ✓ | ✓ |
| Talk | ✓ | ✓ | ✓ |
| U.S. Long Distance | ✓ | ✓ | ✓ |
| Caller ID | ✓ | ✓ | ✓ |
| Call Waiting | ✓ | ✓ | ✓ |
| 3-Way Calling | ✓ | ✓ | ✓ |
| Call Forwarding | ✓ | ✓ | ✓ |
| Voicemail | ✓ | ✓ | ✓ |
| Visual Voicemail |  | ✓ | ✓ |
| 411 Directory Assistance (5 Call Credits) |  | ✓ | ✓ |
| **Unlimited Messaging** | ✓ | ✓ | ✓ |
| Text, Picture and Video Messaging | ✓ | ✓ | ✓ |
| International Text, Picture and Video Messaging |  | ✓ | ✓ |
| **Unlimited Data** | ✓ | ✓ | ✓ |
| Full-speed Data Allowance | 1GB | 2.5GB | 5GB |
| Data Backup |  | ✓ | ✓ |
| Mobile Hotspot |  | ✓ | ✓ |
| **Unlimited Muve Music** | ✓ | ✓ | ✓ |

Source: MyCricket Guide, Summer 2013, p. 11, CRICKET00003031.

---

[54] See, Exhibit 4.  See also, MyCricket Guide, Fall 2013, p. 13, showing that the data allocations on $50, $60, and $70 plans increased respectively to 2.5GB, 5GB, and 10GB of full-speed data, CRICKET00003227.

40.     _Few Customers Returned Cricket Phones for a Refund._  _Finally_, the fact that Mr. Mallinson's and Mr. Browne's damages estimates (an average of $134.76–$170.33 on the phone purchase, and $122.90 on the plan payments per putative class member)[55] are flawed and invalid is demonstrated by putative class members' own behavior during the proposed class period. Putative class members who were truly dissatisfied with Cricket's 4G/LTE coverage could have simply avoided the financial losses implied by Mr. Browne's estimates by returning their devices within one week of purchase to receive a full refund, and by cancelling their 4G/LTE data subscription.[56]  Because phones had network indicators, which displayed the network to which they were connected, it would have been obvious to Cricket customers whether their phones were connected at any time to a 4G/LTE network.  Presumably, Cricket customers who prioritized 4G/LTE access but did not receive it would have complained and returned their devices if Mr. Mallinson's theories about consumer motivation are correct.  Specifically, I calculate that only 5.5 percent of putative class members identified by Mr. Browne kept all their Cricket plans for less than a month.  Hence, Mr. Mallinson's and Mr. Browne's estimates would imply that the vast majority of putative class members preferred to incur a loss of more than $250 to avoid the additional trip to the store to return their devices and cancel their data service. This implication is facially absurd, and calls into question the validity and reliability of Mr. Mallinson's and Mr. Browne's asserted damages methodology and estimates.


## VIII.   The Proposed Class Includes Customers Who Are Likely Not Harmed

41.     _Some Putative Class Members Are Not Harmed on the Phone Plan Purchases._  Mr. Mallinson and Mr. Browne's asserted damages methodology implies that some putative class members did not incur any damages on the phone plan purchases.  This is indicated by the fact that they calculate their plan damages only for monthly plan payments made by customers who activated plans from September 15, 2013 to September 30, 2014, and not from the start of the

---

[55] I divide damages as calculated by Mr. Browne by the 486,808 total unique customers in the class as calculated by Mr. Browne. See, Browne Report, p. 5.

[56] They could not receive a refund for the first month of the data plan, but they could also simply stop paying for all of the subsequent months.  The customers could return the smartphone for a full refund. See, Towster Declaration, May 6, 2021, pp. 3–4.

proposed class period on November 1, 2012.[57]  This restriction on the time period implies that there are some putative class members for whom Mr. Mallinson and Mr. Browne do not calculate any damages on the plan purchases.  These include all individuals who bought 4G/LTE-capable phones and were subscribed to Cricket 4G/LTE plans in the time period from November 1, 2012 to September 14, 2013, but did not keep their subscription afterwards.  I count the number of such customers to be 32,125.  Mr. Browne reports the "Total Unique Customers in the Class" to be 486,808.  Accordingly, for these 32,125 putative class members (which represent 6.6 percent of Mr. Browne's estimated total of 486,808), Plaintiffs' asserted methodology calculates no damages on the plan purchases.

42.     In addition, after applying minor corrections to Mr. Mallinson's and Mr. Browne's asserted damages methodology (which nevertheless remains flawed), this methodology would show that damages may be equal to zero for many putative class members who (i) had Cricket 4G/LTE plans with Muve Music, and (ii) were signed up for Auto Bill Pay.  For example, being subscribed to Auto Bill Pay decreased the effective cost of these putative class members' plans from $50 to $45 per month.  Furthermore, Muve Music was reported to cost $10 per month in August 2012, and $5 per month in March 2013, if purchased separately from the plan.[58]  Thus, I conservatively assume that Muve Music value was approximately equal to $5 per month.[59]  As a result, the effective cost of the Cricket's 4G/LTE plan netted out of Muve Music would be $40. Hence, even with Mr. Mallinson's and Mr. Browne's asserted comparison plans of $40, the difference in value between these plans would be zero.

---

[57] For example, a subscriber with a plan subscription which was started in May 2013 and continued until May 2014, would incur damages from September 2013 to May 2014, but not from May 2013 to August 2013, according to Mr. Browne's calculations.

[58] "A Digital Music Option Thrives, Though Quietly," *The New York Times*, August 29, 2012, https://www.nytimes.com/2012/08/29/business/media/muve-music-for-mobile-users-thrives-in-shadow-of-competitors.html, "YouTube & Google Partnering for Music Subscription Service," *Live*, March 7, 2013, https://livemusicblog.com/news/youtube-google-partnering-for-music-subscription-service/.

