Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane (State Bar No. 286227)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton @wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
**GUPTA WESSLER PLLC**
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

Jennifer Bennett (State Bar No. 296726)
Neil K. Sawhney (State Bar No. 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAMIE POSTPICHAL, *individually*, and URSULA FREITAS, *on behalf of herself and others similarly situated*, <br><br>     *Plaintiffs*, <br><br> v. <br><br><br> CRICKET WIRELESS, LLC, <br><br>     *Defendant*. | Case No. 3:19-cv-07270-WHA <br><br> Hon. William Alsup <br><br> Date:      April 13, 2023 <br> Time:     8:00 a.m. <br> Courtroom:  12, 19th floor |

**OPPOSITION TO DEFENDANT CRICKET WIRELESS, LLC'S**
**MOTION TO EXCLUDE REPORTS AND OPINIONS**
**OF PLAINTIFFS' EXPERTS KEITH MALLINSON AND STEVE BROWNE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 6

    Cricket's Discovery Abuses and Destruction of Documents ......................................... 6

    Steve Browne Determines that Limited Information Precluded Econometric
    Studies .......................................................................................................................... 7

    Keith Mallinson Creates the Benchmark-Driven Methodology ................................. 8

    4G Price Premium Calculation on Plans .................................................................... 11

ARGUMENT ...................................................................................................................... 12

    I.    The Court's reasoning in decertifying the class followed Cricket's misplaced
        reliance on the legal standard applicable to cases requiring economic proof
        of injury, rather than computation of damages; applying the correct legal
        standard for reviewing an expert's calculation of damages, particularly where
        defendant's conduct impeded the calculation, Mallinson's and Browne's
        calculations are more than adequate under *Daubert*. ............................................ 13

    B.    Cricket's other criticisms of Mallinson's methodology are unfounded or go
        only to weight, not admissibility. .......................................................................... 20

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Alaska Rent-A-Car*,
738 F.3d at 970 ................................................................................................... 21

*BCS Servs. v. BG Investments, Inc.*,
728 F.3d 633, 640 ((7th Cir. 2013) .......................................................................... 2

*BE & K Construction Co. v. Will & Grundy Counties Building Trades Council*,
156 F.3d 756, 769–70 (7th Cir.1998)....................................................................... 16

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946) ....................................................................................15, 17, 21

*Brazil v. Dole Packaged Foods, LLC*,
No. 12-CV-01831-LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ................................ 2, 17

*Computer Systems Engineering, Inc. v. Qantel Corp.,*
740 F.2d 59, 67 (1st Cir.1984)............................................................................... 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ............................................................................................ 13

*Dial Corp. v. News Corp.*,
314 F.R.D. 108 (S.D.N.Y. 2015) .............................................................................. 20

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018).................................................................. 2, 17

*Haslund v. Simon Property Group, Inc.*,
378 F.3d 653, 657–59 (7th Cir.2004)....................................................................... 16

*Hilsley v. Ocean Spray Cranberries, Inc.*,
No. 17-CV-2335-GPC (MDD), 2018 WL 6300479 (S.D. Cal. Nov. 29, 2018)..................... 2, 17

*In re Glumetza Antitrust Litigation*,
2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) ............................................................ 13

*In re POM Wonderful LLC*,
2014 WL 1225184 (C.D. Cal. Mar. 25, 2014 ........................................................2, 17, 18, 23

*In re Volkswagen "Clean Diesel" Marketing*,
500 F. Supp. 3d 940 (N.D. Cal. 2020) ................................................................1, 17, 18

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981)......................................................................................... 15, 21

*Mid–America Tablewares, Inc. v. Mogi Trading Co.*,
100 F.3d 1353, 1365 (7th Cir.1996)......................................................................... 16

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
797 F.2d 370, 383 (7th Cir.1986) ............................................................................ 16

*Primiano v. Cook*,
 598 F.3d 558 (9th Cir. 2010) .............................................................................. 13, 14

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
 282 U.S. 555, 562–66, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ........................................ 15

*United States v. Sandoval–Mendoza*,
 472 F.3d 645 (9th Cir. 2006) ...................................................................................... 12

*Werdebaugh v. Blue Diamond Growers*,
 No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014)............................ 2, 17

**Rules**

Fed. R. Evid. 702 .......................................................................................................... 12

**INTRODUCTION**

Plaintiffs bring a RICO claim alleging that Cricket engaged in a scheme to defraud Plaintiffs by aggressively marketing and selling more expensive 4G/LTE ("4G")-capable smartphones and 4G service plans in markets where Cricket had no 4G service and no intention to provide it.  TAC ¶¶ 1-9.  They suffered injury by overpayment, paying for 4G capability in the phones and service plans they bought but did not receive from Cricket.  Id. ¶¶ 315-316.  Although not the measure of damages they seek, Plaintiffs suffered injury by even purchasing their 4G phones and plans from Cricket at all, because if Cricket had been truthful with Plaintiffs that they would never get 4G service from Cricket, Plaintiffs might have gone elsewhere for their purchases. The fact that plaintiffs suffered injury is "common sense" in this case.  The Court, itself, recognized this at the hearing on the decertification motion, when it said:

> "**I'll say it's common sense that there's damages**; but in **calculating the amount of damages**, you need to have something that – a model that controls for variables because – between the benchmark and the 4G phone."

(7/28/2022 Hearing Transcript, Dkt. 457, at p. 11) (emphasis added).

