Tyler W. Hudson (*pro hac vice*)
Eric D. Barton (*pro hac vice*)
Melody R. Dickson (*pro hac vice*)
Austin Brane (State Bar No. 286227)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
thudson@wcllp.com
ebarton@wcllp.com
mdickson@wcllp.com
abrane@wcllp.com

Matthew W.H. Wessler (*pro hac vice*)
Jonathan E. Taylor (*pro hac vice*)
**GUPTA WESSLER PLLC**
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
matt@guptawessler.com
jon@guptawessler.com

Jennifer Bennett (State Bar No. 296726)
Neil K. Sawhney (State Bar No. 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
jennifer@guptawessler.com
neil@guptawessler.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMIE POSTPICHAL and URSULA FREITAS, *on behalf of themselves and others similarly situated,*<br><br>    *Plaintiffs,*<br>v.<br><br>CRICKET WIRELESS, LLC,<br><br>    *Defendant.* | Case No. 3:19-cv-07270-WHA<br><br>Hon. William H. Alsup<br><br>**DECLARATION OF STEVE BROWNE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE REPORTS AND OPINIONS OF PLAINTIFFS' EXPERTS** |

I, Steve Browne, respectfully submit this declaration and declare as follows:

1. I am a partner in Meara Welch Browne, P.C.; I make this declaration based on my personal knowledge.

2. If called upon to testify, I could and would testify competently to the truth of the matters stated herein.

3. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Exclude Reports and Opinions of Plaintiffs' Experts Keith Mallinson and Steve Browne.

4. A true and correct copy of my July 7, 2021 Report is attached hereto as Exhibit A. The version submitted by Defendant at Dkt. 470-2 omits 15 pages of my report.

5. I have been asked by Plaintiffs' counsel to provide comment in response to one of the Court's statements in its Order Re Defendant's Motion to Decertify and Plaintiff's Motion to Amend Class Definition, dated July 29, 2022.

6. On page 5, the Court states: "At class certification, plaintiff stated '[its] expert [could] use econometric tools to isolate the value of 4G/LTE'" (Dkt. No. 225 at 8.)

7. On page 8, the Court states: "There are several methods of damages analysis that one can employ to control for confounding variables. [citations omitted] Plaintiff has not employed any of them."

8. I have been asked to provide additional information to the Court in response to those statements.

9. I was retained by the law firms representing the Plaintiffs in this matter, who, I understood, were suing in their individual capacities as well as on behalf of a proposed class of similar purchasers.

10. As explained in my both my March 4, 2021 and July 7, 2021 Reports, in prior engagements involving analysis of damages incurred by Plaintiffs related to alleged fraud, "I have

employed a variety of well recognized damages methodologies in these cases including the use of an overcharge model, multiple variant linear regression analysis, parametric statistics, and the central limit theorem."

11. Various econometric tools were considered in this case.

12. In my March 4, 2021 Report in support of Plaintiffs' motion, when I understood that discovery was continuing and additional data might be forthcoming, I said the following: "Finally, to the extent that I encounter a variable in the overcharge calculation that needs to be isolated and accounted for, I have utilized additional well recognized econometric tools, such as multiple variable linear regression analysis, that examine other data sources, to further and independently examine the evidence in other data sets to calculate the economic impact of that variable and incorporate that into my damages computation described above." (Browne Report, March 4, 2021, p. 18.)

13. Between the time of my March 4, 2021 Report and my July 7, 2021 Report, I discussed with Keith Mallinson the question of whether it was possible using all of the data available to us to perform a hedonic regression utilizing conjoint analysis as one method for attempting to isolate and account for variables in this case.

14. In my judgment, we lacked sufficient information and data to adequately perform a reliable hedonic regression utilizing conjoint analysis in this case.

15. We looked for sufficient contemporaneous consumer questionnaires designed to rank the importance of various cellphone features. We found some limited questionnaires addressing different cellphone features, but without questions directed at ranking them, for example. We tried looking for such information from third parties, such as Nielsen, but we were not able to find consumer questionnaires that we believed would permit a reliable hedonic regression analysis.

16. We also would have had to consider Mr. Mallinson's opinion that the experience of using many features of a cellphone are interrelated with the data speed available in using it, so there

could be a problem of collinearity in designing an adequate hedonic regression analysis, depending again on the quality of information available from consumer questionnaires, for example. We did not have sufficient information contemporaneous to the time period, in any case. I previously also testified in my August 17, 2021 deposition regarding these data and collinearity issues impacting the ability to use regression in similar cases (pages 75:4-77:23 & 79:23-84:15).

17. We also believed that it was not advisable to attempt to conduct new consumer surveys in 2021 of preferences on products from 2012 to 2014. Particularly, based on our discussion with Mr. Mallinson, due to evolving technology on all of the features in question, including data speeds, we believed that new surveys of consumers asking them to try to recall or rank the importance of features to them on different products and different technology from seven to nine years earlier would not have been advisable in this instance.

18. We also looked for evidence in Cricket's document productions of how Cricket, itself, may have independently valued or priced different phone features, or how independent features were factored into Cricket's own pricing of cell phones or plans. Again, we did not find information in the Cricket documents to allow us to perform the kind of econometric studies we have performed in other cases.

19. Lacking that information, we agreed that Mr. Mallinson, because of his expertise in the industry, should design the benchmark-based overcharge model, using price averaging of benchmarks, that was used in this case. Our role then became limited to performing the calculations on the data sets as directed by Mr. Mallinson, which we did in this case as reflected in my Report of July 7, 2021.

20. I did not explain in my Report of July 7, 2021 all of the reasons that we did not do different econometric studies in this case. I believed my Report was to explain what we actually did do in this case, rather than what we did not do. We relied on Mr. Mallinson's methodology and performed the calculations as described in my July 7, 2021 Report.

21. I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of March, 2023, in Prairie Village, Kansas.

_____
Steve Browne