# Exhibit C

**REBUTTAL EXPERT REPORT**

**OF**

**KEITH MALLINSON**


**JULY 28, 2021**

**Table of Contents**

I.    Introduction ........................................................................................................... 1

II.   Responses to Cricket's Experts' Criticisms and Opinions ...................................... 5

   A.   All of Cricket's Experts Ignore the Evidence Showing that Cricket Never Provided
        4G/LTE Service in Cricket's "Non-4G" Markets, and Instead of Providing Available
        Sprint 4G/LTE Service to the Class Members, Cricket Secretly Programmed Their Phones
        to Stay on Cricket's 3G Network to Avoid Hundreds of Millions of Dollars in Roaming
        Payments ........................................................................................................... 5

   B.   Cricket's Experts Speculate that Class Members Did Not Expect 4G/LTE Service Despite
        Paying for Both a 4G/LTE Smartphone and a 4G/LTE Service Plan ............................... 11

   C.   Cricket's Experts Speculate that Cricket May Have Unlocked Smartphones or Offered
        Incentives from New Cricket But None of Cricket's Experts Provides Any Evidence that
        Class Members Obtained These Purported Benefits ......................................................... 15

   D.   Cricket's Experts Are Wrong that Wi-Fi Has Any Relevance to Whether Class Members
        Were Damaged by the Lack of 4G/LTE Service. ............................................................. 17

   E.   Crickets' Experts Speculate that Cricket's Refund Policy Could Negate Cricket's Alleged
        Scheme to Defraud ........................................................................................................ 26

   F.   Auto Bill Pay is Irrelevant to My Opinions .................................................................... 26

   G.   Cricket's Experts Have Provided No Evidence Muve Music and other Bundled Features
        Had Any Independent Economic Value During the Class Period. ...................................... 28

   H.   Professor McCrary's Assertion that Certain Class Members Are Uninjured is Wrong .... 29

   I.   Cricket's Experts' Criticisms of My Damages Methodology On Smartphones Are
        Baseless Because the 3G Smartphone Benchmarks Are Appropriate and Provide a
        Reliable Estimate of the Damages Suffered .................................................................... 32

   J.   Cricket's Experts' Criticisms of My Overcharge Damages on the Service Plans Are
        Baseless Because the $40 Plan Benchmark is Appropriate and Provides a Conservative
        Estimate of the Damages Suffered .................................................................................. 34

III.  Conclusion ............................................................................................................. 35

I.    **Introduction**

1.      On July 21, 2021, the Defendant Cricket Wireless, LLC served three expert reports on the Plaintiffs that respond to and address points made in my merits expert report ("Opening Merits Report") served on July 7, 2021.[1]  Cricket's expert Jon Wilkins also incorporated his prior expert report submitted in opposition to Plaintiffs' motion for class certification.  Wilkins Merits Report at ¶ 5.  This report addresses and rebuts the points raised in these reports and confirms the validity of my opinions to date in this case.  I have attached as Appendix A an updated Reliance List.

2.      As explained in my Opening Merits Report, Plaintiffs' theory of the case is that Cricket engaged in a fraudulent scheme to promote and sell 4G/LTE smartphones and 4G/LTE plans for service in what Cricket internally called its "non-4G markets" where Cricket never provided 4G/LTE service.[2] In my prior report, I explained that I see no evidence that Cricket ever had a viable plan or intention to provide 4G/LTE in those markets despite collecting payments for 4G/LTE service from customers for nearly 3 years, and I explained why all class members were harmed by the alleged scheme by being overcharged for both a 4G/LTE smartphone and 4G/LTE service plan.[3]  I worked in coordination with Plaintiffs' expert Steve Browne to develop and apply a methodology to calculate the damages.  Mr. Browne then calculated the aggregate class damages.[4]

---

[1]  I also submitted an expert report ("Class Certification Report") in support of Plaintiffs' motion for class certification on March 4, 2021.  It is my understanding that report was submitted to assist the Court in determining whether to certify a class in this matter.  Although the Court has not yet ruled on that motion, I am continuing to assume that a class will be certified and analyzing the evidence from the standpoint of a class trial.
[2] Mallinson Opening Merits Report at ¶ 9.
[3]*Id.*, at ¶ 14.
[4] *Id.*, at ¶ 15.

3.      Cricket's expert reports are most notable for what they do not dispute.

- None of Cricket's three experts have identified any evidence that Cricket ever offered any 4G/LTE service to any class members' home markets from November 2012 until the Legacy Cricket network was shut down over time in March through September 2015.

- None of Cricket's experts dispute that Cricket sold 4G/LTE smartphones and plans for 4G/LTE service from November 2012 to September 2014.

- None of Cricket's experts dispute my assertion that Cricket was selling 4G/LTE smartphones and plans for service that included 4G/LTE and were priced on par with the other major wireless carriers.

- None of Cricket's experts challenge my methodology for identifying the members of the class using Cricket's records.  Notably, Cricket's experts do not dispute that every member of the class purchased both a 4G/LTE Android smartphone and paid for 4G/LTE service during the class period.

4.      Thus, it appears to be undisputed that every member of the class paid for both 4G/LTE smartphone functionality and 4G/LTE service but did not receive these in their home markets.

5.      Cricket's expert reports are notable for other concessions too.

- Cricket's experts do not refute that 4G/LTE data speeds are much faster than 3G data speeds.

- None of Cricket's experts have provided any evidence to challenge my assertion that Cricket's 4G/LTE network provided eight times faster data speeds than Cricket's 3G network.

- None of Cricket's experts have any evidence that Cricket ever expanded its 4G/LTE network coverage beyond 21 million CPOPs, which was the 4G/LTE coverage that existed at the end of 2012.

- None of Cricket's experts have any evidence that Cricket bought any 4G/LTE service from another carrier under a roaming agreement for any class members.

- None of Cricket's experts have provided any evidence that Cricket had the ability to obtain 4G/LTE service from another carrier other than Sprint under an executed roaming agreement between November 2012 and the end of the class period.

- None of Cricket's experts dispute that Cricket promoted and sold 4G/LTE service in all markets at the same price, but then provided 4G/LTE service only to customers in its 4G/LTE markets.  In other words, for nearly 3 years, Cricket collected monthly payments of $50, $60 or $70 for 4G/LTE service from customers in what Cricket called its "non-4G" markets.

- None of Cricket's experts dispute that Cricket's customers overwhelmingly used their smartphones exclusively in their respective home markets.

- None of Cricket's experts refute the notion that all the other major carriers were collectively spending billions of dollars to upgrade from 3G to 4G/LTE service.

- None of Cricket's experts dispute that Cricket 4G/LTE Android smartphones were sold at a premium to comparable 3G Android smartphones.

- None of Cricket's experts dispute that Cricket sold its Android smartphones locked to Cricket's network at the point of sale.

- None of Cricket's experts have identified a single class member that was able to unlock a Cricket Android smartphone and use it on another carrier's network.

- None of Cricket's experts have identified any class member that was given a discount on a smartphone that operated on New Cricket's 4G/LTE network.

- None of Cricket's experts directly address my core damages methodology or any of the evidence that Mr. Browne and I relied on to develop and apply that methodology.

6.      Rather than address any of these core facts and opinions that lie at the heart of my Opening Merits Report, Cricket's experts make a series of arguments aimed at challenging the notion that Cricket engaged in any wrongdoing by failing to provide 4G/LTE service to customers in their home market and challenging whether Class Members were harmed by the lack of 4G/LTE.  Cricket's experts also accuse me of failing to account for other factors such as enhancements to 4G/LTE smartphones like larger screen size, or Cricket service plan features like auto bill pay and Muve Music.

7.      For the reasons explained below, none of the facts or opinions raised in these reports materially affect any of my initial opinions.  In fact, the lack of new evidence or analysis

provided by any of these experts confirms to me that my initial work was complete and accurate, that I was able to identify all the relevant information, and that I did not unintentionally fail to address any of the key evidence.  I conclude that new evidence put forth by Cricket's experts is irrelevant to my opinions (for example, a discount for using auto bill pay), or I have confirmed that I accounted for the information in my opinions (for example, Muve Music and 4G/LTE smartphone features like larger screen size).

8.      Further, I find that Cricket's experts have ignored critically important information or failed to directly address Plaintiffs' theory of the case that has been accepted by the Court in its recent order denying Cricket's motion to dismiss.  Cricket's experts appear to ignore the obvious:  Cricket's customers bought a 4G/LTE smartphone and paid for a plan that was specifically coded by Cricket as a plan to provide 4G/LTE service; Cricket's 4G/LTE data speeds were eight times faster than Cricket's 3G data speeds; Cricket priced its Android smartphones and 4G/LTE service plans the same in all markets.  So, Cricket's customers with a home market in Cricket's non-4G/LTE coverage areas paid the same price as customers with a home market in Cricket's 4G/LTE coverage areas, but the former received no high-speed 4G/LTE data service.

