# Exhibit D

# Exhibit FF

**Jermaine Thomas, et al.**

**vs.**

**Cricket Wireless, LLC**

**Case No.: 3:19-cv-07270-WHA**
**United States District Court**
**Northern District of California**

**Expert Witness Report**
**(Relating to Motion for Class Certification)**

**March 4, 2021**

**Prepared by**

**Steve W. Browne, CPA, ABV, CITP, CFE, CISA, CFF**

| Table of Contents | Page |
|---|---|
| Introduction | 1 |
| Qualifications | 1 |
| Litigation and Relevant Background | 3 |
| Summary of Opinions | 5 |
| Damages Methodologies | 6 |
| Curriculum Vitae | Exhibit A |
| Expert Witness Testimony | Exhibit B |
| List of Information Considered | Exhibit C |

---

**REPORT OF STEVE W. BROWNE, CPA, ABV, CITP, CFE, CISA, CFF**
**March 4, 2021**

---

## Introduction

I have been retained by the law firms of Wagstaff & Cartmell, LLP and Gupta Wessler LLP to render expert opinions on behalf of the named Plaintiffs Jamie Postpichal, Sarah Waters and Ursula Freitas, on behalf of themselves and others similarly situated, ("Plaintiffs") vs. Cricket Wireless, LLC ("Defendant" or "Cricket"). Specifically, this report summarizes my opinions regarding methodologies that exist to calculate damages suffered by the Plaintiffs due to the actions of the Defendant, and my ability to apply those methodologies to calculate the class-wide damages in the aggregate to a reasonable degree of professional certainty.

## Qualifications

I am a certified public accountant (CPA) licensed in Missouri and Kansas, accredited in business valuation (ABV), a certified information technology professional (CITP), a certified fraud examiner (CFE), a certified information systems auditor (CISA), and am certified in financial forensics (CFF). I earned my Bachelor of Science degrees in Finance and Accounting from Kansas State University and my Master of Arts degree in Economics from the University of Missouri, Kansas City. I am a partner in Meara Welch Browne, P.C., and I direct the litigation support, valuation and audit departments.

For over 30 years, I have participated extensively in engagements for audit and accounting, mergers and acquisitions, business valuations and damage analysis studies as both a client advisor and an expert witness. I have accumulated more than 17,000 hours directing numerous litigation, forensic accounting, fraud investigations, and valuation engagements involving extensive preparation or analysis of damage calculation models, contract disputes and breaches, corporate veil issues, bankruptcies, and business and asset valuation models. I have been called upon to serve as an expert witness for the federal government and the attorneys general of Kansas and Missouri, the Insurance Guaranty Associations of fifteen states of the United States, as well as several Fortune 500 companies

1

and privately held organizations on a variety of issues ranging from economic damage claims and business valuation to white collar crime and fraud.

I have been engaged to render expert witness opinions in a variety of industries in cases involving class-wide damages. I have also been retained to render expert witness opinions in numerous cases including RICO and anti-trust actions on the subject of pricing schemes and the resulting overcharges paid by the Plaintiffs. In my relevant experience, I have analyzed voluminous data sets and explained the economics of transactions that covered multiple years. I have conducted extensive analysis of transaction and operational data by individual class member and in the aggregate using multiple sources of internal and external information. Many of my engagements included additional analysis of transactions related to alleged fraud that was related to the damages incurred by the Plaintiffs. I have employed a variety of well recognized damages methodologies in these cases including the use of an overcharge model, multiple variant linear regression analysis, parametric statistics, and the central limit theorem.

See Exhibit A for my curriculum vitae. See Exhibit B for the cases in which I have testified as an expert witness over the last four years. I have given numerous speeches regarding economic matters, fraud investigation and regulatory compliance. I have also instructed classes for the Association of Certified Fraud Examiners and the Federal Bureau of Investigation ("FBI"). I have not authored any publications in the last ten years. My compensation for this engagement is $450 per hour. Other personnel have assisted me in this matter and are being compensated at rates less than $450 per hour. No part of my compensation depends on the outcome of this litigation.

The opinions set forth in this report are based on my expertise, training, and professional judgment and, I believe, would be replicated by other qualified persons. They are also based on Meara Welch Browne, PC's analysis of financial records and related documents, and other pertinent information, listed in Exhibit C.

2

**Litigation and Relevant Background**

This case is a proposed class action lawsuit brought by customers of defendant Cricket Wireless, LLC ("Cricket"), who allege that Cricket engaged in a deceptive and fraudulent scheme, from November 1, 2012 through September 30, 2014, to sell 4G/LTE Android smartphones with 4G/LTE service plans at a premium price in markets and coverage areas where Cricket did not actually have the capability to ever provide 4G/LTE service. The plaintiffs essentially allege that in the early 2010s, there was a technological advancement in the cellular phone and network technology that allowed consumers with properly equipped smartphones to connect to the internet at faster speeds using "4G long-term evolution" (4G/LTE) technology, and this ability was attractive to consumers, especially because it significantly improved the consumer's experiences when streaming video, streaming music, and accessing other content on the internet from their phones.

Plaintiffs allege that by 2012, most of Cricket's competitors had invested in their network infrastructure enough to be able to offer 4G/LTE speeds or service for much of the country, and as a result, many people had this service and were increasingly using the enhanced smartphone features that the new speeds allowed, and the gap between the 4G/LTE experience and the older 3G experience for consumers continued to grow. Cricket, at this point in time, had an obvious problem. While it recognized the increasing demand for 4G/LTE service, it lacked a 4G/LTE network for the vast bulk of its customers across the country – only had 4G/LTE in a dozen cities across the U.S. – and it did not have an economically feasible plan or the ability to change that in the future. So, Cricket was falling behind, competitively.