[59] This is notwithstanding Mr. Mallinson's implication (Mallinson Report, footnote 131) that Muve Music had no value because it was bundled with the plan.  In fact, Mr. Mallinson has no basis for claiming that the value of Muve Music is zero just because it is included in the cost of plan.  By analogy, the value of in-flight drinks such as a can of Coke is not zero just because they are included in the overall price of an airline ticket.

*EXHIBIT 5*
*Illustration of comparison between a Cricket $50 plan which correctly accounts for Muve Music and Auto Bill Pay discount and Mr. Mallinson's $40 benchmark plan*



Thus, damages to putative class members who received Muve Music and who were signed up for Auto Bill Pay would be zero.  Based on the data Mr. Browne relied on, the number of putative class members who had exclusively a subscription to a $50 plan that included free Muve Music after September 15, 2013 was 310,669.  Out of those putative class members, approximately 17.8 percent were signed up for Auto Bill Pay.[60]  Thus, after accounting for the Auto Bill Pay discount and for the approximate value of Muve Music, Mr. Mallinson's and Mr. Browne's asserted damages methodology would indicate that 310,669*17.8 percent = 55,299 putative class members, or 55,299/486,808 = 11.4 percent of all putative class members, received zero damages on plan purchases.  Hence, after adding this number to the number of putative class members for which Mr. Mallinson and Mr. Browne do not measure damages on plan purchases (6.6 percent of putative class members, as shown in the previous paragraph), Mr. Mallinson's

---

[60] Braxton Declaration, p. 3.

and Mr. Browne's asserted damages methodology would indicate that 18.0 percent of putative class members were either not harmed on the plan subscriptions, or were completely excluded from plan damages calculations.

43.   _Some Putative Class Members Are Not Harmed on Device and Phone Plan Purchases._ Mr. Mallinson and Mr. Browne have also likely overstated the count of harmed putative class members due to the following additional reasons.

44.   _First,_ some putative class members were informed about the actual 4G/LTE coverage when they purchased 4G/LTE phones and plans from Cricket.  As evidenced by plan descriptions on the Cricket web site at that time, they advised customers to consult coverage maps when making a purchase.[61]  I understand that Cricket advertisements likewise reflected disclaimers that the 4G/LTE coverage was not available everywhere.[62]  As a part of the in-store customer experience, "store employees would routinely inform customers about the availability, or lack thereof, of 4G/LTE coverage."[63]  Visitors of the Cricket stores were "frequently referred to a seasonal 'MyCricket Guide,'" which contained Cricket's 4G/LTE coverage maps.[64]  Even accepting Plaintiffs' theory of liability, to the extent that some putative class members were informed, they received the benefit of their bargain and therefore were not harmed.  However, Mr. Mallinson and Mr. Browne did not exclude these individuals from their damages calculations.

45.   _Second_, putative class members who did not find 4G/LTE more valuable than 3G are not harmed.  It is my understanding that during the proposed class period, 3G or WiFi would have provided enough data speed for some consumers.[65]  To the extent that these customers did not value 4G/LTE data services more than 3G data services (for example, because they did not use their phones for data-intensive activities), they would not be harmed.  Furthermore, for other

---

[61] For example, the web page for $50 Smart Plan, accessed on October 17, 2013, contains the "General Terms" section which has a note about coverage: "Coverage is not available everywhere and varies by service - see mapping brochures or visit our official website (www.mycricket.com) for details."  See, PLTF00012431.

[62] Towster Declaration, pp. 7–9.  See also, CRICKET00002997, CRICKET00002744, CRICKET0052466, and CRICKET0025756.

[63] Declaration of Michael Moses filed on April 5, 2021 ("Moses Declaration"), p. 2.

[64] Towster Declaration, pp. 8–9.  See also, CRICKET00003031, pp. 22–23, CRICKET00003227, p. 25.

[65] "For many smartphone uses at the time, 3G data speeds and/or Wi-Fi provided a good experience."  See, Wilkins Report filed on April 5, 2021, p. 5.

putative class members, all or nearly all of their use of their 4G/LTE phones for data-intensive activities may occur on their home WiFi.[66]  Crucially, as shown in Mr. Wilkins' report citing to a Nielsen survey from 2012, 61 percent of U.S. customers who had bought 4G smartphones did *not* include 4G coverage among the factors that influenced their decision to purchase their 4G-capable smartphones.[67]  Putative class members who did not value 4G/LTE coverage may have purchased newer 4G/LTE phones for reasons that have nothing to do with 4G/LTE capability, such as improved design, screen size, battery life, camera quality, storage size, and processor speed.[68]  Furthermore, they could have been interested in purchasing Cricket's 4G/LTE plans because of the Muve Music app that came with the plan, or because of Cricket's network coverage, which may have worked better in their specific geographic markets than that of other carriers.  Such customers would have purchased Cricket smartphones and plans in the "but-for" world at the same prices as in the real world, and, therefore, would not be harmed.

46.     *Finally,* some putative class members may have bought their phones in non-4G/LTE markets, but could have used them in 4G/LTE markets.  For example, they could have bought a phone in a non-4G market, and provided an address registered in non-4G market, but they could have moved to a 4G market shortly after the purchase.  These types of consumers received 4G/LTE regardless of whether the area in which they registered their phone, or the store in which they bought it, was covered by 4G/LTE.  However, Mr. Mallinson and Mr. Browne did not exclude these individuals from their damages calculations.

---

[66] Citing an Informa Telecoms & Media report, Mr. Wilkins notes that "Wi-Fi accounted for approximately 63% of all U.S. smartphone-originated data traffic in January 2012."  See, Wilkins Report filed on April 5, 2021, pp. 30–31.

[67] Mr. Wilkins shows that "…less than half (39%) of 4G users indicated that fast data speed influenced their decision to purchase a 4G-capable smartphone and, even more revealing, only 8% of 4G users indicated that fast speed was the most important factor influencing their decision to purchase a 4G-capable smartphone."  See, Wilkins Report filed on April 5, 2021, pp. 22–23.