The Court's recognition of the "common sense" nature of the injury here is as significant as it is correct.  Cricket (and the Court, in its decertification order) cites and relies on cases that are very different from this one.  They are all cases with more subtle, complex, or esoteric injury claims, where an economists' "model" is required to prove any injury tied to the claim.  In those cases, Article III injury (the *fact* of injury at all) turns on the sufficiency of an expert's damages model, because the "price premium" *is* the only proof of injury tied to the claim, so rigorous econometric studies are necessary and are scrutinized closely for whether they adequately control for confounding variables.  *See, e.g., In re Volkswagen "Clean Diesel" Marketing, Sales Practices*

*and Products Liability Litigation*, 500 F. Supp. 3d 940 (N.D. Cal. 2020) (finding damages model insufficient to establish Article III injury in fact).[1]

But here, as the Court has recognized, Mallinson's and Browne's damages calculations are needed only to prove the amount of damages.  Plaintiffs agree that expert testimony is needed to prove the amount of the price premium they seek.  But the law permits more latitude in the methodology when computing damages, particularly in a RICO case, and *especially* when a defendant's conduct or its own lack of data or information impedes a more precise quantification. *See, e.g., BCS Servs. v. BG Investments, Inc.*, 728 F.3d 633, 640 ((7th Cir. 2013) ("Once the plaintiff proves [RICO] injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification.")  Here, the lack of adequate data, Cricket's failure to produce more complete historical sales and marketing data from the relevant period, plus the inability to conduct reliable consumer surveys in 2021 about what people remember about how they would have ranked their preferences for different smartphone features under 4G versus 3G network speeds in 2013, plus the interdependence of certain features with network speed, all

---

[1] *See, e.g., Brazil v. Dole Packaged Foods, LLC,* No. 12-CV-01831-LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) (challenging truth of "All Natural" label in 10 packaged fruit products; court decertifies class concluding it cannot produce a price premium based on Dole's labeling claim at issue); *In re POM Wonderful LLC*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014)(challenging truth of health-benefit labeling in pomegranate juice products; court decertifies class rejecting expert methodology where no other methodology or evidence linked price difference between defendant's products and benchmark to Pom's actions); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014)(challenging truth of "All Natural" and "evaporated cane juice" labels in almond milk; court decertifies class rejecting expert price premium methodology for multiple reasons because it fails to provide evidence that can be "determined and attributed to plaintiff's theory of liability"); *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-CV-2335-GPC (MDD), 2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) (challenging truth of "no artificial flavors" label in 12 different juice products; court rejects price premium analysis for not connecting to alleged misrepresentations, finding it similar to the analysis rejected in *In re POM*); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018) (challenging truth of health-benefit labeling in cereals and breakfast bars; court grants class certification in part and denying in part, finding some of plaintiffs' expert methodologies sufficient for class certification and others insufficient).

impeded the quantification and made a hedonic regression impossible, or at least, itself, unreliable. Browne Declaration at ¶¶ 13-19, attached as Exhibit 2.

Again, the Court seemed to recognize the correct legal standard and correct level of scrutiny that should apply here, during the hearing on the motion for decertification:

> THE COURT: But the Supreme Court says you've got to have a damages model that's sufficient.   At least – there are some issues always the jury – you can say.   Okay, the jury will decide that. Yes, I agree with that.   **But it has to be in the ballpark** of – and I'm wondering whether you've done it here.

(7/28/22 Hearing Transcript, Dkt. 457, at p. 10) (emphasis added).

The Court was exactly right.  The damages calculation has to be "in the ballpark," without question.  Rule 702 standards apply.  Mallinson's methodology, and using Browne's calculations based on that methodology, arrived at a 36% price premium on Plaintiffs' 4G phone purchases and a $10 price premium per month on Plaintiffs' plan purchases, (*see* Steve Browne 7/7/2021 Merits Report, Browne Declaration Ex. A, at 9, 13) and Mallinson opined that those were the overcharges caused by Cricket's RICO violations. (Mallinson Merits Report, Dkt. 311-2, at 8.)  His opinion is directly tailored to isolate, as best he could, the harm caused by Cricket's conduct.  He sought to compare, using real-world, "most closely comparable" benchmarks from that time, the prices paid by Plaintiffs against a reasonable approximation of what Plaintiffs would have paid for comparable phones and plans at that time that did not offer 4G capability or service.  (*Id.* ¶¶ 182-190, 201-206.) Mallinson's methodology was sensible, even conservative in several respects, and applied his education, training and experience in the wireless communications industry.

Specifically, as to phones, Mallinson performed a tailored benchmarking analysis designed to try to isolate the prime premium a customer paid for a 4G phone that did not receive 4G service. (*Id.* ¶¶ 182-190.)   To avoid overstating damages, he used <u>only</u> comparison pairings of 4G phones with "benchmark" 3G phones <u>of the same brand</u>, with as comparable features as possible, as in the

"preceding model" or "previous model in the series" where possible.  (*Id.* ¶¶ 183-187.)  For example, he did not include any price comparisons of the Samsung Galaxy S4 (the phone purchased by Ms. Postpichal) to the Samsung Galaxy S2 (a 3G phone also being sold at that time), because he observed that the price difference between those phones was greater than the average difference from other comparison and it was "two models later" and a "flagship smartphone" so its feature differences were greater.  (*Id.* ¶¶ 188-189.)  He only included price comparisons of the Galaxy S3 to the Galaxy S2.  (*Id.* ¶ 184.)  He did not include any price difference comparisons for the Samsung Admire II (the phone purchased by Ms. Freitas) to any benchmark 3G phone because, in his judgment, there was no comparable 3G phone at the time being sold by Samsung. (*Id.* ¶ 189.)  His selections included phones of different pricing tiers as reflected the data collected by Browne, so that he had a broad range of price comparisons.  Then, particularly because two of the six phones in the class of 4G phones sold by Cricket in non-4G areas did not have direct comparable 3G benchmarks (the Galaxy S IV and the Admire II), he consulted with Mr. Browne and concluded that the "conservative and consistent" approach was to calculate the "weighted average" percentage from the four comparisons, (*Id.* ¶ 190), which arrived at a single premium percentage (36%), (Browne Merits Report, at 9).  Such averaging was conservative, in part, because it reduced the percentage and damages on higher priced devices possessing more features differing from their 3G benchmark, accounting in part for those other features.  Lacking actual pricing data from Cricket, he asked for calculations based both on the maximum Cricket prices for each device (supported by testimony from a Cricket witness that they typically sold at the maximum price)  (*Id.* ¶ 191), but also an average price of each device that Browne had compiled using other industry sources, for additional comparisons to be available. (*Id.* ¶ 192.) Browne performed the necessary calculations at Mallinson's direction and then and applied to Plaintiffs and all others like them who purchased 4G

phones from Cricket in non-4G areas during the period of Cricket's RICO violations.  All of this is laid out in Browne's and Mallinson's respective reports.