9.      The only significant dispute should be the extent of the damages.  And, of course, the jury will only consider my damages opinions if it accepts Plaintiffs' theory that Cricket engaged in a scheme to defraud Cricket's customers in violation of RICO, and Cricket's actions have caused Plaintiffs to suffer economic injury by being overcharged.

10.      On the smartphone overcharge damages analysis, Cricket's experts ignore that 4G/LTE data speeds unlock the full potential of 4G/LTE capable smartphones, and 36% of the

smartphone price is a conservative estimate of the value paid for but not received without 4G/LTE service.

11.      On the service plan damages, Cricket's experts ignore Cricket's internal communications demonstrating that Cricket knew $40 service plans with a 500MB monthly data allowance at 4G/LTE speeds existed in the market, but Cricket did not offer such a plan because it would erode Cricket's revenues.[5]  Cricket's customers in the class received no 4G/LTE data allocation in their home market, despite paying for 4G/LTE service.  My damages calculations are thus highly conservative in this situation.

12.      Cricket's experts have come forward with no competing damages methodology or analysis to offer the jury a competing aggregate damages figure.

13.      I will now directly address by topic the issues raised in Cricket's Expert Reports.

II.    **Responses to Cricket's Experts' Criticisms and Opinions**

A.  **All of Cricket's Experts Ignore the Evidence Showing that Cricket Never Provided 4G/LTE Service in Cricket's "Non-4G" Markets, and Instead of Providing Available Sprint 4G/LTE Service to the Class Members, Cricket Secretly Programmed Their Phones to Stay on Cricket's 3G Network to Avoid Hundreds of Millions of Dollars in Roaming Payments**

14.      Mr. Wilkins' Merits Report incorporates his prior opinion in his Class Certification Report that Cricket pursued a reasonable and credible build-and-buy strategy to expand its 4G/LTE network.[6]  His report accuses my opening merits report of being unresponsive to his class certification report.[7]  I strongly disagree.

15.      My Opening Merits Report directly addressed Cricket's internal communications and demonstrated that Cricket had no strategy to ever provide 4G/LTE service in Cricket's non-

---

[5] Mallinson Opening Merits Report at ¶ 206-07.
[6] Wilkins Merits Report at ¶ 3.
[7] *Id.* at ¶ 5.

4G markets.[8]  Tellingly, Mr. Wilkins conceded in his deposition that he had reviewed only about

twenty Cricket internal documents.[9]  And Mr. Wilkins' Merits Report reliance list does not

expand much on that list.[10]  Thus, he appears to have insufficient factual basis to form any

opinion about Cricket's strategies because he has not even evaluated the evidence.

16.     It also does not appear to me that Mr. Wilkins has read the Court's motion to

dismiss order, or that he has considered the Plaintiffs' theory of harm. Mr. Wilkins suggests that

Cricket had a viable plan to provide 4G/LTE service in all of Cricket's markets, and that it had

the financial wherewithal to do so.[11]  Nonetheless, he has conceded that Cricket did not ever

provide any 4G/LTE service to customers in most markets.[12]  It is wrong for a wireless carrier to

promote and sell 4G/LTE service with the ability to provide 4G/LTE, but then make the business

decision not to spend $400 million to provide 4G/LTE and instead just keep the money.

17.     Mr. Wilkins seems to be of the view that since Cricket was sold to AT&T, that

absolved Cricket of any need to provide any 4G/LTE service.[13]  Mr. Wilkins conveniently

ignores that Cricket Android smartphones were not compatible with AT&T's network, and he

has identified no Class Member that was able to unlock a Cricket Android smartphone or was

given a free smartphone to switch to New Cricket on AT&T's network.  Class Members were

unable to access 4G/LTE service where they needed it in in their home markets throughout the

Class Period, and the 4G/LTE Android smartphones they had purchased were incompatible with

the New Cricket network. While on the Legacy Cricket network and for the duration of their

---

[8] Mallinson Opening Merits Report at ¶ 100
[9] Wilkins Dep. Tr. at 49:15-18.
[10] Wilkins Merits Report, Appendix B.
[11] Wilkins Merits Report at ¶ 17.
[12] Wilkins Dep. Tr. at p. 345-46.
[13] Wilkins Merits Report at ¶ 20.

subscriptions they were unable to access 4G/LTE service in their respective home markets. They were trapped on Cricket's 3G network until they replaced their phones. This was a major problem for them because "network" is of paramount importance to cellular users.[14]

18.     And there appears to be no dispute that Cricket's 4G/LTE network was far behind other major carriers.  It never expanded beyond 21 million 4G/LTE CPOPs while all the other major carriers rapidly expanded their 4G/LTE network coverage.[15]

19.     Moreover, Mr. Wilkins' opinions about Cricket's roaming agreement options make no sense.  To the extent there were viable roaming options for Cricket, it is actually more egregious that Cricket never provided 4G/LTE service to Class Members.  Cricket never provided 4G/LTE service to any Class Members over the Class Period based on any of the purported roaming agreements it has identified. Cricket never provided 4G/LTE service to any of its customers over the Class Period based on any roaming agreements other than one it had with Sprint.

20.     None of Cricket's purported "roaming agreements" were ever viable technically and commercially to provide Class Members with 4G/LTE services in their home markets.

- LightSquared was planning to provide service in the 1.6GHz frequency band that had not been used by any other carrier for 4G/LTE. LightSquared was prohibited by the FCC from deploying 4G/LTE service in that band.[16]

- Clearwire used "unpaired" spectrum in a 2.5 GHz band. While this spectrum had been used with WIMAX technology, there were no 4G/LTE smartphones using that frequency band or the LTE-TDD mode required for that band until November 2013.[17]  This was after Sprint had completed its acquisition of Clearwire in July 2013 and applied its large-scale buying power to ensure that its suppliers would produce a few smartphone models including that frequency band, together with the other frequency bands used by Sprint.

---

[14] CRICKET01563789 at 799
[15] CRICKET00148779.
[16] https://www.rcrwireless.com/20120215/carriers/fcc-denies-lightsquareds-access-to-spectrum
[17] https://www.engadget.com/2013-10-30-sprint-spark-enhanced-lte.html

- Class Members' smartphones were incompatible with AT&T's network. The legacy Cricket network used CDMA technology for data and for voice with 1X. AT&T's network used GSM and HSPA for voice and data. While both networks also used 4G/LTE, AT&T relied mostly on 700MHz frequencies for coverage in its 4G/LTE network rollout. Most of Cricket's 4G/LTE smartphones could not use 700MHz frequencies. Furthermore, the roaming charges in the purported agreement with AT&T were also prohibitively high at $15 per gigabyte.[18]

21.     Tellingly, Mr. Wilkins report is devoid of any analysis of how Cricket was going to provide 4G/LTE service under any of these roaming agreements.

22.     In fact, Cricket has only provided one roaming agreement that was even an executed version of an agreement: the agreement with Sprint which provided some 4G/LTE roaming to Cricket customers outside the class. Cricket has provided no evidence that any of these other "agreements" were ever completed or that Cricket had any plans to ever provide 4G/LTE service under these other "roaming agreements." On the contrary, Cricket has only produced incomplete and unexecuted "agreement" documents.[19]

23.     Not only are all these documents missing signatures, but none of them define where and when 4G/LTE network coverage will be provided.  Mr. Wilkins is incorrect that there were other viable roaming options that Cricket could have utilized to provide 4G/LTE service.

24.     Mr. Wilkins misleadingly states that "Cricket's two prior wholesale 4G/LTE deals (in 2011 and 2012) would have provided 4G/LTE service at wholesale rates as low as $3.53/GB and $5.50/GB, respectively."[20]

25.     Mr. Wilkins includes Figure 1 in both of his reports:

- "May 2011 – Cricket enters into nationwide wholesale 4G/LTE agreement with LightSquared"
- "Feb.-Mar 2012…Cricket enters into a wholesale 4G/LTE agreement with Clearwire."

---

[18] CRICKET02516703 at 737
[19] CRICKET00002339, CRICKET00372740,
[20] Wilkins Merits Report at ¶ 26

- "Jul.2013… AT&T acquisition of Cricket announced w/LTE Roaming if acquisition is terminated"[21]

Mr. Wilkins seems to be implying that Cricket was contemplating providing 4G/LTE service under the LightSquared and Clearwire agreements up to the point of the AT&T acquisition. This is directly contradicted by the record evidence (that Mr. Wilkins has not reviewed) and is unsupported speculation and deceptively worded in my opinion.