Plaintiffs allege that in response to this problem, Cricket chose to uniformly market its 4G/LTE capability aggressively and consistently across the country, even in the vast majority of geographic areas in the country where Cricket had no ability to provide its customers with 4G/LTE service. Cricket also is alleged to have engineered its 4G/LTE phones in a way that made them locked to Cricket's network, which would prevent Cricket customers who purchased such premium phones outside of Cricket's 4G/LTE coverage areas from switching to a competing cellular service provider using their recently purchased Cricket 4G/LTE phone. This meant that if Cricket could

3

convince people, even outside of Cricket's limited, actual 4G/LTE coverage areas, to purchase a 4G/LTE smartphone and sign up for a 4G/LTE data plan, Cricket would be more likely to keep that customer's business for a longer period of time even if the customer became disappointed in their phone's performance because there was no actual 4G/LTE network service available to that customer.

Plaintiffs further allege that Cricket went further and deceptively represented to potential and existing customers that it had entered into a "nationwide 4G roaming agreement" with Sprint in February 2013, to create and enhance the appearance that it had nationwide 4G/LTE capability for its customers.  In reality, however, Plaintiffs allege that Cricket offered 4G "roaming" only to the limited subset of Cricket customers who lived in the few geographic areas already served by Cricket's limited 4G//LTE network.  For the vast number of Cricket customers – the class members in this case as I understand it – who lived outside of Cricket's existing 4G/LTE coverage territories, Cricket disabled those customers' ability to access Sprint's 4G network through the roaming agreement while within Cricket's footprint.  Thus, while marketing and selling 4G/LTE service to customers everywhere at a premium price, Cricket wasn't telling its customers that most of them would never receive any 4G/LTE service.

I understand the proposed nationwide class of Plaintiffs to be asserting claims under RICO, 18 U.S.C. § 1964(c) and under the California CLRA, Cal. Civ. Code § 1780, to be described as follows (and subject to certain exclusions):

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE-capable Android smartphone with a 4G/LTE monthly plan for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network.

I further understand that the Plaintiffs propose to certify, in the alternative, a state or multi-state class asserting claims under California (and similar) consumer protection laws, described as follows (and subject to certain exclusions):

4

> All persons in California or other states with similar consumer protection laws with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012 and September 30, 2014, purchased from Cricket a 4G/LTE-capable Android smartphone with a 4G/LTE monthly plan for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network, or later activated a 4G/LTE plan with the device for service on Legacy Cricket's network.

For purposes of my opinions, it is my assumption that Plaintiffs are able to prove their claims at trial, that all members of the classes described above can be readily identified and ascertained from Cricket's records, as Plaintiffs' expert Keith Mallinson has opined, and that all class members have suffered legal injury at their time of purchase that will be proven by the Plaintiffs at trial, as Mr. Mallinson's report explains and opines.

## Summary of Opinions

Plaintiffs' counsel have asked me whether a reliable damage methodology exists that can be applied to calculate the concrete financial loss (i.e., economic loss) suffered by the class in the aggregate using well-established economic and/or statistical principles and, potentially, survey methodology, and if so, to explain the methodology I would use to determine the damages sustained in the aggregate by the class.

Specifically, my opinions, stated to a reasonable degree of professional and economic certainty, are that:

1. Based on my review of the expert witness report of Keith Mallinson and my review of evidence in the case, it is apparent that the entire class of individuals have suffered damages due to the actions of the Defendant in the same manner and can be calculated consistently across the class utilizing reliable and well recognized methodologies.

2. Assuming liability is proven, I can, based on available data and information that is common to the class, utilize a reliable and well recognized damages methodology and computation that will determine damages for the class in the aggregate consistent with the class's claims for recovery.

5

## Damages Methodologies

Reliable damages methodologies are available to quantify class-wide damages in the same way for each member of the class because  all class members were overcharged by paying a premium for 1) 4G phones that Cricket rendered customers unable to utilize the 4G features; and in conjunction with the phone overcharge, 2) a 4G service plan Cricket did not provide.

Damages to the class due to the actions of the Defendant can be calculated using an overcharge model by comparing the actual prices paid with the but-for price that would have existed absent the Defendant's wrongful actions.  Because each and every member of the class purchased a 4G/LTE phone and corresponding 4G/LTE service plan, but Cricket did not provide the 4G/LTE service it charged each customer for, all members of the class were similarly overcharged when they paid a market price for the 4G/LTE phone and service, but were unknowingly only provided with 3G service by Cricket, if Plaintiffs' claims are proven.

The damages for this overcharge can be calculated as the difference between the actual price paid for the 4G/LTE phone and 4G/LTE service, and what would have been paid if the Defendant had not engaged in wrongful conduct (i.e., the4G/LTE scheme, including misrepresentations and related omissions).  As Plaintiffs' expert Keith Mallinson's report explains, the scheme is alleged to have allowed Cricket to apply premium 4G/LTE pricing to smartphones and service plans in markets that would provide only 3G service.  By doing so, Plaintiffs allege that Cricket was able to overcharge them by applying a premium price through a fraud scheme.  I have been asked to assume that this fraud scheme is accepted by the jury, and Mr. Mallinson's analysis is correct that every member of the class was injured.

As Mr. Mallinson's report shows, he is able to identify the particular devices and particular service plans purchased by each class member, and the monthly payments made under those service plans. I can reply on and accept this calculation to identify the class members, the aggregate purchases of each type of 4G/LTE Android smartphone, the aggregate payments by month under each month service plan, and then apply a well-accepted methodology to calculate the total damages to the members of the class in the aggregate.