[68] For example, Mr. Wilkins reports the results of a 2012 Nielsen survey showing that many factors influence consumers' decisions to buy smartphones during the proposed class period, such as "as screen size, touchscreen, operating system, price, ease of use, design, brand, fast processor, availability of applications, device size, battery life, storage size, and keyboard."  See, Wilkins Report filed on April 5, 2021, p. 22.  Furthermore, Named Plaintiff Jamie Postpichal mentions "more quality for videos, pictures" when she is asked about what she understood 4G/LTE to mean.  See, Postpichal Deposition, p. 210.  Former Named Plaintiff Jermaine Thomas says about 4G that "the functionality of the phone was better;" "you had more range to work on the Internet."  He also liked that his first 4G phone had an application called Mood [sic "Muve"] Music.  See, Thomas Deposition, pp. 79, 87.

Executed this 21st day of July, 2021

_____

Justin McCrary

# APPENDIX A

# Justin McCrary

Columbia University
School of Law
521 Jerome Greene Hall
New York, NY 10027

Email:       justin.mccrary@gmail.com
Homepage:    https://www.law.columbia.edu/faculty/justin-mccrary

## Current Appointments

Columbia University
2018–    Paul J. Evanson Professor of Law

National Bureau of Economic Research
2012–    Faculty Research Associate

## Past Appointments

National Bureau of Economic Research
2008–19   Co-director, Crime Working Group
2006–12   Faculty Research Fellow

University of California, Berkeley
2014–17   Director, Social Sciences Data Laboratory (D-Lab)
2010–19   Professor of Law
2008–10   Assistant Professor of Law

Columbia University
Fall 2017   Samuel Rubin Visiting Professor of Law

European Central Bank (Banco de España)
2013–14   Economist

University of Michigan
2003–07   Assistant Professor, Gerald R. Ford School of Public Policy
2003–07   Assistant Professor, Department of Economics (courtesy)

Federal Reserve Bank of New York
1996–98   Assistant Economist

## Education

Ph.D. Economics, University of California, Berkeley, 2003

A.B. Public Policy, Princeton University, 1996

*Sarah J. Hunter and David N. Youtz v. Booz Allen Hamilton Holding Corporation*
U.S. District Court for the Southern District of Ohio (Eastern Division)
    Antitrust labor case
    Testimony regarding heterogeneity of impact, incentives, contracting, damages models, salary structure models
    Retained by Booz Allen, Mission Essential Personnel, and CACI International
    Deposed on April 12, 2021 (via video)

*Leinani Deslandes and Stephanie Turner v. McDonald's USA, LLC*
U.S. District Court for the Northern District of Illinois (Eastern Division)
    Antitrust labor case
    Testimony regarding franchising and vertical restraints, procompetitive benefits of vertical restraints, incentives, monopsony theory, general versus specific human capital, and salary structure models
    Retained by McDonald's USA, LLC
    Deposed on May 10, 2021

*Jamie Postpichal, Sarah Waters, and Ursula Freitas v Cricket Wireless, LLC*
U.S. District Court for the Northern District of California (San Francisco Division)
    False advertising case
    Testimony regarding heterogeneity of impact, damages estimation, consumer preferences
    Retained by Cricket Wireless
    Deposed on April 16, 2021 (via video)

*Sarah J. Hunter and David N. Youtz v. Booz Allen Hamilton Holding Corporation*
U.S. District Court for the Southern District of Ohio (Eastern Division)
    Antitrust labor case
    Testimony regarding heterogeneity of impact, incentives, contracting, damages models, salary structure models
    Retained by Booz Allen, Mission Essential Personnel, and CACI International
    Deposed on April 12, 2021 (via video)

*The People of the State of California v. Purdue Pharma L.P. et al.*
Superior Court of the State of California, County of Orange
    Prescription opioid medication litigation
    Testimony regarding causation, economics of crime, regression methodology
    Retained by Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.
    Deposed on February 8, 2021 (via video)

*Donald Conrad et al., v. Jimmy John's Franchise, LLC, et al.*
U.S. District Court for the Southern District of Illinois
    Putative class action regarding antitrust conspiracy
    Testimony regarding liability, damages, heterogeneity, horizontal versus vertical relationships, franchise arrangements, internal labor markets, monopsony theory, and general versus specific

human capital training
Deposed on August 14, 2020
Retained by Jimmy John's Franchise, LLC and Jimmy John's Enterprises, LLC

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*
U.S. District Court for the Southern District of New York
 Putative class action regarding antitrust price fixing (Sherman Act §§ 1, 3 and Commodity
 Exchange Act)
 Testimony regarding liability, heterogeneity, trader communications, and sampling
 methodologies Retained by Credit Suisse
 Deposed on July 30, 2020 (via video)
 Deposed on January 17, 2019 (Merits)

*Alex Morgan, et al. v. United States Soccer Federation, Inc.*
U.S. District Court for the Central District of California, Western Division
 Putative class action alleging discrimination in pay
 Testimony regarding law and economics, labor economics, and damages methodologies
 Retained by United States Soccer Federation
 Deposed on April 9, 2020 (via video)

*Barry Staubus, et al., v. Purdue Pharma, L.P.*
Circuit Court for Sullivan County at Kingsport, Tennessee
 Prescription opioid medication litigation
 Testimony regarding causation, economics of crime, regression methodology
 Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc.,
 and Par Pharmaceuticals, Inc.
 Deposed on April 7, 2020 (via video)

*Rescap Liquidating Trust v. Primary Residential Mortgage, Inc.*
U.S. District Court for the District of Minnesota
 Mortgage-backed securities case (bankruptcy)
 Testimony regarding sampling, damages, and statistical concepts
 Retained by Primary Residential Mortgage, Inc.
 Bench trial testimony on March 12-13, 2020 (via video)
 Deposed on October 23, 2019

*County of Suffolk v. Purdue Pharma LP, et al.; County of Nassau v. Purdue Pharma LP, et al.; and
The People of the State of New York v. Purdue Pharma LP, et al.*
Supreme Court of the State of New York, County of Suffolk
 Prescription opioid medication litigation
 Testimony regarding causation, economics of crime, regression methodology
 Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc.,
 and Par Pharmaceuticals, Inc.
 Deposed on February 25, 2020