Specifically, as to plans, Mallinson surveyed the market and found no pure 3G-only benchmarks on sale at that time, but he concluded that a reasonable estimation for a benchmark price, a price Cricket would have been able to charge for a 3G plan, based on considerable analysis, was a plan offered by a different "pre-paid" carrier (like Cricket) in the market at the time" offering only a very small monthly 4G data allowance.  (*Id.* ¶¶ 198-213.)  The benchmark he chose was a plan sold at $40 per month, which offered very a small amount of 4G/LTE service (which is more than Plaintiffs received from Cricket) per month.  (*Id.* ¶¶ 205-206.) He cross-checked and validated that benchmark choice against Cricket internal documents.  pointing to evidence that "Cricket internally discussed the possibility of also introducing a similar a $40 smart phone plan with 500MB of 4G/LTE speed data," but chose to only offer higher priced plans purporting to offer more 4G/LTE data (but not providing it to customers like Plaintiffs in non-4G areas).  (*Id.* ¶¶ 206-207.)  The $10 difference per month between what Plaintiffs paid Cricket for their non-4G plan and what they could have paid at that time for a comparable plan (very little 4G) was the price premium chosen by Mallinson.

Given the challenges of limited data and the inability for Browne to perform any reliable hedonic regression or other econometric studies,[2] Mallinson's methodology was more than reasonable and was definitely "in the ballpark."  If the Court needs any more reassurance, it can simply look at Mallinson's and Browne's reports and the results they reached for both Plaintiffs. Using their methodology and calculations, Ms. Freitas' phone damages, based upon her $269.99 purchase of a 4G Samsung Admire II in October 2013 were determined to be **$97.20** ($269.99 x

---

[2] Cricket's experts also did not perform a hedonic regression or any other econometric study to disprove or discredit the amount of the price premium calculated by Plaintiffs' experts.  While proving damages is not Cricket's burden, one might expect that if Cricket could have performed such a study that was helpful to their position, they might have.

-5-

Opposition to Defendant Cricket Wireless, LLC's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne (Case No. 3:19-cv-07270-WHA)

36%).  Ms. Postpichals' phone damages, based upon her $343.34 purchase of a 4G Samsung

Galaxy 4 phone in November 2013 were determined to be $**123.60** ($343.34 x 36%). (Browne

7/7/2021 Merits Report,  Browne Declarations, Ex. A, at 13.)  Cricket produced documents,

referenced by Mallinson, showing that from consumer surveys performed by Nielsen in May 2012

and again in August 2013, 34% of respondents said they were willing to pay $100 to $200 for a 4G

phone compared to a 3G phone with "identical features."  (Dkt. 311-2 at 49; CRICKET0155083 at

1553152, attached to Declaration of Melody Dickson, Ex. E)  With respect to plans, in addition to

Cricket having considered selling a limited-4G $40 plan during the relevant time (much like the

benchmark plan used by Mallinson for plan damages), also, a J.D. Power survey from August 2013

showed that that "[o]n average, customers with a 4G device spend **$11 more per month** than do

those with a non-4G device."  (CRICKET01562350, attached to Declaration of Melody Dickson,

Ex. F).  Plaintiffs, of course, had a 4G device but only non-4G service from Cricket, and Mallinson

estimated their plan damages at $10 per month.  (Dkt. 311-2 at 213.)

 Mallinson and Browne landed squarely in the ballpark.  In fair territory.  No methodology

is perfect, and perfection and precision are not the standard.  To the extent Cricket raises issues

with Mallinson's methodology or selection of benchmarks, and argues that one factor or another

may have affected the result had it been done differently, those are fair issues for cross examination

and the jury can decide what weight to give his conclusions.

 Cricket's motion to strike the expert reports of Mallinson and Browne should be denied.

### BACKGROUND

### Cricket's Discovery Abuses and Destruction of Documents

 As the Court is well aware, Cricket has been found to have destroyed documents from the

class period, and has resisted discovery and producing documents in this case at every turn,

necessitating an extraordinary amount of discovery-related motion practice before this Court, none

of which has been pleasant for anyone.  It is not necessary to detail that history here, as it is replete

-6-

Opposition to Defendant Cricket Wireless, LLC's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne (Case No. 3:19-cv-07270-WHA)

1
2
3
4
5
6
7
8
9
10
11
12

throughout the docket of this case.  Plaintiffs remind and refer the Court to a still-pending Motion for an Evidentiary Hearing on how Cricket came to discover documents it had testified under oath had been destroyed. Dkt. 192.  Plaintiffs' brief, particularly the first 15 pages, and the exhibits thereto lay out the remarkable history of Cricket's discovery abuses in this case. Dkt. 192-1, at 1-15.  Of particular note and relevance to this motion, Magistrate Judge Tse has already determined that Cricket had "destroyed information and documents from the putative class period."  Dkt. 185 at 8. The purpose of the evidentiary hearing is for Plaintiffs to investigate and possibly prove spoliation. *Id.*  That issue remains pending, but there is clear evidence already in the record that Cricket destroyed documents sought in discovery from the relevant time period.  At a minimum, that finding is relevant to Browne and Mallinson's determination that there was insufficient data available to perform more econometrically designed studies.

13
14
15
16
17
18
19
20
21
22

### Steve Browne Determines that Limited Information Precluded Econometric Studies

Steve Browne is a CPA with a master's degree in economics.  As explained in both his March 4, 2021 report and his July 7, 2021 report, he has "employed a variety of well recognized damages methodologies including the use of an overcharge model, multiple variant linear regression analysis, parametric statistics, and the central limit theorem."  Browne Declaration ¶ 10.  When he submitted his report for purposes of class certification on March 4, 2021, as discovery was ongoing, he understood that discovery was continuing and additional data might be forthcoming, and said that "to the extent I encounter a variable in the overcharge calculation that needs to be isolated and accounted for," he could use well recognized econometric tools to "calculate the economic impact of that variable and incorporate that into my damages computation."  Browne Declaration, ¶12.