26.    The same is true of the AT&T roaming arrangement.  Cricket has produced an unsigned version of an alleged agreement under which AT&T roaming was purported to be available "if acquisition is terminated."  But if the AT&T roaming had been technically viable, following the completion of Cricket's acquisition by AT&T in March 2014, it would have been surprising and deplorable not to have used such capabilities to provide 4G/LTE service for Class Members who otherwise had no possibility of ever accessing 4G/LTE service on their smartphones locked to Legacy Cricket's network.

27.    Mr. Wilkins has confirmed that none of these roaming agreements was ever used. In deposition testimony, Mr. Wilkins admitted that the only partner network from which legacy Cricket ever provided any of its customers with any 4G/LTE service was Sprint's LTE network

> Q. And can we agree, sir, that the only partner network from which legacy Cricket ever provided any of its customers with any 4G/LTE service was Sprint's LTE network?
>
> A. When you -- yes. When you say "actually provided," yes.

Wilkins at 60:16-22.

28.    I have also already shown that the Sprint 4G/LTE roaming was only possible with Cricket 4G/LTE phones that included Band 25 capabilities.[22]  For example, neither the LG

---

[21] Wilkins Merits Report at ¶ 18.
[22] Mallinson Opening Merits Report at ¶ 99.

Optimus Regard nor either of Cricket's Samsung Galaxy models nor the Samsung Admire II included that frequency band.[23]  I have also shown that Cricket could not afford Class Members from using Sprint roaming due to the high charges of up to $18 per GB.[24]  And, Cricket actually prevented its customers from obtaining 4G/LTE service from Sprint by programming their phones to stay on Cricket's 3G network.[25]  Mr. Wilkins entirely ignores this evidence.  Mr. Wilkins has pointed to no evidence where Cricket ever had an economically viable plan or an intention to provide 4G/LTE service to Class Members.

29.    In an email with the subject "LTE Roaming and Sunrise," on July 4, 2013, Brooks Martin of Cricket emailed Perley McBride (CFO) and Tim Ostrowski (VP) and wrote: "Just so we're clear there's no viable business case at $15 or $16.50 per GB versus building it ourselves so we should work to free up cash to build or defer offering 4G where we can't afford to build."[26]  This is a stark example where internally Cricket is acknowledging in very clear terms that it will never provide 4G/LTE under a roaming agreement with the pricing in the AT&T and Sprint roaming agreements, yet Mr. Wilkins opines that Cricket had options.

---

[23] https://www.gsmarena.com/lg_motion_4g_ms770-4948.php
https://www.mobosdata.com/phone/samsung-galaxy-s3/#sch-r530c
https://www.mobosdata.com/phone/samsung-galaxy-s4-sch-r970c/
https://www.phonescoop.com/phones/phone.php?p=3953

[24] Mallinson Opening Merits Report at ¶¶ 14 and 123.
[25] Mallinson Opening Merits Report at ¶¶ 124-127.
[26] CRICKET03479068.
Nevertheless, Mr Wilkins is critical of my assertion that Cricket could not "afford" its purported buy (or build) plan. Wilkins Merits Report at 17.  But my assertion applies to the unprofitable cash drain that the unaffordable high price of in-market 4G/LTE roaming with Sprint would have caused, as well as it being unable to afford to build.  And, of course, Mr. Wilkins concedes the most important point:  Cricket never provided or had a plan to provide any 4G/LTE service to class members in their home market.  Instead, Cricket was secretly programming smartphones to stay on Cricket's 3G network.

30.     In sum, Mr. Wilkins' opinions have no direct tie to Plaintiffs' theory that Cricket overcharged its customers in "non-4G" markets for 4G/LTE service that was never provided. Mr. Wilkins points to no evidence from late 2012 to 2015 that would explain why Cricket did not provide 4G/LTE service in Cricket's "non-4G" markets under the Sprint 4G/LTE roaming agreement, other than that it wanted to save money.  Mr. Wilkins may be right that Cricket made business decisions that maximized short-term shareholder value and the stock price for LEAP's owners by avoiding more than $400 million in costs for 4G/LTE, but the Class Members are the collateral damage of that scheme that benefited LEAP's owners at the expense of Cricket's customers.  Mr. Wilkins has provided no evidence that any Class Member obtained any benefit from Cricket's migration to AT&T's more expansive 4G/LTE network.  He speculates that Cricket offered incentives to customers[27], but he has identified no Cricket customer who was given a new Cricket smartphone or accepted any of these smartphone credits.  All of the Class Members were trapped on Legacy Cricket's network receiving only much slower 3G service, but still paid full price to Cricket without obtaining any 4G/LTE service in return.  In my opinion, Cricket should not promote and sell 4G/LTE to maximize its revenues, but then fail to have a viable plan or commit the resources to provide 4G/LTE service to those customers.

## B.  Cricket's Experts Speculate that Class Members Did Not Expect 4G/LTE Service Despite Paying for Both a 4G/LTE Smartphone and a 4G/LTE Service Plan

31.     Cricket's experts opine that Cricket customers did not expect to receive 4G/LTE service.  For example, Mr. Rarrick notes that, "[m]any reputable publications, in their reviews of these early-phase, 4G/LTE-enabled smartphones, clearly recommend that customers should make the investment in these devices, even if they lived in markets where 4G/LTE service was not yet available. The rationale at this time was twofold in that customers could immediately

---

[27] Wilkins Merits Report at ¶ 22.

benefit greatly from these aforementioned advanced features, while waiting for 4G/LTE service to arrive.  At this time, carriers marketed 4G/LTE capable devices as an 'investment in subscribers 4G future'" (citations omitted).[28]

32.     4G/LTE customers of other networks were realizing their "4G future[s]" in the Class Period. For example, Verizon and AT&T customers with 4G/LTE devices were reportedly "see[ing] 91 to 100 percent of their mobile usage going over LTE rather than 3G," by December 2013.[29]  However, with no 4G/LTE service on the Legacy Cricket network and no ability to migrate those phones to New Cricket, there was no "4G future" for the "investment" in those devices by Class Members.

33.     Mr. Wilkins cites extensively from a Nielsen consumer market research survey, stating that "61 percent of U.S. customers who had bought 4G smartphones did *not* include 4G coverage among the factors that influenced their decision to purchase their 4G capable smartphones."  That survey was fielded in March 2012— eight months before the beginning of the Class Period.  Consumer awareness about and desire for 4G and LTE was increasing rapidly over the entire period from March 2012 until October 2014, as illustrated by the exponential increase in 4G/LTE smartphone penetration and service subscriptions over that extended period.[30]  As 4G/LTE service rapidly expanded over time, consumers "increasingly demand[ed]" 4G/LTE service, as acknowledged by Legacy Cricket's CEO Douglas Hutcheson.[31]

34.     Mr. Rarrick opines that prepaid subscribers were different to postpaid subscribers in that they did not "expect to receive, a premier network performance experience on par with

---

[28] Rarrick Merits Report at ¶ 24.
[29] https://www.fiercewireless.com/tech/verizon-sprint-lead-delivering-mobile-data-traffic-over-lte
[30] CRICKET01563789 at 798 and Mallinson Opening Merits Report at p. 94-95.
[31] PLTF00002317 at 2318.

the postpaid wireless carriers."[32]  This logic defies common sense in this context given that all of the Class Members were paying for both a 4G/LTE smartphone and a 4G/LTE service plan, and it is also contrary to the evidence.  Nielsen surveys taken during the Class Period show the importance of faster download speeds with 4G to prepaid subscribers.[33]



CRICKET01774539

35.     Mr. Rarrick also erroneously opines that due to customer unfamiliarity, customers would have been satisfied with Cricket's 3G versus "4G" offerings that were not based on LTE technology.[34]  I find no validity to Mr. Raddick's reasoning and see significant evidence to the contrary.  Around 2012, it was GSM carriers AT&T and T-Mobile with relatively fast HSPA+

---

[32] Rarrick Merits Report at ¶ 19.
[33] CRICKET01774519 at 539.
[34] Rarrick Merits Report at ¶ 17.

networks—not CDMA carriers like Verizon or Sprint with EV-DO networks—that were claiming to have 4G service prior to their 4G/LTE network launches.[35]

36.     The HSPA+ networks generally delivered the same speed as Cricket's 4G-LTE, which was eight times faster than Cricket's 3G with CDMA EV-DO.  This is what Mark Israel, citing Mr. Hutcheson, Cricket's CEO, had to say about this issue in "2013.08.01 An Economic Analysis of Competitive Effects and Consumer Benefits", as submitted to the FCC. "Leap's LTE deployments generally support throughput speeds on par with AT&T's HSPA+ network and lower than AT&T's more robust LTE network." Cricket measured average (download) data speeds on its own networks and found that its 4G/LTE network was eight times faster than its 3G network (4 Mbps (4G/LTE) vs. 500 kbps (3G). (Exhibit 153, Wilkins Dep. (Slide 20).) Independent speed testing around that time also showed that the HSPA+ networks were several times faster than EV-DO networks — even those of Verizon and Sprint that were faster than Cricket's EV-DO network.[36]

37.     Regardless of customer expectations, Cricket promoted and sold 4G/LTE service but did not deliver it to Class Members while consumer adoption and use of 4G/LTE services grew rapidly across the United States over the Class Period.  It defies common sense that a customer would pay for both a 4G/LTE smartphone and a 4G/LTE service plan, but then not expect to receive any 4G/LTE service that would have been substantially faster and better.