6

This calculation is often applied in RICO fraud scheme or antitrust cases that arise from a defendant's systematic action.  The key concept and theme that pervades in these cases is that the economic injury is caused by the Defendant's systematic action.  Once the jury determines the scope of the scheme, and Mr. Mallinson's calculations are applied based on those findings to determine who has been harmed by that scheme, I can then apply an overcharge calculation using benchmarks from the "but for" world that would have existed had the wrongful conduct not occurred, to calculate the aggregate damages of the class.  This is a class-wide methodology because it involves using the same common evidence – evidence used to establish benchmarks for the premium paid for particular devices and particular service plans that can be applied to all members of the class using the same approach.

This approach is a widely recognized methodology that has been applied in numerous RICO and antitrust class action cases to reliably calculate the class-wide damages to a reasonable degree of professional and economic certainty. For example, in *In re: EpiPen Mktg., Sales Practices & Antitrust Litig.*, 2020 WL 1873989 (D. Kan. Feb. 27, 2020), the court accepted the plaintiffs' damages expert's overcharge methodology at the class certification phase of the case.  There, plaintiffs alleged that defendants' wrongful actions allowed them to overcharge customers for the price of EpiPens. As another example, in *In re Chrysler-Dodge-Jeep EcoDiesel Mktg.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018), the plaintiffs alleged that the defendants engaged in wrongful conduct that caused the plaintiffs to pay a premium for certain vehicles.  Again, the Court accepted an overcharge or premium calculation based on benchmarks that can be used to reliably estimate from an economic perspective what the price would have been absent the defendant's misconduct.

I can do the same here.  At the merits phase of this case, if a class is certified and the court accepts the class definition, then applying a methodology similar to these other RICO class actions and numerous other cases that have involved pricing premiums and alleged overcharges, I will be able to use data and information common to the proposed class to determine one or more "overcharge" amounts or "price premium" amounts for each Cricket 4G/LTE Android phone and 4G/LTE data plan sold to class members over time (those who lived outside a Cricket 4G/LTE coverage area) during the class period.

7

The first step will be determining the price paid by the class members in the aggregate for the products and service plans in the class definition.   The Defendant has submitted a series of spreadsheets of data relevant to the class that can be utilized to calculate the actual price paid by each member of the class, including the following:

- CRICKET01644897: Spreadsheet containing 4G/LTE-capable device activations, including store and customer information for each activation for dates 5/1/2012–10/1/2014

- CRICKET_REPRODUCTION00426014: Spreadsheet containing 4G/LTE plan subscriptions for dates 5/1/2012–10/1/2014

Although Cricket did not provide the actual purchase price of the individual phone purchase, it did provide a minimum and maximum price and an activation date that can be utilized in the overcharge calculation.   Further, Cricket provided its rate plans, monthly revenue, and starting and ending dates of service that can be utilized in the overcharge calculation.

Next, I will use benchmarks to approximate what would have happened in the but for world absent Defendant's misconduct.   In order to derive the overcharge or premium paid by the class members, relevant contemporaneous benchmarks can be relied upon to quantify the price that should have been paid but for the Defendant's misconduct.

At the merits phase of this case, I will work with Mr. Mallinson to identify the appropriate benchmarks to perform calculations that can be scrutinized and challenged by the Defendant.   In overcharge cases, I often apply more than one benchmark to create a reasonable range of damages to present to the jury for their determination.

The following are examples of market benchmarks that can be utilized in quantifying damages to each member of the class in the same way.

<u>Dollar amount differential as a measure of the overcharge for phones and/or percentage differential as a measure of the overcharge for service plans:</u>

Pricing data from other mobile prepaid providers that are the closest competitors to Cricket in the market.  Through industry research and publicly available information I will be able to locate and access pricing data from these competitors to evaluate whether they were offering 3G or, in the alternative 3G and 4G service plans.  My early research has identified two competitors with similar characteristics to Cricket:

- MetroPCS –3G phones and 3G service compared to Cricket's charges for 4G phones and 4G/LTE service.
- Boost Mobile - 3G phones and 3G service compared to Cricket's charges for 4G phones and 4G/LTE service.

An additional or alternative source for benchmarking is to look at pricing patterns in other industries that exhibit technology-based pricing to identify percentage discounts applied by companies that fall behind the technological curve and must apply discount pricing in the absence of the ability to compete on price and/or to identify pricing differentials similar to that of 3G and 4G/LTE phones and service, and may also be used to calculate yardsticks, or benchmarks of the but for pricing differential.

Yet another potential source of benchmarking is to build a "bottoms-up" premium based on the estimated pricing.  For example, for service plans, if I can identify the cost component that impacts pricing, such as data usage, then I can apply recognized econometric tools to determine the data usage differential between the average 4G user and 3G service user, and then model the pricing that would have been applied in a 3G market versus a 4G market based on that data usage.  I can also look to competitors in the industry with similar service plans to construct benchmarks to further refine and sharpen these calculations so that they are tailored to and benchmarked against the "but for" world.  Mr. Mallinson, as an expert in this industry, provided examples of Cricket applying uniform pricing in 4G/LTE markets and 3G markets.  Working with Mr. Mallinson, we can determine the overcharge based on the pricing that would have been applied given the data usage.

9

Example MetroPCS as a But-For Pricing Benchmark

Although at the class certification, my focus is to show that a reliable methodology exists, which as I explained above is the case, I can further provide an example of how econometric tools can be used to apply benchmarks in this methodology.