*Government of the United States Virgin Islands v. Toyota Motor Corporation, et al.*
Superior Court of the Virgin Islands, Division of St. Thomas and St. John
> Consumer products liability case
> Testimony regarding the car market and damages methodologies
> Retained by Ford Motor Company
> Deposed on February 14, 2020


*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
U.S. District Court for the Eastern District of New York Antitrust case
> Testimony regarding liability, two-sided markets, market power, and credit and debit card
> payment systems
> Retained by Mastercard, Bank of America, Barclays, Capital One, Citibank, Fifth Third, First
> National Bank of Omaha, HSBC, JPMorgan Chase, PNC, SunTrust, Texas Independent
> Bancshares, and Wells Fargo
> Deposed on January 14, 2020


*Phoenix Light SF Limited, et al. vs. Wells Fargo Bank*
U.S. District Court for the Southern District of New York Mortgage-backed
securities case (servicing)
> Testimony regarding matching and other statistical methodologies
> Retained by Wells Fargo Bank
> Deposed on October 4, 2019


*Jacob Beaty and Jessica Beaty vs. Ford Motor Company*
U.S. District Court for the Western District of Washington
> Consumer products liability case
> Testimony regarding conjoint analysis and heterogeneity Retained by Ford Motor Company
> Deposed on June 25, 2019


*Shamrell v. Apple Inc.*
Superior Court of the State of California, County of San Diego
> Putative class action regarding products liability, Unfair Competition Law and Consumers
> Legal Remedies Act
> Testimony regarding heterogeneity across putative class members, failure rate methodologies,
> econometrics, and data science
> Retained by Apple, Inc.
> Deposed on June 6, 2019


*Cuyahoga County v. Purdue Pharma LP, et al., and Summit County v. Purdue Pharma LP, et al.,*
U.S. District Court of the Northern District of Ohio
> Prescription opioid medication litigation
> Testimony regarding causation, drug use, economics of crime, regression methodology
> Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc.,
> and Par Pharmaceuticals, Inc.
> Deposed on May 31, 2019

*Lerman v. Apple Inc.*
U.S. District Court for the Eastern District of New York

    Putative class action regarding products liability

    Testimony regarding heterogeneity across putative class members, the nature of products, and conjoint analysis

    Retained by Apple, Inc.

    Deposed on May 29, 2019

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc.*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley

    Deposed on May 15, 2019

*Rebuttal Testimony of Powerex Corp re: BPA Southern Intertie Hourly Rate*
U.S. Department of Energy, Bonneville Power Administration

    Administrative proceeding concerning the rates for transmission of electricity

    Testimony regarding regression methodology

    Retained by Powerex Corp.

    Testimony before the Hearing Officer on April 23, 2019

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley & Co. LLC, as successor to Morgan Stanley & Co. Inc., Morgan Stanley, and Saxon Mortgage Services, Inc.*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley

    Deposed on January 8, 2019

*Samsung Electronics Co., Ltd., v. Kuroda Electric Co., Ltd., Sakai Display Products Corporation and Sharp Corporation*
International Chamber of Commerce

    Contractual dispute regarding supply of television panels

    Testimony regarding economic theory, data science, statistics

    Retained by Samsung Electronics Co.

    Testified at arbitration hearing on December 20, 2018

*In re: Part 60 RMBS Put-Back Litigation*

    Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on November 27, 2018

*In Re: RFC and ResCap Liquidating Trust Litigation*
U.S. District Court for the District of Minnesota and U.S. Bankruptcy Court for the Southern District of New York

  Mortgage-backed securities case (bankruptcy)
  Testimony regarding sampling, damages, and statistical concepts
  Retained by Advanced Financial Services, BMO Harris Bank, Cadence Bank, Colonial Savings, CTX Mortgage, Decision One, First Guaranty, Freedom Mortgage, Home Loan Center, HSBC Mortgage, Impac Funding, PNC, Provident, Standard Pacific, Synovus, and Universal American
  Testified at jury trial on November 1, 2018 (Minnesota; Home Loan Center)
  Deposed on April 24, 2018

*Cheryl Phipps and Shawn Gibbons v. Wal-Mart Stores, Inc.*
U.S. District Court for the Middle District of Tennessee

  Putative class action alleging discrimination in employment
  Testimony regarding the decentralized nature of Walmart's internal labor market and concomitant heterogeneity across proposed class members in pay and promotion outcomes
  Retained by Walmart
  Deposed on April 30, 2018

*People of the State of California v. Morgan Stanley & Co.*
Superior Court of the State of California, County of San Francisco

  Mortgage-backed securities case
  Testimony regarding sampling and statistical methods
  Retained by Morgan Stanley & Co.
  Deposed on February 9, 2018

*Federal Home Loan Bank of Chicago v. Banc of America Funding Corporation, et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

  Mortgage-backed securities case
  Testimony regarding sampling, regression, and statistical methods
  Retained by Morgan Stanley
  Deposed on December 14, 2017

*In re Lehman Brothers Holdings, Inc., et al., Debtors*
U.S. Bankruptcy Court for the Southern District of New York

  Mortgage-backed securities case
  Testimony regarding sampling, resampling methods for inference, and statistical methods
  Retained by Lehman Brothers Holdings, Inc.
  Deposed on October 9, 2017

# Scholarship on Sampling, Statistics, and Econometrics

Valid *t*-Ratio Inference for IV (with David S. Lee, Marcelo Moreira, and Jack Porter)

   Revise and resubmit, *American Economic Review*

Conservative Tests Under Satisficing Models of Publication Bias (with Garret Christensen and Daniele Fanelli)

   *PLOS One*, Volume 11, Number 2, February 22, 2016

New Evidence on the Finite Sample Properties of Propensity Score Matching and Reweighting Estimators (with Matias Busso and John DiNardo)

   *Review of Economics and Statistics*, Volume 96, Number 5, December 2014

Incomes in South Africa Since the Fall of Apartheid (with Murray Leibbrandt and James Levinsohn)