23
24
25
26
27
28

Between the time of Browne's March 4, 2021 Report and his July 7, 2021 Report, Browne discussed with Mallinson whether it was possible, based on available records from Cricket and other available information they had gathered from the relevant time period, to perform a hedonic regression with a conjoint analysis. *Id.* ¶13-14.  He discussed that question with Mallinson, and was also concerned about a potential problem with collinearity due to Mallinson's opinion on the interdependence of smartphone features with the network they connect to. *Id.* He also believed it

was not advisable to conduct new consumer surveys in 2021 about customers' preferences regarding products from 2012 to 2014, because of the passage of time and changes in technology. *Id.* ¶ 17. They looked at the documents produced by Cricket from the relevant time period to see if there was sufficient information there about how Cricket independently valued or priced different phone features, or how independent features were factored into Cricket's pricing of phones and plans. *Id.* ¶18. Finding nothing sufficient that would permit reliable econometric studies, he agreed that Mallinson should design a benchmark-based overcharge model because of his industry expertise, and Browne would perform the calculations as directed by Mallinson. His role then became limited to performing calculations on the data sets as described in his Report, and as directed by Mallinson. *Id.* ¶ 19-20.

### Keith Mallinson Creates the Benchmark-Driven Methodology

Mallinson "has been an industry expert in the field of telecommunications for over 25 years," and has long been "recognized as a leader in the industry," particularly with respect to the subject matter of this case—"next generation mobile broadband network technology adoption." Dkt. 216, at 6–7. Cricket's motion does not challenge Mallinson's qualifications as an industry expert.

Mallinson offered several opinions based on his extensive expertise and examination of the record, none of which are directly challenged by Cricket in its motion, including that:

- "4G/LTE was [a] revolutionary" technological development that "unlocked the potential of mobile applications by connecting consumers to the internet at much faster data speeds, allowing them to play videos, stream music, and access all kinds of other content through their smartphones";

- as a result of this technological revolution, "wireless carriers were able to, and did, charge a substantial premium during the class period for 4G-LTE capable smartphones" and "monthly service plans that provided 4G/LTE service, which could be paired with the smartphones to provide the full potential of the major 4G/LTE technological innovation";

- "Cricket's 4G/LTE network on average provided data speeds of as much as eight-times faster than Cricket's 3G network";

- "Cricket had no economically viable plan to ever provide 4G/LTE service in what it internally described as its non-4G markets";

- "Cricket priced its 4G/LTE-capable smartphones and plans for 4G/LTE service the same in all its markets, even though it did not ever provide any 4G/LTE to its non-4G/LTE markets";

- "Cricket priced its 4G/LTE-capable smartphones and plans for 4G/LTE service comparable to other wireless carriers, even though Cricket was not spending the hundreds of millions of dollars necessary to evolve to 4G/LTE or to provide 4G/LTE to customers located in its non-4G/LTE markets";

- "Cricket's conduct during the 4G/LTE evolution deviated from all of its competitors";

- "[Plaintiffs] we overcharged by Cricket for a 4G/LTE smartphone because they paid a premium for 4G/LTE-capability and a plan for 4G/LTE service that was not provided"— and instead "received a hobbled device with a reduced value because it was locked to Legacy Cricket's network and had no ability to obtain the 4G/LTE service needed to provide the value the customer paid for."

Dkt. 311-2, Ex. C ("Mallinson Merits Report"), at 5–8.

Turning to his damages methodology, Mallinson used a most-comparable benchmark methodology for separately evaluating the 4G price premium paid by Plaintiffs in the phone and plan purchases, respectively. Mallinson's methodology for determining a 4G price premium on phones involved several steps. First, Mallinson attempted to identify only the "most comparable" 3G phones, in terms of all features, and only of the same brand, as each of the Cricket 4G/LTE phones sold to customers in Cricket's non-4G areas during the relevant period. (*Id.* ¶¶ 183-187.) Second, Mallinson excluded from any price comparisons to be used in calculation the 4G price premium two, relevant Cricket 4G phones (Samsung Admire 2 and Samsung Galaxy S IV), because, in his opinion and based on his expertise, each of those 4G phones – while sold to Plaintiffs and others in Cricket's

non-4G areas during the relevant time period -- lacked a sufficiently comparable, same-brand, 3G phone on the market at the same time, so using the prices of those phones in computing the 4G price premium would require using an acceptably dissimilar 3G benchmark phone and would be failing to reasonably control for the impact of other features in calculating the price premium. (*Id.* ¶¶ 188-189.) Third, Mallinson directed that all price comparisons between 4G/LTE phones and benchmark 3G phones were to be made based on the best available pricing data (because Cricket did not produce actual sales transaction prices from the period) only from the relevant period, only from the relevant geographic areas (where Cricket sold but did not provide 3G), and used only contemporaneous price comparisons between the 4G phones used for comparison and their respective, comparable 3G benchmark phones. Fourth, <u>instead</u> of using 100% of the price difference between each relevant Cricket 4G phone and its most comparable, same-brand 3G benchmark phone as a "4G price premium" for each of the 4G-compared phones, Mallinson added a further "conservative" step to arrive at a reasonable 4G price premium across all devices: he asked Browne to perform weighted averaging of all contemporaneous price differences across all of the compared device pairs, (*Id.* ¶ 190), which Browne did, resulting in a single, final 4G price premium percentage of 36%, then used for consistent application to each Plaintiffs' Cricket 4G device purchase price to determine the amount of their overpayment. (Browne Merits Report, at 13.) The effect of this averaging step requested by Mallinson lowered the price premium derived from the model compared to the price differences seen with higher priced devices, further accounting for some contribution of other features to their price difference. Fifth, Mallinson cross-checked the final 4G/LTE price premium that resulted from his methodology (36%) against an example available from outside of the Cricket 4G phone data set. He found a real-world, contemporaneous example where two devices were being sold that were <u>identical</u> in all features <u>except</u> the presence and absence of 4G – the iPod Touch (no cellular) and the iPhone 5 (identical to the iPod Touch in all features, including brand, except with 4G) – and observed that based on Browne's contemporaneous price comparisons of those devices, the average price difference between those devices showed that the iPhone 5 (with 4G) was $251 more expensive than the iPod Touch. (Dkt. 472-3 at 54-55.) This provided additional validation to

Mallinson that the 36% price premium calculated for the premium of 4G over 3G appeared reasonable, in comparison to a high-quality, contemporaneous example of another price premium for 4G.