---

[35] https://www.eweek.com/mobile/t-mobile-calls-hspa-4g-introduces-largest-4g-network/ https://www.fiercewireless.com/tech/at-t-details-hspa-markets-enhanced-backhaul-its-coverage-map Clearwire also claimed that its WiMAX network was 4G.
[36] https://uk.pcmag.com/old-cell-phones/4875/fastest-mobile-networks-2013

**C. Cricket's Experts Speculate that Cricket May Have Unlocked Smartphones or Offered Incentives from New Cricket But None of Cricket's Experts Provides Any Evidence that Class Members Obtained These Purported Benefits**

38.    Cricket sold smartphones locked to its network. None of Cricket's experts have identified a single Class Member that was able to unlock a smartphone and use it on another carrier's network.

39.    Cricket's 4G/LTE smartphones could not be used outside of Cricket's network. While Mr. Wilkins cites a Cricket employee saying that customers could unlock their phones,[37] Professor McCrary is incorrect that "Cricket phones were being unlocked during the class period and unlocked 4G/LTE phones could be used to receive 4G/LTE data with any other carrier."[38] Class Members' phones could not be usefully taken to and used on AT&T's network (i.e., registered on AT&T's network or able to roam onto it), or on any other networks.[39] Even if Class Members' smartphones had been unlocked and registered on AT&T's network, or had been allowed to roam on the AT&T network, Cricket's experts ignore technical challenges that would have prevented these smartphones from making voice calls and significantly limited data coverage on AT&T's network.

40.    Class Members' Cricket smartphones were technically incompatible with the AT&T network. The Legacy Cricket network used CDMA technology for data and for voice

---

[37] Wilkins Merits Report, fn 72 states: "According to William Tindall, an employee on Cricket's device engineering team during the Class Period, Cricket customers could unlock their phones with standardized unlock codes, which were publicly available on the internet and also sometimes provided by Cricket's customer care department during the Class Period. Mr. Tindall also notes that Cricket was aware that customers were unlocking Cricket devices with unlock codes. See Declaration of William Tindall in Support of Cricket Wireless, LLC's Opposition to Plaintiffs' Motion for Class Certification, May 6, 2021 ("Tindall Declaration"), ¶¶ 2-10."
[38] McCrary Merits Report at FN 31.
[39] Mallinson Opening Merits Report at ¶¶ 48- 50.

with 1X. AT&T's network used GSM and HSPA for voice and data. While both networks also used 4G/LTE, AT&T relied mostly on its deep and nationwide trove of 700MHz frequencies for data coverage in its 4G/LTE network rollout—particularly since it had divested a substantial amount of AWS spectrum as a result of the breakup of its proposed acquisition of T-Mobile in 2011.[40] Inclusion of those 700MHz frequencies was essential in the 4G/LTE smartphones sold to any subscribers using its network.[41] However, Class Members' smartphones including the LG Optimus Regard, Samsung Galaxy SIII, Samsung Galaxy SIV and the ZTE Source could not access any 700MHz frequencies.[42] The purported "roaming agreement" with AT&T stated roaming was "on 1.7MHz (or higher frequencies [i.e. including Band 4 AWS] at AT&T Mobility's discretion."[43]

41.     Cricket's experts also offer unsupported assertions about potential credits on a new smartphone at New Cricket on AT&T's network.[44]  But Cricket provides no evidence that Class Members were made good on their smartphone purchases with replacements while their devices were stranded on the obsolescent Legacy Cricket network which was shut down in 2015. While Mr. Wilkins mentions "incentives included smartphone discounts and trade-in offers for a new phone compatible with AT&T's network"[45] with reference to various offers cited in the Towster Declaration, Mr. Wilkins provides no examples of Class Members taking up these

---

[40] https://www.extremetech.com/electronics/116107-what-does-atts-transfer-of-aws-to-t-mobile-mean
[41] https://www.gsmarena.com/samsung_galaxy_s_iii_i747-4803.php, https://www.gsmarena.com/samsung_i9505_galaxy_s4-5371.php
[42] https://www.gsmarena.com/lg_motion_4g_ms770-4948.php, https://www.mobosdata.com/phone/samsung-galaxy-s3/#sch-r530c, https://www.mobosdata.com/phone/samsung-galaxy-s4-sch-r970c/, https://www.phonearena.com/phones/ZTE-Source_id8178.
[43]  CRICKET02516703 at 736.
[44] Wilkins Merits Report at ¶¶ 22-23, 64.
[45] Wilkins Merits Report at ¶¶ 23 and 53.

offers, let alone the numbers of them doing so, or quantification of any financial mitigation against the damages Mr. Browne has calculated. Mr. Browne has calculated damages, bottom-up and in detail for each Class Members month-by-month.

42.     Also, Cricket's experts have provided no quantification of how these offers were more valuable than general incentives offered to any non-Class Members.   Indeed, Cricket has not provided any evidence that Legacy Cricket customers were given any additional benefit or credit for switching that was not provided to new customers.

43.     In my opinion, any potential credits offered to Legacy Cricket customers are economically irrelevant because they do not compensate Class Members for the harm caused by Cricket's overcharging scheme.   The harm in this case occurs at the point of sale of Cricket's 4G/LTE Android smartphones, so any subsequent purchase is economically irrelevant.   Plus, Cricket has not shown Class Members were provided with any unique benefits to compensate them for the harm caused by Cricket's scheme.   New Cricket's smartphone promotions and offers are another red herring in my opinion.

**D. Cricket's Experts Are Wrong that Wi-Fi Has Any Relevance to Whether Class Members Were Damaged by the Lack of 4G/LTE Service.**

44.     Cricket's experts raised another issue that ignores Plaintiffs' theory of harm. Cricket contends that Class Members could have used Wi-Fi or 3G to meet their needs. Cricket's expert economist Professor McCrary misleadingly asserts that "3G or WiFi would have provided enough data speed for some consumers" and that "for other putative Class Members, all or nearly all of their use of their 4G/LTE phones for data-intensive activities may occur on their home WiFi."[46]

---

[46] McCrary Merits Report at ¶ 45.

45.     But, again, this ignores the fact that all Class Members purchased both a 4G/LTE smartphone and a 4G/LTE service plan.  I have already demonstrated in my Opening Merits Report that Cricket charged more for both 4G/LTE smartphones and service plans.[47]  Cricket's experts seem to imply that a 3G device and plan would sell at or close to the same pricing as a 4G/LTE smartphone and plan.  Also, Cricket's experts speculate that Cricket's customers never needed 4G/LTE despite paying extra for it.  This is wrong.

46.     Smartphones can exploit widespread network coverage and availability as well as high data speeds with their connections. The principal attribute of any cellphone is in its mobility and ability to connect to cellular networks and be used almost anywhere—that is why they are also called "mobile phones."  There is a substantial premium in pricing for 4G/LTE smartphones that can provide mobility and high-speed data over devices that cannot provide similar services or data speeds. WiFi is a poor substitute for cellular data connectivity with respect to coverage and mobility. 3G is a weak substitute for 4G/LTE with regard to data speeds.

47.     Cricket's expert economist Professor McCrary misleadingly asserts that "3G or WiFi would have provided enough data speed for some consumers" and that "for other putative Class Members, all or nearly all of their use of their 4G/LTE phones for data-intensive activities may occur on their home WiFi."[48] Professor McCrary's statements inaccurately opine that WiFi and cellular are comparable substitutes, whereas they are very much complements because cellular has functionality and utility that WiFi lacks. Some of McCrary's reasoning is defectively circular. For example, in the case of Class Members who had been deprived of high-speed data coverage, they had limited alternatives other than to use WiFi, if that was available, for "data-

---

[47] *See generally* Mallinson Opening Merits Report at Section V.
[48] McCrary Merits Report at ¶ 45.

intensive activities."[49] WiFi's very limited geographic coverage renders it a limited substitute for cellular. Furthermore, Professor McCrary has provided no evidence that Class Members had WiFi Internet access at home. I have addressed comparisons of speed and coverage for 3G versus 4G/LTE, and the superiority of the latter elsewhere in my reports including in Section II.B of this report.