A direct competitor of Legacy Cricket in the prepaid wireless industry, MetroPCS, faced similar circumstances in 2012 and disclosed as part of its December 31, 2012 10-K (PLTF00014148-14538) the headwinds faced by the company.

---

**Products and Services**

We provide wireless broadband mobile services under the MetroPCS® brand. We offer these services under a family of service plans, which include all applicable taxes and regulatory fees and offer nationwide voice, text and web access services on a predominately unlimited, no long-term contract, paid-in-advance, flat-rate basis starting at as little as $40 per month. For an additional $5 to $30 per month, our customers may select alternative service plans that offer additional features on an unlimited basis. We also offer discounts to customers who purchase services for additional handsets on the same account. We also offer 4G LTE service plans that allow customers to enjoy unlimited voice, text and web access services at fixed monthly rates starting as low as $40 per month. For additional usage fees, we also provide certain other value-added services.

---

*We may have difficulty meeting the demands placed on our network by data products.*

We are increasingly selling, and may in the future sell even larger numbers of, handsets, devices (such as devices using the Android operating system), services and content that place a higher demand on our existing networks than handsets, devices, services and content we have historically sold. Industry trends, as well as our own experience, suggest that the demand for data services and the amount of data that will be consumed by a subscriber will continue to grow. We may not be able to satisfy the demands that these handsets, devices, services and content place on our network, we may not be able to profitably provide the data services used by these devices, and these devices, services and content may cause network congestion, strain the resources we devote to, and our ability to engage in, network management and limit our ability to meet the demands and expectation of our customers. We predominately offer data services using 1xRTT CDMA while most of our competitors use EVDO or other technologies which offer higher data speeds. In addition, because of our limited bandwidths for 4G LTE, our 4G LTE data speeds will not be as fast as those competitors who are using wider channels to offer 4G LTE or other high speed services. As a result, customers may not find our data services as attractive as those of our competitors. If we are unable to satisfy the demands of these new devices, services and content on our existing networks, we may be unable to offer these services profitably, these devices, services and content may cause network congestion and issues with respect to our existing customers, or we may have to raise prices or forego our unlimited service model, such that we may lose customers and may have difficulty attracting new customers. In addition, in order to meet the capacity demands of these new devices, services and content for data usage, we may be required to spend significant capital to build additional network capacity, lease additional sites, build additional DAS systems, purchase additional spectrum, redeploy spectrum from 4G LTE to CDMA or EVDO, refarm our CDMA spectrum to 4G LTE, or undertake other expenses or actions which could increase our costs. We also may be required to invest in technologies which have a shorter depreciable life which could increase our depreciation or result in write-offs. These demands also may require us to engage in network management technologies and practices which customers may find undesirable. All of the above could have a material adverse effect on our business, financial condition and operating results.

10

> *We may be unable to acquire additional spectrum in the future at a reasonable cost or at all.*
>
> Because we offer predominately unlimited calling and data services for a flat rate, our customers tend, on average, to use our services more than the customers of other wireless broadband mobile carriers. We believe, based on industry trends and our own experience, that the average data usage of our customers may continue to rise. We anticipate we will need to acquire additional spectrum in order to continue our customer growth, expand into new metropolitan areas, maintain our quality of service, meet increasing customer demands and data usage, or to allow the deployment of new technologies. Over the past several years we have tried to acquire spectrum from a number of sources, including participating in government auctions and private transactions, but we have not been successful. In addition, there is no assurance that additional spectrum will be made available by Congress or the

> and other manufacturers. As the CDMA infrastructure of our network becomes less popular or obsolete, the cost of compatible equipment and technology may also increase and we may also be subject to significant write-offs or changes in estimated useful life and we may have difficulty securing upgrades and improvements in such equipment when needed.

It is noteworthy that MetroPCS continued to offer 3G service plans with 3G pricing, alongside 4G/LTE service plans during the class period and applied different pricing to the two different levels of service. An excerpt from CRICKET01925184 is below from a Deloitte presentation dated October 12, 2012 titled "AYCE Competitor Profiles" illustrating the various plans with MetroPCS offered at the time[1].

| Type | Cost | Voice (local calling, Nationwide long distance, voicemail) | Messaging | Data (MetroWEB) | Additional Features |
|------|------|------------------------------------------------------------|-----------|-----------------|--------------------|
| 4GLTE | $40/mo. | Unlimited | Unlimited[1] | 250MB data at 4GLTE | None |
| | $50/mo. | Unlimited (plus visual voicemail) | Unlimited Plus[2] | 2.5GB data at 4GLTE | None |
| | $55/mo.[3] | Unlimited (plus Metro 411 Premium Directory Assistance, visual voicemail) | Unlimited Plus | Unlimited data at 4GLTE | Add up to 5 lines total for $50/per month each |
| | $60/mo. | Unlimited (plus Metro 411 Premium Directory Assistance, visual voicemail) | Unlimited Plus | 5 GB data 4GLTE | Rhapsody Unlimited Music |
| | $70/mo. | Unlimited (plus Metro 411 Premium Directory Assistance, visual voicemail) | Unlimited Plus | Unlimited data at 4GLTE, Video on Demand | Rhapsody Unlimited Music |
| 3G | $40/mo. | Unlimited | Unlimited | Unlimited | None |
| | $45/mo. | Unlimited (plus Metro 411 Premium Directory Assistance) | Unlimited Plus | Unlimited | None |
| | $50/mo. | Unlimited (plus Metro 411 Premium Directory Assistance, visual voicemail) | Unlimited Plus | Unlimited | None |
| | $60/mo. | Unlimited (plus Metro 411 Premium Directory Assistance, visual voicemail) | Unlimited Plus | Unlimited | Mobile instant messaging |
| | $60/mo. | Unlimited (plus Metro 411 Premium Directory Assistance, visual voicemail) | Unlimited Plus | Unlimited | Rhapsody Unlimited Music |