   *Journal of Globalization and Development*, Volume 1, Issue 1, January 2010

Manipulation of the Running Variable in the Regression Discontinuity Design: A Density Test

   *Journal of Econometrics*, Volume 142, Issue 2, February 2008

# Scholarship on Competition

Measuring Benchmark Damages in Antitrust Litigation (with Daniel L. Rubinfeld)

   *Journal of Econometric Methods*, Volume 3, January 2014

# Scholarship on Finance

Subsidizing Liquidity with Wider Ticks: Evidence from the Tick Size Pilot Study Timestamps (with Robert Bartlett)

   *Journal of Empirical Legal Studies*, Volume 17, Issue 2, June 2020

Dark Trading at the Midpoint: Pricing Rules, Order Flow, and Price Discovery (with Robert Bartlett)

   *Journal of Law, Finance, and Accounting*, Volume 4, Issue 2, 2019

How Rigged Are Stock Markets?: Evidence from Microsecond Timestamps (with Robert Bartlett)

   *Journal of Financial Markets*, Volume 45, September 2019

Shall We Haggle in Pennies at the Speed of Light or in Nickels in the Dark?:

How Minimum Price Variation Regulates High Frequency Trading and Dark Liquidity (working paper, 2015, with Robert Bartlett)

## Scholarship on Risk and  Crime

The Impact of the Coronavirus Lockdown on Domestic Violence (with Sarath Sanga)
 Forthcoming, *American Law and Economics Review*, 2021

Why We Need Police (with Deepak Premkumar)
 Chapter 3 in *The Cambridge Handbook of Policing in the United States*, Tamara Rice Lave and Eric Jr. Miller, eds., Cambridge University Press, June 2019

Are U.S. Cities Underpoliced? Theory and Evidence (with Aaron Chalfin)
 *Review of Economics and Statistics*, Volume 100, Issue 1, March 2018, 167–186

Criminal Deterrence: A Review of the Literature (with Aaron Chalfin)
 *Journal of Economic Literature*, Volume 55, Number 1, March 2017, 5–48 (lead article)

The Deterrence Effect of Prison: Dynamic Theory and Evidence (with David S. Lee)
 *Advances in Econometrics*, Volume 38, 2017, editors Matias D. Cattaneo and Juan Carlos Escanciano 2018 Emerald Literati Award, Outstanding Author Contribution

Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process: An Empirical Inquiry (with Tamara Lave)
 *Brooklyn Law Review*, Volume 78, Summer 2013, Number 4, 1391–1439

General Equilibrium Effects of Prison on Crime: Evidence From International Comparisons (with Sarath Sanga)
 *Cato Papers on Public Policy*, Volume 2, 2012

*Controlling Crime: Strategies and Tradeoffs* (co-edited with Phil Cook and Jens Ludwig), Chicago: University of Chicago Press, 2011.

## Scholarship on Labor Economics

Unmarked? Criminal Record Clearing and Employment Outcomes (with Jeffrey Se bin (lead author) and Joshua Epstein)

  *Journal of Criminal Law and Criminology*, Volume 108, Number 1, 2017 (lead article)

The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Laws Using Exact Date of Birth (with Heather Royer)

  *American Economic Review*, Volume 101, Number 1, February 2011

Comment on "Free to Punish? The American Dream and the Harsh Treatment of Criminals", by Rafael di Tella and Juan Dubra

  *Cato Papers on Public Policy*, Volume 1, 2011

Dynamic Perspectives on Crime

  in *Handbook of the Economics of Crime*, Chapter 4, Edward Elgar, 2010

The Effect of Court-Ordered Hiring Quotas on the Composition and Quality of Police

  *American Economic Review*, Volume 97, Number 1, March 2007

Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment

  *American Economic Review*, Volume 92, Number 4, September 2002

## Scholarship on Intellectual Property

A Reconsideration of Copyright's Term (with Kristelia A. Garcia)

  *Alabama Law Review*, Volume 71, Issue 2, 2019

Copyright and Economic Viability: Evidence from the Music Industry (with Kristelia A. Garcia and James Hicks)

  *Journal of Empirical Legal Studies*, Volume 17, Issue 4, December 2020

## Scholarship on Monetary Policy

Following Germany's Lead: Using International Monetary Linkages to Estimate the Effect of Monetary Policy on the Economy (with Julian di Giovanni and Till von Wachter)

  *Review of Economics and Statistics*, Volume 91, Number 2, May 2009

# Other Scholarship

The Ph.D. Rises in American Law Schools, 1960-2011: What Does It Mean for Legal Education?
(with Joy Milligan and James Phillips)
   *Journal of Legal Education*, Volume 65, Number 543, Spring 2016

# Referee

*Econometrica*

*American Economic Review*

*Quarterly Journal of Economics*

*Journal of Political Economy*

*Review of Economic Studies*

*Journal of Econometrics*

*Journal of Economic Literature*

*Review of Economics and Statistics*

*Journal of the American Statistical Association*

*American Economic Journal*

*Advances in Econometrics*

*American Law and Economics Review*

*International Law and Economics Review*

*Journal of Labor Economics*

*Journal of Econometric Methods*

*Industrial and Labor Relations Review*

*Journal of Law and Economics*

*Journal of Empirical Legal Studies*

*Journal of Urban Economics*

*Journal of Quantitative Criminology*

*American Political Science Review*

*American Sociological Review*

*Stanford Law Review*

*Yale Law Journal*

*Columbia Law Review*

## Other Activities

2020–    Member, Board of Directors, Frameable, LLC

2019–    Member, Board of Directors, Plectica, LLC

2017–19 Member, Board of Directors, American Law and Economics Association

2007–19 Co-Director (with Phil Cook and Jens Ludwig), *Crime Working Group*, National Bureau of Economic Research

2009–14 Co-Director, *Law and Economics Program*, University of California, Berkeley

## Courses Taught

### Columbia

2020-21    L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2019-20    L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall)

2018-19    L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2017-18    L6231: Corporations (Fall)