**4G Price Premium Calculation on Plans**

Mallinson's methodology for computing a 4G-related price premium on Plaintiffs' plan purchases followed a similar approach:

First, he decided to limit the time period for any potential plan-related damages attributable to paying for 4G that was not provided to after September 15, 2013. He explained that, while he did not see evidence of this in his review, Cricket alleged that prior to that date, they sold 3G and 4G plans – described as such – at the same time and same price. (Dkt. 311-2 at ¶197.) Without agreeing that Cricket had done so, Mallinson limited his analysis of plan damages to September 15, 2013 purchases and later, because by that time, Cricket admitted it was marketing and selling all of its data plans in all of its markets as 4G/LTE data plans, while only providing 3G service in its non-4G areas. Thus, he removed from consideration any disputes about what Cricket had sold, and how it had represented what it was selling, prior to that start date, to ensure that any plan damages computed from his methodology would be limited to persons with purchases during the time Cricket conceded it did not identify 3G service with any of its data plans.

Second, surveying the market during that time period for the data plans and pricing being offered by Cricket and its competitors, he observed that there were no plans offered by any carrier at the time marketed as providing only 3G service, including by Cricket. Cricket, instead, while only providing 3G service to most of its customers, was marketing and pricing its plans consistently with its competitors as if they were true, 4G plans.

Third, with no pure 3G-only benchmark for comparison, he conservatively looked at the industry pricing in the time period after September 15, 2013, and found that a reasonable way to identify a benchmark as a reasonable estimation for the value of a 3G-only plan at this time was to look at "comparable rate plans" offered by "other pre-paid carriers in the market at the time," and he found plans that provided the best approximation of what Cricket would have needed to offer

customers in non-4G markets had it accurately disclosed that those customers were buying a 3G-only rate plan with no 4G data allowance.  Those plans, offering a very small monthly 4G data allowance, were $40 per month, offering a small amount of 4G/LTE service (up to 1 GB, or, 1 GB more than Plaintiffs received per month).

Fourth, Mallinson cross-checked and bolstered his opinion by pointing to evidence showing that "Cricket internally discussed the possibility of also introducing a similar a $40 smart phone plan with 500MB of 4G/LTE speed data," but chose to only offer higher priced plans purporting to offer more 4G/LTE data, while actually still providing no 4G/LTE data to its many customers in non-4G areas, like Plaintiffs. Mallinson thus concluded that, "[b]ut for Cricket's fraud scheme, in my opinion, Cricket would have been able to charge customers no more than $40 per month for plans that were not going to provide any 4G/LTE service in the customer's home market." *Id.* at 104. Using that $40 plan "as a conservative benchmark," Plaintiffs' plan-related damages were determined to be $10 per month for the value of the 4G service not provided to them by Cricket.

**Steve Browne Performs Damages for Plaintiffs (and the Proposed Class) Based on the 36% Price Premium for Phone Damages and $10 Per Month Plan Damages**

Based on the price premiums determined by Mallinson, Browne performed the calculations to determine the Plaintiffs damages, as well as damages for the proposed Class.  He determined that Ms. Freitas's total damages were $237.20, with $140.00 in plan damages, based on 14 months of a $10 overpayment per month to for Cricket service that provided her no 4G service, and $97.20 in phone damages, based on her $269.99 purchase of a 4G Samsung Admire phone from Cricket, with no 4G service provided to her.  Ms. Postpichal's damages as calculated were $193.60, with $70 in plan damages (seven months at $10 per month), and $123.60 in phone damages based on her purchase of a 4G Samsung Galaxy S IV for $343.34.

## ARGUMENT

In determining the admissibility of expert testimony, the district court assumes the role of "a gatekeeper, not a fact finder." *United States v. Sandoval–Mendoza*, 472 F.3d 645, 654 (9th Cir.

2006). The "court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car*, 738 F.3d at 969–70.  Two questions guide the inquiry. The court must make sure "that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)); *see* Fed. R. Evid. 702. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.

    As this Court has observed, "while the proponent of expert testimony bears the burden of demonstrating its admissibility, the *Daubert* inquiry should be applied with a liberal thrust favoring admission." *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, *2 (N.D. Cal. Aug. 25, 2021) (Alsup, J.). This is in keeping with the court's limited role: "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Primiano*, 598 F.3d at 565.

**I.** **The Court's reasoning in decertifying the class followed Cricket's misplaced reliance on the legal standard applicable to cases requiring economic proof of injury, rather than computation of damages; applying the correct legal standard for reviewing an expert's calculation of damages, particularly where defendant's conduct impeded the calculation, Mallinson's and Browne's calculations are more than adequate under *Daubert*.**

    Cricket's first argument relies on the arguments it made in its decertification motion, which the Court, initially, has accepted.  The argument is that Mallinson's methodology and Browne's calculations were deficient in accounting for the potential impact of other phone and plan features that may also have contributed to price, such as faster processers, improved and larger screens,

longer-lasting batteries, more sophisticated operating systems, and better cameras for the phones, and international texting, greater data allowances, hotspot capabilities, and free access to the Muve Music service for the service plans.  Motion, Dkt. 469, at 10.