48.     Cricket's industry marketing expert Mr. Rarrick correctly states that "prepaid customers also showed heavy interest in devices that featured WiFi connectivity," but he was incorrect to assert that WiFi connectivity "eclipsed the desire for 4G/LTE connectivity in the prepaid space."[50] The newspaper story he cites in support of his statement makes no mention of 4G/LTE, nor does it state that WiFi was eclipsing, displacing or pre-empting cellular or 4G/LTE.[51] To the contrary, the various WiFi connectivity options it refers to include "tether your phone" which "allows you to turn your smartphone's cellular Internet connection into a Wi-Fi hot spot for your tablet or laptop." The article's focus is on laptops and tablets as well as smartphones, and the picture below the headline is of someone using a laptop. Mr. Rarrick also misleads by citing figures from two sources that were depicting global, not US domestic, data traffic.[52]  The US was highly developed for cellular data and was a frontrunner and the global leader in deployment of 4G/LTE up until at least the end of the Class Period.[53]

49.     Over many years prior to the Class Period, consumers became accustomed to the major benefit of being able to use a cellphone almost anywhere for calling and text messaging.

---

[49] *Id.*
[50] Rarrick Merits Report at ¶ 25.
[51] https://eu.usatoday.com/story/tech/columnist/komando/2013/03/15/komando-free-wifi-on-the-go/1982111/
[52] Rarrick Merits Report at ¶ 20.
[53] https://www2.deloitte.com/content/dam/Deloitte/us/Documents/technology-media-telecommunications/us-tmt-mobile-index-09262014.pdf

During the Class Period, many consumers had no landline or Internet connection at home, let alone one connected to a WiFi access point that also provided coverage there. Adopting Cricket's revolutionary "unlimited" cellular calling services was the major reason why many consumers "cut the cord" by abandoning use of a landline connection, years before the Class Period. Cricket has claimed that most of its customers have no landline.[54]

50.     Market research shows that the 47% of Hispanics and 38% of African Americans were living in wireless-only households in 2013.[55] As such, these individuals have a much higher propensity to subscribe to prepaid instead of postpaid wireless services.[56]

51.     Cricket's prepaid offerings were also targeted at and highly adopted by consumers with relatively low incomes.[57] According the US Census Bureau, most households with income below $25,000 had no Internet connection at all, let alone a "high-speed Internet connection" in 2013.[58] Cricket's unlimited data proposition appealed to these demographics by providing Internet access to the unlimited calling and unlimited text messaging Cricket provided.

---

[54] Keith Mallinson, *Wireless Substitution of Wireline Increases Choice and Competition in Voice Services, Yankee Group*, 2 (July 2005). https://www.wiseharbor.com/wp-content/uploads/2019/09/Yankee-Group-Mallinson-Wireless-substitution-July-2005.pdf
[55] CRICKET01529374 at 387.
[56] CRICKET01774519 at 427.
[57] Keith Mallinson, *Wireless Substitution of Wireline Increases Choice and Competition in Voice Services, Yankee Group*, 2 (July 2005). Cricket claimed significantly larger proportions of customers versus other wireless brands in the $15,000 to $25,000 income (23% versus 9%) segment: https://www.wiseharbor.com/wp-content/uploads/2019/09/Yankee-Group-Mallinson-Wireless-substitution-July-2005.pdf   and https://www.prnewswire.com/news-releases/cricket-reminds-eligible-americans-of-wireless-phone-assistance-available-through-lifeline-credit-222941861.html
[58] Computer and Internet Use in the United States: 201, US Census Bureau, November 2014, Table1.   https://www2.census.gov/library/publications/2014/acs/acs-28.pdf

Table 1.
## Computer and Internet Use for Households: 2013
(In thousands. For information on confidentiality protection, sampling error, nonsampling error, and definitions,
see *www.census.gov/acs/www*)

| Household characteristics | Total households | Household with a computer | | | Household with Internet use | |
|---|---|---|---|---|---|---|
| | | Total | Desktop or laptop computer | Handheld computer | With some Internet subscription[1] | With high-speed Internet connection[1] |
| **Total households . . . . . . . . . . . . . . . . . . . . .** | **116,291** | **83.8** | **78.5** | **63.6** | **74.4** | **73.4** |
| **Age of householder** | | | | | | |
| 15–34 years . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,331 | 92.1 | 82.1 | 83.3 | 77.7 | 77.4 |
| 35–44 years . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,745 | 92.5 | 86.4 | 80.7 | 82.5 | 81.9 |
| 45–64 years . . . . . . . . . . . . . . . . . . . . . . . . . . | 46,015 | 86.8 | 82.7 | 65.2 | 78.7 | 77.6 |
| 65 years and older . . . . . . . . . . . . . . . . . . . . . | 27,201 | 65.1 | 62.3 | 31.8 | 58.3 | 56.3 |
| **Race and Hispanic origin of householder** | | | | | | |
| White alone, non-Hispanic . . . . . . . . . . . . . . . . | 80,699 | 85.4 | 81.4 | 63.4 | 77.4 | 76.2 |
| Black alone, non-Hispanic . . . . . . . . . . . . . . . . | 13,816 | 75.8 | 66.3 | 58.9 | 61.3 | 60.6 |
| Asian alone, non-Hispanic . . . . . . . . . . . . . . . . | 4,941 | 92.5 | 90.0 | 78.6 | 86.6 | 86.0 |
| Hispanic (of any race) . . . . . . . . . . . . . . . . . . . | 14,209 | 79.7 | 70.0 | 63.7 | 66.7 | 65.9 |
| **Limited English-speaking household** | | | | | | |
| No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 111,084 | 84.7 | 79.6 | 64.6 | 75.5 | 74.4 |
| Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,207 | 63.9 | 54.9 | 43.7 | 51.4 | 50.6 |
| **Metropolitan status** | | | | | | |
| Metropolitan area . . . . . . . . . . . . . . . . . . . . . . | 98,607 | 85.1 | 79.9 | 65.9 | 76.1 | 75.2 |
| Nonmetropolitan area . . . . . . . . . . . . . . . . . . . . | 17,684 | 76.5 | 70.6 | 51.1 | 64.8 | 63.1 |
| **Household income** | | | | | | |
| Less than $25,000 . . . . . . . . . . . . . . . . . . . . . . | 27,605 | 62.4 | 53.9 | 39.6 | 48.4 | 47.2 |
| $25,000–$49,999 . . . . . . . . . . . . . . . . . . . . . . . | 27,805 | 81.1 | 74.0 | 55.2 | 69.0 | 67.6 |
| $50,000–$99,999 . . . . . . . . . . . . . . . . . . . . . . . | 34,644 | 92.6 | 88.4 | 71.9 | 84.9 | 83.8 |
| $100,000–$149,999 . . . . . . . . . . . . . . . . . . . . . | 14,750 | 97.1 | 95.1 | 84.5 | 92.7 | 92.1 |
| $150,000 and more . . . . . . . . . . . . . . . . . . . . . | 11,487 | 98.1 | 96.8 | 90.2 | 94.9 | 94.5 |
| **Region** | | | | | | |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,937 | 84.1 | 79.9 | 62.8 | 76.8 | 76.0 |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26,161 | 83.1 | 77.9 | 61.2 | 73.4 | 72.1 |
| South . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43,399 | 82.2 | 76.0 | 63.2 | 71.7 | 70.7 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,793 | 86.8 | 82.0 | 67.4 | 78.1 | 77.1 |
| **Total 25 years and older . . . . . . . . . . . . . . .** | **111,700** | **83.5** | **78.5** | **62.8** | **74.5** | **73.5** |
| **Educational attainment of householder** | | | | | | |
| Less than high school graduate . . . . . . . . . . . . . | 12,855 | 56.0 | 47.2 | 36.5 | 43.8 | 42.7 |
| High school graduate (includes equivalency) . . . . . . . | 28,277 | 73.9 | 66.9 | 48.5 | 62.9 | 61.4 |
| Some college or associate's degree . . . . . . . . . . . | 34,218 | 89.0 | 83.9 | 67.0 | 79.2 | 78.0 |
| Bachelor's degree or higher . . . . . . . . . . . . . . . . | 36,349 | 95.5 | 93.5 | 79.3 | 90.1 | 89.4 |

[1] About 4.2 percent of all households reported household Internet use without a paid subscription. These households are not included in this table.
Note: Handheld computers include smart mobile phones and other handheld wireless computers. High-speed Internet indicates a household has Internet service type other than dial-up alone.
For a version of Table 1 with margins of error, please see Appendix Table A at <www.census.gov/hhes/computer/>.
Source: U.S. Census Bureau, 2013 American Community Survey.