This table along with the archived images of MetroPCS's website indicate that Legacy Cricket's competition inherently recognized in their pricing model that there was a difference between 3G and 4G/LTE and that customers would pay a premium for the 4G/LTE access as well as additional data at the increased speeds provided by the new technology. It is noteworthy that all of the 3G

---

[1] PLTF00012691-12773

plans from MetroPCS offer unlimited data at the slower 3G speeds. Boost Mobile was another competitor of Legacy Cricket and MetroPCS but due to their ownership by Sprint were not hampered by the same limited financial and spectrum realities. MetroPCS's bifurcated plans not only provide evidence of a wireless company's ability to apply pricing to both 3G service plans and 4G/LTE service plans at the same time, but more importantly provides a concrete, real world benchmark that existed around the relevant time period by which we can calculate the premium charged by Legacy Cricket to the class members for the 4G/LTE service which was never delivered. This benchmark can be used to calculate pricing differentials that can be uniformly applied to all class members based on the available data.

Again, although at this phase of the case, I have not started to construct benchmarks and perform calculations, the MetroPCS service plan pricing is useful in another respect. During 2013 and 2014, MetroPCS transitioned to a simplified pricing model in which each plan offered 4G/LTE service through their website and related marketing clearly identified that this service was only available on 4G/LTE capable phones[2]. MetroPCS maintained various pricing tiers based upon the monthly amount of data that was available at unrestricted speeds during this time period, which indicates that the cost for providing the data is a key driver for the price wireless carriers charge in a transparent and competitive market. This transition in pricing also indicates that overtime during the class period the price premium that Legacy Cricket realized from the overcharge scheme will move in line with other market forces.

Beyond the monthly damages incurred by class members that were charged a premium for 4G/LTE service plans, each class member was also damaged immediately at the point of sale when purchasing a 4G/LTE capable device. Industry Expert Mallinson's report states:

---

[2] PLTF00012721-12724

12

It would have had a lower price for its 4G/LTE-capable Android smartphones in non-4G/LTE markets because those devices still utilized only 3G technology. The price difference for 4G/LTE-capable Android smartphones in the two markets can be estimated by looking at the pricing of 3G-only smartphones at this time, and then determining how much of the difference was attributable to 4G/LTE capability (rather than incremental improvements in other features). As explained herein, 4G/LTE service was needed to unlock the potential of advanced technology 4G/LTE-capable smartphones. Thus, a service provider offering 4G/LTE capable Android smartphones would have had to offer substantial discounts on these devices, which were permanently locked to Cricket's network, to entice customers to forego the 4G/LTE experience.

This statement is supported by MetroPCS's pricing of phones during the class period. Specifically, the 3G capable phones were sold at a steep discount relative to 4G/LTE capable phones. Additional discounts and sales specials were also utilized in order to sell the 3G capable products at various points in time. The below images are taken from MetroPCS's website from July 10, 2012 (PLTF00012744-12783) and illustrate the stark price difference between 3G phones and 4G/LTE phones from the same manufacturer (Huawei). The Huawei Activa 4G is a 4G/LTE capable phone whereas the Huawei Pinnacle only offers 3G capability.





13

The same document and other examples[3] over time during the class period contain numerous comparable phones with various features, which will allow us to prepare a model that isolates the premium paid for 4G/LTE phones and their embedded features. By conducting this analysis, the damages for the class members can be uniformly calculated for all class members based upon the phone they purchased and the resulting overcharge for the functionality they were never able to utilize.

Industry Expert Mallinson opines that the overcharge for all 4G/LTE smartphone devices should be the same or within a close range because of the importance of 4G/LTE. The same is true for the 4G/LTE service plans offered by Legacy Cricket for the same reason. Therefore, Legacy Cricket would have been applying a uniform discount across this product line to entice customers to buy outdated technology but for the pricing scheme.

Example of Overcharge Formulas

Once we have calculated the premium, in consultation with Mr. Mallinson and utilizing the information and approach outlined above based on the premium that was charged in the real world versus the discounted amount that would have been charged in the but for world, we can apply those premiums into the class-wide damages model. To calculate the class-wide damages in the aggregate, there will need to be two overcharge calculations for the devices and service plans, respectively. The example formulae are laid out below which will vary over time during the class period as the premium fluctuates with the broader market demand and supply forces.

| For Each Unique Device Sold | | For Each Service Plan Sold | |
|---|---|---|---|
|   | Number of Devices Sold |   | Monthly Price Paid for Plan |
| x | Price Paid for Unique Device | x | No. of Months of Service |
| x | 4G/LTE Device Premium | x | 4G/LTE Plan Premium |
| = | **4G/LTE Device Overcharge** | = | **4G/LTE Service Overcharge** |

---

[3] PLTF00012774-12810

14

The two formulas above are the basic model which will be applied to the members class-wide based upon which 4G/LTE device they purchased and which service plan they purchased and for how long they purchased that plan.  For members that modified or changed their plan throughout the period, the same formula would be applied for each separate change to the plan and summed to calculate the total damages to that member. This will likely be captured in the company's records and will be reflected in the aggregate damage calculations using those records. Lastly, the damages incurred due to overcharge in the pricing scheme from the device and plan(s) for each member would be added to arrive at the total damages to each member.