### Berkeley

2016-17    Law 244.4: Litigation and Statistics (Fall); Law 216: Law and Economics Workshop (Fall); Law 218.6: Law and Economics of Discrimination (Fall)

2015-16    Law 250: Business Associations (Fall); Law 244.4: Litigation and Statistics (Fall); Letters and Science 39D: Race, Policing, and Data Science (Fall)

2014-15    Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer)

2013-14    Law 250S: Business Associations (Summer)

2012-13    Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3:    Introductory Statistics (Fall)

2011-12    Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3:    Introductory Statistics (Fall); Law 251.31: Introduction to Law, Economics, and Business (Spring);    Legal Studies 145: Law and Economics I (undergraduate)

2010-11    Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 216: Law and Economics Workshop (Fall and Spring); Legal Studies 145: Law and Economics I (undergraduate); Law 209.6: Topic in Quantitative Methods (JSP); Econ 250C: Labor Economics (graduate, shared course with 209.6)

2009–10  Law 216: Law and Economics Workshop (Fall and Spring); Law 209.32: Quantitative Methods II (JSP)

2008–09      Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP);

Law 209.32:Quantitative Methods II (JSP)

2007–08    Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP)

Michigan

Introduction to Quantitative Methods (policy), First Econometrics Field Course (economics), Advanced Economic Theory (policy)

# Grants and Fellowships

2007–2010 NIH, Constructive Proposals for Dealing With Attrition (with John DiNardo)

2009            Committee on Research, Junior Faculty Research Grant, UC Berkeley

2006–2009 NIH, The Effect of Female Education on Fertility and Infant Health (with Heather Royer, Grant # R03 HD051713)

2006–2011 NSF, New Instrumental Variables Estimates of the Effects of Schooling and Military Service: Empirical Strategies Using Non-Public-Use Data (with Josh Angrist and Stacey Chen)

2005            RWJ Foundation Health and Society Scholars Program, Small Grant Program

2004            Rackham Interdisciplinary Grant, University of Michigan

2004            CLOSUP Grant, University of Michigan

2004            National Poverty Center Grant, University of Michigan

2002–2003 Chancellor's Dissertation Year Fellowship, UC Berkeley

# Presentations

2018–2019 Columbia University, School of Law; Conference on Empirical Legal Studies, University of Michigan

2017–2018 Columbia University, School of Law; Georgetown University, School of Law

2016–2017 George Mason University, School of Law; University of Michigan, Economics Department (Summer, Fall); Equities Leaders Summit; University of Zürich, Department of Economics; ETH (Swiss Federal Institute of Technology) Zürich, Law and Economics; Northwestern University, School of Law; Duke University, School of Law; Duke University, Information

Initiative

2015–2016 Goldman Sachs; University of California, Berkeley, School of Law; University of Virginia, School of Law; University of California, Irvine; Equal Employment Opportunity Commission; National Bureau of Economic Research, Summer Institute

2014–2015 Duke University; Federal Reserve Bank of New York; Equal Employment Opportunity Commission (EEO- DataNet); American Law and Economics Association (discussant); New York University (NYU / Penn Law and Finance Conference); National Bureau of Economic Research, Summer Institute (discussant)

2013–2014 University of Southern California, School of Law; London School of Economics; Bank of Spain; CEMFI; Carlos III; University of Zaragoza; University of Rotterdam; University of Maastricht; University of Götenborg

2012–2013 University of California, Los Angeles, School of Law

2011–2012 University of Oregon, Department of Economics; University of British Columbia, Department of Economics; Brown University, Department of Economics; University of Rochester, Department of Economics; Cato Institute; National Bureau of Economic Research, Summer Institute; Harvard Law School

2010–2011 Northwestern, School of Law; University of Wisconsin, Department of Economics; Brookings Institution; Cato Institute

2009–2010 University of Chicago, School of Law; Cornell University, School of Law and Department of Economics; University of Michigan, School of Law and Department of Economics; University of Virginia, School of Law, Olin Conference

2008–2009 University of California, Los Angeles, School of Law; University of Arizona, School of Law and Department of Economics; Stanford University, School of Law and Department of Economics; University of Miami, Department of Economics

2007–2008 Northwestern University, School of Law; University of Michigan, Department of Economics; National Bureau of Economic Research, Summer Institute; Florida State University

*Prior to 2007–2008, presentations are at departments of economics, unless otherwise noted*

2006–2007 University of Michigan, Program in Survey Methodology; Public Policy Institute of California; Brown University

2005–2006 University of Michigan; University of California, Irvine; University of California, Santa Barbara; University of California, Santa Cruz; California State University, Long Beach; University of Western Ontario; University of Toronto; University of Illinois, Chicago;

University of Chicago, Graduate School of Business; APPAM; University of Florida; University of California, Berkeley, School of Law; Princeton University; RAND; Hebrew University (conference in honor of Reuben Gronau); Stanford University, University of Wisconsin, Madison; Northwestern University; Crime and Economics Summer Workshop, University of Maryland

2004–2005  Federal Reserve Bank of Chicago; University of Illinois, Urbana-Champaign; University of Michigan, William Davidson Institute; University of Maryland; Urban Institute; American Economics Association Meetings; City University of New York Health Economics Seminar; University of Wisconsin, Madison; Stanford University; University of California, Davis; University of California, Berkeley, Labor Lunch; NBER Summer Institute, Education/Labor Studies

2003–2004  University of Michigan; APPAM; NBER Labor Studies Meeting (Fall); Massachusetts Institute of Technology; Harvard University, Kennedy School; University of California, Los Angeles; University of California, San Diego; Columbia University; University of California, Berkeley; NBER Summer Institute, Monetary Policy; NBER Summer Institute, Labor Studies

2002–2003  University of California, San Diego; University of California, Los Angeles; RAND Institute; University of Chicago, Graduate School of Business; University of Chicago, Harris School of Public Policy; University of Michigan, Ford School of Public Policy; Columbia University; Dartmouth College; Federal Reserve Bank of New York; Boston University

Last updated:  June 25, 2021

# APPENDIX B

# List of Documents Considered[1]

**Legal Pleadings**

- Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *Jermaine Thomas, et al. v. Cricket Wireless, LLC*, Case No. 3:19-cv-07270-WHA, March 4, 2021.