The Court stated, correctly, in its decertification order that Plaintiffs' counsel had stated at class certification that their experts "could" provide an econometric study to isolate the value of 4G/LTE, like those often found in price premium cases.  Order, Dkt. 455, at 5 ("At class certification, plaintiff stated '[its] expert [could] use econometric tools to isolate the value of 4G/LTE' (Dkt. No. 225 at 8).  At that point, discovery was continuing, and it was certainly the hope of Plaintiffs' counsel and their experts that such a study might be possible if sufficient data became available, but due in no small part to Cricket's discovery abuses and its destruction of documents from the relevant period, it did not.  Plaintiffs' experts could not perform such a study with any confidence or reliability because they lacked sufficient data.  Browne Declaration, ¶¶ 13-20.  Much of that blame lies with Cricket and its approach to its retention of documents, even after litigation holds are in place, and its approach to discovery in this case.

Perhaps Cricket had more robust consumer survey evidence in its files from 2012 to 2014, with rankings of preferences for different features in a 4G environment verses a 3G environment, from which a regression could have been attempted to more precisely isolate the value of 4G/LTE. We will never know.  But the Court, based on following Cricket's misplaced legal arguments drawn from litany of price premium cases where such studies are required to show injury, felt that the lack of an econometric study to isolate the value of 4G/LTE was a fatal deficiency and a mistake by Plaintiffs' counsel.  Order, Dkt. 455, at 8 ("There are several methods of damages analysis that one can employ to control for confounding variables . . . Plaintiff has not employed any of them.")

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, the lack of an econometric study is not fatal, even though one would have been provided if the data had permitted.  In a RICO case, the standard of causation "requires merely a probability of harm attributable to the defendant's wrongful act."  *BCS Servs. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011).  If a trier of fact finds causation using that standard, the only remaining issue is the amount of damages to be awarded to the plaintiff.  *Id.*  On that phase of the case the plaintiff has a more relaxed burden of proof than on the issue of causation, especially where the defendant's conduct has made it difficult for the plaintiff to prove the precise extent of his damages." *Id.* (citing *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566–67, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–66, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Haslund v. Simon Property Group, Inc.,* 378 F.3d 653, 657–59 (7th Cir.2004); *BE & K Construction Co. v. Will & Grundy Counties Building Trades Council,* 156 F.3d 756, 769–70 (7th Cir.1998); *Computer Systems Engineering, Inc. v. Qantel Corp.,* 740 F.2d 59, 67 (1st Cir.1984).)

"Once the plaintiff proves [RICO] injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification." *BCS Servs. v. BG Investments, Inc.*, 728 F.3d 633, 640 ((7th Cir. 2013).  Even "speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1365 (7th Cir.1996), quoting *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 383 (7th Cir.1986). Otherwise "the more grievous the wrong done, the less likelihood there would be of a recovery." *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. at 265, 66 S.Ct. 574.

These are the legal standards applicable in this case.  And under these standards, Mallinson's methodology and calculations are plainly sufficient.  The Court has been correct about

-15-

1    every single thing it has said about this case: the injury is one of "common sense," and the issue on

2    damages is whether the plaintiffs' calculations are "in the ballpark."  The Court's only glitch was

3    in accepting Cricket's invitation to apply the wrong legal standard in deciding the decertification

4    motion, which arises from very different kinds of cases.  This case is not like a food-mislabeling

5    case,[3] as are so many of the cites cited by Cricket are, or a "low emissions" auto case brought by

6    people who bought and sold their cars without ever knowing of a mislabeling claim,[4] or any other

7    type of price premium case with a highly complex or esoteric theory of injury.

8

9             As an example of Cricket's misleading arguments on the legal standard, Cricket suggests

10   that *POM Wonderful* presents "nearly identical circumstances" to this case.  Motion, Dkt. 469, at

11   10.  But that case is not even remotely comparable.  In *POM Wonderful,* the court initially certified

12   a nationwide class action of all persons who purchased a Pom Wonderful 100% juice product

13   between October 2005 and September 2010.  2014 WL 1225184, at *1.  The plaintiffs claimed that

14   POM made false and misleading advertising claims about health benefits from consuming Pom

15   Wonderful, and falsely said millions of dollars of research backed up those claims.  *Id.*  After

16   reviewing the plaintiffs' economists' report and methodology, it decertified the class.  *Id.*  The

17   court observed, for starters, that "realistically the class includes ten to fifteen million purchasers,"

18   who "paid only a few dollars per bottle, and likely made their purchases for a variety of reasons,"

19   and that "[n]o bottle, label, or package included any of the alleged misrepresentations."  *Id.* at *6.

20

21

22   _____

23   [3] *See, e.g., Brazil v. Dole Packaged Foods, LLC,* No. 12-CV-01831-LHK, 2014 WL 5794873
     (N.D. Cal. Nov. 6, 2014) (challenging truth of "All Natural" label in 10 packaged fruit products);
24   *In re POM Wonderful LLC,* 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014)(challenging truth of
     health-benefit labeling in pomegranate juice products); *Werdebaugh v. Blue Diamond Growers*,
25   No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014)(challenging truth of "All
     Natural" and "evaporated cane juice" labels in almond milk) *Hilsley v. Ocean Spray Cranberries,
26   Inc.*, No. 17-CV-2335-GPC (MDD), 2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) (challenging
     truth of "no artificial flavors" label in 12 different juice products; *Hadley v. Kellogg Sales Co.*, 324
27   F. Supp. 3d 1084 (N.D. Cal. 2018) (challenging truth of health-benefit labeling in cereals and
     breakfast bars).
28   [4] *See, e.g., In re Volkswagen "Clean Diesel" Marketing,* 500 F. Supp. 3d 940 (N.D. Cal. 2020)

Addressing the damages methodology, the Court noted that plaintiffs' expert's price premium model "made no attempt, let alone an attempt based on a sound methodology, to explain how Defendants' misrepresentations caused any amount of damages." *Id.* at *5. Literally comparing apples to oranges to pomegranates, it simply determined a price difference between Pom Wonderful pomegranate juice, and "an average of refrigerated orange, grape, apple, and grapefruit juice prices as a benchmark," *id.,* and attributed all of that difference to the effect of the alleged misrepresentations. This, the Court understandably concluded, provided no evidence tying that price difference to the alleged misrepresentations. The Court also noted, however, that "[t]he methodology required to explain consumer behavior will vary, of course, with the nature of the relevant product and circumstances of sales." *Id.* at *5, n.6.