52.     Even where WiFi is available to consumers, rather than substituting for cellular, WiFi has served as the "training wheels" for the anytime-anywhere usage, that consumers obtain from their smartphones and that only cellular connectivity can provide.  As some consumers develop the habit of using smartphone applications using WiFi, they have also been able to exploit cellular's ubiquity in connectivity. These consumers have also exploited high speed cellular connections, for example, with Verizon and AT&T customers with 4G/LTE devices

21

reportedly "see[ing] 91 to 100 percent of their mobile usage going over LTE rather than 3G," by December 2013.[59] WiFi connections at home and elsewhere, if available at all, are limited to very small coverage areas and by other constraints, including the need to subscribe to public area "hotspot" services.

53.     That WiFi is more a complement than a substitute for cellular is also evidenced by the fact that users with faster, 4G/LTE, cellular connections tend to use more WiFi data than users with slower, 3G, cellular connections.[60]

54.     A comparison between the pricing and demand for Apple's iPod Touch (with WiFi but no cellular) and Apple's iPhone 5C (with WiFi and 4G/LTE) shows how highly both Apple and its customers value the premium in 4G/LTE cellular over WiFi-only connectivity in devices with almost identical specifications.  While this comparison is on device prices rather than service prices, it indicates that consumers are willing to pay a large premium for a device that can access cellular services including 4G/LTE, without which the two devices would be functionally identical.

55.     The much higher value—at more than twice the price for the device with 4G/LTE— is clearly indicated in a presentation I first gave in 2015 in which I compared the cost of a 5th Generation Apple iPod Touch to an Apple Phone 5c including 4G/LTE connectivity.[61]

---

[59] https://www.fiercewireless.com/tech/verizon-sprint-lead-delivering-mobile-data-traffic-over-lte

[60]  Verizon, Sprint lead on delivering data traffic over LTE, Fierce Wireless, February 2014. '"4G and Wi-Fi are complementary to a degree, with 4G devices seeing higher monthly use of both 4G and Wi-Fi, rather than one technology cannibalizing the other," the report said. "Wi-Fi monthly use on 3G devices increased 24 percent between January and December 2013, to 3.2 GB, but jumped 86 percent on 4G devices over the same period, to 7.3 GB, which is more than 5 GB higher than cellular use on 4G devices," the companies added.'
https://www.fiercewireless.com/tech/verizon-sprint-lead-delivering-mobile-data-traffic-over-lte

[61] The IP Platform: Supporting Invention & Inspiration, October 1, 2015. GMU CPIP Conference George Mason University School of Law Center for the Protection of Intellectual

The only meaningful technical difference between the two devices, besides the fact that the 5th Generation iPod Touch has twice the amount of storage as the iPhone 5c, is that the iPhone 5c provides 4G/LTE cellular connectivity. The price difference between the two devices was $251 as of May 2015. The difference in component and manufacturing costs was only around $32, as illustrated in "teardown analysis" of other cellular and non-cellular iPads.

---

Property. https://www.wiseharbor.com/wp-content/uploads/2016/12/WiseHarbor-Mallinson-GMU-CPIP-Oct-2015-1.pdf

Exhibit : iPhone 5C v. iPod Touch (5th Generation)





56.     Even more remarkable than the large price difference— which was set unilaterally by Apple— between these products is the market-based effect that iPhones outsold all iPod models 12-fold by volume and 46-fold by revenue. Fundamental economic theory on supply and demand shows— for any given product under virtually all market conditions— that sales volumes tend to reduce as prices are increased.  The extent of change is dependent on the elasticity of demand.[62] That sales volumes for the iPhone are so much larger, despite its much higher price, confirms that the iPhone 5c and iPod Touch 5th Generation are in totally different product markets. Similarly, the functionality and utility of cellular services including 4G/LTE is also quite distinct from WiFi.



---

62 https://www.economicsonline.co.uk/Competitive_markets/Price_elasticity_of_demand.html

57.     This example directly refutes Cricket's experts' inference that 4G/LTE provided small additional value to customers, and that customers were unwilling or would not need to pay substantially more for 4G/LTE in a smartphone device over a similar one with only WiFi connectivity.

**E.   Crickets' Experts Speculate that Cricket's Refund Policy Could Negate Cricket's Alleged Scheme to Defraud**

58.     Professor McCrary argues that "*Few Customers Returned Cricket Phones for a Refund*" and that "Putative Class Members who were truly dissatisfied with Cricket's 4G/LTE coverage could have simply avoided the financial losses implied by Mr. Browne's estimates by returning their devices within one week of purchase to receive a full refund, and by cancelling their 4G/LTE data subscription."[63]

59.     But the harm was caused by Cricket's alleged deception and with its overcharging.  Damages are not dependent on whether Class Members figured out within the first week of buying their 4G/LTE smartphones that they had no 4G/LTE coverage and would never be able to obtain 4G/LTE service on those devices in their home areas.  And none of Cricket's experts have identified any Class Member that was given a discount on a smartphone on New Cricket's 4G/LTE network.  Thus, Cricket's refund policy is thus irrelevant to my opinions.

**F.   Auto Bill Pay is Irrelevant to My Opinions**

60.     Professor McCrary also opines that the damages calculations should be reduced because they do not account for auto bill pay (ABP).[64]  This is wrong. Allowing Cricket to reduce the damages suffered by the 17.8% of Class Members because they opted for auto bill

---

[63] McCrary Merits Report at ¶ 40.
[64] McCrary Merits Report at ¶ 42.

pay makes no sense.  Auto bill pay entitles the customers to a discount in exchange for giving up flexibility on payment.  Cricket has provided no evidence that it offered auto bill pay on only its higher priced plans.  Instead, Cricket offered this option for all customers who were willing to allow Cricket to automatically collect from them each month.  Cricket has provided no evidence that these customers would not have also opted for auto bill pay in a world in which Cricket did not commit fraud.  My $40 benchmark is an apples-to-apples comparison with Cricket's $50, $60, and $70 Smart plans.  Cricket has no evidence to assert that the $5 reduction for auto bill pay would not have existed if Cricket had also offered an equivalent to my $40 benchmark plan (i.e., including a small 4G/LTE data allowance of 1GB or less).  Moreover, the only reason I did not consider and address the auto bill pay discount in my Opening Merits Report is because Cricket did not even produce the customer information relating to auto bill pay. This shows that Cricket knew that this is an irrelevant issue, but Mr. McCrary is apparently willing to raise irrelevant issues like auto bill pay to try to argue to the jury that Class Members have suffered no injury.  Mr. McCrary's opinions about auto bill pay are baseless.

61.     Furthermore, in some cases, other carriers did not impose additional charges that Cricket's customers had to pay. For example, while Aio included taxes and fees in the $40 benchmark and its other service plans, Cricket's prices were exclusive of taxes.[65]

> *"Aio makes wireless easy with a friendly in-store and online experience and three simple plans to choose from. All three plans include unlimited talk, text, and data—with a pre-established amount of high-speed access, including 4G LTE.  Plans range from $40 to $70 per month, **with taxes and fees included.**"* (emphasis added)

Under Mr. McCrary's reasoning, this difference would increase damages.

---

[65] https://about.att.com/newsroom/aio_wireless_available_soon_for_all_us_customers.html and PLTF00012431.

**G. Cricket's Experts Have Provided No Evidence Muve Music and other Bundled Features Had Any Independent Economic Value During the Class Period.**

62.     Professor McCrary states that he "conservatively assume[s] that Muve Music value was approximately equal to $5 per month."[66]  In my opinion, this estimate is wildly overstated and unsupported by any record evidence.  Professor McCrary has merely taken a conveniently available but inapplicable figure in an attempt to reduce certain Plaintiffs' damages to zero.  His opinion is based on no credible evidence.

63.     Prior to 2013, Muve Music might have had value to Cricket in attracting and retaining customers, and some customers had historically chosen to pay $5 for Muve Music on an à la carte basis.  However, by 2013, the record provides no evidence that Cricket was able to attract customers to purchase Muve Music on a stand-alone basis, and thus the evidence shows that Cricket was not marketing Muve Music and solely offering it in a bundle as an added feature.[67]  This shows that Cricket no longer had the ability to charge an added price for it in a competitive marketplace.