As discussed above, I can work with Mr. Mallinson to determine the difference in price, or overcharge premium paid, for each class member at the point of sale between the phone and plan that the class member purchased (represented as offering 4G/LTE capability), and the phone and plan that the class member actually received (one that could not access 4G/LTE service in their home area).  This pricing overcharge will be determined using evidence common to the class, and which does not depend upon individual class member preferences.  The sum of all such pricing differential computations, which may differ in amounts for different Cricket 4G/LTE phones and plans offered to class members during the class period, will produce a reliable total amount of damages for the class, using common evidence.

I have applied this overcharge/premium damages methodology in numerous cases which have been accepted by the finder of fact.  And, as explained above, the overcharge/premium damages methodology has been accepted as a reliable damages methodology for determining class-wide damages at the class certification phase in numerous RICO or antitrust class action cases, including, for example: *In re: EpiPen Mktg., Sales Practices & Antitrust Litig.*, 2020 WL 1873989 (D. Kan. Feb. 27, 2020); and *In re Chrysler-Dodge-Jeep EcoDiesel Mktg.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018).

Similarly, this overcharge/premium damages methodology is consistent with and supported by the legal remedies available under the California Legal Remedies Act (CLRA).  The CLRA generally prohibits misrepresentations or material omissions by sellers about the characteristics, quality, or standings of goods or services, Cal. Civ. Code §§ 1770(a)(5), (7), (9), and it permits an action for

15

damages to "[a]ny consumer who suffers any damage as a result of a [violation of the statute.]" Cal. Civ. Code. § 1780.  Assuming this claim is proven at trial, my class-wide damages calculation can be applied in the same way to this claim, whether a nationwide or a state law class is certified.

Finally, to the extent that I encounter a variable in the overcharge calculation that needs to be isolated and accounted for, I have utilized additional well recognized econometric tools, such as multiple variable linear regression analysis, that examine other data sources, to further and independently examine the evidence in other data sets to calculate the economic impact of that variable and incorporate that into  my damages computation described above.

We reserve the right to modify, amend or further clarify our opinions upon the receipt of further information, discovery, and analysis.

This report was prepared with the assistance of my associates and staff under my direct supervision.  The use of "our" or "we" reflects the efforts of my firm, however, the final opinions and statements are made by me and are mine alone.

The opinions set forth in this report are based on my expertise, training and professional judgment and, I believe, would be replicated by other qualified persons.

_____

Steve W. Browne

16

**EXHIBIT A**



# Stephen W. Browne
## CPA, ABV, CITP, CFF, CFE, CISA
## Meara. Welch. Browne, PC
**2020 West 89th Street, Suite 300**
**Leawood, Kansas 66206-1946**
**(816) 561-1400**

## PROFESSIONAL EXPERIENCE:

| | | |
|---|---|---|
| **Partner** | Meara.Welch.Browne, PC | 1990 - Present |
| **Auditor** | Ernst & Young | 1988 - 1990 |

## AREAS OF EXPERTISE:

### Forensic & Fraud Investigation, Business Valuation and Litigation Resolution

➢ Served as expert witness in Federal and State courts in cases involving economic damage claims and business valuation issues
➢ Retained by Federal and State governments in white collar crime and fraud cases
➢ Served as Federal Court appointed business monitor in white collar crime cases
➢ Incurred over 15,000 hours directing numerous litigation and valuation engagements involving extensive preparation or analysis of:
  ➢ Damage calculation models
  ➢ Contract disputes and breaches
  ➢ Corporate veil issues
  ➢ Bankruptcies
  ➢ Business and asset valuation models
➢ Authored and managed all procedures regarding the administration of three (3) multi-million dollar class action law suit settlements.
➢ Directed dozens of fraud investigations involving:
  ➢ Extensive forensic accounting procedures
  ➢ Conducting interviews with suspected perpetrators and other client personnel
  ➢ Coordination of efforts and evidence with law enforcement authorities

### Audit & Accounting

➢ Directs all aspects of annual corporate financial statement audits.  Experience includes the following industries: telecommunications, commodities, manufacturing and distribution, information technology, governmental & not for profit, A-133, textiles, construction, banking, health care, reinsurance and insurance agency, professional services, mortgage banking, agri-business, and brokerage.
➢ Directs all aspects of annual pension and health and welfare benefit plan audits.
➢ Incurred over 3,000 hours supervising firm and client personnel on computer system upgrades and installation projects. Served as liaison between computer programmers and operations management in developing system business rules/logic and implementing financial reporting requirements.
➢ Extensive experience with data extraction and analysis software (ACL).

## Mergers & Acquisitions

➢ Incurred over 5,000 hours directing due diligence work on over thirty Five (35) acquisitions, ranging in size from $600,000 to $70,000,000.
➢ Performed valuation services related to acquisition pricing and FASB 141R and 142.
➢ Assisted clients with managing the integration of acquired entities into the corporate structure and culture.

## Instructor

➢ Mr. Browne has served as a speaker and instructor for the Association of Certified Fraud Examiners and the Federal Bureau of Investigation and has instructed dozens of courses for continuing professional education for accountants and lawyers.