- Second Amended Class Action Complaint, *Jermaine Thomas, et al. v. Cricket Wireless, LLC*, Case No. 3:19-cv-07270-WHA, January 27, 2021.

- Stipulation and Agreement of Settlement, *Tim Bond v. Cricket Communications, LLC*, Case No. 1:15-cv-923-MJG, November 22, 2017.

- Plaintiffs' Third Amended Class Action Complaint, *Jamie Postpichal, et al. v. Cricket Wireless, LLC*, Case No. 3:19-cv-07270-WHA, March 11, 2021.

- Cricket Wireless LLC's Third Amended Responses and Objections to Plaintiffs' First Set of Interrogatories, *Jermaine Thomas, et al., v. Cricket Wireless, LLC*, Case No. 3:19-cv-07270-WHA, January 15, 2021.

- Cricket Wireless LLC's Second Amended Responses and Objections to Plaintiffs' Second Set of Interrogatories, *Jermaine Thomas, et al., v. Cricket Wireless, LLC*, Case No. 3:19-cv-07270-WHA, December 23, 2020.

- Cricket Wireless LLC's Second Amended Responses and Objections to Plaintiffs' First Request for Admissions, *Jermaine Thomas, et al., v. Cricket Wireless, LLC*, Case No. 3:19-cv-07270-WHA, December 4, 2020.

- Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, I*n Re Chrysler–Dodge–Jeep Ecodiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 17–md–02777–EMC, March 15, 2018.

- Memorandum and Order, *In Re: Epipen (Epinephrine Injection, Usp) Marketing, Sales Practices and Antitrust Litigation*, MDL No. 2785 Case No. 17-md-2785-DDC-TJJ, February 27, 2020.

**Depositions**

- Deposition of Jamie Postpichal on October 15, 2020.

- Deposition of Jermaine Thomas on November 6, 2020.

- Deposition of Keith Mallinson on March 24, 2021.

- Deposition of Keith Mallinson on March 24, 2021, Exhibit 144, "Verizon Coverage Map."

- Deposition of Keith Mallinson on March 24, 2021, Exhibit 145, "Cricket Rate Plans."

---

[1] In addition to the materials on this list, I considered all materials cited in my report to form my opinions.

# APPENDIX B

- Deposition of Steve Browne on March 31, 2021.

- Deposition of Timothy Towster on February 3, 2021.

- Deposition of Damian Donckels on January 22, 2021.

- Deposition of Ursula Freitas on March 19, 2020.

- Deposition of Beverly Addison on November 25, 2020.

**Declarations**

- Declaration of Damian Donckels filed on March 1, 2021.

- Declaration of William Tindall filed on April 5, 2021.

- Declaration of Timothy Towster filed on April 5, 2021.

- Declaration of Timothy Towster filed on April 5, 2021, Exhibit A, "CIRCKET00002997."

- Declaration of Timothy Towster filed on April 5, 2021, Exhibit B, "CRICKET00002744."

- Declaration of Timothy Towster filed on April 5, 2021, Exhibit C, "CRICKET00352466."

- Declaration of Timothy Towster filed on April 5, 2021, Exhibit D, "CRICKET00025756."

- Declaration of Timothy Towster filed on April 5, 2021, Exhibit E, "CTRL00020449 (CRICKET00003031)."

- Declaration of Michael Moses filed on April 5, 2021.

- Declaration of Gary W. Braxton dated July 21, 2021.

**Expert Reports**

- Expert Report of Jon Wilkins filed on April 5, 2021.

- Expert Report of Keith Mallinson filed on March 4, 2021.

- Expert Witness Report of Steve W. Browne filed on March 4, 2021.

- Expert Report of Keith Mallinson dated July 7, 2021.

- Expert Witness Report (Relating to Damages) of Steve W. Browne dated July 7, 2021, with Backup Materials

- Expert Report of Professor Justin McCrary filed on April 5, 2021.

- Expert Report of Jon Wilkins dated July 21, 2021

- Expert Report of John Rarrick dated July 21, 2021

# APPENDIX B

**Websites**

- "A Digital Music Option Thrives, Though Quietly," *The New York Times*, August 29, 2012, https://www.nytimes.com/2012/08/29/business/media/muve-music-for-mobile-users-thrives-in-shadow-of-competitors.html.

- "How much RAM does your Android phone actually need?" April 19, 2020, *Android Central*, https://www.androidcentral.com/ram-what-it-how-its-used-and-why-you-shouldnt-care.

- "HTC One V," *Phone Scoop*, https://www.phonescoop.com/phones/phone.php?p=3684.

- "LG Optimus M+ MS695," *Gsmarena*, https://www.gsmarena.com/lg_optimus_m+_ms695-4649.php.

- "MetroPCS Aggressively Expands, Adding 15 New Markets; Triples Reach to 45 Markets across the United States Just Six Months after T-Mobile-MetroPCS Combination," *T-Mobile*, https://www.t-mobile.com/news/press/metropcs-aggressively-expands-adding-15-new-markets-triples-to-t.

- "No Annual Contract Plans," *AIO* Wireless, https://web.archive.org/web/20131207115535/http://www.aiowireless.com/shop/plans.html.

- "Simple Mobile Launches New Plans, Increases 4G Data Limits," *Android Guys*, https://www.androidguys.com/news/simple-mobile-launches-new-plans-increases-4g-data-limits/.

- "What is mAh (milliampere hour)? mAh in Batteries – Explained!" *Power Bank Expert*, May 20, 2021, https://www.powerbankexpert.com/what-does-mah-stand-for-in-batteries/.

- "YouTube & Google Partnering for Music Subscription Service," *Live*, March 7, 2013, https://livemusicblog.com/news/youtube-google-partnering-for-music-subscription-service/.

- "ZTE Engage LT / Engage MT," *Phone Scoop*, https://www.phonescoop.com/phones/phone.php?p=3909.