Another case relied on by Cricket, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation,* is an example of a case where the theory of injury is so complex and esoteric, the existence of such an injury could only ever be shown through a rigorous econometric study. In *Clean Diesel,* plaintiffs were a putative class of automobile consumers who bought or leased cars without receiving the "low emissions" feature for which they paid, but only those who then unwittingly sold or returned those cars without "giving" (or disclosing) that feature for which they were compensated. 500 F. Supp. at 942. The Court found that, among many other problems, the plaintiffs' expert damages model failed because it assumed without any basis that all features of a vehicle depreciate at the same rate as the overall vehicle, including the depreciation of a false "low emissions" feature. *Id.* at 950-51. Granting the motion to exclude, the Court concluded that "[w]ithout any injury Plaintiffs lack standing, which means the Court lacks jurisdiction and must dismiss this case" for lack of jurisdiction. *Id.* at 943, 952.

But again, this case is different because the only issue is computation of damages, where broader latitude is permitted, and Cricket made matters worse by impeding the computation with

1    its discovery abuses.  But this is correctable, starting with reviewing Mallinson's and Browne's

2    approach under the correct *Daubert* standard and whether they are, in fact, "in the ballpark."

3           And they definitely are in the ballpark, especially given the options.  Mallinson tried to

4    account for other features as best he could without a conjoint analysis and hedonic regression

5    study.  He chose only the most comparable, 3G same-brand phones, one generation apart, from the

6    4G phones sold by Cricket, eliminating two from his sample because they had no prior generation

7    3G phone of the same brand and he deemed their differences to be too much for comparison.  He

8    averaged all price differences, reducing the resulting percentage on the higher-priced, higher-

9    difference comparisons, with comparatively more differences.  And, he applied his professional

10   judgment in concluding that the other features in the 4G phones that were better and different from

11   their 3G counterparts were of less value when the phone was only able to be used on a 3G network,

12   as was only provided to Plaintiffs.  His analysis was similar for plans.  He found the most

13   comparable benchmark plan he could find on the market at the time to the "actual" value that

14   Plaintiffs received from Cricket, and he found that in a different carrier's very limited 4G data

15   allowance plan.  The price of that plan passed other cross-checks as a benchmark.  There was no

16   way, through econometric studies, to attempt to isolate or "account" in any quantitative way for

17   any value for other plan differences, such as international texting.  He noted that even Cricket did

18   not charge separately for Muve music, though it once had, and noted that Spotify, by this time, was

19   so dominant in streaming music that Muve was not that valuable independently anyway, but how

20   was he to quantify any of those potential differences?  He chose a reasonable, real-world

21   benchmark that was definitely in the ballpark.

22          "[A] benchmark need not be perfectly comparable, so long as it allows the jury to calculate

23   a reasonable estimate of damages," and that "is particularly true where a Defendant's [unlawful]

24   conduct has rendered selection of a perfectly comparable benchmark difficult or impossible."

1   *AngioDynamics*, 2021 WL 1792394, at *47 (quotation marks omitted).; *see also, e.g.*, *Dial Corp. v.*

2   *News Corp.*, 314 F.R.D. 108, 118–19 (S.D.N.Y. 2015) (explaining that arguments about a

3   benchmark's comparability go to the weight given to an expert's testimony, not its admissibility,

4   particularly when the defendant's unlawful conduct made "the selection of perfectly comparable

5   benchmark[s]. . . impossible").

6

7        Cricket did not perform its own econometric study to prove it could be done, nor to

8   disprove Mallinson's results, and it has not suggested, specifically, ways that Mallinson using the

9   data available from the real world could have necessarily better accounted for the differences

10  between his comparison phones than he did.  They only argue that he did not account for thos

11  differences, but that is not accurate.  He simply did not do and was unable to do the kind of study

12  they are talking about, largely because of Cricket.

13

14       Indeed, as this Court has noted, "[t]he Supreme Court has repeatedly explained that courts

15  should afford plaintiffs relatively broad leeway in constructing a damages model," because "'[t]he

16  vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have

17  been in the absence of the defendant's [illegality].'" *In re Glumetza Antitrust Litig.*, 336 F.R.D. at

18  479 (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981), and citing

19  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)); *see also BCS Servs.*, 728 F.3d at 640

20  ("[B]road latitude is allowed in quantifying damages, especially when the defendant's own conduct

21  impedes quantification."). "Because the "element of speculation" is "unavoidable" in a case like this,

22  "[e]ven speculation has its place in estimating damages, and doubts should be resolved against the

23  wrongdoer"—not the victims. *BCS Servs.*, 728 F.3d at 640 (quotation marks omitted).

24

25       Perfection is not the test.  Mallinson's approach was reasonable, and the results it yielded

26  check out with other evidence of 4G's value to consumers at that time period.  It was in the

27  "ballpark," certainly not nonsense, and the Cricket can make its criticisms of the model and the

28

jury can weigh those.  Cricket's first argument that the Court should grant their *Daubert* motion for the reasons it granted decertification should be rejected.

### B. Cricket's other criticisms of Mallinson's methodology are unfounded or go only to weight, not admissibility.

Cricket's offers several additional critiques of Mallinson's methodology.  None have merit, or at most, they only "go to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car*, 738 F.3d at 970.

First, Cricket complains with the methodology as applied to Plaintiffs because Mallinson was unable to identify any sufficiently comparable 3G phones to the two phones purchased by Plaintiffs, the Samsung Admire II purchased by Ms. Freitas, and the Samsung Galaxy S IV purchased by Ms. Postpichal.  However, this judgment by Mallinson in selecting appropriate benchmarks for a price premium study demonstrates his reasonableness and supports the study rather than discrediting it.  Mallinson avoided including these two phones, in particular, into his model because they did not have sufficiently comparable, same-brand, 3G counterparts on the market.  This supports his study more than discredits it.  He preserved control for brand and other features as much as possible using real-world comparisons by only comparing prices of same-brand, "most comparable" smartphones, and then determining a price premium percentage through a weighted average of the price differences of all phones that met his standard for comparability.