64.     Bundled features such as Muve Music, that were secondary to unlimited calling and plans' 4G/LTE data allowances, had no material impact on service plan pricing, including offerings at various price points. Muve Music was offered as an included feature to try to attract and retain customers to Cricket's services.  The fact that Cricket's expert could point to one Class Member, Jermaine Thomas, that mentioned the appeal of Muve Music does not establish that Muve Music had any broader market value.  If it had such value, then I would have expected Cricket to continue to sell it on a stand-alone basis or continue with Muve Music marketing and branding.  That was not occurring by 2013.  That is likely because many subscribers did not use

---

[66] McCrary Merits Report at ¶ 42.
[67] CRICKET00008437 at Slides 6 and 7.

music services, while others preferred streaming services such as Spotify or listened to music on other devices including iPods. AT&T soon decided it was better off without Muve Music, as indicated by it selling it to Deezer in January 2015.[68]

65.    Nevertheless, other carriers including those offering my pricing benchmark plans also bundled additional features in their service plans. For example, Metro PCS bundled its music service for free during the Class Period – its $60 plan with a 5GB data allocation at 4G/LTE speeds included its Rhapsody Unlimited Music, offering unlimited access to millions of songs, along with other features such as Unlimited Metro411 Premium Directory Assistance.[69]

## H. Professor McCrary's Assertion that Certain Class Members Are Uninjured is Wrong

66.    Professor McCrary opines that the class includes members who are likely not harmed.  Professor McCrary incorrectly asserts that Plaintiffs have narrowed the Class Period.[70] This is wrong.   In response to Cricket's claim that 4G/LTE service was not widely available under other carriers' plans at the start of the class period in 2012, I took a conservative approach to calculating the aggregate damages by assigning no premium to customers' plan damages from November 2012 to September 15, 2013.

---

[68] https://techcrunch.com/2015/01/08/att-sells-crickets-muve-music-service-to-deezer-for-under-100m-under-new-partnership/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_ref errer_sig=AQAAADX5DDxwC0MOMCJxk3ZqP-ZxZUxUSdGufid4oDEQHxLiaEWF3BlJqqCDs1pFqzYxT3Ciz_Jr-qBFwIbZiutqj8mobXCRSLgQweYlke6r1oF3c2ogBWMupO3NFdIULAlFZttLjQ_m5qBL5Y2P XFpIKUSoP02-R-C-GfrjmzP2AMlM#:~:text=Deezer%2C%20the%20music%20streaming%20service,AT%26T%20 to%20sell%20Deezer%20music

[69]https://web.archive.org/web/20121104101157/http://www.metropcs.com/metro/detail/per+mon th+4GLTE+with+Rhapsody/4GALL60

[70] McCrary Merits Report at ¶ 22.

67.     This approach to calculating the service plan damages has no impact on the Class Members who were harmed.  All class members purchased both a 4G/LTE smartphone and a 4G/LTE service plan.  Even if roughly 6.6% of class members did not continue with Cricket's 4G/LTE service beyond September 15, 2013, those Class Members still suffered overcharge damages at the point of sale of the 4G/LTE Android smartphone.  Professor McCrary continues to ignore the class definition, and this important fact demonstrates that all members of the class suffered harm.

68.     In my opinion, Cricket has no viable argument that 4G/LTE service was not widely available during the time period when Cricket's customers were charged for but not provided with 4G/LTE service.  As stated in my Opening Merits Report at paragraphs 74 to 75, in 2013, the major U.S. wireless carriers increased their 4G/LTE deployments to cover overall 98.5 percent of the population by January 2014.[71]  This meant that 4G/LTE services were available from at least one carrier to nearly the entire U.S. population in their home market. This also meant that 4G/LTE became a key basis for cellular services competition everywhere. Network rollouts continued in 2014. By December 2014, for example, 97.8 percent of the non-rural U.S. population and 64.8 percent of the rural U.S. population had a choice of three or more 4G/LTE service providers.[72] The very same networks were providing 4G/LTE services to both postpaid and prepaid users. And, as indicated in Section II.B of this report, Verizon and AT&T

---

[71] FCC's 17th Annual Report of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, published December 2014. Table III.A.2 Estimated Mobile Wireless Data/Broadband Network Coverage by Census Block, Jan. 2014.
[72] FCC's 18th Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Released December 23, 2015.

customers with 4G/LTE devices were reportedly "see[ing] 91 to 100 percent of their mobile usage going over LTE rather than 3G," by December 2013.[73]

69.    Correspondingly, 4G/LTE clearly became a major factor in smartphone purchasing from mid-2012 onwards. As a result of increasing awareness and understanding, adoption also increased quickly, as indicated in a presentation by AT&T Mobility's President and CEO, Ralph de la Vega, in September 2013 which showed the very rapid increase of 4G/LTE smartphone penetration from low single-digit percentages in early 2012 to more than 50 percent by the end of 2013 and nearly 80 percent penetration by expected by year-end 2014.[74]



---

[73] https://www.fiercewireless.com/tech/verizon-sprint-lead-delivering-mobile-data-traffic-over-lte
[74] CRICKET01563789 at 798. While this is for postpaid smartphones at AT&T, with AT&T's market leading position and postpaid phones and services predominating in the US, this chart provides a good indication of marketplace developments overall and as a proxy for overall awareness of, interest in and adoption of LTE and 4G/LTE.

I. **Cricket's Experts' Criticisms of My Damages Methodology On Smartphones Are Baseless Because the 3G Smartphone Benchmarks Are Appropriate and Provide a Reliable Estimate of the Damages Suffered**

70.     Cricket's expert Professor McCrary does not directly challenge my methodology for estimating Class Members' damages on their 4G/LTE smartphone purchases, which is based on the difference between the price Class Members paid for these devices and the fair market value of a 3G benchmark smartphone. Our disagreement appears to be about the value of features other than 4G/LTE in my benchmarking analysis.

71.     I recognize that these other features have potential added value, but I have explained why any such value is outweighed by the significant limitations of a 4G/LTE device that does not have 4G/LTE connectivity.  My comparison in Section II.D between the pricing and demand for Apple's iPod Touch (with WiFi but no cellular) and Apple's iPhone 5C (with WiFi and 4G/LTE) shows how highly both Apple and its customers valued the premium in 4G/LTE cellular connectivity over WiFi-only connectivity in a device which otherwise has almost identical specifications. In this case, more than half of the iPhone's value was shown to be in its cellular connectivity including 4G/LTE.

72.     Professor McCrary has provided no alternative estimate of the value in Class Members' smartphones, despite suggesting conjoint analysis could have provided that.  Instead, he relies on market research that was fielded in March 2012—8 months before the beginning of the Class Period—and Mr. Wilkins' conclusion that "this survey evidence indicates that customers during the Class Period valued many smartphone features other than 4G/LTE connectivity, including screen size, touchscreen, operating system, ease of use, design, brand, fast processor, availability of applications, device size, battery life, storage size, and keyboard."[75]

---

[75] McCrary Merits Report at ¶ 45 (citing Wilkins Merits Report at ¶ 58).

73.     This unfounded and unquantified conclusion presupposes that these features operate independently of cellular connectivity including 4G/LTE.  They do not.  My core opinion is that the interconnectedness of smartphones means that the value of the phone's functions and features are substantially diminished without 4G/LTE connectivity data speeds.  My reliable damage estimate of 36% of the 4G/LTE smartphone price is supported by the data in my report and Mr. Browne's report, and none of Cricket's experts directly challenged this percentage with any alternative figures.

74.     As stated in my deposition and in my Opening Merits report, in my opinion it is not possible to isolate the value of features such as displays and batteries from the value of cellular connectivity including 4G/LTE.[76] This is because those features are so heavily dependent upon the cellular connectivity in a cellphone. As we have all learned over many years in our voice calling and text messaging, the major attribute of a cellphone is that it can be used almost anywhere. While it might be possible conduct surveys on consumer preferences on a feature-by-feature basis, or attempt to derive implicit price increments per feature from the inherent bundling of features in a smartphone, these will tend to overstate the value of such features that are dependent upon the network technology about which Mr. Rarrick claims consumers were ignorant and unfamiliar, and about which Mr. Wilkins claims consumers were relatively uninfluenced in their device purchasing (i.e. 4G or LTE and the differences versus 3G).[77]

---

[76] Mallinson Opening Merits Report at ¶ 14.
[77] Rarrick Merits Report at ¶ 17; Wilkins Class Certification Report at ¶ 48 (citing a Nielsen study on consumer attitudes that was fielded in March 2012) (i.e., 8 months prior to the beginning of the Class Period).

75.     This interdependence results in multicollinearity in mathematical derivations using techniques such as linear regression. This is a well-known, major problem affecting the validity and accuracy of such techniques that are based on the premise that explanatory variables are independent.[78]

**J. Cricket's Experts' Criticisms of My Overcharge Damages on the Service Plans Are Baseless Because the $40 Plan Benchmark is Appropriate and Provides a Conservative Estimate of the Damages Suffered**

76.     Cricket's experts do not directly challenge my methodology for determining the overcharge damages using service plan benchmarking with comparison of market prices for various offerings (i.e. including different monthly allocations of data at 4G/LTE speeds) versus Cricket's purported 4G/LTE offerings. Instead, Cricket's experts' criticisms are about availability of these service plans in all markets, and what the applicable market prices should be for a service plan that provided no 4G/LTE service.