**EDUCATION:**      Kansas State University                 Manhattan, KS
                          Bachelor of Science in Finance

                          Kansas State University                 Manhattan, KS
                          Bachelor of Science in Accounting

                          University Missouri - Kansas City      Kansas City, MO
                          Master of Arts in Economics

## PROFESSIONAL DESIGNATIONS:

Certified Public Accountant  (Certification #7348)  State of Kansas
                                    (Certificate #2003003671) State of Missouri

Accredited in Business Valuation (ABV) – American Institute of Certified Public Accountants

Certified Information Technology Professional (CITP) – American Institute of Certified Public Accountants

Certified in Financial Forensics (CFF) - American Institute of Certified Public Accountants

Certified Fraud Examiner (CFE) – Association of Certified Fraud Examiners

Certified Information Systems Auditor (CISA) – Information Systems Audit and Control Association

## CURRENT BOARD/DIRECTOR POSITIONS:

The Midwest Innocence Project - Treasurer

Highlands's Ranch Homeowner's Association - President

**COMMUNITY INVOLVEMENT**

➢ Volunteer for Restart (Kansas City homeless shelter)
➢ Volunteer for Christmas in October (Kansas City program for building houses for the homeless)
➢ Conducted pro-bono services for Cradles and Crayons (Daycare for disabled & disadvantaged children)
➢ Organizer/participant in community disaster relief efforts (Greensburg Kansas, Joplin Missouri)

**EXHIBIT B**

# STEVE W. BROWNE, CPA, ABV, CITP, CFF, CFE, CISA
## Expert Witness Testimony
## Last Four Years

| Deposition | Trial | Action | Venue | Case # |
|---|---|---|---|---|
| 3/21 | - | Asner, et al., v. Raizada, et al. | Arbitration | 01-19-0001-2031 |
| 2/21 | - | Tarvisium Holdings, LLC, et al. v. Dukat, LLC, et al. | U.S. Dist. Ct. Western Dist. of MO | 4:19-cv-00086DGK |
| 2/21 | - | Edelman Financial Engines, LLC v. Visionary Wealth Advisors, LLC, et al. | Dist. Ct. of Johnson County, KS | 20CV01338 |
| 1/21 | - | Brown v. Curators of the University of MO | Circuit Ct, Boone County, MO | 17BA-CV04715 |
| 12/20 | - | Wiederin, Inc., et al. v. Landus Cooperative | District Ct. of Story County, IA | LACV051479 |
| 12/20 | - | Thies v. Beatty, et al. | Circuit Ct., Jackson County, MO | 1816-CV27605 |
| - | 10/20 | Casey Parisoff, et al. v. Cornerstone Kansas City, LLC, et al. | Arbitration | 01-19-0002-7306 |
| - | 9/20 | USA v. Gregory | U.S. Dist. Ct. of Kansas | 147-CR-20079-JAR |
| 12/19 | - | News-Press & Gazette Co., et al. v. CliftonLarsonAllen, LLP | Circuit Ct., Jackson County, MO | 1816-CV19796 |
| - | 11/19 | Compton v. Compton | Dist. Ct. of Johnson County, KS | 13-CV-1156 |
| 9/19 | - | Commerce Bank, et al. v. Wells Fargo, et al. | Dist. Ct. of Finney County, KS | 2016-CV-000123 |
| 7/19 | - | Pinnacle Financial Solutions, et al. v. North Oak, LLC, et al. | Circuit Ct., Clay County, MO | 17CY-CV05297 |
| 8/18,10/18 | 12/18,1/19 | Jo Ann Howard & Associates, PC, et al. v. J. Douglas Cassity, et al. | U.S. Dist. Ct. Eastern Dist. of MO | 4:09-CV-01252-ERW |
| 7/18 | - | Lenexa Hotel, LP v. Holiday Hospitality Franchising, Inc. | U.S. Dist. Ct. of Kansas | 2:15-cv-09196-KHV-JPO |
| 7/18 | - | IPFS Corp. v. Scott | Arbitration | 01-18-0000-7096 |
| 7/18 | - | William S. Wollesen, et al. v. West Central Cooperative, et al. | U.S. Dist. Ct. Northern Dist. of IA Western Division | 16-CV-4012-MWB |
| 12/17 | - | Hibu, Inc. v. Chad Peck | U.S. Dist. Ct. of Kansas | 16-CV-01055-JTM-TJJ |
| 4/17 | 10/17 | Raizada Group, et al. v. PHC Holding Company, LLC, et al. | Circuit Ct., Jackson County, MO | 1416-CV14245 |
| 6/17 | 2/17 | Porters Building Centers, Inc., v. Sprint Lumber, et al. | U.S. Dist. Ct. Western Dist. of MO and Mediation | 16-cv-6055 |