**Other Documents**

- Cal. Civ. Code § 1770.
- Cal. Civ. Code § 1780.

**Bates Stamped Documents**

- CRICKET00000001.
- CRICKET00000332–47.
- CRICKET00000827.
- CRICKET00000842–861.
- CRICKET00002933–34.
- CRICKET00002969–70.

# APPENDIX B

- CRICKET00002997.
- CRICKET00003077.
- CRICKET00003218.
- CRICKET00003227–239.
- CRICKET00003885–893.
- CRICKET00004624.
- CRICKET00005414–15.
- CRICKET00005601–03.
- CRICKET00008293–94.
- CRICKET00010913.
- CRICKET00010914–18.
- CRICKET00012279.
- CRICKET00012601.
- CRICKET00013216–220
- CRICKET00013351–52.
- CRICKET00016884–87.
- CRICKET00017941–945.
- CRICKET00021398–1400.
- CRICKET00043716–19.
- CRICKET00043822–25.
- CRICKET00049190–93.
- CRICKET00049194–95.
- CRICKET00049347–49.
- CRICKET00049357–70.
- CRICKET00059164–73.
- CRICKET00060542.
- CRICKET00061124–138.
- CRICKET00064270–289.
- CRICKET00186028–030.
- CRICKET0025756.
- CRICKET00326445–48.
- CRICKET00351657.
- CRICKET00352543–2612.
- CRICKET00352756–57.
- CRICKET00354776.
- CRICKET00354980.
- CRICKET00355183–5257.
- CRICKET00358854.
- CRICKET00372740.
- CRICKET00388913.
- CRICKET00415820.
- CRICKET00426014.
- CRICKET00426014.
- CRICKET00427540.
- CRICKET00427732.
- CRICKET00428245.
- CRICKET00428352.
- CRICKET00429225–27.
- CRICKET00429229–41.
- CRICKET00432508.
- CRICKET00432509.
- CRICKET00438132.
- CRICKET00441063.
- CRICKET00444411–13.
- CRICKET00444885.
- CRICKET00458766–69.
- CRICKET00469084–9119.
- CRICKET00469409–17.
- CRICKET00469418–31.
- CRICKET00477211–16.
- CRICKET00479333–39.
- CRICKET00509258–364.
- CRICKET00513221–22.
- CRICKET0052466.

# APPENDIX B

- CRICKET00553782.
- CRICKET00588000–10.
- CRICKET00588290–300.
- CRICKET00588808–18.
- CRICKET00588881–91.
- CRICKET00606418.
- CRICKET00612199–209.
- CRICKET00650479–0703.
- CRICKET00688448–58.
- CRICKET00729583–93.
- CRICKET00774621.
- CRICKET00783023–24.
- CRICKET00793602–03
- CRICKET00794710.
- CRICKET00824984–94.
- CRICKET00828124–34.
- CRICKET00851416.
- CRICKET00865787–948.
- CRICKET00866906–38.
- CRICKET00866939–71.
- CRICKET00877821–22.
- CRICKET01178252.
- CRICKET01553083–3169.
- CRICKET01644896.
- CRICKET01644897.
- CRICKET01644898.
- CRICKET01645003–679154.
- CRICKET01647479.
- CRICKET01653745.
- CRICKET01654078.
- CRICKET01658865.
- CRICKET01660961.
- CRICKET01662527.
- CRICKET01663118.
- CRICKET01663555.
- CRICKET01665105.
- CRICKET01668410.
- CRICKET01671239.
- CRICKET01671822.
- CRICKET01672932.
- CRICKET01673829.
- CRICKET01674670.
- CRICKET01676089.
- CRICKET01925171–5201.
- CRICKET02432919–90.
- CRICKET02508433–35.
- CRICKET02508450–53.
- CRICKET025088444–45.
- CRICKET02764489–92.
- CRICKET02930213–16.
- CRICKET02930468–71.
- CRICKET02930472–81.
- CRICKET02930503–13.
- CRICKET02930514–24.
- CRICKET02930568–78.
- CRICKET02930579–89.
- CRICKET02930590–600.
- CRICKET02930656–66.
- CRICKET03149877–87.
- CRICKET03160810–13.
- CRICKET03247986–96.
- CRICKET03248056–66.
- CRICKET03248073–83.
- CRICKET03250509–12.

# APPENDIX B

- CRICKET03250523–26.
- CRICKET03250584–94.
- CRICKET03250688–98.
- CRICKET03250865–75.
- CRICKET03250899–909.
- CRICKET03250916–17.
- CRICKET03250951–61.
- CRICKET03255590–93.
- CRICKET03271560–63.
- CRICKET03272122–25.
- CRICKET03278882–85.
- LAZARD0000007–016.
- PLTF0002262–2304.
- PLTF0002317–325.
- PLTF0002332–377.
- PLTF0008663–8976.
- PLTF00012322.
- PLTF00012323.
- PLTF00012324.
- PLTF00012325.
- PLTF00012326.
- PLTF00012336.
- PLTF00012352.
- PLTF00012353.
- PLTF00012354.
- PLTF00012355.
- PLTF00012356.
- PLTF00012357.
- PLTF00012358.
- PLTF00012359.
- PLTF00012360.
- PLTF00012361.
- PLTF00012362.
- PLTF00012363.
- PLTF00012364.
- PLTF00012365.
- PLTF00012366.
- PLTF00012367.
- PLTF00012368.
- PLTF00012374.
- PLTF00012390.
- PLTF00012429.
- PLTF00012430.
- PLTF00012431.
- PLTF00012432.
- PLTF00012433.
- PLTF00012480.
- PLTF00012623–640.
- PLTF00012641–651.
- PLTF00012652–670.
- PLTF00012671–690.
- PLTF00012691–92.
- PLTF00012721–24.
- PLTF00012774–783.
- PLTF00014148–4538.
- PLTF00016262–73.
- PLTF00016274–93.
- PLTF00016294–316.
- PLTF00016317–37.
- PLTF00016338–59.
- PLTF00016360–79.
- PLTF00016380–99.
- PLTF00016400–17.