Second, Cricket complains that Mallinson and Browne do not adequately explain their use of an average price premium percentage as opposed to an average dollar price premium for 4G-connectivity, nor their use of a weighted rather than unweighted average.  Cricket does not argue that either decision was unreasonable, their complaint is that those choices were not explained.  These critiques go to weight, not admissibility.  The use of an average price premium percentage as opposed to a dollar-price premium allowed Mallinson to account for other variables in two ways: he only selected the most closely comparable phones for comparison, rather than forcing a

comparison with a phone lacking a sufficiently comparable 3G same-brand counterpart, and his

weighted average reduced the premium applicable on the most expensive, more-featured devices.

Third, Cricket criticizes the methodology for computing Ms. Freitas' plan damages because

it failed to account for an autopay discount and government assistance credit she received.  It says

the model ignores those discounts and that her damages would have been negated if those were

considered.  But there is no evidence or suggestion by Cricket that Ms. Freitas would not have

received those same discounts if she had been sold her at a lower-cost 3G data plan if Cricket had

been honest with her about what she was getting.

Fourth, Cricket argues that Plaintiffs' damages calculations fail to consider a variety of

mitigation efforts Plaintiffs could have taken, such as ending their month-to-month service early

out of disappointment.  Mallinson has noted, however, that Cricket locked the Plaintiffs' phones to

its network.  Cricket also provides no authority suggesting that a victim of a RICO fraud scheme is

under a duty to mitigate while the fraud is ongoing.

Fifth, Cricket suggests that Plaintiffs rely on a "fraud on the market" theory for their theory

of harm, and that such a theory requires an efficient market, on which Mallinson has not opined

concerning the wireless telecommunications market.  This is a red herring, as Plaintiffs allege a

direct RICO fraud scheme by Cricket against Plaintiffs and others like them who bought phones

and plans in Cricket's non-4G areas.  Cricket's citation of *POM Wonderful*, 2014 WL 1225184 to

support this argument is unhelpful as that was not a RICO case and is readily distinguishable for

reasons already discussed.  This criticism fails.

Sixth, Cricket argues that Mallinson's selection of a $40 benchmark service plan from

another carrier is improper because he should have relied on Cricket's pricing of its own service

plans prior to September 2013, when it priced 3G plans and 4G plans at the same amount of $50

per month.  As Mallinson's report explained, he did consider that fact in selecting only the period

starting September 2013 for his analysis of plan-related damages.  But not for the reason Cricket

suggests.  It is not because Cricket's pricing before September 2013, or after, provided the best

evidence of the true value of its offerings.  Cricket was engaging in a fraud scheme telling

everyone it had "4G in non-4G" areas.  It is because after September 2013, the consequence of that

fraud was clear to everyone who purchased a Cricket plan in a non-4G area and was offered no 3G

plan to buy, despite 3G being the only service they would get.  Cricket's criticism that Mallinson

should have considered its own pricing as the best benchmark is incredulous, but, at most, an issue

of weight to be given to his benchmark selection on plans and does not go to admissibility.

## II.      There is no independent basis to conclude that Mr. Browne's report and calculations are inadmissible under Rule 702; they rise or fall with Mallinson.

Finally, Cricket has also moved to exclude the entire expert report of Steve Browne.  Mr.

Browne performed calculations at Mr. Mallinson's direction to compute the damages of the named

plaintiffs and the class.  However, Cricket does not make any direct challenge to any of Mr.

Browne's opinions or his work.  Indeed, Cricket does not assert that Mr. Browne's damages

calculations are wrong in any way.  In fact, Cricket acknowledges that "Browne's expert report

was largely *ministerial*."  That is largely correct in how damages were ultimately calculated.

Browne accepted as true all of Mallinson's conclusions and then calculated damages, both

classwide and for the two individual Plaintiffs, based on Mallinson's conclusions.  Cricket has

apparently moved to strike both expert reports, instead of only Mr. Mallinson's report, because Mr.

Browne's work is dependent upon inputs from Mr. Mallinson and Mr. Browne's calculations are

based on direction from Mr. Mallinson, plaintiffs' industry expert.

Plaintiffs agree that if Mr. Mallinson's conclusions are not able to be presented at trial, then

Mr. Browne would have no foundation or ability to calculate the damages.  Plaintiffs agree that Mr.

Browne's damages calculations are based entirely on Mr. Mallinson's direction, analysis and

conclusions, and thus Mr. Browne would not be able to offer testimony at trial without relying on

-22-

Mr. Mallinson's conclusions. But that is not a basis to conclude that Mr. Browne's work is unreliable or that it does not meet the requirements of Rule 702.  It does, and Cricket doesn't assert otherwise.  Thus, the Court should not exclude Mr. Browne's report under Rule 702.  At most, if the Court were to strike Mallinson's opinions, which it should not, then it should simply conclude that without Mr. Mallinson's opinions, plaintiffs have no ability to call Mr. Browne at trial to calculate damages.

Opposition to Defendant Cricket Wireless, LLC's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne (Case No. 3:19-cv-07270-WHA)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Cricket's motion to exclude the plaintiffs' expert reports should be denied.

Dated: March 13, 2023

/s/ Tyler W. Hudson
Tyler W. Hudson

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*
*jon@guptawessler.com*

**GUPTA WESSLER PLLC**
Jennifer Bennett, SBN 296726
Neil K. Sawhney, SBN 300130
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*
*neil@guptawessler.com*

*Attorneys for Plaintiffs*

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane, SBN 286227
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
*thudson@wcllp.com*
*ebarton @wcllp.com*
*mdickson@wcllp.com*
*abrane@wcllp.com*

Opposition to Defendant Cricket Wireless, LLC's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne (Case No. 3:19-cv-07270-WHA)