77.     For example, Professor McCrary speculates that a $40 plan may not have been available to every class member during the class period.[79] Professor McCrary's opinion on this issue is similar to most of his other opinions – pure speculation unsupported by any evidence. But it is also irrelevant.  The purpose of the benchmark is to identify the fair market value of what customers received compared to what customers paid.  Here, a conservative estimate of what the customer received can be calculated using a $40 plan benchmark.  Indeed, whether a Class Member paid $50, $60, or $70 per month for a Cricket 4G/LTE plan, that subscriber received the same amount of 4G/LTE in the home market:  NONE.

---

[78] This article with an example in real estate valuation illustrates this problem in multivariable regression analysis: http://www.cbabuilder.co.uk/Quant5.html The technique is based on a an assumed linear relationship between the dependent variable (i.e. price) and the explanatory variables. If the latter are not actually independent of each other, the analysis becomes distorted as a result of relationships among explanatory variables.
[79] McCrary Merits Report at ¶ 20.

78.     Plus, Professor McCrary's assertions about the availability of these plans is also wrong.   Professor McCrary also states that, "Mr. Mallinson has not established that, prior to May 2014, these [small 4G allocation] plans were available to customers. In fact, Aio used to have a $40 plan in Q4 2013, however, it was not a plan for 'smartphones,' but rather a plan for 'basic phones only'."[80] To the contrary, no basic phones had 4G/LTE capabilities, and yet AT&T indicated in an August 2013 press release that Aio was providing a range of 4G/LTE plans:

> *"Aio makes wireless easy with a friendly in-store and online experience and three simple plans to choose from. All three plans include unlimited talk, text, and data—with **a pre-established amount of high-speed access, including 4G LTE**.  Plans range from $40 to $70 per month, with taxes and fees included."*(emphasis added)[81]

79.     Professor McCrary also notes that documents I have cited "do not ever claim that Page Plus plans offered 4G connectivity."[82]  However, press reports indicated that Page Plus' MVNO host—Verizon— did provide 4G/LTE to MVNOs and to its own prepaid customers.[83]

80.     Mr. Rarrick also addresses pricing, but his analysis is not relevant or reliable. His analysis is for offerings of a wide variety of plans (e.g. including plans with per minute charges for voice calling) in mid-2012, which was several months before the beginning of the Class Period; and none of the pricing examples in his citation included 4G/LTE.

### III.   Conclusion

81.     Cricket's experts have not provided any new evidence or opinions that change any of my prior opinions in this case.  I continue to believe that Cricket overcharged all Class

---

[80] McCrary Merits Report at ¶ 35.
[81] https://about.att.com/newsroom/aio_wireless_available_soon_for_all_us_customers.html

[82] McCrary Merits Report at ¶ 35.
[83] https://www.fiercewireless.com/wireless/rumor-mill-verizon-wireless-mvnos-to-get-lte-q3 and https://www.whistleout.com/CellPhones/News/page-plus-customers-get-verizons-lte-network-without-verizon-lte-pricing

Members, and in my opinion my damages methodology for both smartphones and service plan overcharge damages is based on reliable benchmarks that provided a reasonable approximation of the aggregate damages suffered by the class.  Cricket's experts have provided no competing damages figures for either smartphones or service plans.

July 28, 2021

_____
Keith Mallinson

**Appendix A**

**Rebuttal Reliance List**

**Bates Stamped Resources:**

| CRICKET00148779 | CRICKET01529374 | CRICKET01563789 | CRICKET01774519 |
|---|---|---|---|
| CRICKET02516703 | | | |

**Non-Bates Stamped Resources:**

| |
|---|
| 2021.03.04 (Doc. 175-1) Mallinson "Class Certification Report" and all documents relied upon. |
| 2021.07.07 Mallinson Opening Merits Report and all documents relied upon. |
| 2021.07.21 McCrary Merits Report and Exhibits |
| 2021.07.21 Rarrick Merits Report and Exhibits |
| 2021.07.21 Wilkins Merits Report and Exhibits |
| Computer and Internet Use in the United States: 201, US Census Bureau, November 2014, Table1.   https://www2.census.gov/library/publications/2014/acs/acs-28.pdf |
| Declaration of William Tindall in Support of Cricket Wireless, LLC's Opposition to Plaintiffs' Motion for Class Certification, May 6, 2021 ("Tindall Declaration") |
| http://www.cbabuilder.co.uk/Quant5.html |
| https://about.att.com/newsroom/aio_wireless_available_soon_for_all_us_customers.html |
| https://about.att.com/newsroom/aio_wireless_available_soon_for_all_us_customers.html |
| https://eu.usatoday.com/story/tech/columnist/komando/2013/03/15/komando-free-wifi-on-the-go/1982111/ |
| https://techcrunch.com/2015/01/08/att-sells-crickets-muve-music-service-to-deezer-for-under-100m-under-new-partnership/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAADX5DDxwC0MOMCJxk3ZqP-ZxZUxUSdGufid4oDEQHxLiaEWF3BlJqqCDs1pFqzYxT3Ciz_Jr-qBFwIbZiutqj8mobXCRSLgQweYlke6r1oF3c2ogBWMupO3NFdIULAlFZttLjQ_m5qBL5Y2PXFpIKUSoP02-R-C-GfrjmzP2AMlM#:~:text=Deezer%2C%20the%20music%20streaming%20service,AT%26T%20to%20sell%20Deezer%20music |
| https://uk.pcmag.com/old-cell-phones/4875/fastest-mobile-networks-2013 |
| https://web.archive.org/web/20121104101157/http://www.metropcs.com/metro/detail/per+month+4GLTE+with+Rhapsody/4GALL60 |
| https://www.economicsonline.co.uk/Competitive_markets/Price_elasticity_of_demand.html |
| https://www.engadget.com/2013-10-30-sprint-spark-enhanced-lte.html |
| https://www.eweek.com/mobile/t-mobile-calls-hspa-4g-introduces-largest-4g-network/ |
| https://www.extremetech.com/electronics/116107-what-does-atts-transfer-of-aws-to-t-mobile-mean |
| https://www.fiercewireless.com/tech/at-t-details-hspa-markets-enhanced-backhaul-its-coverage-map |

| |
|---|
| https://www.fiercewireless.com/tech/verizon-sprint-lead-delivering-mobile-data-traffic-over-lte |
| https://www.fiercewireless.com/tech/verizon-sprint-lead-delivering-mobile-data-traffic-over-lte |
| https://www.fiercewireless.com/tech/verizon-sprint-lead-delivering-mobile-data-traffic-over-lte |
| https://www.fiercewireless.com/wireless/rumor-mill-verizon-wireless-mvnos-to-get-lte-q3 |
| https://www.gsmarena.com/samsung_galaxy_s_iii_i747-4803.php |
| https://www.gsmarena.com/samsung_i9505_galaxy_s4-5371.php |
| https://www.phonearena.com/phones/ZTE-Source_id8178 |
| https://www.prnewswire.com/news-releases/cricket-reminds-eligible-americans-of-wireless-phone-assistance-available-through-lifeline-credit-222941861.html |
| https://www.rcrwireless.com/20120215/carriers/fcc-denies-lightsquareds-access-to-spectrum |
| https://www.whistleout.com/CellPhones/News/page-plus-customers-get-verizons-lte-network-without-verizon-lte-pricing |
| https://www.wiseharbor.com/wp-content/uploads/2016/12/WiseHarbor-Mallinson-GMU-CPIP-Oct-2015-1.pdf |
| https://www2.deloitte.com/content/dam/Deloitte/us/Documents/technology-media-telecommunications/us-tmt-mobile-index-09262014.pdf |
| Keith Mallinson, Wireless Substitution of Wireline Increases Choice and Competition in Voice Services, Yankee Group, 2 (July 2005). Cricket claimed significantly larger proportions of customers versus other wireless brands in the $15,000 to $25,000 income (23% versus 9%) segment: https://www.wiseharbor.com/wp-content/uploads/2019/09/Yankee-Group-Mallinson-Wireless-substitution-July-2005.pdf |
| Keith Mallinson, Wireless Substitution of Wireline Increases Choice and Competition in Voice Services, Yankee Group, 2 (July 2005). https://www.wiseharbor.com/wp-content/uploads/2019/09/Yankee-Group-Mallinson-Wireless-substitution-July-2005.pdf |