**EXHIBIT C**

| **Bates** | **Bates** | **Bates** | **Bates** |
|---|---|---|---|
| CRICKET00000827 | CRICKET00606418 | CRICKET02504887 | PLTF00015051 |
| CRICKET00000842 | CRICKET00608082 | CRICKET02504926 | PLTF00015267 |
| CRICKET00002289 | CRICKET00774621 | CRICKET02508426 | PLTF00015454 |
| CRICKET00003077 | CRICKET00783023 | CRICKET02508429 | PLTF00015663 |
| CRICKET00003756 | CRICKET00793602 | CRICKET02508433 | PLTF00015887 |
| CRICKET00004624 | CRICKET00794710 | LAZARD0000007 | PLTF00015938 |
| CRICKET00005601 | CRICKET00851416 | PLTF00010637 | PLTF00015983 |
| CRICKET00008293 | CRICKET00866906 | PLTF00012601 | PLTF00016027 |
| CRICKET00010914 | CRICKET00866939 | PLTF00012623 | PLTF00016077 |
| CRICKET00012601 | CRICKET00877821 | PLTF00012641 | PLTF00016124 |
| CRICKET00012671 | CRICKET00900263 | PLTF00012671 | |
| CRICKET00013216 | CRICKET01553083 | PLTF00012691 | |
| CRICKET00017941 | CRICKET01594252 | PLTF00012693 | |
| CRICKET00020771 | CRICKET01644896 | PLTF00012698 | |
| CRICKET00021398 | CRICKET01644897 | PLTF00012701 | |
| CRICKET00021816 | CRICKET01644898 | PLTF00012704 | |
| CRICKET00043716 | CRICKET01647479 | PLTF00012707 | |
| CRICKET00049190 | CRICKET01653745 | PLTF00012709 | |
| CRICKET00049194 | CRICKET01654078 | PLTF00012721 | |
| CRICKET00060542 | CRICKET01655873 | PLTF00012725 | |
| CRICKET00061417 | CRICKET01656278 | PLTF00012729 | |
| CRICKET00068065 | CRICKET01657105 | PLTF00012736 | |
| CRICKET00078396 | CRICKET01657609 | PLTF00012744 | |
| CRICKET00273030 | CRICKET01658865 | PLTF00012774 | |
| CRICKET00351657 | CRICKET01660316 | PLTF00012784 | |
| CRICKET00352543 | CRICKET01660961 | PLTF00012784 | |
| CRICKET00354344 | CRICKET01661715 | PLTF00012795 | |
| CRICKET00354776 | CRICKET01662527 | PLTF00012795 | |
| CRICKET00354980 | CRICKET01663118 | PLTF00012806 | |
| CRICKET00368224 | CRICKET01663555 | PLTF00012806 | |
| CRICKET00377443 | CRICKET01665105 | PLTF00012811 | |
| CRICKET00388913 | CRICKET01668410 | PLTF00012840 | |
| CRICKET00426014 | CRICKET01670893 | PLTF00012874 | |
| CRICKET00427540 | CRICKET01671239 | PLTF00012908 | |
| CRICKET00428352 | CRICKET01671244 | PLTF00012935 | |
| CRICKET00434098 | CRICKET01671822 | PLTF00012961 | |
| CRICKET00441063 | CRICKET01672082 | PLTF00012981 | |
| CRICKET00444885 | CRICKET01672932 | PLTF00013185 | |
| CRICKET00458766 | CRICKET01673829 | PLTF00013346 | |
| CRICKET00469409 | CRICKET01674670 | PLTF00013520 | |
| CRICKET00469418 | CRICKET01675540 | PLTF00013690 | |
| CRICKET00477211 | CRICKET01676089 | PLTF00013902 | |
| CRICKET00479333 | CRICKET01925184 | PLTF00014148 | |
| CRICKET00509258 | CRICKET02441744 | PLTF00014539 | |
| CRICKET00519245 | CRICKET02503936 | PLTF00014683 | |
| CRICKET00527484 | CRICKET02504734 | PLTF00014838 | |

**Non-Bates**

2020.01.21 Cricket's Responses and Objections to Plaintiffs' Second Request for Admissions
2020.07.27 (Doc. 71) Stipulation with Protective Order
2020.08.09 Plaintiffs' First Interrogatories to Defendant Cricket Wireless, LLC
2020.08.10 (Doc. 78) Letter from Matthew Ingber to the Honorable William Alsup
2020.08.21 Plaintiffs' First Request for Admissions to Cricket
2020.08.21 Plaintiffs' Second Interrogatories to Defendant Cricket Wireless, LLC
2020.09.08 Defendant's Responses to Plaintiffs' First Interrogatories to Defendant Cricket Wireless LLC
2020.09.21 Cricket Wireless, LLC's Responses and Objections to Plaintiffs' Second Set of Interrogatories
2020.09.21 Cricket's Responses and Objections to Request for Admissions to Cricket
2020.09.21 Cricket's Responses and Objections to Second Set of Interrogatories
2020.10.09 (Doc. 94) Cricket Wireless LLC's Opposition to Plaintiffs' Motion to Extend Class Certification Deadline
 and Modify Case Management Order
2020.10.28 Cricket Wireless LLC's Amended Responses and Objections to Plaintiffs' First Request for Admission
2020.10.28 Cricket Wireless LLC's Amended Responses and Objections to Plaintiffs' First Set of Interrogatories
2020.10.28 Cricket Wireless, LLC's Amended Responses and Objections to Plaintiffs' Second Set of Interrogatories
2020.10.28 Cricket's Amended Responses and Objections to Plaintiffs' First Interrogatories
2020.10.28 Cricket's Amended Responses and Objections to Plaintiffs' Second Interrogatories
2020.12.04 Cricket Wireless LLC's Second Amended Responses and Objections to Plaintiffs' First Set of Interrogatories
2020.12.04 Cricket's Second Amended Responses and Objections to Plaintiffs' First Interrogatories
2020.12.04 Cricket's Second Amended Responses and Objections to Plaintiffs' First Request for Admissions
2020.12.22 Plaintiffs' Second Requests for Admission to Defendant Cricket Wireless, LLC
2020.12.23 Cricket Wireless, LLC's Second Amended Responses and Objections to Plaintiffs' Second Set of Interrogatories
2021.01.15 Cricket Wireless LLC's Third Amended Responses and Objections to Plaintiffs' First Set of Interrogatories
2021.01.27 (Doc. 158) Second Amended Complaint
Cal. Civ. Code §§ 1770
Cal. Civ. Code. § 1780
Damian Donckels Deposition Transcript
Expert Report of Keith Mallinson and documents referenced therein
*In re Chrysler-Dodge-Jeep Ecodiesel Mktg.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018).
*In re: EpiPen Mktg., Sales Practices & Antitrust Litig.*, 2020 WL 1873989 (D. Kan. Feb. 27, 2020)
Leap Wireless Public Filings with the FCC and SEC
Proposed Third Amended Complaint and documents referenced therein
Timothy Towster Deposition Transcript